1  Jean-Jacques Cabou (#022835)
   Matthew R. Koerner (#035018)
2  Margo R. Casselman (#034963)
   Benjamin C. Calleros (#034763)
3  **PERKINS COIE LLP**
   2901 North Central Avenue, Suite 2000
4  Phoenix, Arizona 85012-2788
   Telephone: 602-351-8000
5  Facsimile: 602-648-7000
   JCabou@perkinscoie.com
6  MKoerner@perkinscoie.com
   MCasselman@perkinscoie.com
7  BCalleros@perkinscoie.com
   DocketPHX@perkinscoie.com
8
   *Attorneys for Plaintiffs–Petitioners*
9  *(additional counsel identified on signature*
   *page)*
10

11           **IN THE UNITED STATES DISTRICT COURT**

12              **FOR THE DISTRICT OF ARIZONA**

13

14  Maria Guadalupe Lucero-Gonzalez; Claudia          No.
    Romero-Lorenzo; Tracy Ann Peuplie; James
15  Tyler Ciecierski; and Marvin Lee Enos; each
    individually and on behalf of all others similarly
16  situated,                                          **CLASS-ACTION COMPLAINT**
                                                       **FOR DECLARATORY AND**
17                                                     **INJUNCTIVE RELIEF**
                                                       **AND**
                          Plaintiffs–Petitioners,      **PETITION FOR WRITS OF**
18                                                     **HABEAS CORPUS**

19  v.

20  Kris Kline, Warden of the Central Arizona          **(Jury Trial Demanded)**
    Florence Correctional Complex; David
21  Gonzales, U.S. Marshal for the District of         **(Immediate Relief Sought)**
    Arizona; Donald W. Washington, Director of
22  the U.S. Marshals Service; Michael Carvajal,
    Director of the Federal Bureau of Prisons, in
23  their official capacities,

24                          Defendants–Respondents.

25

26

27

28

# I.   INTRODUCTION

1.      On March 11, 2020, Arizona declared a public health emergency to prepare for, respond to, and mitigate the spread of COVID-19.  On March 19, Arizona closed most businesses and gathering places by executive order.  On March 30, Arizona issued an order requiring that individuals remain six feet apart when sharing space.  And on May 5, "[t]he number of new deaths reported . . . was 33, the largest single-day increase in COVID-19-related deaths in Arizona since the pandemic began."[1]   That day, Arizona's total identified cases rose to 9,305, with 395 known deaths.[2]

2.      Today, social distancing is a necessary part of life, and the sight of people in public wearing masks, gloves, and other personal protective equipment ("PPE"), traditionally reserved for hospitals, is now commonplace.  While COVID-19 has radically altered life for most people, though, life remains largely the same for the federal detainees at CoreCivic Inc.'s Central Arizona Florence Correctional Complex ("CoreCivic").  Up to 14 people are crammed into a cell and stacked on bunk beds against a single wall.  Soap is scarce; disinfecting products are all but non-existent.   And those housed in these conditions—afraid of contracting this deadly disease while increasingly noticing those around them showing symptoms—have resorted to wiping down communal telephones with either T-shirts or watered-down menstrual pads.  No one outside these walls would willingly risk these conditions in the face of the dangers posed by COVID-19.  Nor should those inside be forced to do so.  But, as of today, 20 people at CoreCivic have tested positive for COVID-19.[3]  More will soon.

---

[1] Alison Steinbach, *Arizona coronavirus update: 9,945 confirmed cases, 450 known deaths as of Thursday*, AZ CENTRAL (May 7, 2020 9:51 a.m.), https://www.azcentral.com/story/news/local/arizona-health/2020/05/07/coronavirus-arizona-update-may-7-9-945-cases-450-deaths/5179488002/.
[2] *Id.*
[3] *About 400 Inmates Quarantined at CoreCivic Prison in Florence, After 13 Test Positive for COVID-19*, AZ CENTRAL (May 8, 2020 7:00 a.m.), https://www.azcentral.com/story/news/local/arizona-health/2020/05/08/coronavirus-cases-multiple-inmates-test-positive-corecivic-prison-covid-19/3093348001/ (reporting that "13 inmates" and "seven employees have contracted COVID-19"); *see also* Declaration of Christina M. Woehr ("Woehr Decl.") ¶ 19, attached as Ex. 1.

3.      Across the globe, COVID-19 has infiltrated our communities.  As of May 8, 2020, there were 3,860,000 confirmed cases globally, with 270,000 deaths.[4]  The United States has led the world in confirmed cases of COVID-19 since March 26, 2020.[5]  In Arizona, the COVID-19 infection rate is still rising, with over 9,700 confirmed cases and 426 deaths statewide, as of May 6, 2020.[6]  Over the last few weeks, as many as 427 new cases of COVID-19 are reported in Arizona, every day.[7]  But, although the Arizona Department of Health Services ("ADHS") warns that the coronavirus is "widespread" throughout the state, a lack of testing may be causing a drastic undercounting of cases in Arizona.[8]  Arizona, in fact, ranks last out of all 50 states for COVID-19 tests per 1 million people, as of May 7, 2020.[9]

4.      There is no vaccine or cure for COVID-19.[10]  The best course, according to public health experts, is to slow and prevent transmission, primarily through a practice known as "social distancing."[11]  Social distancing requires all people to stay at least six feet away from all other people to control the spread of the virus.[12]  These measures are particularly important because the novel coronavirus spreads aggressively and because people can spread the disease even if they do not feel sick or show any symptoms.[13]  The

---

[4] Johns Hopkins University & Medicine, *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, https://cutt.ly/StEyn2U.
[5] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, N.Y. TIMES (March 26, 2020), https://cutt.ly/QtQ7zz6.
[6] Johns Hopkins University & Medicine, *supra* note 4.
[7] Arizona Department of Health Services, Data Dashboard, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited May 7, 2020).
[8] Lazaro Gamio, Weiyi Cai, & Adeel Hassan, *Where the U.S. Stands Now on Coronavirus Testing*, N.Y. TIMES (Mar. 26, 2020), https://www.nytimes.com/interactive/2020/03/26/us/coronavirus-testing-states.html (ranking Arizona last among the states in Coronavirus testing).
[9] *Coronavirus*, Worldometer, https://www.worldometers.info/coronavirus/country/us/ (last visited May 7, 2020) (compiling data from state reports).
[10] Declaration of Joseph Goldenson, M.D. ("Goldenson Decl.") ¶ 17, attached as Ex. 2.
[11] Goldenson Decl. ¶¶ 17, 21; World Health Organization, *Coronavirus - Prevention*, https://www.who.int/health-topics/coronavirus#tab=tab_2 (last visited May 7, 2020).
[12] Goldenson Decl. ¶ 17.
[13] Centers for Disease Control and Prevention, *How COVID-19 Spreads*,

only assured way to curb the pandemic is through dramatically reducing close physical contact.[14]  So, public health officials have urged every American institution—from schools to places of worship, from businesses to legislatures—to reduce the number of people in close quarters, if not to empty entirely.  These institutions also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces with products containing particular alcohol concentrations, and closing off any areas used by a sick person.[15]

5.      These imperatives apply especially to jails, prisons, and detention facilities, where the government almost entirely controls a person's ability to avoid others and maintain adequate sanitation.  Yet jails and prisons face inherent challenges with implementing these recommendations.  And incarcerated people are already suffering and dying nationwide, and in Arizona, as a result.

