Jean-Jacques Cabou (#022835)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602-351-8000
Facsimile: 602-648-7000
JCabou@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
BCalleros@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Plaintiffs–Petitioners*
*(additional counsel identified on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Guadalupe Lucero-Gonzalez; Claudia Romero-Lorenzo; Tracy Ann Peuplie; James Tyler Ciecierski; and Marvin Lee Enos, each individually and on behalf of all others similarly situated, <br><br> Plaintiffs–Petitioners, <br><br> v. <br><br> Kris Kline, Warden of the Central Arizona Florence Correctional Complex; David Gonzales, U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; Michael Carvajal, Director of the Federal Bureau of Prisons, in their official capacities, <br><br> Defendants–Respondents. | No. _____ <br><br> **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** <br><br> **(Oral Argument and Expedited Ruling Requested)** |

# MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs–Petitioners ("Plaintiffs"), on behalf of themselves and the proposed class members, respectfully move for a temporary restraining order ("TRO") and a preliminary injunction against Defendants–Respondents ("Defendants"). *See* Fed. R. Civ. P. 65. Plaintiffs seek injunctive relief to remedy unconstitutional conditions of confinement at CoreCivic Inc.'s Central Arizona Florence Correctional Complex ("CoreCivic"), due to a growing outbreak of COVID-19 transmissions among detainees, guards, and medical staff. Plaintiffs specifically request that this Court: (1) issue an order (a) appointing an independent expert, under Rule 706 of the Federal Rules of Civil Procedure, to inspect CoreCivic and its social-distancing and hygienic practices, and (b) directing the expert to submit to the Court a report on whether these measures comply with recommendations of public-health experts and are adequate to protect Plaintiffs from COVID-19; and (2) if based on this report the Court concludes that these conditions violate Plaintiffs' constitutional right not to be subjected to unreasonable conditions of confinement, issue an order directing Defendants to (a) immediately implement the expert's recommendations and (b) provide weekly updates on their progress.

Plaintiffs meet the requirements, under Federal Rules of Civil Procedure ("Rule") 65, for a TRO and a preliminary injunction. Defendants have failed to protect Plaintiffs from the known and serious risks posed by the COVID-19 pandemic. These failures have violated Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution. Absent such relief, Plaintiffs will suffer irreparable harm up to and including their deaths. And both the balance of equities and the public interest favor granting Plaintiffs' requested relief.

Plaintiffs also have satisfied the notice requirements of Rule 65. On May 8, 2020, counsel for Plaintiffs notified Defendants that they have failed to protect against COVID-19 transmission and must remedy these unconstitutional conditions. Plaintiffs' counsel also disclosed that this litigation was imminent. After filing, Plaintiffs' counsel promptly will send Defendants a copy of Plaintiffs' Class-Action Complaint for Declaratory and Injunctive Relief and Petition for Writs of Habeas Corpus (the "Complaint"), along with a copy of this Motion.

Due to Plaintiffs' immediate and irreparable injury, no further notice should be required. *See* Fed. R. Civ. P. 65(b)(1)(A), (B). Plaintiffs also request that this Court waive any security requirement. *See* Fed. R. Civ. P. 65(c).

This Motion is based on the below Memorandum in Support; the Complaint and its supporting documents and exhibits; and other evidence and arguments as may be presented. For these reasons, Plaintiffs respectfully request that this Court issue a TRO and a preliminary injunction, and grant such other relief as appropriate, to prevent the serious and deadly risks that Plaintiffs face at CoreCivic during this global pandemic.

**MEMORANDUM IN SUPPORT**

For the past six weeks, much of the United States has been socially distancing as a result of the COVID-19 pandemic. While knowing of this crisis and the dangers posed by unsanitary conditions and inadequate social distancing and testing, though, Defendants have failed to protect Plaintiffs from these risks. Now, COVID-19 diagnoses are increasing at CoreCivic. Plaintiffs are crammed in 80-person pods, masks and gloves are unavailable or inadequate, and without action it is only a matter of time before this initial outbreak engulfs the entire facility. The window for averting widespread infection will soon close without this Court's intervention.

Detaining Plaintiffs in these conditions violates Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution. Therefore, for the reasons below, Plaintiffs respectfully request that the Court issue a TRO and a preliminary injunction.

**I.  BACKGROUND**

The ongoing pandemic presented by COVID-19 already has altered many aspects of our society and will continue to do so. As of May 8, 2020, over 1,239,000 people have tested positive for COVID-19 and over 76,000 have died as a result of the disease, in the United States alone. In Arizona, nearly 10,000 people have tested positive and 426 have died. These numbers rise daily.

