1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Nicholas D. Acedo, Bar No. 021644
   Jacob B. Lee, Bar No. 030371
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona  85226
   Telephone:  (480) 420-1600
5  dstruck@strucklove.com
   rlove@strucklove.com
6  nacedo@strucklove.com
   jlee@strucklove.com
7
   *Attorneys for Defendant-Respondent Kris*
8  *Kline*

9  MICHAEL BAILEY
   United States Attorney
10 District of Arizona
   WILLIAM C. STAES
11 Assistant United States Attorney
   Illinois State Bar No. 6314835
12 40 North Central Avenue, Suite 1800
   Phoenix, AZ  85004-4449
13 Telephone:  (602) 514-7500
   Fax:  (602) 514-7693
14 William.Staes@usdoj.gov

15 *Attorneys for Defendants-Respondents*
   *David Gonzales, Donald Washington,*
16 *and Michael Carvajal*

17
                 **UNITED STATES DISTRICT COURT**
18
                      **DISTRICT OF ARIZONA**
19

20 Maria Guadalupe Lucero-Gonzalez, et al.,      NO. CV-20-00901-PHX-DJH (DMF)

21                    Plaintiffs-Petitioners,   **DEFENDANTS-RESPONDENTS'**
                                                **JOINT RESPONSE IN**
22            v.                                **OPPOSITION TO MOTION FOR**
                                                **TEMPORARY RESTRAINING**
23 Kris Kline, et al.,                          **ORDER AND PRELIMINARY**
                                                **INJUNCTION**
                      Defendants-Respondents.
24

25        Defendants-Respondents Kris Kline, Warden of the Central Arizona Florence

26 Correctional Complex ("CAFCC"); David Gonzales, U.S. Marshal for the District of

27 Arizona; Donald W. Washington, Director of the U.S. Marshals Service ("USMS"); and

28

Michael Carvajal, Director of the Federal Bureau of Prisons ("BOP"), by and through their undersigned counsel, submit this Joint Response in opposition to Plaintiffs-Petitioners' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2).[1]  For the following reasons, Petitioners' Motion should be denied.

## I.     Procedural Background and Relevant Facts.

### A.     Petitioners and Their Allegations.

Petitioners are five pretrial or post-conviction federal criminal detainees at the Central Arizona Florence Correctional Complex ("CAFCC").  (Dkt. 1, ¶¶ 19–23.)  CAFCC is owned and operated by CoreCivic, Inc., and houses federal criminal detainees pursuant to a service agreement with the United States Marshals Service.  (Bayless Decl., ¶¶ 5–6.)  The following summarizes each Petitioner's criminal case:[2]

Maria Guadalupe Lucero-Gonzalez, Case No. 4:19-cr-03359-JGZ-BGM-1 (related case 2:19-cr-00426-JGZ-BGM-1).  She is charged with illegal reentry of removed alien, in violation of 8 U.S.C. § 1326(a), enhanced by 8 U.S.C. § 1326(b).  After holding a bond hearing pursuant to 18 U.S.C. § 3142(f), the court ordered Ms. Lucero-Gonzalez detained, finding probable cause to believe that she has committed an offense and a serious risk that she will not appear.  On April 28, 2020, the court denied Ms. Lucero-Gonzalez's motion to review detention order.

Claudia Romero-Lorenzo, Case No. 4:20-cr-00171-JGZ-EJM-1.   She entered a guilty plea to one count of illegal reentry of removed alien, in violation of 8 U.S.C. §§ 1326(a), enhanced by 8 U.S.C. § 1326(b), which the court accepted on January 30, 2020.  Following a bond hearing pursuant to 18 U.S.C. § 3142(f), on February 4, 2020, the court ordered Ms. Romero-Lopez detained, finding probable cause to believe that she has

---

[1] There is no personal jurisdiction over Defendants-Respondents with respect to non-habeas subject matter jurisdiction and claims because there has been no service of process. In providing this court-ordered Response, they do not waive any available defenses.

[2] The Court may take judicial notice of the factual and procedural posture of each criminal case. *See Rosciano v. Sonchik*, 2002 WL 32166630, at *6 (D. Ariz. Sept. 9, 2002); Fed. R. Evid. 201.

committed an offense and a serious risk that she will not appear. The court reset her sentencing hearing for June 12, 2020, pursuant to General Order 20-17.

Tracy Ann Peuplie, Case No. 4:20-cr-00299-CKJ-DTF. She is charged in a four-count Indictment with conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; possession and intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); importation of methamphetamine into the United States from Mexico, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(1)(H); and conspiracy to import methamphetamine into the United States from Mexico, in violation of 21 U.S.C. § 963. Following a bond hearing pursuant to 18 U.S.C. § 3142(f), on January 30, 2020, the court ordered Ms. Peuplie detained, finding, among other things, that she presents a flight risk and danger to the public safety. The court granted her motion to continue trial until July 21, 2020.

James Tyler Ciecierski, Case No. 4:19-cr-03122-RM-LAB-1. He is charged in a one-count Indictment with bank robbery by force or violence, in violation of 18 U.S.C. § 2113(a). On December 3, 2019, Magistrate Judge D. Thomas Ferraro held a detention hearing and ordered Mr. Ciecierski released to a residential treatment facility subject to various conditions of release. Upon the Government's petition to revoke pre-trial release, alleging that Mr. Ciecierski had violated the conditions of his release, on April 1, 2020, Magistrate Judge Ferraro ordered him detained pending trial. The court affirmed that decision, finding, among other things, that Mr. Ciecierski presents a flight risk and he had not shown that release would mitigate the risk to his health posed by COVID-19 to overcome the factors set forth in 18 U.S.C. § 3142(g) weighing in favor of detention.

Marvin Lee Enos, Case No. 4:19-cr-02041-JAS-DTF. He is charged in a four-count Indictment with aggravated sexual abuse, in violation of 18 U.S.C. §§ 2241(a)(1), 2246(2)(A), and 1153, and assault with intent to commit aggravated sexual abuse, in violation of 18 U.S.C. §§ 113(a)(1) and 1153. Following a detention hearing on September 3, 2019, the court ordered Mr. Enos detained, finding, among other things, that he presents a flight risk and danger to the safety of other persons or the community. On April 30, 2020,

1   the court denied his emergency motion for reconsideration of detention in light of COVID-

2   19 and his alleged health conditions that place him at especially high risk from the virus.

