Jean-Jacques Cabou (#022835)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602-351-8000
Facsimile: 602-648-7000
JCabou@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
BCalleros@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Plaintiffs–Petitioners*
*(additional counsel identified on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Guadalupe Lucero-Gonzalez; Claudia Romero-Lorenzo; Tracy Ann Peuplie; James Tyler Ciecierski; and Marvin Lee Enos, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs–Petitioners,<br><br>v.<br><br>Kris Kline, Warden of the Central Arizona Florence Correctional Complex; David Gonzales, U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; Michael Carvajal, Director of the Federal Bureau of Prisons, in their official capacities,<br><br>Defendants–Respondents. | No. 2:20-CV-00901-DJH (DMF)<br><br>**REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**(Oral Argument and Expedited Ruling Requested)** |

At CoreCivic, Inc.'s Central Arizona Florence Correctional Complex ("CoreCivic"), only a fraction of the population has been tested for COVID-19, but at least 24 people have tested positive (so far). More will soon. And absent this Court's needed intervention, the entire population at CoreCivic is at risk of contracting COVID-19. Despite the increasing number of positive tests—and the mere handful of individuals to be tested—at CoreCivic, though, Defendants assure the Court (at 5) that the Plaintiffs' factual "allegations do not reflect *at all* the reality of what is actually happening at [CoreCivic]." Defendants assert—no fewer than six times—that Plaintiffs' factual allegations about the conditions at CoreCivic are "false." [Doc. 16 at 6, 10; Doc. 16-3, ¶¶ 45–46, 110, 114] But those detained at CoreCivic—across different units, pods, and cells—consistently tell a different story: no social distancing, slipshod cleaning practices, rationed cleaning supplies, and shared personal protective equipment ("PPE"), like masks. Plaintiffs' factually supported allegations are sufficient to grant Plaintiffs their requested injunctive relief and to maintain the status quo. The stark differences between Plaintiffs' and Defendants' stories, though, reaffirm the need for an independent expert to inspect the facility and advise the Court on the conditions inside. And in the face of the serious risks posed by COVID-19 spreading through CoreCivic, prompt action is needed.

## I. Injunctive relief is needed to prevent further spread of COVID-19 at CoreCivic.

"'A preliminary injunction is appropriate when the [movant] demonstrates . . . that serious questions going to the merits were raised and the balance of the hardships tips sharply in the [movant]'s favor,' . . . so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (first alteration in original) (citation omitted). Plaintiffs have established each of these elements.

### A. Plaintiffs raise, at a minimum, serious questions going to the merits.

Plaintiffs are likely to succeed in establishing that they are subject to unconstitutional conditions of confinement at CoreCivic, based on the risks posed by COVID-19 and Defendants' failure to address these unreasonable risks. These conditions violate Plaintiffs' rights under the Fifth and Eighth Amendments to the U.S. Constitution.

**1.  Plaintiffs are likely to succeed on the merits of their claims that the conditions at CoreCivic violate the Fifth and Eighth Amendments.**

Plaintiffs are likely to establish that the conditions at CoreCivic violate the "*minimum standard of care*" required under the Eighth Amendment. *Gordon v. County of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018) (citation omitted). For an infectious disease like COVID-19, the Eighth Amendment's deliberate-indifference test is satisfied when officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* at 33. Plaintiffs here satisfy both the objective and subjective prongs of this test. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

*First*, Plaintiffs are likely to establish that the current conditions at CoreCivic—exacerbated by the COVID-19 pandemic—are "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). This objective analysis "turns on the 'facts and circumstances of each particular case,'" *id.* (citation omitted), and considers whether a detainee is confined in "unsafe, life-threatening conditions" that threaten "reasonable safety" or pose an "unreasonable risk of serious damage to his future health," *McKinney*, 509 U.S. at 33, 35.

