# SUPPLEMENTAL DECLARATION OF WARDEN K. KLINE

I, K. Kline, make the following Declaration:

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Supplemental Declaration in response to statements made in Plaintiffs' Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction and declarations attached to the Reply based on my own personal knowledge and my review of the relevant documents as maintained by CoreCivic in the usual course of business.

2. I am currently the Warden of CoreCivic's Central Arizona Florence Correctional Complex ("CAFCC"), located in Florence, Arizona, a position I have held since August 2016.[1] Prior to that, I was the Warden of CoreCivic's Kit Carson Correctional Center in Colorado for two years.

3. I have been in corrections for over 20 years, having started as a Correctional Officer at CoreCivic's Bay Correctional Facility in Florida in February 2000.

## CAFCC Design and Population

4. CAFCC is owned and operated by CoreCivic. CAFCC was formerly two facilities—Central Arizona Detention Center ("CADC") and Florence Correctional Center ("FCC")—both owned and operated by CoreCivic, and located in close proximity to each other in Florence, Arizona. The two facilities were administratively combined into CAFCC in 2017. Internally, the former CADC is referred to as CAFCC East, and the former FCC is referred to as CAFCC West.

5. CoreCivic provides immigration and criminal detention services for U.S. Immigration and Customs Enforcement ("ICE"), the United States Marshals Service

---

[1] CAFCC was formerly two facilities—Central Arizona Detention Center ("CADC") and Florence Correctional Center ("FCC")—both owned and operated by CoreCivic. The two facilities were administratively combined into CAFCC in 2017. I was the Warden of FCC when the facilities were combined.

("USMS"), and the City of Mesa ("Mesa") pursuant to detention service contracts with those entities. CoreCivic provides healthcare services to CAFCC's detainee population.

6. Neither I, as Warden of CAFCC, nor CoreCivic, determine which USMS detainees are assigned to CAFCC, or for how long. Rather, such assignments, as well as transfer and release determinations, are made by USMS and/or the federal courts.

7. CAFCC has a total design capacity of 5,003 detainees, with capacity for 3,110 USMS detainees. CAFCC operates 15 housing units of varying layouts and designs, including traditional two-person cells and larger cells housing 14-16 detainees.

8. As of May 21, 2020, CAFCC was operating at 59.3% of its design capacity, with 2,968 total detainees and 2,922 USMS detainees.

**COVID-19 Test Data and Screening Procedures**

9. As stated in my previous Declaration, when a detainee displays symptoms of COVID-19 as defined by CDC guidelines, they are removed from their pod and quarantined in J Pod, where they are assessed by medical staff, who determine whether the detainee needs to be tested for COVID-19 based on their symptoms, medical history, and other applicable testing guidelines issued by the CDC and other state and local public health agencies. CAFCC has not done any widespread or mass testing of detainees, as such testing would not be an efficient use of resources and is not required by the CDC or any other state or local public health agency with jurisdiction over CAFCC.

10. As of May 21, 2020, 24 USMS detainees have tested positive for COVID-19 at CAFCC, 12 detainees have tested negative, and 8 were pending results, for a total of 44 detainees tested as of May 21, 2020. The first positive USMS detainee was identified on May 1, 2020. No ICE or Mesa detainees have required testing.

11. From May 1 to May 13, 2020, no COVID-19-positive detainees at CAFCC contracted the virus from the general population—all cases of COVID-19 at CAFCC came from the cohort pods, and were identified during their stay in the cohort pods, which all new intakes are subject to when they arrive at CAFCC as described more fully in my prior

Declaration. The first COVID-19-positive detainee from the general population showed symptoms on May 12, 2020, and was confirmed positive on May 13, 2020.

12. No CAFCC detainees have been hospitalized due to COVID-19, and none have died due to COVID-19.

13. As of May 21, 2020, CAFCC employed 923 staff members, only 14 of whom have tested positive for COVID-19. Seven of those 14 have fully recovered and are back to work.

14. As also stated in my previous Declaration, all persons entering CAFCC, including staff, are subject to screening, which consists of a series of questions and a temperature check. The screening questions ask whether the person has returned from international travel, had close contact with anyone diagnosed with COVID-19, or returned from military deployment related to COVID-19 response in the past 14 days, as well as whether the person has experienced fever, cough, shortness of breath, chills, sore throat, or diarrhea in the past 24 hours. (*See* Doc. 16-5 at Attachment 13.) These questions go above and beyond the screening questions recommended by CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Interim Guidance"). (*See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#verbal-screening, last accessed May 20, 2020.)

15. If a person answers affirmatively to any of the screening questions, or if the person exhibits symptoms of COVID-19 as defined by CDC guidelines, including but not limited to a fever in excess of 100.4 degrees, they are denied entry to the facility.

16. CoreCivic does not test employees who fail the entrance screening or display symptoms of COVID-19 while on duty. Rather, such employees are sent home and directed to see a healthcare provider for further screening and testing as needed. Before they can return to work, these employees must obtain clearance from their medical provider and provide documentation before they will be admitted back into the facility.

