**EXHIBIT 1**

**EXHIBIT 1**



OPINION

# Opinion: Colorado legislators must regulate immigrant detention centers

MAR 29, 2020 2:58AM MDT

 Dr. Carlos Franco-Paredes

On Wednesday, an ICE employee at the GEO-owned Aurora immigration detention facility tested positive for COVID-19. Last week, 10 immigrants at the facility were isolated after possible exposure to the virus.

The outbreak that advocates and health officials have predicted for the past few weeks is igniting.

We echo the calls from multiple advocacy groups to consider alternative forms of detainment, including supervised release and other non-custodial manners for individuals who are at high risk of serious effects from COVID-19.

As health professionals on the ground, we know the spread of coronavirus in detention centers is unavoidable, especially when we factor in both public and private detention center's history with medical negligence. Parallel to the growing pandemic, each day brings a new horror story of medical malfeasance, lack of adequate care and even preventable death due to incomplete treatment or care failures within the detention centers.



Dr. Carlos Franco-Paredes

Our Colorado representatives have a moral obligation for the good of immigrant health and public safety to ensure standards of care in both private and public detention centers across the state.

There are endless examples to cite. While detained at GEO's Aurora detention center, Rene Lima Marin slipped and fell, hitting his face against a steel toilet. He called for medical attention, but guards remained complacent for more than an hour.

After finally being taken to an emergency room, physicians let him know that he had fractured multiple bones in his face and would need surgery within a week to avoid permanent impairment.

Lima-Marin never got that procedure because ICE never brought him back to the hospital, nor did they give him the strong pain meds he was prescribed.

In the same detention center, Miguel Angel suffered a broken hand at the hands of a GEO guard in March 2019 that never received treatment, and endured numerous quarantines after several outbreaks of mumps, measles and chicken pox inside of the center.

Influenza vaccine which is considered a crucial public health intervention is also not routinely administered to detainees, resulting in some preventable deaths occurring inside detention centers.

In September 2019, the American Civil Liberties Union (ACLU) issued a scathing report on the rampant medical neglect and maltreatment at GEO's Aurora ICE facility. As one attorney said, "The conditions at (the Aurora

☣ **COVID-19 IN COLORADO**

The latest from the coronavirus outbreak in Colorado:

- **MAP:** Known cases in Colorado.
- **TESTING:** Here's where to find a community testing site. The state is now encouraging anyone with symptoms to get tested.
- **WRITE ON, COLORADO:** Tell us your coronavirus stories.
- **STORY:** Nearly a quarter of the people Colorado said died from coronavirus don't have COVID-19 on their death certificate

**>> FULL COVERAGE**

detention center) represent that worst of what currently plagues our society and government. GEO Group is profiting off caging people and denying them conditions consistent with human decency, including basic medical care."

Despite the continued evidence of abuse and immorality, GEO reported a net income of $33.4 million in the fourth quarter of 2018 and is valued at $2.3 billion.

> **READ:** Colorado Sun opinion columnists.

It is not just GEO inflicting unnecessary pain and suffering. In August, immigrants detained in Teller County Jail in Colorado and in Adelanto, Calif., filed a lawsuit against ICE and the private-detention company for their failure to provide adequate medical care and a failure by authorities to provide accommodations for disabilities.

The indecency of the clear lack of adequate medical care for immigrants by private companies in Colorado is matched only by our government's unwillingness to administer any real oversight and regulation on detention centers.

There are no reasonable alternatives being implemented and a clear insufficient amount of staffing. Our federal government has left it up to cities and states to step up and take action.

Our Colorado representatives have a responsibility to call for the release of detainees who are at high-risk of coronavirus, to stop the continued detainment of immigrants and asylum seekers, and ensure that those in detainment have access to preventive measures, quality healthcare, medical testing and treatment without co-pays or additional costs.

To do so, Colorado representatives must pass the Inspection of Facilities Housing Immigrants Act, which will bring all detention centers in line with standards of care already established by the state and protect the health and safety of all. It would mandate inspections of these facilities and reports to the state legislature.

Besides the humanitarian premise and the moral justification for the release of detainees in the midst of the ongoing epidemic in the U.S., the potential medical impact that COVID-19 may produce among detainees may become devastating and it may require major financial investment by ICE. Therefore, anticipating the impact of this epidemic inside immigration detention facilities justifies exploring alternative strategies to reduce its impact in U.S. soil.



