ASH

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Guadalupe Lucero-Gonzalez, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Kris Kline, et al., <br><br> Defendants. | No. CV-20-00901-PHX-DJH (DMF) <br><br> **ORDER** |

Plaintiffs Maria Guadalupe Lucero-Gonzalez, Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos, who are confined in CoreCivic's Central Arizona Florence Correctional Complex (CAFCC), have filed, through counsel on behalf of themselves and all others similarly situated, a civil rights Complaint pursuant to 28 U.S.C. §§ 1331, 1346, 2201-02, and 2241 (Doc. 1). Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2), which is fully briefed, and the Court has taken oral argument from the parties on the Motion.

**I.  Injunctive Relief Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy

never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) s/he is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**II. Motion for Injunctive Relief**

Put broadly, Plaintiffs allege in their Complaint that Defendants have violated their Fifth or Eighth Amendment rights by placing them at unconstitutional risk from exposure to COVID-19. In their Motion, Plaintiffs seek the appointment of a Rule 706 expert[1] to

---

[1] Rule 706 of the Federal Rules of Evidence provides for court-appointed expert

inspect CAFCC's facility in order "to determine whether Defendants have implemented consistent social (or physical) distancing, novel coronavirus testing procedures, and hygienic practices sufficient to reasonably protect Plaintiffs and Class Members from contracting COVID-19 while in Defendants' custody." (Doc. 2-1 at 1-2). If the expert determines that Plaintiffs are at unreasonable risk from contracting COVID-19, then the expert shall submit "recommendations as to how such practices should be achieved and within what approximate timeline." (*Id.* at 2). Thereafter, Defendants would be required to "begin implementing the expert's recommendations immediately," "provide weekly updates to Plaintiffs' counsel and this Court on their progress," and, absent good cause, "complete the implementation of the recommendations within the timeline established by the expert." (*Id.*).

## IV.   Discussion

### A.   COVID-19

COVID-19, a disease caused by a novel strain of coronavirus (SARS-CoV-2), was declared by the World Health Organization as a global pandemic on March 11, 2020. As of June 1, 2020, 1,817,785 individuals have been confirmed as positive for COVID-19 in the United States, of which 105,644 have died.[2] In Arizona, 21,264 cases have been identified, of which 943 have died.[3]

The United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") reports that individuals who contract and transmit COVID-19 experience symptoms that range from negligible, with some individuals remaining entirely asymptomatic, to mild, such as fever, coughing, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock,

---

witnesses. Under that Rule "[t]he Court may appoint any expert that the parties agree on and any of its own choosing," "[b]ut the Court may only appoint someone who consents to act." Fed.R.Evid. 706(a).

[2] *Coronavirus Resource Center*: *COVID-19 Dashboard*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu/map.html (last accessed June 2, 2020).

[3] *Id.*

and multi-organ failure, or even death.[4] The CDC estimates that serious illness or death occurs in 16% of all cases.[5] Those at high-risk of suffering severe illness or death from COVID-19 include individuals who are 65 years and older, or individuals of any age with underlying medical conditions including chronic lung disease, moderate to severe asthma, a serious heart condition, a weakened immune system, severe obesity, diabetes, chronic kidney disease, or liver disease.[6]

The virus that causes COVID-19 "is thought to spread mainly through close contact from person-to-person in respiratory droplets from someone who is infected."[7] The incubation period for COVID-19 extends 14 days on average, with a median time of 4-5 days from exposure to symptoms onset.[8] The CDC recommends that to avoid exposure and transmission, the public should maintain a physical distance of at least six feet from others, wear cloth face covers, frequently wash hands or use hand sanitizer, and disinfect frequently touched surfaces.[9] High-risk individuals should take additional "special precautions," such as continue active treatment of their underlying medical conditions, obtain vaccinations against other diseases like influenza and pneumococcal illness, stay home, and remain away from others "as much as possible."[10]

**B.  Detention Facility COVID-19 Guidance**

On March 23, 2020, the CDC issued an "Interim Guidance on Management of

---

[4] CDC *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed June 1, 2020).

