1                                                     SKC

2

3

4

5

6                  **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

| 9<br>10<br>11<br>12<br>13<br>14<br>15 | Maria Guadalupe Lucero-Gonzalez, et al.,<br><br>             Plaintiffs,<br><br>v.<br><br>Kris Kline, et al.,<br><br>             Defendants. | No.  CV-20-00901-PHX-DJH (DMF)<br><br>**ORDER** |
|---|---|

16         Plaintiffs Maria Guadalupe Lucero-Gonzalez, Claudia Romero-Lorenzo, Tracy Ann

17  Peuplie, James Tyler Ciecierski, and Marvin Lee Enos, who are confined in CoreCivic's

18  Central Arizona Florence Correctional Complex (CAFCC), have filed, through counsel, a

19  civil rights Complaint pursuant to 28 U.S.C. §§ 1331, 1346, 2201-02, and 2241 (Doc. 1).

20  Plaintiffs bring this action on behalf of themselves and all similarly situated individuals

21  confined by CoreCivic, claiming that Defendants have failed to take reasonable measures

22  to protect them from exposure to COVID-19 in violation of their due process rights and

23  their rights to be free from "cruel and unusual punishment" under the Fifth and Eighth

24  Amendments to the U.S. Constitution.  (*Id.*)

25         Before the Court is Plaintiffs' Motion for Class Certification (Doc. 3).[1] Defendants

26  CAFCC Warden Kris Kline, United States Marshal for the District of Arizona David

27

28

---

       [1] Also before the Court is Defendants-Respondents' Joint Motion to Dismiss (Doc. 48), which the Court will address by separate order.

1   Gonzalez, Director of the United States Marshals Service Donald W. Washington, and
2   Director of the Federal Bureau of Prisons Michael Carvajal, who are all sued in their
3   official capacities, oppose the Motion.  (Doc. 53.)  For the reasons discussed, the Court
4   will grant the Motion and certify the proposed classes.

5   **I.    Factual Background**

6       This action and Plaintiffs' Motion for Class Certification are based in pertinent part
7   on the following factual allegations:[2]

8       The 2019 novel coronavirus, known as COVID-19, is a viral illness that spreads
9   from person to person though respiratory droplets, close personal contact, and contact with
10  contaminated surfaces or objects.  (Doc. 1 ¶ 28.)  There is currently no vaccine or known
11  medication to prevent the virus.  (*Id.*)  Once contracted, COVID-19 can cause severe
12  damage to lung tissue, including permanent loss of respiratory capacity.  (*Id.* ¶ 29.)  It can
13  also damage tissues of other vital organs, including the liver and the heart, and the overall
14  fatality rate for COVID-19 is up to 35 times greater than the fatality rate for influenza, with
15  individuals over the age of 50 at increased risk of experiencing serious illness or death.
16  (*Id.* ¶¶ 29−30.)  Additionally, individuals with underlying medical conditions, including
17  lung disease, heart disease, liver or kidney disease, epilepsy, hypertension, and other
18  diseases causing compromised immune systems, face greater risks and higher mortality
19  rates from contracting COVID-19.  (*Id.* ¶ 31.)

20      The risk of contracting COVID-19 is especially high in congregate environments,
21  where people live, eat, and sleep in close proximity, which has led to rapid spreads in cruise
22  ships, nursing homes, and correctional settings, including the Cook County Jail and Riker's
23  Island, where the transmission rate for COVID-19 has been estimated to be among the
24  highest in the world.  (*Id.* ¶ 36.)

25

26      [2] These alleged facts are taken primarily from the Introduction section of the
27  Complaint and represent the overall bases for Plaintiffs' class action lawsuit.  In the Factual
    Allegations section of the Complaint, Plaintiffs allege more detailed facts about COVID-
28  19 and the specific conditions of their confinement, which the Court will not set forth in
    detail except where such additional facts are necessary to decide this Motion.

On March 11, 2020, Arizona declared a public health emergency to prepare for, respond to, and mitigate the spread of COVID-19.  (Doc. 1 ¶ 1.)  On March 19, 2020, Arizona closed most businesses and gathering places by executive order, and on March 30, 2020, Arizona issued another executive order for individuals to remain six feet apart while sharing space.  (*Id.*)  On May 5, 2020, three days before Plaintiffs filed this action, Arizona recorded 33 deaths from COVID-19, its highest single day count, and the State had, by then, identified 9,305 cases of infection, with 395 known deaths.  (*Id.*)

Even though COVID-19 radically altered life for most people, such that social distancing and wearing masks, gloves, and other personal protective equipment became commonplace, federal inmates at CoreCivic's CAFCC (hereinafter, "CoreCivic") continued to be housed with up to 14 people to a cell with bunkbeds stacked against a single wall.  (*Id.* ¶ 2.)  Additionally, soap and disinfecting products were scarce, and detainees— noticing others around them were increasingly showing symptoms—had to resort to wiping down communal property, such as shared telephones, with t-shirts or watered-down menstrual pads.  (*Id.*)  At the time Plaintiffs filed this action, 20 people housed at CAFCC had tested positive for COVID-19.  (*Id.*)

COVID-19 has spread across the globe, and on March 26, 2020, the United States led the world in confirmed cases.  (*Id.* ¶ 3.)  As of May 6, 2020, Arizona had 9,700 cases and 426 deaths, with as many as 427 new cases added each day; however, the Arizona Department of Health Services (ADHS) warned that a lack of testing could cause an undercount.  (*Id.*)  As of May 7, 2020, Arizona ranked last of all 50 states for COVID-19 tests per 1 million people.  (*Id.*)[3]

According to public health experts, the best way to slow the spread of COVID-19 is through "social distancing," which requires people to stay at least six feet apart.  (*Id.*

---

[3] As of October 29, 2020, the Arizona Department of Health Services reports 242,480 cases of COVID-19 and 5,918 deaths.  https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Oct. 29, 2020).

¶ 4.)   Consequently, health experts have urged all American institutions, including businesses, schools, places of worship, and legislatures, to reduce the number of people in close proximity or to close down altogether, undertake aggressive sanitation measures, and close off any areas used by a sick person.   (*Id.*)   This guidance is particularly important in detention facilities, where the government controls every aspect of inmates' ability to maintain social distance and have adequate sanitation.   (*Id.*)

Individuals confined at CoreCivic have insufficient access to soap, masks, and gloves; inability to social distance; and are housed in pods of up to 80 people, in cells of up to 14 people, and with bunk beds stacked against a single wall only several feet apart. (*Id.* at 6.)   Detention facilities, by their nature, require correctional and medical staff as well as detainees awaiting trial or detained for only short periods of time to go in and out, increasing the risk of spreading COVID-19, both to those within and outside the institution. (*Id.* ¶ 7.)   COVID-19 outbreaks in other institutions around the country demonstrate the need for immediate intervention to protect Plaintiffs and all similarly situated individuals housed at CoreCivic.   (*Id.* ¶ 8.)

