SKC

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Claudia Romero-Lorenzo, et al.,

Plaintiffs-Petitioners,

v.

Brian Koehn, et al.,

Defendants-Respondents.

No.   CV-20-00901-PHX-DJH (DMF)

**ORDER**

   Plaintiffs-Petitioners Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos, who are confined in CoreCivic's Central Arizona Florence Correctional Complex (CAFCC), brought this civil rights/habeas action pursuant to 28 U.S.C. §§ 1331, 1346, 2201-02, and 2241.  (Doc. 1).

   In their "Class-Action Complaint for Declaratory and Injunctive Relief and Petition for Writs of Habeas Corpus," Plaintiffs-Petitioners allege on behalf of themselves and all similarly situated individuals confined by CoreCivic that Defendants are failing to protect them from exposure to COVID-19 in violation of their due process rights and their rights to be free from "cruel and unusual punishment" under the Fifth and Eighth Amendments to the U.S. Constitution.  (*Id.*)  Plaintiffs-Petitioners seek various forms of injunctive relief aimed at preventing the spread of COVID-19 within CAFCC.  (*Id.* at 26−27.)  Plaintiffs-Petitioners further request that, if expert recommendations for doing so "cannot be achieved without reducing the detained population at CoreCivic," the Court "issue writs of habeas corpus on the ground that Plaintiffs' continued detentions violate the Due Process

Clause or the Eighth Amendment, and order Plaintiffs' release." (*Id.* at 27.)  Plaintiffs-Petitioners also filed a Motion for Temporary Restraining Order (Doc. 2), which the Court denied, and a Motion for Class Certification (Doc. 3), which the Court granted, certifying two classes of individuals, a pre-trial class, whose claims arise under the Fifth Amendment, and a post-conviction class, whose claims arise under the Eighth Amendment.  (*See* Doc. 69.)

Before the Court is a Joint Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants-Respondents' Kris Kline, Warden of the CAFCC, David Gonzales, U.S. Marshall for the District of Arizona, Donald Washington, Director of the U.S. Marshall's Service, and Michael Carvajal, Director of the Federal Bureau of Prisons (BOP).  (Doc. 48.)  The Motion has been fully briefed. (Docs. 64, 68.)

The Court will grant in part and deny in part the Joint Motion to Dismiss.

## I.    Legal Standards

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to raise the defense that the court lacks jurisdiction over the subject matter of an entire action or of specific claims alleged in the action.  A motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) may facially attack the existence of subject-matter jurisdiction or may challenge the truth of the alleged facts that would confer subject-matter jurisdiction on the court. *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).

### B.    Rule 12(b)(6)

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)).  In determining

whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted).  To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  If a court considers evidence outside the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).  A court may, however, consider documents incorporated by reference in the complaint or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment.  *Id.*

## II.   Plaintiffs-Petitioners' Allegations

The 2019 novel coronavirus, known as COVID-19, is a viral illness that spreads from person to person though respiratory droplets, close personal contact, and contact with contaminated surfaces or objects.  (Doc. 1 ¶ 28.)  At the time of filing this action, there was no vaccine or known medication to prevent the virus.  (*Id.*)  Once contracted, COVID-19 can cause severe damage to lung tissue, including permanent loss of respiratory capacity.  (*Id.* ¶ 29.)  It can also damage tissues of other vital organs, including the liver and the heart,

and the overall fatality rate for COVID-19 is up to 35 times greater than the fatality rate for influenza, with individuals over the age of 50 at increased risk of experiencing serious illness or death.  (*Id.* ¶¶ 29−30.)  Additionally, individuals with underlying medical conditions, including lung disease, heart disease, liver or kidney disease, epilepsy, hypertension, and other diseases causing compromised immune systems, face greater risks and higher mortality rates from contracting COVID-19.  (*Id.* ¶ 31.)

The risk of contracting COVID-19 is especially high in congregate environments, where people live, eat, and sleep in close proximity, which has led to rapid spreads in cruise ships, nursing homes, and correctional settings, including the Cook County Jail and Riker's Island, where the transmission rate for COVID-19 has been estimated to be among the highest in the world.  (*Id.* ¶ 36.)

On March 11, 2020, Arizona declared a public health emergency to prepare for, respond to, and mitigate the spread of COVID-19.  (Doc. 1 ¶ 1.)  On March 19, 2020, Arizona closed most businesses and gathering places by executive order, and on March 30, 2020, Arizona issued another executive order for individuals to remain six feet apart while sharing space.  (*Id.*)  On May 5, 2020, three days before Plaintiffs filed this action, Arizona recorded 33 deaths from COVID-19, its highest single day count, and the State had, by then, identified 9,305 cases of infection, with 395 known deaths.  (*Id.*)

Even though COVID-19 radically altered life for most people, such that social distancing and wearing masks, gloves, and other personal protective equipment (PPE) rapidly increased, federal inmates at CoreCivic's CAFCC continued to be housed with up to 14 people to a cell with bunkbeds stacked against a single wall.  (*Id.* ¶ 2.)  Additionally, soap and disinfecting products were scarce, and detainees—noticing others around them were increasingly showing symptoms—had to resort to wiping down communal property, such as shared telephones, with t-shirts or watered-down menstrual pads.  (*Id.*)  At the time Plaintiffs filed this action, 20 people housed at CAFCC had tested positive for COVID-19.  (*Id.*)

COVID-19 has spread across the globe, and on March 26, 2020, the United States led the world in confirmed cases.  (*Id.* ¶ 3.)  As of May 6, 2020, Arizona had 9,700 cases and 426 deaths, with as many as 427 new cases added each day; however, the Arizona Department of Health Services (ADHS) warned that a lack of testing could be causing an undercount.  (*Id.*)  As of May 7, 2020, Arizona ranked last of all 50 states for COVID-19 tests per 1 million people.  (*Id.*)[1]

According to public health experts, the best way to slow the spread of COVID-19 is through "social distancing," which requires people to stay at least six feet apart.  (*Id.* ¶ 4.)  Consequently, health experts have urged all American institutions, including businesses, schools, places of worship, and legislatures, to reduce the number of people in close proximity or to close down altogether, undertake aggressive sanitation measures, and close off any areas used by a sick person.  (*Id.*)  This guidance is particularly important in detention facilities, where the government controls every aspect of inmates' ability to maintain social distance and have adequate sanitation.  (*Id.*)

Individuals confined at CAFCC have insufficient access to soap, masks, and gloves; inability to social distance; and are housed in pods of up to 80 people, in cells of up to 14 people, and with bunk beds stacked against a single wall only several feet apart.  (*Id.* at 6.)  Detention facilities, by their nature, require correctional and medical staff as well as detainees awaiting trial or detained for only short periods of time to go in and out, increasing the risk of spreading COVID-19, both to those within and outside the institution.  (*Id.* ¶ 7.)  COVID-19 outbreaks in other institutions around the country demonstrate the need for immediate intervention to protect Plaintiffs and all similarly situated individuals housed at CAFCC.  (*Id.* ¶ 8.)

