# **<u>EXHIBIT 1</u>**

**Expert Report of Homer Venters, M.D., M.S.**

***Romero-Lorenzo et al. v. Koehn et al.*, No. 2:20-cv-00901-DJH-DMF (D. Ariz.)**

**Introduction and qualifications**

1.      I have been retained by plaintiffs' counsel in the case of *Romero-Lorenzo et al. v. Koehn et al.*, No. 2:20-cv-00901-DJH-DMF. I have been asked to assess the adequacy of the COVID-19 response in the portion of the Central Arizona Florence Correctional Complex housing people in the custody of the U.S. Marshals Service ("CAFCC").[1]

2.      I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as providing testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

3.      After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in New York City's 12 jails, as well as oversight of medical policies for their care.

---

[1] Throughout this report, I use "CAFCC" to refer to the portion of the facility holding detained people for the U.S. Marshals Service, excluding the portions of the facility that hold detained people for other agencies.

This role included oversight of chronic care, sick call, specialty referral, and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services to detained people, including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints. During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacted almost one-third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks. These efforts also included coordination of all health policies and protocols for outbreak response with security officials, training and orientation of security staff and implementation of large-scale vaccination programs for seasonal influenza and H1N1.

4.     In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

5.     Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across

the United States. I have also worked as a medical expert in cases involving correctional

health since 2017 and I wrote and published a book on the health risks of jail, *Life and

Death in Rikers Island*, which was published in early 2019 by Johns Hopkins University

Press. I hold an appointment as a Clinical Associate Professor in the NYU College of

Global Public Health.

6.      Since April 2020, I have worked on COVID-19 responses in detention settings. During

this time, I have conducted inspections of numerous federal, state and local detention

facilities to assess the adequacy of their COVID-19 responses, to date including:

- MDC Brooklyn (BOP), NY
- MCC Manhattan (BOP), NY
- FCI Danbury (BOP), CT
- Cook County Jail, IL
- Broome County Jail, IL
- Sullivan County Jail, NY
- Shelby County Jail, TN
- Farmville Detention Center (ICE), VA
- Lompoc Prison (BOP), CA
- Southern Mississippi Correctional Facility, MS
- Central Mississippi Correctional Facility, MS
- FDC Philadelphia (BOP), PA
- Osborn Correctional Institution, CT
- Robinson Correctional Institution, CT
- Hartford Correctional Center, CT
- Dallas County Jail, TX
- Cheshire Correctional Institution, CT
- Calhoun County Jail, MI
- York Correctional Institution, CT
- Pender Correctional Institution, NC
- Craven Correctional Institution, NC
- Central Prison, NC
- North Carolina Correctional Institution for Women, NC
- Chesapeake Detention Facility, MD
- Chesapeake Detention Facility Reinspection, MD
- Lompoc Prison Re-inspection (BOP), CA
- Broward County Jail, FL
- Maricopa County Jail, AZ
- Northeast Florida State Hospital, FL

- Florida State Hospital, FL
- Western Regional Jail, WV
- Northern Regional Jail, WV
- Tygart Regional Jail, WV
- Women's Community Correctional Center, HI
- Halawa Correctional Facility, HI
- Oahu Community Correctional Center, HI
- Maui Community Correctional Center, HI
- Kauai Community Correctional Center, HI
- Clayton County Jail, GA
- Cummins Unit Prison, AR
- Varner Unit Prison, AR
- Ouachita Unit Prison, AR
- East Arkansas Regional Unit, AR
- Lompoc Prison Re-inspection (BOP), CA

7.    I have been named as an independent monitor for COVID-19 response in Connecticut and Hawaii State Prisons and have been invited to present COVID-19 guidance to several organizations including the National Academy of Sciences on three occasions as well as the National Association of Counties and the American Medical Association. I have also been named as independent health services monitor for the Santa Barbara, CA county jail, the Fluvanna Women's Correctional Institution in Virginia, and the VI Department of Corrections.

8.    I also was named by President Biden to serve on the COVID-19 Health Equity Task force and served on that task force through the issuance of its final report and recommendations in October 2021.[2]

9.    A copy of my curriculum vitae is attached to this report, which includes my publications, as well as a list of recent depositions I have given and testimony I have provided.

---

[2] https://www.whitehouse.gov/briefing-room/press-briefings/2021/02/10/president-biden-announces-members-of-the-biden-harris-administration-covid-19-health-equity-task-force/

10.    The COVID-19 pandemic has caused at least 588,574 documented cases of infection in U.S. prisons, jails, and immigration facilities and at least 3,039 deaths.[3] These counts of cases and deaths is likely a significant undercount.[4]

11.    CAFCC does not publicly report data on positive tests for COVID-19. However, over the course of the COVID-19 pandemic, the U.S. Marshals Portion of CAFCC has reported two deaths of detained people as a result of COVID-19.[5] This count of two deaths may understate the true number of people who died as a result of COVID.[6]

12.    There remains a significant need to implement life-saving measures to guard against COVID-19 infection in jails and prisons. Fortunately, the pool of people who are at risk of serious illness or death now appears somewhat smaller than prior waves, with risk factors for hospitalization and death relating to prior health problems or not being vaccinated. The CDC has identified that most of the people currently hospitalized with Omicron-variant-COVID-19 have multiple of these risk factors, including existing health conditions and lack of current vaccination.[7]

13.    The world will likely see new, highly transmissible variants of COVID-19. Even if these variants are generally less deadly than other variants such as the Delta variant, the incredibly high rate at which cases occurred during the wave of the Omicron variant overwhelmed health systems, public education, and correctional settings across the nation, suggesting that something similar or worse is likely to occur when the next variant arrives. In detention facilities, the multiple waves of COVID-19 infections in surrounding

---

[3] https://uclacovidbehindbars.org/.
[4] https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html.
[5] Rose Deposition, 116:13-16, Ex. 4 at CORECIVIC-MLG003489.
[6] *E.g.*, Jaramillo Deposition, 180:16-22.
[7] https://www.cdc.gov/mmwr/volumes/71/wr/mm7101a4.htm;
https://www.cdc.gov/mmwr/volumes/71/wr/mm7105e1.htm.

communities have led to much more prolonged and intermittent outbreaks behind bars. As a result, facilities that elude an initial wave of cases are subject to experiencing serious outbreaks weeks or months after the community rates decline. In addition, detention facilities have been hampered by extremely low rates of COVID-19 vaccination among security staff, which creates a reservoir of potential new cases. This problem is exacerbated when detention facilities lack the ability or practice to identify people who are at high risk of serious illness or death from these infections. Prospectively, we must anticipate too that many people will suffer from "Long Covid," meaning that they will be left with debilitating symptoms for months, if not years. While this represents 10-30% of people who are infected, these post-COVID-19 symptoms represent new chronic health problems and HHS has also identified a new category of disability from post-COVID-19 illness.[8]

14.   Omicron poses an especially high risk of severe illness or death for those who fall into certain high-risk categories, including age, body-mass index, and serious medical conditions that include cancer and heart disease.[9] Being unvaccinated significantly increases the risk of infection and, ultimately, death.[10] But the recent communication from the CDC that most patients hospitalized with COVID-19 have multiple of these risk factors allows for targeted efforts on a smaller cohort to be identified, monitored, and afforded every opportunity to be vaccinated and boosted: people with two or more risk factors of serious illness or death.

---

[8] https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html
[9] https://www.cdc.gov/mmwr/volumes/71/wr/mm7101a4.htm.
[10] https://www.cdc.gov/mmwr/volumes/71/wr/mm7105e1.htm.

**Methodology**

15.    The goal of my review of the COVID-19 practices and procedures at CAFCC was to assess the adequacy of the facility's current response to COVID-19. In order to achieve this goal, I relied on three basic questions:

    *a.*   Does the facility adequately identify and respond to individual cases of COVID-19?

    *b.*   Does the facility adequately implement vaccination, infection control, social distancing, and other measures to slow the spread of the virus?

    *c.*   Does the facility adequately identify and protect high-risk patients?

16.    These questions are interrelated in that all three domains are essential to an adequate COVID-19 response and they rely upon one another to be effective. Adequacy is determined using guidelines of the Centers for Disease Control and Prevention (the "CDC") relating to COVID-19 in detention settings, which contain a set of basic protections that serve as a floor for what I would consider to be medical best practices in any facility, as well as basic correctional health standards.[11] I also utilized policies and practices reported and/or produced by CAFCC to assess adequacy. I also relied on questions posed to staff and detained people in depositions and an inspection in order to elicit their understanding of the policies in place and whether/how they are being implemented. The adequacy of CAFCC's response to COVID-19 is presented below in "Findings" which includes strengths, deficiencies and recommendations.

17.    An attorney for Plaintiffs and Dr. Todd Wilcox, medical director of the Salt Lake County Jail System, conducted an inspection of CAFCC with facility leadership as well as

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html.

attorneys for Defendants on September 2, 2021. I have spoken with that attorney for

Plaintiffs, Jared Keenan. During the inspection, Mr. Keenan was able to speak with a

number of detained people and was also able to ask some questions of the warden of the

facility, Warden Kline.

18.     I understand that during the inspection, staff did not block or impede access to any part of

the facility that was included in the inspection protocol and were helpful in orienting Mr.

Keenan to the overall layout and operations of the facility.

19.     I have also considered and relied on certain documents and deposition transcripts provided

to me by plaintiffs' counsel, including:

- Deposition of Kristyn Jaramillo, February 4, 2022, and exhibits
- Deposition of Carrie Rose, February 2, 2022, and exhibits
- 30(b)(6) Deposition of Warden Kline, November 9, 2021, and exhibits
- 30(b)(6) Deposition of Chief Marshal Bayless, November 15, 2021, and exhibits[12]

I have also considered and relied on certain documents publicly available on the internet,
including:

- https://uclacovidbehindbars.org/
- https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html
- https://www.cdc.gov/mmwr/volumes/71/wr/mm7101a4.htm
- https://www.cdc.gov/mmwr/volumes/71/wr/mm7105e1.htm
- https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html
- https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html
- https://www.cdc.gov/media/releases/2021/s1216-covid-19-vaccines.html
- https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e1.htm
- https://amend.us/covid/
- https://www.mdcalc.com/veterans-health-administration-covid-19-vaco-index-covid-19-mortality
- https://www.bop.gov/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf

---

[12] I understand that plaintiffs' counsel is receiving reports from detained people at the facility and additional
discovery documents, which may shed further light on the issues I discuss in this report. I reserve the right to update
my opinions based on new information.

**Findings and Recommendations**

20.    This section includes findings of strengths and deficiencies, as well as recommendations to reduce the potential for morbidity and mortality among staff and detained people from COVID-19 at CAFCC.

Strengths

21.    It appears that CAFCC has made efforts to procure COVID-19 vaccines and make them available to some detained people. This approach appears to include offering the Johnson & Johnson vaccine widely, and in certain limited circumstances, also the Moderna vaccine.

22.    CAFCC has recently implemented an incentive program to increase vaccine uptake, which is a good strategy to improve general vaccination rates and uptake among young and healthy people.[13]

23.    CAFCC appears to offer COVID-19 testing to at least some detained people before their release as well as upon intake, and in limited circumstances in response to new cases of COVID-19.[14]

24.    CAFCC appears to screen staff and visitors entering the facility on a daily basis for COVID-19 symptoms and elevated temperature.[15]

25.    CAFCC has conducted a series of town halls in the facility housing areas to present COVID-19 vaccination information, which generally are separate from the actual vaccination visits.[16]

---

[13] Rose Deposition, 183:19-25.
[14] Rose Deposition, 104:2-105:5.
[15] Jaramillo Deposition, 161:6-15.
[16] Jaramillo Deposition, 115:12-15.