6.      Despite the ubiquity of this guidance, those responsible for Plaintiffs' custody have failed to provide basic safeguards against COVID-19.  People detained at CoreCivic report insufficient access to soap, masks, and gloves.  They also report no measures to ensure appropriate social distancing and report, in fact, policies and practices requiring close physical contact.  At CoreCivic, detainees are housed in pods with up to 80 people and live in cells with up to 14 people, sleeping on stacked bunk beds spaced only several feet apart.

7.      Jails are not hermetically sealed.  By their nature, the people who go in—from correctional and medical staff, to those detained prior to trial, to those serving short sentences—typically come out in very short order.  Failing to mitigate the spread of

---

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 7, 2020).
[14] Harry Stevens, *Why outbreaks like coronavirus spread exponentially, and how to "flatten the curve,"* WASH. POST (Mar. 14, 2020), https://www.washingtonpost.com/graphics/2020/world/corona-simulator/.
[15] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility*, https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html (last visited May 7, 2020).

COVID-19 endangers not only those within the institution, but also the entire community. Immediate action therefore is the only mitigation effort that can prevent the current onset of COVID-19 cases at CoreCivic from devolving into a future outbreak.

8.      Absent intervention from this Court, devastating, and in many cases deadly, irreparable harm will befall incarcerated persons, jail staff, and the community.   The outbreaks in similar detention facilities around the country prove the need for immediate action.[16]

9.      Accordingly, the named Plaintiffs here, on behalf of themselves and all other similarly situated persons detained by Defendants at CoreCivic (collectively, "Plaintiffs"), bring this action requesting that this Court (1) appoint a Rule 706 expert to immediately inspect CoreCivic and to recommend to this Court measures and practices sufficient to protect those detained at CoreCivic from contracting COVID-19, and (2) implement the expert's recommendations to stop the spread of COVID-19 within CoreCivic and beyond. Given the likelihood of COVID-19 spreading exponentially through CoreCivic now that 20 people (so far) have tested positive—there is no time to spare.  Plaintiffs request a hearing as soon as possible.

## II.      NATURE OF THE ACTION

10.      Plaintiffs Maria Lucero-Gonzalez, Claudia Romero-Lorenzo, Tracy Peuplie, James Ciecierski, Marvin Lee Enos, and the proposed class members bring this putative class action, seeking constitutionally adequate conditions of confinement, including possible release from confinement, to remedy ongoing violations of Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution.

11.      Plaintiffs seek a declaratory judgment, injunctive relief, and writs of habeas corpus.

12.      Plaintiffs seek this relief from Defendants Kris Kline, David Gonzales,

---

[16] *See, e.g.*, Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, CHICAGO SUN-TIMES (Mar. 30, 2020), HTTPS://CHICAGO.SUNTIMES.COM/CORONAVIRUS/2020/3/29/21199171/COOK-COUNTY-JAIL-CORONAVIRUS-POSITIVE-134-CASES-COVID-19.

Donald W. Washington, Michael Carvajal, and their successors, as well as their officers, employees, agents, and all persons acting in cooperation with them, under their authority or supervision, at their direction, or under their control ("Defendants").

13. An actual, definite, and concrete controversy exists between Plaintiffs and Defendants, concerning Plaintiffs' conditions of confinement at CoreCivic.

14. This controversy will be resolved through the declaratory and injunctive relief that Plaintiffs seek in this action, as well as the writs of habeas corpus.

15. Specifically, Plaintiffs seek a declaratory judgment, under 28 U.S.C. §§ 2201 and 2202, that the current conditions of confinement at CoreCivic—exacerbated by the COVID-19 pandemic—violate Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution and seek writs of habeas corpus under 28 U.S.C. § 2241.

16. And, under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law, Plaintiffs seek an award of their reasonable attorneys' fees and their costs.

### III.   JURISDICTION & VENUE

17. Because this action arises under the Constitution and laws of the United States, this Court has subject-matter jurisdiction. *See* 28 U.S.C. § 1331 (federal-question jurisdiction); 28 U.S.C. § 1346 (original jurisdiction); *see also* 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act); 28 U.S.C. § 2241 (habeas corpus).

18. Venue is proper in the District of Arizona, under 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions giving rise to this action have occurred in this judicial district. Venue also is proper, under 28 U.S.C. § 2241(d), because Plaintiffs are in custody in this judicial district and venue.

### IV.   PARTIES

19. Plaintiff Maria Guadalupe Lucero-Gonzalez has been detained in CoreCivic since November 2019. She is 50 years old and is the mother of three children. She suffers from several medical conditions, including asthma, hypertension, diabetes, and kidney cancer. Before being detained at CoreCivic, she was undergoing treatment for her kidney cancer. She has asked CoreCivic staff, on several occasions, to allow her to continue her

cancer treatments.  CoreCivic staff have refused, stating that she is not allowed to leave CoreCivic due to the COVID-19 pandemic.  Ms. Lucero's last cancer treatment was in July 2019.  That same month, she was convicted of illegally reentering the United States and was sentenced to time served and three years of supervised release.  She is being detained at CoreCivic for allegedly violating these conditions of release by illegally reentering the United States.  In the last week, sometime around May 4, 2020, Ms. Lucero has developed a fever and a cough.  Despite requesting medical care, she has not been tested for COVID-19.[17]

20.    Plaintiff Claudia Romero-Lorenzo has been detained in CoreCivic since January 2020.  She was charged with illegal reentry and is awaiting sentencing.  She is 39 years old and has three children, including a 9-year-old son.  She has been diagnosed with several medical conditions, including a type of leukemia.  Before being detained at CoreCivic, she was undergoing treatment for this condition, attending regular appointments, and taking medicine.  She has asked CoreCivic staff, at least twice, to continue her medical treatments.  Ms. Romero's last treatment was in April 2019.[18]

21.    Plaintiff Tracy Ann Peuplie has been detained in CoreCivic since December 2019.  She is 49 years old and suffers from several medical conditions, including asthma, hypertension, anxiety, substance-abuse disorder, and spinal stenosis.  She has asked CoreCivic staff for medicine to treat the pain from her spinal stenosis, a condition where the spine pinches nerves in the lower back and neck.  She has not received medication for this pain.  She has been told that she needs to go to the hospital for this treatment but that she is not allowed to leave CoreCivic due to the COVID-19 pandemic.  Ms. Peuplie was indicted for several offenses and is awaiting trial on these charges.  She is presumed innocent of these charges.[19]

---

[17] *See generally* Declaration of Maria Guadalupe Lucero-Gonzalez ("Lucero Decl."), attached as Ex. 3.
[18] *See generally* Declaration of Claudia Romero-Lorenzo ("Romero Decl."), attached as Ex. 4.
[19] *See generally* Declaration of Tracy Ann Peuplie ("Peuplie Decl."), attached as Ex. 5.