Individuals held in detention, and staff in detention facilities, are among the most vulnerable to an outbreak. Without social distancing and hygienic measures, the virus spreads uncontrollably in close quarters. At CoreCivic, Defendants have crammed up to 80 people into

one pod and up to 14 people in one cell, where beds are stacked on beds fewer than six feet apart. Defendants likewise have created unsanitary conditions: soap is scarce, cleaning supplies are limited, and social distancing is impossible. With at least 20 positive COVID-19 diagnoses at the facility so far,[1] the chances of stopping an outbreak grow increasingly slim each passing day. Everyone at CoreCivic—including Plaintiffs, correctional officers, and medical staff—will be affected. Many will become infected. Too many of those will die without immediate action. And many of these infected individuals—especially those who are asymptomatic—will further circulate the virus throughout CoreCivic, the broader community, and beyond.

**A.  Defendants have detained federal pretrial and post-conviction detainees—including Plaintiffs—at CoreCivic.**

The named Plaintiffs are five individuals detained in federal custody at CoreCivic, who seek to represent a class of all detainees in federal custody at CoreCivic. Plaintiff Maria Guadalupe Lucero-Gonzalez is detained at CoreCivic for a supervised-release violation, following a conviction for illegal reentry. She seeks to represent the class of post-conviction detainees ("Post-Conviction Class"). The remaining Plaintiffs—Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos—are detained at CoreCivic while they await trial or sentencing on various federal criminal charges, for which they are presumed innocent.[2] They seek to represent the class of pretrial detainees ("Pretrial Class").

Many of the Plaintiffs and proposed class members have one or more underlying medical conditions that make them particularly vulnerable to COVID-19. Ms. Lucero-

---

[1] *About 400 Inmates Quarantined at CoreCivic Prison in Florence, After 13 Test Positive for COVID-19*, AZ Central (May 8, 2020 7:00 a.m.), https://www.azcentral.com/story/news/local/arizona-health/2020/05/08/coronavirus-cases-multiple-inmates-test-positive-corecivic-prison-covid-19/3093348001/.

[2] Several circuits have held that the Fifth Amendment's Due Process Clause applies to both pretrial detainees and people who have been convicted but not yet sentenced. *See, e.g.*, *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). The Supreme Court also has observed that "Eighth Amendment[] protections d[o] not attach until after conviction and sentence." *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1986). And the Ninth Circuit has addressed this issue only in the context of the standard for determining a due-process liberty interest in being free from segregated housing. *See Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000). Here, because a court has not yet issued a judgment and commitment for Plaintiffs Romero, Peuplie, Ciecierski, and Enos, they have not received a "formal adjudication of guilt" subjecting them to the Eighth (rather than the Fifth) Amendment. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Gonzalez suffers from asthma, hypertension, diabetes, and kidney cancer. Ms. Romero-Lorenzo suffers from several medical conditions, including a type of leukemia. Ms. Peuplie suffers from multiple conditions, including asthma, hypertension, anxiety, substance-abuse disorder, and spinal stenosis. Mr. Ciecierski suffers from severe asthma. And Mr. Enos suffers from multiple severe medical conditions, including asthma and hypertension.

Defendants are the federal and private officials who have immediate custody over Plaintiffs and all class members whom Plaintiffs seek to represent. Defendant Kris Kline is the warden of CoreCivic. Defendant David Gonzales is the U.S. Marshal for the District of Arizona, and Defendant Donald W. Washington is the Director of the U.S. Marshals Service. And Defendant Michael Carvajal is the Director of the Federal Bureau of Prisons.

**B.      COVID-19 poses an unprecedented risk of illness, injury, and death.**

The 2019 novel coronavirus known to cause coronavirus disease 2019 ("COVID-19") spreads from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects. [Compl. ¶ 28 & Ex. 2 (Declaration of Joseph Goldenson, M.D. ("Goldenson Decl.")) ¶ 21] There is no vaccine, nor any known medication to prevent or treat the virus. [Compl. ¶ 28 & Ex. 2, ¶¶ 17, 24] The only known measures for effectively protecting against transmission of COVID-19 are "social distancing"—that is, keeping at least six feet between persons to avoid transmission—and a vigilant hygienic regimen, including frequent and thorough hand washing. [Compl. ¶ 28 & Ex. 2, ¶¶ 17, 24] Because the coronavirus spreads among people who do not show symptoms, social distancing is the best way to prevent transmission. [Compl. ¶ 28] Up to 25% of people infected with COVID-19, it is estimated, lack symptoms of COVID-19. [Compl. ¶ 28 & Ex. 2, ¶ 31]

Once contracted, COVID-19 can cause severe damage or even death. [Compl. ¶ 29] People of any age who suffer from certain underlying medical conditions—including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma—also have elevated risks due to COVID-

19. [Compl. ¶ 31 & Ex. 2, ¶ 10] Most people in higher risk categories who develop serious illness will need advanced medical support, requiring highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers. [Compl. ¶ 32] Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner. [Compl. ¶ 34]