3   Trial in his case is set for July 28, 2020.

4        Petitioners allege that the conditions of their confinement at CAFCC expose them to

5   "unreasonable risk of contracting COVID-19," in violation of their Fifth Amendment right

6   to due process and their Eighth Amendment right to be free from cruel and unusual

7   punishment.  (Dkt. 1, ¶¶ 45, 80–103.)  More specifically, they allege the following: up to

8   80 detainees share the same housing unit (pod); up to 14 detainees share the same cell, toilet,

9   and sink within each pod; "[s]ometimes" a detainee who is in quarantine is removed "by

10  mistake" and placed in general population before the end of the 14-day quarantine period;

11  detainees "frequently stand close together in lines when waiting for food at mealtime, for

12  medical appointments … and for the communal telephones"; Petitioners did not receive

13  masks until mid-April 2020 or not at all; detainees are not required to wear masks when in

14  the housing units or cells; staff are not consistently wearing masks or gloves; Petitioners

15  receive, only once per week, a small amount of soap and shampoo and are required to

16  purchase additional supplies from the commissary; the housing units and cells are not

17  "adequately and consistently" cleaned; only a "handful" of detainees have been tested for

18  COVID-19 or checked for symptoms; and detainees are not provided information regarding

19  COVID-19.  (*Id.*, ¶¶ 46–60.)  Petitioners also criticize Respondents' policy of "quarantining

20  groups of persons who are transferred to [CAFCC] on the same day."  (*Id.*, ¶ 61.)

21       Petitioners contend that Respondents "must address [the risk of contracting COVID-

22  19] by following public-health guidelines, including those by the Centers for Disease

23  Control and Prevention ('CDC')."  (*Id.*, ¶ 44.)  They seek a non-descript permanent

24  injunction that will "ensure" all detainees can "practice social (or physical) distancing at all

25  times" and "practice adequate hygiene"; "frequently touched surfaces" are "cleaned and

26  disinfected with disinfectant products effective against" COVID-19; every detainee and

27  staff member have access to "adequate personal protective equipment"; every detainee or

28  staff member "exposed to COVID-19" is quarantined in a non-punitive setting and tested

4

for COVID-19; Respondents "implement novel coronavirus testing procedures"; and, if all else fails, that the Court order Respondents to "release" an unstated number of detainees pursuant to a "writs of habeas corpus." (*Id.* at 26–27.)

**B.     The Extensive Measures Taken by Respondents to Protect Detainees and Staff at CAFCC from Exposure to COVID-19.**

The aforementioned allegations derive from the Declarations of the five Petitioners, none of which are signed under penalty of perjury by the Petitioners themselves, and one Assistant Federal Public Defender, who admittedly has no personal knowledge of the conditions at CAFCC (Dkt. 1-3, ¶ 25). Petitioners' allegations do not reflect *at all* the reality of what is actually happening at CAFCC or the significant efforts and measures Respondents have taken in response to COVID-19 to safeguard the health and well-being of inmates and detainees in their care at CAFCC. (*See* Declarations of Acting Chief Deputy Bayless, Dr. Ivens, and Warden Kline.)

CAFCC has a total design capacity of 5,003 detainees, including 3,110 USMS detainees, who are housed across 15 units of varying layouts and designs, including traditional two-person cells and larger cells housing 14–16 detainees. (Kline Decl., ¶¶ 9–11.) As of May 13, 2020, CAFCC was operating at 62% of its design capacity, with 3,090 total detainees and 3,045 USMS detainees. (*Id.*, ¶ 13.) New intakes have decreased from an average of 100 per day to an average of five per day since March 19, 2020, and the total detainee population at CAFCC has decreased by approximately 1,300 in that same timeframe. (*Id.*, ¶ 14.)

As of May 13, 2020, only 15 detainees at CAFCC—less than 0.5% of the total population—have tested positive for COVID-19. (*Id.*, ¶¶ 13, 15.) More importantly, only one positive test has come out of CAFCC's general population; 13 were new intakes identified during their initial 14-day cohort period, and one was confirmed positive at another facility before being transferred to CAFCC. (*Id.*, ¶¶ 16–17, 62.)

This low infection rate is due to CAFCC's prompt and coordinated efforts to comply with CDC Interim Guidance regarding COVID-19 in correctional and detention facilities

beginning as early as February 2020.  (*Id*., ¶¶ 20–135.)  Since the beginning of the pandemic, CoreCivic has coordinated with facility leadership to implement protocols consistent with CDC guidelines, which have been adapted by CAFCC leadership based on the facility's unique detainee population, physical plant, and safety and security concerns.  (*Id*., ¶¶ 20–25, 28–30; *see also* Ivens Decl., ¶¶ 11–13.)  CAFCC Warden Kline has also been in continual contact with USMS, ICE, and the City of Mesa—all of whom have detainees at CAFCC—as well as the Pinal County Public Health Services District and other local government bodies and officials to coordinate CAFCC's response.  (Kline Decl., ¶¶ 26-27; Ivens Decl., ¶¶ 11–13; Bayless Decl., ¶¶ 9–11.)

### 1.     Cohort/Quarantine Strategies.

CAFCC is constantly reviewing and adapting its contingency plans as circumstances and guidelines evolve.  (*Id*., ¶¶ 31–32.)  Beginning March 19, 2020, CAFCC has been cohorting new arrivals and detainees returning from outside transports for 14 days based on their intake/facility return date in order to minimize the risk that these detainees may bring COVID-19 into the facility.  (*Id*., ¶¶ 33–40; Ivens Decl., ¶ 20.)  While they are cohorted, detainees are housed individually as much as possible.  (Kline Decl., ¶ 37.)  They are only allowed to be out of their cells with other detainees from their own cohort group, and the dayroom and other common areas are sanitized between groups with a disinfectant registered by the EPA as effective against COVID-19.  (*Id*., ¶ 39.)

Any allegations that CAFCC is allowing healthy detainees to be exposed to symptomatic detainees are false.  (*Id*., ¶¶ 45-46; Ivens Decl., ¶¶ 22–23.)  Detainees who display symptoms of COVID-19 are quarantined in J Pod pending medical assessment and testing as directed by medical staff, and the detainee's pod in placed on quarantine status for 14 days.  (Kline Decl., ¶ 41.)  Symptomatic detainees are transported from their pod to J Pod via facility transport vehicle, which is disinfected before and after each use.  (*Id*., ¶ 42.)  They remain in J Pod until they are symptom-free for 72 hours, then they are cohorted for an additional 14 days before they return to a general population ("GP") pod.  (*Id*., ¶¶ 43–44.)

Staff entering a cohort or quarantine area observe strict PPE requirements, including a full suit/coveralls, rubber boots, gloves, N-95 mask, and goggles/face shield.  (*Id.*, ¶ 47.) Upon exiting, staff proceed through a decontamination zone where their PPE is sanitized or disposed of as appropriate, and where they practice appropriate hygiene.  (*Id.*, ¶¶ 48–49.)

Cohorting and quarantining are not punitive measures.  (*Id.*, ¶ 50.)  Detainees in these statuses are provided the same opportunities and services as they would receive in GP.  (*Id.*, ¶¶ 50–51, 58–60.)