Though Defendants dispute on several grounds the serious risks posed by COVID-19 at CoreCivic, their arguments fail. Defendants first contend (at 15) that Plaintiffs present in their Motion a "truncated and conclusory analysis." Not so. Plaintiffs' Motion—and the seven declarations submitted in support—detail *at length* the serious risks posed by COVID-19. [Doc. 2 at 13; *see also id.* at 7–11 (citing declarations)] These declarations from numerous detainees and from an assistant federal public defender, all corroborate the same inadequacies at CoreCivic: non-existent social distancing, minimal disinfecting and cleaning supplies, and rationed PPE.[1] And as further detailed in the supplemental declaration of Dr. Goldenson, even

---

[1] Defendants complain (at 5, 13, 14) that Plaintiffs' declarations are not signed "by the

CoreCivic's COVID-19 policies as written only recommend maintaining distance from people who are sick, an inadequate measure to prevent the spread of a virus that frequently spreads through asymptotic individuals. [Supp. Decl. of Joseph Goldenson, MD, attached as Ex. 1] Other declarations further prove that the social distancing recommended under existing policy is not happening in practice. [*See, e.g.*, Supp. Decl. of Christina M. Woehr, attached as Ex. 2] Furthermore, as Dr. Goldenson explains, CoreCivic appears to be quarantining unconfirmed cases together when CDC guidelines provide that unconfirmed, symptomatic individuals must be held in isolation. Quarantining unconfirmed cases together only facilitates the spread of the virus. Simply put, Defendants' response to COVID-19 has not been, as they claim (at 7), "ample and appropriate." *See Hutto v. Finney*, 437 U.S. 678, 681, 683 (1978) (upholding district court's orders to remedy unconstitutional conditions at prison).

Defendants next claim (at 5) that "only 15 detainees [and nine employees] . . . have tested positive for COVID-19" and (at 7) that these "low infection numbers are a testament to the success of" CoreCivic's response. Defendants fail to disclose, however, that Defendants generally have failed to test detainees for COVID-19—including those who exhibit symptoms. Indeed, nowhere in Defendants' 300 pages of exhibits do Defendants disclose the total number of detainees and employees who have been tested for COVID-19. Comprehensive testing would likely confirm the inevitable: COVID-19 has begun to spread throughout the facility. *See These Prisons are Doing Mass Testing for COVID-19--And Finding Mass Infections*, Marshall Project (Apr. 24. 2020), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections ("From California to North Carolina, prisons that do aggressive testing are finding that infection is spreading quickly.").

---

[Plaintiffs] themselves." To the extent Defendants imply these declarations are improper, Defendants are incorrect. *See* Order at 10 n.21, *Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL (JFM) (D. Ariz. May 5, 2020), ECF No. 52 ("*Keeton* Order") (overruling similar evidentiary objections based on Rule 807 of the Federal Rules of Evidence). The declarations reflect Plaintiffs' statements, taken by telephone due to the unavailability of in-person visits as a result of the pandemic. [Doc. 1-3 ¶¶ 12–14] Defendants do not suggest how Plaintiffs' counsel could have done otherwise. And each Plaintiff certified "under penalty of perjury" that their statements were true and correct. [Docs. 1-5 at 2; 1-6 at 2; 1-7 at 2; 1-8 at 2; 1-9 at 2]

Many of Defendants' factual assertions, in fact, are contradicted by not only Plaintiffs' papers, but also Defendants' own exhibits. And though Plaintiffs cannot address every contradiction under the circumstances here, a few examples are worth noting. For example, Warden Kline's sworn narrative insists that "if a detainee's mask becomes soiled or otherwise unusable, the detainee can request a new mask, and it will be provided to them." [Doc. 16-3 ¶ 89] But, as numerous Plaintiffs explained, that isn't true. And other information submitted by Kline himself proves as much. Also attached to Kline's Declaration are the minutes of various "Town Hall Meetings." These minutes clearly tell detainees they "will only be issued the 1 mask." [Doc. 16-6 at 65] These minutes corroborate the Declaration of Christina Woehr, who explained that detainees were only "given one disposable mask per person." [Doc. 1-3 ¶ 29] And the minutes corroborate the account of Mr. Enos, who says: "We have only been provided one mask." [Doc. 1-9 ¶ 6][2]

Similarly, Warden Kline's opinion of the situation is that CoreCivic has "ensure[d] that regular cleaning and disinfecting measures are taking place." [Doc. 16-3 ¶ 115] Again, his sworn conclusion is undone by the Town Hall minutes, which candidly reflect CoreCivic staff's assessment that "sanitation is not what it needs to be." [Doc. 16-6 at 64] And again the meeting minutes corroborate what Plaintiffs, who live at CoreCivic every day, know and swear to be true including that their bathroom facilities are "filthy" [Doc. 1-9 ¶ 16] and they lack "cleaning supplies to clean [their] pods, cells, cups, or dishes" [Doc. 1-6 ¶ 10].