### Detainee Mask Use

17.  I am aware that Plaintiffs believe a statement in my previous Declaration regarding mask replacement is inconsistent with a statement in the Town Hall Meeting Records for April 13 and 17, 2020 attached to my Declaration that detainees "will only be issued the 1 mask." (*See* Doc. 16-3 at ¶¶ 88-89; Doc. 16-6 at Attachment 26, CORECIVIC-MLG000188.) I am also aware of statements made by detainee Marvin Enos and attorney Christina Woehr that, as of April 30, 2020 (Enos) and May 7, 2020 (Woehr), detainees had only been issued one mask each.

18.  These statements are not inconsistent. On April 13, 2020, when CAFCC first offered paper face masks to detainees, CAFCC's supply of such masks was limited. In order to effectively manage this resource, detainees were instructed to take care of the masks and make them last. At any time, however, if a detainee's mask became soiled, torn, or otherwise unusable, they could request a new mask, and it would be provided to them. Neither Enos nor Woehr makes any claims that Enos or any other detainee requested a fresh mask and was denied.

19.  CAFCC offered all detainees a new paper face mask on May 11, 2020. CAFCC also recently acquired washable cloth masks, and offered them to all detainees on May 21, 2020. Detainees were not required to return or dispose of their paper mask in order to receive a cloth mask.

### Housing Unit Sanitation

20.  I am also aware that Plaintiffs believe a statement in my previous Declaration regarding enhanced sanitation procedures is inconsistent with a statement in the Town Hall Meeting Records for April 13 and 17, 2020 attached to my Declaration that "sanitation is not what it needs to be." (*See* Doc. 16-3 at ¶ 115; Doc. 16-6 at Attachment 26, CORECIVIC-MLG000187.)

21.  These statements are not inconsistent. CAFCC policies, as set forth in the detainee handbook and regularly communicated to detainees in daily interactions with them and at Town Hall Meetings, set high expectations regarding sanitation and cleanliness in

1 | detainee housing units. As Warden, I continually encourage staff and detainees to raise the bar, and challenge both staff and detainees to look for ways to improve sanitation and cleanliness during my rounds each day. For example, even if a housing unit meets the minimum standards, I will look for things that could be improved, and require my staff to do the same during their own rounds and inspections.

22. Thus, a statement in the April 13 and 17 Town Hall Meeting Record that "sanitation is not what it needs to be" does not mean that minimum standards were not being met, or that the enhanced sanitation procedures described in my previous Declaration at ¶¶ 105-124 were not being performed. Rather, it is a reflection of staff carrying out my directives to continually look for ways to improve the cleanliness and sanitation of the facility, and specifically the detainee housing units.

23. As stated in my previous Declaration, Town Hall Meetings during the pandemic include instructions to detainees on how to safely sanitize the common-area surfaces they use during the day, and detainees are provided facility-approved, EPA-registered cleaning and disinfecting supplies to clean and sanitize those surfaces and their cells and immediate living areas. Each housing pod has a cleaning closet with mops, brooms, towels, and spray bottles of cleaning and disinfecting chemicals, all of which are available for detainee use on a daily basis and upon request during waking hours.

24. Detainees are also provided with ample soap and water to allow them to practice proper personal hygiene consistent with CDC guidelines. CAFCC distributes two bars of soap and one bottle of shampoo/body wash to each detainee each week, and will replace both types of soap upon request if a detainee runs out of them in between weekly distributions. In April 2020 alone, CAFCC issued approximately 27,960 bars of soap and 13,980 bottles of shampoo/body wash free of charge to detainees.

///
///
///
///

## **Lima Unit Quarantine**

25. I am aware that attorney Christina Woehr takes issue with a statement in my previous Declaration that Lima Unit did not go on quarantine status until May 1, 2020, as an unidentified person informed her office that Lima Unit was placed on quarantine status effective April 27, 2020.

26. My statement that Lima Unit went from cohort status to quarantine status on May 1, 2020 was an inadvertent error. Woehr is correct that Lima Unit went from cohort status to quarantine status on April 27, 2020. As a practical matter, however, the daily lives of detainees in Lima Unit were unaffected as a result of the change in status. As stated in my previous Declaration, new arrivals and detainees returning from outside transport are placed in cohorts based on their date of arrival at or return to the facility. Prior to Lima Unit being converted from cohort status to quarantine status, most such detainees were cohorted in Lima Unit.[2]

27. While on cohort status, detainees are in a lockdown status to prevent detainees from different cohorts from intermixing and potentially cross-contaminating, but they are permitted dayroom time with other detainees from their cohort on a rotating schedule that allows each cohort to have dayroom time. This did not change when Lima Unit was converted to quarantine status. As stated in my previous Declaration, no detainees were ever moved from Lima Unit to a general population pod and then back to Lima Unit several hours later, as claimed by Woehr in her original declaration based on the alleged statement of an unidentified detainee.

///
///
///
///
///

---

[2] Since then, most such detainees are cohorted in Delta Unit.

I declare under penalty of perjury under the laws of the United States and the State of Arizona that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 21 day of May, 2020, in Florence, Arizona.

_____
K. KLINE

3709388

7