The prompt release on parole of detainees with medical conditions at risk of severe disease and death due to coronavirus infection may reduce the impact of this outbreak among immigration detention facilities. This intervention may also effectively reduce the potential spillover of the outbreak from a detention center into the community.

For the good of our public health, and to act with decency and morality, we must demand robust health, safety and human rights standards for all immigrants in Colorado detention centers.

*Dr. Franco-Paredes is currently an Associate Professor of Medicine in the Division of Infectious Diseases at the University of Colorado, Anschutz Medical Center. He is an infectious diseases clinician with expertise in tropical medicine and neglected tropical diseases and vaccine-prevent diseases.*

**EXHIBIT 2**

**EXHIBIT 2**

# Comment

# COVID-19 and the coming epidemic in US immigration detention centres



Individuals in US Immigration and Customs Enforcement (ICE) detention are at risk from serious consequences resulting from the rapid spread of the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) infection and inadequate access to appropriate medical care. This situation represents a moral and public health imperative for rapid action by the US Department of Homeland Security (DHS) to mitigate the human toll of the pandemic.

SARS-CoV-2 emerged in late 2019 in Wuhan, China, causing coronavirus disease 2019 (COVID-19), which has been rapidly spreading across geopolitical, social, and economic boundaries around the world. In the USA, a rapid increase in SARS-CoV-2 infections in every state of the country has resulted in a growing number of hospitalisations, admissions to intensive care units, and deaths in specific age groups and in many people with underlying medical conditions.[1]

Individuals who are incarcerated, including immigrants in ICE detention, are among the most vulnerable to infection and complicated disease because of existing drivers of inequality.[2–3] The incarceration of undocumented immigrants is a relatively new phenomenon in the USA. The annual average daily population in ICE detention has risen more than seven times in the past 25 years to a peak of more than 50 000 individuals in 2019.[4] Many individuals in ICE detention have never been charged with a criminal offense. Immigrants in ICE detention around the country have expressed panic over conditions that put them at exceptionally high risk of an outbreak of COVID-19 and proposed an immediate humanitarian response to mitigate the risk of infection.[5] Rapid implementation of infection prevention and control measures in immigration detention is essential to the wider national public health response. Although people who are incarcerated are confined, a high degree of interaction occurs between people in facilities and the community, including people being transported between facilities, releases and new intakes that generate a population turnover, and the comings and goings of staff, visitors, vendors, and contractors. Inadequate implementation of infection prevention strategies will affect the spread of COVID-19 in the community and burden an already stretched health-care system.

Because the transmission of SARS-CoV-2 is predominantly from person to person through droplets, a pillar of infection prevention is social distancing and disinfection, which is antithetical to closed detention settings. Incarceration requires large groups of people to be held together in confined and often poorly ventilated spaces. Many areas within the facility are communal, including housing, waiting rooms, eating areas, recreation spaces, and classrooms. Disinfection and decontamination practices are also complicated by the ability of SARS-CoV-2 to survive for extended periods on materials that are highly prevalent in detention settings, such as metals and other non-porous surfaces.

From a public health perspective, mitigation strategies in detention facilities should be complemented by routine screening and containment procedures. These entail screening all people who enter facilities, including individuals in detention, staff, visitors, and vendors, and quarantining those who screen positive for COVID-19 exposure. People who screen positive for symptoms on intake or develop symptoms during detention must be medically isolated and receive appropriate medical care. ICE facilities do not have the staffing capacity or facilities to screen, quarantine to monitor for symptoms, isolate infected individuals, or deliver medical management in a setting with high rate of infection.[6]

Clinical deterioration, often rapid with COVID-19, will require the rapid transfer of individuals with COVID-19 to local medical facilities for specialised care that might exceed the capacity of local health-care systems, particularly in the rural and semi-rural settings where many ICE detention facilities are located. The combination of a captive population exposed to a highly infectious disease and substandard care has the potential to increase the incidence of infection and case-fatality rates among detained individuals, put the public at greater risk, and consume substantial medical and financial resources.

Because of the existing barriers to adequate mitigation, containment, and provision of medical care in detention facilities, the policy response to this crisis

*Lancet Infect Dis* 2020

Published **Online**
April 15, 2020
https://doi.org/10.1016/
S1473-3099(20)30295-4

must involve the release of individuals in ICE detention and a halt of ICE enforcement action in the community. These actions should include the immediate release on humanitarian parole of individuals at risk of severe disease and death due to COVID-19 infection. An even more robust and effective response would be to release all individuals who do not represent a threat to public safety. This does not represent amnesty, but rather the use of existing structures within the DHS and the US Department of Justice to enforce immigration laws in the community setting.