[5] CDC *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/summary.html (*last accessed* June 1, 2020).

[6] CDC *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed June 1, 2020).

[7] CDC *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed June 1, 2020).

[8] *See* n.3, *supra*.

[9] CDC *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed June 1, 2020).

[10] CDC *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed June 1, 2020).

Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Guidance")[11] which "provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors." (CDC Guidance at 2.) The guidance reports there is a heightened risk of transmission of COVID-19 to and among individuals within detention facilities due to, among other things, the number of sources which can introduce them into a facility's population, including detention staff, visitors, contractors, vendors, legal representatives, court staff, and new detainees; the congregate environment in which detainees "live, work, eat, study, and recreate"; and limited medical isolation options, hygiene supplies, and dissemination of accurate information among detainees. (CDC Guidance at 2.)[12] For those reasons, the guidance recommends that detention facilities implement specific measures to prepare for potential transmission of COVID-19, to prevent the spread of COVID-19, and to manage confirmed and suspected COVID-19 cases to prevent further transmission and provide treatment.

The guidance states that "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." (CDC Guidance at 4.) It recommends implementing social distancing strategies to increase the physical space between detained persons "(ideally 6 feet between all individuals, regardless of the presence of symptoms)," such as increasing space between individuals in cells, increasing space between individuals in lines and waiting areas; choosing recreation spaces where individuals can spread out and staggering time in those spaces; staggering meals and rearrange seating in the dining hall

---

[11] CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed June 1, 2020).

[12] "People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19." CDC *FAQs for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html#People (last accessed June 1, 2020).

so that there is more space between individuals; providing meals inside housing units or cells; limiting the size of group activities and increasing space between individuals during group activities. (*Id.* at 4, 11.) It further recommends that facilities should house quarantined individuals who have had close contact with a COVID-19 case, or individuals in medical isolation who are suspected or confirmed positive with COVID-19, in order of preference, separately in single cells or as a cohort, although "[c]ohorting should only be practiced if there are no other available options." (*Id.* at 15-20.)[13] "If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the higher-risk individuals." (*Id.* at 19.)

CDC Guidance also recommends that facilities implement intensified cleaning and disinfecting procedures and provide education on, and reinforcement of, hygiene practices. (CDC Guidance at 9-10.) Facilities should, among other things, provide adequate supplies to support intensified cleaning and disinfection practices, and "continually restock hygiene supplies throughout the facility." Facilities should provide detainees and staff no-cost access to soap, running water, hand drying machines or disposable paper towels, tissues, no-touch trash receptacles, and alcohol-based hand sanitizer with at least 60% alcohol where security restrictions allow. (*Id.*) The guidance underscores that because the virus can be transmitted from contagious, yet asymptomatic individuals who are present within the facilities, "[b]oth good hygiene practices and social distancing are critical in preventing further transmission." (*Id.* at 8.)

Notably, the CDC does not specify when testing for COVID-19 shall occur, stating only that "Clinicians should use their judgment to determine if a patient has signs and symptoms compatible with COVID-19 and whether the patient should be tested."[14] However, the CDC does note that "[r]esidents in long-term care facilities or other

---

[13] "Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." (CDC Guidance at 3.)

[14] CDC *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last accessed June 1, 2020).

congregate living settings, including prisons and shelters, **with** symptoms" are a "high priority" for testing.[15]

### C. CAFCC

CAFCC has a total design capacity of 5,003 detainees. (Kline Decl. ¶¶ 9-11). As of May 13, 2020, CAFCC had a total of 3,090 detainees. (*Id.* ¶ 13).[16] As of May 13, 2020, 15 detainees have tested positive for COVID-19; 13 of those cases were identified during intake, one was identified at another facility before transfer to CAFCC, and one was identified in general population. (*Id.* ¶¶ 16-17, 62). At oral argument, the parties represented that this number has subsequently increased; as of the date of the hearing (May 22, 2020), 26 detainees have tested positive (including the 15 previously identified), of which three have been identified in general population (including the one previously identified).[17] Defendants' avowed at oral argument that no detainees have been hospitalized, and none have died.