As relief in this action, Plaintiffs seek declaratory judgment, injunctive relief, and possible release from confinement via writs of habeas corpus.   (*Id.* ¶¶ 10−11.)

**II.   Motion for Class Certification**

In their Motion for Class Certification, Plaintiffs seek to certify two classes: (1) a Pretrial Class, defined as "All current and future persons held by Defendants Kline, Gonzalez, and Washington in pretrial detention at Central Arizona Florence Correctional Complex ('CoreCivic')," and (2) a Post-Conviction Class, defined as "All current and future persons held by Defendants Kline and Carvajal in post-conviction detention at CoreCivic." (Doc. 3 at 2.)   Plaintiffs Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos are members of, and seek to represent, the Pretrial

1    Class, and Plaintiff Maria Guadalupe Lucero-Gonzalez was a member of, and sought to
2    represent, the Post-Conviction Class.[4]  (*Id.* ns. 1, 2.)

3    **III.    Governing Standard**

4           The Court's authority to certify a class action is found in Federal Rule of Civil
5    Procedure 23.  Plaintiffs first bear the burden of establishing the four requirements of Rule
6    23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there
7    are questions of law or fact common to the class; (3) the claims or defenses of the
8    representative parties are typical of the claims or defenses of the class; and (4) the
9    representative parties will fairly and adequately protect the interests of the class.
10   Additionally, Plaintiffs must establish one of the requirements found in Rule 23(b).  In this
11   case, Plaintiffs allege that class certification is appropriate pursuant to Rule 23(b)(2), which
12   requires a demonstration that "the party opposing the class has acted or refused to act on
13   grounds that apply generally to the class, so that final injunctive relief or corresponding
14   declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

15          When analyzing whether class certification is appropriate, the Court must conduct
16   "a rigorous analysis" to ensure that "the prerequisites of Rule 23(a) have been satisfied."
17   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349−351 (2011) (citing *Gen'l Tel. Co. of the*
18   *SW. v. Falcon*, 457 U.S. 147, 161 (1982)).

19   **IV.    Rule 23(a) Analysis**

20          **A.    Numerosity**

21          Plaintiffs contend that both proposed classes, which seek only class-wide relief,
22   contain hundreds of individuals and thereby meet the numerosity requirement.  (Doc. 3 at
23   4.)  They state that the exact numbers and identities of individuals who fit into each
24   proposed class is unknown because this information is exclusively within Defendants'
25   control; however, they proffer evidence that CoreCivic is designed to house over 4,000
26   inmates, there are hundreds of prospective Pre-Trial and Post-Conviction Class members

27   _____

28          [4] As discussed later on in this Order, Ms. Lucero-Gonzalez's detention status has
     since changed.

at CoreCivic who currently have open cases with the Office of the Federal Public Defender for the District of Arizona, and the number of individuals in the Post-Conviction class is even higher than normal due to a decrease in post-conviction transfers during the COVID-19 pandemic.  (*Id.* at 5.)  Plaintiffs also argue that joinder is impracticable here because the nature of the requested relief is time-sensitive and it would be difficult to identify and join every potential class member in a timely fashion; the transitory nature of confinement makes it especially difficult to identify both current and future class members; and, as incarcerated individuals, most potential class members are indigent, limiting their ability to seek counsel or file individual lawsuits.  (*Id.* at 5−6.)  Plaintiffs also point out that, due to COVID-19, CoreCivic has discontinued in-person legal visits, the available time slots for individual legal calls are now backlogged, and potential class members who are in quarantine with COVID-19 may be unable to make and receive legal calls at all.  (*Id.* at 6.)

Defendants do not dispute that the numerosity requirement is satisfied.  Indeed, there is no doubt that joinder of hundreds of potential incarcerated class members in a single action would be impracticable.  *See Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 242 (C.D. Cal. 2006) (acknowledging that joinder will be impracticable for very large classes); *Torres v. Goddard*, 314 F.R.D. 644, 654 (D. Ariz. 2010) ("In addition to class size, courts consider other indicia of impracticability, such as . . . the size of individual claims, the financial resources of class members, and the ability of claimants to institute individual suits.").  Based on the estimated hundreds of potential class members in this action and other circumstances making it impracticable for the Court to join all class members in a single action or for class members to file individual lawsuits, the numerosity requirement for class certification is satisfied.

**B.    Common Questions of Law and Fact ("Commonality")**

Plaintiffs must also demonstrate that there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To establish such commonality, Plaintiffs need not demonstrate that all questions are common to the class; rather, class claims must "depend upon a common contention . . . [that is] capable of classwide resolution."  *Wal-Mart Stores,*

*Inc.*, 564 U.S. at 350.  "Even a single [common] question" will suffice to satisfy Rule 23(a). *Id.* at 358 (citation omitted).  In the civil rights context, commonality is satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).

In assessing commonality, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen'l. Tel. Co. of SW*, 457 U.S. at 160 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citations and quotation marks omitted).  That said, although the Court must consider the underlying merits of Plaintiffs' claims to ascertain whether commonality exists, it is not the Court's function at this juncture to "go so far . . . as to judge the validity of these claims." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).  Thus, a motion for class certification is not an opportunity to hold "a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

Plaintiffs argue that all members of the proposed classes share a "common core of facts" by virtue of their common confinement at CoreCivic.  (Doc. 3 at 7.)  As such, Plaintiffs argue that they are all subject to the same policies and practices, wherein Defendants are allegedly "unwilling to implement facility-wide measures regarding social distancing and other hygienic practices consistent with the CDC's and other public health officials' guidance on preventing the spread of COVID-19 at CoreCivic and protecting detained persons against serious illness or death." (*Id.*)  Plaintiffs further argue that all putative class members present common questions of law: i.e., "whether Defendants' policies subject them to a heightened risk of serious illness and death in violation of their Fifth Amendment due process rights and/or Eighth Amendment rights against cruel and unusual punishment." (*Id.*)