. . . .

. . . .

---

[1]  As of February 3, 2021, the ADHS had recorded 767,379 cases of COVID-19 in the state, with 13,576 deaths and a current rate of 10,674 cases per 100,000 people.  *See* https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious     -disease-epidemiology/covid-19/dashboards/index.php (last visited February 3, 2021).

1  ## III.    Discussion

2        Defendants-Respondents argue that this action should be dismissed in part under

3   Rule 12(b)(1) because the Court lacks jurisdiction over Plaintiffs-Petitioners' writs of

4   habeas corpus under 28 U.S.C. § 2241.  (Doc. 48 at 7−11.)  Defendants-Respondents also

5   argue that Plaintiffs-Petitioners' Fifth and Eighth Amendment claims should be dismissed

6   pursuant to Rule 12(b)(6) for failure to state a claim.  (*Id.* at 11−17.)[2]

7   ### A.    Jurisdiction

8        Defendants-Respondents argue that Plaintiffs-Petitioners' prayer for relief seeking

9   writs of habeas corpus ordering their release due to the alleged unconstitutional conditions

10  of confinement at CAFCC should be dismissed for lack of subject-matter jurisdiction

11  because habeas corpus relief under 28 U.S.C. § 2241 is only available when challenging

12  the legality or duration of one's confinement, not to remedy civil rights violations.  (*Id.* at

13  7.)  Defendants-Respondents further argue that, even if construed as an alternative form of

14  injunctive relief stemming from Plaintiffs-Petitioners' alleged unconstitutional conditions

15  of confinement, Plaintiffs-Petitioners' requests for release should be dismissed because the

16  Prison litigation Reform Act (PLRA) prevents this Court from granting prisoner release as

17  a remedy in a civil rights action.  (*Id.* at 10−11.)

18  ### 1.    28 U.S.C. § 2241

19        A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C.

20  § 2241 where a petitioner is "in custody under or by color of the authority of the United

21

22  _____

23

24        [2] Defendants-Respondents additionally argue that Plaintiffs-Petitioners' Eighth Amendment claims should be dismissed because the named representative for the post-conviction class has been released from custody, making those claims moot, and their Fifth Amendment claims should be dismissed because the named representative for the pre-trial detainee class has been sentenced and therefore can no longer assert Fifth Amendment claims.  (Doc. 48 at 6−7.)  The Court already addressed and resolved these issues in its Order on class certification by ordering the substitution of other named representatives, as needed, and the docket has been updated accordingly.  (*See* Doc. 69 at 20−25.)  The Court therefore need not address these arguments here.

25

26

27

28

States . . . in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §§ 2241(c)(1), (3).

In general, "[h]abeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement.  A civil rights action, in contrast, is the proper method of challenging 'conditions of . . . confinement.'"  *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (citation omitted).  *See also Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus . . . and a complaint under . . . 42 U.S.C. § 1983.")  Thus, [c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus; requests for relief turning on circumstances of confinement may be presented in a § 1983 action."  (*Id.*)  For this reason, when a federal detainee believes the *fact* of his detention is unconstitutional, he may seek release by filing a habeas corpus petition under 28 U.S.C. § 2241.  *See also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention").  In contrast, when a federal detainee or prisoner wishes to challenge the *conditions* in which he is being held, the usual vehicle for asserting such a claim is a civil rights action.

The United States Supreme Court, however, has not explicitly or implicitly foreclosed the use of habeas corpus for conditions-of-confinement claims.  *See Ziglar v. Abbasi*, 582 U.S. ___, 137 S. Ct. 1843, 1862 (2017) (leaving open the question of whether alien detainees challenging "large-scale policy decisions concerning the conditions of confinement imposed . . . might be able to challenge their confinement conditions via a petition for a writ of habeas corpus"); *Boumediene v. Bush*, 553 U.S. 723, 792 (2008) (declining to determine "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Bell v. Wolfish*, 441 U.S. 520, 526, n. 6 (1979) (leaving for

"another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement").[3]

The Ninth Circuit has found as to a federal prisoner's combined civil rights/habeas action challenging the conditions—not the *fact*—of his confinement that dismissal of the habeas petition was appropriate under the "traditional interpretation" that a "writ of habeas corpus is limited to attacks upon the legality or duration of confinement." *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979) (citing *Preiser,* 411 U.S. at 484−86.)  However, since *Crawford*, other Ninth Circuit cases have not expressly foreclosed the ability of courts to order habeas relief under 28 U.S.C. § 2241 in response to alleged civil rights violations.  *See Badea*, 931 F.2d at 574 (declining to address "whether Badea should have sought relief through a habeas petition or a civil rights complaint" because his release on parole made the issue moot); *Nettles v. Grounds*, 830 F.3d 922, 931-32 (9th Cir. 2016) (observing that the PLRA reflects statutory intent to make § 1983 the exclusive remedy for state inmate suits "about prison life," but declining to address whether its holding applied "to relief sought by prisoners in federal custody").  And Courts of Appeals in other circuits have recognized the applicability of habeas relief to remedy unconstitutional conditions of confinement caused by COVID-19.  *See Hope v. Warden York County Prison*, 972 F.3d 310, 325 (3d Cir. 2020) (holding "Petitioners' claim that unconstitutional conditions of confinement at York and Pike require their release [was] cognizable in habeas."); *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) (holding that "[b]ecause petitioners [sought] release from confinement, 'the heart of habeas corpus,' . . . jurisdiction [was] proper under § 2241." (internal citation omitted)).