26.    An intake quarantine process (referred to cohorting by the facility) appears to be in place, as does a standard approach to medical isolation for suspected and newly identified cases of COVID-19.

27.    Although several of these processes are inconsistent with basic CDC guidance in how they have been implemented, as I detail below, the presence of each of these systems is important to limiting morbidity and mortality from COVID-19. Several other core systems identified by the CDC for COVID-19 response in detention settings appear to be lacking altogether or more seriously flawed.

Deficiencies and Recommendations

28.    <u>Detained Person Vaccinations and Boosters</u>. CAFCC offers detained people the vaccine during their first 14 days at the facility.[17] As mentioned above, CAFCC appears to have made efforts to procure COVID-19 vaccines and to have a generally adequate supply of both the Moderna and Johnson & Johnson vaccines.

29.    CAFCC is not aware what the vaccination rate among detained people is, apparently because they have failed to implement a system that reliably checks vaccination status for every newly detained person.[18] As a result, they appear aware of the vaccines they have given, but unaware of whether, which type or how many doses other people have received prior to detention. As of February 2, 2022, 24% of detained people who were currently at CAFCC were vaccinated by CAFCC staff.[19] Additional detained people may have already been vaccinated on arrival at CAFCC. CAFCC medical staff ask during intake whether detained people have already been vaccinated before arriving

---

[17] Jaramillo Deposition, 84:10-20.
[18] Rose Deposition, 157:22-158:13.
[19] Rose Deposition, 157:18-21.

at CAFCC and enter this information into detained people' medical charts.[20] However, CAFCC does not track this percentage.[21] Based on this incomplete information, the vaccination rates at CAFCC appear relatively low. These low rates suggest that CAFCC can take steps to improve uptake. Knowing the vaccination status of all detained people is essential to providing booster shots as well as knowing who is at elevated risk from subsequent infection. In addition, the most CDC recommendations concerning quarantine for newly admitted detained people (which CAFCC refers to as its intake cohort process) require knowing vaccination status at intake.[22]

30.    CAFCC provides detained people limited information about the vaccines it offers. It provides detained people with the information sheets prepared by the vaccines' manufacturers.[23] It also posts a document with some limited information about how and when vaccines and boosters may be requested.[24] CAFCC health staff intended the most up-to-date version of this document to be posted in all housing units.[25] However, images that Plaintiffs' attorneys tell me CAFCC produced in November of 2021 as part of this litigation show that some units have posted an out-of-date version of this document that do not include any references to boosters, and that other units do not have posted any version of this document.[26] CAFCC has not worked with community

---

[20] Rose Deposition, 157:22-158:9.
[21] Rose Deposition, 158:4-13.
[22] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html
[23] Rose Deposition, 29:3-18, Ex. 1 at CORECIVIC-MLG000738-64.
[24] Rose Deposition, 166:20-167:2, Ex. 10.
[25] Rose Deposition, 167:18-20.
[26] Rose Deposition, Ex. 6, 178:2-7.

groups, faith leaders, or formerly incarcerated people to promote vaccination among detained people.[27]

31.    CAFCC is relying almost entirely on the Johnson & Johnson vaccine for primary doses, and relying entirely on Moderna for booster doses, with no supply of the Pfizer vaccine.[28] Detained people can specifically request the Moderna vaccine, but they are not informed of this fact.[29] Even if detained people do request the Moderna vaccine, it may not be provided to them if not enough people request it to use a complete vial.[30] CAFCC received some guidance in the past from the Pinal County Health Department to rely on the Johnson & Johnson vaccine for primary doses.[31] This advice might have been appropriate based on the understanding we had of the science at some significantly earlier part of the pandemic, but it is seriously flawed now based on developments since vaccines first became available. For example, the CDC has now indicated a clinical preference in favor of the mRNA vaccines over the Johnson & Johnson vaccine.[32] This is because of lower efficacy, antibody levels that wane more quickly, and potential side effects that, although rare, do not appear to occur in people who have received the mRNA vaccines.[33] In an era of abundant supply, CAFCC should use the mRNA vaccines that we now know provide significantly more protection, particularly against the latest variants. CAFCC can also expect uptake among detained people to be lower if it primarily offers the Johnson & Johnson

---

[27] November 9, 2021 Kline Deposition, 80:17-81:7.
[28] Rose Deposition, 24:17-25.
[29] Conversation with J. Keenan. Additionally, Rose Deposition, Ex. 10, makes no mention of detained people being able to choose which vaccine to request.
[30] Rose Deposition, 25:16-26:5.
[31] Rose Deposition, 25:2-14.
[32] https://www.cdc.gov/media/releases/2021/s1216-covid-19-vaccines.html.
[33] *Id.*; *see also* https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e1.htm.

vaccine because some people who would accept the Moderna vaccine choose not to accept the inferior Johnson & Johnson vaccine. I generally disagree with this choice because any vaccine is better than no vaccine, but conversations with detained people during the facility tour confirmed that many people have chosen not to get vaccinated because they do not want to receive the Johnson & Johnson vaccine.[34]

32.  CAFCC provides booster shots to detained people only by request.[35] Even if a detained person is eligible for a booster when they arrive at the facility, CAFCC medical staff does not inform that detained person as part of the intake process that they are eligible.[36] CAFCC does not have a notation or reminder in its electronic medical records system of to the date that a detained person is eligible for a booster.[37] CAFCC has produced a poster indicating that detained people can request a booster by filling out a medical health request that "includes the name of the COVID 19 vaccine & the date you last received your vaccine."[38] This poster instructs detained people to request a booster "6 months from your last dose" for "Moderna vaccines."[39] This information is incorrect; the CDC recommends boosters starting five months after the final dose of an initial course of a Moderna vaccine.[40] This poster does not include any information about booster eligibility or the request process for detained people who received an initial course of the Pfizer vaccine.[41] This poster is further

---

[34] Conversation with J. Keenan.; November 9, 2021 Kline Deposition, Ex. R.
[35] Rose Deposition, 154:5-18.
[36] Jaramillo Deposition, 104:13-20; Kline Nov. 9, 2021 Deposition, 37:3-7.
[37] Rose Deposition, 154:5-18.
[38] Rose Deposition, Ex. 10.
[39] Rose Deposition, Ex. 10.
[40] Ms. Rose testified that she would update this document to correct this mistake. *See* Rose Deposition, 190:3-5. Two days later, Ms. Jaramillo testified that the document had been updated within the preceding days to correct this mistake. Jaramillo Deposition, 69:5-22. Plaintiffs' attorneys inform me that no updated version of this document has been produced, and that no pictures have been produced of bulletin boards produced indicating that it is posted.
[41] Rose Deposition, 190:6-11, Ex. 10.

problematic because it puts the burden on detained people to remember the vaccine that they received and the date on which they received it, even though detained people often lack access to their medical records predating their detention. This information for many detained people is available to CAFCC, either because it administered the initial vaccination or because it has access to ASIIS, the state database listing people's vaccination records. Finally, as mentioned above, this poster is problematic because many units did not have a version updated with information about boosters or any version of the poster at all.

33.   There is no staff member at CAFCC who has been assigned the task of attempting to improve vaccination rates among detained people.[42] Nor has any staff member at CAFCC investigated the reasons why detained people have refused the vaccine.[43]

34.   *Recommendations: Improve vaccination rates overall, with special focus on high-risk patients. This includes one on one encounters between health staff and high-risk patients as well as town hall or other in person briefings by health staff in housing areas to discuss and answer questions about vaccination before the large scale town halls occur.*

   a.   *Boosters: CAFCC should track vaccine dates of everyone in the facility (based on a verification of vaccination status in the ASIIS system performed as part of the intake process), and it should affirmatively offer COVID 19 booster shots when people become eligible rather than doing it only upon request.*

   b.   *Expansion of vaccination, symptom screening and testing efforts are required to compensate for challenges in contact tracing.*

---

[42] Rose Deposition, 186:13-17.
[43] Rose Deposition, 186:22-25.

    c.  *I recommend that the facility offer all three vaccines to their patients for both initial and primary doses, given the recent preference for the Pfizer and Moderna vaccines identified by the FDA and CDC. This will improve uptake because people who had refused vaccination due to of hesitancy specific to the Johnson & Johnson vaccine would now agree to be vaccinated. This is also important because it will allow people who received an initial dose of the Pfizer vaccine before being booked at the facility to receive a second dose of the same vaccine.*

    d.  *I recommend that CAFCC improve its educational efforts. Written educational materials tend to be more effective in jails and prisons when they are concise and written with an incarcerated audience in mind. AMEND, a project at the University of California at San Francisco, has prepared materials in English and Spanish that were developed with the collaboration of incarcerated and formerly incarcerated people.[44] These types of materials would be suitable for CAFCC, and can help increase vaccine uptake in jail and prison settings. CAFCC should also improve its posted materials by ensuring that they contain up-to-date information about how to request vaccines and boosters, and that they are posted uniformly throughout the facility.*

35.   <u>Staff Vaccinations and Boosters</u> As of November of 2021, approximately half of the staff at CAFCC were vaccinated.[45] CoreCivic has had corporate-level discussions about providing its staff a monetary incentive to be vaccinated, but it has decided against

---

[44] https://amend.us/covid/
[45] Nov. 9, 2021 Kline Deposition, 62:4-6.

providing this incentive.[46] CAFCC also made plans to mandate staff vaccination after an Executive Order was issued that would have required it to do so, subject to certain exemptions.[47] The Executive Order is not in force, however, so those plans have been rescinded.

36.    Staff, unlike detained people, regularly enter and exit CAFCC. This means that staff are a likely means for introducing COVID-19 into the facility. It is important to ensure that staff are vaccinated to limit the risk that they will enter the facility while infected with COVID-19.

37.    *Recommendations: In my medical and epidemiological opinion, CAFCC should take all feasible measures to increase staff vaccination rates. CAFCC had identified plans to institute monetary incentives and staff mandates, subject to some potential exemptions. CAFCC should take both of these available options to increase staff vaccination rates.*

38.    <u>Identification and Protection of High-Risk Patients</u> Earlier in the pandemic, CAFCC kept a running list of people at the facility with medical vulnerabilities that placed them at a higher risk of significant complications or death from COVID-19.[48] It maintained this list using its electronic medical recordkeeping system, Allscripts.[49] It no longer keeps this list because of the burden involved in keeping the list.[50]

39.    When CAFCC kept its list of medically vulnerable detained people, it used this list to provide those people with special protections against COVID-19 infection. As soon as a unit went onto quarantine, detained people with medical vulnerabilities in that unit would

---

[46] Nov. 9, 2021 Kline Deposition, 65:12-19.
[47] Nov. 9, 2021 Kline Deposition, 85:17-22.
[48] Rose Deposition, 135:9-17.
[49] *Id.*
[50] *Id.*

be provided single cells to allow them to more effectively isolate.[51] Now that CAFCC no longer keeps its list of medically vulnerable detained people, it no longer provides these single cells to medically vulnerable detained people in quarantine units.[52] CAFCC also does not provide medically vulnerable detained people in quarantined units with additional symptom or temperature screenings.[53]

40.     A list of all medically vulnerable detained people would help CAFCC to better prioritize its resources. An even better approach would be for CAFCC to keep a list of detained people with multiple medical vulnerabilities, which would correlate to people at particularly high risk of serious complications or death if they contract COVID-19. This list would indicate people who should be provided special protections and prioritized for medical resources, particularly if large numbers of infections among detained people and absences among staff in an outbreak require CAFCC to triage cases to which it will devote its medical resources. This list would be shorter and could be kept without creating a serious burden, particularly given that it can be somewhat automatically generated by CAFCC's electronic medical records system. CAFCC does not keep this type of list.[54]

41.     Despite the ability to identify high-risk people, CAFCC is not using this information to take essential steps to prevent their infection, illness, and death from COVID-19. This deficiency is extremely dangerous because, as staff become increasingly overwhelmed due to a combination of increased COVID infections in the facility and staff shortages, it is absolutely essential for them to have the ability to know and follow the patients who

---

[51] Rose Deposition, 138:11-18.
[52] *Id.*
[53] Rose Deposition, 138:24-139:10
[54] Rose Deposition, 139:16-21.

are at the greatest risk of the worst health outcomes. This approach allows a health system overwhelmed with a rapid surge of a highly contagious variant such as Omicron or future variants to deal with the dual challenges of high case rates and staff shortages. This system can maintain focus on a small number of people as they cycle through new admission, general population, or restricted housing, and are potentially placed into exposure quarantine and medical isolation. There are several crucial tasks that must be prioritized for these patients with multiple risk factors, from vaccination to symptom checks during quarantine to enhanced assessments during medical isolation.