22.     Plaintiff James Tyler Ciecierski has been detained in CoreCivic since February 2020.  He is 26 years old and has a fiancée and a 10-month-old daughter.  He suffers from severe asthma, requiring him to always carry an inhaler.  He was indicted on one count and is awaiting trial.  He is presumed innocent of this charge.[20]

23.     Plaintiff Marvin Lee Enos has been detained in CoreCivic since August 2019.  He is 29 years old and suffers from multiple severe medical conditions, including asthma and hypertension.  He is currently awaiting trial.  He is presumed innocent of the charges pending against him.[21]

24.     Defendant Kris Kline is the warden of CoreCivic and currently has immediate custody over Plaintiffs.  He is sued in his official capacity only.

25.     Defendant David Gonzales is the U.S. Marshal for the District of Arizona and is responsible for all people housed, on behalf of the U.S. Marshals, in the District of Arizona, including Plaintiffs who are housed at CoreCivic.  He is sued in his official capacity only.

26.     Defendant Donald W. Washington is the Director of the U.S. Marshals Service and is responsible for all people housed on behalf of the U.S. Marshals, including Plaintiffs who are housed at CoreCivic.  He is sued in his official capacity only.

27.     Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons and is responsible for all people housed on behalf of the Bureau of Prisons, including Plaintiffs who are housed at CoreCivic.  He is sued in his official capacity only.

## V.     FACTUAL ALLEGATIONS

**A.     COVID-19 poses an unprecedented risk of illness, injury, and death.**

28.     The 2019 novel coronavirus known to cause coronavirus disease 2019 ("COVID-19") spreads from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects.[22]  There is no vaccine, nor any

---

[20] *See generally* Declaration of James Tyler Ciecierski ("Ciecierski Decl."), attached as Ex. 6.
[21] *See generally* Declaration of Marvin Lee Enos ("Enos Decl."), attached as Ex. 7.
[22] Goldenson Decl. ¶ 21; Centers for Disease Control and Prevention, *Interim*

known medication to prevent or treat the virus.[23]  The only known measures for effectively protecting against transmission of COVID-19 are social distancing—that is, keeping at least six feet between persons to avoid transmission—and a vigilant hygiene regimen, including frequent and thorough hand washing.[24]  Because the coronavirus spreads among people who do not show symptoms, social distancing is the best way to prevent transmission.  Up to 25% of people infected with COVID-19, it is estimated, lack symptoms of COVID-19.[25]

29.    Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity.  COVID-19 also can damage tissues in other vital organs, such as the heart and liver.[26]  The overall fatality rate is estimated to range from 0.1% to 3.5%, or up to 35 times the rate associated with influenza infection.[27]

30.    People over the age of 50 face an increased risk of serious illness or death from COVID-19.[28]  In a February 29, 2020 preliminary report, individuals from ages 50 to 59 had an overall mortality rate of 1.3%, those aged 60 to 69 had a 3.6% mortality rate, and those aged 70 to 79 had an 8% mortality rate.[29]

31.    People of any age who suffer from certain underlying medical conditions—including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma—also have elevated risks due to COVID-19.[30]  Early reports estimate that the mortality rate for

---

*Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl (last visited May 7, 2020).

[23] World Health Organization, *supra* note 12.

[24] Goldenson Decl. ¶¶ 17, 24; Johns Hopkins Medicine, *Coronavirus, Social and Physical Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG (last visited May 7, 2020).

[25] Goldenson Decl. ¶ 28.

[26] Centers for Disease Control and Prevention, *supra* note 22.

[27] Goldenson Decl. ¶ 9.

[28] *Id.*, ¶ 10.

[29] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths*, Worldometer (Apr. 16, 2020, 7:00 GMT update), https://cutt.ly/ytEimUQ.

[30] Goldenson Decl. ¶ 10; *Coronavirus disease (COVID-19) advice for the public:*

those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[31]

32.    Most people in higher risk categories who develop serious illness will need advanced medical support, requiring highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[32]

33.    In serious cases, COVID-19 causes acute respiratory disease syndrome ("ARDS"), which is life-threatening: those who receive ideal medical care with ARDS have a 30% mortality rate.[33]  COVID-19 also can trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.[34]

34.    Many of these complications can manifest at an alarming pace.  Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[35]

35.    Beyond the general health concerns presented by the COVID-19 pandemic, people in congregate environments—i.e., places where people live, eat, and sleep in close proximity—face increased risks of contracting COVID-19.  These risks are evidenced by the rapid spread of the virus in cruise ships and nursing homes, as well as the dramatic outbreaks in the Cook County Jail[36] and Rikers Island in New York City, where the

---

*Myth busters*, World Health Organization, https://cutt.ly/dtEiCyc (last visited May 7, 2020).
    [31] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), https://www.who.int/publications-detail/report-of-the-who-china-joint-mission-on-coronavirus-disease-2019-(covid-19).
    [32] Goldenson Decl. ¶ 11.
    [33] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf. .
    [34] *Id.*
    [35] Centers for Disease Control and Prevention, *supra* note 22.
    [36] *See supra* note 17.

transmission rate for COVID-19 is estimated to be among the highest in the world.[37]  These congregate environments also are susceptible to "community spread," where the virus spreads easily and sustainably within a community and where the source of the infection is unknown.[38]

36.     Correctional settings—like CoreCivic—further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene products, limited access to medical care, numerous high-contact surfaces, and no possibility of staying at a distance from others.[39]  Correctional facilities house large groups of people together, and move people in groups to eat, recreate, and go to court.  They frequently have insufficient medical care for the population even outside times of crisis.  Hot water, soap, and paper towels are often in limited supply.  And detained people, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies.

37.     As CDC staff explained in a recent report: "Although symptom screening is important, an investigation of a COVID-19 outbreak in a skilled nursing facility found that approximately one half of cases identified through facility-wide testing were among asymptomatic and presymptomatic persons, who likely contributed to transmission.  These data indicate that symptom screening alone is inadequate to promptly identify and isolate infected persons in congregate settings such as correctional and detention facilities.  Additional strategies, including physical distancing, movement restrictions, use of cloth face coverings, intensified cleaning, infection control training for staff members, and

---

[37] *See* Legal Aid Society, *Analysis of COVID-19 Infection Rate in NYC Jails*, https://cutt.ly/RtYTbWd (last visited May 7, 2020).

[38] Centers for Disease Control and Prevention, *see* supra note 13.