Correctional settings—like CoreCivic—further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene products, limited access to medical care, numerous high-contact surfaces, and no possibility of staying at a distance from others. [Compl. ¶ 36 & Ex. 2, ¶¶ 19–30] Numerous public health experts have all strongly cautioned that people booked into and held in jails and prisons are likely to face serious, even deadly, harm due to the outbreak of COVID-19. [Compl. ¶ 38]

**C. Governments, businesses, and communities have implemented stringent preventative measures to slow the spread of COVID-19.**

Due to the risks posed by the COVID-19 pandemic, people have implemented responsive measures globally, nationally, and in Arizona. On March 13, 2020, the President declared a state of emergency. [Compl. ¶ 40] Numerous states also have issued "stay at home" orders, asking people to stay home in order to stop the spread of COVID-19. [Compl. ¶ 41]

The State of Arizona similarly is taking unprecedented steps to manage the public health crisis caused by COVID-19 and to minimize the spread of the virus. On March 11, 2020, Arizona Governor Doug Ducey declared a State of Emergency due to the COVID-19 outbreak. [Compl. ¶ 42] Days later, on March 15, Governor Ducey closed all public schools, a closure later extended through the end of the 2019–2020 school year. [*Id.*] Then, on March 30 Governor Ducey ordered a statewide "stay-at-home" order. [*Id.*] And on April 29, Governor Ducey extended the stay-at-home order to at least May 15, 2020. [*Id.*]

**D. Despite the grave risks posed by COVID-19, Defendants have not provided safe conditions of confinement to protect Plaintiffs from infection.**

Defendants must address these risks above by following public-health guidelines,

including those by the Centers for Disease Control and Prevention ("CDC").[3] But Defendants have failed to do so, exposing Plaintiffs to unreasonable risks of contracting COVID-19.

Detainees at CoreCivic are detained in community "pods," or housing units, typically containing either 40 or 80 people. [Compl. Ex. 6 (Declaration of James Tyler Ciecierski ("Ciecierski Decl.")) ¶ 4; Compl. Ex. 5 (Declaration of Tracy Ann Peuplie ("Peuplie Decl.")) ¶ 5; Compl. Ex. 3 (Declaration of Maria Guadalupe Lucero-Gonzalez ("Lucero Decl.")) ¶ 8; Compl. Ex. 4 (Declaration of Claudia Romero-Lorenzo ("Romero Decl.")) ¶ 7] All 40 or 80 people in the pod share between four to six showers and three to four telephones. [Ciecierski Decl. ¶ 4; Peuplie Decl. ¶ 5; Lucero Decl. ¶ 8; Romero Decl. ¶ 7; Compl. Ex. 1 (Declaration of Christina M. Woehr ("Woehr Decl.") ¶ 33] Within their pods, Plaintiffs share a cell with either one person or as many as 13 other people. [Ciecierski Decl. ¶¶ 4–5; Woehr Decl. ¶ 42; Peuplie Decl. ¶ 6; Lucero Decl. ¶ 10; Romero Decl. ¶ 8] In cells with one other person, beds are placed only a couple feet, or arms' length, apart. [Woehr Decl. ¶ 43; Ciecierski Decl. ¶ 4; Lucero Decl. ¶ 10; Romero Decl. ¶ 8] In cells with bunk beds, as many as six bunks are often placed against the same wall, within one or two feet apart. [Ciecierski Decl. ¶ 5; Peuplie Decl. ¶ 6] Everyone in a cell—regardless of whether it houses two or 14 people—shares a single toilet and sink. [Peuplie Decl. ¶ 6; Lucero Decl. ¶ 10; Romero Decl. ¶ 8] In isolation, Plaintiff Enos is held in a small cell with two other people as close to two feet apart without access to daily showers. [Compl. Ex. 7 (Declaration of Marvin Lee Enos) ¶¶ 13–15]

When people are first transferred to CoreCivic, they are placed in a "quarantine room" or "cohort" with other people who recently came to the facility. [Peuplie Decl. ¶ 12] These cohorts are held in a small room for 14 days. [*Id.*] After 14 days, they are moved to the pod and are placed in a cell housing between two to 14 people. [*Id.*] Sometimes before the end of the 14 days, though, people in quarantine are removed from quarantine and placed in the general population, "by mistake," before eventually being returned to quarantine. [Woehr Decl. ¶ 30]

---

[3] *See, e.g.*, Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 7, 2020).