On March 18, 2020, CAFCC identified 67 detainees at higher risk of severe illness based on CDC guidelines, and it updates that list regularly as new detainees are booked into CAFCC and others are transferred or released.  (*Id.*, ¶ 52.)  CAFCC monitors the detainees on that list and ensures they continue to receive medical care for their underlying conditions, but does not cohort them in order to avoid inadvertently exposing them to COVID-19.  (*Id.*, ¶¶ 53–56.)  As of May 13, 2020, none of these higher-risk detainees have been exposed or suspected of being exposed to COVID-19, and none have tested positive.  (*Id.*, ¶ 57.)

**2.      Efforts to Mitigate Risk of Introduction/Spread of COVID-19.**

Consistent with CDC guidelines, CAFCC has taken ample and appropriate steps to reduce COVID-19 exposure and infection for detainees and staff.  (*Id.*, ¶ 61.)  CAFCC's low infection numbers are a testament to the success of these efforts.  (*Id.*, ¶ 62.)

CAFCC suspended social visitation and volunteer entry on March 12, 2020.  (*Id.*, ¶ 63.)  Legal visitation has not been suspended, but non-contact visitation, including through the use of telephones or the facility video teleconferencing ("VTC") system is encouraged. (*Id.*, ¶¶ 64, 66.)  If an attorney requests a contact visit, the visitation area is sanitized before and after the visit.  (*Id.*, ¶ 65.)  The VTC system is also used for various court appearances, as CAFCC does not currently transport detainees for in-person court hearings due to restrictions imposed by the District of Arizona.  (*Id.*, ¶¶ 67–68.)

All persons entering the facility are subject to screening consisting of a series of questions and a temperature check.  (*Id.*, ¶¶ 69–75, 77.)  All entrants are required to wear a mask, and staff conducting the screening wear full PPE, including coveralls, gloves, N-95

mask, and face shield, and social distancing measures are employed. (*Id.*, ¶¶ 70–73.) CAFCC employs contact tracing to identify any additional employees or detainees who may require additional surveillance, precautions, or testing in order to minimize the spread of COVID-19 within the facility after an employee or detainee tests positive or is denied entry to the facility. (*Id.*, ¶¶ 75–76.)

CAFCC has also limited detainee movement within and outside of the facility, and requires detainees to wear face masks any time they leave their pod. (*Id.*, ¶¶ 78–80.) All non-urgent transports for outside medical consults have ceased, and those detainees who are transported are screened before transport and cohorted for 14 days when they return. (*Id.*, ¶¶ 79–80.)

CAFCC began increasing its stock of PPE and sanitation supplies in February, and has plenty of supplies on-hand. (*Id.*, ¶¶ 81–82, 106.) CAFCC has always required staff to wear gloves when interacting with detainees, their cells, and their personal property as part of universal precautions. (*Id.*, ¶ 83.) And CAFCC continues to adjust its policies and procedures as circumstances evolve, such as with regard to the wearing of face masks by persons who are well, which the CDC only recently began recommending. (*Id.*, ¶¶ 84–89.) Staff have been permitted to wear a cloth or paper face mask since April 11, 2020, and CAFCC distributed paper face masks to detainees on April 13, 2020, and again on May 11, 2020. (*Id.*, ¶¶ 87–89.) The masks were provided at no cost to the detainees, and will be replaced as needed and requested. (*Id.*, ¶¶ 88–89.)

Detainees are encouraged to wear masks inside their housing pods, but CAFCC does not enforce the failure to do so as a rules violation for various safety, security, and operational concerns. (*Id.*, ¶¶ 90–91.) As noted above, however, they are required to wear them to leave the pod for any reason. (*Id.*, ¶ 78.) Detainees participating in the facility Voluntary Work Program ("VWP") as pod porters, kitchen workers, commissary workers, and laundry workers are provided with masks, gloves, and other appropriate equipment. (*Id.*, ¶¶ 92, 103, 120.)

### 3.     Staff and Detainee Education.

CAFCC has long trained its staff with respect to exposure to pathogens, preventing the spread of disease, emergency response, and adherence to universal precautions.  (*Id*., ¶ 93.)   Consistent with CDC guidelines, CAFCC has posted educational materials throughout the facility and in all housing units regarding COVID-19 symptoms, what to do if you are sick, hand-washing, sanitation and cleanliness, mask use, and steps to reduce the risk of exposure.  (*Id*., ¶ 94.)   Unit staff also hold regular town halls meetings each time procedures change, resulting in these meetings occurring once or twice per week on average, all of which are documented in written Town Hall Meeting Records that are posted in the housing units as well.  (*Id*., ¶¶ 95–96.)   Town hall meetings in recent weeks have covered such topics as the issuance and use of face masks, the number of infected persons at the facility, and social distancing strategies.  (*Id*., ¶ 96.)  During these town hall meetings, staff regularly remind detainees to maintain appropriate social distances, and staff are always available to answer questions or respond to detainees' concerns.  (*Id*., ¶¶ 97–98.)

### 4.     Maintaining Social Distancing.

CAFCC has implemented practices to promote social distancing.  (*Id*., ¶ 99.)  The dayroom areas of CAFCC's housing pods are large and allow ample space for detainees to practice social distancing, and they are regularly advised of the importance of doing so.  (*Id*., ¶¶ 100–101.)  Although they are encouraged to practice social distancing within their pods, CAFCC does not enforce the failure to do so for various safety, security, and operational concerns.  (*Id*., ¶ 104.)

CAFCC has not eliminated programming, but has reduced it by limiting activities to groups of less than 10 to comply with applicable guidelines and to allow six feet of social distancing.  (*Id*., ¶ 102.)  Additionally, CAFCC used a satellite feeding procedure long before COVID-19 in which meals are delivered to the housing units rather than having the detainees come to a dining hall.  (*Id*., ¶ 103.)  Kitchen workers wear appropriate PPE, and detention officers inside the pod remind detainees to practice appropriate social distancing while they wait in line for their meal.  (*Id*.)  Once they receive their trays, detainees are

permitted to eat wherever they would like within the pod, such as at the dayroom tables or in their cells, in order to further facilitate social distancing.  (*Id.*)

### 5.     Enhanced Sanitation Procedures.

Consistent with CDC guidelines, CAFCC has enhanced its already robust sanitation practices in response to COVID-19.  (*Id.*, ¶ 105.)  CAFCC checks and restocks its inventory of cleaning chemicals and supplies, which it began increasing in February 2020, every day to maintain a sufficient supply on hand and to guard against shortages in the public market, and has updated and enhanced its facility housekeeping plan to specifically include the use of EPA-registered disinfectants and use of PPE in areas where COVID-19 might be present.  (*Id.*, ¶¶ 106–107.)  CAFCC staff also instruct detainees on proper sanitization of common area surfaces before and after each use, such as telephones and kiosks, and provides detainees with ample supplies to do so, including HDQC2, which has been confirmed by the EPA as effective against COVID-19.  (*Id.*, ¶¶ 108–114.)  Detainees are also provided two bars of soap and a bottle of shampoo/body wash each week, and will be provided replacements if they run out before the weekly distribution.  (*Id.*, ¶ 109.)  Any allegations that detainees are not provided sufficient cleaning supplies or soap are false.  (*Id.*, ¶¶ 110, 114.)  In April 2020 alone, CAFCC distributed approximately 27,960 bars of soap and 13,980 bottles of shampoo/body wash free of charge to detainees.  (*Id.*, ¶ 110.)