*Second*, Plaintiffs are likely to establish the subjective prong as well. This prong is satisfied when an official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Despite acknowledging this standard (and the risks from COVID-19), though, Defendants appear to dispute (at 15–16) they have the requisite subjective knowledge. But in arguing (at 16) that Defendants have not "disregarded known dangers,"

---

[2] Oddly, Defendants assert that "[a]fter searching various databases, no detainee by th[e] name [Claudia Romero-Lorenzo] . . . has been detained at [CoreCivic]." That is false. As Defendants acknowledge elsewhere, she is assigned to a pod at CoreCivic. [Doc. 16-3 ¶ 132]

-4-

Defendants largely revert to their argument on the objective prong—i.e., that "their response has been reasonable." As Plaintiffs establish in their Motion (at 13–14), though, the obvious risks posed by the global COVID-19 pandemic satisfy this subjective standard because "the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).[3]

*And third*, the Pretrial Class is likely to succeed under the objective-only analysis from the Ninth Circuit's opinion in *Gordon*. In addressing Plaintiffs' argument under *Gordon*, Defendants contend (at 17) that "the significant measures that [Defendants] have implemented at [CoreCivic] in response to COVID-19 show, *at the very least*, that [Defendants] have not recklessly disregarded the health and safety of inmates and detainees in their care." But Defendants' subjective intentions are irrelevant to the Pretrial Class's claim. "[T]he proper standard of review for [these] claims," the Ninth Circuit has held, "is one of objective indifference, not subjective indifference." *Gordon*, 888 F.3d at 1120. And as Plaintiffs' Motion (at 14–16) establishes, the Pretrial Class is likely to succeed on their claims under *Gordon*.

**2.   Exhaustion does not apply to Plaintiffs' alternative habeas claims, and Plaintiffs exhausted their available remedies.**

Defendants argue (at 13) that Plaintiffs' claims are unlikely to succeed because Plaintiffs failed to exhaust their administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). This argument fails for at least three reasons. *First*, the PLRA does not apply to Plaintiffs' habeas petitions. *See* 42 U.S.C. § 1997e; *Walker v. O'Brien*, 216 F.3d 626, 634 (7th Cir. 2000) (joining three other circuits in holding that "habeas corpus petitions are not subject to the PLRA"); *Grier v. Hood*, 46 F. App'x 433, 440 (9th Cir. 2002) (holding that PLRA exhaustion did not apply to § 2241 habeas petition).

*Second*, even if the PLRA applies to Plaintiffs' other claims, Plaintiffs have satisfied its requirements to "complete the administrative review process in accordance with the applicable procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Each Plaintiff here properly pursued administrative remedies in accordance with CoreCivic policy. Plaintiffs cannot control the fact

---

[3] Defendants also attach statements establishing their subjective knowledge, including, for example: "sanitation is not what it needs to be." [Doc. 16-6 at 64]

that CoreCivic failed to do the same. Under CoreCivic policies, detainees may raise complaints by seeking informal resolution or filing a formal or emergency grievance. [Doc. 16-8 at 15] When a formal grievance is filed, CoreCivic must respond within ten days of its submission (or five days if the grievance relates to medical care). [*Id.* at 16] For emergency grievances, detainees must receive a response within *one day*. [*Id.* at 5 ¶ 32]

Here, all Plaintiffs filed formal or emergency grievances about CoreCivic's failure to protect detainees from COVID-19. Ms. Lucero-Gonzalez filed an emergency grievance on May 1, 2020 [Doc. 1-5 ¶ 21]; Ms. Romero-Lorenzo attempted, but was unable, to file a grievance on April 29, 2020, and then successfully filed a grievance on May 1, 2020 [Doc. 1-6 ¶ 17]; Ms. Peuplie filed emergency grievances on April 22 and 30, 2020 [Doc. 1-7 ¶ 14]; Mr. Ciecierski filed a grievance around April 15, 2020, and again on April 30, and attempted to file emergency grievances, but no forms were available [Doc. 1-8 ¶ 10]; and Mr. Enos filed emergency grievances on April 19 and 22, 2020 [Doc. 1-9 ¶ 22]. But CoreCivic not only failed to respond to these grievances within the timeframes mandated, but also still has not responded to most of these grievances. This violates CoreCivic's own policy requiring responses to formal grievances in ten days and emergency grievances in one day. [Doc. 16-8 ¶¶ 24, 32][4]