As physician advocates, we believe that prompt action in this brief and rapidly closing window represents not only the humanitarian and moral course, but also the best public health intervention to prevent unnecessary deaths.

We declare no competing interests.

*Jaimie P Meyer, \*Carlos Franco-Paredes, Parveen Parmar, Faiza Yasin, Matthew Gartland*
**Carlos.franco-paredes@cuanshutz.edu**

Yale University School of Medicine, AIDS Program, New Haven, CT, USA (JPM); Division of Infectious Diseases, Department of Medicine University of Colorado, Anschutz Medical Center, Aurora, CO 80045, USA (CF-P); Hospital Infantil de México, Federico Gomez, Mexico City 06720, Mexico (CF-P); Division of Global Emergency Medicine, Keck School of Medicine, University of Southern California, Los Angeles, CA, USA (PP); Department of Infectious Diseases, Yale University School of Medicine, New Haven, CT, USA (FY); and Massachusetts General Hospital Asylum Clinic, Department of Medicine Brigham and Women's Hospital, Department of Pediatrics Newton Wellesley Hospital, and Harvard Medical School, Boston, MA, USA (MG)

1   CDC COVID-19 Response Team. Severe outcomes among patients with coronavirus disease 2019 (COVID-19)—United States, February 12–March 16, 2020. *MMWR Morb Mortal Wkly Rep* 2020; published online March 18. DOI:10.15585/mmwr.mm6912e2.
2   Farmer P. Social inequalities and emerging infectious diseases. *Emerg Infect Dis* 1996; **2:** 259–69.
3   Edge CL, King EJ, Dolan K, McKee M. Prisoners co-infected with tuberculosis and HIV: a systematic review. *J Int AIDS Soc* 2016; **19:** 20960.
4   US Immigration and Customs Enforcement. US Immigration and Customs Enforcement fiscal year 2019 enforcement and removal operations report. 2019. https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf (accessed March 25, 2020).
5   Team B Bristol Count Correctional Center of North Dartmouth, Massachusetts. Letter to US Immigration and Customs Enforcement Office of Detention and Removal. 2020. https://assets.documentcloud.org/documents/6816564/Bristol-County-letter.pdf (accessed March 25, 2020).
6   Office of Inspector General. Concerns about ICE detainee treatment and care at four detention facilities. 2019. https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf (accessed March 25, 2020).

**EXHIBIT 3**

**EXHIBIT 3**



**Carlos Franco-Paredes, MD, MPH**
**Division of Infectious Diseases**
**Department of Medicine**
**Director, Infectious Diseases Fellowship**
**Training Program**

Mail Stop B168
Research Complex 2
12700 E. 19th Avenue | Aurora, Colorado 80045
**o** 303-724-4443  |  **f** 7208480192  |
carlos.franco-paredes@cuanschutz.edu

March 22, 2020

**To Policymakers, Judicial Officers, Sheriffs, Wardens, and Parole Boards:**

The Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is a newly emerging zoonotic agent initially identified in December 2019 that causes the Coronavirus Disease 2019 (COVID-19), formerly known as the 2019 novel Coronavirus (2019nCoV). Infection with COVID-19 is associated with significant morbidity and mortality, especially in patients with chronic medical conditions and those 55 years of age and older. Based on a recently published systematic review of the literature, of which I am a co-author, at least one-fifth of infected cases required supportive care in medical intensive care units. Equally concerning is the fact that despite the implementation of optimal supportive interventions, case fatality rate among hospitalized patients is higher than 10 percent.

**As an infectious disease clinician with a public health degree in the dynamics of infectious disease epidemics and pandemics, I am concerned about the inevitable spread of COVID-19 in jails, prisons, community corrections facilities, and juvenile detention centers. The conditions in these facilities do not allow for appropriate infection control protocols and will make the current COVID-19 pandemic worse. Incarcerated populations have higher rates of underlying illness and, by extension, will have a higher case fatality rate. It is now clear that asymptomatic individuals can spread this infection. With staff traveling between their homes and the facilities, and newly arrested individuals brought in as others are released, containment of the virus is not possible. This epidemic has the potential to become the Coming Prison Plague.**

**Experience**

Over my 20 years of experience as an infectious disease clinician, I have provided care at outpatient clinics and during inpatient consultation services in infectious diseases to a large number of patients residing in jail and prison populations. Based on my conversations with patients, my own observations, and information that exists regarding the resources available within jail, prison, community corrections, and juvenile detention facilities, it is my professional opinion that the medical care available cannot properly accommodate the needs of patients should there be an outbreak of COVID-19 in these facilities.