On March 19, 2020, CAFCC began cohorting new arrivals and detainees returning from outside transports. (*Id.* ¶¶ 33-40; Ivers Decl. ¶ 20). While cohorted, detainees are only allowed out of their cells with other members of their cohort, and the dayroom and common areas are sanitized between groups. (Kline Decl. ¶ 39). Detainees — whether in a cohort or general population — who display symptoms of COVID-19 are quarantined in

---

[15] *Id.* (emphasis in original).

[16] Per the parties' representations at oral argument, that number has decreased in the interim.

[17] Defendants assert that these positive cases reflect that "less than 0.5% of the total detainee population have tested positive for COVID-19," and that "this low infection rate is due to CAFCC's prompt and coordinated efforts to comply" with CDC guidance. (Doc. 16 at 17-18). This statement is misleading, and conflates two distinct statistics. While only 26 detainees have *tested* positive, testing has not been widespread. At oral argument, Defendants conceded that only 45 total tests COVID-19 tests have been conducted on detainees at CAFCC. As such, the total number of positive tests does not, as Defendants' style it, reflect a "low infection rate." Rather, the infection rate at CAFCC is nearly 58% (26 positive cases out of 45 total tests, or 57.8%), significantly above Arizona's statewide average of 9.3%.
See *Coronavirus Resource Center*: *COVID-19 Dashboard*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu/map.html (last accessed June 2, 2020) (reflecting that, as of June 2, 2020, Arizona has conducted 228,070 COVID-19 tests, and has identified 21,264 positive cases).

J-Pod, evaluated, and tested if necessary; the pod from which the detainee came is placed on quarantine status for 14 days. (*Id.* ¶ 41). Quarantined detainees remain in J-Pod until they are symptom free for 72 hours, at which point they are cohorted for 14 days before release in general population. (*Id.* ¶¶ 43-44).

Staff entering a cohort or quarantined area are required to wear a full suit/coveralls, rubber boots, gloves, N-95 mask, and goggles/face shield. (*Id.* ¶ 47). Upon exiting, staff are decontaminated in a dedicated decontamination zone where their protective equipment is decontaminated or disposed of as appropriate. (*Id.* ¶¶ 48-49).

Beginning on March 12, 2020, CAFCC suspended social visitation and volunteer entry. (*Id.* ¶ 63).[18] All persons entering the facility are subjected to screening, which consists of a series of questions and a temperature check, and are required to wear a mask. (*Id.* ¶¶ 69-75, 77). Detainees are required to wear masks whenever they are outside their pod, and are encouraged to wear masks within the pods, although CAFCC does not enforce noncompliance within the pods for reasons of safety, security, and operational concerns. (*Id.* ¶ 78-80, 90-91). Detainees were originally provided with one paper-style mask each on April 13, 2020 (*id.* ¶ 87-89), and were provided with cloth masks on May 21, 2020 (Doc. 23-1 at 4).

CAFCC has posted materials throughout the facility regarding COVID-19 symptoms, hand washing, sanitation and cleanliness, mask use, and steps to reduce the risk of exposure. (Kline Decl. ¶ 94). Staff also conduct "town hall" meetings to discuss topics such as face masks, social distancing strategies, and updating detainees on the number of infected persons in the facility. (*Id.* ¶ 95-96).