1     Defendants argue that commonality is not met because commonality depends on the
2     nature of the underlying claims, and Plaintiffs have not distinguished between their Fifth
3     and Eighth Amendment claims.  (Doc. 53 at 11.)  Defendants rely on *Jimenez v. Allstate*
4     *Ins. Co.*, which states that "[w]hether a [common] question will drive the resolution of the
5     litigation necessarily depends on the nature of the underlying legal claims that the class
6     members have raised."  765 F.3d 1161, 1165 (9th Cir. 2014) (citing *Parsons v. Ryan,* 754
7     F.3d 657, 676 (9th Cir.2014)) ("commonality cannot be determined without a precise
8     understanding of the nature of the underlying claims").
9         Defendants' argument that Plaintiffs have failed to distinguish between their Fifth
10    And Eighth Amendment claims is without merit.  Plaintiffs First Claim for Relief, brought
11    under the Fifth Amendment Due Process Clause, specifically applies to the claims brought
12    on behalf of the proposed Pre-Trial Class, for whom the Fifth Amendment due process
13    standard, not the Eighth Amendment deliberate indifference standard, applies.  (*See* Doc. 1
14    at 22.)   Likewise, Plaintiffs' Second Claim for Relief, brought under the Eighth
15    Amendment's protection against "cruel and unusual punishment," specifically applies to
16    Plaintiffs' claims brought on behalf of the proposed Post-Conviction Class, for whom the
17    Eighth Amendment sets the proper legal standard.  (*Id.* at 24.)  Plaintiffs have already
18    accounted for the differences in the legal standards underlying their Fifth and Eighth
19    Amendment claims by proposing two separate classes.  Accordingly, the different legal
20    standards applicable to each separate class is insufficient  to deny class certification.

21                    **1.    Eighth Amendment Claims/Post-Conviction Class**

22        Defendants also argue with respect to Plaintiff's Eighth Amendment claims that
23    commonality is not met because it is impossible to resolve such claims on a class-wide
24    basis. (Doc. 53 at 11.)  They point out that the resolution of an Eighth Amendment claim
25    requires an initial determination that a prisoner is exposed to a "*substantial* risk of *serious*
26    harm," *Farmer v. Brennan*, 511 U,S. 825, 828 (1994) (emphases added by Defendants),
27    and they argue that, in the COVID-19 context, this determination depends on case-by-case
28

evaluations of such things as each prisoner's age, pre-existing medical conditions, and exposure, thereby defeating commonality.  (*Id.*)

This argument lacks merit because it overlooks Plaintiffs' core contention that all prospective class members, by virtue of their confinement at CoreCivic, are subject to the same policies and conditions of confinement, which are, themselves, deliberately indifferent to the substantial risk of serious harm associated with the spread of COVID-19. Plaintiffs relevantly allege that "Defendants' *policies and the conditions of confinement* at CoreCivic violate the Fifth and Eighth Amendments to the United States Constitution." (Doc. 1 ¶ 75) (emphasis added).  For purposes of this action, therefore, the operative question under the Eighth Amendments is not whether each prospective class member faces the same degree of risk or is likely to suffer the same degree of harm, but whether the policies and conditions to which all prisoners are equally subject are deliberately indifferent to a substantial risk of serious harm.

Relevant Supreme Court and Ninth Circuit caselaw supports that this core question of fact and law is amenable to class-wide resolution.  *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that the risk of contracting a communicable disease is "one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed") (internal citation omitted).  "[I]n a civil-rights suit, . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Armstrong* 275 F.3d at 868; *Parsons*, 754 F.3d at 678 ("What all members of the putative class and subclass have in common is their alleged exposure . . . to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent.").

In *Parsons*, the Ninth Circuit affirmed the district court's finding of commonality where the plaintiffs had alleged systemic deficiencies in the Arizona Department of Corrections' (ADC's) provision of healthcare to prisoners.  754 F. 3d at 678−79.  *Parsons* found that the alleged constitutionally deficient policies and practices in that action were

1    "the 'glue' that holds together the putative class and the putative subclass; either each of

2    the policies and practices is unlawful as to every inmate or it is not." *Id.* at 678. *Parsons*

3    went on to clarify that this inquiry "does not require us to determine the effect of those

4    policies and practices upon any individual class member (or class members) or to undertake

5    any other kind of individualized determination." *Id.*

6        Defendants argue that this finding in *Parsons* does not apply here because, in

7    disavowing the need for individualized determinations of deliberate indifference, *Parsons*

8    opined that, at some point, all prisoners confined in ADC would eventually need medical

9    care and were therefore at risk of becoming "that system's next potential victims."

10   (Doc. 53 at 13 (quoting *Parsons*, 754 F.3d at 678) (internal quotation marks omitted).)

11   Defendants argue that the distinction here is that Plaintiffs' evidence shows that not

12   everyone who contracts COVID-19 becomes seriously ill; some infected individuals may

13   experience only mild symptoms or no symptoms at all; and, at one Ohio facility, close to

14   95% of individuals who tested positive for COVID-19 were asymptomatic. (Doc. 53 at

15   13; *see* Doc. 1-4, Ex. 2 (Decl. of Joseph Goldenson, MD) ¶¶ 31, 35, 40.))[5] Defendants also

16   point to additional evidence available online that, in one European study, at least 40% of

17   individuals who tested positive for COVID-19 were asymptomatic, and the Centers for

18   Disease Control (CDC) concedes that the impact of specific underlying medical conditions

19   on the health effects caused by COVID-19 is uncertain. (Doc. 53 at 13−14, ns.3, 4.) From

20   this, Defendants argue that the relevant question is not whether Defendants' policies fail to

21   _____

22       [5] Plaintiff's expert, Dr. Goldenson, cited this statistic to show that prisoners may be
     infected with COVID-19 before they show any symptoms and should therefore be tested,
23   as was done at the Ohio facility, even if they are asymptomatic. (Doc. 1-4 ¶ 31.) The
     evidence shows only that the Ohio prisoners were asymptomatic at the time of testing, not
24   that they were not at risk of developing symptoms, which Dr. Goldenson opined commonly
     start 5−6 after exposure but can take up to 14 days. (*Id.*) Dr. Goldenson further opined
25   that "According to the CDC, up to 25 percent of people infected with COVID-19 will
     remain asymptomatic" and some will develop only mild symptoms, meaning that "newly
26   infected, asymptomatic, and mildly symptomatic individuals can, and do, transmit the
     virus, contributing to its rapid spread." (*Id.*)

27

28

1   protect prospective class members from exposure to COVID-19 but whether, even if they

2   contract COVID-19, each prospective class member is at substantial risk of serious harm—

3   a question they maintain can only be determined on an individual basis.  (*Id.* at 13−14.)

4       Defendants' attempt to distinguish *Parsons* from this action claiming that the risks

5   posed to CoreCivic prisoners from exposure to COVID-19 are less certain than the risks

6   posed to the *Parsons* class from exposure to inadequate healthcare is unpersuasive.