---

[3] *See also Brown v. Plata,* 563 U.S. 493, 563 (2011) (Scalia, J., dissenting) (stating that prisoner-release injunction was "the functional equivalent of 46,000 writs of habeas corpus" and release should be ordered only if it is determined "that the prisoner is suffering from a violation of his constitutional rights, and that his release, and no other relief, will remedy that violation. Thus, if the court determines that a particular prisoner is being denied constitutionally required medical treatment, and the release of that prisoner (and no other remedy) would enable him to obtain medical treatment, then the court can order his release").

In *Ibarra-Perez v. Howard*, a sister court in this District found "a strong argument" that an immigration detainee's habeas claims based on the respondents' alleged "failure to implement sufficient safety precautions related to COVID-19 at his detention facility" were not cognizable under § 2241, but the district court did not ultimately decide the issue, finding instead that the petitioner's claims failed on the merits. 468 F. Supp. 3d 1156, 1170 (D. Ariz. 2020).[4]  Moreover, in *Gebreweldi v. Barr*, this Court recently found that a federal immigration detainee could seek habeas relief based on exposure to COVID-19, opining that, "in the absence of binding authority to the contrary, Petitioner's claims are cognizable under § 2241."  CV-20-00875-PHX-DJH (MTM), Doc. 37 at 14.

Defendants-Respondents argue that *Gebreweldi* is distinguishable because it involved a civil immigration detainee, not, as here, classes of criminal detainees and prisoners,[5] and they point out that there is no Ninth Circuit precedent finding that a class of federal criminal detainees or prisoners may seek writs of habeas corpus under § 2241 based on conditions of confinement due to the threat of COVID-19.  (Doc. 68 at 3, 4.) Further, *Torres v. Milusnic*, 472 F. Supp. 3d 713, 726 (C.D. Cal. 2020), a lone district court case within the Ninth Circuit that found federal criminal detainees could seek habeas relief under § 2241 based on alleged COVID-19 related conditions of confinement, is distinguishable.  In *Torres*, the court premised its § 2241 jurisdiction on the petitioners'

---

[4] Notably, in *Ibarra-Perez*, the court's reluctance to find the petitioner's habeas request cognizable under § 2241 was due, in part, to its reasoning that the appropriate remedy for unconstitutional conditions of confinement is judicially mandated changes in those conditions or damages, not immediate release.  *See* 468 F. Supp. 3d at 1169.  This reasoning is less applicable here, where Plaintiffs-Petitioners seek both injunctive relief to remedy the alleged unconstitutional conditions at CAFCC, and, in the alternative, writs of habeas corpus, limited to the degree to which an expert determines that available changes to current conditions would not adequately remedy the risk of harm of contracting COVID-19 absent a reduction in the existing detainee/prisoner population.  (*See* Doc. 1 at 27.)

[5] Defendants-Respondents correctly note that civil immigration detainees do not have all the statutory and regulatory avenues of relief that are otherwise available to criminal detainees/prisoners, such at the Cares Act and the Bail Reform Act.  (Doc. 64 at 4.)

allegations that "no set of conditions of confinement under the present circumstances could be constitutional," making the very fact of their confinements unconstitutional.  *Id.* Plaintiffs-Petitioners in this action have not alleged that Defendants-Respondents cannot cure the unconstitutional conditions of confinement through other forms of injunctive relief short of a "highly expedited process" of class-wide habeas corpus release, as the petitioner class sought in *Torres*.  *See id.*  Rather, it is undisputed that Plaintiffs-Petitioners seek writs of habeas corpus only to the extent that other forms of relief may prove inadequate to remedy the alleged unconstitutional conditions at CAFCC.  Because Plaintiffs-Petitioners do not actually allege that the unconstitutional conditions in this action cannot be cured through other forms of injunctive relief short of release, their claims do not challenge the very "fact or duration" of their confinements.

At most, the Court's review of relevant cases shows that there is, as yet, no definitive precedent in this Circuit establishing that the Court has jurisdiction under § 2241 over Plaintiffs-Petitioners' alternative requests for writs of habeas corpus based solely on their alleged unconstitutional conditions of confinement.  The Court need not ultimately determine, however, whether it has jurisdiction under § 2241 to issue writs of habeas corpus on this basis because the Court has jurisdiction to order injunctive relief for constitutional violations—including targeted reductions in the inmate population—under 28 U.S.C. § 1331, which Plaintiffs-Petitioners have also asserted as a statutory basis for their claims.  (*See* Doc. 1 ¶ 17.)

### 2.    28 U.S.C. § 1331

"Section 1331 provides jurisdiction for the exercise of the traditional powers of equity in actions arising under federal law.  No more specific statutory basis is required." *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) (recognizing the " jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution").

As this Court noted in *Gebreweldi*, even if the Court lacks jurisdiction under § 2241, Plaintiffs-Petitioners' claims for injunctive relief "remain cognizable for review because

[they] ha[ve] alternatively pleaded a cause of action under the Fifth [and Eighth] Amendment[s] for injunctive and declaratory relief, over which the Court would have jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution." CV-20-00875-PHX-DJH (MTM), Doc. 37 at 14 (citing *Ziglar*, 137 S. Ct. at 1865 (observing that alien detainees challenging their conditions of confinement could seek "an injunction requiring the warden to bring his prison into compliance with the regulations discussed above [] or some other form of equitable relief"); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (federal courts have equitable authority to grant injunctive relief "against federal officials violating federal law"); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights.")).

In addition to the above cases, shortly after briefing on Defendants-Respondents' Motion to Dismiss was complete, the Ninth Circuit found in the civil immigration context that federal courts have the authority under § 1331 to order preliminary injunctive relief, including the reduction of a detention facility's population, when such relief is required to remedy unconstitutional conditions of confinement associated with the risks of contracting COVID-19. *Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020). In *Roman*, a class of civil immigration detainees alleged they were being subjected to unconstitutional conditions of confinement due to the risk of contracting COVID-19.[6] *Id.* at 938. As here, the class likewise sought declaratory, injunctive, and habeas corpus relief. *Id.* at 939. The district court in *Roman* granted preliminary injunctive relief, which included ordering the

---

[6] Because *Roman* involved civil immigration detainees, the claims were brought only under the Fifth Amendment, not under both the Fifth and Eighth Amendments relied upon by the two classes of federal criminal detainees and prisoners in this action.