42. *Recommendations: Identify all high risk detained people. Because a subset of people in detention are known to be at elevated risk of serious complications or death from COVID-19, and because their identity is known, health staff should run a weekly list of people who meet these CDC criteria and use this information in the following manner:*

   a. *Review vaccination status of every person at intake (using ASIIS) with priority for all high-risk patients and for any who remain unvaccinated or incompletely vaccinated (lacking but eligible for a booster). Conduct an in-person counseling encounter to answer questions or address concerns to promote vaccination. Many high-risk people remain unvaccinated because they have questions or concerns that are not addressed in the large-scale housing area town halls and a one-on-one session can improve their acceptance, significantly decreasing risk of death or illness from COVID-19. It is likely that more than once weekly vaccination clinics will be required in the short term.*

   b. *Conduct a daily vital signs and symptom check (by nursing staff) of each person in quarantine, including intake cohorts and exposure quarantine. Detecting*

*symptoms of COVID-19 in quarantine settings is an essential component of basic CDC guidelines.[55] It is especially important that staff observe each high-risk person on a daily basis. I have investigated numerous deaths from COVID-19 in which a high-risk person in quarantine did not respond to having their name called out because they were too ill to walk and they were marked as refusing care or not present when they were in fact deteriorating from COVID-19 illness.*

c.  *Modify the nursing assessments being conducted for patients with suspected or known COVID-19 to include whether the person is high-risk and modify the action steps (notify providers, consider hospital transfer, etc.) to reflect a lower threshold for these high-risk patients. As the number of symptomatic patients grows, one useful tool for medical providers is a risk assessment tool that goes beyond simply yes/no for high-risk status and stratifies mortality risk based on having multiple risk factors. The Veteran's Administration has developed such a tool for estimation of 30-day mortality risk from COVID-19 infection.[56]*

d.  *Lists of high-risk patients are also essential to estimate the potential need for the oral treatment Paxlovid and other therapies.*

43.  <u>Masks</u> Detained people at CAFCC are given two cloth masks.[57] If they develop symptoms or test positive, they are given a surgical mask to wear instead of their cloth masks.[58] Detained people are not otherwise provided surgical or KN95 masks.

44.  Masks provide the best protection when they fit well. They also provide the best protection when they are comfortable to wear, which increases mask use. I have observed that cloth

---

[55] https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html
[56] https://www.mdcalc.com/veterans-health-administration-covid-19-vaco-index-covid-19-mortality
[57] Rose Deposition, 130:24-131:6, Jaramillo Deposition, 188:10-19.
[58] *Id.*

masks provided in jails and prisons generally fit quite poorly and uncomfortably. Observations during the facility tour corroborate this general observation.[59] Surgical masks provide a more comfortable and closer fit. Additionally, the CDC has indicated a preference for surgical masks over cloth masks because surgical masks provide better filtration than cloth masks. The best masks to be provided in a jail or prison are KN95 masks because they provide a significantly better fit than standard-issue cloth masks and surgical masks and they are also more comfortable.

45.     *Recommendation: CAFCC should provide all detained people with surgical or KN95 masks, replaced weekly or when they become dirty or break. When two or more cases have been detected among detained people or staff in a 14-day period, KN95 masks should be provided for all staff and incarcerated people, as a replacement for surgical masks.*

46.     <u>Intake Cohorting</u> CAFCC holds detained people who are new to the facility in cohorts, each of which includes all people who entered the facility on the same day.[60] Cohorts are housed together for 14 days.[61] Detained people who are new to the facility are offered a COVID-19 test as part of the intake process.[62]

47.     Other than the test at intake, people in intake cohorts are offered COVID-19 tests during the cohort period only if they become symptomatic or are sharing a cell with someone who has tested positive for COVID-19.[63] They are not given daily symptom or temperature screenings.[64] Instead, they receive these screenings only on the 14th day of a cohort period.[65]

---

[59] Conversation with J. Keenan.
[60] Rose Deposition, 51:5-7.
[61] Rose Deposition, 51:11-16.
[62] Rose Deposition, 51:17-23.
[63] Rose Deposition, 55:5-11.
[64] Rose Deposition, 54:25-55:4, Jaramillo Deposition, 168:14-16.
[65] Rose Deposition, 57:18-21.

48.   CDC guidance indicates that best practices are for people who undergo cohorted intake quarantines such as those performed at CAFCC to be tested every 3-7 days if community transmission is high and to be re-tested at the end of the intake cohort period.[66]

49.   *Recommendations: CAFCC should increase the testing it performs in intake cohorts. There are a variety of specific timing strategies that could serve to better protect against transmission within an intake cohort, but at a minimum CAFCC should offer two tests to each person in an intake cohort over the course of the intake cohort period. CAFCC should also provide daily symptom checks to people in intake cohorts.*

50.   <u>Quarantine</u> At CAFCC, a unit is placed on quarantine if a detained person housed in the unit either develops symptoms of COVID-19 or tests positive for COVID-19.[67] When the unit goes on quarantine, the detained person who developed symptoms or tested positive (termed the "Index Case") is removed from the unit to be placed into medical isolation and tested.[68] That person's cellmates are then offered tests for COVID-19, but no other efforts are made to identify contacts or to offer tests to anyone else in the quarantined unit.[69]

51.   All units at CAFCC consist of individual cells (usually housing multiple detained people each) around a dayroom.[70] Quarantine units are not kept on any type of schedule where people have staggered access to the dayroom to avoid people having contact with others in the unit.[71] As a result, any detained person in the unit may have

---

[66] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[67] Rose Deposition, 59:18-23.
[68] Rose Deposition, 65:9-66:7.
[69] Rose Deposition, 74:8-12, 18-25, Jaramillo Deposition, 182:8-11.
[70] Conversation with J. Keenan.
[71] Rose Deposition, 75:13-17.

contact with any other detained person in the unit, including with people who are considered contacts because they shared a cell with the index case.[72] CDC guidance recommends that when entire units are quarantined as a cohort, every person in the unit be offered a test every 3-7 days.[73] This type of serial re-testing is particularly important when people in the unit continue to have contact with each other while on quarantine status. The Bureau of Prisons policies state clearly that "[b]ecause COVID-19 is very contagious and may be spread by asymptomatic as well as symptomatic individuals, expanded testing of all inmates in an entire housing unit should be considered—especially if the unit has open sleeping areas (rather than cells with solid walls and doors) or common areas where inmates have close contact."[74] This portion of the Bureau of Prisons policies applies equally to CAFCC. Given the common and close contact in the day rooms, showers and bathrooms of the housing units of CAFCC, this would clearly include all people in a housing area as close contact, a standard practice across correctional settings. But CAFCC has chosen to ignore this guidance and only interpret cellmates as potential close contacts, and thus limit testing of many people who are doubtless exposed to an index case, thereby prolonging and increasing transmission.

52.     People in quarantine units are offered symptom and temperature checks daily, performed by security (not medical) staff.[75]

---

[72] *Id.*
[73] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[74] https://www.bop.gov/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf at 41.
[75] Rose Deposition, 126:18-127:5.

53.     If a detained person is released while on quarantine, they are not provided with any

        information about the increased transmission risk that they pose or any precautions

        such as isolation that they should take after release.[76]

54.     *Recommendations: As with intake cohorts, CAFCC should increase the testing it*

        *performs in cohorted quarantine units. Again, a variety of specific timing strategies*

        *are acceptable, but at a minimum CAFCC should offer two tests to each person in a*

        *cohorted quarantine unit over the course of the quarantine period, with additional*

        *testing every 3-7 days if the quarantine period is extended. Detained people released*

        *from a quarantine unit should be treated as potentially COVID positive on release,*

        *and accordingly they should be notified that they have potentially been exposed to*

        *COVID and provided with information about isolation strategies.*

55.     <u>Pre-Release Testing</u> CAFCC performs pre-release testing before detained people are

        sent to court or transferred to another facility.[77] The purposes of a test like this is to

        clear someone of COVID-19 before they leave the facility to guard against the

        possibility that a detained person who was infected while at the facility could spread

        it elsewhere. However, CAFCC does not perform pre-release testing on detained

        people who are being released to the community.[78] The CDC recommends routine

        screening testing on all detained people before transfer or release.[79]

56.     *Recommendation: CAFCC should consider whether it is feasible to provide a routine*

        *release quarantine to all detained people with known release or transfer dates, consistent*

---

[76] Rose Deposition, 79:2-6.
[77] Rose Deposition, 104:2-22.
[78] Rose Deposition, 105:3-5.
[79] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

*with CDC guidance.[80] At a minimum, CAFCC should provide testing to all detained people leaving the facility, regardless of whether they are being transferred to court or another facility or released to the community.*

57.     Contact Tracing CAFCC, as a matter of policy, never conducts contact tracing to determine whether a staff member who has tested positive for COVID-19 had any close contacts with detained people.[81] CAFCC's policy rests solely on the assumption that staff mask-wearing is adequate to prevent the spread of infection.[82] This approach is completely inconsistent with basic infection control practices as well as the Bureau of Prisons Policy that covers contact tracing in the following manner after a new case is identified: "Promptly complete a contact investigation with SARS-CoV-2 positive inmates and staff to identify close contacts and complete contact tracings to stop transmission or decrease the number of cases within the institution. Utilize information from the contact investigation to identify and trace all close contacts of the source case(s) 48 hours prior to the source case's symptom onset or testing (if asymptomatic). Close contact is defined as a cumulative exposure time > 15 minutes in 24 hours and within < 6 feet of distance."[83] Of note, there is no qualifier for mask wearing among either detained people or staff in how a close contact is defined. In addition, while CDC data do show improved protection for masked close contacts versus unmasked, they also make clear that repetitive exposures are associated with increased risk, a circumstance that correctional staff face routinely as they enter and leave the same housing areas.[84]

---

[80] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[81] Rose Deposition, 60:12-61:3.
[82] Rose Deposition, 62:6-11.
[83] https://www.bop.gov/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf at 67.
[84] https://www.cdc.gov/mmwr/volumes/70/wr/mm7036a3.htm

58.    In a jail or prison setting, many, if not most, index cases occur via staff transmission. This is particularly true for index cases that occur outside of the new admission process. Staff transmission is so common in jails and prisons because staff regularly enter and exit the building, in contrast to detained people who have very little contact with the outside world. The CDC recognizes the risks of transmission via staff, and it recommends that, even when facilities cannot conduct meaningful contact tracing for all people with confirmed cases of COVID-19, they consider all people detained in a particular unit and all staff assigned to that unit to be contacts.[85]

59.    *Recommendation: CAFCC should continue to conduct contact-tracing efforts when staff members test positive for COVID-19, and it should expand those contact-tracing efforts to determine whether the positive staff member had any close contacts with detained people.*

*Executed this 25th day of February, 2022 in Port Washington, NY*

Signed,

_____

Homer Venters, M.D., M.S.