[39] Goldenson Decl. ¶¶ 18–30; David Waldstein, *To Fight Virus in Prisons, C.D.C. Suggests More Screenings*, N.Y. TIMES (May 6, 2020), https://www.nytimes.com/2020/05/06/health/coronavirus-prisons-cdc.html ("Jails and prisons are among the most challenging places to control the outbreak of the coronavirus.  Similar to cruise ships and nursing homes, detention facilities have crowded living spaces and shared dining areas, as well as communal bathrooms and a lack of space to isolate infected detainees, all of which makes physical distancing practices difficult to achieve.").

disinfection of high-touch surfaces in shared spaces are recommended to prevent and manage spread within correctional and detention facilities.   Some jurisdictions have implemented decompression strategies to reduce crowding, such as reducing or eliminating bail and releasing persons to home confinement or community supervision."[40]

38.   Numerous public health experts have all strongly cautioned that people booked into and held in jails are likely to face serious, even deadly, harm due to the outbreak of COVID-19.[41]

**B.   Governments, businesses, and communities have implemented stringent preventative measures to slow the spread of COVID-19.**

39.   Due to the risks posed by the COVID-19 pandemic, people have implemented responsive measures globally, nationally, and in Arizona.

40.   On March 13, 2020, the President declared a national state of emergency.[42]

41.   Numerous states also have issued "stay at home" orders, asking people to stay home in order to stop the spread of COVID-19.

42.   The State of Arizona similarly is taking unprecedented steps to manage the public health crisis caused by COVID-19 and to minimize the spread of the virus.   On March 11, 2020, Arizona Governor Doug Ducey declared a State of Emergency due to the COVID-19 outbreak.   Days later, on March 15, Governor Ducey closed all public schools, a closure

---

[40] Megan Wallace et al., *COVID-19 in Correctional and Detention Facilities—United States, February–April 2020* (May 6, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm?s_cid=mm6919e1_w.

[41] Kelan Lyons, *Elderly prison population vulnerable to potential coronavirus outbreak,* CONNECTICUT MIRROR (Mar. 11, 2020), https://cutt.ly/BtRSxCF; Craig McCarthy and Natalie Musumeci, *Top Rikers doctor: Coronavirus 'storm is coming,'* NEW YORK POST (Mar. 19, 2020), https://cutt.ly/ptRSnVo; Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R; Oluwadamilola T. Oladeru et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, Health Affairs Blog (Mar. 10, 2020), https://cutt.ly/QtRSYNA; Anne C. Spaulding, MD, MPDH, *Coronavirus and the Correctional Facility,* Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020), http://www.chip.sph.emory.edu/documents/For%20Correctional%20Facility%20Leadership_2020.pdf; Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[42] Derek Hawkins et al., *Trump declares coronavirus outbreak a national emergency*, WASH. POST (Mar. 13, 2020, 10:46 PM EST), https://cutt.ly/ftWyIPb.

later extended through the end of the 2019–2020 school year.  Then, in a March 30 letter to Governor Ducey, ADHS Director Dr. Cara M. Christ implored the State to "prioritize *physical distancing* as a critical mitigation strategy to protect [the state's] healthcare system."[43]  In response, on March 30 Governor Ducey ordered a statewide "stay-at-home" order.[44]  And on April 29, Governor Ducey extended the stay-at-home order to at least May 15, 2020.[45]

43.     Both this Court and the Arizona Supreme Court have implemented similar measures in response to COVID-19.  Since March 13, 2020, the Arizona Supreme Court has limited or halted entirely in-person proceedings, including grand-jury proceedings, hearings, trials, and sentencings.[46]  The U.S. District Court for the District of Arizona has acted similarly, suspending certain in-person proceedings since March 16, 2020.[47]

**C.     Despite the grave risks posed by COVID-19, Defendants have not provided safe conditions of confinement to protect Plaintiffs from infection.**

44.     Defendants must respond to and manage the continued risks posed by the COVID-19 outbreak by following CDC and other public health guidelines.[48]

45.     The conditions and policies at CoreCivic expose Plaintiffs to unreasonable risks of contracting COVID-19.  With at least 20 confirmed cases of COVID-19 at

---

[43] Letter from ADHS Director Dr. Cara M. Christ to Hon. Douglas A. Ducey, Governor of Arizona, March 30, 2020, https://www.azdhs.gov/documents/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/novel-coronavirus/governor-letter-recommendations-3-30-2020.pdf.

[44] State of Arizona, Exec. Order No. 2020-18, Stay Home, Stay Healthy, Stay Connected: Physical Distancing to Mitigate COVID-19 Transmission, (Mar. 30, 2020), https://www.azdhs.gov/documents/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/novel-coronavirus/eo-stay-home-stay-healthy-stay-connected.pdf.

[45] State of Arizona, Exec. Order No. 2020-33, Returning Stronger: Amending the Stay Home, Stay Healthy, Stay Connected Order (Apr. 29, 2020), https://azgovernor.gov/sites/default/files/eo_2020-33_sw.pdf.

[46] Admin. Order No. 2020-44, *Matter of Judicial Review of Public Health Emergency Orders to Control Communicable or Infectious Diseases* (Ariz. Mar. 13, 2020), http://www.azcourts.gov/Portals/22/admorder/Orders20/2020-44.pdf.

[47] General Order 20-12, *Matter of Suspension of Grand Jury Proceedings in the District of Arizona in Response to Coronavirus Disease (COVID-19)* (D. Ariz. Mar. 16, 2020), http://www.azd.uscourts.gov/sites/default/files/general-orders/20-12.pdf; *see also* Woehr Decl. ¶¶ 4–17 (outlining changes to court procedures and resulting consequences).

[48] *See, e.g.*, Centers for Disease Control and Prevention, *supra* note 22.

CoreCivic already and hundreds of detainees reportedly under counterproductive "group quarantine" without widespread testing,[49] these risks increase daily.

46.     At CoreCivic, Plaintiffs are detained in community "pods," or housing units, containing either 40 or 80 people.[50]  All 40 or 80 people in the pod share between four to six showers and three to four telephones.[51]

47.     Within their pods, Plaintiffs share a cell with either one person or as many as 13 other people.[52]  In cells with one other person, beds are placed only a couple feet, or arms' length, apart.[53]  In cells with bunk beds, as many as six bunks are often placed against the same wall, within one or two feet apart.[54]  Everyone in a cell—regardless of whether it houses two or 14 people—shares a single toilet and sink.[55]

48.     In isolation, Plaintiff Enos is held in a small cell with two other people as close to two feet apart without access to daily showers.[56]

49.     When people are first transferred to CoreCivic, they are placed in a "quarantine room" or "cohort" with other people who recently came to the facility.[57]  These cohorts are held in a small room for 14 days.[58]  After 14 days, these people are moved to the pod and are placed in a cell housing between two to 14 people.[59]  Sometimes before the end of the 14 days, though, people in quarantine are removed from quarantine and placed in the general population, "by mistake," before eventually being returned to quarantine.[60]

50.     Defendants have not attempted to implement social distancing.[61]  People frequently stand close together in lines when waiting for food at mealtime, for medical