1 | Defendants have not attempted to implement social distancing by any means. [Peuplie
2 | Decl. ¶ 7; Lucero Decl. ¶ 8; Romero Decl. ¶¶ 7, 16] People frequently stand close together in
3 | lines when waiting for meals, for medical appointments, and for the communal telephones.
4 | [Ciecierski Decl. ¶ 9; Peuplie Decl. ¶ 7; Lucero Decl. ¶ 9; Woehr Decl. ¶ 40] These telephones
5 | are placed "considerably less than six feet apart, requiring [detainees] to stand within 2 to 3 feet
6 | to other detainees while using the phone to call their attorneys or families." [Woehr Decl. ¶ 36]
7 | There is nearly always a line of people waiting to use these phones. [Woehr Decl. ¶ 37; Peuplie
8 | Decl. ¶ 7] People cram together at tables during mealtime. [Woehr Decl. ¶ 38; Ciecierski Decl.
9 | ¶ 9; Peuplie Decl. ¶ 7; Lucero Decl. ¶ 9] And jobs for detainees, including kitchen staff and
10 | barbers, have continued as usual, with as many as 17 people working in close quarters.
11 | [Ciecierski Decl. ¶ 9; Romero Decl. ¶ 9; Woehr Decl. ¶¶ 72–73]

12 | Despite CDC and other public health recommendations, Plaintiffs did not receive any
13 | sort of mask until mid-April 2020. [Ciecierski Decl. ¶ 7; Lucero Decl. ¶ 17; Romero Decl. ¶ 12]
14 | Some still have not received masks. [Woehr Decl. ¶¶ 61–63] The masks Plaintiffs did receive,
15 | if at all, were thin disposable paper masks, not the N95 masks recommended by the CDC.
16 | [Woehr Decl. ¶ 62; Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 9; Lucero Decl. ¶ 17; Romero Decl.
17 | ¶ 11] CoreCivic's guards also tease detainees that these disposable masks "'don't work' against
18 | the virus." [Woehr Decl. ¶ 68]

19 | When Plaintiffs eventually received masks, Defendants did not require everyone to wear
20 | a mask. [Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 9; Lucero Decl. ¶ 17] And because masks were
21 | not required, most people—including guards and other CoreCivic staff—did not wear a mask.
22 | [Ciecierski Decl. ¶ 7; Peuplie Decl. ¶¶ 9, 11; Lucero Decl. ¶ 17] Although beginning around
23 | April 30, 2020, Plaintiffs have been required to wear masks when outside the pods, Plaintiffs
24 | are not required to wear masks when in their pods or cells. [Peuplie Decl. ¶ 9; Lucero Decl.
25 | ¶ 17; Romero Decl. ¶ 11] Few people (if any) wear masks inside the pods and cells. [Lucero
26 | Decl. ¶ 17; Woehr Decl. ¶ 62] Guards and other staff began wearing masks beginning around
27 | April 30, 2020, after the first confirmed case within the facility, but many still are not
28 | consistently wearing masks or gloves. [Lucero Decl. ¶¶ 18–19; Romero Decl. ¶ 12; Woehr Decl.

¶¶ 31, 66–67] Plaintiffs have received only one or two masks, and when these masks are broken or lost, Defendants have required Plaintiffs to share and swap each other's masks in order to leave the pod for things like laundry and legal calls. [Peuplie Decl. ¶ 10; Woehr Decl. ¶ 29]

Plaintiffs receive, only once per week, a small amount of soap and shampoo. [Ciecierski Decl. ¶ 6; Lucero Decl. ¶ 15; Romero Decl. ¶ 10; Woehr Decl. ¶ 53] Plaintiffs have not received additional or different hygiene products since COVID-19 spread to Arizona. [Peuplie Decl. ¶ 8; Lucero Decl. ¶¶ 15–16; Romero Decl. ¶ 10; Woehr Decl. ¶ 28] These bathroom supplies frequently are not enough to last the week, especially because Plaintiffs—lacking other cleaning supplies—are forced to use their personal allotment of soap to clean their plates, cups, or even cells. [Lucero Decl. ¶ 15; Romero Decl. ¶ 10; Woehr Decl. ¶¶ 27–28, 52, 54] When people run out of their weekly allotment of soap, they must purchase more—if they can afford to do so—from the commissary at CoreCivic. [Lucero Decl. ¶ 15; Romero Decl. ¶ 10] If they cannot afford to do so, they have no soap at all. [Woehr Decl. ¶ 55]

Defendants also fail to adequately and consistently clean the pods and cells, in order to disinfect and stop the spread of COVID-19. Plaintiffs are responsible for cleaning their own pods and cells. [Peuplie Decl. ¶¶ 5–6; Lucero Decl. ¶¶ 12, 14; Romero Decl. ¶ 13; Woehr Decl. ¶¶ 48–49] When cleaning the pods and cells, Plaintiffs do not receive or wear personal protective equipment ("PPE"), like gloves or masks. [Peuplie Decl. ¶ 5; Lucero Decl. ¶ 12; Romero Decl. ¶ 13] To clean both the pods and cells, Plaintiffs receive only a small amount of cleaning solution—none of which is antibacterial. [Peuplie Decl. ¶ 5; Lucero Decl. ¶ 14] For some, this cleaning solution runs out, every day, before the pod and cells are cleaned. [Woehr Decl. ¶ 50; Peuplie Decl. ¶ 5] Some resort to cleaning with water only. [Woehr Decl. ¶ 50] And frequently used items—like communal telephones—are not cleaned between uses, or even every day. [Woehr Decl. ¶¶ 33, 46; Lucero Decl. ¶ 13] Lacking any disinfecting products or wipes to clean the telephones between uses and fearing the possibility of contracting COVID-19, women in the pods have resorted to cleaning the phones with shirts or with menstrual pads wet down with water. [Lucero Decl. ¶ 13; Romero Decl. ¶ 13]