CAFCC has divided the facility into zones and assigned a staff supervisor to each zone who is tasked with verifying that all hard-surface, high-touch areas in their zone are cleaned and disinfected multiple times per day on a regular schedule.  (*Id.*, ¶ 115.)  Detainees performing these tasks are given masks and gloves.  (*Id.*)  Each housing pod also has 10-20 detainee pod porters who are assigned to clean the common areas, including hard-surface, high-touch areas, at various times during the day.  (*Id.*, ¶ 116.)  Between the two activities, high-touch hard surfaces are cleaned and disinfected at least once per hour.  (*Id.*)  CAFCC has also made changes to employee time clock procedures, and requires that mattresses, library books and carts, commissary and meal carts, library kiosks, laundry, and medical areas are cleaned and disinfected frequently.  (*Id.*, ¶¶ 117–121.)  When cleaning an area

where a confirmed COVID-19-positive detainee was housed, staff wear full PPE, treat any trash coming out of such units as medical waste, and follow strict Environmental Cleaning and Disinfection Recommendations.  (*Id*., ¶¶ 122–123.)  CAFCC also cleans and disinfects all transport vehicles before and after each use, and requires the use of masks and proper personal hygiene for staff and detainees.  (*Id*., ¶ 124.)

### 6. Restrictive Housing Units.

The RHU houses detainees in administrative or disciplinary detention.  (*Id*., ¶ 125.) Detainees in the RHU are housed individually as much as possible, remain in their cells for up to 23 hours per day with limited interaction with other detainees, receive their meals in-cell, and typically recreate alone in single-occupancy enclosures, meaning they are already in a semi-quarantined state.  (*Id*., ¶¶ 126–128.)[3]  Detainees in the RHU have been provided paper masks, and have been educated on appropriate hand-washing, hygiene, and cleanliness per CDC Interim Guidance.  (*Id*., ¶¶ 130–131.)  Additionally, pod porters assigned to the RHU perform the same enhanced sanitation practices described above, including regular deep cleanings of the unit, and detainees in the RHU are provided cleaning and disinfecting supplies as described above to clean their cells.  (*Id*., ¶ 131.)

### 7. Conditions of Confinement in Housing Pods.

Petitioners are currently assigned to Pods 900C, 1100A, 1100B, 1100F, and 1200C; Unit 900 is the RHU.  (*Id*., ¶ 132.)  The dayrooms of these pods are large, and allow ample space for detainees to practice proper social distancing.  (*Id*., ¶ 133.)  Detainees in these pods—as in all pods throughout the facility—are regularly advised of the importance of wearing face masks and social distancing when outside of their cells.  (*Id*., ¶ 134.)  All facility-wide COVID-19 response operations described above are in place for these pods as well.  (*Id*., ¶ 135.)

---

[3] Staff check on detainees in the RHU every 30 minutes; medical staff make rounds twice each day, and mental health staff make daily rounds; and detainees are given the opportunity to participate in weekly Segregation Committee meetings. (*Id*., ¶ 129.)

**C.   Petitioners' Motion for Preliminary Injunction.**

Petitioners' Motion for Preliminary Injunction seeks an order appointing a Rule 706 expert to inspect CAFCC and review "whether Defendants have implemented consistent social (or physical) distancing, novel coronavirus testing procedures, and hygienic practices sufficient to reasonably protect [them] from contracting COVID-19." (Dkt. 2-1, ¶ 1.)  The appointed expert must do this within 48 hours of granting Petitioners' request and, if the expert concludes that the practices at CAFCC are inadequate, the expert must submit (within 24 hours of the review) recommendations "as to how such practices should be achieved." (*Id.*, ¶¶ 2–3.)   Respondents "shall" then implement the expert's recommendations "immediately," provide weekly updates on their progress, and "complete the implementation within the timeline established by the expert," unless good cause is shown. (*Id.*, ¶ 4.)

**II.   Standard of Review.**

"The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964).  Because an injunction is "an extraordinary remedy," it "may only be awarded upon a *clear* showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).  Petitioners must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  Alternatively, "serious questions going to the merits and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  This is a "heavy burden." *Center for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015).

**III.    Petitioners Have Failed to Make a Clear Showing That They Are Entitled to a Preliminary Injunction.**

    **A.    Petitioners Have Not Established That They Are Likely to Succeed on the Merits of Their Claims.**

"Likelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry, [the Court] need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (internal quotations and citation omitted).  A court may deny a preliminary injunction if the request involves "doubtful and difficult questions of law or disputed questions of fact," *Dymo*, 326 F.2d at 143, or if there are "material disputed issues of fact which cast reasonable doubt upon the certainty of plaintiff's prevailing at a trial on the merits," *Knudsen Corp. v. Ever-Fresh Foods, Inc.*, 336 F. Supp. 241, 248 (C.D. Cal. 1971).  The substantial evidence recounted in Section II.B—particularly when compared to the unsworn Declarations of the five Petitioners—forecloses any conclusion that Petitioners have clearly shown that they are likely to succeed on the merits of their claims.

    **1.    Petitioners did not exhaust their administrative remedies.**

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under … any … Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion … is mandatory.").  The PLRA's mandatory exhaustion requirement applies equally to pretrial criminal detainees, 42 U.S.C. § 1997e(h), and, indeed, "all inmate suits about prison life[.]" *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion requires compliance with "all steps" of the facility's grievance system. *Woodford*, 548 U.S. at 88, 90–91.  Strict compliance is necessary so that officials are alerted to "the nature of the wrong for which redress [is] sought" and can "take corrective action where appropriate." *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (quoting *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), and citing *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016)).

Claims that were not properly and fully exhausted prior to filing suit are barred. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *McKinney v. Carey*, 311 F.3d 1198, 1199–1201 (9th Cir. 2002). "This exhaustion obligation is mandatory—there are no 'futility or other judicially-created exceptions to the statutory exhaustion requirements." *Valentine v. Collier*, 956 F.3d 797, __ (5th Cir. 2020) (quoting *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)). Nor is a detainee or inmate excused from complying with a facility's grievance process because of the "special circumstances of the COVID-19 crisis." *Id.*; *see also Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *3 (5th Cir. Apr. 27, 2020).