Defendants' suggestion (at 14) that all five Plaintiffs are lying is unfounded and unfortunate. Defendants submit a declaration from CoreCivic Grievance Coordinator A. Partain, who claims "none of the Petitioners submitted a Formal Grievance with respect to allegations related to [CoreCivic's] COVID-19 response protocols" aside from Mr. Enos. [Doc. 16-8 ¶ 35] Partain further states that there is "no record" of grievances from Mr. Ciecierski "on either April 15, 2020 or April 30, 2020" [*Id.* ¶ 41]; from Mr. Enos "on April 19, 2020, or on April 22, 2020" [*Id.* ¶ 46]; from Ms. Lucero-Gonzalez "on May 1, 2020" [*Id.* ¶ 56]; or from Ms. Peuplie "on April 22, 220[sic], or on April 30, 2020" [*Id.* ¶ 60]. To reach these conclusions, Partain reviewed Plaintiffs' grievance history in CoreCivic's Apps electronic database and an

---

[4] Notably, in the two grievances that Defendants admit they received, Plaintiffs complained that "my life is in danger" [Doc. 16-8 at 34] or that Plaintiff "[could] die" [*Id.* at 31], but Defendants nonetheless took about a week to respond to both.

Excel document referred to as the Grievance Log. [Doc. 16-8 ¶ 33] But grievance information is not added until what CoreCivic deems the "receipt" of the grievance. [*See id.* ¶¶ 12–13] Thus, while it could be true that there was "no record" of Plaintiffs' grievances that was (1) received, (2) added in Apps or the Grievance Log, and (3) done so *on those specific dates*, Partain does not address the possibility that the grievances were inputted on different dates—or have not yet been inputted at all. Indeed, Partain's own declaration and attachments demonstrate there can be a significant delay from when a detainee files a grievance to when CoreCivic marks the grievance as "received."[5] Considering that staff recently informed Ms. Peuplie that CoreCivic is receiving about 400 grievances per day and would get to her grievance "whenever we get to it" [Doc. 1-7 ¶ 14], it is likely that the COVID-19 outbreak at CoreCivic and corresponding influx of grievances has exacerbated the delay between grievance submission and "receipt" so that "no record" of Plaintiffs' grievances yet existed when Partain reviewed the records.

In any event, "[f]ailure to exhaust under the PLRA is 'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc) (citation omitted). Defendants have not met their burden to show they are likely to succeed on this defense by submitting their policies on the books and vague record searches, without engaging with Plaintiffs' specific assertions.

### 3. Further exhaustion was unavailable, as evinced by the concessions of CoreCivic's staff that "we'll get to it whenever we get to it."

Even if Plaintiffs have not exhausted administrative remedies, they were not required to—because CoreCivic's grievance procedures are not "available" to remedy Plaintiffs' claims. Under the PLRA, Plaintiffs only need to exhaust "such administrative remedies as are *available*," 42 U.S.C. § 1997e(a) (emphasis added), and "need not exhaust unavailable" remedies, *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The circumstances here fall squarely within the Supreme

---

[5] For instance, Ms. Lucero-Gonzalez submitted a medical-care grievance on April 20, 2020. [Doc. 16-8 at 40 & ¶ 51] CoreCivic did not "receive" the grievance until April 28, 2020 [*Id.* at 40], three days after CoreCivic's response was due under its grievance procedure [*Id.* at 16]. Additionally, Mr. Ciecierski submitted an informal resolution request on April 28, 2020, that CoreCivic did not "receive" until May 4, 2020. [*Id.* at 31 & ¶ 36]

Court's holding in *Ross* that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." 136 S. Ct. at 1859.

As noted above, during the past month the five named Plaintiffs have filed eight grievances expressing fear for their lives and safety, which CoreCivic has (at best) lost, or (at worst) ignored. It is no surprise that Plaintiffs' pleas have gone unanswered. CoreCivic staff have explicitly told Plaintiffs that they receive hundreds of grievances per day and would get to the grievance "whenever we get to it" [Doc. 1-7 ¶ 14], and that "everything at [CoreCivic] is just fine" when one Plaintiff asked for a grievance form [Doc. 1-6 ¶ 17]. Moreover, "[g]rievance forms are not always available" [Doc. 1-7 ¶ 15] or "rarely available" [Doc. 1-8 ¶ 10]. *See Marella v. Terhune*, 568 F.3d 1024, 1027 (9th Cir. 2009) (reversing district court's dismissal of claim based on failure to exhaust where prisoner alleged that he "did not have access to the necessary forms"). Thus, CoreCivic staff has been "unable or consistently unwilling to provide any relief" to Plaintiffs via CoreCivic's official grievance procedures. *Ross*, 136 S. Ct. at 1859. There is no available process that can provide timely relief in the face of imminent danger. *Fuqua v. Ryan*, 890 F.3d 838, 850 (9th Cir. 2018) ("[T]he particular circumstances of the prisoner's case must be considered when deciding whether administrative remedies were properly exhausted.").