People who are considered at high risk of severe illness and death should they be infected with the coronavirus include the following:

- People age 55 or older
- Anyone diagnosed with cancer, autoimmune disease (including lupus, rheumatoid arthritis, psoriasis, Sjogren's, Crohn's), chronic lung disease (including asthma, COPD, bronchiectasis, idiopathic pulmonary fibrosis), history of cardiovascular disease (MI), chronic arthritis (rheumatoid, psoriatic), chronic liver or kidney disease, diabetes, hypertension, heart failure, HIV, on chronic steroids or other immunosuppressant medications for chronic conditions
- People with a history of smoking or other substance use disorders
- Pregnant women

I can also certify that incarcerated individuals have a higher prevalence of chronic medical conditions that place them at high risk of developing severe coronavirus disease and potentially dying from this infection. Some of these medical conditions include HIV/AIDS, uncontrolled diabetes mellitus, chronic obstructive pulmonary disease, and other conditions.

**Risk Factors Present in Jails, Prisons, and Juvenile Detention Centers**

Detention and incarceration of any kind requires large groups of people to be held together in a confined space and creates the worst type of setting for curbing the spread of a highly contagious infection such as COVID-19. To contain the spread of the disease, infection prevention protocols must be meticulously followed. These infection prevention protocols include "social distancing" measures, where individuals maintain a distance of at least six feet from each other, and frequent hand-washing and other good hygiene practices. These protocols apply to both incarcerated and non-incarcerated individuals. In a carceral setting, these protocols would require, for example, that individuals sleep one person per cell, rather than in bunk beds. These protocols are necessary to prevent spread of COVID-19 among otherwise healthy people, and are imperative for high-risk individuals.

The number of private rooms in a typical jail, prison, or juvenile detention facility is insufficient to comply with the recommended airborne/droplet isolation guidelines. Another important consideration that complicates disinfection and decontamination practices is the ability of this novel coronavirus to survive for extended periods of time on materials that are highly prevalent in secure settings, such as metals and other non-porous surfaces. Current outbreak protocols require frequent disinfection and decontamination of all surfaces of the facility, which is exceedingly difficult given the large number of incarcerated individuals, frequent interactions between incarcerated individuals and staff, and regularity with which staff move in and out of each facility. Again, it is critical to

2

understand that even asymptomatic individuals can spread virus to others. Therefore, merely screening those with symptoms is inadequate to keep COVID-19 out of jail and prison facilities.

Responding to this outbreak calls for highly trained staff to correctly institute and enforce isolation and quarantine procedures and have training on the appropriate utilization of personal protective equipment. It is essential that nursing and medical staff be trained in infection control practices, implementing triage protocols, and the medical management of suspected, probable and confirmed cases of coronavirus infection. These same personnel would have to initiate the management of those with severe disease. Since these are closed facilities, the number of exposed, infected, and ill individuals may rapidly overwhelm staff and resources. As a result, many patients would need transfer to hospitals near these facilities, likely overwhelming the surrounding healthcare systems, which are already functioning at full capacity caring for the general non-incarcerated community.

**Likely Outcome if COVID-19 Spreads in Jails, Prisons, and Juvenile Detention**

Given the high population density of jails, prisons, and juvenile detention centers, and the ease of transmission of this viral pathogen, the infection rate will be exponential if even a single person, with or without symptoms, that is shedding the virus enters a facility. For every person with the virus, they will infect more than 2 other people – whether they be incarcerated individuals or staff. Of those infected, one-fifth will get so ill that they require hospital admission, and about 10% will develop severe disease requiring treatment only available in the intensive care unit. To illustrate the magnitude of this threat, a jail or prison that holds 1500 individuals can anticipate that 500-650 individuals may acquire the infection. Of these, 100 to 150 individuals may develop severe disease requiring admission to the hospital, potentially to an intensive care unit. Of these, 10-15 individuals may die from respiratory failure. The cost of care in the intensive care unit is on the order of $5,000 to $8,000 dollars per day, and often more for those requiring mechanical ventilation.