Each pod in CAFCC has a dayroom shared by the detainees. The dayrooms are large and have space for the detainees to practice social distancing while in the dayrooms. (*Id.* ¶ 100-101). Detainees are encouraged to practice social distancing while in the dayrooms, but CAFCC does not enforce violations for reasons of safety, security, and

---

[18] Legal visitations have not been suspended, but non-contact legal visits using videoconferencing technology is encouraged. (Kline Decl. ¶¶ 64, 66). When contact legal visits are unavoidable, the visitation area is sanitized before and after the visit. (*Id.* ¶ 65).

operational concern. (*Id.* ¶ 104). Programming within CAFCC has not been eliminated, but programs are now limited to groups of no more than 10 detainees in order to allow for social distancing. (*Id.* ¶ 102). CAFCC has also begun delivering meals to detainees in their detention unit rather than having detainees take their meals in a dining hall. (*Id.* ¶ 103). Detainees are reminded to practice social distancing while waiting in line to receive their meals. (*Id.* ¶ 103). Once a detainee receives their meal, they are allowed to eat it anywhere they wish within the pod. (*Id.*).

Detainees are provided with two bars of soap and one bottle of shampoo each week, and are provided with additional supplies if they run out before weekly distribution. (*Id.* ¶ 109). CAFCC uses EPA-approved disinfectants to clean common areas. (*Id.* ¶¶ 106-107). CAFCC has been divided into several zones, with a staff supervisor assigned to each zone to verify that all hard-surface, high-touch areas are cleaned and disinfected multiple times per day. (*Id.* ¶ 115). Detainee cleaning porters are provided with masks and gloves in order to clean these common areas. (*Id.*). High-touch employee-only areas — such as timecards — are also cleaned multiple times per day (*Id.* ¶¶ 117-121). When cleaning an area where a confirmed COVID-19 detainee was housed, staff wear full-body personal protective equipment, treat any trash coming out of the area as medical waste, and follow strict environmental cleaning and disinfection recommendations. (*Id.* ¶¶ 122-123). Transport vehicles are also cleaned and disinfected before and after each use. (*Id.* ¶ 124).

Detainees housed in administrative or disciplinary segregation are housed individually as much as possible, remain in their cells for 23 hours each day, receive their meals in-cell, and typically recreate alone in single-occupancy enclosures. (*Id.* ¶¶ 125-128). As with detainees in general population, segregated inmates have been provided with masks and educated on proper hygiene and sanitation. (*Id.* ¶¶ 130-131). Staff check on detainees in segregated housing every 30 minutes, medical staff make rounds twice per day, and mental health staff make rounds once per day. (*Id.* ¶ 129). Segregated housing pods are cleaned in the same manner as general population pods, and segregated housing inmates are provided with the same personal hygiene supplies. (*Id.* ¶ 131).

### D. Plaintiffs

Plaintiffs each suffer from one or more conditions that place them at higher risk from adverse effects of COVID-19.[19] Plaintiff Lucero-Gonzalez suffers from asthma, hypertension, diabetes, and kidney cancer. (Doc. 2 at 5); Plaintiff Romero-Lorenzo suffers from leukemia (*id.*); Plaintiff Peuplie suffers from asthma, hypertension, anxiety, substance-abuse disorder, and spinal stenosis (*id.*); Plaintiff Ciecierski suffers from severe asthma (*id.*); and Plaintiff Enos suffers from asthma and hypertension (*id.*).

Plaintiffs report that the pods at CAFCC contain either 40 or 80 detainees. (Doc. 2 at 7) (citations to specific exhibits omitted). In each pod, detainees share between four and six showers, and three or four telephones. (*Id.*). Plaintiffs are celled with as few as one, and as many as thirteen, other detainees. (*Id.*). In cells with one other person, beds are placed against the walls one or two feet apart. (*Id.*). In cells with multiple people, bunk beds are placed against the same wall one or two feet apart. (*Id.*). Everyone in a cell shares a single toilet and sink. (*Id.*). Plaintiff Enos — who is in segregated housing — shares a cell with two other detainees. (*Id.*) Given the size of the cell, Plaintiff Enos is as close as two feet to the other detainees for up to 23 hours each day, and does not have daily access to a shower. (*Id.*).