7   *Parsons* relied on the Supreme Court's findings in *Helling*, *Farmer*, and *Brown v. Plata*,

8   563 U.S. 493 (2011), as well as prior Ninth Circuit precedents, and it noted that these courts

9   asked "only whether the plaintiffs were exposed to a substantial risk of harm to which

10  prison officials were deliberately indifferent," while, at the same time, they recognized that

11  "many inmates can simultaneously be endangered by a single policy."  *Parsons*, 754 F.3d

12  at 678.  Of note, the cases upon which *Parsons* relied involved prisoners' alleged exposures

13  to several different policy- and practice-based risks to prisoners' health and safety.  *Helling*

14  dealt with unsafe drinking water; *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010)

15  dealt with heat exposure; *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) dealt with

16  asbestos exposure; and *Hoptowit v. Spellman*, 753 F.2d 779, 783–84 (9th Cir.1985) dealt

17  with substandard fire prevention.  Relying on these and other precedents, *Parsons* affirmed

18  that,

19          although a presently existing risk may ultimately result in
            different future harm for different inmates—*ranging from no*
20          *harm at all to death*—every inmate suffers exactly the same
            constitutional injury when he is exposed to a single . . . policy
21          or practice that creates a substantial risk of serious harm.

22

23  754 F.3d at 678 (emphasis added).

24       In this case, Plaintiffs argue that CoreCivic prisoners are in an even better position

25  with respect to showing exposure to a substantial risk of serious harm than the prisoners in

26  *Parsons. They claim that* unlike the *Parsons* classes for whom the risk of harm depended

27  upon them first encountering circumstances that would require them to rely on ADC's

28  allegedly substandard provision of healthcare, prisoners at CoreCivic currently face a

substantial risk of contracting COVID-19, which is already present in, and rapidly spreading through, the CoreCivic facility.  (Doc. 58 at 7.)

Plaintiffs are correct that the proper inquiry for their Eighth Amendment claim is not whether each prospective Post-Conviction Class member can show actual harm from Defendants' policies, but whether each of them, by virtue of their common confinement at CoreCivic, faces a *substantial risk* of contracting COVID-19 and suffering serious harm as a result.  *Cf. Parsons*, 754 F.3d at 679 ("While no inmate can know in advance whether he will receive adequate and timely care in the event that he falls ill or is injured, or know exactly what form of harm he will suffer . . . , *every single inmate has allegedly been placed at substantial risk of future harm* due to the general unavailability of constitutionally adequate care.") (emphasis added); *see also B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) ("The plaintiffs have not brought a concatenation of individual claims that must be redressed through individual injunctions; they have brought unified claims that 'a specified set of centralized . . . policies and practices . . .' have placed them at a substantial risk of harm.") (internal citation omitted).

Defendants also attempt to distinguish *Parson*'s finding of commonality from the alleged circumstances at CoreCivic by arguing that, unlike in *Parsons*, Plaintiffs have not adduced "sufficient evidence of systemic and centralized policies or practices in a prison system that allegedly expose all inmates in that system to a substantial risk of serious future harm."  (Doc. 53 at 12 (quoting *Parsons*, 754 F.3d at 684).)  This is because, Defendants contend, Plaintiffs' prisoner declarations regarding the alleged conditions at CoreCivic are unsworn; other declarations, including the declaration of Plaintiffs' expert Dr. Goldenson, are either based on hearsay or do not speak adequately to the conditions at CoreCivic; and Defendants have rebutted "the handful of avowals that do pertain to [CoreCivic]."  (Doc. 53 at 12.)

Plaintiffs have produced declarations from each of the named Plaintiffs attesting to the alleged constitutionally deficient conditions at CoreCivic, including a lack of testing for COVID-19; a lack of social distancing in shared housing facilities, bathrooms, cells,

work areas, and food lines; a lack of available masks, gloves, and proper cleaning supplies; and having to remain in close contact with other prisoners, even after others in their housing unit or their cellmates show symptoms of COVID-19.  (*See, generally*, Docs. 1-5−1-9.)  In addition, Plaintiffs have produced the declarations of Assistant Federal Public Defender Christina M. Woehr, who represents pretrial detainees and has knowledge of hundreds of Federal Public Defender clients who are detained at CoreCivic, and of Dr. Goldenson, a physician with 33 years' experience in correctional healthcare, including 22 years as a Director or Medical Director, who opines about the heightened risks of contracting and spreading COVID-19 in detention facilities, including at CoreCivic.  (Docs. 1-3, 1-4.)

Defendants' argument that the declarations of the named Plaintiffs are unsworn is not a reason to discount this evidence for purposes of class certification.  As noted, a motion for class certification is not an opportunity to hold "a dress rehearsal for the trial on the merits."  *Messner*, 669 F.3d at 811; *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 636 (D. Ariz. 2016) (citation omitted).  Moreover, Federal Rule of Evidence 807 allows for the use of hearsay evidence not otherwise covered by a hearsay exception if

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made . . .; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807.  Here, the declarations of the named Plaintiffs were taken by Plaintiffs' counsel over the phone due to the dangers of in-person visits caused by COVID-19, and counsel certified in each instance that they had reviewed the information over the phone with each respective declarant, who then "certified that the information contained in this declaration was true and correct to the best of [his or her] knowledge." (*See* Docs. 1-5−1-9; Doc. 58 at 6 n.4.)  Under the totality of the circumstances, these declarations are sufficiently trustworthy to support the declarants' averments regarding alleged policies, practices, and overall living conditions at CoreCivic.  *See* Fed. R. Evid. 807(a)(1).

1    Additionally, the named Plaintiffs' first-hand accounts of these conditions are undoubtedly

2    among the most probative evidence "on the point for which [they are] offered" in this

3    action.  *Id.* at 807(a)(2).  Moreover, in a similar action in this District, Judge Steven P.

4    Logan rejected the habeas respondents' contention that prisoner declarations "taken via

5    telephone due to the unavailability of in-person visits to detainees as a result of the COVID-

6    19 pandemic" should be excluded.  *See Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL

7    (JFM), 2020 WL 2319980, at *5 (D. Ariz. May 11, 2020).  Defendants' objections to

8    Plaintiffs' declarations on the same ground here overruled.

9         Defendants' additional arguments that Federal Public Defender Woerh relies

10   "largely on untested hearsay" and Dr. Goldenson's declaration "hardly speaks to the

11   conditions at [CoreCivic]," and—where it does—it is "thoroughly rebutted by the

12   Defendants' experts and evidence" also do not evince a lack of sufficient evidence to

13   support the common questions of fact and law at the heart of Plaintiffs' claims.  (*See*

14   Doc. 53 at 12.)  Instead, the declarations of the named Plaintiffs regarding the relevant

15   living conditions at CoreCivic, combined with Dr. Goldenson's expert opinion on the

16   substantial risks of spreading COVID-19 associated with those conditions, are sufficient to