reduction of the facility's detainee population to a level that would allow appropriate social distancing in compliance with the Center for Disease Control (CDC) guidance for reducing the spread of COVID-19. *Id.* Notably, the injunction "left to the Government's discretion whether to achieve the requisite population reduction by deporting selected detainees, transferring selected detainees to other facilities, or releasing selected detainees with appropriate conditions of release" and "likewise allowed the Government to determine which detainees to release, deport, or transfer." *Id.* On appeal, the Ninth Circuit declined to reach the government's argument that the district court lacked jurisdiction to order habeas corpus relief, finding that the plaintiffs' "action for declaratory and injunctive relief independently provided the district court jurisdiction to hear [their] challenges and authority to grant the types of relief that [they] sought." *Id.* at 941. It reasoned that because the plaintiffs' claims arose under the Constitution, the district court had subject-matter jurisdiction to order appropriate injunctive relief under 28 U.S.C. § 1331 "irrespective of the accompanying habeas petition" and "an implied cause of action exists for Plaintiffs to challenge allegedly unconstitutional conditions of confinement." *Id.* at 941−42 (citing cases). Of particular relevance here, the Ninth Circuit found that "the district court's power to grant injunctive relief included the authority to order a reduction in population, if necessary to remedy a constitutional violation." *Id.* at 942 (citing *Plata*, 563 U.S. at 500−502, 545 (affirming a three-judge district court's findings that overcrowding was the primary cause of constitutional violations in California prisons and that a reduction in the prison population, even if it required the release of some prisoners, was an appropriate remedy)).

Even though *Roman* supports that federal courts have the authority to order constitutionally-required reductions in the civil detainee/prisoner population of a given facility by various means, including through transfers, home confinement, and release, it is not dispositive of the Court's authority to order class-wide release of criminal detainees and prisoners in this action. (Doc. 1 at 27 ¶ 6.) First, *Roman* did not expressly order the plaintiffs' release to reduce the detainee population; instead, it gave discretion to the

1   government to determine the means by which it would achieve such a reduction.  Second,

2   *Roman* ordered only preliminary injunctive relief, not final relief, and to the extent it found

3   that federal courts have the authority to order final relief in the form of release, it relied on

4   *Plata*, 563 U.S. at 512, which specifically involved a three-judge district court, consistent

5   with PLRA requirements for ordering such relief in cases involving prisoners.  Therefore,

6   to the extent Plaintiffs-Petitioners specifically seek their release, the Court must determine

7   whether the PLRA permits the Court to order such relief.

8                    **3.      The PLRA**

9            The PLRA sets forth strict guidelines whereby courts may order injunctive relief

10  regarding prison conditions.  As relevant to Plaintiffs-Petitioners alternative requests for

11  release in this action, these include that "[i]n any civil action with respect to prison

12  conditions, *no court shall enter a prisoner release order* unless--

13               (i) a court has previously entered an order for less
14               intrusive relief that has failed to remedy the deprivation of the
                 Federal right sought to be remedied through the prisoner
15               release order; and

16               (ii) the defendant has had a reasonable amount of time
17               to comply with the previous court orders.

18  18 U.S.C. § 3626(a)(3)(A) (emphasis added).[7]  Additionally, § 3626(a)(3)(B) provides that

19  "a prisoner release order shall be entered *only by a three-judge court*," which may do so

20  only upon finding 'clear and convincing evidence that--

21               (i) crowding is the primary cause of the violation of a Federal
22               right; and

23               (ii) no other relief will remedy the violation of the Federal
                 right.

24

25

26   _____

27        [7] In this context, "the term 'prisoner' means any person subject to incarceration,
     detention, or admission to any facility who is accused of, convicted of, sentenced for, or
28   adjudicated delinquent for, violations of criminal law or the terms and conditions of parole,
     probation, pretrial release, or diversionary program." 18 U.S.C. § 3626(g)(3).

1    *Id.* § 3626(a)(3)(B) & (F) (emphasis added); *see Plata*, 563 U.S. at 512 (recognizing that

2    "[u]nder the PLRA, only a three-judge court may enter an order limiting a prison

3    population").  For this reason, "[a] party seeking a prisoner release order in Federal court

4    shall file with any request for such relief, a request for a three-judge court and materials

5    sufficient to demonstrate that the requirements of subparagraph (A) have been met."  18

6    U.S.C. § 3626(a)(3)(C).

7         Plaintiffs-Petitioners' prayer for relief is facially consistent with the first of these

8    provisions, requiring, in effect, that orders of release be a last resort to cure constitutional

9    violations, to be used only after all other lesser measures of injunctive relief have proven

10   ineffective.  *See* 28 U.S.C. § 3626(a)(3)(F).  In their Complaint/Petition, Plaintiffs-

11   Petitioners first seek an injunction mandating that Defendants-Respondents take specific

12   corrective measures to cure the alleged unconstitutional conditions at CAFCC with respect

13   to the risk of contracting COVID-19.  (Doc. 1 at 26−27 ¶ 5.)  These measures include

14   ensuring adequate social distancing for all detainees and staff; access to hygiene supplies;

15   regular cleaning of touched surfaces; adequate PPE; quarantining of staff and inmates

16   exposed to COVID-19; and the implementation of testing procedures "consistent with CDC

17   and other public health guidance."  (*Id.*)  Only in the event an expert's recommendations

18   for relief "cannot be achieved without reducing the detained population," do Plaintiffs-

19   Petitioners seek "writs of habeas corpus on the ground that Plaintiff's continued detentions

20   violate the Due Process Clause or the Eighth Amendments."  (*Id.* at 27 ¶ 7.)

21        Plaintiffs-Petitioners have nonetheless failed to acknowledge or comply with the

22   PLRA's other requirements that, in a prisoner civil rights action challenging conditions of

23   confinement, only a three-judge court may issue a release order and that a party seeking

24   such an order in federal court must file a specific request to convene a three-judge court,

25   along with materials showing that the preliminary grounds for making such a request have

26   been met.  *See* 18 U.S.C. § 3626(a)(3)(C); *Plata*, 563 U.S. at 512.  Instead, Plaintiffs-

27   Petitioners argue only that the PLRA does not apply here.  (Doc. 64 at 18.)  This is because,

28   they argue, their alternative requests for release are "cognizable under habeas," and the

1   PLRA by its own terms does not apply to "habeas corpus proceedings challenging the fact
2   or duration of confinement."  (*Id.* (citing 18 U.S.C. § 3626(g)).)