---

[85] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

# EXHIBIT A

# Dr. Homer D. Venters

hventers@gmail.com,

**Health Administrator**            **Physician**            **Epidemiologist**

## *Professional Profile*

○ Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
○ Leader in provision and improvement of health services to patients with criminal justice involvement.
○ Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
○ Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
○ Independent correctional health monitor
  ➢ Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  ➢ Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  ➢ HI Department of Corrections (COVID-19 only 9/2021-present)
  ➢ CT Corrections Department (COVID only, 2020). Oversee and report on the adequacy of COVID-19 responses with other monitoring panel members throughout CT DOC combined jail/prison system.
  ➢ VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in 2 detention facilities.
○ U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
○ Review COVID-19 policies and procedures in congregate settings including in-person inspections of:
  ➢ MDC Brooklyn (BOP), NY
  ➢ MCC Manhattan (BOP), NY
  ➢ FCI Danbury (BOP), CT
  ➢ Cook County Jail, IL
  ➢ Broome County Jail, NY
  ➢ Sullivan County Jail, NY
  ➢ Shelby County Jail, TN
  ➢ Farmville Detention Center (ICE), VA
  ➢ Lompoc Prison (BOP), CA

- ➢ Southern Mississippi Correctional Facility, MS
- ➢ Central Mississippi Correctional Facility, MS
- ➢ FDC Philadelphia (BOP), PA
- ➢ Osborn Correctional Institution, CT
- ➢ Robinson Correctional Institution, CT
- ➢ Hartford Correctional Center, CT
- ➢ Dallas County Jail, TX
- ➢ Cheshire Correctional Institution, CT
- ➢ Calhoun County Jail, MI
- ➢ York Correctional Institution, CT
- ➢ Chesapeake Detention Facility Re-inspection, MD
- ➢ Pender Correctional Institution, NC
- ➢ Craven Correctional Institution, NC
- ➢ Central Prison, NC
- ➢ North Carolina Correctional Institution for Women, NC
- ➢ Chesapeake Detention Facility Re-inspection, MD
- ➢ Broward County Jail, FL
- ➢ Lompoc Prison Re-inspection (BOP), CA
- ➢ Maricopa County Jail, AZ
- ➢ Northeast Florida State Hospital, FL
- ➢ Florida State Hospital, FL
- ➢ Western Regional Jail, WV
- ➢ Northern Regional Jail, WV
- ➢ Tygart Regional Jail, WV
- ➢ Women's Community Correctional Center, HI
- ➢ Halawa Correctional Facility, HI
- ➢ Oahu Community Correctional Center, HI
- ➢ Maui Community Correctional Center, HI
- ➢ Kauai Community Correctional Center, HI
- ➢ Clayton County Jail, GA
- ➢ Cummins Unit Prison, AR
- ➢ Varner Unit Prison, AR
- ➢ Ouachita Unit Prison, AR
- ➢ East Arkansas Regional Unit, AR

- o Conduct analysis of health services and outcomes in detention settings.
- o Conduct site inspections and evaluations in detention settings.
- o Produce expert reports, testimony regarding detention settings.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
- ➢ Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.
- ➢ Work with Task Force and Federal partners to produce final report, recommendations and implementation plan for reducing inequities in COVID-19 and other pandemic responses.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
o        Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
o        Oversee operations and programmatic development of COCHS
o        Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
o        Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
o        Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
o        Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
o        Initiate vicarious trauma program.
o        Expand forensic documentation of mass killings and war crimes.
o        Develop and support sexual violence capacity development with physicians, nurses and judges.
o        Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o        Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o        Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o        Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o        Reduced overall mortality in the nation's second largest jail system.
o        Increased operating budget from $140 million to $160 million.
o        Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o        Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o        Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o        Increased operating budget of health service from $115 million to $140 million.
o        Established surveillance systems for injuries, sexual assault and mental health that

drove new program development and received American Public Health Association Paper of the Year 2014.
o       Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.


**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o       Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o       Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o       Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o       Developed training program with Montefiore Social internal medicine residency program.
o       Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.


**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## *Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein University 7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## *Academic Appointments, Licensure*

Adjunct Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

Print articles and public testimony

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health.* 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.*2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved.* (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209217.

## *Honors and Presentations (past 10 years)*

**Invited presentation,** Screening and treatment for sexually transmitted infecitons in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher

rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional

Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990-December 1991.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## Prior Testimony and Deposition

- Benjamin v. Horn, 75–cv–03073–LAP (S.D.N.Y.). Expert for Defendants 2015.
- Newbrough v. Piedmont Regional Jail Authority, 3:10CV867–HEH (E.D.V.A. 2011). Expert for Plaintiffs.
- Rodgers v. Martin, 2:16-cv-00216 (N.D.T.X.). Expert for Plaintiffs 10/19/2017
- Fikes v. Abernathy, 7:16-cv-00843-LSC (N.D.A.L.). Expert for Plaintiffs 10/30/20017
- Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.N.Y. 2017). Defendant in role as City Employee, 4/10/2018.

- Charleston v. Corizon Health Inc., 2:17-cv-03039-MAK (E.D. P.A.). Expert for Plaintiffs 4/20/2018.
- Atencio v. Board of Cnty. Comm. of Sante Fe Cnty., 1:17-CV-00617 WJ/KK (N.M.). Expert for Plaintiffs 7/23/2018.
- Hammonds v. Dekalb Cnty. , 4:16-cv-01558-KOB (M.D.A.L.). Expert for Plaintiffs 11/30/2018.
- Mathiasen v. Rio Arriba Cnty., 17-CV-1159 JHR/KBM (N.M.). Expert for Plaintiff 2/8/2019.
- Hutchinson v. Bates, 2:17-cv-00185-WKW-SMD (M.D.A.L.). Expert for Plaintiff 3/27/2019.
- Lewis v. East Baton Rouge Parish, 3:16-cv-00352-JWD-RLB (M.D.L.A.). Expert for Plaintiff 6/25/2019, 7/1/2019.
- Belcher v. Lopinto., 2:18-cv-07368-JTM-DPC (E.D.L.A.). Expert for Plaintiffs 12/5/2019.
- Imperati v. Semple, 3:18-cv-01847-RNC (C.T.) Expert for Plaintiffs 3/11/2020.
- Camera v. Semple, 3:18-cv-01595 (C.T.). Expert for Plaintiffs 9/23/2020.
- Staten v. Semple, 3:18-cv-01251 (VAB) (C.T.). Expert for Plaintiffs 2020.
- Woodward v. Lopinto, 2:18-cv-04236-MVL-KWR (E.D.L.A) Expert for Plaintiffs 12/1/2020.
- U.S. v. Pratt, 2:19-cr-00213-DWA (W.D.P.A.). Expert for Defendant 4/28/2020 (Video hearing).
- U.S. v. Nelson, 1:19-cr-00021-DSC (W.D.P.A.). Expert for Defendant 5/4/2020 (Video hearing).
- Chunn v. Edge, 1:20-CV-01590-RPK-RLM (E.D.N.Y.) Expert for Plaintiffs 4/30/2020 (Video deposition), 5/12/2020 (Video hearing).
- Martinez-Brooks v. Easter, 3:20-cv-569 (MPS) (C.T.). Expert for Plaintiffs 6/8/2020 (Video deposition), 6/11/2020 (Video hearing).
- Busby v. Bonner, 2:20-cv-02359-SHL (W.D.T.N.). Expert for Plaintiffs 7/10/2020 (Video hearing).
- Braggs v. Dunn, 2:14-cv-601-MHT (M.D.A.L.). Expert for Plaintiffs 10/19/2020 (Audio testimony).
- Royston v. Christian, 6:19-cv-00274-RAW (E.D.O.K.). Expert for Plaintiffs 3/26/21 (Video deposition).
- Fraihat  v. U.S. Immigration and Customs Enforcement, 5:19-cv-01546-JGB-SHK (C.D.C.A.). Expert for Plaintiffs 2020.
- Torres v. Milusnic, CV 20-04450-CBM-PVC(x) (C.D.C.A) Court appointed expert 5/24/21 (Video deposition).
- Sanchez v. Brown, 20-cv-832-E (N.D.T.X.). Expert for Plaintiffs 5/25/21 (Video deposition).

- Barnett et al. v. Tony, 20-cv-61113-WPD (S.D. FL). Expert for Plaintiffs 10/21/2021 (Video hearing).

# <u>EXHIBIT 2</u>

**Rebuttal Expert Report of Homer Venters, M.D., M.S.**

***Romero-Lorenzo et al. v. Koehn et al.*, No. 2:20-cv-00901-DJH-DMF (D. Ariz.)**

**May 27, 2022**

## Summary

1. In my opening expert report, I set out my opinions, the basis for my opinions, certain areas I view as strengths in the CoreCivic Central Arizona Florence Correctional Complex's ("CAFCC") COVID-19 response, and several recommendations for ways in which the facility can correct deficiencies in its COVID-19 response. I have reviewed the expert report prepared by Dr. Owen Murray in this case.

2. In formulating the opinions I express in this rebuttal report, I relied on the supporting information that I identified in my opening expert report, and also the following documents:

   - Expert Witness Report of Dr. Owen J. Murray and evidence cited in that report
   - https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html
   - https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
   - https://stacks.cdc.gov/view/cdc/114297
   - https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html
   - https://www.azdhs.gov/covid19/data/index.php#vaccine-admin
   - https://dchealth.dc.gov/release/dc-health-reaching-out-eligible-residents-get-boosted
   - https://www.covid19treatmentguidelines.nih.gov/management/clinical-management/nonhospitalized-adults--therapeutic-management/
   - https://directorsblog.health.azdhs.gov/antivirals-are-increasingly-available-to-complement-covid-19-vaccination/
   - https://www.azdhs.gov/covid19/index.php#antivirals
   - https://www.kff.org/medicaid/issue-brief/nursing-facility-staff-vaccinations-boosters-and-shortages-after-vaccination-deadlines-passed/
   - *Torres v. Milusnic*, No. 2:20-cv-04450, ECF No. 239-1 (C.D. Cal. May 12, 2021).
   - *Torres v. Milusnic*, No. 2:20-cv-04450, ECF No. 367-1 (C.D. Cal. Mar. 4, 2022).
   - CORECIVIC-MLG003510
   - CORECIVIC-MLG003528
   - CORECIVIC-MLG003529-62

**Methodology**

1.  In my work as an expert witness, and particularly in my work as a court-appointed monitor, I find it essential to review multiple sources of information to ascertain the full picture of the medical care that a facility provides. This is because different people have different perspectives, and only by understanding all perspectives and examining the underlying data can I obtain a complete perspective. Even the National Commission on Correctional Health Care, the American Correctional Association, and other organizations that accredit detention facilities—whose methodologies I often find are insufficient to uncover problems that exist at facilities—require an examination of multiple sources of information, including data that indicates whether facilities are complying with certain metrics. My review of multiple sources of information also helped me to obtain a view of the current COVID-19 response at the facility and a view of how this response has (or has not) evolved to face different challenges, rather than simply a snapshot on the day of a tour.

2.  Dr. Murray's report relies primarily—and often entirely—on information told to him by healthcare staff. This reliance on only partial information represents a serious methodological flaw, and as a result Dr. Murray's report is based on incomplete information and an incorrect view of the facility's COVID-19 response. This approach is not endorsed by the correctional health organizations I referred to above and would not be sufficient in community health care settings, where medical records, interviews with patients and staff, information about the physical setting where care is provided, and review of administrative data are standard tools in assessing adequacy of health care access and quality.