---

[49] Woehr Decl. ¶¶ 19, 22.
[50] Ciecierski Decl. ¶ 4; Peuplie Decl. ¶ 5; Lucero Decl. ¶ 8; Romero Decl. ¶ 7.
[51] Ciecierski Decl. ¶ 4; Peuplie Decl. ¶ 5; Lucero Decl. ¶ 8; Woehr Decl. ¶ 33.
[52] Ciecierski Decl. ¶¶ 4–5; Woehr Decl. ¶ 42; Peuplie Decl. ¶ 6; Lucero Decl. ¶ 10; Romero Decl. ¶ 8.
[53] Woehr Decl. ¶ 43; Ciecierski Decl. ¶ 4; Lucero Decl. ¶ 10; Romero Decl. ¶ 8.
[54] Ciecierski Decl. ¶ 5; Peuplie Decl. ¶ 6.
[55] Peuplie Decl. ¶ 6; Lucero Decl. ¶ 10; Romero Decl. ¶ 8.
[56] Enos Decl. ¶¶ 13–15.
[57] Peuplie Decl. ¶ 12.
[58] Id.
[59] Id.
[60] Woehr Decl. ¶ 30.
[61] Peuplie Decl. ¶ 7; Lucero Decl. ¶ 8; Romero Decl. ¶¶ 7, 16.

-13-

appointments at CoreCivic's medical office, and for the communal telephones.[62]   These telephones are placed "considerably less than six feet apart, requiring [detainees] to stand within 2 to 3 feet to other detainees while using the phone to call their attorneys or families."[63]   There is nearly always a line of people waiting to use these phones.[64]   People cram together at tables during mealtime.[65]   And jobs for detainees, including kitchen staff and barbers, have continued as usual, with as many as 167 people working in close quarters.[66]

51.     Despite CDC and other public health recommendations, Plaintiffs did not receive any sort of mask until mid-April 2020.[67]   Some still have not received masks.[68]   The masks Plaintiffs did receive, if at all, were thin disposable paper masks, not the N95 masks recommended by the CDC.[69]   CoreCivic's guards also tease detainees that these disposable masks "'don't work' against the virus."[70]

52.     When Plaintiffs eventually received masks, Defendants did not require everyone to wear a mask.[71]   And because masks were not required, most people—including guards and other CoreCivic staff—did not wear a mask.[72]

53.     Although beginning around April 30, 2020, Plaintiffs have been required to wear masks when outside the pods, Plaintiffs are not required to wear masks when in their pods or cells.[73]   Few people (if any) wear masks inside the pods and cells.[74]   Guards and other CoreCivic staff began wearing masks beginning around April 30, 2020, after the first confirmed case within the facility, but many still are not consistently wearing masks or

---

[62] Ciecierski Decl. ¶ 9; Peuplie Decl. ¶ 7; Lucero Decl. ¶ 9; Woehr Decl. ¶ 40.
[63] Woehr Decl. ¶ 36.
[64] *Id*; Peuplie Decl. ¶ 7.
[65] Woehr Decl. ¶ 38; Ciecierski Decl. ¶ 9; Peuplie Decl. ¶ 7; Lucero Decl. ¶ 9.
[66] Ciecierski Decl. ¶ 9; Romero Decl. ¶ 9; Woehr Decl. ¶¶ 72–73.
[67] Ciecierski Decl. ¶ 7; Lucero Decl. ¶ 17; Romero Decl. ¶ 12.
[68] Woehr Decl. ¶¶ 61–63.
[69] Woehr Decl. ¶ 62; Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 9; Lucero Decl. ¶ 17; Romero Decl. ¶ 11.
[70] Woehr Decl. ¶ 68.
[71] Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 9; Lucero Decl. ¶ 15.
[72] Ciecierski Decl. ¶ 7; Peuplie Decl. ¶¶ 9, 11; Lucero Decl. ¶ 17.
[73] Peuplie Decl. ¶ 9; Lucero Decl. ¶ 17; Romero Decl. ¶ 11.
[74] Lucero Decl. ¶ 17; Woehr Decl. ¶ 62.

gloves.[75]

54.     Plaintiffs have received only one or two masks, and when these masks are broken or lost, Defendants have required Plaintiffs to share and swap each other's masks in order to leave the pod for things like laundry and legal calls.[76]

55.     Plaintiffs receive, only once per week, a small amount of soap and shampoo.[77] Plaintiffs have not received additional or different hygiene products since COVID-19 spread to Arizona.[78] These bathroom supplies frequently are not enough to last the week, especially because Plaintiffs—lacking other cleaning supplies—are forced to use their personal allotment of soap to clean their plates, cups, or even cells.[79] When people run out of their weekly allotment of soap, they must purchase more—if they can afford to do so— from the commissary at CoreCivic.[80] If they cannot afford to do so, they have no soap at all.[81]

56.     Defendants also fail to adequately and consistently clean the pods and cells, in order to disinfect and stop the spread of COVID-19.  Plaintiffs are responsible for cleaning their own pods and cells.[82] When cleaning the pods and cells, Plaintiffs do not receive or wear PPE, like gloves or masks.[83]  To clean both the pods and cells, Plaintiffs receive only a small amount of cleaning solution—none of which is antibacterial.[84]  For some, this cleaning solution runs out, every day, before the pod and cells are cleaned.[85]

---

[75] Lucero Decl. ¶¶ 18–19; Romero Decl. ¶ 12; Woehr Decl. ¶¶ 31, 66–67.
[76] Peuplie Decl. ¶ 10; Woehr Decl. ¶ 29.
[77] Ciecierski Decl. ¶ 6; Lucero Decl. ¶ 15; Romero Decl. ¶ 10; Woehr Decl. ¶ 53.
[78] Peuplie Decl. ¶ 8; Lucero Decl. ¶¶ 15–16; Romero Decl. ¶ 10; Woehr Decl. ¶ 29.
[79] Lucero Decl. ¶ 15; Romero Decl. ¶ 10; Woehr Decl. ¶¶ 27–28, 52, 54.
[80] Lucero Decl. ¶ 15; Romero Decl. ¶ 10.
[81] Woehr Decl. ¶ 28 ("[D]etainees had requested additional soap and shampoo to clean the showers with, since they frequently run out of 'chemicals,' but were told no by staff.").
[82] Peuplie Decl. ¶¶ 5–6; Lucero Decl. ¶¶ 12, 14; Romero Decl. ¶ 13; Woehr Decl. ¶¶ 48–49.
[83] Peuplie Decl. ¶ 5; Lucero Decl. ¶ 12; Romero Decl. ¶ 13.
[84] Peuplie Decl. ¶ 5; Lucero Decl. ¶ 14.
[85] Woehr Decl. ¶ 50; Peuplie Decl. ¶ 5; see also Woehr Decl. ¶ 51 ("At least two detainees reported . . . . that they are not allowed to use the pink cleaner to clean their rooms, and stated [they] have to resort to using their personal shampoo or soap to clean their rooms and their toilets.").