Plaintiffs also have been exposed to numerous people who have showed symptoms of

COVID-19. [Lucero Decl. ¶ 19; Romero Decl. ¶ 15] Some of the people showing such symptoms were placed in quarantine and then returned to the pod without being tested for COVID-19, even though their symptoms continued. [Romero Decl. ¶ 15] Despite the risks of COVID-19 spreading through CoreCivic and signs of symptoms from people at CoreCivic, Defendants also have failed to even investigate the spread at the facility. Only a handful of people at CoreCivic have been tested for COVID-19 or checked for symptoms of COVID-19 by, for example, taking a person's temperature. [Ciecierski Decl. ¶ 7; Peuplie Decl. ¶ 13; Lucero Decl. ¶ 20; Romero Decl. ¶ 14; Woehr Decl. ¶¶ 19, 69–70] And even some showing symptoms of COVID-19 and requesting medical care have not been tested. [Woehr Decl. ¶ 70]

Defendants also have exposed Plaintiffs to unnecessary risk of exposure by failing to provide them with information about COVID-19, measures for preventing its spread, or the very real risks of contracting and spreading COVID-19 at CoreCivic. [Peuplie Decl. ¶ 11; Lucero Decl. ¶ 11; Ciecierski Decl. ¶ 8; Woehr ¶ 76] And despite acknowledging elsewhere that COVID-19 has spread to CoreCivic [Woehr Decl. ¶¶ 19, 76], Defendants have refused to inform the people most needing this information: Plaintiffs. Defendants have failed to disclose to Plaintiffs that people at CoreCivic have tested positive for COVID-19. [Peuplie Decl. ¶ 11; Ciecierski Decl. ¶ 8; Romero Decl. ¶ 17] Defendants, in fact, have affirmatively denied these positive tests, claiming they are merely "rumors" from other facilities. [Romero Decl. ¶ 17] But even the correctional officers at CoreCivic acknowledge (privately) these positive tests. [Ciecierski Decl. ¶ 8]

Furthermore, Defendants' generic policies for "managing" COVID-19 are inadequate to stop it from spreading.[4] Defendants' policy of quarantining groups of persons who are transferred to CoreCivic on the same day, for example, will not stop COVID-19 from continuing to spread within the facility. The World Health Organization has reported that "the

---

[4] *See* CoreCivic Inc., *How CoreCivic is Managing COVID-19*, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf; *see also* Media Statement, CoreCivic Inc., *CoreCivic Statement on COVID-19 Prevention*, https://www.corecivic.com/en/corecivic-statement-on-covid-19-prevention; CoreCivic Inc., *Frequently Asked Questions Regarding COVID-19*, https://www.corecivic.com/hubfs/_files/FAQ%20Regarding%20COVID.pdf.

incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptoms onset, is an average of 5–6 days, however can be up to 14 days." World Health Organization, *Coronavirus Disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2. During this "pre-symptomatic" time, "infected persons can be contagious." *Id.* Because Defendants have quarantined people together without social distancing, proper PPE, or sanitation, detainees can spread the virus to each other and then throughout the facility. One medical physician, in fact, concludes that this practice "does not conform to CDC guidelines and it would likely contribute to the overall transmission rate." [Goldenson Decl. ¶ 33]

Now, 20 people at CoreCivic—detainees, guards, and medical staff—have tested positive for COVID-19. Defendants have failed to implement policies and conditions to stop this outbreak now spreading through the facility. And Defendants thus have exposed Plaintiffs (and the public) to unreasonable risk of harm arising from this global pandemic.

## II. LAW AND DISCUSSION

A court may grant injunctive relief when the movant "establish[es] [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tip in his favor, and [4] that an injunction is in the public interest." *Aleman Gonzalez v. Barr*, 955 F.3d 762, 768 (9th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Courts have applied this approach to motions both for a preliminary injunction and for a TRO. *See, e.g.*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "[a] preliminary injunction is appropriate when the [movant] demonstrates . . . that serious questions going to the merits were raised and the balance of the hardships tips sharply in the [movant]'s favor, . . . so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1134–

35 (citation omitted). Each of these elements is satisfied here.