Here, CAFCC has a specific grievance process. (Partain Decl., ¶¶ 7–32.) None of the Petitioners, however, have exhausted that process. (*Id.*, ¶¶ 33–60.) Their unsworn, uncorroborated, and vague assertions that they submitted grievances that went unanswered are controverted by evidence that they did not. They have also not established that the process was unavailable to them. *See Ross v. Blake*, 136 S. Ct. 1850, 1853–54, 1859–60 (2016) (articulating only three circumstances). Because Petitioners have not exhausted their administrative remedies, which is a threshold issue, they *cannot* succeed on the merits of their claims and the Court should deny their motion for preliminary relief. *See Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *7 (11th Cir. May 5, 2020); *see also United States v. Tomlinson*, 2020 WL 1935522, at *1 (D. Ariz. Apr. 22, 2020) (denying federal prisoner's request for an early release in light of COVID-19 where he failed to exhaust administrative remedies in strict compliance with 18 U.S.C. § 3582(c)(1)(A)(i)). Even if there were a disputed fact as to exhaustion, that dispute precludes a "clear showing" that they are likely to succeed.

### 2. Petitioners have not clearly shown that they will likely succeed on their Eighth Amendment claim.

Petitioners' Second Claim for Relief alleges unconstitutional conditions of confinement in violation of the Eighth Amendment. (Dkt. 1, ¶¶ 93–103.) An Eighth Amendment conditions-of-confinement claim alleging involuntary exposure to an environmental hazard "requires an inmate to prove both an objective and a subjective

factor." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019).  The objective component requires the inmate to show an "objectively intolerable risk of harm," *Farmer v. Brennan*, 511 U.S. 825, 846 (1994), i.e., the challenged conditions present an "unreasonable risk of serious damage to his future health," *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  The subjective component requires the inmate to show that the prison official acted with "deliberate indifference," which means the official "knows of and disregards an excessive risk to inmate health or safety, *Farmer*, 511 U.S. at 837.  In other words, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  Even if a prison official "actually knew of a substantial risk to inmate health or safety," a petitioner cannot show deliberate indifference where the official "reasonably responded to the risk, even if the ultimate harm was not averted."  *Id.* at 844–45 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause.").

Here, Petitioners merely assert that the "risk of harm [posed by COVID-19] is obvious" and that the measures Respondents have taken are "objectively unreasonable."  This truncated and conclusory analysis—of both the objective and subjective prongs—is woefully insufficient to establish an Eighth Amendment violation, much less "clearly" show that Petitioners are likely to succeed on the merits of their claim.  "There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates." *Valentine*, 956 F.3d 797, ___.  But the "legal question is whether the Eighth Amendment requires [Respondents] to do more" than what they have already done.  *Id.*; *see also Marlowe*, 2020 WL 2043425, at *2.  Petitioners insist that Respondents must comply with CDC guidelines and other unspecified public-health standards.  But as discussed above, Respondents *are* complying with CDC guidelines, which are legally sufficient.  *See Valentine*, 956 F.3d 797, ___ ("Plaintiffs have cited no precedent holding that the CDC recommendations are insufficient to satisfy the Eighth Amendment."); *see also Marlowe*, 2020 WL 2043425, at *2 n.2 (noting that the warden's declaration "blunts many (if not all) of Plaintiffs' concerns, giving us further cause to doubt that Plaintiff has

1    come close to satisfying the 'extremely high burden' of deliberate indifference"); *Swain*,

2    2020 WL 2043425 at *5 (same).

3        Petitioners also impermissibly "collapse[] the objective and subjective components

4    of the Eighth Amendment inquiry established in *Farmer*, treating inadequate measures as

5    dispositive of [Respondents'] mental state." *Valentine*, 956 F.3d 797, ___; *see also*

6    *Marlowe*, 2020 WL 2043425, at *3 (condemning district court's treatment of inadequate

7    measures as dispositive of defendant's mental state, and noting that "an increase in infection

8    rate alone is insufficient to prove deliberate indifference").  General awareness of the

9    dangers posed by COVID-19 is not enough.  *Id.*  Nor is an allegation that social-distancing

10   policies are not uniformly enforced.  *Swain*, 2020 WL 2161317, at *5.  Only if Respondents

11   disregarded known dangers can they be considered deliberately indifferent.  *See id.* at *4

12   (no deliberate indifference where prison officials did not subjectively believe that the

13   measures they were taking were inadequate).  Here, the evidence shows that Respondents

14   "ha[ve] taken and continue[] to take measures—informed by guidance from the CDC and

15   medical professionals—to abate and control the spread of virus."  *Id.*  At a minimum, their

16   response has been reasonable and any "disagreement" does not render them indifferent.  *Id.*;

17   *see also Swain*, 2020 WL 2161317, at *4 (holding that the "inability to 'achieve meaningful

18   social distancing'" does not evince a reckless state of mind); *Marlowe*, 2020 WL 2043425,

19   at *2 n.2 ("Defendants point to a plethora of measures they are taking to abate the risks

20   posed by COVID-19…").

21       On this record, Petitioners have not established that they are likely to prove an Eighth

22   Amendment violation.  *See Grinis v. Spaulding*, 2020 WL 2300313, at *1, 4 (D. Mass. May

23   8, 2020) (denying BOP inmates' motion for a preliminary injunction requiring respondents

24   to "comply with CDC guidelines and best practices to prevent the spread of COVID-19,

25   including, without limitation, by reducing the prisoner population at FMC Devens

26   sufficiently to permit effective social distancing").

27

28

### 3.   Petitioners have not clearly shown that they are likely to succeed on their Fifth Amendment claim.

Petitioners contend that the objective deliberate indifference standard set forth in *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), applies to their Fifth Amendment due process claims. (Dkt. 2 at 14–15.)  Under that standard, a plaintiff must establish that "the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined" and "did not take reasonable available measures to abate" a "substantial risk of suffering serious harm" where "a reasonable official in the circumstances would have appreciated the high degree of risk involved." *See Gordon*, 888 F.3d at 1125.  Moreover, "the defendant's conduct must be objectively unreasonable," which requires the plaintiff to prove "more than negligence but less than subjective intent — something akin to reckless disregard," and which "turn[s] on the facts and circumstances of each particular case." *Id.* (internal quotations and citation omitted).