What Plaintiffs have explained they are experiencing at CoreCivic—significant hurdles to filing grievances and insurmountable hurdles to obtaining adjudication of those grievances—is "the reality of what is actually happening at [CoreCivic]" [Doc. 16 at 5], while Defendants' accounts from the facility-wide Grievance Coordinator and attached vague record searches are not. Plaintiffs have followed CoreCivic grievance policy to the absolute best of their abilities, and have faced a "simple dead end." *Ross*, 136 S. Ct. at 1859.

**4.    Plaintiffs' habeas claims are cognizable under 28 U.S.C. § 2241.**

Defendants next challenge, on two separate grounds, only part of Plaintiffs' pleading: the additional request for writs of habeas corpus. Neither argument passes scrutiny.

*First*, Defendants contend (at 20–21) that "[i]ndividual motions pursuant to the Bail Reform Act ("BRA") . . . are the proper legal vehicle" for part of Plaintiffs' requested relief

(i.e., release through writs of habeas corpus). Defendants thus imply that Plaintiffs are barred from seeking relief except through the BRA. But Defendants cite no binding authority for this proposition; nor could they. Rather, in support of this supposed BRA bar, Defendants cite (at 21) two inapposite district-court cases. One explicitly "decline[d] to address . . . [the government's argument] under the Bail Reform Act." *Alvarez v. Larose*, No. 20-cv-00782-DMS (AHG), 2020 WL 2315807, at *2 (S.D. Cal. May 9, 2020). The other never mentioned the BRA. *See Plata v. Newsom*, No. 01-cv-01351-JST, 2020 WL 1908776 (N.D. Cal. Apr. 17, 2020).

On the merits, the dearth of caselaw supporting Defendants' contention is unsurprising. Defendants appear to argue that the BRA serves as the exclusive (or predominant) legal remedy for Plaintiffs' habeas claims. Not so. The BRA establishes an initial inquiry for district courts considering whether a person's release pending trial "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). Nothing in the BRA contemplates the conditions and constitutionality of confinement *after* a district court has made this determination. The BRA simply does not apply.

*Second*, Defendants claim (at 18) that Plaintiffs are unlikely to succeed through habeas because "[Plaintiffs] cannot seek release from detention in a Habeas action but must instead pursue relief under the . . . [PLRA]." But the PLRA did not suspend writs of habeas corpus, nor did Plaintiffs seek release under the PLRA. *See* U.S. Const. art I, § 9 cl. 2. Habeas relief is available to individuals (like Plaintiffs) who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Generally, "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus," where a civil-rights action is the avenue for "requests for relief turning on circumstances of confinement." *Muhammad v. Close*, 540 U.S. 749, 750 (2004). The Supreme Court, in fact, has repeatedly refused to foreclose detainees from using "the writ with respect to claims of unlawful conditions of treatment or confinement." *Boumediene v. Bush*, 553 U.S. 723, 792 (2008); *see also, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017). And release from unconstitutional confinement falls "within the core of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973). The PLRA, by comparison, does not apply to "habeas corpus proceedings

1  challenging the fact or duration of confinement." 18 U.S.C. § 3626(g)(2).

2  Here, Plaintiffs bring (in part) petitions for habeas corpus, challenging the fact or duration of confinement. Plaintiffs specifically ask that the Court "issue writs of habeas corpus on the ground that Plaintiffs' continued detentions" are unconstitutional, "[i]f the expert's recommendations cannot be achieved without reducing the detained population at CoreCivic." [Doc. 1 at 27] This requested relief and its corresponding claims "challeng[e] the fact [and] duration of confinement in prison." 18 U.S.C. § 3626(g)(2). "The fact that [Plaintiffs'] claims require consideration of detention conditions does not necessarily preclude habeas corpus review," as this Court recently held; "these claims are cognizable under § 2241." *Keeton* Order at 12. Thus, the PLRA and its requirements neither apply to nor bar Plaintiffs' claims for relief.