For the 2,200-inmate Denver Jail, for example, the only hospital that is currently accepting these patients is Denver Health. Denver Health only has a capacity of 525 beds in the entire facility. Intensive care unit capacity at Denver Health is 24 beds in the medical ICU, 23 beds in the surgical/trauma ICU, and 12 beds in a step-down unit (that may be able to support ventilated patients). Therefore, a large outbreak in a jail or prison facility would put a tremendous strain on the medical system in Colorado to the detriment of patients across the region. It is reasonable to anticipate that there will be the loss of additional lives that could have otherwise been saved.

**Risk Minimization Through Release from Jails, Prisons, and Juvenile Detention**

Reducing the number of incarcerated individuals is necessary for effective infection control and sanitization practices that could dramatically reduce the burden COVID-19 will inevitably place on our health system. Urgent action is needed given the predicted shortage of medical supplies such as personal protective equipment, shortage of staff as medical personnel become ill themselves, and limited life-saving resources such as ventilators.

**Conclusion**

The COVID-19 virus will inevitably enter and expand exponentially in jails, prisons, community corrections, and juvenile detention facilities. These facilities are not designed to contain the spread of a highly contagious disease or to treat those with significant illness. It is likely that there will be high numbers of ill incarcerated individuals, as well as the staff critical to these facilities. The broader health system does not have the capacity to handle a wave of critically ill patients coming from jails and prisons in addition to the expected community outbreak.

**The prompt release of individuals with medical conditions at risk of severe disease and death due to coronavirus infection, and prompt reduction in incarcerated populations overall, is necessary to reduce the impact of this outbreak.**

Sincerely,

Carlos Franco-Paredes, MD, MPH, DTMH (Gorgas)
Associate Professor of Medicine
Division of Infectious Diseases
Department of Medicine
Division of infectious Diseases
Program Director Infectious Disease Fellowship
Training Program, University of Colorado



**Carlos Franco-Paredes, MD, MPH**
**Division of Infectious Diseases**
**Department of Medicine**
**Director, Infectious Diseases Fellowship Training Program**

Mail Stop B168
Research Complex 2
12700 E. 19th Avenue | Aurora, Colorado 80045
**o** 303-724-4443 | **f** 7208480192 |
carlos.franco-paredes@cuanschutz.edu

March 19, 2020

**To Whom It May Concern:**

The Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2), is a newly emerging zoonotic agent initially identified in December 2019 that causes the Coronavirus Disease 2019 (COVID-19), formerly known as the 2019 novel Coronavirus (2019nCoV). Infection with COVID-19 is associated with significant morbidity especially in patients with chronic medical conditions. Based on a recently published systematic review of the literature in which I am a co-author of the study, at least one fifth of infected cases require supportive care in medical intensive care units. Equally concerning is the fact that despite the implementation of optimal supportive interventions, case fatality rate among hospitalized patients is more than 10 percent.

**As an infectious disease clinician with a public health degree in the dynamics of infectious diseases epidemics and pandemics, I am concerned about the treatment of immigrants inside detention centers which could make the current COVID-19 epidemic worse in the U.S. by having a high case fatality rate among detainees and potentially spreading the outbreak into the larger community. This epidemic has the potential to become the Coming Prison Plague.**

**Experience Working with People in DHS Custody**

I have experience providing care to individuals in a civil detention center and have performed approximately two medical forensic examinations and fifteen medical second opinion evaluations for patients in the custody of the Department of Homeland Security. Based on my conversations with patients, my own observations, and information that exists regarding the resources available within immigration detention facilities as detailed by the ICE Health Services Corps, it is my professional opinion that the medical care available in DHS custody cannot properly accommodate the needs of patients should there be an outbreak of COVID-19 in an immigration detention facility.

**Persons Considered High Risk**

People who are considered at high risk of severe illness and death should they be infected with the coronavirus include the following:

- People age 50 or older
- Anyone diagnosed with cancer, autoimmune disease (including lupus, rheumatoid arthritis, psoriasis, Sjogren's, Crohn's), chronic lung disease (including asthma, COPD, bronchiectasis, idiopathic pulmonary fibrosis), history of cardiovascular disease (MI), chronic arthritis (rheumatoid, psoriatic), chronic liver or kidney disease, diabetes, hypertension, heart failure, HIV, chronic steroids to treat chronic conditions
- People with a history of smoking

I can also certify that many of the detainees from the Aurora Immigration detention facility that I have cared for as an infectious diseases clinician either at the infectious diseases clinic and inpatient hospital services of the Anschutz Medical Center of the University of Colorado or while performing second opinion evaluations within the Aurora detention facility have chronic medical conditions that place them at high risk of developing severe coronavirus disease and potentially dying from this infection. Some of these medical conditions include HIV/AIDS, uncontrolled diabetes mellitus, chronic obstructive pulmonary disease, and other conditions. Many of them are also malnourished due to poorly nutritional diets.