Plaintiffs state that detainees frequently stand close together while waiting for meals, medical appointments, or to use the telephones. (*Id.* at 8). The telephones are spaced less than six feet apart, requiring people to stand within two or three feet of each other when using the phone. (*Id.*). Detainees working in jobs are required to be in close proximity with as many as 17 other detainees. (*Id.*).

Plaintiff's further assert that they did not receive any sort of mask until mid-April, that some detainees did not receive masks at all, and that the masks were thin, paper-masks rather than the N95 masks recommended by the CDC. (*Id.*). Further, even after receiving masks, Plaintiffs report that many detainees do not wear them, and that Defendants have

---

[19] The Court notes that Plaintiff do not seek relief based on their alleged heightened risk to COVID-19, but instead seek to represent subclasses of detainees based on their status as pre-trial detainees or post-conviction prisoners.

- 10 -

not required people to wear them. (*Id.*). Plaintiff also report that many guards do not wear masks, and that even though (as of April 30, 2020) detainees have been required to wear masks when out of their pod, they are not required to wear masks when in their pod or cells, and that few detainees do so. (*Id.*). Plaintiffs also report that when their masks have broken or been lost, Defendants have required them to swap and share masks in order to leave the pods for things like laundry or legal calls. (*Id.* at 8-9).

Additionally, Plaintiffs report that they receive only a small amount of soap and shampoo each week, and that it often does not last the entire week, especially because detainees are forced to use these supplies to clean items such as plates and cups, as well as their cells. (*Id.* at 9). Plaintiff's assert that if they are unable to purchase additional soap at the commissary, they "have no soap at all." (*Id.*).

Plaintiffs also report that their cells and pods are not adequately and consistently cleaned. (*Id.*). Detainees are responsible for cleaning their own pods and cells, but are not given PPE such as a mask or gloves to do so. (*Id.*). Detainees also only receive a small amount of cleaning solution, "none of which is antibacterial."[20] (*Id.*). Often, this cleaning solution runs out before all of the pod or cells are cleaned, and that detainees sometime resort to cleaning with water only. (*Id.*). Plaintiffs also report that frequently touched surfaces — such as the communal telephones — are not cleaned between uses, or even every day, and that some detainees have taken to wiping them down with their shirts or dampened menstrual pads. (*Id.*).

Plaintiffs also report that they have been exposed to other detainees exhibiting symptoms of COVID-19. (*Id.*). Some of these people were quarantined and then returned to the pods without being tested for COVID-19 even though their symptoms continued. (*Id.* at 10). Plaintiffs further assert that Defendants have failed to investigate the spread of COVID-19 within the facility, and that only "a handful" of people have been tested for COVID-19 or checked for COVID-19 symptoms. (*Id.*). Plaintiffs further report that even

---

[20] The Court notes that an antibacterial solution would have no effect on viruses such as COVID-19, though it would help to prevent other forms of infection.

- 11 -

detainees exhibiting symptoms and requesting medical attention have not been tested for COVID-19. (*Id.*).

Plaintiffs also assert that Defendants have failed to provide them with information about COVID-19, measures for preventing its spread, or the risks of contracting COVID-19. (*Id.*). Defendants have not informed Plaintiffs of the number of people who have tested positive for COVID-19. (*Id.*).

Finally, Plaintiffs assert that Defendants have not taken steps to mitigate the risks of spread of COVID-19 by "pre-symptomatic" or asymptomatic carriers. (*Id.* at 10-11).

### E.    Plaintiff Lucero-Gonzalez

Plaintiff Lucero-Gonzalez is currently being held at CAFCC pursuant to a supervised release violation stemming from her underlying conviction for illegal reentry. (Doc. 2 at 4). Accordingly, Plaintiff Lucero-Gonzalez seeks to represent herself and a putative class of "post-conviction" detainees at CAFCC protected under the Eighth Amendment.

To state an Eighth Amendment conditions-of-confinement claim, plaintiffs must meet a two-part test. "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted). Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Id.* at 835. In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* at 837 (emphasis added).