17   support that the policies and practices of Defendants at CoreCivic are deliberately

18   indifferent to a substantial risk of serious harm to the prisoners in the proposed Post-

19   Conviction Class.  At this stage, Defendants' argument that they have thoroughly rebutted

20   much of this evidence is also of no moment here where the Court must not go so far as to

21   attempt to "judge the validity of [Plaintiffs'] claims."  *United Steel*, 593 F.3d at 808-09.  It

22   is enough for purposes of class certification that Plaintiffs possess sufficient evidence to

23   demonstrate common questions of fact and law pertaining to all members of the proposed

24   Post-Conviction Class.

25              **2.      Fifth Amendment Claims/Pre-Trial Class**

26        Defendants also argue that Plaintiffs have not established commonality as to their

27   Fifth Amendment claims, for which they argue the reasoning in *Parsons*, as an Eighth

28   Amendment case, does not apply.  (Doc. 53 at 14−15.)  This argument also fails because

the question for purposes of commonality is whether Plaintiffs have presented "a common contention . . . [that is] capable of classwide resolution," meaning "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc*., 564 U.S. at 350.  The common question pertaining to members of the proposed Pre-Trial Class is whether Defendants' allegedly deficient policies and practices for protecting them from COVID-19 while detained at CoreCivic violate their due process rights under the Fifth Amendment.  Although the legal standard for a Fifth Amendment due process claim differs from those for an Eighth Amendment deliberate indifference claim, this does not change that the claims brought by and on behalf of the proposed Pre-Trial Class are, themselves, based on common contentions of conditions at CoreCivic that are "capable of classwide resolution." *Id.*; *Unknown Parties*, 163 F. Supp. 3d at 637 ("For purposes of commonality, the operative question is not whether the same detention status and same legal standard applies as applies in other analogous class action cases[, but] whether the putative class members, themselves, present a common contention that 'is capable of classwide resolution'") (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350).  For the reasons already discussed with respect to the proposed Post-Conviction Class, the commonality requirement for class certification is likewise met for the proposed Pre-Trial Class.

### C.    Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart Stores, Inc.*, 564 U.S. 349 n. 5 (quoting *Falcon*, 457 U.S. at 158-59).  In *Armstrong*, the Ninth Circuit explained that the "named plaintiffs' injuries [need not] be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs, and that the injuries result from the same, injurious course of conduct." 275 F.3d at 869.  Additionally, "[a] litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (internal citations omitted).

1    Plaintiffs argue that the typicality requirement is met because the named Plaintiffs
2    in both proposed classes are detained in the same facility and under the same conditions as
3    all potential class members, and they bring the exact same claims under the exact same
4    legal theories as apply to the unnamed class members they seek to represent.  (Doc. 3 at 9.)
5    At the time of the Complaint, Plaintiffs Romero-Lorenzo, Peuplie, Ciecierski, and Enos,
6    who seek to represent the proposed Pre-Trial class, were awaiting trial and brought their
7    claims under the Fifth Amendment (*see* Doc. 1 at 6−7), and Plaintiff Lucero-Gonzalez,
8    who sought to represent the Post-Conviction Class, had been convicted and was awaiting
9    sentencing and therefore brought her claims under the Eighth Amendment.  (*Id.* at 5−6.)

10    Defendants do not dispute that typicality is met as to the proposed Pre-Conviction
11    Class; however, they argue that Plaintiff Lucero-Gonzalez cannot now represent the Post-
12    Conviction Class because, on August 7, 2020, Ms. Lucero-Gonzalez was sentenced to time
13    served, and on August 8, 2020, was released from custody.  (Doc. 53 at 6.)  They further
14    argue that Plaintiffs cannot substitute a new class representative at this point because Ms.
15    Lucero-Gonzalez's claim became moot at the time of her release, before any certification
16    of the proposed Post-Conviction Class, and Plaintiffs knew her claim was moot before
17    Defendants responded to the Motion for Class Certification but did not seek to file an
18    amended complaint.  (*Id.* at 7−8.)

19    Plaintiffs acknowledge that Ms. Lucero-Gonzalez has been released from custody
20    and  that she has since been deported, but they dispute that they were aware of her
21    sentencing and release prior to Defendants' filing their Response to this Motion.  (Doc. 58
22    at 9, at 9 n.6.)  They also argue that Defendants, by previously seeking a stay of this Motion,
23    hindered its prompt resolution prior to Ms. Lucero-Gonzalez's release and therefore should
24    not be permitted to capitalize on the delay; additionally, they argue that Defendants and
25    CoreCivic staff gave conflicting information to Plaintiffs' counsel about whether Ms.
26    Lucero-Gonzalez was still in custody and even scheduled a legal call with her and counsel,
27    and Defendants did not confirm Ms. Lucero-Gonzalez's release until *after* they filed their
28    Response.  (Doc. 58 at 9 n.6.)

Plaintiffs further argue that, since Ms. Lucero-Gonzalez was in custody at the time they filed their Complaint and Motion for Class Certification, the Court can decide the Motion for Class Certification under the relation-back doctrine and still certify the Post-Conviction Class.  (*Id.* at 9−10.)  They seem to argue that, because there are no pertinent differences between the Pre-Trial and Post-Conviction Classes, a separate representative for the Post-Conviction class is not required.  (*Id.* at 10.)  Finally, they claim that, since the filing of their Motion, Plaintiff Romero-Lorenzo has been convicted and sentenced to 10 months in custody; therefore, the Court can still certify both classes, if Ms. Romero-Lorenzo is substituted as the Post-Conviction Class representative.  (*Id.*)  Alternatively, Plaintiffs request that, if the Court determines that substituting Ms. Romero-Lorenzo for Ms. Lucero-Gonzalez as the Post-Conviction Class representative requires Plaintiffs to amend their Complaint and withdraw and refile this Motion, the Court would permit them to do so expeditiously without requiring further briefing and delay in resolving the Motion.  (*Id.*)

Apart from raising the issue of Plaintiff Lucero-Gonzalez's release, Defendants do not dispute that typicality exists for the named Plaintiffs and the unnamed members of each proposed class.  Additionally, as already found with respect to commonality, the named Plaintiffs and all putative class members are subject to the same policies, practices, and conditions of confinement at CoreCivic that are central to each proposed class' claims.  Therefore, the first requirement for typicality is met for both proposed classes: i.e., "the unnamed class members have injuries similar to those of the named plaintiffs," and "the injuries result from the same, injurious course of conduct."  *Armstrong*, 275 F.3d at 869.  Because the claims of each proposed class arise under different legal standards, however, they cannot readily be resolved in "one stroke."  *Wal-Mart Stores, Inc*., 564 U.S. at 350.  As such, commonality and typicality break down as between the two proposed classes, necessitating that the Post-Conviction Class be represented by a named plaintiff who is part of that class.  The Supreme Court has "repeatedly held" that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class

1   members." *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citing

2   cases).