3   These arguments are unpersuasive.  First, the PLRA does not, as Plaintiffs-
4   Petitioners imply, exempt from its statutory reach all actions in which criminal
5   detainees/prisoners seek their release from custody.  Instead, it is clear from the above-
6   cited statutory provisions that the PLRA squarely applies to requests for release "in any
7   civil action with respect to prison conditions," as is the case here.  *See* 18 U.S.C.
8   § 3626(a)(3)(A); *see also* § 3626(g)(4) ("the term 'prisoner release order' includes any
9   order . . . that has the purpose or effect of reducing or limiting the prison population, or that
10  directs the release . . . of prisoners").  True, the PLRA distinguishes between such actions
11  and more traditional habeas corpus actions, stating that the term "civil action with respect
12  to prison conditions" means "any civil proceeding arising under Federal law with respect
13  to the conditions of confinement . . . , but does not include habeas corpus proceedings
14  challenging the fact or duration of confinement in prison."  *Id.* § 3626(g)(2).  But as
15  previously discussed, here, Plaintiffs-Petitioners do not claim there is no set of conditions
16  that would cure the alleged unconstitutional conditions at CAFCC apart from their release,
17  such that they challenge the "fact or duration" of their confinements.  For this reason, the
18  Court's jurisdiction to order Plaintiffs-Petitioners' release as an alternative form of relief,
19  whether invoked under § 1331 or § 2241, remains squarely in the context of a "civil action
20  with respect to prison conditions" to which the requirements of the PLRA apply.  18 U.S.C.
21  §§ 3626(a)(3).

22  Absent any authority to the contrary, the PLRA applies to all the claims and requests
23  for relief in this action.  Plaintiffs-Petitioners, however, have not requested a three-judge
24  panel or otherwise shown that the preliminary requirements under the PLRA, 18 U.S.C.
25  § 3626(a)(3)(A), have been met as to Plaintiffs-Petitioners' alternative request for release.
26  This Court therefore does not have jurisdiction to grant such relief.

27  The Court will therefore grant Defendants-Respondents' Motion to Dismiss as to
28  Plaintiffs-Petitioners' claims to the extent they seek writs of habeas corpus under 28 U.S.C.

1   § 2241 or release under 28 U.S.C. § 1331 and will dismiss these claims without prejudice

2   for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  Further, in the absence of

3   any cognizable petitions for habeas corpus, the Court will hereinafter refer to Plaintiffs-

4   Petitioners only as Plaintiffs and Defendants-Respondents solely as Defendants.

5            **B.**     **Eighth Amendment Claims (Post-Conviction Class)**

6                      **1.**     **Legal Standard**

7            The Eighth Amendment's prohibition against cruel and unusual punishment

8   protects prisoners from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465

9   F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and

10  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).[8]  While conditions of confinement may

11  be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary

12  infliction of pain.  *Morgan*, 465 F.3d at 1045.  Prison officials have a duty to ensure that

13  prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and

14  personal safety.  *See Farmer*, 511 U.S. at 832; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th

15  Cir. 1996); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

16           To state an Eighth Amendment conditions-of-confinement claim, plaintiffs must

17  meet a two-part test.  First, the plaintiff must make an "objective" showing that the alleged

18  deprivation is "sufficiently serious."  *Farmer*, 511 U.S. at 834.  To be sufficiently serious

19  to form the basis of an Eighth Amendment violation, "a prison official's act or omission

20  must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.* (citing

21  *Rhodes*, 452 U.S. at 347).  Second, the plaintiff must make a "subjective" showing that the

22  prison official acted with a "sufficiently culpable state of mind"; that is, that the defendant

23  acted with deliberate indifference to the plaintiff's health or safety.  *Farmer*, 511 U.S. at

24  834.  To show deliberate indifference, the plaintiff must establish that the defendant knew

25  of and disregarded an excessive risk to inmate health or safety.  *Id.* at 837.  To satisfy the

26  _____

27

28           [8] "[T]he Eighth Amendment's Cruel and Unusual Punishment Clause . . . applies to
     convicted criminals while the [the Fifth Amendment's Due Process Clause] applies to
     pretrial and immigration detainees."  *Ziglar,* 137 S. Ct. at 1877 (Breyer, J., dissenting).

1    knowledge component, "the official must both be aware of facts from which the inference
2    could be drawn that a substantial risk of serious harm exists, and he must also draw the
3    inference." *Id.* Deliberate indifference is a higher standard than negligence or lack of
4    ordinary due care for the prisoner's safety. *Id.* at 835.

5         Prison officials may avoid Eighth Amendment liability for the harm suffered by an
6    inmate if they show that: (1) "they did not know of the underlying facts indicating a
7    sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "they
8    knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts
9    gave rise was insubstantial or nonexistent"; or (3) they responded reasonably to the risk.
10   *Id.* at 844.

11                        **2.      Discussion**

12        Defendants do not dispute that, as alleged, the risk to Plaintiffs of contracting
13   COVID-19 at CAFCC, particularly among detainees and prisoners with other serious
14   medical conditions, is sufficient to constitute a serious medical need. They argue, however,
15   that the Court should dismiss Plaintiffs' Eighth Amendment challenge for failure to state a
16   claim because Plaintiffs have failed to allege any facts from which to infer "that
17   Defendants, through any policy, practice, or custom implemented at CAFCC, have acted
18   with subjective deliberate indifference" to the risks of serious harm posed by COVID-19.
19   (Doc. 48 at 11.)

20        Defendants point out that the allegations in the Complaint, together with additional
21   facts appropriate for consideration here because they are set forth in materials cited by the
22   Complaint, show that Defendants have enacted policies at CAFCC to protect detainees and
23   prisoners from COVID-19. (*Id.*) These include that CAFCC requires detainees and
24   prisoners to be quarantined for 14 days upon admission; CAFCC staff provide masks and
25   require detainees and prisoners to wear masks when outside their pods; CAFCC requires
26   staff to wear masks; CAFCC staff screen all employees upon entry, and those conducting
27   the screening are required to wear appropriate PPE; CAFCC has adopted policies
28   consistent with CDC guidelines for cleaning and disinfecting surfaces; CAFCC routinely

1   encourages staff and inmates to practice social distancing, including at regular town hall

2   meetings and through materials posted at the facility; CAFCC has suspended visitation,

3   purchased COVID-19 test kits, secured additional stores of PPE, and communicated best

4   practices for personal hygiene; CAFCC staff have made soap and hygiene supplies readily

5   available; CAFCC has taken measures to ensure that detainees and prisoners have access

6   to medical care; and the facility has implemented processes to detect and track COVID-19;

7   to collect, analyze, and report data on individuals exhibiting signs of the virus; and to

8   segregate infected individuals. (*Id.* at 12−13.)