3. The flaws in Dr. Murray's methodology of relying solely on reports from CoreCivic staff are perhaps best explained through an example. Dr. Murray takes the opinion that "CAFCC is making every effort to change the dynamic on vaccination within the detainee population."[1] He bases this opinion on his conversations with healthcare staff and logs showing that town hall events occurred and papers were passed out at those events.[2] However, Dr. Murray neglected other sources of evidence showing that these efforts are ineffective. As I explain below in paragraph 11, the facility's vaccination rate is unclear but appears to be well below that of the Arizona community as a whole. This low vaccination rate strongly suggests that the facility's educational efforts are deficient. As I also explain below in paragraph 22, Dr. Murray neglects that the materials handed out at these educational events, and the talking points staff use to conduct them, are not written to provide any educational information about the vaccines or to answer any of the common medical questions detained people may have about them. My experience as an independent COVID-19 monitor in multiple jails and prisons is that when far more people are recorded as refusing the vaccine than accepting it, as is the case at CAFCC,[3] efforts by health staff have stopped or failed. My work in these jails and prisons shows that education and outreach efforts can be implemented to achieve well over 50% vaccination rates.

4. There are many additional examples where Dr. Murray's approach of relying primarily or entirely on his discussions with healthcare staff give him an incomplete picture of the facility's COVID-19 response. I disagree with many of the conclusions he reaches because

---

[1] Murray Report, 17.
[2] Murray Report, 13-17
[3] Documents produced in this case list the number of detained people who have refused the vaccine as 5,156 and the number of detained people who have received at least one dose as 3,103. CORECIVIC-MLG003528.

they are based on incomplete information. Conclusions based solely on reports of facility staff would not satisfy the requirements that professional organizations use to accredit jail, prison, or detention facilities, and they would not satisfy the level of rigor that is required to monitor health and safety in a jail, prison, or detention facility.

5. Dr. Murray criticizes the fact that I presented an expert opinion without personally inspecting the facility. I was able to do this by reviewing photographs of the facility and speaking with plaintiff's counsel, who inspected the facility. Through these additional steps I was able to acquire information that—in conjunction with my review of deposition transcripts, records from the facility, and information from detained people relayed to me by counsel—gave me a full picture of the aspects of the operations at CAFCC that are relevant to my opinions in this case, which generally address overarching issues of facility policy. In this particular case I am comfortable that I have gathered information from multiple sources that has given me a full picture of CAFCC's operations relevant to the opinions I have been asked to provide, but if the Defendants would like me to visit the facility for an inspection, I am happy to do so.

6. I agree with Dr. Murray in principle, however, that one needs multiple sources of information in order to obtain a full picture of the operations of a detention facility. I am comfortable that I have obtained sufficient information about the facility. As I explain above in paragraphs 1-4, Dr. Murray's opinions are frequently based solely on his conversations with facility staff, which is problematic.

**May 3, 2022 CDC Guidance**

7. On May 3, 2022, the CDC updated its Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. This

guidance contains a set of basic protections that serve as a floor for what I would consider to be medical best practices in any facility, as well as basic correctional health standards.

8.      At a high level, the May 3, 2022 guidance involved a shift to rely more on data in guiding a facility's response to COVID-19. This guidance requires facilities to track community levels of transmission, transmission within the facility, vaccination rates within the facility, numbers of high-risk people in the facility and other factors. If any of these factors indicates elevated COVID-19 risk, then the facility should take what the guidance terms "enhanced COVID-19 prevention strategies." If all factors indicate lower COVID-19 risk, then the facility need only take what the guidance terms "strategies for everyday operations." This shift underscores the need for an active, ongoing process to measure these various risks and use this information to increase or decrease the facility's COVID-19 responses based on those measurements.

9.      The framework set out in the May 3, 2022 guidance demonstrates that COVID-19 risk at CAFCC is elevated, requiring the use of enhanced protections. The guidance sets out a number of factors and explains that if even one is triggered, the facility must use enhanced prevention strategies. These factors are: (1) the COVID-19 community level is medium or high, (2) the facility has not determined that it has high levels of vaccination, (3) there is currently transmission within the facility, (4) the facility has not determined that staff and residents are unlikely to get very sick from COVID-19, and (5) facility characteristics and operational protocols can contribute to COVID-19 spread within the facility.

10.     First, the community level may at times require the use of enhanced protections. Pinal County, Arizona, where CAFCC is located, currently has a community level of low, but

these community levels fluctuate with the state of the pandemic.[4] The CDC guidance dictates that when the community level is medium or high, facilities should use enhanced protections. This factor will be triggered at times when the community level increases above the low level, which are likely to occur as the pandemic progresses in the future.

11. Second, the available vaccination data requires the use of enhanced protections. The CDC guidance states that, to assess this factor, facilities should "[d]etermine the proportion of staff and residents who are up to date on COVID-19 vaccines."[5] CAFCC has not even made this determination, and as a result it should use enhanced protections. The limited data on vaccinations that is available further supports the use of enhanced protections. As of February 18, 2022, 21% of detained people currently at CAFCC had been vaccinated by CAFCC staff.[6] Additional detained people may have already been vaccinated on arrival at CAFCC, but CAFCC does not track this number.[7] Some of the 21% of people currently detained at CAFCC who were vaccinated by CAFCC staff will no longer be up to date on vaccination, meaning that the percentage of people currently detained at CAFCC who are up to date on vaccination may be lower than 21%. By way of comparison, 71% of Arizona residents are vaccinated, and 61% of Arizona residents are up to date on their vaccinations.[8] Based on the incomplete data kept by Defendants, the vaccination rate among detained people at CAFCC appears to be relatively low, and therefore according to the CDC's guidelines, requires enhanced protections. Similarly, it

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/your-health/covid-by-county.html.
[5] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[6] CORECIVIC-MLG003528; *see also* Rose Deposition, 157:18-21.
[7] Rose Deposition, 157:22-158:13.
[8] https://www.azdhs.gov/covid19/data/index.php#vaccine-admin.

is unclear that the rate of staff who are up to date on vaccination is adequate. During

depositions in this case, Warden Kline testified in November 2021 that approximately

half of staff were vaccinated against COVID-19.[9] This rate was low relative to the

vaccination rate in Arizona at the time. Other deponents who testified in February 2022

did not know the staff vaccination rate.[10] Dr. Murray states that the staff vaccination rate

as of the date of his tour was 80%, but he does not explain where he obtained this rate, or

point to any documentation supporting his assertion; critically he does not indicate if this

rate is for solely medical staff or all facility staff, both custody and medical staff. He also

offers no explanation for the significant increase from the 50% rate shown by the

evidence in this case, and in my experience it is unusual to see a significant rate increase

without any change in policy, such as the mandate or incentive program that I

recommended in my previous report. A true vaccination rate of 80% or greater among ***all***

staff and detained people would represent a significant improvement and a serious

(though partial) protective factor, but Dr. Murray provides no data to support his

assertion or any others regarding vaccination rates. In sum, CAFCC has not sufficiently

tracked its vaccination rates, and the available data suggest that CAFCC lacks high

vaccination rates and the willingness to track them. This CDC requirement for enhanced

protection is therefore triggered.

12.     Third, rates of transmission within the facility likely require enhanced protections. Dr.

Murray states that there have been 1,332 known cases in the facility,[11] which amounts to

multiple new cases per day on average throughout the two years of the pandemic.

---

[9] Nov. 9, 2021 Kline Deposition, 62:4-6.
[10] Rose Deposition, 192:4-11; Jaramillo Deposition, 143:16-21.
[11] Murray Report, 29.

Similarly, the documentary evidence in this case related to quarantines shows that as a general matter there are multiple units in the facility on quarantine at any given time.[12] This evidence suggests that at any given time, there has been recent transmission within the facility (as measured by either at least one case in the non-intake population or at least one case appearing in a quarantined unit after the index case has been removed). This extent of transmission in the facility will necessarily vary significantly over time, but given CAFCC's track record and the flaws in its COVID-19 protections, it is highly likely that at any given time it triggers this requirement for enhanced protections. With adequate testing and symptom monitoring in place (see below), a two-week period without two or more cases is adequate to return to the standard level of precautions, If the other factors also indicate.

13.    Fourth, CAFCC has not made any determination on the risk of severe health outcomes. The CDC guidance requires CAFCC to "[d]etermine whether the facility's residents or staff are more likely to get very sick from COVID-19."[13] As I explain in more detail below in my discussion of identification and protection of high-risk patients, I recommended that CAFCC make this determination and regularly update it by keeping a list of detained people with risk factors for hospitalization and death from COVID-19. Dr. Murray disagrees that this list is necessary (a position that conflicts directly with the CDC guidance), but he admits that CAFCC does not keep one.[14] CAFCC has not made

---

[12] *E.g.*, Rose Deposition, Ex. 4.
[13] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[14] Murray Report, 24.

this determination required by this factor, so enhanced protective measures are needed, pursuant to CDC guidelines.

14.     Fifth, characteristics of CAFCC and its operations—specifically, the high turnover rate of its population—triggers the fifth factor for enhanced protective measures. The CDC notes that this factor is triggered by "frequent population turnover."[15] Dr. Murray reports that the population at CAFCC is "rapidly changing," with the average stay less than 120 days.[16] This factor is therefore triggered as well, indicating a need for enhanced protective measures.

**Responses to Dr. Murray's Conclusions**

15. I continue to believe that the recommendations I set out in my opening report are sound. Dr. Murray reviewed those recommendations. He agreed with some of my findings and recommendations, and it appears that the facility has accepted some of my recommendations. He critiqued others. I disagree with those critiques, which are unsupported and wrong.

16.     Detained Person Vaccinations and Boosters: In my opening report, I explained that CAFCC was relying almost entirely on the Johnson & Johnson vaccine for primary doses. I also explained that, even though facility staff believed that detained people could receive the Moderna vaccine on request, the facility was not informing detained people of this choice, which resulted in low numbers of people requesting the Moderna vaccine. I recommended that CAFCC stop this outdated approach and begin affirmatively offering

---

[15] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[16] Murray Report, 17.

mRNA vaccines to all detained people. Dr. Murray states, based on his conversations with CAFCC staff, that the facility is now relying primarily on the Moderna vaccine. I am not comfortable relying on this claim based solely on Dr. Murray's conversations with CAFCC staff, and this claim should be verified using information from multiple sources, including documentation in data reports, before any conclusions about the facility's operations are drawn. However, it appears as though the facility heeded my recommendation and has significantly decreased its reliance on the Johnson & Johnson vaccine. Although the ideal course would be to additionally offer the Pfizer vaccine, this acceptance of my recommendation as to the Moderna vaccine is an improvement.

17.     However, CAFCC's efforts remain deficient in the other ways I identified in my opening report. As I discussed in my opening report and above in paragraph 11, CAFCC does not track its vaccination rate among detained people, and its limited tracking efforts suggest that the percentages of detained people who are vaccinated and up to date are low relative to the percentages in Arizona as a whole. These unknown and apparently low rates suggest that CAFCC's efforts to track vaccinations and to educate and vaccinate people detained in the facility are deficient.