Some resort to cleaning with water only.[86]  And frequently used items—like communal telephones—are not cleaned between uses, or even every day.[87]

57.    Lacking any disinfecting products or wipes to clean the telephones between uses and fearing the possibility of contracting COVID-19, women in the pods have resorted to cleaning the phones with shirts or with menstrual pads wet down with water.[88]

58.    Plaintiffs also have been exposed to numerous people who have showed symptoms of COVID-19.[89]  Some of the people showing such symptoms were placed in quarantine and then returned to the pod without being tested for COVID-19, even though their symptoms continued.[90]

59.    Despite the risks of COVID-19 spreading through CoreCivic and signs of symptoms from people at CoreCivic, Defendants also have failed to even investigate the spread at the facility.  Only a handful of people at CoreCivic have been tested for COVID-19 or checked for symptoms of COVID-19 by, for example, taking a person's temperature.[91]  And even some showing symptoms of COVID-19 and requesting medical care have not been tested.[92]

60.    Defendants also have exposed Plaintiffs to unnecessary risk of exposure by failing to provide them with information about COVID-19.  Defendants generally have not provided Plaintiffs with any information about COVID-19, measures for preventing its spread, or the very real risks of contracting and spreading COVID-19 at CoreCivic.[93]  And despite acknowledging elsewhere that COVID-19 has spread to CoreCivic and that at least 20 people have tested positive,[94] Defendants have refused to inform the people most needing this information: Plaintiffs.  Defendants have failed to disclose to Plaintiffs that

---

[86] Woehr Decl. ¶ 50.
[87] *Id.* ¶¶ 33, 46; Lucero Decl. ¶ 13.
[88] Lucero Decl. ¶ 13; Romero Decl. ¶ 13.
[89] Lucero Decl. ¶ 19; Romero Decl. ¶ 15.
[90] Romero Decl. ¶ 15.
[91] Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 13; Lucero Decl. ¶ 20; Romero Decl. ¶ 14; Woehr Decl. ¶¶ 19, 69–70.
[92] Woehr Decl. ¶ 70.
[93] Peuplie Decl. ¶ 11; Lucero Decl. ¶ 1; Ciecierski Decl. ¶ 8; Woehr Decl. ¶ 76.
[94] Woehr Decl. ¶¶ 19, 76.

people at CoreCivic have tested positive for COVID-19.[95]  Defendants, in fact, have affirmatively denied these positive tests, claiming they are merely "rumors" from other facilities.[96]  But even the correctional officers at CoreCivic acknowledge (privately) these positive tests.[97]

61.     Furthermore, Defendants' generic policies for "managing" COVID-19 are inadequate to stop it from spreading.[98]  Defendants' policy of quarantining groups of persons who are transferred to CoreCivic on the same day, for example, will not stop COVID-19 from continuing to spread within the facility.  The World Health Organization has reported that "the incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptoms onset, is an average of 5–6 days, however can be up to 14 days."[99]  During this "pre-symptomatic" time, "infected persons can be contagious."[100]  Because Defendants have quarantined people together without social distancing, proper PPE, or sanitation, detainees can spread the virus to each other and then throughout the facility.  One medical physician, in fact, concludes that this practice at CoreCivic "does not conform to CDC guidelines and it would likely contribute to the overall transmission rate."[101]

62.     Pursuant to CoreCivic Policy 14-103, Detainee Grievance Procedures (USMS only), an emergency grievance is "[a] grievance for which the potential for personal injury or irreparable harm exists."  By the terms of the same policy, "[g]rievance forms are readily

---

[95] Peuplie Decl. ¶ 11; Ciecierski Decl. ¶ 8; Lucero Decl. ¶ 11; Romero Decl. ¶ 17.
[96] Romero Decl. ¶ 17.
[97] Ciecierski Decl. ¶ 8.
[98] *See* CoreCivic Inc., *How CoreCivic is Managing COVID-19*, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf; *see also* Media Statement, CoreCivic Inc., *CoreCivic Statement on COVID-19 Prevention*, https://www.corecivic.com/en/corecivic-statement-on-covid-19-prevention; CoreCivic Inc., *Frequently Asked Questions Regarding COVID-19*, https://www.corecivic.com/hubfs/_files/FAQ%20Regarding%20COVID.pdf.
[99] World Health Organization, *Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.
[100] *Id.*
[101] Goldenson Decl. ¶ 26.

available and easily accessible to detainees . . . in such a manner that the detainee is not required to request a form from a correctional or other facility staff." Where a grievance is an emergency as defined above, "[a]n individual authorized to serve as Administrative Duty Officer . . . shall take action to resolve the grievance within one (1) calendar day of receipt of the grievance and provide a written response to the detainee."

63.    Fearful for her health and well-being at CoreCivic, Ms. Peuplie filed an emergency grievance on or around April 22, 2020. She did not receive a response, so she filed a second emergency grievance on April 30, 2020. At that time, she handed her emergency-grievance form to a CoreCivic staff member and inquired about the status of her first emergency grievance. The staff member replied that CoreCivic receives about 400 grievances per day and "we'll get to it whenever we get to it." Ms. Peuplie has not received a response to either emergency grievance.[102]

64.    Concerned for his safety given his health and the unsafe conditions at CoreCivic, Mr. Ciecierski filed a grievance on or around April 15, 2020, requesting that conditions be improved to reduce the risk of COVID-19 spreading in his pod. He did not receive a response. He filed a second grievance asking for the same on April 30, 2020. He tried to file both grievances as emergency grievances, but no emergency grievance forms were available. He has continued to look for grievance forms, but they are rarely available. He has not received a response to either grievance he filed.[103]

65.    Concerned for her health and safety and survival under current conditions at CoreCivic, Plaintiff Romero-Lorenzo attempted to file an emergency grievance on April 29, 2020. She went with several other people from her pod and asked for a grievance form from an officer. The officer denied that anyone at CoreCivic had tested positive for COVID-19 and told them that everything was fine. Ms. Romero-Lorenzo looked again and eventually found a grievance form and filed an emergency grievance on May 1, 2020, seeking improved conditions to protect against COVID-19. She has not received any

---

[102] *See* Peuplie Decl. ¶¶ 14–15.
[103] *See* Ciecierski Decl. ¶ 10.

1   response.[104]

2          66.    Concerned for her health and safety, on May 1, 2020, Ms. Lucero-Gonzalez

3   filed an emergency grievance seeking improved conditions of confinement and protection

4   against the spread of COVID-19.  She has not received a response.  She also sought review

5   of her detention on April 20, 2020, based on her serious medical conditions and the risks

6   posed by the COVID-19 pandemic.  That request was denied on April 28, 2020.[105]

7          67.    Concerned about the conditions at CoreCivic, Mr. Enos filed emergency

8   grievances on April 19, 2020, and April 22, 2020, requesting safer and more sanitary

9   conditions to protect against the spread of COVID-19. Approximately one week after his

10  April 19 grievance he was informed by the unit manager in his pod that everything was

11  "fine" and there would be no changes.  His grievance receipt was confiscated.  Mr. Enos

12  also sought review of his detention in light of COVID-19 through the Bail Reform Act.