### A. Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs divide into a Pretrial Class governed by the Fifth Amendment and a Post-Conviction Class governed by the Eighth Amendment. The Eighth Amendment's deliberate indifference test "provide[s] a *minimum standard of care*" for both classes. *Gordon v. County of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (applying test to post-conviction detainees). Plaintiffs are likely to succeed in establishing that Defendants have acted with deliberate indifference to Plaintiffs' safety and serious medical needs, thereby violating the constitutional rights of both classes. The Pretrial Class also is likely to establish that Defendants have subjected the class to unconstitutional punishment under the Fifth Amendment.

#### 1. Defendants are subjecting all Plaintiffs to unconstitutional conditions of confinement under the Eighth Amendment.

Under the Eighth Amendment, corrections officials have a constitutional obligation to "provide humane conditions of confinement," including adequate medical care, and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). "[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833. Corrections officials violate this obligation by showing "deliberate indifference" to a substantial risk of serious harm. *Estelle*, 429 U.S. at 104 ("deliberate indifference to serious medical needs of prisoners" is "proscribed by the Eighth Amendment").

The deliberate-indifference test contains both an objective-knowledge and a subjective-intent prong. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Allen v. Sakai*, 48 F.3d 1082, 1083 (9th Cir. 1994). Defendants have violated both prongs of the deliberate-indifference test.

For an impending infectious disease like COVID-19, both prongs are satisfied when officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate

-11-

shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). In *Helling*, an asymptomatic plaintiff's showing of pervasive secondhand smoke in the detention facility was sufficient to order injunctive relief: "That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* at 33.

The conditions at CoreCivic, as described above, are objectively unreasonable. Defendants have failed to implement adequate social-distancing measures. Up to 80 people are crammed into pods, up to 14 people share a single cell with a single bathroom, and detainees are forced to wait in lines—standing closer than six feet apart—to collect food trays, receive medical attention, or use the telephone. These lines are a hotbed for transmission. And making matters only worse, Plaintiffs share masks or lack proper masks because Defendants have provided only some people with one or two disposable masks. Defendants similarly have failed to disinfect CoreCivic from the spread of COVID-19. Plaintiffs lack cleaning supplies to clean their cells and pods. So, instead, they use only water. Some detainees, in fact, are forced to use their personal hygiene products (like soap) to clean their own cups and cells, leaving them without soap until the next week's allotment. And women at CoreCivic—lacking any disinfecting products or wipes to clean the telephones and fearing COVID-19—have resorted to cleaning telephones with shirts or with menstrual pads wet down with water. Based on these facts, Plaintiffs are likely to establish that their conditions are objectively unreasonable.

As to the subjective prong, a court "may infer the existence [of subjective deliberate indifference] from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). Here, Defendants have acted with deliberate indifference to the serious risk of harm posed by COVID-19. Defendants undoubtedly have known of the obvious risks posed by COVID-19. This historic pandemic has struck both across the globe and within Arizona. Communities, governments, and organizations have implemented stringent preventative measures to slow the spread of COVID-19, as detailed above. Defendants cannot seriously dispute they have known of the risks posed by COVID-19. *Cf. Hare v. City of Corinth*, 74 F.3d

633, 644 (5th Cir. 1996) ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.").

Based on the obviousness of these risks, Plaintiffs are likely to establish the subjective prong of deliberate indifference. And combined with the unreasonable risks of COVID-19, Plaintiffs are likely to succeed on their claim under the Eighth Amendment.

### 2. Defendants are subjecting the Pretrial Class to unconstitutional punishment under the Fifth Amendment.

Because Defendants have violated all Plaintiffs' Eighth Amendment rights, they necessarily have violated the Pretrial Class's Fifth Amendment rights. The Fifth Amendment's Due Process Clause governs the Pretrial Class's claims. Because these individuals are presumptively innocent and lack a "formal adjudication of guilt" for their charges, *City of Revere*, 463 U.S. at 244, the Supreme Court has held that "due process rights . . . are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* The Ninth Circuit recognizes that, where an individual's rights arise under the Due Process Clause, "the guarantees of the Eighth Amendment provide a *minimum standard of care* for determining their rights, including the rights to medical and psychiatric care." *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (quoting *City of Revere*, 463 U.S. at 244). Here, as shown above, Defendants have failed to meet even the more exacting Eighth Amendment standard and Plaintiffs have therefore shown a likelihood of success on the merits of their Fifth Amendment claims as well.

Furthermore, the Pretrial Class, unlike the Post-Conviction Class, need not establish "subjective indifference"—i.e., that "'[a] prison official . . . knows of and disregards an excessive risk to inmate health or safety.'" *Gordon*, 888 F.3d at 1120, 1125 n.4 (citation omitted); *accord Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017); *see Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). This purely objective analysis requires a court to consider several factors:

(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(ii) those conditions put the plaintiff at substantial risk of suffering serious

-13-

|   |       | harm; |
|---|-------|-------|
|   | (iii) | the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and |
|   | (iv)  | by not taking such measures, the defendant caused the plaintiff's injuries. |

*Gordon*, 888 F.3d at 1125. Every one of these factors is satisfied here.