Even assuming the objective standard applies,[4] Petitioners are still unlikely to succeed on the merits because the significant measures that Respondents have implemented at CAFCC in response to COVID-19 show, *at the very least*, that Respondents have not recklessly disregarded the health and safety of inmates and detainees in their care. Petitioners' bald assertions that Respondents have not taken reasonable measures is belied by the record, as set out above in Section I.B.  It is also belied by their request for a Rule 706 expert to "determine *whether* Defendants have implemented" adequate measures. (Dkt. 2-1 at 1–2, emphasis added.)  Moreover, Petitioners have failed to establish that, in light of those substantial precautionary measures Respondents have implemented, they *are* at substantial risk of contracting COVID-19.  Less than 0.5% of the total detainee population have tested positive for COVID-19. (Kline Decl., ¶¶ 13, 15.)  Petitioners' Declaration from

---

[4] Respondents do not concede the objective deliberate indifference standard applies to Petitioners' garden-variety conditions of confinement claims but assume it applies solely for purposes of this Response. *See, e.g.*, *Bulltail v. Yellowstone Cty. Judge Det. Facility*, 2018 WL 3421375, at *2 (D. Mont. June 28, 2018) (noting "the Ninth Circuit has not expressly extended the objective deliberate indifference standards to all conditions of confinement claims").

1   Dr. Goldenson is refuted by the Declaration of Dr. Ivens (¶¶ 17, 22, 24, 26, 33–34).  In

2   addition, they cannot point to any intentional decision that has caused any risk of harm.

3   Even the failure to implement particular measures is not an "intentional decision."  *See*

4   *Moriarty v. Cty. of San Diego*, 2019 WL 4643602, at *10 (S.D. Cal. Sept. 24, 2019) (ruling

5   that the "failure to appreciate that he was suicidal was not an 'intentional decision'" under

6   the objective-reasonableness test).

7        Petitioners alternatively argue that the conditions in CAFCC amount to pre-

8   adjudication punishment because of its "refusal to facilitate social distancing as needed to

9   prevent further spread of COVID-19."  (Dkt. 2 at 16.)  Petitioners cannot dispute that their

10   detention serves "a permissible nonpunitive objective."  *Bell v. Wolfish*, 441 U.S. 520, 561

11   (1979).  The premise of their argument—that CAFCC is refusing to take reasonable

12   measures—is simply incorrect and ignores the many measures that are currently in place to

13   prevent the spread inside the facility.  At a minimum, those measures—which meet or

14   exceed CDC guidelines—are a reasonable response to COVID-19.

15          **4.**      **Petitioners cannot seek release from detention in a Habeas action**

16                  **but instead pursue relief under the Bail Reform Act and Prison Litigation Reform Act.**

17        The PLRA precludes this Court from ordering Petitioners' request for release from

18   detention and reduction of detainee population.  (Dkt. 1, Prayer for Relief, ¶ 6.)  Congress

19   enacted the PLRA to "revive the hands-off doctrine," which was "a rule of judicial

20   quiescence derived from federalism and separation of powers concerns[,]" in order to

21   remove the federal judiciary from day-to-day prison management.  *Gilmore v. California*,

22   220 F.3d 987, 991, 996–97 (9th Cir. 2000) (ref. 141 Cong. Rec. S14418, at S14418-19

23   (1995); H.R. Rep. No. 104-378, at 166 (1995); and H.R. Rep. No. 104-21, at 24 n.2 (1995)).

24   The PLRA "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999,

25   and, "[b]y its terms . . . restricts the circumstances in which a court may enter an order 'that

26   has the purpose or effect of reducing or limiting the prison population,'" *Brown v. Plata*,

27   563 U.S. 493, 511 (2011).  The PLRA's "requirements ensure that the 'last remedy' of a

28   population limit is not imposed 'as a first step.'"  *Id*. at 514 (quoting *Inmates of Occoquan*

18

1   *v. Barry*, 844 F.2d 828, 843 (D.C. Cir. 1988)).  "The release of prisoners in large numbers

2   . . . is a matter of undoubted, grave concern."  *Plata*, 563 U.S. at 501.

3       By its terms, the PLRA places strict limits on a district court's ability to order the

4   release of inmates "in any civil action with respect to prison conditions," and expressly

5   precludes a single district judge from doing so.  18 U.S.C. § 3626(a)(3)(B).  That prohibition

6   applies to "any civil proceeding arising under Federal law with respect to the conditions of

7   confinement or the effects of actions by government officials on the lives of persons

8   confined in prison, but does not include habeas corpus proceedings challenging the fact or

9   duration of confinement in prison[.]"  18 U.S.C. § 3626(g)(2).  In non-prohibited suits, the

10   court "may enter a temporary restraining order or an order for preliminary injunctive relief,"

11   but such injunctive relief "must be narrowly drawn, extend no further than necessary to

12   correct the harm the court finds requires preliminary relief, and be the least intrusive means

13   necessary to correct that harm."  18 U.S.C. § 3626(a)(2).  Moreover, "[t]he authority to

14   release prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a

15   power reserved to a three-judge district court, not a single-judge district court."  *Plata*, 563

16   U.S. at 500 (citing 18 U.S.C. § 3626(a)); *see* 18 U.S.C. § 3626(a)(3)(B).  And a three-judge

17   court may not enter such an order unless "(i) a court has previously entered an order for less

18   intrusive relief that has failed to remedy the deprivation of the Federal right sought to be

19   remedied through the prisoner release order; and (ii) the defendant has had a reasonable

20   amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A).

21       Here, there can be no dispute that Petitioners' lawsuit is a "civil action with respect

22   to prison conditions" governed by the PLRA.  Although Petitioners invoke habeas corpus

23   and 28 U.S.C. § 2241, (Dkt. 1 at ¶¶ 17, 18), this is not a "habeas corpus proceeding[]

24   challenging the fact or duration of confinement in prison."  18 U.S.C. § 3626(g)(2). Indeed,

25   a plain reading of the Complaint shows that Petitioners do not challenge the fact or duration

26   of their detention but instead challenge the conditions of their confinement at CAFCC as

27   inadequate to address the threat to health and safety posed by COVID-19.  (Dkt. 1, ¶¶ 10,

28   15, 80–103.)  Thus, this case is a "civil proceeding arising under Federal law with respect

1   to the conditions of confinement or the effects of actions by government officials on the

2   lives of persons confined in prison" governed by the PLRA.  18 U.S.C. § 3626(g)(2).

3       The PLRA strictly limits the relief this Court may grant.  Under the PLRA, a single

4   district court judge may not enter "a prisoner release order," § 3626(a)(3)(B), which is

5   broadly defined to "include[ ] any order, including a temporary restraining order or

6   preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison

7   population, or that directs the release from or nonadmission of prisoners to a prison[.]"  18

8   U.S.C. § 3626(g)(4).  Therefore, to the extent Petitioners seek an order or injunction that

9   would require Respondents to "release" an unstated number of class members "from

10  confinement" (Dkt. 1, Prayer for Relief, ¶ 10), the PLRA precludes that relief.  Moreover,

11  courts have held that habeas is an inappropriate collateral attack when detainees can seek

12  release in their pending criminal cases, as Petitioners can here. *Reese v. Warden*

13  *Philadelphia FDC*, 904 F.3d 244, 246–48 (3d Cir. 2018); *Medina v. Choate*, 875 F.3d 1025,

14  1029 (10th Cir. 2017); *Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995);

15  *Fassler v. United States*, 858 F.2d 1016, 1017–19 (5th Cir. 1988).