**B.     The remaining injunctive-relief factors similarly favor granting relief.**

The likelihood of irreparable harm to Plaintiffs, without injunctive relief, is far from "speculative," as Defendants claim (at 21–22)—it is exceedingly urgent. Conditions that are "very likely to cause serious illness and needless suffering the next week or month or year" violate the Constitution, and a court "need not await a tragic event" before granting relief. *Helling*, 509 U.S. at 33; *see also Parsons v. Ryan*, 754 F.3d 657, 680 (9th Cir. 2014). And "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). In fact, courts have found irreparable harm for detainees facing similar circumstances. *See, e.g.*, *Carranza v. Reams*, 2020 WL 2320174, at *11 (D. Colo. May 11, 2020) (finding "irreparable harm" at jail where "at least ten inmates have tested positive for COVID-19"); *Barbecho v. Decker*, No. 20-cv-2821 (AJN), 2020 WL 2317876, at *6 (S.D.N.Y. May 11, 2020) (finding risk of irreparable harm where jailers "do not offer evidence that testing is widely offered or used to ascertain the scope of the outbreak among the detainee and inmate populations" (internal quotation marks and citation omitted)). In this case, the balance of equities tips sharply in Plaintiffs' favor. *See Ariz. Dream Act Coal. V. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor [injunctive relief].").

Plaintiffs do not, as Defendants suggest (at 22), seek a "boundless" preliminary injunction that will result in a "facility czar." Rather, they seek a remedy that is well within this Court's discretion: confinement that complies with the Constitution. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights.").

**II.  An expert is appropriate here, and Plaintiffs have identified five such individuals.**

Defendants last argue (at 23) that a preliminary injunction is inappropriate because such relief should only serve to maintain "the status quo." That is exactly what Plaintiffs seek. The "status quo" in this case is that Petitioners remain alive and (seemingly) uninfected by COVID-19. Defendants' similar argument (at 22) that appointment of an expert is "premature" is belied by the rapid spread of COVID-19 in these congregate living settings. Defendants' remaining arguments—that there will be concerns with the expert's neutrality, that the Court will "rubber stamp" the expert's report, that the expert's report will be so unreliable that it will fail under *Daubert*, and that there will not be an opportunity to cross-examine the expert—are premature and unfounded. It is well within this Court's competence to craft orders and implement procedures to protect against these concerns as it sees fit, including at a later time.

Plaintiffs thus respectfully request that this Court appoint any of these highly qualified individuals as an expert in this case, to promptly inspect CoreCivic and advise the Court on the facility's conditions and compliance with recommendations by public-health experts.[6]

**III.  Conclusion**

Plaintiffs request that this Court issue a temporary restraining order and a preliminary injunction, as detailed in Plaintiffs' Motion and the proposed order lodged with the Court.

---

[6] Counsel for Plaintiffs have worked to identify someone whom this Court can *immediately* appoint as an expert. Plaintiffs' counsel have identified five such experts, and résumés and letters from these individuals are attached collectively as Exhibits 3–7.

| | |
|---|---|
| Dated: May 15, 2020 | **PERKINS COIE LLP** |
| | By: /s/ Matthew R. Koerner |

Jean-Jacques Cabou (#022835)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Emma Andersson*
eandersson@aclu.org
Taylor Brown*
tbrown@aclu.org
Alejandro Ortiz*
ortiza@aclu.org
Chase Strangio*
cstrangio@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Fl.
New York, New York 10004
Telephone: 917-345-1742

Somil Trivedi*
strivedi@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St., NW
Washington, DC  20012
Telephone: 202-715-0802

Jared G. Keenan (#027068)
jkeenan@acluaz.org
Christine K. Wee (#028535)
CWee@acluaz.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ  85014

*Attorneys for Plaintiffs*

*Applications for *pro hac vice* forthcoming.*

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on May 15, 2020, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of same to:

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Jacob B. Lee, Bar No. 030371
STRUCK LOVE BOJANOWSKI& ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com
*Attorneys for Respondent Kline*

AUSA William Staes
Two Renaissance Square
40 N. Central Ave, Suite 1200
Phoenix, Arizona 85004
William.Staes@usdoj.gov
*Attorney for David Gonzlaes, Donald W. Washington and Michael Carvajal*

By: Jennifer McNamara
Perkins Coie, LLP