**Risk Factors Present in Immigration Detention**

Detention of any kind allows for large groups of people to be held together in a confined space and creates the worst type of setting for curbing the spread of a highly contagious infection such as COVID-19. Under the current circumstances, incomplete adherence to infection prevention protocols including the appropriate use of personal protective equipment is insufficient to contain the spread of this disease.

In order to adequately contain any type of outbreak, there must be sufficient resources allocated to determining the risk of infection. Namely, the facility should be testing people who are symptomatic in order to determine whether they have COVID-19. Based on news reports, it is my understanding that DHS is not testing people in its custody. The effective institution of interventions to mitigate an outbreak will fail without having the ability to test those infected inside detention centers.

Should an outbreak occur, the number of isolation rooms in a given detention facility is insufficient to comply with the recommended airborne/droplet isolation guidelines. Another important consideration that complicates disinfection and decontamination practices in detention facilities is the ability of this coronavirus to survive in aerosol and metal surfaces which are highly prevalent security materials. The current outbreak requires multiple routine disinfection and decontamination of all surfaces of the facility. With a large population of detainees and staff coming in and out of any given facility, it is highly unlikely to maintaining optimal infection prevention practices.

Responding to this outbreak calls for highly-trained staff to correctly institute and enforce isolation and quarantine procedures, and to have the training to wear personal protective equipment. It is required that during the outbreak, sufficient nursing and medical staff need to be trained in infection control prevention practices, in implementing triage protocols, and adequate training in the medical management of suspect, probable and confirmed cases of coronavirus infection. This same personnel would have to initiate the management of those with severe disease. Since these are closed facilities, the number of exposed, infected, and ill detainees may prove to rapidly overwhelm staff and resources within a detention center. As a result, many patients would need transfer to hospitals near detention centers potentially overwhelming surrounding healthcare systems which are already functioning at full-capacity caring for the general community.

**Likely Outcome if COVID-19 Spreads in Immigration Detention**

Given the large population density of immigration detention centers, and the ease of transmission of this viral pathogen, the attack rate may take exponential proportions. Behind the walls of a detention center, the basic reproductive rate of the infection ($R_{0=2}$) may be responsible for infecting between 30-50% of detainees and staff within a facility. Of these one-fifth will require hospital admission, and about 10% will develop severe disease requiring intensive care unit.   For an immigration detention center that holds 1500 detainees, we can estimate that 500-650 may acquire the infection.  Of these, 100 to 150 individuals may develop severe disease potentially requiring admission to an intensive care unit. Of these, 10-15 individuals may die from respiratory failure.  The cost of care of in the intensive care unit is in the order of $5000 to $8,000 dollars per day for those requiring mechanical ventilation.

**Risk Minimization Through Release from Detention**

In contrast, releasing those in the high risk age groups and those with underlying medical conditions with lessen the impact of an outbreak of COVID-19.  The main reason is that those in these groups at risk carry the highest concentration of virus in their respiratory secretions and act as human incubators of the virus. Additionally, by having a reduced number of people and held together in a confined space, there is a reduced number of networks of transmission of the infection.   This intervention is the public interest since the release people from detention will minimize the number of people infected with COVID-19 that may potentially spread to the surrounding communities around detention centers.

**Conclusion**

Besides the humanitarian premise and the moral justification for the release of detainees in the midst of the ongoing epidemic in the U.S., the potential medical impact that COVID-19 may produce among detainees may become devastating and require major financial

investment by ICE. Therefore, anticipating the impact of this epidemic inside immigration detention facilities justifies exploring alternative strategies to reduce its impact in U.S. soil. **The prompt release on parole of detainees with medical conditions at risk of severe disease and death due to coronavirus infection may reduce the impact of this outbreak among detention facilities. This intervention may also effectively reduce the potential spillover of the outbreak from a detention center into the community.**

Sincerely,

Carlos Franco-Paredes, MD, MPH, DTMH (Gorgas)
Associate Professor of Medicine
Division of Infectious Diseases
Department of Medicine
Division of infectious Diseases
Program Director Infectious Disease Fellowship
Training Program, University of Colorado