Similarly, not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff

must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Further, because all of the Defendants are named in their official capacities only,

Plaintiff Lucero-Gonzalez must demonstrate that her injuries were caused by a policy, practice, or custom of the Defendants' agencies. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

> There are three ways to meet the policy, practice, or custom requirement for municipal liability under § 1983: (1) the plaintiff may prove that a public entity employee committed the alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom, which constitutes the standard operating procedure of the local government entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official government policy; or (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action . . . . An unconstitutional policy need not be formal or written to create municipal liability under § 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, . . . (1970). Furthermore, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, . . . (1985).

*Avalos v. Baca*, 596 F.3d 583, 587-88 (9th Cir. Feb. 24, 2010) (quoting *Avalos v. Baca*, 517 F. Supp 2d 1156, 1162 (C.D. Cal. 2007).

Here, the Court concludes that Plaintiff Lucero-Gonzalez has failed to demonstrate that the Defendants have violated her Eighth Amendment rights. Specifically, Plaintiff has not demonstrated that Defendants, through any policy, practice, or custom they have implemented, have been subjectively deliberately indifferent to her health or safety. There is no dispute between the parties that Defendants have enacted various policies in response to the risks posed by COVID-19. Nor have Plaintiffs presented evidence to support that these policies are, subjectively, deliberately indifferent to the real risks posed by COVID-19. Rather, the main dispute between the parties is whether these policies are, *objectively*, sufficient. However, as noted, Plaintiff Lucero-Gonzalez and those situated similarly to her, must demonstrate that Defendants' policies are both objectively insufficient and subjectively deliberately indifferent to her health and safety. The very fact that Defendants

have enacted such policies supports that they have not been subjectively indifferent to the risks posed by COVID-19 to Plaintiffs like Ms. Lucero-Gonzalez. Accordingly, the Court concludes that, on the record before it at this time, Plaintiff Lucero-Gonzalez has not demonstrated that she is likely to succeed on the merits of her Eighth Amendment claim, and is therefore not entitled to preliminary injunctive relief.

### F. Plaintiffs Romero-Lorenzo, Peuplie, Ciecierski, and Enos

Plaintiffs Romero-Lorenzo, Peuplie, Ciecierski, and Enos assert that they are pre-trial detainees. (Doc. 2 at 4). As such, unlike Plaintiff Lucero-Gonzalez, their protections arise from the Fourteenth Amendment rather than the Eighth Amendment. A pretrial detainee has a right under the Due Process Clause of the Fourteenth Amendment to be free from punishment prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation, medical care, and personal safety.'" *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). To state a claim of unconstitutional conditions of confinement against an individual defendant, a pretrial detainee must allege facts that show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

Whether the conditions and conduct rise to the level of a constitutional violation is an objective assessment that turns on the facts and circumstances of each particular case. *Id.*; *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005). However, "a de minimis level of imposition" is insufficient. *Bell*, 441 U.S. at 539 n.21. In addition, the "'mere lack

of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). Thus, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Similarly, the Ninth Circuit Court of Appeals has held that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). To state a medical care claim, a pretrial detainee must show

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, ___ U.S. ___, ___, 135 S. Ct. 2466, 2473 (2015); *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

Further, as with Defendant Lucero-Gonzalez, because all of the Defendants are named in their official capacities only, Plaintiffs Romero-Lorenzo, Peuplie, Ciecierski, and Enos must demonstrate that their injuries were caused by a policy, practice, or custom of the Defendants' agencies. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

As an initial observation, the Court notes that the current global pandemic is unprecedented, at least in the past century. It is a new virus for which our understanding of how best to combat its transmission and symptoms is rapidly and continuously evolving. There is not, to put it mildly, a large and well-developed body of either research or caselaw against which to measure, objectively, the policies implemented in response to COVID-19. As such, the Court relies on those recommendations provided by the CDC, and specifically the CDC's recommendations for prison populations.[21]