3          This does not mean, however, that the Court is unable to certify the Post-Conviction

4   Class simply because named representative Plaintiff Lucero-Gonzalez has been released

5   and can no longer represent that class.  In the incarceration context, in which the duration

6   of the individual class representatives' time in custody is by nature transitory, "the

7   termination of a class representative's claim does not moot the claims of the unnamed

8   members of the class." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (quoting

9   *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)).  In *Gerstein*, the Supreme Court noted

10  with respect to class action claims brought by pretrial detainees that "pretrial detention is

11  by nature temporary" and could be "ended at any time by release on recognizance,

12  dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial,"

13  making it "by no means certain that any given individual, named as plaintiff, would be in

14  pretrial custody long enough for a district judge to certify the class."  420 U.S. at 110 n.11.

15  The same could be said—and has indeed proven true—for the named representatives of

16  both the proposed Pre-Trial and Post-Conviction classes in this lawsuit.

17         In addition, as recognized in *Gerstein*, "the constant existence of a class of persons

18  suffering the [same] deprivation is certain." *Id.*  Accordingly, "[t]his case belongs . . . to

19  that narrow class of cases in which the termination of a class representative's claim does

20  not moot the claims of the unnamed members of the class." *Id.*; *see also Sosna v. Iowa,* 419

21  U.S. 393, 402 n.11(1975); *Schall v. Martin,* 467 U.S. 253, 256, n. 3 (1984).  "In such cases,

22  the 'relation back' doctrine is properly invoked to preserve the merits of the case for

23  judicial resolution." *Cnty. of Riverside*, 500 U.S. at 52.  Thus, the claims of the proposed

24  Post-Conviction class are not moot.

25         Relation back, however, does not fill the need for a named plaintiff to represent the

26  Post-Conviction class in this action.  Plaintiff Lucero-Gonzalez must be replaced because

27  "[a] representative whose individual claim becomes moot" while an action is still pending,

28  may only continue to represent the class "if the class was duly certified *prior* to mootness,"

which did not happen here.  *See Kennerly v. United States*, 721 F.2d 1252, 1260 (9th Cir. 1983) (internal citations omitted) (emphasis added).  Additionally, where, as here, "the personal representative has no personal stake in injunctive relief and has not adequately shown [s]he is in a position to provide vigorous advocacy," the named representative can no longer represent the proposed class.  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 402 (1980) (class representative must have a "personal stake" in the class certification claim).

Defendants confirm that Plaintiff Romero-Lorenzo, whom Plaintiffs put forth as a replacement to represent the proposed Post-Conviction Class, has now been sentenced (*see* Doc. 53 at 8, Doc. 48-2, Ex. B.), and they do not dispute that, consequently, she is now an interested member and potential named representatives of that class.  Defendants merely argue that, because of her sentencing, Ms. Romero-Lorenzo can no longer adequately represent the Pre-Trial Class, not that she cannot now represent the proposed Post-Conviction Class.  (Doc. 53 at 8.)  Moreover, for the reasons already discussed, Ms. Romero-Lorenzo also meets the typicality requirement for purposes of representing the proposed Post-Conviction Class.  First, because she continues to be confined at CoreCivic, Ms. Romero-Lorenzo remains subject to all the same relevant factual circumstances as the members of both proposed classes.  Additionally, as a post-conviction prisoner, her claims now arise under the Eighth Amendment, which governs the claims of the proposed Post-Conviction Class.  For these reasons, and to prevent further delay, the Court will substitute Plaintiff Romero-Lorenzo for Plaintiff Lucero-Gonzalez as the class representative for the Post-Conviction Class.  *Cf. Kennerly*, 721 F.2d at 1260 (remanding class action to the district court after named representative's claims were moot "for consideration of possible intervention by other members of the putative class").

Based on the above, the typicality requirement for class certification is met for both proposed classes in this action.

. . . .

. . . .

- 19 -

**D.      Adequacy of Representation**

Rule 23(a)(4) requires that class representatives fairly and adequately represent the interests of the entire class.  "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel."  *Dukes v. Wal-Mart Stores, Inc*, 603 F.3d 571, 614 (9th Cir. 2010) (*rev'd on other grounds by* 564 U.S. 338).

**1.      Named Representatives**

Plaintiffs argue that the named representatives can adequately represent both respective classes because they allege the same injuries and seek the same relief as all prospective class members.  (Doc. 3 at 11.)

Defendants argue that the named representatives cannot adequately represent the proposed classes because Plaintiffs request injunctive relief in the form of adequate social distancing, hygiene supplies, personal protective equipment, quarantine protocols, testing procedures, and daily cleaning of surfaces on behalf of all class members, but if such measures are not effective, they seek release.  (Doc. 53 at 8.)  Defendants argue that these alternate requests for relief create a conflict of interest between the class representatives and the members of the proposed classes because the named Plaintiffs will have a "perverse incentive" to argue that no measures can adequately protect them in order to show they should be released rather than argue for measures that could protect all prospective class members.  (*Id.*)

Plaintiffs argue in response that Defendants misconstrue the requested relief because Plaintiffs seek release only as an alternative form of relief, *if necessary*, and their request that the Court "issue writs of habeas corpus" if other relief is ineffective applies not just to the named Plaintiffs but to all putative class members.  (Doc. 58 at 11.)  Plaintiffs further argue that their requests for relief do not alter the class certification analysis, which rests on claims, not remedies.  (*Id.*)  Plaintiffs rely on *Probe v. State Teachers' Retirement System*, 780 F.2d 776, 781 (9th Cir. 1986), which found that the "fact that plaintiffs are concurrently pursuing their individual Equal Pay Act claims [in addition to class claims]

- 20 -

does not automatically prevent them from adequately representing the interests of the class members." (Doc. 58 at 11.)  *Probe* also went on to find that the plaintiffs' individual claims in that action were "merely incidental to their primary claim for injunctive relief."  780 F.2d at 780.