9       Defendants argue based on Plaintiff's direct and indirect acknowledgement of these

10  measures in the Complaint, that the mere allegation that Defendants' efforts are

11  "inadequate to stop the virus from spreading" (*see* Doc. 1 ¶ 61) does not suffice to show

12  deliberate indifference because it says nothing about the officials' state of mind," and

13  Plaintiffs cannot state an Eighth Amendment claim absent facts showing that Defendants

14  "subjectively believe the measures they are taking are inadequate." (*Id.* at 13 (quoting

15  *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020)).) Defendants further argue that

16  Plaintiffs' allegations of non-compliance with the above policies—such as inadequate

17  cleaning, infrequent sanitation of high-touch areas, non-compliance with social distancing,

18  inconsistent mask wearing by staff, the inability to practice social distancing at all times,

19  and the lack of uniform enforcement of COVID-19 policies at CAFCC—are insufficient

20  to show deliberate indifference because "these allegations 'at most show that [D]efendants'

21  response was imperfect,' which 'is not enough to establish deliberate indifference.'" (*Id.*

22  (quoting *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (unreported)).)

23      Plaintiffs argue in their Response that they have alleged sufficient facts to establish

24  deliberate indifference. (Doc. 64 at 14−15.) As to the knowledge component of this

25  standard, they argue that the allegations in the Complaint are sufficient to show that the

26  risk of contracting COVID-19 in the incarceration context is obvious. (*Id.* at 14.) They

27  point out that the Complaint details how both the President of the United States and the

28  Governor of Arizona declared states of emergency in response to the COVID-19 pandemic;

governments, businesses, and courts have implemented responsive measures globally, nationally, and in Arizona; COVID-19 has caused millions of illnesses and deaths worldwide; and, at the time Plaintiffs filed this lawsuit, 20 inmates at CAFCC had tested positive for COVID-19.  (Doc. 64 at 14; *see* Doc. 1 ¶¶ 1−2, 39−43.)  Plaintiffs also point to allegations in the Complaint that the CDC has issued warnings of facility-wide COVID-19 outbreaks in nursing homes, where half of those who tested positive for COVID-19 were either asymptomatic or pre-symptomatic, thereby unknowingly contributing to the spread of COVID-19.  (Doc. 1 ¶ 37.)

Plaintiffs have also alleged known conditions of confinement at CAFCC that allegedly place them at an unreasonable risk of contracting COVID-19.  They allege, for instance, that they are housed in pods of up to 80 people and in cells of up to 14 people, where they cannot maintain adequate social distancing; their beds are stacked close together; and they must stand close together when lining up for meals, medical appointments, and to use communal telephones, in contravention of CDC guidelines for proper distancing within correctional facilities.  (*Id.* ¶¶ 1−4, 28, 46−50.)  Likewise, Plaintiffs allege having inadequate disinfectants and cleaning supplies; insufficient masks, leading to mask sharing or non-compliance with mask requirements; a lack of COVID-19 testing or checks for COVID-19 symptoms among prisoners and detainees; and the failure to test or separate those showing active symptoms of COVID-19, also in contravention of CDC guidelines.  (*Id.* ¶¶ 4, 37, 55−61.)

These allegations, taken as true, are sufficient to infer that Defendants and CAFCC staff know that prisoners face a substantial risk of serious harm from exposure to COVID-19 while confined in a congregate setting.  The allegations are likewise sufficient to show that the policies in place within CAFCC have either been insufficient to address that risk or have been inconsistently enforced, such that prisoners are nonetheless being subjected to conditions of confinement that pose a serious risk to their health.

As Defendants argue, however, these alleged deficiencies say nothing about Defendants' subjective intent.  Therefore, absent additional allegations from which to infer

a culpable state of mind, they are insufficient to demonstrate the "wanton and unnecessary infliction of pain." *See Farmer*, 511 U.S. at 834 (to show an Eighth Amendment violation "a prison official must have a 'sufficiently culpable state of mind,'" because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

To be sure, it is deliberately indifferent for prison officials to intentionally disregard a prisoner's known serious medical needs; likewise, it is deliberately indifferent to "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (non-smoking prisoner with health issues stated an Eighth Amendment claim based on allegedly being forced to share a cell with a prisoner who smoked 5 packs of cigarettes a day); *see also Hutto v. Finney*, 437 U.S. 678, 682–83, (1978) (cited in *Helling*) (Eighth Amendment violation where 4−11 prisoners were placed for indeterminant periods of time in 8 x 10 cells without separating out those with known infectious diseases, and their mattresses were "jumbled together each morning, then returned to the cells at random in the evening.")

Unlike in the above-cited cases, however, the allegations in Plaintiffs' Complaint and the materials referenced therein do not demonstrate that Defendants have simply ignored the risks associated with the spread of COVID-19. Nor have they, as in *Hutto*, failed to make any attempts to separate and quarantine infected prisoners from those in the general prison population. *See* 437 U.S. at 682–83. Instead, the Complaint acknowledges that individuals transferred to CAFCC are quarantined for 14 days; are given masks; are required to wear masks when outside their pods; and that Defendants have implemented numerous policies for managing the spread of COVID-19. (Doc. 1 ¶¶ 49−54, 61.) These same allegations also identify various insufficiencies in these measures, such as that the 14-day quarantine period does not properly account for an up to 14-day incubation period or for pre-symptomatic cases of COVID-19, and that masks have not always been available, are too thin, and are swapped between inmates when an inmate is required to

wear a mask to leave the pod.  (*See id.*)  But mere inadvertence and negligence in carrying out protective measures, as are alleged here, are not enough to show deliberate indifference. *See Wilson*, 501 U.S. at 297 (allegations of "inadvertent failure to provide adequate medical care," or mere negligence "simply fail to establish the requisite culpable state of mind"). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" not to avert all possible harm.  *Farmer*, 511 U.S. at 844 (internal citations omitted).