18.     I recommended that CAFCC track vaccination dates of everyone in the facility (based on a verification of vaccination status in the ASIIS system performed as part of the intake process).[17] Dr. Murray agrees that this "suggestion is within reason," but he states that this information often cannot be verified in the ASIIS because many detained people come from outside of Arizona.[18] Dr. Murray's logic does not hold. He agrees with my

---

[17] Opening Report, 14.
[18] Murray Report, 17-18.

opinion that there are good reasons to track detained people's vaccination rates. Both Dr. Murray and I agree, then, that CAFCC should track vaccination dates for all people. CAFCC should also, as an additional layer of protection, verify this information through the ASIIS system when possible. Dr. Murray contends that this additional layer of ASIIS verification is not always available because some people came from outside of Arizona and are not in the Arizona-specific ASIIS database. However, this contention —if true— provides no reason to abandon tracking vaccinations altogether. Additionally, although CAFCC should track vaccinations even if it cannot verify some of those vaccinations in ASIIS, Dr. Murray's assertion that many people detained at CAFCC are not from Arizona appears faulty. He cites no supporting data for his contention, and the data that I have reviewed suggest that people are in fact from Arizona. The most recently produced quarantine logs list as the "Agency" for the significant majority of detained people either "PHX," "YUM," "TUC," or "FLA."[19] In other words, most people detained at the facility are detained there because they have court cases in Phoenix, Yuma, Tucson, or Flagstaff—all in Arizona. It thus appears that the facility could in fact verify vaccination information for a significant portion of detained people in ASIIS.

19.     CAFCC should prioritize people who have not yet received any vaccination for its education efforts and for targeted offers of vaccination. It should particularly prioritize those people who have not yet received any vaccination and have a risk factor for hospitalization or death, using the list of high-risk detained people I also recommend. CAFCC should also use vaccination dates to identify people eligible for boosters and make affirmative outreach efforts to those people.

---

[19] CORECIVIC-MLG003531-52.

20.     Dr. Murray states that CAFCC need not affirmatively reach out to detained people to schedule booster shots because health services do not do this in the community. This is incorrect: certain public health departments have affirmatively reached out to people eligible for booster shots to communicate that eligibility.[20] This opinion also conflicts with basic correctional health practices. Some of the most basic functions of correctional health departments involve scheduling healthcare measures after particular time intervals, even when this healthcare might not be scheduled in this way in the community. For example, in carceral settings, tuberculosis tests are recommended on an annual interval. Correctional healthcare systems generally take affirmative efforts to schedule these tests after a year has passed, rather than waiting for individual detained people to request them. Correctional healthcare systems also generally perform affirmative outreach to people eligible for certain vaccinations, such as the pneumovax and shingles vaccine, both of which are available to a subset of the population. Among the reasons why correctional health services undertake these efforts is that detained people generally lack access to their medical records and may not be able to track eligibility themselves. Dr. Murray's suggestion that CAFCC does not need to perform this type of outreach for booster vaccines is contrary to these basic correctional healthcare practices. This suggestion also does not make sense because detained people do not have access to their medical records and are unable to reliably track their booster eligibility dates.

21.     Dr. Murray also states that CAFCC does not need to track booster eligibility or affirmatively offer boosters because detained people in the facility have a relatively short

---

[20] *E.g.*, https://dchealth.dc.gov/release/dc-health-reaching-out-eligible-residents-get-boosted.

average stay of approximately four months.[21] However, those initially vaccinated with the Johnson & Johnson vaccine, like many people at CAFCC, are eligible for boosters after two months.[22] People who initially received an mRNA vaccine or who are eligible to receive a third booster become eligible after four months.[23] Of course, the four-month stay is merely an average, and a significant number of people will be detained at CAFCC for longer than four months. Many people will become eligible for a booster while at CAFCC. I therefore disagree with Dr. Murray's opinion that notifying detained people of booster eligibility is not a worthwhile endeavor due to the average length of stay. There are numerous other aspects of correctional health that require time for assessment and treatment in a jail setting similar to CAFCC, including serious mental illness, kidney and liver disease, and it is not credible to assert that because some patients leave before we conduct all of the care we may plan for them, we should withhold it from everyone else.

22. Dr. Murray states that the facility's educational efforts are adequate because "CAFCC does provide written information to all detainees" and because "CAFCC has been providing regular monthly town hall meetings with all detainees" regarding vaccination.[24] My recommendations did not address whether or not these materials were provided and these town halls were held but instead addressed the quality of these educational efforts. As I explained in my opening report, CAFCC should improve its written educational materials by using materials that are concise and are written with an incarcerated audience in mind.[25] I also explained that town halls in housing areas should be conducted

---

[21] Murray Report, 17.
[22] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html.
[23] *Id.*
[24] Murray Report, 13, 19.
[25] Opening Report, 15.

by health staff.[26] Dr. Murray does not examine the quality of these educational efforts. A review of the educational materials provided to detained people shows that the facility has chosen materials written by the manufacturers to avoid legal risk from side effects rather than educational materials designed for an audience of incarcerated people and intended to promote vaccination and answer questions.[27] Similarly, a review of the talking points for town halls, which do not address medical questions about the vaccines' safety or efficacy, shows that these town halls do not properly educate detained people.[28] These materials and talking points are inadequate to provide the type of education necessary to improve vaccination rates, a fact that is corroborated by the apparently low vaccination rate in the facility.[29]

23.     Dr. Murray also states that my recommendation of one-on-one outreach by medical providers to unvaccinated, high-risk detained people is not necessary because detained people can request medical appointments to ask questions about the vaccine.[30] But waiting for detained people to request medical appointments is not an effective way to increase vaccination uptake. High-risk detained people generally have complex medical histories and often take medications or have specific health conditions. In my experience, those high-risk people who remain unvaccinated do so because they have complex, personal questions about interactions between the vaccines and their medical conditions

---

[26] Opening Report, 14.

[27] Rose Deposition, 29:3-18, Ex. 1 at CORECIVIC-MLG000738-64.

[28] CORECIVIC-MLG003510. *See also* Rose Deposition, 29:19-30:16. In contrast, Rose Deposition, Ex. 12 is a set of frequently asked questions for staff vaccination that goes into considerably more depth on potential medical questions about vaccination. That document was not used for purposes of educating detained people at town halls. Rose Deposition, 203:10-21.

[29] CORECIVIC-MLG003528; *see also* Rose Deposition, 157:18-21.

[30] Murray Report, 16.

or medications. In addition, providers often operate under pressure to limit the time and number of health problems they address at each encounter, making vaccination education and answering questions a distant priority. The predicable questions high-risk people have about vaccination are not suited to group town halls and may also involve private information, such as HIV-positive status, that these detained people do not want to share in group settings. For example, when I inspected the federal Bureau of Prisons' Lompoc facility in April of 2021, I spoke with a number of unvaccinated detained people. The large majority of these people were willing to become vaccinated but had questions about the vaccine. Many of these people with questions were at high risk for hospitalization or death and had questions specific to their conditions or medications.[31] These questions served as an impediment to vaccination even though detained people at that facility could have used the sick call process to ask those questions as Dr. Murray states detained people may at CAFCC. After BOP Lompoc implemented my recommendation of one-on-one counseling, many high-risk unvaccinated people were able to obtain answers to their questions and became vaccinated.[32] The same would likely occur at CAFCC, and outreach to high-risk unvaccinated people for one-on-one counseling would be likely to significantly increase vaccine uptake among the crucial high-risk segment of its population.

24.    Finally, Dr. Murray states that, because COVID-19 vaccines have been available for some time, "most people, including detainees, are aware of the strengths and weaknesses of vaccination and have come to their own decision about their personal health and well-

---

[31] *Torres v. Milusnic*, No. 2:20-cv-04450, ECF No. 239-1, 9 (C.D. Cal. May 12, 2021).
[32] *Torres v. Milusnic*, No. 2:20-cv-04450, ECF No. 367-1, 9 (C.D. Cal. Mar. 4, 2022).

being." I disagree with this statement on a number of levels. For a number of reasons, incarcerated people generally lack adequate information about vaccination even at this stage of the pandemic. In my experience, many incarcerated people have received information or have not had access to adequate medical counseling on vaccination, whether or not they have been incarcerated for the entirety of the pandemic. Additionally, those outside of the U.S. do not necessarily have access to the same vaccine choices as people in the U.S. do. Finally, when people are incarcerated, they find themselves in a congregate living setting where their risk for COVID-19 infection has increased, and they are often exposed to substandard medical care. These changes should cause unvaccinated people to reevaluate their decisions once they find themselves incarcerated. All of these factors can contribute to a lack of adequate information among people incarcerated at the facility. An evaluation of the rate of existing vaccination could help determine the level of vaccine access and education among people entering the facility. If that rate is close to the rate in the community as a whole, then CAFCC might assume that the level of access and education is comparable to that in the community as a whole; if the rate is lower, then CAFCC should assume that vaccine access and education among people entering the facility is relatively low. CAFCC does not keep data on vaccination rates of people entering the facility,[33] so Dr. Murray has no basis for his assumption about the levels of vaccine access and education in the population entering the facility. Dr. Murray's suggestion that facilities do not need to provide education about a preventative measure that has existed for over a year also conflicts with basic correctional health practice. For example, Methicillin-resistant Staphylococcus aureus (MRSA) has been a significant

---

[33] Rose Deposition, 157:22-158:13.

concern in jail and prison environments for decades, but correctional health services continue to provide education on this disease and ways to prevent it. Finally, Dr. Murray's suggestion conflicts with the fundamental medical principle of informed consent: people detained at CAFCC should be made aware of the benefits and consequences of all medical interventions they are offered, including COVID-19 vaccination.

25. <u>Staff Vaccinations and Boosters:</u> In my opening report, I explained the importance of staff vaccination, and I explained that based on my review of the evidence, CAFCC had considered two methods of increasing staff vaccination rates: mandates and monetary incentives.[34] Dr. Murray does not disagree with any of those opinions. He only offers two observations: that the staff vaccination rate was 80% on the date of his tour, and that "the reality of significant staff vacancies if vaccination was made mandatory guided against its adoption."[35] As I explained above in paragraph 11, it is unclear what evidence supports Dr. Murray's statement about the 80% staff vaccination rate, nor is it clear whether this rate represents a rate for just the medical staff or all staff, including correctional officers. However, given the lack of policy changes at CAFCC related to staff vaccination, it is unlikely that the staff vaccination rate could have changed so significantly from the 50% rate that Warden Kline testified to in his November, 2021 deposition.

26. My recommendations from my original report remain unchanged: CAFCC should implement the incentive and mandate plans that it prepared to increase staff vaccinations. It appears from Dr. Murray's report that the facility declined to mandate staff

---

[34] Opening Report, 15-16.
[35] Murray Report, 19-20.

17

vaccinations due to concerns about attrition,[36] but without any specific information about the attrition that might have occurred, it is difficult to identify any concrete concern that could have militated against the significant benefits of such a mandate. This concern is particularly speculative because evidence shows that in other settings where vaccine mandates have been implemented, their effects on staffing shortages have been less than expected.[37] Additionally, any attrition could be overcome by providing incentives for staff vaccination, as I recommended, and extending those incentives to new hires who are vaccinated or willing to become vaccinated.

27.   <u>Identification and Protection of High-Risk Patients:</u> In my opening report, I noted that CAFCC had in the past kept a list of all high-risk patients and provided them additional protections, and I recommended that it resume this practice.[38]

28.   The May 3, 2022 CDC guidance further emphasizes the need to track people at high risk of severe illness or death from COVID-19. For example, it states that before a facility may stop employing enhanced protective measures, it must "[d]etermine whether the facility's residents or staff are more likely to get very sick from COVID-19."[39] This guidance also includes as an everyday prevention strategy a requirement that facilities "[a]ssess residents' risk for severe health outcomes from COVID-19 and ensure timely treatment after infection for those who are eligible for COVID-19 therapeutics" such as

---

[36] Murray Report, 20.
[37] https://www.kff.org/medicaid/issue-brief/nursing-facility-staff-vaccinations-boosters-and-shortages-after-vaccination-deadlines-passed/ (finding that the March 2022 nursing facility "vaccine mandate has not exacerbated staffing shortages to the extent initially hypothesized since shortages have actually fallen nationally since January 2022.").
[38] Opening Report, 16, 20.
[39] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

the drugs Paxlovid, remdesivir, and molnupiravir.[40] A crucial part of this process of ensuring timely treatment after infection is determining in advance the number of people at high risk of hospitalization or death, which in turn determines the number of people who should be assessed for treatment with these drugs if they test positive within a certain number of days of symptom onset.