13  That request was denied on April 30, 2020.[106]

14         68.    Now, with 20 confirmed cases among both detainees and staff, Defendants

15  have failed to implement policies and conditions to stop the outbreak of COVID-19

16  spreading through CoreCivic.  Defendants thus have exposed Plaintiffs (and the public) to

17  unreasonable and increased risks of harm arising from this global pandemic.

18                 **VI.    CLASS ACTION ALLEGATIONS**

19         69.    Plaintiffs bring this action, under Rule 23 of the Federal Rules of Civil

20  Procedure, on behalf of themselves and a class of similarly situated individuals.

21         70.    Plaintiffs Romero, Peuplie, Ciecierski, and Enos seek to represent a class of

22  all current and future persons detained by Defendants Kline, Gonzales, and Washington at

23  CoreCivic pending trial (the "Pretrial Class").

24         71.    Plaintiff Lucero seeks to represent a class of all current and future persons

25  detained by Defendants Kline and Carvajal at CoreCivic following a judgment of

26

27         [104] *See* Romero Decl. ¶¶ 17–18.
           [105] *See* Lucero Decl. ¶¶ 21–22.
28         [106] *See* Enos Decl. ¶ 22.

1   conviction (the "Post-Conviction Class").

2       72.    Plaintiffs reserve the right to amend the class definitions or establish sub-

3   classes as appropriate if discovery or further investigation reveals that the class or a subclass

4   should be expanded or modified.

5       73.    This action is brought, and may properly be maintained, as a class action

6   under federal law.  It satisfies the numerosity, commonality, typicality, and adequacy

7   requirements for maintaining a class action under Rule 23(a) of the Federal Rules of Civil

8   Procedure.

9       74.    <u>Numerosity</u>:  The class is so numerous that joinder is impracticable.  Joinder

10   is impracticable because (1) the classes are numerous; (2) the classes include future

11   members, and (3) the class members are incarcerated, rendering their ability to institute

12   individual lawsuits limited, particularly due to Defendants terminating legal visits at

13   CoreCivic, to reduced availability of legal calls at CoreCivic, and to court closures in

14   Arizona.  Based on information and belief, there are several hundred people in the proposed

15   Pretrial Class and the proposed Post-Conviction Class.

16       75.    <u>Commonality</u>:  The claims of the Pretrial Class and the Post-Conviction Class

17   share common issues of fact and law, including whether Defendants' policies and the

18   conditions of confinement at CoreCivic violate the Fifth and Eighth Amendments to the

19   United States Constitution.  The resolution of these issues will drive the outcome of this

20   action.

21       76.    <u>Typicality</u>:  The claims of the named plaintiffs are typical of the claims of the

22   classes as a whole.  Each named plaintiff is currently detained at CoreCivic and these

23   plaintiffs' claims arise from the same policies, practices, and procedures (or lack thereof)

24   that provide the basis for all proposed class members' claims.

25       77.    <u>Adequacy</u>:  The named plaintiffs are adequate class representatives who meet

26   all the requirements of Rule 23(a)(4) of the Federal Rules of Civil Procedure.  The named

27   plaintiffs maintain the requisite personal interest in the outcome of this action, will fairly

28   and adequately represent the interests of the class, understand the responsibilities as a class

1   representative, and have retained *pro bono* counsel with experience and success in the

2   prosecution of civil-rights litigation.  Counsel for Plaintiffs know of no conflicts among

3   proposed class members or between counsel and proposed class members.

4       78.    Defendants have acted on grounds generally applicable to all proposed class

5   members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek

6   class certification under Rule 23(b)(2).

7       79.    In the alternative, the requirements of Rule 23(b)(1) of the Federal Rules of

8   Civil Procedure are satisfied, because prosecuting separate actions would create a risk of

9   inconsistent or varying adjudications with respect to individual class members that would

10  establish incompatible standards of contact for the party opposing the proposed classes.

11                          **VII.   CLAIMS FOR RELIEF**

12                          **First Claim for Relief**

13  **Unconstitutional Conditions of Confinement in Violation of**
    **the Due Process Clause of the Fifth Amendment to the U.S. Constitution**

14  *The Pretrial Class against Defendants Kline, Gonzales, and Washington*

15      80.    The Pretrial Class incorporates by reference Paragraphs 1 through 79 above

16  as though fully set forth herein.

17      81.    The Due Process Clause guarantees that no person shall "be deprived of life,

18  liberty, or property without due process of law."  U.S. Const. amend. V.  Based on this

19  guarantee, "when the [government] takes a person into its custody and holds him there

20  against his will, the Constitution imposes upon [the government] a corresponding duty to

21  assume some responsibility for [the person's] safety and general well-being."  *DeShaney v.*

22  *Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).  This responsibility

23  includes the "unquestioned duty to provide reasonable safety for all residents and personnel

24  within the institution" and "to provide adequate … medical care."  *Youngberg v. Romeo*,

25  457 U.S. 307, 324 (1982); *accord DeShaney*, 489 U.S. at 200 (observing that "when the

26  State by the affirmative exercise of its power so restrains an individual's liberty that it

27  renders him unable to care for himself," then the State assumes the responsibility "to

28  provide for his basic human needs—e.g., food, clothing, shelter, medical care, and

reasonable safety"). The government violates these obligations by exposing pretrial detainees—i.e., individuals who have not been convicted of the charges for which they stand—to conditions that are "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) ("[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the [Due Process Clause]' must be evaluated under an objective deliberate indifference standard." (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc))).

82. Defendants have violated the Pretrial Class's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution, by failing to provide for the Pretrial Class's reasonable safety and by failing to provide adequate medical care.

83. Defendants also have violated the Pretrial Class's Fifth Amendment rights because "the challenged governmental action is not rationally related to a legitimate governmental objective or . . . it is excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473–74.

84. Defendants have made an intentional decision regarding the conditions under which the Pretrial Class have been confined and regarding the denial of medical care.

85. The conditions of confinement and the denial of needed medical care have put the Pretrial Class at substantial risk of suffering serious harm.

86. Defendants have not taken reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable custodian under the circumstances would have understood the high degree of risks involved—making the consequences of Defendants' conduct obvious.

87. By not taking such measures, Defendants have placed the Pretrial Class at risk of irreparable harm or even death.

88. Defendants have known, or reasonably should have known, about the substantial risk to the Pretrial Class's health or safety—including the risks posed by COVID-19—and have disregarded such risks.

89.     Defendants have subjected the Pretrial Class to conditions of confinement that increase the risk of contracting COVID-19, a disease for which there is no known vaccine, treatment, or cure.

90.     Defendants have exposed the Pretrial Class to a substantial, grave, and unjustifiable risk of serious harm, including death.

91.     Defendants' continued detention of the Pretrial Class under the current conditions fails to protect the Pretrial Class from the risks of contracting COVID-19.

92.     As a result of Defendants' unconstitutional actions and omissions, the Pretrial Class members have suffered—and likely will continue to suffer—irreparable injury.