*First*, Defendants cannot dispute they have "made an intentional decision with respect to the conditions under which [Plaintiffs] [are] confined." *Id.* at 1125. Defendants have confined Plaintiffs to CoreCivic while they either await trial or serve their short terms of incarceration. The conditions of confinement at CoreCivic—including inadequate social distancing, disinfecting, and PPE—have resulted from Defendants' deliberate decisions.

*Second*, Defendants also have "put [Plaintiffs] at substantial risk of suffering serious harm," *Gordon*, 888 F.3d at 1125, as the above establishes (at 12). Though the risks and spread of COVID-19 are well known, the record here establishes that Plaintiffs face heightened and unreasonable exposure to these serious—and often deadly—risks at CoreCivic. In this pandemic, few places are more dangerous than a jail. The declaration of Dr. Joe Goldenson, who has extensive experience in correctional health care, further establishes the unreasonable risks at CoreCivic due to the COVID-19 pandemic. [Goldenson Decl. ¶¶ 19, 33–36].

*Third*, Defendants have not "take[n] reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of [Defendants'] conduct obvious." *Gordon*, 888 F.3d at 1125. Defendants, despite publicly acknowledging the importance of measures to protect those in their custody, have not implemented public-health experts' recommended measures to abate the risks of COVID-19. Defendants have not implemented social distancing, the primary tool recommended to prevent contracting COVID-19. Defendants also have not provided Plaintiffs with adequate soap, hand sanitizer, masks, or other PPE, to prevent the spread of COVID-19. And Defendants have tested only a few people for COVID-19.

*Fourth*, "by not taking such measures," Defendants will cause Plaintiffs' injuries and

perhaps even deaths. *Gordon*, 888 F.3d at 1125. Without the measures recommended by public-health experts and with the close quarters and lack of mitigation measures to stop the spread of COVID-19, it is inevitable that the virus—which already has entered the facility— will continue to envelop CoreCivic. This not only will infect dozens of individuals, but also will lead to numerous deaths. [Goldenson Decl. ¶¶ 33–37] In sum, the Pretrial Class is likely to establish the objective factors enumerated above. *See Gordon*, 888 F.3d at 1125.

Separately, the Pretrial Class may establish likelihood of success by showing Defendants have subjected them to unconstitutional pre-adjudication punishment. The Fifth Amendment's Due Process Clause prohibits the government from punishing detainees before "a formal adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–72 n.40 (1977)). Thus, the government violates a detained person's rights if conditions of confinement amount to punishment. *See Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (quoting *Bell*, 441 U.S. at 539). A punitive condition can be established "where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (internal quotation marks and citations omitted).

Here, the relevant "restriction" is CoreCivic's refusal to facilitate social distancing as needed to prevent further spread of COVID-19. Given the current outbreak at CoreCivic, without immediate action further spread of the virus is inevitable. Once the virus spreads further, the consequences will be catastrophic. And even if Defendants' current approach to COVID-19 prevention could be described as serving a non-punitive purpose, their inadequate approach to social distancing and hygienic measures are excessive in relation to that purpose. By enacting these measures at CoreCivic, Defendants can avert these harms. The Pretrial Class therefore is likely to establish that Defendants' policies are unconstitutional punishment.

### B. Without injunctive relief, Plaintiffs face irreparable injury and even death.

Plaintiffs face "a likelihood of irreparable injury." *All. for the Wild Rockies*, 632 F.3d at

1135. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). As shown above, Plaintiffs are likely to prevail on their claims that Defendants have violated their constitutional rights.

Even more concerning are the actual risks COVID-19 poses to those at CoreCivic. The risk of illness or death is not theoretical. At least 20 people so far already are infected at CoreCivic, and expanded testing likely will reveal more. And without the requested relief, Plaintiffs face intolerable risks of COVID-19 infection, injury, and even death. *See Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding "irreparable harm" from "pain, infection," and possible "death due to delayed treatment").

**C.  The balance of the equities and the public interest favor Plaintiffs.**

Similarly, both "the balance of equities" and "the public interest" favor granting Plaintiffs injunctive relief. *Aleman Gonzalez*, 955 F.3d at 768 (quoting *Winter*, 555 U.S. at 20). "[I]t is always in the public interest," the Ninth Circuit has held, "to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). And as Plaintiffs establish above (at II.A), the conditions at CoreCivic combined with the risks posed by the COVID-19 pandemic violate Plaintiffs' constitutional rights. Thus, "by establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Defendants, by comparison, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Also, granting Plaintiffs their requested relief will help mitigate the spread of COVID-19 not only inside CoreCivic, but also through neighboring communities, the state, and across the country. With the numerous individuals (including staff) who come and go from CoreCivic each week, COVID-19 will continue to spread both inside and outside the walls of this facility.