16      As another district court recently recognized, although "the issue of inmate health

17  and safety is deserving of the highest degree of attention," an "order imposing a court-

18  ordered and court-managed 'process' for determining who should be released" from a state

19  prison in response to the COVID-19 pandemic falls "squarely within Section 3626(a)(3) –

20  which forbids this Court from granting it."  *Money v. Pritzker*, 2020 WL 1820660, at *13

21  (N.D. Ill. Apr. 10, 2020).  "[T]he release of inmates requires a process that gives close

22  attention to detail, for the safety of each inmate, his or her family, and the community at

23  large demands a sensible and individualized release plan – especially during a pandemic."

24  *Id*. at *1.  Individual motions pursuant to the Bail Reform Act ("BRA"), under which a

25  person charged with an offense may be released or detained pending trial, 18 U.S.C.

26  § 3142(a), and which requires the court to "take into account the available information

27  concerning," inter alia, "the history and characteristics of the person, including . . . the

28  person's . . . physical and mental condition" in making that determination, allows judges to

undertake that "inherently inmate-specific inquiry," *id*. at *2, and are the proper legal vehicle for Petitioners to attempt to obtain release due to health risks posed by the COVID-19 pandemic.  *See*, *e.g.*, *Alvarez v. Larose*, 2020 WL 2315807, at *1 (S.D. Cal. May 9, 2020) (holding "the PLRA applies to Plaintiffs' claims and divests the Court of authority to grant" their "release"); *Plata v. Newsom*, 2020 WL 1908776, at *1 (N.D. Cal. Apr. 17, 2020) (similar).  Moreover, Petitioners have all made appearances in BRA hearings, already heard by other courts in this district, with one district court denying Petitioner Enos's contention that his continued pretrial confinement deprives him of adequate medical care and constitutes punishment in violation the Fifth Amendment—i.e., the same claims that Petitioners raise here.

### B.     Petitioners Have Not Established That They Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Injunctive Relief.

A plaintiff seeking a preliminary injunction bears the burden of demonstrating that irreparable harm is likely in the absence of such relief.  *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  "Speculative injury cannot be the basis for a finding of irreparable harm," *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007), rather a movant "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm," *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014).  As one leading commentator has explained, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that … the applicant is likely to suffer irreparable harm" in the absence of such relief.  C. Wright, A. Miller & M. Kane, 11A Fed. Practice and Procedure § 2948.1 (3d ed.).

Petitioners contend that the "risk of illness or death is not theoretical" (Dkt. 2 at 17), but that is not enough. "There is no doubt that COVID-19 poses risks of harm to all Americans." *Valentine*, 956 F.3d 797, __. "But the question is whether Plaintiffs have shown that they will suffer irreparable injuries even after accounting for the protective measures in [CAFCC]." *Swain*, 2020 WL 2161317, at *5; *Valentine*, 956 F.3d 797, __.

21

Petitioners do not even attempt to make that showing for them individually, instead only generally asserting that everyone is at risk of infection unless they are granted relief.  But the relief they seek—a court-appointed expert to determine *whether* they are at risk or not— is proof that their claims are merely speculative.  Moreover, it is important to note that the preliminary relief Petitioners seek is appointment of a Rule 706 expert.  Petitioners will not suffer irreparable harm in the event the Court denies their requested relief, which it should for the reasons explained herein, including that appointing a Rule 706 expert is premature at this early stage in the litigation, because Plaintiffs can renew their request a more appropriate time.  Nowhere in their Motion do Petitioners even attempt to explain how they will suffer irreparable harm in the absence of an order appointing a Rule 706 expert.  Thus, they have failed to establish this factor as well.  *See Bean v. Pearson Educ., Inc.*, 2011 WL 1211684, at *1 (D. Ariz. Mar. 30, 2011) (citing *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)) ("[I]rreparable harm is the 'single most important prerequisite' for a preliminary injunction to issue.").

### C.   The Balance of Equities Does Not Favor a Preliminary Injunction, Nor Is a Preliminary Injunction in the Public Interest.

Because the government is opposing the preliminary injunction, the remaining two factors—balance of harms and the public interest—merge.  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  Both weigh sharply against an injunction.

Petitioners seek a preliminary injunction that is boundless in scope and will effectively result in a facility czar who will dictate the government's COVID-19 response at CAFCC.  It requires the immediate implementation of recommendations by an appointed expert 72 hours after an order granting the injunction, weekly progress reports, and completion within the timeframe set by the expert.  (Dkt. 2-1.)  But "[p]rison administration is … a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint."  *Turner v. Safley*, 482 U.S. 78, 85 (1987).  Because of that delegation of responsibility, "judges … must defer to prison officials' expert judgments."  *Norwood v. Vance*, 591 F.3d 1062, 1066–

67 (9th Cir. 2010); *see also LeMaire v. Maass*, 12 F.3d 1444, 1454 (9th Cir. 1993) (recognizing the "limited competence of federal judges to micromanage prisons"). Indeed, the Supreme Court has cautioned that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," and therefore prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security." *Bell*, 441 U.S. at 547; *see also Whitley v. Albers*, 475 U.S. 312, 322 (1986) (noting that this deference requires "that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice").

The preliminary injunction intrudes upon this separation of powers and tramples the deference that prison officials are owed. *See Alvarez*, 2020 WL 2315807, at *5 (third and fourth prongs not satisfied because the court "could not issue injunctive relief without unfairly intruding on Defendants' operation of the prison system"). The proposed preliminary injunction also creates "an administrative nightmare" for Respondents to comply with, particularly during a time in which they must remain flexible in their response to this unprecedented pandemic. *See Valentine*, 956 F.3d at __. The burden "in terms of time, expense, and administrative red tape is too great." *Id.*

## IV.   The Injunctive Relief Petitioners Seek Is Not Appropriate.

"A preliminary injunction can only be employed for the 'limited purpose' of maintaining the status quo." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) (citing omitted). Petitioners' motion for preliminary injunction does not seek to maintain the status quo, but instead requests the appointment of a Rule 706 expert to investigate the conditions at CAFCC. The Motion is improper for that reason alone. *See Frohwerk v. Levenhagen*, 2013 WL 6839915, at *1 (N.D. Ind. Dec. 27, 2013) ("[N]either selecting a Special Master nor appointing a medical expert can be properly described as an emergency nor achieved via a preliminary injunction.").