Upon its own review of the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* and comparison between those Guidelines and those implemented by defendants, the Court concludes that Defendants' policies related to COVID-19 at CAFCC have not been, objectively, deliberately indifferent to Plaintiffs' health or safety. Rather, Defendants' policies reflect the recommendations from the CDC, and have been implemented without unreasonable delay as the CDC's recommendations have been promulgated and updated. Indeed, while Plaintiffs acknowledge that Defendants "must address [the risks posed by COVID-19] by following public-health guidelines, ***including those by the Centers for Disease Control and Prevention***" (Doc. 2 at 7), Plaintiffs have not identified a single instance in which Defendants' policies have not complied with CDC guidance,[22] or where

---

[21] CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed June 1, 2020).

[22] The Court notes that Plaintiffs do argue that they were only initially provided with thin, paper masks, "not the N95 masks recommended by the CDC." (Doc. 2 at 8). However, while the CDC recommends that N95 be worn by both detainees and guards, it also recognizes that shortages of N95 masks may require the use of alternatives. The CDC

1    their implementation has been unreasonably delayed.  Yet, Plaintiffs' contend that
2    Defendants' still need to do more.[23]  Further, the fact that Plaintiffs seek, as injunctive
3    relief, the appointment of an expert "to determine *whether* Defendants have implemented
4    consistent social (or physical) distancing, novel coronavirus testing procedures, and
5    hygienic practices sufficient to reasonably protect Plaintiffs and Class Members from
6    contracting COVID-19 while in Defendants' custody" (Doc. 2-1 at 1-2) (emphasis added),
7    supports that Plaintiffs have not made the requisite showing that they are likely to succeed
8    on the merits of their claims at this time.[24]

9    Although there may be instances in which Defendants' policies have not been
10   *followed* — such as lack of cleaning supplies or inconsistent cleaning, or where the
11   detainees themselves do not practice social distancing or wear their masks — this does not
12   reflect that the policies *themselves* are objectively insufficient.  Rather, it supports only that
13   various staff, detainees, or other individuals — who are not named as Defendants to this
14   action — have failed to comply with Defendants' COVID-19-related policies.  Such
15   failures do not, however, support that Defendants, named in their official capacities only,
16   are liable for Plaintiffs' alleged injuries.  Accordingly, based on the record presented at this
17   time, Plaintiffs Romero-Lorenzo, Peuplie, Ciecierski, and Enos have failed to demonstrate
18   that they are likely to succeed on the merits of their Fourteenth Amendment claim, and are
19   thus not entitled to preliminary injunctive relief.

20   / / /
21   / / /

---

specifically states that face masks are an acceptable alternative in the event of a shortage of N95 respirators.  CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed June 1, 2020).

[23] Plaintiffs offer the opinion of Dr. Goldenson who states that CoreCivic must "substantially reduce the population" . . . "those who are medically vulnerable" and "over the age of 50" . . . "need to be moved out of Core Civic to the absolute maximum extent possible." (Doc.1-4 at 13) (Goldenson Dec'l at ¶¶ 45 & 46).

[24] Indeed, and notwithstanding the clear risks posed by COVID-19, that Plaintiffs seek an expert to determine "whether" Defendants have violated their rights smacks of a fishing expedition.

## V. Conclusion

Because neither of the two classes of Plaintiff (pre-trial and post-conviction) have met their burden for preliminary injunctive relief, the Court will deny the Motion. The Court notes, however, that the denial of Plaintiffs' Motion for Preliminary Injunction is without prejudice, and if circumstances develop to where Plaintiffs again believe irreparable harm may result without preliminary injunctive relief, they may seek such relief by new motion to this Court.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2).

(2) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2) is **denied**.

(3) All other matters **must remain** with the Magistrate Judge for disposition as appropriate.

Dated this 2nd day of June, 2020.

Honorable Diane J. Humetewa
United States District Judge