In the Prayer for Relief portion of their Complaint, Plaintiffs request that, if the injunctive relief they seek with respect to COVID-19 prevention at CoreCivic "cannot be achieved without reducing the detained population," the Court "issue writs of habeas corpus on the ground that Plaintiffs' continued detentions violate the Due Process Clause or the Eighth Amendment, and order Plaintiffs' release." (Doc. 1 at 27 ¶ 6.)  This request does not, as Defendants argue, place the named representatives' interests at odds with the interests of unnamed class members.  As Plaintiffs point out, the named Plaintiffs do not seek habeas relief for themselves, but for all class members who would continue to be at risk if other forms of protection against the spread of COVID-19 are impractical without reducing the numbers of individuals detained at CoreCivic.  Additionally, it is clear from the Complaint that habeas relief is, as in *Probe*, "incidental to [Plaintiffs'] primary claim for injunctive relief." 780 F.2d at 780.  The possibility that some class members, as a result of high population density at CoreCivic, could be granted habeas relief to make social distancing and other safety measures possible does not place the named Plaintiff's interests above or at odds with the unnamed members of each proposed class.  Quite simply, Plaintiffs do not make any individualized claims for habeas relief for the named representatives or for any other specific class members.  Instead, they seek the overall reduction of those detained, if needed, to make the overall conditions for themselves and other class members safe.[6]

---

[6] Elsewhere in their Response, Defendants argue that the Court "should not certify a class that seeks release," and/or "should not certify the habeas action." (Doc. 53 at 15–18.) Defendants' arguments rest on the asserted need for courts to make determinations regarding individual risk factors when considering release and on cases showing that class certification in habeas actions is disfavored. (*See id.*) These arguments do not apply here because Plaintiffs' have not brought a "habeas action"; nor do they primarily seek habeas

1    Defendants also argue that the named Plaintiffs cannot adequately represent the
2    proposed classes because each Plaintiff must separately overcome challenges regarding
3    such issues as standing, mootness, and exhaustion of administrative remedies, and each of
4    the named Plaintiffs is subject to unique defenses.  (Doc. 53 at 9−10.)  This argument is
5    also misplaced because Plaintiffs have not made individualized Fifth and Eighth
6    Amendment claims that are subject to particularized defenses.  *See Parsons*, 754 F.3d at
7    686 n.31 ("The defendants' argument that each named plaintiffs' description of past
8    injuries must be treated as its own claim for Eighth Amendment relief, potentially subject
9    to unique defenses, rests on the same misunderstanding of the nature of the plaintiffs'
10   claims that infected their objections to commonality.").  Here, as in *Parsons*, "[t]he named
11   plaintiffs allege that they are all exposed to a substantial risk of serious harm, not that their
12   particular experiences in the past violated the [Fifth or] Eighth Amendment."  *Id.*  Further,
13   "where the defendant's [constitutional violations] were allegedly made on a uniform and
14   classwide basis, individual [defenses] do not preclude class certification." *Moyle v. Liberty*
15   *Mut. Ret. Ben. Plan*, 823 F.3d 948, 964–65 (9th Cir. 2016).

16   The cases upon which Defendants rely do not call for a different conclusion.  *Hanon*
17   *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) recognized that "[s]everal courts
18   have held that 'class certification is inappropriate where a putative class representative is
19   subject to unique defenses which threaten to become the focus of the litigation.'" (internal
20   citations omitted).  But in this case, Defendants' proposed defenses (mootness, lack of
21   standing, failure to exhaust), like those discussed in *Parsons*, apply equally to the proposed
22   class representatives and the class members, such that their claims will either succeed or
23   fail as a whole.  This underlying commonality obviates any danger that unique defenses

24
25   relief.  Instead, Plaintiffs have brought civil rights claims on behalf of two classes of
26   CoreCivic inmates for whom they seek classwide injunctive relief in the form of facility-
27   wide safety measures aimed at preventing the spread of COVID-19.  (Doc. 1.)  Plaintiffs'
28   alternative request for the release of class members in the event these measures are
     ineffective does not alter the classwide nature of their underlying claims.  The Court
     therefore finds no need to strike this alternative request for relief at this time.

1    will sidetrack the focus of the litigation from classwide harms and injunctive relief or that

2    "individual questions [will] predominate over common questions."  *Navellier v. Sletten*,

3    262 F.3d 923, 941 (9th Cir. 2001).

4         Defendants also argue that the named Plaintiffs cannot adequately represent the

5    proposed classes because there is no evidence they will vigorously represent the class.

6    (Doc. 53 at 9.)  And they argue that Plaintiff Romero-Lorenzo in particular is unqualified

7    to act as a class representative due to her demonstrated dishonesty because she told the

8    U.S. Marshals Service ("USMS") and the magistrate judge at her initial appearance that

9    her last name was Romero-Lopez, and she subsequently admitted that her last name was

10   Romero-Lorenzo.  (Doc. 53 at 9; Doc. 27.)

11        Neither of these asserted reasons is grounds to disqualify the named Plaintiffs from

12   serving as class representatives.  First, as to whether the named Plaintiffs can adequately

13   represent the proposed classes, Defendants do not dispute, and the proffered declarations

14   demonstrate, that the named Plaintiffs all have strong personal interests that align with

15   those of prospective class members.  Ms. Romero-Lorenzo attests to being a 39-year-old

16   mother of three who has several serious medical conditions and is housed in a pod with 40

17   other people who share showers, telephones, and dining tables, are in continuous close

18   contact with one another and unable to socially distance—even from those infected with

19   or exhibiting active symptoms of COVID-19—and are not provided adequate cleaning

20   supplies or masks.  (*See generally* Doc. 1-6, Ex. 4 (Romero-Lorenzo Decl.).)  She also

21   states that her health is not good, and she is fearful of contracting COVID-19.  (*Id.* ¶ 20.)

22   Likewise, Ms. Peuplie, a 49-year-old detainee who is awaiting trial, attests to having

23   serious medical conditions, living in an 80-person pod under the same or similar conditions

24   as those alleged by Ms. Romero-Lorenzo, and being afraid of contracting COVID-19.  (*See*

25   Doc. 1-7, Ex. 5 (Peuplie Decl.).)  Mr. Ciecierski, a 26-year-old pre-trial detainee with a

26   fiancée and ten-year-old daughter, attests to having severe asthma; being detained in a 40-

27   person pod with shared telephones and showers, no required mask-wearing or social

28   distancing; having to live and work in conditions that require close personal contact, and

1    being afraid of contracting COVID-19.  (Doc. 1-8, Ex. 6 (*See* Ciecierski Decl.).)  Finally,

2    Mr. Enos, a 29-year-old detainee awaiting trial, attests to having hypertension, asthma,

3    being overweight and a former smoker; living in close quarters in a 56-person pod with 14

4    people to a room, without proper personal protective equipment, hand sanitizer, or cleaning

5    supplies; and being concerned he will not be able to remain in these conditions without

6    becoming seriously ill and possibly dying.  (*See* Doc. 1-9, Ex. 7 (Enos Decl.).)