Plaintiff's citation to *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) for the proposition that the requisite culpable state of mind may be inferred where, as here, the potential for serious harm from contracting COVID-19 is obvious (Doc. 64 at 15), does not compel a different conclusion.  *Hope* involved a prison disciplinary incident in which officers shackled a non-compliant work-crew prisoner to a hitching post, where he remained shirtless and outside in the hot sun for 7 hours, and the officers taunted him and gave him water only once but no bathroom breaks.  *Hope*, 536 U.S. at 734−35.  Under these circumstances, the Supreme Court found that it could infer a culpable state of mind on the parts of the officers because the overt cruelty and risk of harm to a prisoner forced to remain shackled in this way was "obvious." (*Id.* at 738.)  Plaintiffs, however, have not alleged any such willful, deliberate exposure of prisoners to a substantial risk of serious harm by Defendants or prison staff; nor have they alleged any other facts suggestive of a sufficiently culpable state of mind to give rise to an equivalent Eighth Amendment claim.

Plaintiff's arguments based on the "obviousness" of the risk are also reminiscent of the Supreme Court's finding in *Canton v. Harris*, that, in the failure-to-train context, "the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. 378, 390 (1989).  But the Supreme Court in *Farmer* specifically rejected *Canton's* standard for showing deliberate indifference by prison officials in the Eighth Amendment conditions of confinement context.  511 U.S. at 841.  The Court reasoned that showing a city's mental state is nearly impossible, and so the plaintiffs' Eighth Amendment claim had to rely on

1   more objective indicia of indifference.  *Id.*  But with individual prison officials, for whom

2   subjective intent is more readily discernable, parties may not rely on "obvious" needs for

3   new policies to demonstrate deliberate indifference.  *Id.* at 841–42.  In other words, it is

4   not enough for Plaintiffs to allege that Defendants' current COVID-19 policies show an

5   obvious need for change.  Deliberate indifference here requires a greater showing of actual

6   subjective intent, which is lacking from the Complaint.

7          Absent such a showing, Plaintiff's allegations fail to establish the required "culpable

8   state of mind" to state an Eighth Amendment claim.  *Farmer*, 511 U.S. at 834; *Wilson v.*

9   *Seiter*, 501 U.S. at 297.  Accordingly, the Court will grant Defendants' Motion to Dismiss

10   as to Plaintiff's Eighth Amendment deliberate indifference claims and will dismiss these

11   claims from this action.

12          **C.**    **Fifth Amendment Claims (Pre-Trial Class)**

13              **1.**    **Legal Standard**

14          The Fifth Amendment's Due Process Clause prohibits the federal government from

15   depriving "any 'person . . . of . . . liberty . . . without due process of law,'" and its protections

16   extend "to all 'persons' within the United States."  *Zadvydas v. Davis*, 533 U.S. 678, 690,

17   693 (2001).

18          **(a)**    **Conditions of Reasonable Health and Safety**

19          Freedom from physical restraint falls at the core of the liberty interest protected

20   from arbitrary governmental action by the Due Process Clause.  *Youngberg v. Romeo*, 102

21   457 U.S. 307, 316 (1982).  The government deprives an individual of this substantive

22   liberty interest without due process when it restrains his "freedom to act on his own

23   behalf—through incarceration, institutionalization, or other similar restraint of personal

24   liberty—" thereby "render[ing] him unable to care for himself, and at the same time fails

25   to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and

26   reasonable safety."  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S.

27   189, 200 (1989).

28          In the Ninth Circuit, the government has violated its duty under the Due Process

Clause to provide a detainee "conditions of reasonable health and safety" when:

> (i) [It] made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the [government] did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved . . . ; and (iv) by not taking such measures, the [government] caused the plaintiff's injuries.

*Roman*, 977 F.3d at 943 (alternations in original) (quoting *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (discussing the "objective deliberate indifference standard")).

"With respect to the third element, the [government's] conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (second alteration in original) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Objective unreasonableness is "more than negligence but less than subjective intent—something akin to reckless disregard"; "mere lack of due care" is not enough. *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071). "To satisfy the fourth element, a plaintiff need only prove a 'sufficiently imminent danger[],' because a 'remedy for unsafe conditions need not await a tragic event.'" *Roman*, 977 F.3d at 943 (alteration in original) (quoting *Helling*, 509 U.S. at 33-34).

### (b) Punitive Conditions

Where pretrial detention is incident to legitimate government objectives, a detainee has a protected liberty interest in freedom from punishment absent an adjudication of guilt. *Bell*, 441 U.S. at 534. The government deprives a detainee of this substantive liberty interest without due process when it detains him or her under conditions that "amount to punishment." *Bell*, 441 U.S. at 535. Conditions resulting in harm or "disability" amount to punishment if (1) they are expressly imposed for the purpose of punishment, (2) they are not "rationally related to a legitimate nonpunitive governmental purpose," or (3) they

1    "appear excessive in relation to" a legitimate governmental purpose. *Bell*, 441 U.S. at 538-

2    39, 561; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473 (2015)

3    (government action amounts to punishment if it is "objectively unreasonable"); *Vazquez v.*

4    *County of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020).

5                              **2.    Discussion**

6            Defendants argue that Plaintiffs also fail to state Fifth Amendment Due Process

7    claims on behalf of the pre-trial detainee class.  (Doc. 48 at 14−17.)  They argue that this

8    is because the array of policies they have implemented at CAFCC to protect detainees from

9    the spread of COVID-19 are not, themselves, objectively deliberately indifferent and do

10   not fall below CDC guidelines.  (*Id.* at 15−16.)  They also argue that, given these policies,

11   the conditions of confinement at CAFCC are also rationally related to and not excessive in

12   relation to the government's legitimate interests in ensuring the presence of pre-trial

13   detainees at future court proceedings and safe-guarding the community and therefore do

14   not amount to punishment.  (*Id.* at 16−17.)

15           Plaintiffs argue in response that the Complaint alleges sufficient facts to show both

16   that Defendants do not take reasonable available measures to abate the risks to detainees

17   of contracting COVID-19 and that the resulting conditions at CAFCC are thereby excessive

18   in relation to the purpose of confinement, resulting in punishment.  (Doc. 64 at 6−11.)