29.   Dr. Murray opined that it is not necessary to keep this list of high-risk patients because CAFCC is able to use its electronic medical recordkeeping system, Allscripts, to identify all people with any specific risk factor, and because medical staff have the ability to take high-risk status into account when making medical decisions. Dr. Murray does not identify the source on which he basis this statement. However, the evidence in this case shows that Dr. Murray's statement is likely incorrect. When CAFCC kept a list of high-risk patients, it did so in the way that Dr. Murray suggests—by running reports from Allscripts—but this process was time-consuming.[41] Therefore, contrary to Dr. Murray's suggestion, this list cannot be created on the spot when necessary and must be kept in advance. The evidence also shows that when the facility stopped keeping this list, it stopped providing protections to people on the list. For example, it stopped providing single cells to high-risk patients when their unit went on quarantine.[42] I therefore disagree with Dr. Murray's conclusions that the facility could straightforwardly obtain the information on this list or that it is currently providing the same quality of care that it could provide with this list. In addition, to track and use the level of high-risk patients,

---

[40] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[41] Rose Deposition, 135:9-17, 137:6-14.
[42] Rose Deposition, 138:12-18.

this is something the facility must do on an ongoing basis, not simply have the capacity to on an occasional basis.

30.     I made several, specific recommendations as to the protections these high-risk patients should receive, which I will discuss below. First, I recommended CAFCC provide additional, one-on-one counseling to unvaccinated people appearing on this high-risk list. I have already addressed that opinion and Dr. Murray's critiques of it above in paragraph 23.

31.     Second, I recommended that CAFCC provide vital sign and symptom checks by nursing staff in quarantine, including intake cohorts and exposure quarantine. Dr. Murray disagrees and states that, based on his conversations with healthcare staff at CAFCC, they believe symptom and temperature checks by security staff are adequate. Dr. Murray's opinion misses several important aspects of my recommendation. I recommend vital sign checks beyond just temperature for high-risk people. These vital sign checks provide additional important information that can track severe illness, such as oxygen saturation. I also recommend that these symptom and vital sign checks be performed by healthcare staff, because those are the staff members who will be aware of detained people's particular risk factors and will be able to appreciate what signs are causes for concern in people with particular risk factors. For example, in investigating deaths from COVID-19 during a recent outbreak in Hawaii state prisons, I found that multiple people died despite the facility attempting to perform regular symptom and vital sign checks, because they became so ill that they could not report for these checks when they were performed by custody staff in their units. These people were marked as refusing checks, and the warning signs of severe disease went unnoticed. CAFCC's current system risks the same

outcome occurring. Healthcare staff targeting high-risk patients for vital and symptom checks, in contrast, would be likely to notice any detained people who are too sick to report for their checks and would be better positioned to recognize that this inability to report for a check is a sign of danger.

32. Third, I recommended that CAFCC modify the nursing assessments being conducted for patients with suspected or known COVID-19 so that when a person is high-risk, healthcare staff modify the action steps to reflect a lower threshold for these high-risk patients. Dr. Murray agrees that the CDC guidance recommends considering high-risk status.[43] He opines that CAFCC healthcare staff explained to him that they understand the factors that make a patient high-risk and take measures accordingly. This case-by-case approach is motivated by the same concerns as the uniform policy I recommend, but it is a highly flawed way of achieving the goal of uniformly protecting high-risk patients because it creates a high risk of someone slipping through the cracks and not being provided the enhanced protection that they require. This risk is particularly high during the most dangerous phases of the pandemic when outbreaks cause high case counts and staffing shortages. Dr. Murray provides no reasoning supporting CAFCC's risky decision not to establish any uniform policy making safeguards for high-risk patients. I therefore continue to take the opinion that a uniform policy is necessary to adequately protect high-risk patients, particularly during an outbreak.

33. Fourth, I suggest that keeping a list of high-risk patients can help a facility to ensure it has sufficient stock of oral antiviral medications such as Paxlovid and Molnupiravir to treat eligible people in the event of an outbreak. The May 3, 2022 CDC guidance

---

[43] Murray Report, 23-24.

emphasizes the importance of this recommendation, dictating that facilities should ensure adequate stock of therapeutic medications and should follow guidelines by the National Institutes of Health (NIH) for treatment with therapeutic medications.[44] I agree with these recommendations. Based on the current recommendations, CAFCC should evaluate every high-risk person who tests positive for COVID-19 within 5 days of symptom onset for Paxlovid, assuming sufficient supply.[45] If Paxlovid is indicated, CAFCC should prescribe it. If Paxlovid is not indicated, CAFCC should evaluate the patient for treatment with remdesivir. If remdesivir is not indicated, feasible, or available, CAFCC should evaluate the patient for treatment with Molnupiravir (or bebtilovimab). CAFCC must keep sufficient levels of these medications on hand to prescribe them as dictated by NIH guidelines. Dr. Murray agrees with this assessment, but he does not explain how CAFCC should assess its needs.[46] Only by keeping the list of high-risk patients that I recommend can CAFCC ensure it keeps adequate supply of these medications on hand. In fact, Dr. Murray's report does not make mention of CAFCC having requested or received any of these medications, suggesting that the facility had neither requested nor received them as of his April 15, 2022 inspection.

---

[44] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html;
https://www.covid19treatmentguidelines.nih.gov/management/clinical-management/nonhospitalized-adults--therapeutic-management/.

[45] Supply in the community is currently sufficient, as is evidenced by the Arizona Department of Health Services' announcement in April 2022 that supplies are sufficient that it had expanded access to all eligible patients in the state. https://directorsblog.health.azdhs.gov/antivirals-are-increasingly-available-to-complement-covid-19-vaccination/;
https://www.azdhs.gov/covid19/index.php#antivirals.

[46] Murray Report, 24.

34.   <u>Masks:</u> I noted that detained people at CAFCC are provided two cloth masks, and that if

they develop symptoms or test positive, they are given a surgical mask. I recommended

that CAFCC provide all detained people with surgical or KN95 masks, replaced weekly

or when they become dirty or break. I also recommended that, when two or more cases

have been detected among detained people or staff in a 14-day period, KN95 masks

should be provided for all staff and detained people.[47] Dr. Murray apparently disagrees.

He states that the CDC guidance permits cloth masks in certain circumstances.[48]

Although it is correct that the CDC guidance does not specify that surgical or KN95

masks are required in all circumstances, the CDC does make clear that a mask that fits

tightly or snugly is recommended for every person,[49] and my experience is that the type

of cloth masks issued by CAFCC do not meet these CDC criteria.  I explained in my

opening report that surgical or KN95 masks provide more effective protection against the

spread of COVID because they are more effective and more comfortable to wear.[50] Dr.

Murray does not disagree with either of these facts. Dr. Murray also states that CAFCC

provides all detained people with cloth and surgical masks.[51] He does not indicate the

source of this information, but it conflicts with the evidence in this case, which shows

that detained people are given only cloth masks unless they develop symptoms or test

positive.[52]

---

[47] Opening Report, 20.
[48] Murray Report, 24.
[49] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html; *see also* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (recommending that masks be "well-fitting").
[50] *See* Opening Report, 20.
[51] Murray Report, 24-25.
[52] Rose Deposition, 130:24-131:6, Jaramillo Deposition, 188:10-19.

35.  <u>Intake Cohorting:</u> In my opening report, I recommended that CAFCC increase the testing that it performs in intake cohorts. I noted that there are a variety of acceptable timing strategies. In my opening report, I recommended that CAFCC offer two tests to each person over the course of the intake period. After I submitted my opening expert report, the CDC modified its guidance to require only a test at the end of the intake period, so long as the cohort is kept small.[53] I continue to believe that the best way to protect health and ensure the efficient operation of the facility is to perform multiple tests over the intake cohort period so that any people in the cohort who brought COVID-19 into the facility can be isolated to limit spread within the cohort. However, I note that CAFCC may follow the CDC guidelines by keeping its intake cohorts small (that is, limiting the number of people in a cohort to permit social distancing within the unit) and performing just one test on the final day of the intake cohort period. CAFCC is not performing this alternate strategy either, so its current intake cohorting practices remain deficient.

36.  Dr. Murray offers only one opinion on this subject, which is that the CDC guidance does not require any increase in the testing that CAFCC performs in intake cohorts. This is incorrect. The evidence shows that, although CAFCC performs a test on intake, it does not perform any tests as part of the intake cohort process.[54] The distinction here is that when a person enters detention, they may be tested in the initial hours of their intake processing, but not be placed into an intake cohort until many hours or even days later. During this time, significant close contact occurs with other people, and without subsequent testing, new cases that predictably occur as a result of this early go

---

[53] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[54] Rose Deposition, 55:5-11.

undetected. Additionally, people may predictably become infected during an intake cohort period without showing symptoms due to the higher risk of exposure in an intake cohort, and then may be positive for COVID-19 on the final day of the cohort period. Failing to test on this final day of the period similarly risks that someone will exit the cohort while infectious and be placed in general population. CAFCC's faulty testing schedule falls short of the minimum standard set out by the current CDC guidance.[55] It also falls short of what the CDC guidance at the time of Dr. Murray's report required, which was testing at the end of the intake cohort period and testing every 3-7 days in times of high community transmission.[56] Dr. Murray's incorrect statement about the CDC guidance does not change my opinion about my recommendations set out above.

37.    Quarantine: In my opening report, I recommended that CAFCC follow the CDC guidance by increasing the testing it offers in quarantine units. The CDC guidance continues to recommend serial testing in cohorted quarantine units such as those used by CAFCC every 3-7 days.[57] In my opinion, this strategy remains an effective one. My recommendation remains that a variety of specific timing strategies are acceptable, but at a minimum CAFCC should offer two tests to each person in a cohorted quarantine unit over the course of the quarantine period, with additional testing every 3-7 days if the quarantine period is extended.

---

[55] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[56] https://stacks.cdc.gov/view/cdc/114297.
[57] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

38. Dr. Murray states that "[c]urrently in a cohorted quarantine group, CAFCC provides COVID-19 testing upon request, if a detainee develops symptoms, and at day 10."[58] This statement conflicts with the evidence in this case, which shows that tests are only offered to people in quarantine units who report symptoms or who share a cell with someone who has tested positive or exhibited symptoms.[59] This statement must be examined further to determine whether the facility has changed its policy and the extent to which this policy is actually implemented, but if true, it is a helpful—but partial—improvement to the facility's mitigation measures. Throughout the pandemic and particularly with recent variants, it has been common for a person who tested positive to already have infected others in their housing unit before they were removed, and for at least some of these others to be asymptomatic. CAFCC's existing policy does not effectively identify these other asymptomatic carriers in the unit, and it does nothing to prevent them from spreading COVID-19 within the quarantine unit during the quarantine period. As I mentioned in my opening report, there are a variety of testing strategies that could acceptably mitigate this risk, but CAFCC should address this risk by implementing some strategy that involves offering multiple tests over the quarantine period, with serial retesting every 3-7 days if the quarantine period is extended.