**Second Claim for Relief**
**Unconstitutional Conditions of Confinement in Violation of**
**the Eighth Amendment to the U.S. Constitution**
*Pretrial Class against Defendants Kline, Gonzales, and Washington*
*Post-Conviction Class against Defendants Kline and Carvajal*

93.     Plaintiffs incorporates by reference Paragraphs 1 through 92 above as though fully set forth herein.

94.     The Eighth Amendment to the United States Constitution protects Plaintiffs from "cruel and unusual punishments."  As part of this right, the government must protect incarcerated persons from a substantial risk of serious harm to their health and safety.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also DeShaney*, 489 U.S. at 200 ("[W]hen the [government] takes a person into its custody and holds him there against his will, the Constitution imposes upon [the government] a corresponding duty to assume some responsibility for [the person's] safety and general well-being.").  This obligation requires Defendants to protect Plaintiffs from infectious diseases like COVID-19; Defendants may not wait until Plaintiffs or others test positive for the virus and an outbreak grows larger.  *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition."); *Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government

1    and its officials are not free to let the state of nature take its course.").

2           95.    By failing to provide such protection, Defendants have shown and continue

3    to show deliberate indifference to a substantial risk of serious harm.  Thus, Defendants have

4    violated and continue to violate the Eighth Amendment.

5           96.    Defendants' acts and failures to act have placed the Plaintiffs at risk of

6    irreparable harm or even death.

7           97.    Defendants have exposed the Plaintiffs to a risk of harm that today's society

8    does not tolerate, namely the risk of exposure to COVID-19.

9           98.    Plaintiffs are exposed to a substantial risk of serious harm to their health and

10   safety, including the possibility of death, due to the presence and spread of COVID-19.

11          99.    Defendants have acted with deliberate indifference to the risks posed to

12   Plaintiffs, due to the presence and spread of COVID-19.

13          100.   Defendants have known of, or are presumed to have known of, the risks that

14   COVID-19 poses to Plaintiffs.

15          101.   The risks posed by COVID-19 are and have been obvious to Defendants.

16          102.   Defendants' response to COVID-19 has not been reasonable.

17          103.   As a result of Defendants' actions, Plaintiffs have suffered—and likely will

18   continue to suffer—irreparable injury.

19                            **VIII.  PRAYER FOR RELIEF**

20          **WHEREFORE**, Plaintiffs respectfully request that this Court grant the following

21   relief:

22          1.     Assume jurisdiction over this action;

23          2.     Certify the proposed classes;

24          3.     Issue a declaration that Defendants' acts and omissions violate,

25                 a.  with respect to the Pretrial Class, the Due Process Clause of the Fifth

26                     Amendment to the United States Constitution,

27                 b.  with respect to the Post-Conviction Class, the Eighth Amendment to

28                     the United States Constitution;

4.      Enter a temporary restraining order and/or preliminary injunction requiring an independent Rule 706 expert to lead a review of CoreCivic to determine whether Defendants have implemented consistent social (or physical) distancing, novel coronavirus testing procedures, and hygienic practices sufficient to reasonably protect Plaintiffs and proposed class members from contracting COVID-19 while in Defendants' custody.  The initial review will be completed within 48 hours of this Court's order.  If the expert concludes that Defendants have not implemented the social and physical distancing, novel coronavirus testing procedures, and hygienic practices sufficient to reasonably protect Plaintiffs and Class Members from contracting COVID-19, then the expert will submit within 24 hours recommendations as to how such practices should be achieved and this Court will order Defendants to: (a) begin implementing the expert's recommendations immediately, (b) provide weekly updates to Plaintiffs' counsel and this Court on their progress, and (c) complete the implementation of the recommendations within the timeline established by the expert, unless Defendants can show good cause as to why an extension is necessary;

5.      Enter a preliminary and/or permanent injunction to ensure:

a.   That all detainees and staff can practice social (or physical) distancing at all times (with exceptions for exigent medical and security needs),

b.   That every detainee is able to practice adequate hygiene including by providing access, free of charge to:

i.   a sufficient supply of hand soap, disposable paper towels, and hot water, for frequent and adequate hand washing,

ii.  hand sanitizer containing at least 60% alcohol, when not in a location where the detainee can access hot water and soap for adequate hand washing, and

iii. disinfectant hand wipes or cleaning products effective against the virus that causes COVID-19,

c.   That frequently touched surfaces be cleaned and disinfected with

disinfectant products effective against the virus that causes COVID-19 multiple times per day,

    d.   That every staff member and detainee has access to adequate personal protective equipment including masks and gloves,

    e.   That every staff member and detainee exposed to COVID-19 is quarantined in a non-punitive setting and tested for COVID-19, and

    f.   That CoreCivic implement novel coronavirus testing procedures consistent with CDC and other public health guidance;

    6.    If the expert's recommendations cannot be achieved without reducing the detained population at CoreCivic, issue writs of habeas corpus on the ground that Plaintiffs' continued detentions violate the Due Process Clause or the Eighth Amendment, and order Plaintiffs' release;

    7.    Award Plaintiffs their attorneys' fees and costs under 5 U.S.C. § 504 and 28 U.S.C. § 2412 (the Equal Access to Justice Act, as amended), and any other applicable law; and

    8.    Award any further relief that this Court deems appropriate.

Dated:  May 8, 2020

**PERKINS COIE LLP**

By:  /s/ Matthew R. Koerner

Jean-Jacques Cabou (#022835)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Emma Andersson*
eandersson@aclu.org
Taylor Brown*
tbrown@aclu.org
Alejandro Ortiz*
ortiza@aclu.org
Chase Strangio*
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Fl.
New York, New York 10004
Telephone:  917-345-1742

Somil Trivedi*
strivedi@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC  20012
Telephone:  202-715-0802

Jared G. Keenan (#027068)
jkeenan@acluaz.org
Christine K. Wee (#028535)
CWee@acluaz.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014

*Attorneys for Plaintiffs*
*Applications for *pro hac vice* forthcoming.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

☒      I hereby certify that on May 8, 2020, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of same to:

Kris Kline, Warden of the Central Arizona Florence Correctional Complex
  Kristopher.kline@corecivic.com
  publicaffairs@corecivic.com

David Gonzales, U.S. Marshal for the District of Arizona
  District of Arizona (D/AZ)
  U.S. Marshal: David Gonzales
  Sandra Day O'Connor U.S. Courthouse
  401 W. Washington St., SPC 64, Suite 270
  Phoenix, AZ 85003-2159
  David.Gonzales2@usdoj.gov

Donald W. Washington, Director of the U.S. Marshals Service
  District of Arizona (D/AZ)
  U.S. Marshal: Donald W. Washington
  Sandra Day O'Connor U.S. Courthouse
  401 W. Washington St., SPC 64, Suite 270
  Phoenix, AZ 85003-2159

Michael Carvajal, Director of the Federal Bureau of Prisons
  Two Renaissance Square 40 N. Central Avenue, Suite 1800
  Phoenix, AZ 85004-4449
  mcarvajal@bop.gov

By: Jennifer McNamara
Perkins Coie, LLP