Allowing Defendants to maintain these conditions will cause Plaintiffs irreparable harm, and the balance of the equities and the public interest favor granting Plaintiffs their requested

relief. Injunctive relief is designed precisely for situations like this global pandemic.

> **D. Immediate injunctive relief in the form of a Rule 706 expert is a first step toward remedying Defendants' constitutional failings.**

To date, several courts have agreed that the risks posed by COVID-19 require jails and prisons around the country to implement changes far more significant than the minimal, and even counterproductive, measures Defendants have adopted.

Plaintiffs seek immediate, expert assistance to implement constitutionally required social distancing and hygiene practices at CoreCivic. Rule 706 experts can "assist the court in evaluating contradictory evidence about an elusive disease of unknown cause." *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999). And "under Ninth Circuit law, district courts enjoy wide latitude to make these appointments." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009). Other courts have appointed experts in similar circumstances. *See, e.g.*, *Stickney v. List*, 519 F. Supp. 617, 619 (D. Nev. 1981) (ordering Rule 706 expert to determine "whether or not said institution has met its obligation under the Eighth Amendment to the Constitution to furnish sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care and physical safety"); *Karsjens v. Jesson*, 6 F. Supp. 3d 958, 978 (D. Minn. 2014) (ordering Rule 706 expert to assess conditions at detention facility and crafting remedies therefrom). And an expert similarly is needed here.[5]

## III. CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court issue a temporary restraining order and a preliminary injunction as described in the accompanying Motion.

---

[5] Order, *Wilson v. Williams*, No. 20-3447 (6th Cir. May 4, 2020), ECF No. 23-2 (denying government's motion to stay district court's preliminary injunction directing government to evaluate medically vulnerable prisoners' "eligibility for transfer out of [the prison] by any means within two weeks"); Order, *Banks v. Booth*, No. 1:20-cv-00849-CCK (D.D.C. Apr. 20, 2020), ECF No. 50 (granting in part TRO sought by putative class of jail detainees alleging their conditions of confinement during COVID-19 pandemic violates their constitutional rights, and adopting recommendations of *amici curiae* experts who inspected jail to assess the risk of COVID-19 infection); Order, *Costa v. Bazron*, No. 1:19-cv-03185-RDM (D.D.C. May 1, 2020), ECF No. 68 (appointing experts, as *amici curiae*, to inspect the conditions inside a hospital and assess the risk of COVID-19 infection to people held through involuntary civil commitment).

Dated: May 8, 2020

**PERKINS COIE LLP**

By: /s/ Matthew R. Koerner
    Jean-Jacques Cabou (#022835)
    Matthew R. Koerner (#035018)
    Margo R. Casselman (#034963)
    Benjamin C. Calleros (#034763)
    PERKINS COIE LLP
    2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788

    Emma Andersson*
    eandersson@aclu.org
    Taylor Brown*
    tbrown@aclu.org
    Alejandro Ortiz*
    ortiza@aclu.org
    Chase Strangio*
    cstrangio@aclu.org
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    125 Broad St., 18th Fl.
    New York, New York 10004
    Telephone: 917-345-1742

    Somil Trivedi*
    strivedi@aclu.org
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    915 15th St., NW
    Washington, DC 20012
    Telephone: 202-715-0802

    Jared G. Keenan (#027068)
    jkeenan@acluaz.org
    Christine K. Wee (#028535)
    CWee@acluaz.org
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA
    3707 N. 7th Street, Suite 235
    Phoenix, AZ 85014

*Attorneys for Plaintiffs*
*Applications for *pro hac vice* forthcoming.

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on May 8, 2020, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of same to:

Kris Kline, Warden of the Central Arizona Florence Correctional Complex
 Kristopher.kline@corecivic.com
 publicaffairs@corecivic.com

David Gonzales, U.S. Marshal for the District of Arizona
 District of Arizona (D/AZ)
 U.S. Marshal: David Gonzales
 Sandra Day O'Connor U.S. Courthouse
 401 W. Washington St., SPC 64, Suite 270
 Phoenix, AZ 85003-2159
 David.Gonzales2@usdoj.gov

Donald W. Washington, Director of the U.S. Marshals Service
 District of Arizona (D/AZ)
 U.S. Marshal: Donald W. Washington
 Sandra Day O'Connor U.S. Courthouse
 401 W. Washington St., SPC 64, Suite 270
 Phoenix, AZ 85003-2159

Michael Carvajal, Director of the Federal Bureau of Prisons
 Two Renaissance Square 40 N. Central Avenue, Suite 1800
 Phoenix, AZ 85004-4449
 mcarvajal@bop.gov

<u>By: Jennifer McNamara</u>
Perkins Coie, LLP