Even outside of the preliminary relief context, "[c]ourts do not commonly appoint an expert pursuant to Rule 706 and usually do so only in exceptional cases in which the ordinary adversary process does not suffice or when a case presents compelling circumstances warranting appointment of an expert." *Hart v. Agnos*, 2008 WL 2008966, at *5 (D. Ariz. Apr. 25, 2008); 29 Charles Allen Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6304 (2d ed.) ("The most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance.").

Here, Petitioners seek "immediate, expert assistance to implement constitutionally required social distancing and hygiene practices" at CAFCC. (Dkt. 2 at 17.) Yet Petitioners have made no showing that the evidence or claims are so complex that it is beyond the Court's ability to understand without the assistance of a Rule 706 expert, much less that appointment of an expert is warranted as a matter of extraordinary preliminary relief. Indeed, courts routinely evaluate prison conditions of confinement under the Constitution without the assistance of court-appointed experts under Rule 706. *See*, *e.g.*, *Ledford v. Sullivan*, 105 F.3d 354, 358-60 (7th Cir. 1997) (upholding denial of prisoner's motion to appoint an expert in section 1983 action, regarding whether prison officials showed deliberate indifference to the prisoner's serious medical needs); *Owens v. Clark*, 2017 WL 6513214, at *2 (E.D. Cal. Dec. 20, 2017) (holding "claims of deliberate indifference . . . are not so complex that the court requires a neutral expert at the summary judgment stage"); *Ellsworth v. Prison Health Servs., Inc.*, 2013 WL 6587876, at *8 (D. Ariz. Dec. 12, 2013) (similar); *Hart*, 2008 WL 2008966 at *5 (denying motion to appoint health care expert and an environmental health and safety expert to investigate prison conditions); *Skylstad v. Reynolds*, 248 F. App'x 808, 810 (9th Cir. 2007) (in prisoner's civil rights action for medical malpractice, excessive force, deliberate indifference to medical needs, and due process violations, district court did not error in declining to appoint expert because action did not involve complex scientific evidence of complex issues).

In addition, "Rule 706 does not contemplate the appointment of . . . an expert to aid one of the parties." *See*, *e.g.*, *Womack v. GEO Grp., Inc.*, 2013 WL 2422691, at *2 (D. Ariz. June 3, 2013) (internal quotations omitted).   Again, Petitioners here seek "expert assistance" in diminishing the numerous measures Respondents have implemented in response to COVID-19 and "implement[ing] constitutionally required social distancing and hygiene practices" in light of those ostensible deficiencies.  (*See* Dkt. 2 at 17.)  Rule 706 does not contemplate the appointment of an expert for such a purpose.  Moreover, even if Petitioners are truly seeking a neutral expert, the appointment of a neutral expert under Rule 706 is not warranted at this early stage of the litigation.  Respondents have not yet answered the Complaint or submitted evidence on the issues raised in this case.  Hence, it is "premature" to decide whether appointment of a Rule 706 expert is warranted at this early stage in the litigation.  *See*, *e.g.*, *Womack*, 2013 WL 2422691 at *3 ("[Because there is a summary judgment motion pending on Plaintiff's Eighth Amendment liability claim . . . it premature to decide whether appointment of a medical or sleep expert is warranted on issues related to causation or damages."); *Estrada v. Rowe*, 2011 WL 249453, at *4–5 (N.D. Cal. Jan. 25, 2011) ("[U]ntil the Court has had the opportunity to review the arguments and evidence submitted by the parties . . . no determination can be made that the issues are so complex as to require the testimony of an expert to assist the trier of fact."); *Wallace v. Dep't of Corr.*, 2019 WL 3944315, at *1 (W.D. Wash. Aug. 21, 2019); *Garcia v. Wright*, 2012 WL 2681797, at *1 (D. Colo. July 6, 2012).

Furthermore, Petitioners' requested relief—which seeks (a) appointment of an expert, (b) an expert report, (c) the Court's review of that report, and then (d) an order directing Respondents to implement the expert's recommendations (Dkt. 2 at 1)—foreclosures any opportunity for Respondents to examine the admissibility of the Rule 706 expert's report under *Daubert v. Merrell Dow Pharmaceuticals* or otherwise subject his or her opinions to cross-examination.  In other words, Petitioners' requested relief contravenes Rule 706's established "procedural framework for nomination and selection of an expert witness and for the proper performance of his role after an appointment is accepted (e.g.,

[show cause], advising the parties of his findings, submitting to depositions, being called to testify, being cross-examined)." *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988); *see also Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 591 (9th Cir. 2000) (court-appointed experts must be subject to cross-examination); 29 Charles Allen Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6304 (2d ed.) (explaining "testimony from an expert appointed by the court under Rule 706 is treated no differently under the Evidence Rules than testimony from the parties' experts").

Lastly, Petitioners' request for preliminary relief effectively requires the Court to rubber stamp the appointed expert's findings and order Respondents to comply with those recommendations. Although an expert may present recommendations, it "may not issue findings of fact or conclusions of law." *Armstrong v. Brown*, 768 F.3d 975, 987–88 (9th Cir. 2014) *see also Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*, 362 F.3d 1204, 1214 (9th Cir. 2004) (district court improperly relied on appointed expert's findings and conclusions where it stated it "was unlikely to disagree with the court-appointed expert" and then immediately issued an injunction after hearing expert's opinions); *Reilly*, 863 F.2d at 155 ("[T]he grasp of Rule 706 is confined to court-appointed expert witnesses; the rule does not embrace expert advisors or consultants.").

## V.   Conclusion.

For these reasons, the Court should deny Petitioners' Motion for Preliminary Injunction. If the Court is not inclined to deny the Motion on the briefs, Respondents request a hearing.

/ / /

/ / /

/ / /

Respectfully submitted this 14th day of May 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Nicholas D. Acedo
   Daniel P. Struck
   Rachel Love
   Nicholas D. Acedo
   Jacob B. Lee
   3100 West Ray Road, Suite 300
   Chandler, Arizona 85226

*Attorneys for Defendant-Respondent Kris Kline*

MICHAEL BAILEY
United States Attorney
District of Arizona

By /s/ Nicholas D. Acedo (with authority)
   William Staes
   Assistant United States Attorney

*Attorneys for Defendants-Respondents David Gonzales, Donald W. Washington, and Michael Carvajal*

3705719.1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Benjamin C. Calleros      bcalleros@perkinscoie.com
Emma A. Andersson      eandersson@aclu.org
Jean-Jacques Cabou      jcabou@perkinscoie.com
Margo R. Casselman      mcasselman@perkinscoie.com
Mathew R. Koerner      mkoerner@perkinscoie.com
William Staes      William.Staes@usdoj.gov

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

/s/ Nicholas D. Acedo