7          Defendants do not deny that this evidence shows that each of the named Plaintiffs

8    has a personal stake in obtaining relief, both for themselves and on behalf of the unnamed

9    class members.  Instead, Defendants point out that each named Plaintiff also expresses an

10   eagerness to be released and that, if released, only two seek to remain in Arizona, which

11   Defendants appear to argue disqualifies them from adequately representing the proposed

12   classes.  (Doc. 53 at 9.)  Eagerness for release does not show that the named Plaintiffs are

13   unable to adequately represent the shared interests of all putative class members, all of

14   whom currently remain incarcerated under the same alleged unconstitutional conditions.

15   Additionally, insofar as Defendants appear to focus on the transitory nature of these

16   Plaintiffs' confinements and on whether they intend to stay in Arizona as bearing on their

17   ability to represent the proposed classes, these factors also do not disqualify the named

18   Plaintiffs from serving as class representatives.  As previously discussed, if a named

19   Plaintiff's circumstances materially change and, as a result, his or her interests diverge

20   from the remainder of the class or he or she is otherwise no longer personally interested in

21   or capable of continuing to represent that class, other unnamed class members may be

22   appointed to serve in his or her place, allowing for continued adequate representation by

23   those who remain in custody and continue to share the same interests as the respective

24   class.  *See Gerstein*, 420 U.S. at 110 n.11; *Sosna v. Iowa,* 419 U.S. at 402 n.11; *Schall v.*

25   *Martin,* 467 U.S. at 256, n. 3; *Cnty. of Riverside*, 500 U.S. at 52.

26         Defendants' argument that Plaintiff Romero-Lorenzo should be disqualified due to

27   her documented dishonesty is also unpersuasive.  Plaintiffs dispute that Ms. Romero-

28   Lorenzo was dishonest about her name—which she provided through an interpreter—at

her arrest and initial appearance.  They argue that the name discrepancy was likely the result of a translation error, and, in any event, Ms. Romero-Lorenzo informed the court of her actual name in her criminal case four days later.  (Doc. 58 at 12; *see* Doc. 27 at 3.)  Absent additional facts, the Court cannot conclude on the current record that Ms. Romero-Lorenzo was intentionally dishonest about her last name.  Moreover, credibility issues, while relevant to the adequacy analysis "do not automatically render a proposed class representative inadequate." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (internal quotation marks and citation omitted).  Instead, "[t]here is "inadequacy only where the representative's credibility is questioned on issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud." *Id.* (internal quotation marks and citation omitted).  No such factors are in evidence here that would render Ms. Romero-Lorenzo inadequate to serve as a class representative.

### 2.    Plaintiffs' Counsel

Plaintiffs are represented by counsel from the American Civil Liberties Foundation (ACLU), the ACLU of Arizona, and Perkins Coie, LLP.  (Doc. 3 at 10.)  Collectively, counsel have extensive relevant experience in litigating class action cases regarding the civil rights of incarcerated people.  (Doc. 4 at 19; *see* Docs. 3-1, 3-2, 3-3.)  Defendants do not challenge the adequacy of representation in this case.  (Doc. 41 at 17 n. 8.)  The Court finds that Plaintiffs are represented by qualified and competent counsel.  Adequacy of representation is satisfied.

### V.    Rule 23(b) Analysis

To obtain class certification, Plaintiffs must also satisfy one of the requirements set forth in Federal Rule of Civil Procedure Rule 23(b).  Plaintiffs claim that they meet the requirements under Rule 23(b)(2), which states that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

1    or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

2    Civ. P. 23(b)(2).[7]

3        Plaintiffs argue that this requirement is met because "Defendants have subjected all

4    proposed class members to the same policies or practices that expose Plaintiffs to an

5    unreasonable risk of serious harm in violation of the Due Process Clause or the Eighth

6    Amendment." (Doc. 3 at 12.)  They further argue, as to relief requested, that "[e]ach class

7    requests uniform relief in the form of certain declarations and an injunction" and that "[i]n

8    order to comply with the requested injunction, Defendants would have to implement

9    facility-wide changes applicable to, and for the benefit of, all class members." (*Id.*)

10       For purposes of Rule 23(b)(2), what matters is that a pattern of alleged violations

11   can be remedied for all putative class members by the same form of injunctive relief.  Thus,

12   "[i]t is sufficient if class members complain of a pattern or practice that is generally

13   applicable to the class as a whole"; further, "[e]ven if some class members have not been

14   injured by the challenged practice, a class may nevertheless be appropriate." *Walters v.*

15   *Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (citing 7A Charles Alan Wright, Arthur R.

16   Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 (2d ed. 1986)).  For the

17   reasons already discussed with respect to commonality, Plaintiffs have also satisfied Rule

18   23(b)(2).  For each proposed class, Plaintiffs have alleged that Defendants have failed to

19   take constitutionally adequate measures to prevent the spread of COVID-19, creating a

20   substantial risk of infection for all class members at Core Civic "on grounds that apply

21   generally to the class." Fed. R. Civ. P. 23(b)(2).  Further, in seeking to remedy the

22   conditions of confinement for all class members, Plaintiffs have sought "final injunctive

23   relief or corresponding declaratory relief [that] is appropriate respecting the class[es] as a

24   whole." *Id.*

25

26       _____

27       [7] Plaintiffs also argue, in the alternative, that the proposed classes satisfy Rule
     23(b)(1) "because requiring hundreds of individual class members to prosecute separate
28   actions on the same claims would create a significant risk of inconsistent or varying
     adjudications that would establish incompatible standards of conduct for Defendants."
     (Doc. 3 at 12 n.5.)

Because the requirements for class certification under Federal Rules of Civil Procedure 23(a) and 23(b) are met, the Court will grant Plaintiffs Motion for Class Certification and certify the two proposed classes in this action.

**IT IS ORDERED**:

(1)    Plaintiffs' Motion for Class Certification (Doc. 3) is **granted**.

(2)    The following Classes are **certified** pursuant to Rule 23:

(a) **The Pretrial Class**, defined as

All current and future persons held by Defendants Kline, Gonzalez, and Washington in pretrial detention at Central Arizona Florence Correctional Complex ('CoreCivic'), and

(b) **The Post-Conviction Class**, defined as

All current and future persons held by Defendants Kline and Carvajal in post-conviction detention at CoreCivic.

(3)    Named Plaintiffs Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos are **appointed** as class representatives for the Pretrial Class, and Plaintiff Claudia Romero-Lorenzo is **appointed** as class representative for the Post-Conviction Class.

(4)    Named Plaintiff Lucero-Gonzalez is dismissed from this action.

(5)    The Clerk of Court must update the docket to reflect that named Plaintiff Maria Guadalupe Lucero-Gonzalez has been released from custody and is no longer a Plaintiff in this action.

Dated this 3rd day of November, 2020.

Honorable Diane J. Humetewa
United States District Judge

- 27 -