19           As an initial matter, Plaintiffs' asserted Fifth Amendment claims do not fail simply

20   because, as Defendants argue, Plaintiffs have not alleged that the policies at CAFCC are,

21   themselves, objectively unreasonable.  Instead, "[a] policy, practice, or custom may be

22   inferred from widespread practices or evidence of repeated constitutional violations for

23   which the errant officials are not reprimanded." *Menotti v. City of Seattle*, 409 F.3d 1113,

24   1147 (9th Cir. 2005) (citing *Nadell v. Las Vegas Metro. Police Dep't.*, 268 F.3d 924, 929

25   (9th Cir. 2001)).  When assessing liability for an improper custom or practice, courts should

26   look at whether the practice at issue is one of sufficient duration, frequency, and

27   consistency such that the alleged conduct may be the "traditional method of carrying out

28   policy." *Trevino v. Gates*, 99 F.3d 991, 918 (9th Cir. 1996).

1    Here, Plaintiffs have alleged that, in practice, detainees are placed into cells of up
2    to 14 people without adequate social distancing or adequate cleaning supplies, all sharing
3    a single toilet and only a few telephones and showers; they must stand close together to
4    wait for meals, medical appointments, and to use communal telephones; they are not
5    provided sufficient masks or are asked to share masks; they have been exposed to numerous
6    people showing COVID-19 symptoms, including some who were placed in quarantine, but
7    not tested, and then returned from quarantine while still symptomatic; and only a small
8    number of detainees have been tested for COVID-19 or checked for symptoms, with even
9    those showing symptoms not receiving medical care or tests.  (*See* Doc. 1 ¶¶ 46−50.
10   53−59.)   These allegations, based on six declarations attesting to the same or similar
11   treatment and conditions, are sufficient to infer widespread practices and customs bearing
12   on the spread of COVID-19 at CAFCC and to infer that these practices are "the traditional
13   method[s] of carrying out policy."  These allegations therefore satisfy the requirement that,
14   to state a Fifth Amendment claim, Plaintiffs must allege that Defendants made intentional
15   decisions respecting the conditions under which detainees are confined.  Likewise, given
16   the alleged serious health risks associated with the spread of COVID19, it is possible to
17   infer that these same alleged conditions have placed detainees at substantial risk of
18   suffering serious harm.  *Roman*, 977 F.3d at 943.

19   The essential question then, for Fifth Amendment purposes, and at this juncture, is
20   whether the facts alleged show that Defendants have failed to "take reasonable available
21   measures to abate that risk, even though a reasonable official in the circumstances would
22   have appreciated the high degree of risk involved."  *Id.*  Because this is an objective
23   standard, a showing of a "culpable mind" is not required; instead, the Court looks only to
24   whether the allegations in the Complaint support that a reasonable official under the same
25   circumstances would have apprehended the high degree of risk involved to CAFCC
26   detainees of contracting COVID-19, and that Defendants have failed to take reasonable
27   available measures to abate that risk.  *Id.*; *Gordon*, 888 F.3d at 1125.

28

Plaintiffs argue that "in a pandemic where [adequate sanitation, social distancing, and mask wearing], among [other measures], are essential to save lives," the allegations in the Complaint are sufficient to make this showing.  (Doc. 64 at 9−10.)  Defendants do not address whether a reasonable official would have appreciated the seriousness of the risk to detainees at CAFCC due to the facility's alleged failures to adhere to its own COVID-19 policies and CDC guidelines.  Instead, they focus only on the reasonableness of the official policies, themselves, and they deny that the allegations in the Complaint are sufficient to show "a *de facto* policy, practice, or custom in reckless disregard to Plaintiff's health and safety." (Doc. 48 at 16.)  On the same basis, they argue that the conditions to which pretrial detainees are allegedly subjected at CAFCC are not "punitive" or excessive in relation to the government's substantial and legitimate interest in holding individuals charged with serious federal crimes.  (*Id.* at 16−17.)

As already noted, Defendants' argument based solely on the asserted reasonableness of their official policies, as incorporated by reference in the Complaint, is misplaced.  For purposes of a 12(b)(6) Motion, the Court must accept Plaintiffs' allegations in the Complaint as true and draw all reasonable inferences in Plaintiffs favor.  *Outdoor Media Group*, 506 F.3d at 900; *Iqbal*, 556 U.S. at 678.  And based on the above-discussed allegations of specific, widespread deficiencies in CAFCC's policies and practices for preventing the spread of COVID-19, it is possible to infer both that Defendants made intentional decisions regarding Plaintiff's conditions of confinement and that a reasonable official, knowing the seriousness of the risks associated with COVID-19, could appreciate the high degree of risk these conditions posed to the health and welfare of detainees.  Additionally, many of Plaintiffs allegations in the Complaint, including CAFCC's alleged failures to check inmates for COVID-19 symptoms or to test or quarantine even those showing active symptoms, are sufficient to show that Defendants have failed to take reasonable available measures to abate that risk.  (*See* Doc. 1 ¶¶ 4, 37, 55−61.)

For the above reasons, the allegations in the Complaint are sufficient to show that the conditions of confinement to which pre-trial detainees are subjected are objectively

unreasonable and excessive in relation to the government's legitimate interests in confining these detainees.  *See Castro*, 833 F.3d at 1085 (Ikuta, J., dissenting) ("objectively unreasonable action has no legitimate nonpunitive governmental purpose").  Moreover, because a "remedy for unsafe conditions need not await a tragic event," the final, injury prong required to state a Fifth Amendment claim is also met.  *Roman*, 977 F.3d at 943. Accordingly, the Court will deny Defendants' Motion to Dismiss Plaintiff's Fifth Amendment claims on behalf of the pre-trial class.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants-Respondents' Joint Motion to Dismiss (Doc. 48).

(2)     The Joint Motion to Dismiss (Doc. 48) is **granted in part and denied in part**.  The Motion is **granted in part** as to (a) Plaintiffs-Petitioners' claims seeking release under § 1331 and/or writs of habeas corpus under § 2241, and these claims are **dismissed** for lack of subject-matter jurisdiction under Rule 12(b)(1); and (b) Plaintiffs' Eighth Amendment claims on behalf of the post-conviction class, and these claims are **dismissed** for failure to state a claim under Rule 12(b)(6).

(3)     The Motion is **denied** as to Defendants' Motion to Dismiss Plaintiff's Fifth Amendment claims on behalf of the pre-trial class.

Dated this 17th day of February, 2021.

Honorable Diane J. Humetewa
United States District Judge