39. In my opening report, I also recommended that CAFCC treat people released from a quarantine unit as potentially COVID-19 positive on release, by notifying them that they have potentially been exposed to COVID-19 and providing them with information about isolation strategies.[60] Dr. Murray does not disagree with this recommendation. In fact, he

---

[58] Murray Report, 26.
[59] Rose Deposition, 74:8-12, 18-25, Jaramillo Deposition, 182:8-11.
[60] Opening Report, 23.

states that the Complex Health Services Administrator, Ms. Jaramillo, reported that the facility is taking these steps.[61] The evidence in this case conflicts with Dr. Murray's statement because it shows that the facility has no such policy.[62] If the facility has in fact changed its policy to follow my recommendation as Dr. Murray suggests, then this is a welcome change. If not, then the facility should make this change.

40.    Pre-Release Testing: In my opening report, I recommended that CAFCC should consider whether it is feasible to provide a routine release quarantine to all detained people with known release or transfer dates, and that at a minimum, it should provide testing to all detained people leaving the facility.

41.    Dr. Murray does not set out any opinion disagreeing that people should be offered tests before release to the community. Instead, Dr. Murray states that approximately half of people who are released to the community are released directly from court, and that those people are offered tests before leaving the facility for court.[63] Dr. Murray also states that the other half of people who are released to the community (those on a B&B) receive a test before being released.[64] These statements conflict with the evidence in the case, which shows that no people released directly from the facility receive tests.[65] If the facility has changed its protocols to adopt my suggestion after the depositions in this case were taken, then I applaud this change. If not, then it should make this change. The updated CDC guidelines clearly reference testing before transfer and release as one of the recommended practices when enhanced measures are in place, and a reasonable approach

---

[61] Murray Report, 26.
[62] Rose Deposition, 79:2-6.
[63] Murray Report, 26.
[64] Murray Report, 26.
[65] Rose Deposition, 104:23-105:5.

I have seen elsewhere is to simply conduct testing before court appearances, as well as before planned releases and other movements.

42. Dr. Murray also states that CAFCC considered the creation up a pre-release quarantine unit but decided against it for logistical reasons.[66] He does not explain the source of this information or whether he did any investigation to validate these concerns. I therefore continue to believe that that CAFCC may benefit from thoroughly considering a pre-release quarantine.[67]

43. Contact Tracing: In my opening report, I recommended that CAFCC expand its contact-tracing efforts for staff positives to determine whether the positive staff member had any close contacts with detained people.[68] Dr. Murray does not offer an opinion on whether this is a necessary measure. Dr. Murray instead explains that CAFCC staff determined not to trace staff contacts with detained people because the "immense size of the facility" made it difficult to do so.[69] I disagree with CAFCC's reasoning for deciding against doing this contact tracing. The fact that the facility is large does not excuse it from complying with basic standards of healthcare. In fact, some standards such as contact tracing become more important in a large facility where a single staff member can potentially spread the disease through multiple units.

---

[66] Murray Report, 27.
[67] Murray Report, 27.
[68] Opening Report, 25.
[69] Murray Report, 27.

*Executed this 27th day of May, 2022 in Port Washington, NY*

Signed,

HOMER VENTERS, M.D., M.S

29

# **EXHIBIT 3**

(NIOSH), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice as required by 42 CFR 83.12(e) of a decision to evaluate a petition to designate a class of employees at the Vitro Manufacturing in Canonsburg, Pennsylvania, to be included in the Special Exposure Cohort under the Energy Employees Occupational Illness Compensation Program Act of 2000. The initial proposed definition for the class being evaluated, subject to revision as warranted by the evaluation, is as follows:

*Facility:* Vitro Manufacturing.

*Location:* Canonsburg, Pennsylvania.

*Job Titles and/or Job Duties:* All Atomic Weapons Employer employees.

*Period of Employment:* August 13, 1942 through December 31, 1957.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 4, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29244 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institute for Occupational Safety and Health

### Final Effect of Designation of a Class of Employees for Addition to the Special Exposure Cohort

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice concerning the final effect of the HHS decision to designate a class of employees at Connecticut Aircraft Nuclear Engine Laboratory in Middletown, Connecticut, as an addition to the Special Exposure Cohort (SEC) under the Energy Employees Occupational Illness Compensation Program Act of 2000. On October 24,

2008, as provided for under 42 U.S.C. 7384q(b), the Secretary of HHS designated the following class of employees as an addition to the SEC:

All employees of the Department of Energy (DOE), its predecessor agencies, and DOE contractors or subcontractors who worked at the Connecticut Aircraft Nuclear Engine Laboratory in Middletown, CT, from January 1, 1958 through December 31, 1965 for a number of work days aggregating at least 250 work days occurring either solely under this employment or in combination with work days within the parameters established for one or more other classes of employees in the Special Exposure Cohort.

This designation became effective on November 23, 2008, as provided for under 42 U.S.C. 7384*l*(14)(C). Hence, beginning on November 23, 2008, members of this class of employees, defined as reported in this notice, became members of the Special Exposure Cohort.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 5, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29246 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Office of the Secretary

### Findings of Scientific Misconduct

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the Office of Research Integrity (ORI) and the Assistant Secretary for Health have taken final action in the following case:

*Homer D. Venters, Jr., M.D., University of Illinois at Urbana-Champaign:* Based on the report of an investigation conducted by the University of Illinois at Urbana-Champaign (UIUC) and extensive additional image analysis conducted by the Office of Research Integrity (ORI), the U.S. Public Health Service (PHS) found that Dr. Homer D. Venters, former graduate student, Neuroscience

Program, UIUC, engaged in scientific misconduct in research supported by National Institute of Mental Health (NIMH), National Institutes of Health (NIH), awards R01 MH051569 and F30 MH12558 and National Institute on Aging (NIA), NIH, award R01 AG06246.

Specifically, PHS found that the Respondent committed misconduct in science:

• By intentionally and knowingly preparing and including duplicate image data in Figures 5 and 10 of PHS fellowship application F31 MH12558, "Neurodegeneration via TNF-alpha inhibition of IGF–1," submitted in 1999, which was funded as F30 MH12558 from June 1, 2000, to May 31, 2003. Because the duplicate data were labeled as having been obtained from different experiments, the results for at least one of the two figures were intentionally falsified and constitute an act of scientific misconduct.

• By intentionally and knowingly preparing and including duplicate image data in Figure 3 and/or 4 of a manuscript submitted and published as: Venters, H.D., *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences U.S.A.* 96:9879–9884, 1999.

• By preparing and providing to his dissertation committee in March 2000 a thesis proposal entitled "An Alternate Mechanism of Neurodegeneration: Silencing of Insulin-like Growth Factor-I survival signals by Tumor Necrosis Factor-a," which contained five falsified figures: Figures 1.3, 1.4a, 2.1b, 2.3e, and 2.5b. In each figure, he reused data within the same figure or in another thesis proposal figure as representing differently treated samples or as data obtained with different immunoblotting antisera.

• In March and April 2001, Respondent included several of the same falsified figures as in the thesis proposal and multiple additional falsified figures in his dissertation "Silencing of Insulin-like Growth Factor I Neuronal Survival Signals by Tumor Necrosis Factor-a." In all, Figures 3.3, 3.4a, 3.4b, 4.1b, 4.3a, 4.5b, 5.1a, 5.2, 5.4a, 5.5a, 5.6a, 5.7a, and 5.8a were falsified. In each instance, he assembled figures by reusing significant data, on some occasions after manipulating the orientation of the data, either within the same figure or in other figures related to his thesis and represented the data falsely as coming from different samples or different experiments.

Dr. Venters has entered into a Voluntary Settlement Agreement

(Agreement) in which he has voluntarily agreed, for a period of three (3) years, beginning on November 19, 2008:

(1) That any institution that submits an application for PHS support for a research project on which the Respondent's participation is proposed or that uses the Respondent in any capacity on PHS-supported research, or that submits a report of PHS-funded research in which the Respondent is involved, must concurrently submit a plan for monitoring of the Respondent's research to the funding agency and ORI for approval; the monitoring plan must be designed to ensure the scientific integrity of the Respondent's research contribution; Respondent agreed that he will not participate in any PHS-supported research until such a monitoring plan is submitted to ORI and the funding agency;

(2) That Respondent will ensure that any institution employing him will submit to ORI, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS-funded research in which the Respondent is involved, a certification that the data provided by the Respondent are based on actual experiments or are otherwise legitimately derived, and that the data analyses, procedures, and methodology are accurately reported in the application or report; Respondent must ensure that the institution sends a copy of each certification to ORI; and

(3) To exclude himself from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant or contractor to PHS.

Respondent also voluntarily agreed that within 30 days of the effective date of this Agreement:

(4) He will submit a letter to the journal editor, with copies to his coauthors, identifying his falsification of Figures 3 and/or 4 in the following article: Venters *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences* 96:9879–9884, 1999.

**FOR FURTHER INFORMATION CONTACT:**
Director, Division of Investigative Oversight, Office of Research Integrity, 1101 Wootton Parkway, Suite 750, Rockville, MD 20852, (240) 453–8800.

**Chris B. Pascal,**
*Director, Office of Research Integrity.*
[FR Doc. E8–29203 Filed 12–9–08; 8:45 am]
**BILLING CODE 4150–31–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Resources And Services Administration**

**Agency Information Collection Activities: Proposed Collection: Comment Request**

In compliance with the requirement for opportunity for public comment on proposed data collection projects (section 3506(c)(2)(A) of Title 44, United States Code, as amended by the Paperwork Reduction Act of 1995, Pub. L. 104–13), the Health Resources and Services Administration (HRSA) publishes periodic summaries of proposed projects being developed for submission to OMB under the Paperwork Reduction Act of 1995. To request more information on the proposed project or to obtain a copy of the data collection plans and draft instruments, call the HRSA Reports Clearance Officer on (301) 443–1129.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

**Proposed Project: Health Centers Patient Survey—(NEW)**

The Health Center program supports Community Health Centers (CHCs), Migrant Health Centers (MHCs), Health Care for the Homeless (HCH) projects, and Public Housing Primary Care (PHPC) programs. Health Centers (HCs) receive grants from HRSA to provide primary and preventive health care services to medically underserved populations.

The proposed Patient Survey will collect in-depth information about HC patients, their health status, the reasons they seek care at HCs, their diagnoses, the services they utilize at HCs and elsewhere, the quality of those services, and their satisfaction with the care they receive, through personal interviews of a stratified random sample of HC patients. Interviews are planned to take approximately 1 hour and six minutes each.

The Patient Survey builds on previous periodic User-Visit Surveys which were conducted to learn about the process and outcomes of care in CHCs and HCH projects. The original questionnaires were derived from the National Health Interview Survey (NHIS) and the National Hospital Ambulatory Medical Care Survey (NHAMCS) conducted by the National Center for Health Statistics (NCHS). Conformance with the NHIS and NHAMCS allowed comparisons between these NCHS surveys and the previous CHC and HCH User-Visit Surveys. The new Patient Survey was developed using a questionnaire methodology similar to that used in the past, and will also potentially allow some longitudinal comparisons for CHCs and HCH projects with the previous User-Visit survey data, including monitoring of process outcomes over time. In addition, this survey will include interviews of patients drawn from migrant populations and from residents of public housing, populations not included in the previous surveys.

The estimated response burden for the survey is as follows:

SURVEY

| Type of respondent; activity involved | Number of respondents | Responses per respondent | Total number of responses | Burden per response (hours) | Total hour burden |
|---|---|---|---|---|---|
| Grantee/Site Recruitment and Site Training .. | 115 | 3 | 345 | 3.75 | 1294 |
| Patient Recruitment ......................................... | 5658 | 1 | 5658 | .167 | 945 |
| Patient Survey 4526 ...................................... | 4526 | 1 | 4526 | 1.1 | 4979 |
| Total ......................................................... | 5773 | ............................ | 10529 | ............................... | 7218 |