# EXHIBIT 1

## Declaration of Warden Kris Kline

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Jacob B. Lee, Bar No. 030371
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com

*Attorneys for Defendant Kris Kline*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Claudia Romero-Lorenzo, et al., | NO. CV-20-00901-PHX-DJH (DMF) |
| Plaintiffs, | |
| v. | **DECLARATION OF WARDEN KRIS KLINE** |
| Brian Koehn, et al., | |
| Defendants. | |

I, K. Kline, make the following Declaration:

1.      I am over 18 years of age, and I am competent to testify to the matters set forth in this Declaration. I make this Declaration based on my own personal knowledge and my review of the relevant documents maintained by CoreCivic in the usual course of business.

2.      I am currently the Warden of CoreCivic's Central Arizona Florence Correctional Complex ("CAFCC"), located in Florence, Arizona, a position I have held since August 2016.[1] Prior to that, I was the Warden of CoreCivic's Kit Carson Correctional Center, located in Burlington, Colorado, for two years.

---

[1] CAFCC was formerly two facilities—Central Arizona Detention Center ("CADC") and Florence Correctional Center ("FCC")—both owned and operated by CoreCivic. The two facilities were administratively combined into CAFCC in 2017. I was the Warden of

3.      I have been in corrections for over 20 years, having started as a Correctional Officer at CoreCivic's Bay Correctional Facility, located in Panama City, Florida, in 2000.

4.      I briefly left CAFCC in October 2020 to serve as Warden of CoreCivic's Saguaro Correctional Center ("SCC") in Eloy, Arizona. I returned to CAFCC as Warden on May 16, 2021.

5.      This declaration supplements and incorporates my prior declarations, including attachments, at Dkt. 16-3, 23-1, 41-1, 48-1, and 57-1. Unless otherwise stated below, the conditions, policies, and procedures discussed in my prior declarations remain in place. The following statements apply to current conditions, policies, and procedures at CAFCC to the extent they have changed since my prior declarations.

6.      All documents attached to this and my prior declarations are true and accurate copies of documents generated and/or maintained in the normal course of CAFCC's business operations.

7.      All photographs attached to this and my prior declarations fairly and accurately depict the subject matter shown in the photos, as that subject matter existed on the dates the photographs were taken.

8.      CAFCC has a total design capacity of 5,003 detainees, with capacity for 3,900 USMS detainees.

9.      Although my prior declarations stated that CAFCC had capacity for 3,110 USMS detainees, 1200 Unit, which was previously closed, has since been reopened for use by USMS detainees.

10.     As of July 22, 2022, CAFCC was operating at 84% of its design capacity, with 4,222 total detainees and 3,724 USMS detainees.

11.     As early as January 2020, CoreCivic began monitoring the COVID-19 outbreak.

_____

FCC when the facilities were combined.

12.     CoreCivic's first COVID-19 screening tool was developed as early as March 2020 and has been amended as new information and new symptoms have been identified by the CDC.

13.     Consistent with CDC Interim Guidance, the entry screening consists of a series of questions and a temperature check with a no-touch thermometer. Staff administering the screening initially wore full PPE, including coveralls, gloves, N-95 respirator, and face shield; currently, staff administering the screening wear a mask. Social distancing has been employed during the entrance screening process throughout.

14.     Early in the pandemic, each day and based upon need, CoreCivic facility administrators with a first COVID-19 positive test or significant change in circumstances participated in a conference call with CoreCivic's Emergency Operations Center to review current and new protocols, receive CDC updates, and discuss additional concerns and requests. Currently, these calls occur bi-weekly.

15.     Early in the pandemic, CoreCivic facility leaders also participated in a call three times a week to discuss new protocols, receive CDC updates, and discuss additional concerns and requests related to COVID-19 response. Currently, these calls occur as needed, such as, for example, when changed circumstances require adjustments to facility protocols.

16.     On March 12, 2020, CAFCC suspended all social visits in order to limit spread of the virus. Volunteer entry was also suspended for the same reason. (Dkt. 16-3, ¶ 63.) Social visits resumed on August 16, 2021.

17.     As of March 20, 2020, CAFCC stopped transporting detainees for in-person court hearings, as the District of Arizona suspended in-person hearings. (Dkt. 16-3 at ¶ 68.) Since the District of Arizona resumed in-person hearings and trials in March 2021, CAFCC has resumed transporting detainees.

18.     Similarly, pursuant to USMS directives, CAFCC stopped all transports for non-urgent outside medical consults as of April 2, 2020 (but continued to make emergency transports as needed). (Dkt. 16-3 at ¶ 68.) Beginning in August 2020, CAFCC resumed non-

1  urgent transports as well subject to outside-provider-imposed restrictions on whether

2  detainees can been seen while in quarantine, whether COVID-19 vaccination is required,

3  etc.

4      19.    I communicate regularly with CAFCC medical team leads, the CoreCivic

5  Regional Health Service Administrator, and CoreCivic's Chief Medical Officer ("CMO")

6  about COVID vaccine policies and programs.

7      20.    As of July 22, 2022, CAFCC had the following PPE items in stock:

8          •  400 face shields

9          •  4,080 N-95 masks

10          •  21,900 paper surgical masks

11          •  2,188 pairs of gloves

12  Additionally, CAFCC maintains an inventory of 25 washable fabric coveralls for use in the

13  medical isolation areas that are laundered after each use.

14      21.    Although CAFCC stopped performing contact tracing using the facility

15  surveillance system towards the end of 2020, it has continued to conduct contact tracing by

16  interviewing persons who have tested positive for COVID-19 to identify persons with

17  whom they may have had close contact within the last 48 hours prior to their test.

18      22.    After reviewing the May 3, 2022 CDC Guidance, CoreCivic approved a

19  change from required masking to voluntary masking for staff, visitors, and detainees at each

20  facility with partner approval and if both parts of the CDC's framework are met for a

21  particular facility: (1) the local COVID-19 community level is "low," and (2) the Warden

22  and healthcare staff agree that the facility-based risk factors support it.

23      23.    Once a facility moves to voluntary masking, CoreCivic requires it to monitor

24  the COVID-19 community levels at the above website daily and be prepared to return to

25  mandatory masking if the community level changes to medium or high. As part of its

26  preparations, the facility must have a plan in place for mask distribution and communication

27  regarding the change to staff and inmates/detainees.

28

24.     On May 9, 2022, after determining that these factors supported a change to voluntary masking in consultation with facility healthcare staff, I sought and obtained USMS approval for the change.

25.     On June 30, 2022, CAFCC returned to mandatory masking because of increases in community and facility transmission consistent with the above-referenced guidance.

26.     For the months of June and July (through July 22) 2022, CAFCC issued 60,000 bars of soap and 32,000 bottles of shampoo/body wash free of charge to detainees.

27.     CAFCC does not charge any co-pays for detainees seeking any type of medical evaluation or treatment.

28.     During intake, the nurse conducting intake reviews COVID-19 vaccine fact sheets with every detainee. These fact sheets are available in both English and Spanish. This information is also available in 82 other languages through the interpreter line.

29.     After the CDC issued its February 10, 2022 update, the cohort period was shortened to 10 days. Effective June 1, 2022, CAFCC is no longer required to cohort new intake USMS detainees for any period of time.

30.     In this scenario, the cohorts were put on a schedule that allowed each cohort access to the dayroom while preventing commingling with other cohorts in the pod.

31.     Meals, recreation, programming, and medical services are provided on-unit during quarantine.

32.     CAFCC also has a 12-bed infirmary that is licensed by the Arizona Department of Health.

33.     The unit has 24-hour RN coverage and focuses on higher acuity patients.

34.     Prior to August 4, 2020, CAFCC policy was to test symptomatic detainees for COVID-19 as determined necessary by a licensed independent medical provider based on a particular detainee's symptoms. (Dkt. 48-1 at ¶ 14.) CAFCC now also tests detainees who have been in close contact with a confirmed COVID-19-positive individual, consistent with CDC guidelines.

35.    Approximately 95% of CAFCC detainees are transferred to another correctional facility and are provided COVID-19 testing prior to the transfer.

36.    Approximately half of the remaining 5% are released on a B&B (Bag and Baggage), which does not take place immediately, and CAFCC is able to provide COVID-19 testing prior to their release. If a test is positive, CAFCC does not have the authority to hold them. Instead, medical staff contact the Pinal County Public Health Services District and notifies them of the release and the detainee's last known address so that the Public Health Services District can follow up with the detainee. The detainee is also issued PPR prior to leaving the facility.

37.    Only 2.5% of the population is released immediately from court where the logistics of prerelease testing is not possible. However, each of these individuals would have had a COVID-19 test done before attending court on that day, which essentially becomes a prerelease COVID-19 test.

38.    If a detainee declines vaccination during the intake process, they are educated on how they can request a vaccine in the future.

39.    In December 2020, CAFCC established a COVID-19 Vaccination Plan for Health Services. The Vaccination Plan sets out the facility's plan for the administration of the COVID-19 vaccine, including preparation, registration, storage, tracking, reporting, training, and vaccination administration measures.

40.    The COVID-19 Vaccination Plan was developed by CAFCC medical staff as a guideline and was meant to be adapted as situations and the environment changed.

41.    On January 22, 2021, CAFCC began offering the COVID-19 vaccine to the detainee population.

42.    Since CAFCC began offering the COVID-19 vaccine to detainees, it has never run out of doses. When the facility's supply of vaccine doses reaches or falls below 100 doses, CAFCC places an order for 100 doses through the Arizona State Health Department and the ASIIS online portal. Vaccine orders are usually received within 2–3 business days after the order is placed. The State also provides CAFCC with supplies (i.e.,

syringes, alcohol preparation pads, face shields, masks) for every order placed at no charge to ensure that CAFCC is able to complete the task of vaccinating those in its care.

43.     When CAFCC first received the vaccine, it set vaccination target dates for each housing unit. Unit staff conducted Pre-Town Hall Meetings in each housing unit approximately five days prior to vaccine administration. The Pre-Town Hall Meetings were held to notify the detainees that COVID-19 vaccines would be offered shortly and to request that the detainees begin considering whether they would consent to or refuse the vaccine.

44.     Pre-Town Hall Vaccine Information sheets were provided to detainees and posted in the units after the Pre-Town Hall Meetings. The information sheets were posted in each housing unit in both English and Spanish.

45.     Approximately two to three days prior to each housing unit's vaccination target date, medical and unit staff would conduct a Town Hall Meeting in each housing unit to answer any questions about the vaccines and to distribute consent and refusal forms and manufacturer fact sheets in English and Spanish. This information and documentation were provided to detainees regardless of their decision to consent to or refuse the vaccine. Staff also explained at this time that if any detainee refused the vaccination, they could later change their mind, submit a medical request, and be placed on the list to receive a vaccine.

46.     The consent for vaccination form allows detainees to request a specific vaccine.

47.     Town Hall Meetings were (and are) conducted in English and Spanish. If other languages are required during the vaccination education process, the CDC has handouts available in a variety of languages. The facility also has access to a language line that provides telephonic interpretation services.

48.     CAFCC designated areas in each housing unit for purposes of vaccinating detainees. These isolated vaccination areas provide detainees with privacy during their vaccination, including any discussions they have with medical personnel concerning the vaccine.

49.   As of March 1, 2022, 85 "vaccination events" had been held in detainee housing units.

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| 03/31/21 | G, J, L | 246 |
| 04/07/21 | 1000, 1100, 400, 600, 800 | 258 |
| 04/16/21 | 1000, 1100, 400, 500, 600, L, SEG, ISO | 20 |
| 04/22/21 | 1100, 1200 | 219 |
| 04/23/21 | 1000, 1200, 400, 500, 600, 700, G, L | 20 |
| 04/27/21 | 700, 1200, G, Infirmary | 146 |
| 04/28/21 | 600, 900 | 284 |
| 04/29/21 | 600, 800, 900, D, SEG | 159 |
| 04/30/21 | 400, 500, 700, 800, 900, 1000, J | 33 |
| 05/04/21 | 1000, 700 | 143 |
| 05/05/21 | 1000, 400 | 223 |
| 05/06/21 | 1000, 500, 800 | 173 |
| 05/07/21 | G, SEG | 54 |
| 05/10/21 | L, J, 1000, Infirmary | 77 |
| 05/12/21 | J, 400, 800 | 260 |
| 05/13/21 | 600, 800 | 48 |
| 05/14/21 | 1100, 1200, 500, J | 203 |
| 05/17/21 | J | 31 |
| 05/18/21 | G, J | 33 |
| 05/19/21 | 1100, 1200 | 108 |
| 05/20/21 | J | 25 |
| 05/21/21 | D, F, J, L | 129 |
| 05/24/21 | 1100, 600, F, G, SEG | 29 |
| 05/25/21 | 700, F | 51 |
| 05/26/21 | 600, 900, Infirmary | 135 |
| 05/27/21 | 1100, 900, SEG | 82 |
| 05/28/21 | 1000, 1100, 1200, 400, 500, 700, 800, 900, D, F, J, SEG | 49 |
| 06/01/21 | 1100, 700 | 80 |
| 06/02/21 | 400, 500, G, J | 52 |
| 06/03/21 | 1000, 400, 500, 600 | 90 |
| 06/04/21 | 1000, 500, 600, D, F, G, J, SEG | 70 |
| 06/07/21 | 1000, 1200, 400, G, J | 29 |
| 06/08/21 | 1000, 400, 600, 700, 800 | 39 |
| 06/09/21 | 1200, 400, 500, 900 | 113 |
| 06/10/21 | 1000, 1100, 1200, 600, 700, 900, G | 51 |
| 06/11/21 | J, L, | 71 |

8

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|------|-----------------------------|-------------------------------------|
| 06/14/21 | J, 500, 400 | 18 |
| 06/15/21 | 1100, 1200, 500, L | 11 |
| 06/16/21 | D | 0 |
| 06/18/21 | J, L, 1100, 1200, D, J, L, SEG | 153 |
| 06/22/21 | D | 0 |
| 06/24/21 | D, 1000, 400, 600, 800, 900, J | 40 |
| 06/25/21 | 900, D, G, J, SEG | 108 |
| 06/29/21 | 1000, 1100, 500, 700, 900, F, G, J, SEG | 67 |
| 06/30/21 | | 64 |
| 07/02/21 | 1000, 500, 800, J | 116 |
| 07/05/21 | D, J | 34 |
| 07/06/21 | 1000, 500, 800, D, G | 19 |
| 07/07/21 | F, J, L | 42 |
| 07/09/21 | 1000, 1100, 600, J, O | 107 |
| 07/13/21 | J, L, 400, SEG | 70 |
| 07/14/21 | 900, D, J | 30 |
| 07/15/21 | 1000, 400, 700, 800, 900 | 22 |
| 07/16/21 | 500, 600, D, G, J | 60 |
| 07/20/21 | 500, 800, 900, D | 30 |
| 07/21/21 | 400, 600, 700, 900 | 13 |
| 07/22/21 | 500, 800, 900, 1100 | 16 |
| 07/23/21 | F, J | 67 |
| 07/27/21 | 400, 700, D, J, L | 25 |
| 07/30/21 | 1000, 1100, 500, 600, 700, G, J | 76 |
| 08/04/21 | F, J, SEG | 28 |
| 08/06/21 | 1000, 400, 500, 600, F, G, J | 63 |
| 08/12/21 | J | 29 |
| 08/13/21 | 1000, 400, 500, 600, 700, J | 56 |
| 08/16/21 | D, G, J | 20 |
| 08/17/21 | D, J | 31 |
| 08/19/21 | 800, D, F, G, J, SEG | 51 |
| 08/27/21 | 1000, 1100, 400, 700, G, J | 85 |
| 08/30/21 | D, J | 32 |
| 09/03/21 | 1000, 400, 500, 600, 70, 800, G, J | 147 |
| 09/10/21 | 1000, 600, 800, J | 44 |
| 09/17/21 | D, G, J, L, SEG | 145 |
| 09/24/21 | 1000, 500, 600, 700, D, J, SEG | 110 |
| 09/27/21 | 1000, 1100, 400, 500, 700, 800, 900 | 289 |
| 10/01/21 | 1000, 600, D, G, J, L, SEG | 103 |

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| 10/08/21 | 1000, 1100, 400, 500, 600, 700, 800, 900, F, G, J | 178 |
| 10/14/21 | 1100, 900, G, J, SEG | 148 |
| 10/19/21 | G, J | 11 |
| 10/22/21 | 1100, J, SEG | 86 |
| 10/26/21 | 1000, 400, 500, 600, 700, 800, 900, F, L | 33 |
| 10/29/21 | 1100, 400, G, J, L | 175 |
| 11/12/21 | Infirmary, medical isolation, 1100, 400, 600, 700, 800, 900, F, G, J, L | 294 |
| 11/19/21 | 1100, 400, 600, 700, 800, 900, D, F, G, infirmary, J, L, SEG | 171 |
| 11/22/21 | D, F, G, J | 141 |
| 11/26/21 | D, J, L | 92 |
| 11/29/21 | 1000, 1100, 400, 900, infirmary, F, J, L | 10 |
| 12/03/21 | 1100, 500, 800, L, SEG | 90 |
| 12/10/21 | O, medical, 1000, 1100, 400, 500, 600, 800, 900, D, F, G, J, L, SEG | 231 |
| 12/15/21 | 400, 600, 700, D, L, SEG | 133 |
| 12/17/21 | 1100, 400, 500, 600, 900, D, F, G, J, SEG | 88 |
| 12/22/21 | O, medical, 1000, 1100, 400, 500, 600, 800, 900, F, L, SEG | 75 |
| 12/24/21 | 1100, G, J, L, SEG | 97 |
| 12/31/21 | O, medical, 1000, 1100, 400, 600, 800, F, G, ISO, J, L | 136 |
| 01/07/22 | J, medical isolation, O, 1000, 1100, 400, 500, 600, 700, 800, 900, L, SEG | 81 |
| 01/14/22 | Infirmary, 1000, 1100, 400, 500, 600, 700, 800, 900, G, J, L, SEG | 64 |
| 02/07/22 | 1000, 400, 500, 600, 700 | 57 |
| 02/08/22 | 400, 500, 600 | 45 |

50.     Since that date, no further "vaccination events" have been scheduled to occur, as the vaccine has been offered to all current detainees and is now offered to new intake detainees as they arrive. If a detainee consents to receive the vaccine during intake, they are put on a list for administration of the vaccine after medical staff have completed the tuberculosis protocols.

51.     In addition, CAFCC staff conducts a Town Hall Meeting for every group of detainees that is scheduled to be released from the facility within 8–9 days to provide them

with information regarding vaccines. If detainees sign up to receive the vaccine, medical staff administers the vaccine the following Friday.

52.     While medical staff are on-site providing the vaccine, detainees who previously refused the vaccine can notify medical staff that they have changed their mind, and staff will administer the vaccine at that time as long as doses are ready and available.

53.     Detainees who refuse the vaccine and subsequently change their mind may simply submit a medical request for the vaccine and they will be placed on the request list. Once the detainee is on the list, CAFCC medical staff will work through the list to vaccinate those detainees throughout the facility as soon as possible, as resources are available, and as time permits. CAFCC's priority is to ensure all detainees are offered the vaccine and that no detainee who wants to receive the vaccine is missed.

54.     All detainees who receive the vaccine also receive a CDC vaccine card that states the type of vaccine they received and the date they received it; they are allowed to keep the card in their cell. "Pre-release" detainees who have received the Moderna vaccine are also provided with a COVID-19 Moderna Vaccine Follow Up – Community Release pamphlet in both English and Spanish as well as a handout with local health department contacts.

55.     Detainees who receive the first dose of the Moderna vaccine at CAFCC but are released before receiving their second dose of the vaccine are provided information about when they received their first dose and where and when they can get the second dose after their release.

56.     Detainees are educated about booster shots as part of the COVID-19 vaccine education process.

57.     There are several avenues through which detainees can request a booster shot, including submitting a request form or speaking to a staff member.

58.     Any staff member at CAFCC can point a detainee who wants to receive a booster shot in the right direction; also, detainees are provided education about booster shots

during intake, postings in the housing units provide information about booster shots, and medical and unit staff provide information about booster shots in town hall meetings.

59.     The CAFCC medical department and Communicable and Infectious Disease ("CID") nurses track detainees who receive a booster.

60.     Despite the availability of vaccinations, CAFCC's COVID-19 mitigation plan remains largely the same as it has been throughout the pandemic, including but not limited to:

- Encouraging social distancing
- Encouraging vaccinations
- Encouraging mask use
- Testing symptomatic detainees
- Quarantining detainees suspected of having COVID19
- Medically isolating detainees with confirmed COVID19
- Testing new intakes
- Testing on discharge or transfer
- Signage/education regarding the dangers of COVID19
- Cooperation of medical staff with the Pinal County Public Health Services District for access to vaccines, testing, and program analysis.

61.     In accordance with CDC Interim Guidance, educational materials have been posted throughout the facility and in all housing units regarding COVID-19 symptoms, what to do if you are sick, hand-washing, sanitation and cleanliness, mask use, steps to reduce the risk of exposure; social distancing, how to report, who to report to, vaccines, and boosters. These are updated based on any new information the CDC distributes.

62.     Medical staff who are authorized to administer the vaccine are also provided education as to CDC Guidance as it pertains to vaccines, complications, symptoms that may appear after receiving the vaccine, etc. so they can answer detainee questions.

63.     CAFCC updates COVID-19 information posted in the units to keep staff and detainees informed of new information so that everyone is safe.

64.    COVID-19 vaccines are available at CAFCC for all staff and detainees, and CAFCC encourages staff and detainees to become vaccinated.

65.    Programming was reduced, but not eliminated, during the early days of the pandemic, and was limited to groups of less than 10 to comply with applicable guidelines and to allow six feet of social distancing. In-person programming returned to pre-pandemic levels in July 2021.

66.    All detainees also have access to a wide variety of programming and classes on tablets. These offerings include mental health programming, self-help classes, job skills, education, and religious classes. Programming is available in both English and Spanish.

67.    Detainees can access the following content provided by a third-party vendor through the tablets:

| |
|---|
| Time Management |
| Substance Abuse Education |
| Starter U - Inmates to Entrepreneurs: 3 - Additional Things To Know/Closing |
| Starter U - Inmates to Entrepreneurs: 2 - Growing Your Business |
| Starter U - Inmates to Entrepreneurs: 1 - Introduction and Getting your Business Off the Ground |
| Skillsoft: Understanding Unconscious Bias |
| Skillsoft: Uncovering and Utilizing Your Talents and Skills |
| Skillsoft: The Essentials for Anger Management |
| Skillsoft: The Art of Staying Focused |
| Skillsoft: Solving Problems: Generating and Evaluating Alternatives |
| Skillsoft: Self-improvement for Lifelong Success |
| Skillsoft: Receiving Feedback |
| Skillsoft: Reaching Sound Conclusions |
| Skillsoft: Planning an Effective Presentation |
| Skillsoft: Overcoming Your Own Unconscious Biases |

| |
|---|
| Skillsoft: Overcoming Unconscious Bias in the Workplace |
| Skillsoft: Managing Pressure and Stress to Optimize Your Performance |
| Skillsoft: Making and Carrying Out Tough Decisions |
| Skillsoft: Make the Time You Need: Get Organized |
| Skillsoft: Interpersonal Communication: Communicating with Confidence |
| Skillsoft: Interacting with Customers |
| Skillsoft: Establishing Self-confidence for Life |
| Skillsoft: Ensuring Successful Presentation Delivery |
| Skillsoft: Difficult People: Why They Act That Way and How to Deal with Them |
| Skillsoft: Cultivating Relationships with Your Peers |
| Skillsoft: Choosing and Using the Best Solution |
| Skillsoft: Building Your Presentation |
| Skillsoft: Become a Great Listener |
| Skill Based Education |
| Returning Citizen's Magazine - September 2021 |
| Returning Citizen's Magazine - October 2020 |
| Returning Citizen's Magazine - November 2020 |
| Returning Citizen's Magazine - May 2022 |
| Returning Citizen's Magazine - May 2021 |
| Returning Citizen's Magazine - March 2021 |
| Returning Citizen's Magazine - June 2022 |
| Returning Citizen's Magazine - July 2021 |
| Returning Citizen's Magazine - January 2022 |
| Returning Citizen's Magazine - January 2021 |
| Returning Citizen's Magazine - February 2021 |
| Returning Citizen's Magazine - December 2021 |
| Returning Citizen's Magazine - December 2020 |

Returning Citizen's Magazine - August 2021

Returning Citizen's Magazine - April 2021

Recursos de carrera (Career Resources)

Presentation Skills

Preparación para el trabajo (Job Readiness)

Peace Education Program

Paquete de identificación (Identification Package)

My SWOT - How to use your Knowledge

MANdentity

Job Readiness

Identification Package

i-Pathways Test Preparation Course: Social Studies

i-Pathways Test Preparation Course: Science

i-Pathways Test Preparation Course: Math update

i-Pathways Test Preparation Course: Literacy

i-Pathways Test Preparation Course: Basic Writing

i-Pathways Test Preparation Course: Basic Math

Healthy Coping Skills

Health Education

Haciendo ejercicio (Exercising)

Habilidades de presentación (Presentation Skills)

Habilidades de afrontamiento saludables (Healthy Coping Skills)

Gestión del tiempo (Time Management)

Financial Literacy

Family and Community Reunification

Expectations and Outcomes

Exercising

| Entrepreneurship |
| --- |
| Emprendimiento (Entrepreneurship) |
| Educación Financiera (Financial Literacy) - update |
| Educación de Abuso de Sustancias (Substance Abuse Education) |
| Educación Básica (Basic Education) |
| Educación Basada en Habilidades (Skill Based Education) |
| Control de la ira (Anger Management) |
| Contemporary Technology Skills - v2 |
| Conflict Resolution |
| Career Resources |
| Cambio de comportamiento (Behavior Change) |
| Behavior Change |
| Basic Education |
| Anger Management |
| Reunificación familiar y comunitaria (Family and Community Reunification) |
| Mi SWOT - Cómo usar tus conocimientos (My SWOT - How to use your Knowledge) |
| La resolución de conflictos (Conflict Resolution) |
| Habilidades tecnológicas contemporáneas (Contemporary Technology Skills) |
| Expectativas y resultados (Expectations and Outcomes) |
| Educación para la salud (Health Education) |

68. Detainees also have access to classes that are taught in the units:

| Assertive Communication |
| --- |
| Building Social Networks |
| Cognitive Model |
| Getting Motivated to Change |
| Gratitude Journals |
| Ideas for Better Communication |

| Life Skills |
| --- |
| Strengths and Qualities |
| Strengths Exploration |
| Understanding and Reducing Angry Feelings |
| Unlock Your Thinking and Open Your Mind |
| Values Clarification |
| Partners in Parenting |
| Creative Writing |
| Daily Life |
| Seeking Safety |
| Core Skills |
| Resume Writing |
| Anger Management |
| Teamwork and Creative Problem Solving |

69.     For July 2022, CAFCC offered the following religious classes:

| Monday | Lunes |
| --- | --- |
| 7:30am-8:30am | USMS High Custody Catholic Service G-Unit Bilingual |
| 8:35am-9:35am | USMS Low Custody Catholic Service G & J-Units Bilingual |
| 12:45pm-2:15pm | USMS High Custody Relationship & Marriage Enrichment Class G-Unit |
| Tuesday | Martes |
| 7:30am-8:30am | USMS High Custody Christian Bible Study G-Unit Bilingual |
| 8:40am-10:20am | D-Unit Catholic High Custody Bilingual (1st & 3rd Tuesdays of month) |
| 8:40am-10:20am | D-Unit Christian Service/Study Low Custody Bilingual (2nd & 4th Tuesdays of month) |

17

| | |
|---|---|
| 1:15pm-2:25pm | USMS Low Custody Christian Service G-Unit & JA-JB Pods Bilingual |
| **Wednesday** | **Miercoles** |
| 7:00am-8:30am | USMS Low Custody Christian Bible Study G-Unit & JA-JB Pod Bilingual |
| 8:30am-10:15am | USMS Low Custody Relationship & Marriage Enrichment Class G-Unit |
| 1:15pm-2:40pm | USMS High Custody Christian Service G-Units Bilingual |
| **Thursday** | **Jueves** |
| 7:00am-11:30am | F-Unit Mesa Unit Relgious Pod Rounds |
| 7:00am-11:30am | USMS G & J-Unit Low Custody Native American Sweat Lodge Cermony(2nd Thursday of month) |
| 7:00am-11:30am | USMS G-Unit High Custody Native American Sweat Lodge Cermony(4th Thursday of month) |
| 7:00am-11:30am | USMS L-Unit Native American Sweat Lodge Cermony(5th Thursdays of Month) |
| 12:45pm-2:15pm | D-Unit Christian Service/Study High Custody Bilingual (1st & 3rd Tuesdays of month) |
| 12:45pm-2:15pm | D-Unit Christian Service/Study Low Custody Bilingual (2nd & 4th Tuesdays of month) |
| **Friday** | **Viernes** |
| 7:00am-8:30am | USMS G-Unit & JA-JB Low Custody Native American Culture/Religion Class(1st Friday of month) |
| 7:00am-8:30am | USMS G-Unit High Custody Native American Culture/Religion Class(3rd Friday of month) |

| 11:55am-1:00pm | USMS G-Unit & JA-JB Low Custody Muslim Jumah Prayer (1st & 3rd Friday of month if needed) |
|---|---|
| 11:55am-1:00pm | USMS G-Unit High Custody Muslim Jumah Prayer (2nd & 4th Friday of month if needed) |

70.    Arizona courts issued administrative orders continuing trials and cancelling most in-person appearances during the early stages of the pandemic. For example, on March 13, 2020, the District Court of Arizona continued all civil and criminal jury trials that were scheduled to begin before April 10, 2020.

71.    In addition to attorney-client visits, the VTC system is used for court appearances, including probation interviews, initial appearances, and other court hearings. At its highest point, CAFCC was facilitating approximately 650–700 such uses each week. Now that the federal courts are allowing in-person appearances again, CAFCC facilitates approximately 50 uses each week.

72.    Between April 2020 and July 2022, a total of 44,703 USMS detainees have cycled through CAFCC.

73.    In the same period, a total of 1,782 USMS detainees tested positive for COVID-19 (560 in 2020, 516 in 2021, and 706 in 2022). In other words, only 3.9% (1,782/44,703) of USMS detainees at CAFCC have tested positive for COVID-19 since the start of the pandemic and since testing became available.

74.    During that same time period, only 594 staff members have tested positive for COVID-19. CAFCC maintains approximately 569 people on staff at any given time, and has had 2,377 total staff members during that time period.

75.    Since the pandemic started, there have been two detainee deaths and five staff member deaths due to COVID-19.

76.    Between January 22, 2021, when CAFCC began offering the COVID-19 vaccine, and July 22, 2022, a total of 13,089 detainees have been offered a COVID-19 vaccine at CAFCC, including 9,967 USMS detainees.

77.     A total of 2,785 USMS detainees have received at least one dose of a COVID-19 vaccine at CAFCC, and 2,657 have been fully vaccinated at CAFCC (i.e., they have received either two doses of the Moderna vaccine or one dose of the Johnson & Johnson vaccine).

78.     As of July 22, 2022, 1,700 USMS detainees have received the Johnson & Johnson vaccine, 1,085 USMS detainees have received the first dose of the Moderna vaccine, 957 USMS detainees have received the second dose of the Moderna vaccine, and 256 USMS detainees have received a booster shot while incarcerated at CAFCC; 8,265 USMS detainees have exercised their right to refuse the vaccine.

79.     As of July 22, 2022, the total USMS population at CAFCC was 3,724. Of those, 10% were fully vaccinated. This number includes only detainees who became fully vaccinated at CAFCC, as there is no reliable way to confirm that new intake detainees who claim to be partially or fully vaccinated are so vaccinated, such that the percentage of USMS detainees at CAFCC who are fully vaccinated may be higher.

80.     As of February 16, 2022, approximately 61% of staff members had received the COVID-19 vaccine.

81.     On June 2, 2021, CAFCC was accredited by the National Commission on Correctional Health Care ("NCCHC") following a rigorous on-site survey conducted on March 29–31, 2021, recognizing CAFCC's dedication to compliance with the most respected standards in correctional health care.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1       I declare under penalty of perjury under the laws of the United States and the State

2  of Arizona that the foregoing is true and correct to the best of my knowledge.

3       EXECUTED this __4__ day of _August_ 2022, in Florence, Arizona.

WARDEN KRIS KLINE

21

# EXHIBIT 2

## CDC Guidance
## March 23 2020

Case 2:20-cv-00901-DJH-DMF    Document 192-2    Filed 08/05/22    Page 24 of 31


Centers for Disease
Control and Prevention

# Coronavirus Disease 2019 (COVID-19)

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Printer friendly version 🔴

PowerPoint Presentation: Managing COVID-19 in Correctional and Detention Facilities 🔴 [25 pages, 1 MB]

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of the date of posting, March 23, 2020.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated interim guidance.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

# Who is the intended audience for this guidance?

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

# Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for

control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.
- In most cases, incarcerated/detained persons are not permitted to leave the facility.
- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.
- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.
- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.
- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.
- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.
- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.
- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.
- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.
- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.

# What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

- Operational and communications preparations for COVID-19

- Enhanced cleaning/disinfecting and hygiene practices
- Social distancing strategies to increase space between individuals in the facility
- How to limit transmission from visitors
- Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages
- Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors
- Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited
- Healthcare evaluation for suspected cases, including testing for COVID-19
- Clinical care for confirmed and suspected cases
- Considerations for persons at higher risk of severe disease from COVID-19

# Definitions of Commonly Used Terms

**Close contact of a COVID-19 case** – In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting** – Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19** – Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case** – A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons** – For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation** – Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission.

Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine** – Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing** – Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication ■ .

**Staff** – In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms** – Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

# Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

Case 2:20-cv-00901-DJH-DMF   Document 192-2   Filed 08/05/22   Page 28 of 131

**COVID-19 Guidance for Correctional Facilities**

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness.** This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.
- **Prevention.**  This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).
- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

# Communication & Coordination

- **Develop information-sharing systems with partners.**
  - Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
  - Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.
  - Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
  - Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.
  - Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.
- **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**
  - Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details

regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.

- o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.
- o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

- **Coordinate with local law enforcement and court officials.**
  - o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.
  - o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.
- **Post signage throughout the facility communicating the following:**
  - o **For all:** symptoms of COVID-19 and hand hygiene instructions
  - o **For incarcerated/detained persons:** report symptoms to staff
  - o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.
  - o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

- **Review the sick leave policies of each employer that operates in the facility.**
  - o Review policies to ensure that they actively encourage staff to stay home when sick.
  - o If these policies do not encourage staff to stay home when sick, discuss with the contract company.
  - o Determine which officials will have the authority to send symptomatic staff home.

- **Identify staff whose duties would allow them to work from home.** Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.
  - o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.
  - o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

- **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.
  - o Allow staff to work from home when possible, within the scope of their duties.
  - o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.
  - o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
  - o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

- **Consider offering revised duties to staff who are at higher risk of severe illness with COVID-19.** Persons at higher

risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

- o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

- **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the Influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

- **Reference the** Occupational Safety and Health Administration website ⬈ **for recommendations regarding worker health.**

- **Review CDC's** guidance for businesses and employers **to identify any additional strategies the facility can use within its role as an employer.**

## Operations & Supplies

- **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**
  - o Standard medical supplies for daily clinic needs
  - o Tissues
  - o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.
  - o Hand drying supplies
  - o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
  - o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19 ⬈
  - o Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s. Visit CDC's website for a calculator to help determine rate of PPE usage.
  - o Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

- **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**
  - o See CDC guidance optimizing PPE supplies.

- **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

- **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)
  - o Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

- **If not already in place, employers operating within the facility should establish a** respiratory protection program **as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory**

protection they will need within the scope of their responsibilities.

- Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities. See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

# Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

# Operations

- Stay in communication with partners about your facility's current situation.
  - State, local, territorial, and/or tribal health departments
  - Other correctional facilities
- Communicate with the public about any changes to facility operations, including visitation programs.
- Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.
  - Strongly consider postponing non-urgent outside medical visits.
  - If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

- Implement lawful alternatives to in-person court appearances where permissible.
- Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.
- Limit the number of operational entrances and exits to the facility.

# Cleaning and Disinfecting Practices

- Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.
- Adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.
  - Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

- Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).
- Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 ☐ as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.
- Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

- Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.
- Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.

# Hygiene

- Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).
- Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis. Sample signage and other communications materials are available on the CDC website. Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.
  - Practice good cough etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.
  - Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.
  - Avoid touching your eyes, nose, or mouth without cleaning your hands first.
  - Avoid sharing eating utensils, dishes, and cups.
  - Avoid non-essential physical contact.

- Provide incarcerated/detained persons and staff no-cost access to:
  - Soap – Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.
  - Running water, and hand drying machines or disposable paper towels for hand washing
  - Tissues and no-touch trash receptacles for disposal
- Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions. Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.
- Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.

## Prevention Practices for Incarcerated/Detained Persons

- Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process, in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear

recommended PPE (see PPE section below).

- o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):
  - ▪ Require the individual to wear a face mask.
  - ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.
  - ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)
  - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.
- o **If an individual is a close contact of a known COVID-19 case** (but has no COVID-19 symptoms):
  - ▪ Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
  - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

- **Implement social distancing** strategies to increase the physical space between incarcerated/detained persons (Ideally 6 feet between all individuals, regardless of the presence of symptoms). Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:
  - o **Common areas:**
    - ▪ Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)
  - o **Recreation:**
    - ▪ Choose recreation spaces where individuals can spread out
    - ▪ Stagger time in recreation spaces
    - ▪ Restrict recreation space usage to a single housing unit per space (where feasible)
  - o **Meals:**
    - ▪ Stagger meals
    - ▪ Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
    - ▪ Provide meals inside housing units or cells
  - o **Group activities:**
    - ▪ Limit the size of group activities
    - ▪ Increase space between individuals during group activities
    - ▪ Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
    - ▪ Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out
  - o **Housing:**
    - ▪ If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
    - ▪ Arrange bunks so that individuals sleep head to foot to increase the distance between them
    - ▪ Rearrange scheduled movements to minimize mixing of individuals from different housing areas
  - o **Medical:**
    - ▪ If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible,

consider staggering sick call.
- Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

- Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.

- Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.

- Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.

- Provide up-to-date information about COVID-19 to incarcerated/detained persons on a regular basis, including:
  - Symptoms of COVID-19 and its health risks
  - Reminders to report COVID-19 symptoms to staff at the first sign of illness
- Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.

## Prevention Practices for Staff

- Remind staff to stay at home if they are sick. Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.
- Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry. See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
  - Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

- Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:
  - Symptoms of COVID-19 and its health risks
  - Employers' sick leave policy
  - If staff develop a fever, cough, or shortness of breath while at work: immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.
  - If staff test positive for COVID-19: inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.
  - If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community): self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.
- If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.
  - Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).
- When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.

- Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.

## Prevention Practices for Visitors

- If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.
- Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry. See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
  - Staff performing temperature checks should wear recommended PPE.
  - Exclude visitors and volunteers who do not clear the screening process or who decline screening.
- Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.
- Provide visitors and volunteers with information to prepare them for screening.
  - Instruct visitors to postpone their visit if they have symptoms of respiratory illness.
  - If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.
  - Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.
- Promote non-contact visits:
  - Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.
  - Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.
  - Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.
- Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.
  - If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)
  - Inform potential visitors of changes to, or suspension of, visitation programs.
  - Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).
  - If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health. If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

- Restrict non-essential vendors, volunteers, and tours from entering the facility.

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their

Case 2:20-cv-00901-DJH-DMF Document 192-2 Filed 08/05/22 Page 36 of 131

close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

# Operations

- Implement alternate work arrangements deemed feasible in the Operational Preparedness
- Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.
  - If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.
- If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case). Subsequently in this document, this practice is referred to as routine intake quarantine.
- When possible, arrange lawful alternatives to in-person court appearances.
- Incorporate screening for COVID-19 symptoms and a temperature check into release planning.
  - Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)
    - If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.
    - If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.
    - Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.
- Coordinate with state, local, tribal, and/or territorial health departments. ☑
  - When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.
  - When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.
  - Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

# Hygiene

- Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility. (See above.)
- Continue to emphasize practicing good hand hygiene and cough etiquette. (See above.)

# Cleaning and Disinfecting Practices

- Continue adhering to recommended cleaning and disinfection procedures for the facility at large. (See above.)
- Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).

# Medical Isolation of Confirmed or Suspected COVID-19 Cases

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.

- As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.
- Keep the individual's movement outside the medical isolation space to an absolute minimum.
  - Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.
  - Serve meals to cases inside the medical isolation space.
  - Exclude the individual from all group activities.
  - Assign the isolated individual a dedicated bathroom when possible.
- Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.
- Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options.
  - If cohorting is necessary:
    - Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.
    - Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
    - Ensure that cohorted cases wear face masks at all times.
  - In order of preference, individuals under medical isolation should be housed:
    - Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
    - Separately, in single cells with solid walls but without solid doors
    - As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.
    - As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.
    - As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
    - As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.
    - Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above

arrangements

(NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

- If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19. Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)
    - Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.
    - Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.
- Custody staff should be designated to monitor these individuals exclusively where possible. These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.
- Minimize transfer of COVID-19 cases between spaces within the healthcare unit.
- Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle. Instruct them to:
    - Cover their mouth and nose with a tissue when they cough or sneeze
    - Dispose of used tissues immediately in the lined trash receptacle
    - Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.
- Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.
    - For individuals who will be tested to determine if they are still contagious:
        - The individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND
        - The individual's other symptoms have improved (e.g., cough, shortness of breath) AND
        - The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart
    - For individuals who will NOT be tested to determine if they are still contagious:
        - The individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND
        - The individual's other symptoms have improved (e.g., cough, shortness of breath) AND
        - At least 7 days have passed since the first symptoms appeared
    - For individuals who had a confirmed positive COVID-19 test but never showed symptoms:
        - At least 7 days have passed since the date of the individual's first positive COVID-19 test AND
        - The individual has had no subsequent illness
- Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.
    - If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care

and medical isolation as part of release planning.

# Cleaning Spaces where COVID-19 Cases Spent Time

- Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note – these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.
  - Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
  - Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).
- Hard (non-porous) surface cleaning and disinfection
  - If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.
  - For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.
    - Consult a list of products that are EPA-approved for use against the virus that causes COVID-19 ☐ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).
    - Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:
      - 5 tablespoons (1/3rd cup) bleach per gallon of water or
      - 4 teaspoons bleach per quart of water
- Soft (porous) surface cleaning and disinfection
  - For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:
    - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.
    - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 ☐ and are suitable for porous surfaces.
- Electronics cleaning and disinfection
  - For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.
    - Follow the manufacturer's instructions for all cleaning and disinfection products.
    - Consider use of wipeable covers for electronics.
    - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

- Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE. (See PPE section below.)
- Food service items. Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water

or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

- **Laundry from a COVID-19 cases** can be washed with other individuals' laundry.
  - Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.
- Consult cleaning recommendations above to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.

## Quarantining Close Contacts of COVID-19 Cases

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.

- Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).
  - If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.
- In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:
  - Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR
  - Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

- Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.
  - Provide medical evaluation and care inside or near the quarantine space when possible.
  - Serve meals inside the quarantine space.
  - Exclude the quarantined individual from all group activities.
  - Assign the quarantined individual a dedicated bathroom when possible.
- Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually. Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.
  - If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation
  - If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.
  - Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid

Case 2:20-cv-00901-DJH-DMF Document 192-2 Filed 08/05/22 Page 41 of 131

mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

- ○ If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.
- If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)
- In order of preference, multiple quarantined individuals should be housed:
  - ○ Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
  - ○ Separately, in single cells with solid walls but without solid doors
  - ○ As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
  - ○ As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
  - ○ As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
  - ○ As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
  - ○ As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.
  - ○ Safely transfer to another facility with capacity to quarantine in one of the above arrangements (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)
- Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances (see PPE section and Table 1):
  - ○ If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).
  - ○ If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.
  - ○ All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.
  - ○ Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.
- Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties (see PPE section and Table 1).
  - ○ Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.
- Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.
  - ○ If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)
  - ○ See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of

COVID-19 cases.

- If an individual who is part of a quarantined cohort becomes symptomatic:
  - If the individual is tested for COVID-19 and tests positive: the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
  - If the individual is tested for COVID-19 and tests negative: the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.
  - If the individual is not tested for COVID-19: the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
- Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.
- Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.
- Meals should be provided to quarantined individuals in their quarantine spaces. Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.
- Laundry from quarantined individuals can be washed with other individuals' laundry.
  - Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.
  - Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
  - Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.

- If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.
- Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.
- Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated. Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.
- If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.
  - If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

Case 2:20-cv-00901-DJH-DMF   Document 192-2   Filed 08/05/22   Page 43 of 131

○ If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

# Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

- Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.
  - ○ Consider having healthcare staff perform regular rounds to answer questions about COVID-19.
  - ○ Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.
- Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms. See Screening section for a procedure to safely perform a temperature check.
- Consider additional options to intensify social distancing within the facility.

# Management Strategies for Staff

- Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.
  - ○ Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.
- Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.
  - ○ See above for definition of a close contact.
  - ○ Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

# Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

- All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.
  - ○ Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.
  - ○ Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).
- Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection. Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).
- Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19

cases, contacts, and potentially contaminated items.

# Clinical Care of COVID-19 Cases

- Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.
  - If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.
  - The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.
- Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.
- Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.
- Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).
- The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.
- When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.

# Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

- Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.
  - Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.
  - For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.
- Ensure that all staff are trained to perform hand hygiene after removing PPE.
- If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (see Table 1). Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.
- Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.
- Recommended PPE for incarcerated/detained individuals and staff in a correctional facility will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. As above, note that PPE shortages are anticipated in every category during the COVID-19 response.

- ○ N95 respirator
  See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.
- ○ **Face mask**
- ○ **Eye protection** – goggles or disposable face shield that fully covers the front and sides of the face
- ○ **A single pair of disposable patient examination gloves**
  Gloves should be changed if they become torn or heavily contaminated.
- ○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.
- Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:
  - ○ Guidance in the event of a shortage of N95 respirators
    - Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
  - ○ Guidance in the event of a shortage of face masks
  - ○ Guidance in the event of a shortage of eye protection
  - ○ Guidance in the event of a shortage of gowns/coveralls

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | | X | | | |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | | | | X | X |

Classification of Individual Wearing PPE

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | | X | X | X | X |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | X** | | X | X | X |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | X | | X | X | X |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | | | | X | X |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

- Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:
  - *Today or in the past 24 hours, have you had any of the following symptoms?*

- *Fever, felt feverish, or had chills?*
- *Cough?*
- *Difficulty breathing?*
  - *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*
- **The following is a protocol to safely check an individual's temperature:**
  - Perform hand hygiene
  - Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
  - Check individual's temperature
  - **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check. If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be** cleaned routinely as recommended by CDC for infection control.
  - Remove and discard PPE
  - Perform hand hygiene

Page last reviewed: April 18, 2020

# EXHIBIT 3

## Declaration of C. Rose

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Jacob B. Lee, Bar No. 030371
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com

*Attorneys for Defendant Kris Kline*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Claudia Romero-Lorenzo, et al., | NO. CV-20-00901-PHX-DJH (DMF) |
| Plaintiffs, | |
| v. | **DECLARATION OF C. ROSE** |
| Brian Koehn, et al., | |
| Defendants. | |

I, C. Rose, state the following based upon my personal knowledge:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I make this Declaration in support of Defendant Kline's Motion for Summary Judgment. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could competently testify to them.

2.     I am a Registered Nurse with a Bachelor of Science in Nursing. I am currently a Clinical Supervisor at CoreCivic's Central Arizona Florence Correctional Complex ("CAFCC"), located in Florence, Arizona. I have worked with CoreCivic for over 15 years. I have held the position of Clinical Supervisor since August 2020.

3.     CoreCivic owns and operates CAFCC, and houses a population of United States Marshals Service ("USMS") detainees at CAFCC pursuant to a correctional services agreement with the USMS.

1

4.     As a Clinical Supervisor at CAFCC, I have oversight over different parts of the medical department, including the infectious disease department. I oversee the Communicable and Infectious Disease ("CID") Nurses, Certified Medical Assistants, Certified Nursing Assistants, staffing, vaccinations, and scheduling.

5.     I am familiar with the guidelines provided by the Centers for Disease Control ("CDC") for containment of the Coronavirus Disease 2019 ("COVID-19"), including intake screening, quarantine, isolation, cohorting, personal protection equipment, testing, treatment, and vaccinations.

6.     As a Clinical Supervisor, I was part of the team involved in onboarding the COVID-19 vaccine through the State of Arizona, including obtaining the necessary approvals and training. I also assist with ordering the vaccines and ensuring that administration of the vaccine is properly documented in the Arizona State Immunization Information System ("ASIIS").

7.     I participate in weekly meetings via Google Meet with the head epidemiologist for the Pinal County Public Health Services District and other vaccine providers in the community, and I provide weekly reporting to the County.

8.     The County has reviewed and approved CAFCC's quarantine, isolation, testing, and vaccination plans.

9.     I am familiar with CDC guidelines regarding COVID-19 and am aware that the CDC issued revisions to its guidelines on July 14, 2020, February 19, 2021, May 6, 2021, June 9, 2021, February 10, 2022, and May 3, 2022.

10.    I currently supervise the infectious disease nursing staff that administer the vaccines for COVID-19 to both staff and detainees and have personally administered vaccinations for COVID-19 to both staff and detainees.

11.    I have also supervised and administered testing for COVID-19 at CAFCC across the entire detainee and inmate population.

12.    Early in the pandemic, new intakes at CAFCC were placed in a cohort with other detainees who arrived at CAFCC on the same day. Prior to February 10, 2022, the

2

1  cohort period would last for 14 days. After the CDC issued its February 10, 2022 update

2  to its COVID-19 guidance, the cohort period was shortened to 10 days. Effective June 1,

3  2022, CAFCC is no longer required to cohort USMS detainees for any period of time.

4      13.    Early in the pandemic, every new intake was offered a COVID-19 PCR test

5  during the intake process, although they had the right to refuse. Effective July 19, 2022,

6  all new intakes are swabbed with a rapid swab during the intake process. This includes

7  detainees that arrive throughout the weekend.

8      14.    New intakes also receive a medical screening that incudes a full set of vitals,

9  including temperature and O2 saturation, and questions regarding any chronic health

10  conditions the detainee may have.

11      15.    While CAFCC was cohorting new intakes, detainees in an intake cohort

12  received additional testing and screening during the cohort period only if they showed or

13  reported symptoms of COVID-19. In that event, CAFCC removed the detainee showing

14  or reporting symptoms from the pod and into medical isolation and converted the cohort

15  to a quarantine pod.

16      16.    At the completion of the cohort period, staff gave the detainees a final

17  temperature and symptom screening. If none of the detainees displayed a temperature of

18  100.4 or above or any other symptoms of COVID-19, the cohort was cleared for housing

19  in general population.

20      17.    Unit Managers, Case Managers, Correctional Counselors, and Detention

21  Officers all receive training on how to conduct temperature and symptom screening and

22  were typically the staff members who conducted the screenings at the end of the cohort

23  period.

24      18.    Unit staff tracked cohorts using dedicated spreadsheets. Medical staff track

25  medical isolation detainees and quarantine pods using dedicated spreadsheets.

26      19.    A detainee who is suspected of having COVID-19 due to symptoms or who

27  has tested positive for COVID-19 is housed in medical isolation for 10 days after their

28  symptoms start.

3

20.    When a detainee shows or reports symptoms of COVID-19 (or tests positive for COVID-19 after being tested for some reason other than showing or reporting symptoms), they are immediately moved to medical isolation for testing and monitoring (without returning to their housing unit, if the symptoms were reported or observed in a medical unit), and their pod is placed on quarantine status as a result of the known exposure. The quarantine period was originally 14 days. In February 2022, the period decreased to 10 days. Effective June 17, 2022, the quarantine period is eight days.

21.    CAFCC also checks the detainee's housing history. If the detainee has moved within the last two days, their prior unit is placed on quarantine as well.

22.    The detainee who first showed or reported symptoms or tested positive is considered the index case. Medical staff offer close contacts of the index case a COVID-19 test as well. The detainee's cellmates are considered close contacts.[1]

23.    If the index case test comes back positive, the detainee remains in isolation for the required isolation period. During that time, they may be housed with another detainee who has tested positive for COVID-19. The index case's original pod remains on quarantine.

24.    If the test comes back negative, the detainee may be removed from isolation and returned to general population unless they are still showing symptoms, in which case they will be retested to confirm the result. The index case's original pod remains on quarantine until the index case and any pending close contact tests are resolved.

25.    There is no requirement that a detainee who is showing symptoms but tests negative for COVID-19 remain in medical isolation for any certain period of time. There is similarly no requirement that a pod in which all tests have come back negative remain on quarantine for any certain period of time.

26.    If any close contact tests come back positive, those individuals are moved to medical isolation and the quarantine period restarts for the rest of the pod. If all close

---

[1] Cells at CAFCC are generally either two-man cells or "group" or "gang" cells that can hold up to 14 detainees. As such, there may be 1–13 close contacts.

4

1    contact tests come back negative, the pod is released from quarantine status.

2           27.     Detainees in quarantine are permitted to use the dayroom together, but they

3    generally do not leave their pod during the quarantine period. Necessary exceptions are

4    determined on a case-by-case basis and precautions are taken to minimize exposure of

5    other detainees, including wearing a mask while outside the pod. Effective June 1, 2022,

6    detainees in quarantine are permitted to go to court if they are tested that morning and the

7    test result is negative.

8           28.     During quarantine, unit staff conducts daily symptom screenings, including

9    temperature checks, of all detainees in the pod (except for those detainees, if any, who

10   refuse the screenings). Medical staff reviews the results to ensure any detainees who

11   might require additional follow-up receive it.

12          29.     Medical staff provide COVID-19 testing to detainees in quarantine upon

13   request and upon report or observation of symptoms of COVID-19.

14          30.     Unit staff instruct detainees in quarantine to sleep head to toe to increase the

15   distance between their airways. Staff also instruct detainees in quarantine to socially

16   distance and wear masks and increase sanitation within the pod.

17          31.     USMS detainees who participate in the facility's Voluntary Work Program

18   ("VWP") are permitted to work within their own pods, but detainees who work in a

19   position outside the pod—e.g., the kitchen—are not permitted to leave their pod and

20   therefore cannot work until the quarantine is lifted.

21          32.     A "known exposure" consists of a total of at least 15 minutes of close

22   contact with a COVID-19-positive individual without a mask on.

23          33.     Until early May 2022, all staff members were required to wear masks inside

24   the facility except in limited circumstances. From early May 2022 to the end of June

25   2022, masking was optional consistent with May 3, 2022 revisions to CDC Guidance.

26   Since June 30, 2022, masking is again mandatory.

27          34.     USMS detainees who are being transferred to another facility or going to

28   court are given a BinaxNOW rapid test for COVID-19 pursuant to USMS testing

1    requirements.

2    35.    CAFCC does not isolate detainees who have been tested solely in

3    preparation for a transfer or court appearance while their test results are pending.

4    36.    If the test is positive, however, the detainee is placed in medical isolation

5    and the pod the detainee came from is placed on quarantine status. If the detainee refuses

6    the test, CAFCC informs the receiving agency or court and they decide whether to

7    proceed with the transfer or court appearance.

8    37.    CAFCC will comply with requests to sequester a particular detainee before

9    a transfer or court appearance but does not sequester detainees who are pending transfer or

10   a court appearance as a matter of course.

11   38.    CAFCC generally houses detainees who require medical isolation due to a

12   positive COVID-19 test in one of three pods in Lima Unit—Alpha , Bravo, and Charlie.

13   These pods consist of two-man cells with solid walls and doors.

14   39.    Detainees who require closer monitoring because of low O2 saturation (i.e.,

15   below 95%) or other medical conditions that put them at higher risk from COVID-19

16   (e.g., asthma, diabetes, hypertension, etc.) may be housed in an observation cell in one of

17   CAFCC's medical units.

18   40.    Detainees in medical isolation—whether in Lima Unit or a medical unit—

19   are allowed only limited out-of-cell time to shower and use the telephone to minimize

20   exposure to other detainees. They are not permitted dayroom time with other detainees in

21   the pod.

22   41.    Detainees in medical isolation in a medical unit receive symptom screening

23   at least once per shift (i.e., once every eight hours) and as often as every four hours if

24   ordered by the physician or nurse practitioner. Detainees in medical isolation in Lima Unit

25   receive symptom screening, including their temperature and O2 saturation, once a day

26   also see medical staff at least twice a day during pill pass. Detainees are instructed to

27   report any symptoms they are experiencing to the pill pass nurses or to unit staff.

28   42.    Nursing staff conducts symptom screenings for detainees in medical

6

1    isolation whether they are in a medical unit or Lima Unit.

2         43.    Although detainees generally are not required to wear masks within their

3    own pod, detainees in medical isolation are required to wear a mask any time they are out

4    of their cell. While mandatory masking is in place, all detainees are required to wear a

5    mask any time they are out of their pod.

6         44.    In the early days of the pandemic, CAFCC medical staff kept a list of

7    detainees with medical conditions that placed them at higher risk from COVID-19 by

8    running a report from the electronic health record ("EHR") of all detainees with the

9    conditions identified by CDC Guidance.

10        45.    Medical staff would distribute the list to unit managers so they would be

11   able to house higher-risk detainees in cells by themselves as much as possible when their

12   pod went on quarantine status to reduce their exposure.

13        46.    Due to detainee turnover, keeping the list up-to-date became burdensome to

14   the point of requiring a person dedicated full-time (or nearly so) to keeping track of

15   detainees who were new or had been transferred or released.

16        47.    This is not to say, however, that CAFCC is not aware of detainees with

17   medical conditions that put them at higher risk from COVID-19. Individual medical files

18   still contain information about each detainee's medical conditions such that providers are

19   aware of the detainee's risk factors while they are treating them. Moreover, medical staff

20   are still able to run a report of detainees with one or more risk factors from the EHR

21   should the need arise for that information.

22        48.    CAFCC has developed and implemented a vaccine plan based on CDC

23   Guidance and directives from CoreCivic's Facility Support Center ("FSC") (i.e., corporate

24   headquarters).

25        49.    Even with the availability of COVID-19 vaccines, however, CAFCC

26   continues to enforce protocols related to social distancing, mask use, and sanitation.

27        50.    CAFCC previously offered both the Moderna and Johnson & Johnson

28   vaccines. Detainees requesting a COVID-19 vaccine were given education regarding both

1   available vaccines so they could choose which one to receive.

2       51.    The Pinal County Public Health Services District determines which vaccines 3   will be made available for use by CAFCC. The County is currently providing CAFCC 4   with only the Moderna vaccine; CAFCC no longer utilizes the Johnson & Johnson 5   vaccine.

6       52.    I am part of a committee that includes the Chief of Unit Management and 7   the Unit Managers and ensures that up-to-date information regarding the COVID-19 8   vaccine is available to detainees through town hall meetings, fact sheets, and posters in the 9   housing units. I was also involved in drafting the various iterations of the "Here's the 10   Scoop" posters regarding vaccines and boosters. True and correct copies of vaccine-11   related posters that are placed throughout the facility, including the medical and housing 12   units, including the "Here's the Scoop" poster, are attached as Attachment A 13   (CORECIVIC-MLG003401-02; CORECIVIC-MLG003508-09).

14       53.    COVID-19 vaccine information has been placed on the home screen of the 15   detainees' tablets. Specifically, the tablet shows a copy of the "Here's the Scoop" flyer 16   and provides current information on how to request a COVID-19 vaccine, including 17   boosters; who is eligible for boosters; and the amount of time that must pass between 18   vaccination and administration of a booster. Detainees cannot access the tablet's content 19   until they have acknowledged having read the vaccination information.

20       54.    During committee meetings, Unit Managers receive education about the 21   vaccines so that they can answer detainee questions and instruct detainees on how to 22   submit a medical request for the vaccine.

23       55.    Specifically, unit staff receive "talking points" that provide basic 24   information about the vaccines that are available such as the number and timing of doses, 25   the consent/refusal process, how to request a vaccine after an initial refusal, how to 26   request a booster, contraindications and side effects for the vaccines, how to get answers 27   to specific questions about the vaccines, and more. A true and correct copy of the Talking 28   Points memorandum is attached as Attachment B (CORECIVIC-MLG003510).

8

56.     Medical staff and unit teams provide copies of the vaccine manufacturer fact sheets to detainees during town hall meetings in the housing units. Fact sheets are available in English and Spanish. Every detainee receives a fact sheet whether they plan to get the vaccine or not so they can make an informed decision. True and correct copies of fact sheets for the Johnson & Johnson (no longer in use) and Moderna vaccines (in English) are attached as Attachment C (CORECIVIC-MLG003511-18; CORECIVIC-MLG003403-07).

57.     Staff also bring a pod roster and consent and refusal forms to each town hall meeting and ensure that every detainee signs either a consent or refusal form. True and correct copies of the consent and refusal forms are attached as Attachment D (CORECIVIC-MLG000766-67). The signed forms are scanned into the detainees' medical files. If a detainee refuses to sign either form, a staff member signs a refusal form as a witness.

58.     CAFCC's medical director issued standing orders for both the Moderna and the Johnson & Johnson vaccines that specify the dosage and timing for each vaccine. When a detainee requests either vaccine, nursing staff enter the order in the EHR pursuant to the applicable standing order.

59.     CAFCC staff members may receive the COVID-19 vaccine on-site from medical staff. CAFCC's Human Resources ("HR") department maintains records regarding staff members who choose to do so, such as screening and consent forms.

60.     Consistent with the recommendation of the Pinal County Public Health Services District, and because of the relatively short time most USMS detainees spend at the facility, CAFCC offered the Johnson & Johnson vaccine to detainees who had not been vaccinated at all, as it required only one dose to be considered fully vaccinated.

61.     While the Johnson & Johnson vaccine was in use, CAFCC offered the Moderna vaccine primarily for booster shots. If a detainee requested the Moderna vaccine as their initial dose, however, CAFCC would accommodate their request. Currently, CAFCC only offers the Moderna vaccine for both initial courses and boosters.

9

62.     Once a vial of the Moderna vaccine has been opened, it must be used within 12 hours or else it will expire. To avoid waste, CAFCC schedules detainees who have requested the Moderna vaccine to receive it at the same time, which sometimes requires a detainee to wait a few days to receive it.

63.     To request a COVID-19 vaccine, a detainee submits a medical request, which is routed to the CID nurses for scheduling.

64.     Detainees who refuse the vaccine and subsequently change their mind may simply submit a medical request for the vaccine and they will be placed on the request list. Once the detainee is on the list, CAFCC medical staff will work through the list to vaccinate those detainees throughout the facility as resources are available and as time permits. CAFCC's priority is to ensure all are offered the vaccine, and that no detainee who wants to receive the vaccine is missed.

65.     CAFCC provides individual counseling for all detainees through the sick call process. Any detainee can submit a sick call form requesting to be seen for evaluation and discussion regarding the COVID-19 vaccine at any time.

66.     If a detainee requests the Moderna vaccine as the first course, medical staff put an order in the detainee's file for the second dose pursuant to the standing order. Medical staff regularly runs reports of all detainees with upcoming doses scheduled, along with their current housing assignments, to assist in planning vaccine clinics. Medical staff report all vaccination data to ASIIS.

67.     A "vaccine clinic" is held when enough detainees have requested a particular vaccine that CAFCC is able to administer the entire vial without wasting any doses.

68.     CAFCC does not place a "medical hold" on the detainee that would prevent them from being transferred or released prior to completion of the two-dose series. Rather, if the detainee is transferred or released before receiving the second dose, medical staff provide the detainee with information as to where and when they can get the second dose in the community.

10

69.     CAFCC's medical director has also issued a standing order for booster shots of the COVID-19 vaccines. Pursuant to that standing order, nursing staff puts an order in the file for each detainee who requests a booster. Nursing staff can then run a report of all detainees with pending requests for boosters when planning vaccine clinics.

70.     To request a COVID-19 booster, a detainee submits a medical request, which is routed to the CID nurses for scheduling.

71.     Detainees who received a dose of a COVID-19 vaccine approved for use in the United States prior to their arrival at CAFCC are eligible for a second dose or booster of the Moderna vaccine at CAFCC consistent with CDC guidelines allowing individuals to receive doses of different vaccines.

72.     If a detainee who received a dose of a COVID-19 vaccine approved for use in another country prior to their arrival at CAFCC requests a dose of the Moderna vaccine, medical staff will schedule an appointment for the detainee and seek guidance from the health department in preparation for the appointment.

73.     During intake, medical staff ask detainees whether they have received one or more doses of a COVID-19 vaccine prior to their arrival at CAFCC.

74.     If they report they have, CID staff attempt to verify that information through ASIIS. If the detainee received the dose in another state, CID staff will attempt to get records from their prior facility or clinic offices to verify the information.

75.     Either way, staff enter the information into the detainee's chart in the EHR, but there is no way to run a report for that particular information from the EHR.

76.     Nevertheless, when medical staff are preparing for a town hall meeting in a particular pod, they are able to (and do) review the chart of each detainee in that pod so they know who has already received one or more doses of a vaccine and who has not.

77.     If a detainee reports at intake that they do not know whether they received one or more doses of a COVID-19 vaccine, or which type they received or when, CID staff will attempt to determine through ASIIS whether the detainee has received a vaccine, and if so, when and what type.

11

78.     If a detainee reports at intake that they have received a single dose of either the Pfizer or Moderna vaccine and wants a second dose, staff will administer a second dose of the Moderna vaccine as close to 28 days after administration of the first dose as possible.

79.     All detainees who receive a dose of a COVID-19 vaccine, regardless of the manufacturer or number of the dose (i.e., first, second, or booster), also receive a CDC vaccine card that states the type of vaccine they received and the date they received it and that they can keep in their cell.

80.     The entire health services team at CAFCC is dedicated to improving vaccination rates.

81.     CAFCC began running an incentive program in December 2021 in which detainees who receive the vaccine at CAFCC are given a bag of goodies from the commissary.

82.     Throughout the pandemic, CAFCC medical staff has provided daily updates to USMS regarding positive COVID-19 tests, pending tests, detainees in quarantine, and deaths due to COVID-19.

83.     To date, there have only been two detainee deaths due to COVID-19.

84.     CAFCC medical staff also provides statistics regarding administration of the COVID-19 vaccines to USMS upon request, including the number of detainees who have been offered a vaccine, the number of detainees who have received each vaccine at CAFCC, the number of detainees who have received first and second doses of the Moderna vaccine, and the number of detainees who have refused a vaccine.

I declare under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct.

Executed in Florence, Arizona, on July 27, 2022.

C. Rose
C. Rose

12

# ATTACHMENT A

# TO DECLARATION OF C. ROSE



# COVID-19 VACCINE FACTS

- Safe and up to **95% effective**
- May require **two doses**
- Will not give you COVID-19 or cause you to test positive
- May prevent you from becoming seriously ill
- Helps protect those around you from getting sick

- May cause **side-effects** similar to the flu shot:
  - » Pain at the injection site
  - » Fever
  - » Fatigue
  - » Muscle Aches
  - » Chills



- Side effects are normal and are a good sign that you're building immunity
- May benefit those who have already recovered from COVID-19
- Vaccine supplies will increase over the coming weeks
- Follow facility guidelines for preventative measures such as masking and social distancing

Questions? Connect with the **Health Services Department** today for the latest information.

Revised June 2021

**CORECIVIC-MLG003401**



# INFORMACIÓN ACERCA DE LA VACUNA CONTRA EL COVID-19

- Es segura y hasta un **95% eficaz**
- Es posible que requiera **dos dosis**
- No le transmite el COVID-19 o causa que dé positiva la prueba
- Puede impedir que se enferme de gravedad
- Ayuda a proteger de la enfermedad a las personas que le rodean

- Puede causar efectos secundarios similares a los de la vacuna contra la gripe:
  - » Dolor en el área de la inyección
  - » Fiebre
  - » Fatiga
  - » Dolores musculares
  - » Escalofríos



- Los efectos secundarios son normales y son una buena señal de que está creando inmunidad

- Puede beneficiar a las personas que ya se han recuperado del COVID-19

- En las próximas semanas habrá más suministros de vacunas

- Siga las pautas de la instalación para las medidas preventivas, como el enmascaramiento y el distanciamiento social

¿Preguntas? Comuníquese con el **Departamento de Servicios de Salud** para obtener información más actualizada.

Revised June 2021

CORECIVIC-MLG003402

# HERE IS THE SCOOP ON COVID 19 VACCINES & BOOSTERS.....................!!!!!

If you have changed, your mind and now are requesting the COVID 19 vaccine you can do the following:

- Submit a medical health request and place the form in the medical box in your housing unit.  Include your name, number, and housing location.

Request Boosters:  You can request as above.  Please include the name of the COVID 19 vaccine & the date you last received your vaccine.

- Boosters will be given by priority of those considered "high risk" per CDC and then by a first come first serve basis from when medical receives your health request.
- Moderna vaccines must wait 5 months from your last dose
- J&J vaccines must wait 2 months from last dose before you are eligible for the booster

If you have received a dose of a vaccine OTHER than Moderna or J&J, and would like a second dose or a booster, please submit a request & you will be referred to medical.

## COVID 19 vaccines will be given during clinic days and hours (these are subject to change).



2/3/2022

CORECIVIC-MLG003508

# AQUÍ ESTÁ LA VISTA DE LAS VACUNAS Y REFUERZOS COVID 19 ………………………!!!!!

**Si ha cambiado de opinión y ahora solicita la vacuna COVID 19, puede hacer lo siguiente:**

- Envíe una solicitud de salud médica y coloque el formulario en la caja médica de su unidad de vivienda. Incluya su nombre, número y ubicación de la vivienda.

Solicitar potenciadores: puede solicitar lo anterior. Incluya el nombre de la vacuna COVID 19 y la fecha en que recibió la vacuna por última vez.

- Los refuerzos se darán por prioridad de aquellos considerados de "alto riesgo" por los CDC y luego por orden de llegada desde el momento en que el médico reciba su solicitud de salud.

- Vacunas Moderna debes esperar 5 meses desde tu última dosis

- Vacunas J&J, debe esperar 2 meses desde la última dosis antes de ser elegible para el refuerzo.

Si recibió una dosis de una vacuna que NO sea Moderna o J&J, y desea una segunda dosis o un refuerzo, envíe una solicitud y lo derivarán a un médico.

**Las vacunas COVID 19 se administrarán durante los días y horas de la clínica (están sujetas a cambios).**



2/3/2022

CORECIVIC-MLG003509

# ATTACHMENT B

## TO DECLARATION OF C. ROSE

Talking points - updated 2/2022

*(A Spanish speaking staff member will have to be a available for translation.  Pause after every point in order for time for translation.)*

We onboarded with the State and County last year, these are still federal vaccines allocated to our facility, not a CoreCivic vaccine.

We are giving all detainees the opportunity to get the vaccine and the booster

The vaccine has not been mandated, it is a personal choice.

J&J is a one time dose –for those that will be transferred, you will be considered vaccinated once transferring to the next facility; this is a large amount of our population.

Moderna is 2 doses, the second dose is 28 days after the first dose.

The Moderna booster is 2 months after the J&J or 5 months after the Moderna series

You will all receive 3 forms, a consent/refusal, a screening form, and a fact sheet, even if you refuse

The consent/refusal and screening form will need to be turned in to your unit team so that the vaccine team will know how many vials to pull the day of the vaccine

If you first refused and then change your mind, you will be added to a vaccine list and we will backfill clinics with those that are on that list

If you are requesting a booster and :

- received a vaccine prior to arriving here (CAFCC) please submit a medical request, medical will verify your information and let you know if you are eligible
- received a vaccine in another country, please submit a medical request and medical will review your status.

Contraindications are on the fact sheet

Side effects are on the fact sheet

We will utilize a general area to vaccinate, you will get vaccinated after we review your forms, and you will be observed for 15-30 minutes

We do have to place on your transfer summary, when you leave, that is for your reference.  This does not have anything to do with legal, or your case.

You will receive the CDC Vaccine card as proof of vaccination

Questions for detainees/staff

If you have a specific medical question, you may place a medical request and you will be seen by a facility provider.

[Type here]                                                                                                                2/2022

CORECIVIC-MLG003510

# **ATTACHMENT C**

# **TO DECLARATION OF C. ROSE**

**FACT SHEET FOR RECIPIENTS AND CAREGIVERS**

**EMERGENCY USE AUTHORIZATION (EUA) OF**
**THE JANSSEN COVID-19 VACCINE TO PREVENT CORONAVIRUS DISEASE 2019**
**(COVID-19) IN INDIVIDUALS 18 YEARS OF AGE AND OLDER**

You are being offered the Janssen COVID-19 Vaccine to prevent Coronavirus Disease 2019 (COVID-19) caused by SARS-CoV-2. This Fact Sheet contains information to help you understand the risks and benefits of receiving the Janssen COVID-19 Vaccine, which you may receive because there is currently a pandemic of COVID-19.

The Janssen COVID-19 Vaccine may prevent you from getting COVID-19.

Read this Fact Sheet for information about the Janssen COVID-19 Vaccine. Talk to the vaccination provider if you have questions. It is your choice to receive the Janssen COVID-19 Vaccine.

The Janssen COVID-19 Vaccine has received EUA from FDA to provide:

- A single dose primary vaccination to individuals 18 years of age and older.

- A single booster dose to individuals 18 years of age and older who have completed a primary vaccination with the Janssen COVID-19 Vaccine.

- A single booster dose to individuals 18 years of age and older who have completed primary vaccination with a different authorized or approved COVID-19 vaccine.

The Janssen COVID-19 Vaccine may not protect everyone.

This Fact Sheet may have been updated. For the most recent Fact Sheet, please visit www.janssencovid19vaccine.com.

**WHAT YOU NEED TO KNOW BEFORE YOU GET THIS VACCINE**

**WHAT IS COVID-19?**

COVID-19 is caused by a coronavirus called SARS-CoV-2. This type of coronavirus has not been seen before. You can get COVID-19 through contact with another person who has the virus. It is predominantly a respiratory illness that can affect other organs. People with COVID-19 have had a wide range of symptoms reported, ranging from mild symptoms to severe illness. Symptoms may appear 2 to 14 days after exposure to the virus. Common symptoms may include: fever or chills; cough; shortness of breath; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; diarrhea.

**WHAT IS THE JANSSEN COVID-19 VACCINE?**

The Janssen COVID-19 Vaccine is an unapproved vaccine that may prevent COVID-19.

1

CORECIVIC-MLG003511

The FDA has authorized the emergency use of the Janssen COVID-19 Vaccine to prevent COVID-19 in individuals 18 years of age and older under an Emergency Use Authorization (EUA).

For more information on EUA, see the "**What is an Emergency Use Authorization (EUA)?**" section at the end of this Fact Sheet.

**WHAT SHOULD YOU MENTION TO YOUR VACCINATION PROVIDER BEFORE YOU GET THE JANSSEN COVID-19 VACCINE?**

Tell the vaccination provider about all of your medical conditions, including if you:

- have any allergies,

- have a fever,

- have a bleeding disorder or are on a blood thinner,

- have ever had a low level of platelets (blood cells that help your body stop bleeding),

- are immunocompromised or are on a medicine that affects your immune system,

- are pregnant or plan to become pregnant,

- are breastfeeding,

- have received another COVID-19 vaccine,

- have ever fainted in association with an injection.

**WHO SHOULD GET THE JANSSEN COVID-19 VACCINE?**

FDA has authorized the emergency use of the Janssen COVID-19 Vaccine in individuals 18 years of age and older.

**WHO SHOULD NOT GET THE JANSSEN COVID-19 VACCINE?**

You should not get the Janssen COVID-19 Vaccine if you:

- had a severe allergic reaction after a previous dose of this vaccine.

- had a severe allergic reaction to any ingredient of this vaccine.

- had a blood clot along with a low level of platelets (blood cells that help your body stop bleeding) following Janssen COVID-19 Vaccine or following AstraZeneca's COVID-19 vaccine (not authorized or approved in the United States).

**WHAT ARE THE INGREDIENTS IN THE JANSSEN COVID-19 VACCINE?**

The Janssen COVID-19 Vaccine includes the following ingredients: recombinant, replication-incompetent adenovirus type 26 expressing the SARS-CoV-2 spike protein, citric acid

2

CORECIVIC-MLG003512

monohydrate, trisodium citrate dihydrate, ethanol, 2-hydroxypropyl-β-cyclodextrin (HBCD), polysorbate-80, sodium chloride.

**HOW IS THE JANSSEN COVID -19 VACCINE GIVEN?**

The Janssen COVID-19 Vaccine will be given to you as an injection into the muscle.

<u>Primary Vaccination</u>

The Janssen COVID-19 Vaccine is administered as a **single dose**.

<u>Booster Dose</u>

- A single booster dose of the Janssen COVID-19 Vaccine may be administered at least two months after primary vaccination with the Janssen COVID-19 Vaccine.

- A single booster dose of the Janssen COVID-19 Vaccine may be administered to individuals 18 years of age and older who have completed primary vaccination with a different authorized or approved COVID-19 vaccine. Please check with your health care provider regarding timing of the booster dose.

**HAS THE JANSSEN COVID-19 VACCINE BEEN USED BEFORE?**

The Janssen COVID-19 Vaccine is an unapproved vaccine. In clinical trials, more than 61,000 individuals 18 years of age and older have received the Janssen COVID-19 Vaccine. Millions of individuals have received the vaccine under EUA since February 27, 2021.

**WHAT ARE THE BENEFITS OF THE JANSSEN COVID-19 VACCINE?**

The Janssen COVID-19 Vaccine has been shown to prevent COVID-19. The duration of protection against COVID-19 is currently unknown.

**WHAT ARE THE RISKS OF THE JANSSEN COVID-19 VACCINE?**

Side effects that have been reported with the Janssen COVID-19 Vaccine include:

- Injection site reactions: pain, redness of the skin and swelling.

- General side effects: headache, feeling very tired, muscle aches, nausea, and fever.

- Swollen lymph nodes.

- Blood clots.

- Unusual feeling in the skin (such as tingling or a crawling feeling) (paresthesia), decreased feeling or sensitivity, especially in the skin (hypoesthesia).

- Persistent ringing in the ears (tinnitus).

3

- Diarrhea, vomiting.

<u>Severe Allergic Reactions</u>

There is a remote chance that the Janssen COVID-19 Vaccine could cause a severe allergic reaction. A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the Janssen COVID-19 Vaccine. For this reason, your vaccination provider may ask you to stay at the place where you received your vaccine for monitoring after vaccination. Signs of a severe allergic reaction can include:

- Difficulty breathing,

- Swelling of your face and throat,

- A fast heartbeat,

- A bad rash all over your body,

- Dizziness and weakness.

<u>Blood Clots with Low Levels of Platelets</u>

Blood clots involving blood vessels in the brain, lungs, abdomen, and legs along with low levels of platelets (blood cells that help your body stop bleeding), have occurred in some people who have received the Janssen COVID-19 Vaccine. In people who developed these blood clots and low levels of platelets, symptoms began approximately one to two weeks after vaccination. Blood clots with low levels of platelets following the Janssen COVID-19 Vaccine have been reported in males and females, across a wide age range of individuals 18 years and older; reporting has been highest in females ages 30 through 49 years (about 1 case for every 100,000 vaccine doses administered), and about 1 out of every 7 cases has been fatal. You should seek medical attention right away if you have any of the following symptoms after receiving the Janssen COVID-19 Vaccine:

- Shortness of breath,

- Chest pain,

- Leg swelling,

- Persistent abdominal pain,

- Severe or persistent headaches or blurred vision,

- Easy bruising or tiny blood spots under the skin beyond the site of the injection.

<u>Immune Thrombocytopenia (ITP)</u>

Immune Thrombocytopenia (ITP) is a disorder that can cause easy or excessive bruising and bleeding due to very low levels of platelets. ITP has occurred in some people who have received the Janssen COVID-19 Vaccine. In most of these people, symptoms began within 42 days following receipt of the Janssen COVID-19 Vaccine. The chance of having this occur is very low. If you have ever had a diagnosis of ITP, talk to your vaccination provider before you get the Janssen COVID-

4

19 Vaccine. You should seek medical attention right away if you develop any of the following symptoms after receiving the Janssen COVID-19 Vaccine:

- Easy or excessive bruising or tiny blood spots under the skin beyond the site of the injection,

- Unusual or excessive bleeding.

Guillain Barré Syndrome

Guillain Barré syndrome (a neurological disorder in which the body's immune system damages nerve cells, causing muscle weakness and sometimes paralysis) has occurred in some people who have received the Janssen COVID-19 Vaccine. In most of these people, symptoms began within 42 days following receipt of the Janssen COVID-19 Vaccine. The chance of having this occur is very low. You should seek medical attention right away if you develop any of the following symptoms after receiving the Janssen COVID-19 Vaccine:

- Weakness or tingling sensations, especially in the legs or arms, that's worsening and spreading to other parts of the body.

- Difficulty walking.

- Difficulty with facial movements, including speaking, chewing, or swallowing.

- Double vision or inability to move eyes.

- Difficulty with bladder control or bowel function.

These may not be all the possible side effects of the Janssen COVID-19 Vaccine. Serious and unexpected effects may occur. The Janssen COVID-19 Vaccine is still being studied in clinical trials.

**WHAT SHOULD I DO ABOUT SIDE EFFECTS?**

If you experience a severe allergic reaction, call 9-1-1, or go to the nearest hospital.

Call the vaccination provider or your healthcare provider if you have any side effects that bother you or do not go away.

Report vaccine side effects to **FDA/CDC Vaccine Adverse Event Reporting System (VAERS)**. The VAERS toll-free number is 1-800-822-7967 or report online to https://vaers.hhs.gov/reportevent.html. Please include "Janssen COVID-19 Vaccine EUA" in the first line of box #18 of the report form.

In addition, you can report side effects to Janssen Biotech, Inc. at the contact information provided below.

| e-mail | Fax number | Telephone numbers |
|---|---|---|
| JNJvaccineAE@its.jnj.com | 215-293-9955 | US Toll Free: 1-800-565-4008 |

CORECIVIC-MLG003515

| | | US Toll: (908) 455-9922 |
|---|---|---|

You may also be given an option to enroll in **v-safe**. **V-safe** is a new voluntary smartphone-based tool that uses text messaging and web surveys to check in with people who have been vaccinated to identify potential side effects after COVID-19 vaccination. **V-safe** asks questions that help CDC monitor the safety of COVID-19 vaccines. **V-safe** also provides live telephone follow-up by CDC if participants report a significant health impact following COVID-19 vaccination. For more information on how to sign up, visit: www.cdc.gov/vsafe.

**WHAT IF I DECIDE NOT TO GET THE JANSSEN COVID-19 VACCINE?**

It is your choice to receive or not receive the Janssen COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.

**ARE OTHER CHOICES AVAILABLE FOR PREVENTING COVID-19 BESIDES JANSSEN COVID-19 VACCINE?**

Other choices for preventing COVID-19 are COMIRNATY and SPIKEVAX, which are FDA-approved COVID-19 vaccines. Other vaccines to prevent COVID-19 may be available under Emergency Use Authorization.

**CAN I RECEIVE THE JANSSEN COVID-19 VACCINE AT THE SAME TIME AS OTHER VACCINES?**

Data have not yet been submitted to FDA on administration of the Janssen COVID-19 Vaccine at the same time as other vaccines. If you are considering receiving the Janssen COVID-19 Vaccine with other vaccines, discuss your options with your healthcare provider.

**WHAT IF I AM PREGNANT OR BREASTFEEDING?**

If you are pregnant or breastfeeding, discuss your options with your healthcare provider.

**WILL THE JANSSEN COVID-19 VACCINE GIVE ME COVID-19?**

No. The Janssen COVID-19 Vaccine does not contain SARS-CoV-2 and cannot give you COVID-19.

**KEEP YOUR VACCINATION CARD**

When you receive the Janssen COVID-19 Vaccine, you will get a vaccination card to document the name of the vaccine and date of when you received the vaccine.

**ADDITIONAL INFORMATION**

If you have questions or to access the most recent Janssen COVID-19 Vaccine Fact Sheets, scan the QR code using your device, visit the website or call the telephone numbers provided below.

6

CORECIVIC-MLG003516

| QR Code | Fact Sheets Website | Telephone numbers |
|---|---|---|
| | www.janssencovid19vaccine.com. | US Toll Free: 1-800-565-4008<br>US Toll: (908) 455-9922 |

**HOW CAN I LEARN MORE?**

- Ask the vaccination provider.

- Visit CDC at https://www.cdc.gov/coronavirus/2019-ncov/index.html.

- Visit FDA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization.

Contact your local or state public health department.

**WHERE WILL MY VACCINATION INFORMATION BE RECORDED?**

The vaccination provider may include your vaccination information in your state/local jurisdiction's Immunization Information System (IIS) or other designated system. For more information about IISs visit: https://www.cdc.gov/vaccines/programs/iis/about.html.

**CAN I BE CHARGED AN ADMINISTRATION FEE FOR RECEIPT OF THE COVID-19 VACCINE?**

No. At this time, the provider cannot charge you for a vaccine dose and you cannot be charged an out-of-pocket vaccine administration fee or any other fee if only receiving a COVID-19 vaccination. However, vaccination providers may seek appropriate reimbursement from a program or plan that covers COVID-19 vaccine administration fees for the vaccine recipient (private insurance, Medicare, Medicaid, HRSA COVID-19 Uninsured Program for non-insured recipients).

**WHERE CAN I REPORT CASES OF SUSPECTED FRAUD?**

Individuals becoming aware of any potential violations of the CDC COVID-19 Vaccination Program requirements are encouraged to report them to the Office of the Inspector General, U.S. Department of Health and Human Services, at 1-800-HHS-TIPS or TIPS.HHS.GOV.

**WHAT IS THE COUNTERMEASURE INJURY COMPENSATION PROGRAM?**

The Countermeasures Injury Compensation Program (CICP) is a federal program that may help pay for costs of medical care and other specific expenses for certain people who have been seriously injured by certain medicines or vaccines, including this vaccine. Generally, a claim must

CORECIVIC-MLG003517

be submitted to the CICP within one (1) year from the date of receiving the vaccine. To learn more about this program, visit www.hrsa.gov/cicp or call 1-855-266-2427.

**WHAT IS AN EMERGENCY USE AUTHORIZATION (EUA)?**

The United States FDA has made the Janssen COVID-19 Vaccine available under an emergency access mechanism called an EUA. The EUA is supported by a Secretary of Health and Human Services (HHS) declaration that circumstances exist to justify the emergency use of drugs and biological products during the COVID-19 pandemic.

The Janssen COVID-19 Vaccine has not undergone the same type of review as an FDA-approved or cleared product. FDA may issue an EUA when certain criteria are met, which includes that there are no adequate, approved, and available alternatives. In addition, the FDA decision is based on the totality of scientific evidence available showing that the product may be effective to prevent COVID-19 during the COVID-19 pandemic and that the known and potential benefits of the product outweigh the known and potential risks of the product. All of these criteria must be met to allow for the product to be used during the COVID-19 pandemic.

The EUA for the Janssen COVID-19 Vaccine is in effect for the duration of the COVID-19 declaration justifying emergency use of these products, unless terminated or revoked (after which the products may no longer be used).

Manufactured by:
Janssen Biotech, Inc.
a Janssen Pharmaceutical Company of Johnson & Johnson
Horsham, PA 19044, USA



© 2021 Janssen Pharmaceutical Companies

For more information, call US Toll Free: 1-800-565-4008, US Toll: (908) 455-9922 or go to www.janssencovid19vaccine.com

Revised: JAN/31/2022

 Scan to capture that this Fact Sheet was provided to vaccine recipient for the electronic medical records/immunization information systems.

GDTI: 0886983000363

.

8

CORECIVIC-MLG003518

# FACT SHEET FOR RECIPIENTS AND CAREGIVERS
## EMERGENCY USE AUTHORIZATION (EUA) OF
## THE MODERNA COVID-19 VACCINE TO PREVENT CORONAVIRUS DISEASE 2019 (COVID-19) IN INDIVIDUALS 18 YEARS OF AGE AND OLDER

You are being offered the Moderna COVID-19 Vaccine to prevent Coronavirus Disease 2019 (COVID-19) caused by SARS-CoV-2. This Fact Sheet contains information to help you understand the risks and benefits of the Moderna COVID-19 Vaccine, which you may receive because there is currently a pandemic of COVID-19.

The Moderna COVID-19 Vaccine is a vaccine and may prevent you from getting COVID-19. There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19.

Read this Fact Sheet for information about the Moderna COVID-19 Vaccine. Talk to the vaccination provider if you have questions. It is your choice to receive the Moderna COVID-19 Vaccine.

The Moderna COVID-19 Vaccine is administered as a 2-dose series, 1 month apart, into the muscle.

The Moderna COVID-19 Vaccine may not protect everyone.

This Fact Sheet may have been updated. For the most recent Fact Sheet, please visit www.modernatx.com/covid19vaccine-eua.

## WHAT YOU NEED TO KNOW BEFORE YOU GET THIS VACCINE

### WHAT IS COVID-19?
COVID-19 is caused by a coronavirus called SARS-CoV-2. This type of coronavirus has not been seen before. You can get COVID-19 through contact with another person who has the virus. It is predominantly a respiratory illness that can affect other organs. People with COVID-19 have had a wide range of symptoms reported, ranging from mild symptoms to severe illness. Symptoms may appear 2 to 14 days after exposure to the virus. Symptoms may include: fever or chills; cough; shortness of breath; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; diarrhea.

### WHAT IS THE MODERNA COVID-19 VACCINE?
The Moderna COVID-19 Vaccine is an unapproved vaccine that may prevent COVID-19. There is no FDA-approved vaccine to prevent COVID-19.

The FDA has authorized the emergency use of the Moderna COVID-19 Vaccine to prevent COVID-19 in individuals 18 years of age and older under an Emergency Use Authorization (EUA).

For more information on EUA, see the "**What is an Emergency Use Authorization (EUA)?**" section at the end of this Fact Sheet.

Revised: 12/2020                                                                                                          1

CORECIVIC-MLG003403

**WHAT SHOULD YOU MENTION TO YOUR VACCINATION PROVIDER BEFORE YOU GET THE MODERNA COVID-19 VACCINE?**

Tell your vaccination provider about all of your medical conditions, including if you:

- have any allergies
- have a fever
- have a bleeding disorder or are on a blood thinner
- are immunocompromised or are on a medicine that affects your immune system
- are pregnant or plan to become pregnant
- are breastfeeding
- have received another COVID-19 vaccine

**WHO SHOULD GET THE MODERNA COVID-19 VACCINE?**

FDA has authorized the emergency use of the Moderna COVID-19 Vaccine in individuals 18 years of age and older.

**WHO SHOULD <u>NOT</u> GET THE MODERNA COVID-19 VACCINE?**

You should not get the Moderna COVID-19 Vaccine if you:

- had a severe allergic reaction after a previous dose of this vaccine
- had a severe allergic reaction to any ingredient of this vaccine

**WHAT ARE THE INGREDIENTS IN THE MODERNA COVID-19 VACCINE?**

The Moderna COVID-19 Vaccine contains the following ingredients: messenger ribonucleic acid (mRNA), lipids (SM-102, polyethylene glycol [PEG] 2000 dimyristoyl glycerol [DMG], cholesterol, and 1,2-distearoyl-sn-glycero-3-phosphocholine [DSPC]), tromethamine, tromethamine hydrochloride, acetic acid, sodium acetate, and sucrose.

**HOW IS THE MODERNA COVID-19 VACCINE GIVEN?**

The Moderna COVID-19 Vaccine will be given to you as an injection into the muscle.

The Moderna COVID-19 Vaccine vaccination series is 2 doses given 1 month apart.

If you receive one dose of the Moderna COVID-19 Vaccine, you should receive a second dose of the same vaccine 1 month later to complete the vaccination series.

**HAS THE MODERNA COVID-19 VACCINE BEEN USED BEFORE?**

The Moderna COVID-19 Vaccine is an unapproved vaccine. In clinical trials, approximately 15,400 individuals 18 years of age and older have received at least 1 dose of the Moderna COVID-19 Vaccine.

**WHAT ARE THE BENEFITS OF THE MODERNA COVID-19 VACCINE?**

In an ongoing clinical trial, the Moderna COVID-19 Vaccine has been shown to prevent COVID-19 following 2 doses given 1 month apart. The duration of protection against COVID-19 is currently unknown.

CORECIVIC-MLG003404

**WHAT ARE THE RISKS OF THE MODERNA COVID-19 VACCINE?**
Side effects that have been reported with the Moderna COVID-19 Vaccine include:

- Injection site reactions: pain, tenderness and swelling of the lymph nodes in the same arm of the injection, swelling (hardness), and redness
- General side effects: fatigue, headache, muscle pain, joint pain, chills, nausea and vomiting, and fever

There is a remote chance that the Moderna COVID-19 Vaccine could cause a severe allergic reaction. A severe allergic reaction would usually occur within a few minutes to one hour after getting a dose of the Moderna COVID-19 Vaccine. For this reason, your vaccination provider may ask you to stay at the place where you received your vaccine for monitoring after vaccination. Signs of a severe allergic reaction can include:

- Difficulty breathing
- Swelling of your face and throat
- A fast heartbeat
- A bad rash all over your body
- Dizziness and weakness

These may not be all the possible side effects of the Moderna COVID-19 Vaccine. Serious and unexpected side effects may occur. The Moderna COVID-19 Vaccine is still being studied in clinical trials.

**WHAT SHOULD I DO ABOUT SIDE EFFECTS?**
If you experience a severe allergic reaction, call 9-1-1, or go to the nearest hospital.

Call the vaccination provider or your healthcare provider if you have any side effects that bother you or do not go away.

Report vaccine side effects to **FDA/CDC Vaccine Adverse Event Reporting System (VAERS)**. The VAERS toll-free number is 1-800-822-7967 or report online to https://vaers.hhs.gov/reportevent.html. Please include "Moderna COVID-19 Vaccine EUA" in the first line of box #18 of the report form.

In addition, you can report side effects to ModernaTX, Inc. at 1-866-MODERNA (1-866-663-3762).

You may also be given an option to enroll in **v-safe. V-safe** is a new voluntary smartphone-based tool that uses text messaging and web surveys to check in with people who have been vaccinated to identify potential side effects after COVID-19 vaccination. **V-safe** asks questions that help CDC monitor the safety of COVID-19 vaccines. **V-safe** also provides second-dose reminders if needed and live telephone follow-up by CDC if participants report a significant health impact following COVID-19 vaccination. For more information on how to sign up, visit: www.cdc.gov/vsafe.

CORECIVIC-MLG003405

**WHAT IF I DECIDE NOT TO GET THE MODERNA COVID-19 VACCINE?**
It is your choice to receive or not receive the Moderna COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care.

**ARE OTHER CHOICES AVAILABLE FOR PREVENTING COVID-19 BESIDES MODERNA COVID-19 VACCINE?**
Currently, there is no FDA-approved alternative vaccine available for prevention of COVID-19. Other vaccines to prevent COVID-19 may be available under Emergency Use Authorization.

**CAN I RECEIVE THE MODERNA COVID-19 VACCINE WITH OTHER VACCINES?**
There is no information on the use of the Moderna COVID-19 Vaccine with other vaccines.

**WHAT IF I AM PREGNANT OR BREASTFEEDING?**
If you are pregnant or breastfeeding, discuss your options with your healthcare provider.

**WILL THE MODERNA COVID-19 VACCINE GIVE ME COVID-19?**
No. The Moderna COVID-19 Vaccine does not contain SARS-CoV-2 and cannot give you COVID-19.

**KEEP YOUR VACCINATION CARD**
When you receive your first dose, you will get a vaccination card to show you when to return for your second dose of the Moderna COVID-19 Vaccine. Remember to bring your card when you return.

**ADDITIONAL INFORMATION**
If you have questions, visit the website or call the telephone number provided below.

To access the most recent Fact Sheets, please scan the QR code provided below.

| Moderna COVID-19 Vaccine website | Telephone number |
|---|---|
| www.modernatx.com/covid19vaccine-eua  | 1-866-MODERNA<br>(1-866-663-3762) |

**HOW CAN I LEARN MORE?**
- Ask the vaccination provider
- Visit CDC at https://www.cdc.gov/coronavirus/2019-ncov/index.html
- Visit FDA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization
- Contact your state or local public health department

CORECIVIC-MLG003406

**WHERE WILL MY VACCINATION INFORMATION BE RECORDED?**

The vaccination provider may include your vaccination information in your state/local jurisdiction's Immunization Information System (IIS) or other designated system. This will ensure that you receive the same vaccine when you return for the second dose. For more information about IISs, visit: https://www.cdc.gov/vaccines/programs/iis/about.html.

**WHAT IS THE COUNTERMEASURES INJURY COMPENSATION PROGRAM?**

The Countermeasures Injury Compensation Program (CICP) is a federal program that may help pay for costs of medical care and other specific expenses of certain people who have been seriously injured by certain medicines or vaccines, including this vaccine. Generally, a claim must be submitted to the CICP within one (1) year from the date of receiving the vaccine. To learn more about this program, visit www.hrsa.gov/cicp/ or call 1-855-266-2427.

**WHAT IS AN EMERGENCY USE AUTHORIZATION (EUA)?**

The United States FDA has made the Moderna COVID-19 Vaccine available under an emergency access mechanism called an EUA. The EUA is supported by a Secretary of Health and Human Services (HHS) declaration that circumstances exist to justify the emergency use of drugs and biological products during the COVID-19 pandemic.

The Moderna COVID-19 Vaccine has not undergone the same type of review as an FDA-approved or cleared product. FDA may issue an EUA when certain criteria are met, which includes that there are no adequate, approved, and available alternatives. In addition, the FDA decision is based on the totality of the scientific evidence available showing that the product may be effective to prevent COVID-19 during the COVID-19 pandemic and that the known and potential benefits of the product outweigh the known and potential risks of the product. All of these criteria must be met to allow for the product to be used during the COVID-19 pandemic.

The EUA for the Moderna COVID-19 Vaccine is in effect for the duration of the COVID-19 EUA declaration justifying emergency use of these products, unless terminated or revoked (after which the products may no longer be used).

©2020 ModernaTX, Inc. All rights reserved.
Patent(s): www.modernatx.com/patents
Revised: 12/2020



Scan to capture that this Fact Sheet was provided to vaccine recipient for the electronic medical records/immunization information systems.

Barcode Date: 12/2020

CORECIVIC-MLG003407

# ATTACHMENT D

## TO DECLARATION OF C. ROSE



**<u>Refusal to Take Coronavirus Vaccine</u>**

I understand that CoreCivic has offered me the opportunity to receive a COVID-19 vaccine that has been granted Emergency Use Authorization by the Food and Drug Administration (FDA). The COVID-19 vaccine offered to me has been provided by _____ and made available for inmates and/or detainees at the _____.

I understand that I am not required to take the vaccine and that the decision to take the vaccine is purely a personal choice. I understand that CoreCivic may not offer another opportunity for residents to take the COVID-19 vaccination, and that the vaccine might not be available to me from other resources in the immediate future.

I refuse to accept the vaccine and I understand that I take the risk of contracting COVID-19 and its related complications including, but not limited to: weakness, difficulty breathing, the need for supplemental Oxygen, respiratory failure, intubation, mechanical ventilation, blood clots, mental impairment, permanent disability, and death.

_____
Name

_____
Signature

_____
Number

_____
Date

_____
Witness Name and Title

_____
Witness Signature

_____
Date and Time

**Revised Dec. 2020, CoreCivic**

**CORECIVIC-MLG000766**



**Consent to Take Coronavirus Vaccine**

I understand that CoreCivic has offered me the opportunity to receive a COVID-19 vaccine that has been granted Emergency Use Authorization by the Food and Drug Administration (FDA). The COVID-19 vaccine offered to me has been provided by _____and made available for inmates and/or detainees at the _____. I also understand that the **Pfizer-BioNTech** and **Moderna** vaccines are administered in two doses and that if I choose to take these vaccines, I will be required to take a second dose within a specific time frame to ensure that the vaccine is effective and to avoid wasting limited supplies of vaccine.  If offered the **Jenssen/Johnson and Johnson** vaccine, one inoculation is required.

I understand that I am not required to take the vaccine and that the decision to take the vaccine is purely a personal choice. I understand that CoreCivic may not offer another opportunity for residents to take the COVID-19 vaccination, and that the vaccine might not be available to me from other resources in the immediate future.  I also understand that guidelines or requirements for vaccination may change in accordance with current or future guidance by the CDC, the Department of Health or other state, local or federal regulations.

I acknowledge and understand that taking Coronavirus vaccine may produce side effects including soreness, flu-like symptoms and in very rare cases blood clots associated with the J&J vaccine as described in the revised J&J product information sheet provided to me if the J&J vaccine is being administered. I also understand that individuals that have suffered serious allergic reactions to vaccines in the past may be at greater risk of an adverse outcome if they choose to take the Coronavirus vaccine.

I acknowledge and understand there are potential side effects in taking this Coronavirus vaccine. I acknowledge that my consent to take the vaccine is given freely and voluntarily and without any form of coercion.


_____          _____
Name                                     Signature


_____          _____
Number                                   Date


**Revised April 2021, CoreCivic**

**CORECIVIC-MLG000767**

# EXHIBIT 4

## CDC Guidance
## May 3, 2022

 Centers for Disease Control and Prevention



# Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated May 3, 2022

## Summary of Recent Changes

Updates as of May 3, 2022                                                                                                 ^

- Separated the previous version of this guidance document into two sections:
    - Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities – *guidance on designing a flexible COVID-19 prevention plan based on COVID-19 Community Levels and facility-level factors*
    - Appendix – *detailed guidance on implementing specific prevention strategies in correctional and detention facilities*
- Separated COVID-19 prevention strategies into two categories and provided guidance on when to apply each category in correctional and detention facilities.
    - Strategies for Everyday Operations
    - Enhanced COVID-19 Prevention Strategies
- Added modified post-exposure quarantine options for facilities to consider to reduce the impact of quarantine on residents' mental health and access to services.
- Removed COVID-19-specific PPE recommendations for persons handling laundry or used food service items from people with COVID-19 or their close contacts.

View Previous Updates

This document provides guidance regarding the prevention of coronavirus disease 2019 (COVID-19), tailored for correctional and detention facilities housing adults and/or juveniles. This guidance is based on what is currently known about the transmission and severity of COVID-19 as of May 3, 2022.

The U.S. Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated guidance.

## Intended Audience and Terminology

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities for adults and juveniles to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes COVID-19) in their facilities. These facilities include but are not limited to federal and state prisons, local jails, juvenile detention and correctional facilities, detention centers, law enforcement agencies that have custodial authority for persons who are detained (i.e., U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Marshals Service), and the respective community-based departments of health and child welfare agencies. Some of these facilities and agencies might adapt CDC guidance for correctional and detention facilities based on their specific populations or operational needs. Note that this guidance does not define specific occupancy limits for any correctional or detention facility. It provides a framework to assess COVID-19 risk in a facility and to prioritize prevention strategies based on community and facility-level factors, including factors beyond the control of the facility. This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. This guidance does not replace any applicable federal, state, local, tribal, or territorial health and safety laws, rules, and regulations.

It is important to note that youth who are detained or committed have unique needs related to their age and development, including a need for access to in-person learning. Facilities housing youth may also need to adapt aspects of this guidance document to comply with regulatory requirements and facility operations specific to the juvenile justice and child welfare systems.

This guidance may need to be adapted based on an individual facility's physical space, staffing, population, operations, history of SARS-CoV-2 outbreaks, community factors, and other resources and conditions. Facilities should contact CDC (eocevent366@cdc.gov) or their state, local, tribal, or territorial, public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

Definitions of terms

- COVID-19 Prevention Strategies
  - Strategies for everyday operations: COVID-19 prevention strategies that correctional and detention facilities should keep in place at all times, even when the COVID-19 Community Level is low.
  - Enhanced COVID-19 prevention strategies: Additional COVID-19 prevention strategies for facilities to use when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk.
- Close contact or exposure to someone with COVID-19: Persons with recent exposure to SARS-CoV-2 can be identified in correctional and detention facilities in two ways:
  - Traditional case investigation and contact tracing. Consult the CDC website for the current definition for when a person would be considered a close contact of someone with COVID-19.
  - Location-based contact tracing. When traditional case investigation and contact tracing are not feasible, facilities may identify persons with recent known or potential exposure to SARS-CoV-2 based on whether they spent time in the same locations as an infected person (e.g., all residents and staff members assigned to a housing unit where a case has been identified).
- Incarcerated/detained persons or residents: Adults and juveniles held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced as well as those held for pre-trial or civil purposes.
- Medical isolation: Physical separation of an individual with confirmed or suspected COVID-19 to prevent contact with others and reduce the risk of transmission.
- Quarantine: Physical separation of an individual who has had close contact with someone with confirmed or suspected COVID-19, to reduce the risk of transmission to others if the individual is later found to have COVID-19.
- Staff: All public or private sector employees working within a correctional or detention facility. "Staff" does not distinguish between healthcare, custody, food service, and other types of staff members, nor between government and private employers.
- Up to date on COVID-19 vaccines is defined by CDC guidance. This definition is subject to change over time based on updates to CDC vaccination guidance.

# Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities

# Section 1: Introduction

This document describes a flexible, long-term approach to COVID-19 prevention in correctional and detention facilities. First, it outlines community and facility-level indicators to use to assess COVID-19 risk in a facility. Second, it describes which COVID-19 prevention strategies should be used at all times (strategies for everyday operations) versus only at times of increased risk (enhanced prevention strategies). Additional information on applying each COVID-19 prevention strategy in correctional and detention facilities can be found in the Appendix.

When applying enhanced prevention strategies, correctional and detention facilities should weigh the risks associated with SARS-CoV-2 transmission against their impact on facility operations, mental health, and availability of services and programming for residents. Because of the variation across facilities (e.g., differences in layout, infrastructure, security level, mission, population health needs, on-site healthcare, and staffing levels) and shifting epidemiologic trends due to new SARS-CoV-2 variants and other factors, there is no single COVID-19 prevention plan that will apply across all facilities or time periods.

# Section 2: Assessing COVID-19 Risk in Correctional and Detention Facilities

To develop a flexible, long-term COVID-19 prevention plan, correctional and detention facilities should first assess their unique COVID-19 risks to inform the intensity of prevention strategies needed over time. This risk assessment should be based on a combination of:

- CDC COVID-19 Community Levels
- Facility-level factors

## COVID-19 Community Levels

CDC recommends using COVID-19 Community Levels to guide individual and community decisions about when to apply specific COVID-19 prevention strategies. COVID-19 Community Levels are categorized as low, medium, and high based on the number of COVID-19 cases in a given community and the impact of severe disease on community-based healthcare systems. Visit the CDC website to check any county's current COVID-19 Community Level and to see more detail about how these levels are determined.

When correctional and detention facilities assess a local area's COVID-19 Community Level, they should consider the community where the facility is located as well as the communities from which residents originate and where staff members live. Facilities receiving residents from international locations should make reasonable efforts to determine the risk level in originating countries. See the World Health Organization COVID-19 dashboard ⧉ for case counts by country. Facilities that receive large numbers of residents from a wide geographical area may consider weighing facility-level factors more heavily than COVID-19 Community Levels in decisions about when to apply specific prevention strategies.

Note that correctional and detention facilities providing healthcare services should consult CDC's Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic (which uses COVID-19 Community Transmission Levels rather than COVID-19 Community Levels to guide application of certain COVID-19 prevention strategies in healthcare facilities) for guidance on recommended infection prevention and control strategies for patient care.

## Facility-level Factors

Because COVID-19 Community Levels do not always reflect the COVID-19 risk in correctional and detention facilities, each facility should also assess facility-level factors that reflect its unique characteristics, operations, and populations to guide decisions about when to add or remove enhanced prevention strategies. Examples of relevant facility-level factors are detailed below. However, guidance is not available to set specific thresholds for these factors, or to specify how many factors to consider before shifting to enhanced prevention measures.

Facility-level factors to consider include:

- Vaccination coverage: Determine the proportion of staff and residents who are up to date on COVID-19 vaccines.

  COVID-19 vaccines are highly effective in preventing severe illness, hospitalization, and death from COVID-19. Facilities that do not have high up to date vaccination coverage should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low.

- Transmission in the facility: Evaluate the current level of SARS-CoV-2 transmission within the facility. Transmission can be assessed through diagnostic testing of symptomatic persons and their close contacts, through ongoing routine screening testing, or surveillance testing that the facility uses (such as wastewater testing). Results of testing at intake are not recommended as an indicator of transmission inside the facility, since infections identified at intake most likely occurred elsewhere.

  Because of the risk of unrecognized infection, any new case of COVID-19 in a staff member or resident in a correctional or detention facility should prompt follow-up as described in the Appendix, including a case investigation and/or location-based contact tracing and testing of persons identified as close contacts. Facilities should shift to enhanced prevention strategies if one or more additional cases are identified after follow-up, even if the COVID-19 Community Level is low. Note that enhanced prevention strategies that are put in place due to transmission can be targeted to certain portions of a facility (rather than a whole building or complex) as long as movement and staff assignments are restricted between areas with and without known transmission.

- Risk of severe health outcomes: Determine whether the facility's residents or staff are more likely to get very sick from COVID-19. Additionally, evaluate whether the facility is able to assess infected residents' eligibility for COVID-19 therapeutics and, for eligible residents, to ensure timely access to treatment to prevent severe health outcomes. See Nonhospitalized Patients: General Management | COVID-19 Treatment Guidelines ⧉ . Facilities should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low if they are unable to do one of the following: a) access and administer COVID-19 therapeutics on-site to prevent severe health outcomes among residents more likely to get very sick from COVID-19, OR b) assess residents' risk for severe outcomes and ensure timely access to care outside the facility.

- Facility structural and operational characteristics: Assess how facility characteristics and operational protocols can contribute to or mitigate SARS-CoV-2 spread within the facility.

  Facilities with dense housing arrangements (e.g., dorm/open barracks), frequent population turnover, or ventilation systems that do not meet code-minimum ventilation requirements may consider applying some enhanced prevention strategies, even when the COVID-19 Community Level is low.

# Section 3: Strategies for Everyday Operations vs. Enhanced COVID-19 Prevention Strategies

At all times, facilities should keep certain strategies for everyday operations in place. In addition, facilities should maintain the ability to add or remove enhanced COVID-19 prevention strategies based on ongoing risk assessment as described above. When shifting from a period of higher to lower risk, avoid removing enhanced COVID-19 prevention strategies all at once.

Table 1 provides a summary of which prevention strategies are recommended as strategies for everyday operations (in place at all times) vs. as enhanced COVID-19 prevention strategies (added or removed based on risk assessment). See the Appendix for detailed information on tailoring each of these prevention strategies to correctional and detention facilities.

## Table 1: Strategies for Everyday Operations vs. Enhanced Prevention Strategies

| COVID-19 Prevention Strategy | Strategies for Everyday Operations* | Enhanced COVID-19 Prevention Strategies* |
|---|:---:|:---:|
| Up to date COVID-19 vaccination | ✓ | |
| Standard infection control | ✓ | |
| Enhanced ventilation† | | ✓ |

| COVID-19 Prevention Strategy | Strategies for Everyday Operations* | Enhanced COVID-19 Prevention Strategies* |
|---|---|---|
| **Testing** | | |
| symptomatic people | ✓ | |
| close contacts of people with COVID-19 | ✓ | |
| all residents at intake (or routine observation period) | ✓ | |
| before transfer | | ✓ |
| before/after community visits | | ✓ |
| before release | | ✓ |
| routine screening testing | | ✓ |
| **Access to COVID-19 therapeutics** | ✓ | |
| **Medical isolation & quarantine** | ✓ | |
| **Well-fitting masks/respirators** | | |
| offer to residents and staff | ✓ | |
| universal indoor masking | | ✓ |
| **Prepare for outbreaks** | ✓ | |
| **Routine observation periods during transfer/release protocols** | | ✓ |
| **Minimize movement and contact across housing units and with the community** | | ✓ |
| **Physical distancing** | | ✓ |

*At all times, facilities should keep Strategies for Everyday Operations in place. In addition, facilities should add Enhanced COVID-19 Prevention Strategies when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk. Facilities may not be able to apply all Enhanced COVID-19 Prevention Strategies due to local resources, facility and population characteristics, and other factors, but they should add as many as feasible, as a multi-layered approach to increase the level of protection against COVID-19. Refer to the CDC Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities for details.
†As a Strategy for Everyday Operations, enhanced ventilation options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.

# Strategies for Everyday Operations

At all times, correctional and detention facilities should maintain the following aspects of standard infection control, monitoring, and capacity to respond to COVID-19 cases:

- Provide up to date COVID-19 vaccination, including boosters: Continue to provide and encourage up to date COVID-19 vaccination for staff members and residents (including boosters, as well as additional doses for people with weakened immune systems and for others who are eligible for additional doses).

- Maintain standard infection control strategies: Maintain recommended handwashing and cleaning and disinfection for standard prevention of infectious diseases, including COVID-19. Ensure that ventilation systems operate properly and provide acceptable indoor air quality for the current occupancy level for each space. Make improvements and repairs as necessary. Prepare in advance for periods of higher risk by identifying, obtaining, and testing enhanced ventilation interventions that will be deployed as enhanced prevention strategies when needed (see below for examples and additional resources). Ensure that recommended personal protective equipment (PPE) is available for staff and residents based on their level of risk. (See the Appendix for a table detailing recommended PPE.)

- Maintain diagnostic testing and intake testing strategies: Maintaining a robust COVID-19 testing program can help prevent transmission in congregate settings and can provide critical data for ongoing assessment of the facility's long-term prevention plan. Maintain the COVID-19 testing strategies below to the maximum extent possible based on facility resources and supplies. See the Appendix for details about each testing strategy.

  - Diagnostic testing should be performed for anyone who shows signs or symptoms of COVID-19 and for anyone who has been potentially exposed or identified as a close contact of someone with COVID-19 (either through traditional contact tracing or through location-based contact tracing), regardless of COVID-19 vaccination and booster status.

  - Routine COVID-19 screening testing OR a routine observation period should be implemented for all residents at intake, regardless of COVID-19 vaccination and booster status. The routine observation period option should only be used in the following scenarios: a) Residents under intake observation are housed individually, OR b) Residents under intake observation are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. See the Appendix for detailed information on implementing routine observation periods during intake.

  - In facilities that use wastewater testing, continuing its use as a strategy for everyday operations when the COVID-19 Community Level is low can provide timely data to guide decisions about when to shift to enhanced COVID-19 prevention strategies.

  - COVID-19 screening testing at intake can be added to existing policies for routine intake testing for other infectious diseases, such as tuberculosis, though testing may not need to occur at the same time points for all diseases.

- Assess residents' risk for severe health outcomes from COVID-19 and ensure timely treatment after infection for those who are eligible for COVID-19 therapeutics. For facilities without onsite healthcare capacity, have a plan in place to ensure timely access to care offsite. See Nonhospitalized Patients: General Management | COVID-19 Treatment Guidelines ☑ .

- Maintain medical isolation and quarantine procedures for residents: Regardless of their vaccination and booster status, medically isolate residents who test positive for SARS-CoV-2 and quarantine residents who have been potentially exposed or identified as a close contact of someone with COVID-19 (either through traditional contact tracing or through location-based contact tracing). See the Appendix for detailed information on a) modified approaches to quarantine to reduce the impact of quarantine on mental health, in-person learning, and essential facility operations, b) duration of medical isolation during routine vs. crisis-level operations, and c) ensuring that the conditions in medical isolation and quarantine housing are not punitive and support mental health. Maintain the ability to quickly scale up medical isolation and quarantine during an outbreak.

- Prevent COVID-19 introduction from staff: Regardless of their vaccination and booster status, exclude staff members from work if they have symptoms of COVID-19, test positive for SARS-CoV-2, or have been potentially exposed or identified as a close contact of someone with COVID-19. See the Appendix for detailed information on a) standard and modified approaches to quarantine for staff and b) isolation duration for staff during routine vs. crisis-level operations.

- Offer masks/respirators to all residents and staff who want them: Facilities should make well-fitting masks or respirators available to any residents and staff who would like to use them based on their personal preference. See the Appendix for detailed information on types of masks and respirators and considerations for using them in correctional and detention facilities.

- Prepare for outbreaks: Monitor COVID-19 Community Levels and facility-level factors to be prepared for periods of increased SARS-CoV-2 transmission. Maintain communication with staff members and residents about what to expect if an outbreak occurs, and with external partners including public health and other local correctional and detention facilities.

# Enhanced Prevention Strategies

In addition to the strategies for everyday operations above, facilities should add enhanced COVID-19 prevention strategies when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk. Facilities with low risk tolerance can apply any enhanced prevention strategies at any time, even when the CDC COVID-19 Community Level is low.

Depending on the risk in different areas of the facility, enhanced prevention strategies can be applied across an entire facility OR can be targeted to a single housing unit, wing, or building.

When selecting enhanced prevention strategies, facilities should consider their impact on mental health, access to in-person learning (especially for youth populations), and the likelihood of compliance from staff and residents. Facilities may not be able to apply all enhanced prevention strategies due to local resources, facility and population characteristics, and other factors, but they should add as many as feasible, as a multi-layered approach to increase the level of protection against COVID-19. Enhanced prevention strategies for correctional and detention facilities include the following:

- Require masks/respirators indoors: Require all residents, staff, visitors, vendors, volunteers, and any other persons in the facility to wear a well-fitting mask or respirator while indoors.
- Enhance ventilation in the facility: Use enhancements to code-minimum ventilation requirements to improve overall ventilation in the facility. For options to improve ventilation in buildings, such as increasing the introduction of outdoor air, using portable HEPA filters, and using upper room or in-duct ultraviolet germicidal irradiation systems (UVGI), see COVID-19 Ventilation in Buildings. These options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.
- Strengthen SARS-CoV-2 testing strategies: In addition to providing low-barrier diagnostic testing at all times and universal screening testing or a routine observation period for residents at intake (strategies for everyday operations), add other screening testing strategies to identify cases early and to prevent transmission during movement. Options include:
    - Routine screening testing for residents and staff – see the Appendix for more information on designing a screening testing program based on the unique features of a particular facility and its population.
    - Additional movement-based screening testing:
        - Before transfer to another facility
        - Before/after community visits
        - Before release
- Add routine observation periods during movement: Implement routine observation periods as part of intake, transfer and/or release processes to minimize transmission to/from other facilities and the community during movement. See the Appendix for implementation details.
- Minimize movement and contact across housing units and with the community: For short-term periods, reduce contact between different areas of the facility, and between the facility and the community, to prevent transmission. Examples include:
    - Restricting contact between housing units, including maintaining consistent staff assignments and ensuring that internal work details do not include residents from multiple housing units who do not otherwise interact
    - Restricting work release programs
    - Postponing non-essential community visits
    - Restricting movement across different areas of the facility
    - Restricting movement between facilities
    - Restricting in-person visitation (while ensuring access to virtual options)
    Consider the impact of prolonged restrictions on mental health and well-being for residents and staff with and without pre-existing mental illness.
- Implement physical distancing strategies where feasible: Increase the amount of physical space between people where possible. Examples include:
    - Staggering use of common spaces by different housing units
    - Limiting the size of group activities
    - Temporarily suspending group activities where residents will be in closer contact than they are in their housing environment (while considering impact on mental health and access to services)
    - Implementing decompression/population reduction strategies

# Appendix: Considerations for Applying COVID-19 Prevention Strategies in Correctional and Detention Facilities

This Appendix provides details on tailoring specific COVID-19 prevention strategies to correctional and detention settings. Refer to the full guidance document above for recommendations on when to apply each prevention strategy, based on a combination of COVID-19 Community Levels and facility-level factors.

COVID-19 prevention strategies described in this Appendix include:

- Vaccination
- Standard infection prevention and control
- COVID-19 testing
- Routine observation periods during movement protocols
- Medication to prevent severe disease
- Medical isolation and quarantine
- Masks and respirators
- Preparing for outbreaks
- Physical distancing
- Visitation
- Re-entry considerations

## COVID-19 Vaccination

COVID-19 vaccination is a strategy for everyday operations in correctional and detention facilities and is the most important tool available to prevent severe COVID-19. For more information on vaccine effectiveness, visit Ensuring COVID-19 Vaccines Work.

COVID-19 and other vaccines, including influenza vaccines, may be co-administered at the same time. See the Interim Guidance for Routine and Influenza Immunization Services During the COVID-19 Pandemic for additional considerations for influenza vaccination of persons in congregate settings during the COVID-19 pandemic.

Correctional and detention facilities should:

- Ensure that vaccines and boosters are available for all residents and staff in order to stay up to date.
- Promote COVID-19 vaccination by educating staff and residents on the effectiveness, safety, and importance of vaccines.
- Work with local health departments, healthcare providers, and community organizations on effective ways to increase vaccination uptake, informed by input from residents and staff about why they may not wish to receive the vaccine. Consider recruiting residents and staff who received the vaccine to be peer supporters to encourage others to be vaccinated.

Additional vaccine resources:

- Stay Up to Date with Your Vaccines
- COVID-19 vaccine communications resources available to print specifically for correctional facilities: Print Resources
- Building Confidence in COVID-19 Vaccines
- Workplace Vaccination Program
- COVID-19 Vaccine Information for Specific Groups
- COVID-19 vaccine information for children and teens
  - Vaccines for Children and Teens
  - Resources to Promote the COVID-19 Vaccine for Children & Teens
- Ensuring the Safety of COVID-19 Vaccines in the United States

- COVID-19 Vaccine Booster Shot
- Frequently asked Questions about the COVID-19 Vaccine
- COVID-19 Rapid Community Assessment Guide

# Standard Infection Prevention and Control

Infection prevention and control strategies are strategies for everyday operations in correctional and detention facilities.

Note that correctional and detention facilities providing healthcare services should consult CDC's Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic (which uses COVID-19 Community Transmission Levels rather than COVID-19 Community Levels to guide application of certain COVID-19 prevention strategies in healthcare facilities) for guidance on recommended infection prevention and control strategies for patient care.

## Hand Hygiene

- All individuals in the facility should use preventive actions including regularly washing their hands, avoiding touching their eyes, nose, and mouth, and covering their cough.
- Facilities should ensure adequate access to hand hygiene materials at no cost to staff or residents. These materials should include soap, water, and clean towels or alcohol-based hand sanitizer with at least 60% alcohol.

## Cleaning and disinfection

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 pandemic, including Safe and Proper Use of Disinfectants to Reduce Viral Surface Contamination in Correctional Facilities.
- Facilities should have a plan in place to restock cleaning and disinfection supplies quickly during a COVID-19 outbreak.

## Ventilation

- As a strategy for everyday operations, facilities should ensure that ventilation systems operate properly and provide acceptable indoor air quality for the current occupancy level for each space. Improvements and repairs should be made as necessary.
- As an enhanced prevention strategy, facilities should use enhancements to code-minimum ventilation requirements to improve overall ventilation in the facility. For more information about ventilation considerations and strategies to improve ventilation, such as increasing the introduction of outdoor air, using portable HEPA filters, and using upper room or in-duct ultraviolet germicidal irradiation systems (UVGI), see COVID-19 Ventilation in Buildings. These options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.

## Recommended PPE

Recommended PPE for staff members and residents in a correctional facility will vary based on the type of contact they have with someone with COVID-19 or their close contacts. See Table 2.

- Ensure that staff members and residents who are required to wear PPE have been trained to correctly don, doff, and dispose of PPE they will need to use within the scope of their responsibilities:
  - PPE donning and doffing training videos and job aids ■
  - Protecting Healthcare Personnel (as found on the CDC website)
  - Infection control guidance for healthcare professionals about COVID-19
  - CDC COVID-19 Correction Unit's Infection Prevention and Control training slides ■
- Maintain designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include the following (see the full list of recommended materials in the CDC Correction Unit's Infection Prevention and Control training slides ■ ):
- A dedicated trash can to dispose of used PPE (one for laundry and one for trash or biohazard)
- A hand washing station or access to alcohol-based hand sanitizer with at least 60% alcohol

- Posters illustrating correct donning and doffing procedures
- If not already in place, employers operating within the facility should establish a respiratory protection program, ⧉ as appropriate, to ensure that staff members are fit-tested, medically cleared, and trained for any respiratory protection they will need within the scope of their responsibilities. Residents may also be considered for enrollment in a respiratory protection program depending on work-related exposure risk. For example, residents working in an environment where they may be exposed to COVID-19 – such as in a medical isolation unit – would be considered for enrollment due to occupational risk. For more details, see the OSHA Respiratory Protection Standard ⧉ .
- If staff members must serve multiple facility areas, ensure that they change PPE when leaving medical isolation or quarantine spaces. If a shortage of PPE supplies necessitates reuse, prevent cross-contamination by ensuring that staff members move only from areas of low to high exposure risk while wearing the same PPE. For example, start in a housing unit where no one is known to be infected or exposed, then move to a space used as quarantine for close contacts, and end in a medical isolation unit.
- In case of PPE shortages, use strategies for safely optimizing PPE supplies.

## Table 2. Recommended Personal Protective Equipment (PPE) and Source Control for Residents and Staff in a Correctional or Detention Facility

The PPE described below may only be required for certain activities. See footnotes for details. Note that when the COVID-19 Community Level is low, a well-fitting mask or respirator should be offered and provided to all residents and staff who want them. When the COVID-19 Community Level is medium or high, or when facility-level factors indicate higher risk, facilities should require all persons in the facility to wear a well-fitting mask or respirator indoors.

| | NIOSH-approved Respirator* | International Respirator* or Disposable Procedure Mask | Cloth Mask | Eye Protection† | Gloves† | Gown/Coveralls† |
|---|---|---|---|---|---|---|
| **Residents** | | | | | | |
| With confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | X§ | | | | |
| Quarantined (individually or in a cohort) as a close contact of someone with COVID-19 | | X§ | | | | |
| Working in an area designated for quarantine or medical isolation (*without* having close contact with persons under quarantine or isolation precautions) | X§ | | | | | |
| Working in an area designated for quarantine or medical isolation (*with* close contact with persons under quarantine or isolation precautions) | X§ | | | X | X | X |
| Living or working in areas of the facility not designated for quarantine or medical isolation | | X§ ¶ | | | | |
| **Staff** | | | | | | |

| | NIOSH-approved Respirator* | International Respirator* or Disposable Procedure Mask | Cloth Mask | Eye Protection† | Gloves† | Gown/Coveralls† |
|---|---|---|---|---|---|---|
| Working in medical isolation or quarantine areas (*without* close contact with persons under quarantine or isolation precautions) | X | | | | | |
| Having close contact with (including transport) or providing medical care to persons under quarantine or isolation precautions | X | | | X | X | X |
| Performing temperature checks for any persons who are *not* under quarantine or isolation precautions** | | X§ | | X | X | |
| Working in areas of the facility not designated for quarantine or medical isolation | | X§ ¶ | | | | |

*NIOSH-approved respirators include N95s. International respirators include KN95s and KF94s. Visit the CDC website of Types of Masks and Respirators for a full list of NIOSH-approved and international respirators.

†If residents or staff are using cleaning products, additional PPE may be needed based on the cleaning product label. See CDC guidelines for details.

§Masks and respirators can provide different levels of protection depending on the type and how they are used. Choose the most protective mask or respirator that fits well and can be worn consistently. Loosely woven cloth products provide the least protection; layered finely woven products offer more protection; well-fitting disposable procedure masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection. When possible, offer different types of masks and respirators to staff and residents so that they can choose the option that fits them best and that they can wear consistently. The options that are offered in correctional and detention facilities may be limited by safety and security considerations, such as concerns about metal nose wires. In environments where the risk of transmission is higher (e.g., post-exposure quarantine units) and safety and security considerations allow, residents should be offered masks or respirators providing the same level of protection as those provided to staff in a similar environment.

¶When the COVID-19 Community Level is low, a well-fitting mask or respirator should be offered and provided to all residents and staff who want them. When the COVID-19 Community Level is medium/high or facility-level factors indicate higher risk, facilities should require all persons in the facility to wear a well-fitting mask or respirator indoors.

**Sanitize or change gloves between each temperature check. A gown could be considered if extensive contact with the person being screened is anticipated.

# COVID-19 Testing

## Types of tests and accessing testing supplies

For information on types of tests and how to choose a test, refer to Overview of Testing for SARS-CoV-2, the virus that causes COVID-19.

Facilities can contact their state or local health departments to request access to testing supplies when they are available locally. If testing supplies are unavailable, facilities can consider screening for COVID-19 symptoms (including temperature checks) and asking about recent close contact with someone with COVID-19. Facilities may also consider adding symptom

checks) and asking about recent close contact with someone with COVID-19. Facilities may also consider adding symptom screening as an added layer of protection in addition to testing. Symptom screening can help identify staff members, visitors, vendors, or volunteers who should be excluded from a facility before entry and residents (at intake or in the existing population) who should be evaluated for potential medical isolation or quarantine. *Symptom screening and temperature checks alone will not prevent all transmission, because it will not identify people with asymptomatic or pre-symptomatic infection.*

## Diagnostic testing

Diagnostic testing is used to identify current infection and is performed when a person has signs or symptoms consistent with COVID-19, or when a person is asymptomatic but has recent known or suspected exposure to someone with COVID-19. Viral tests authorized ☐ by the Food and Drug Administration (FDA) for diagnostic testing include nucleic acid amplification tests (NAATs) and antigen tests. Antibody tests are used to detect past infection with SARS-CoV-2. CDC does not recommend using antibody testing to diagnose current infection or to assess immunity.

Diagnostic testing is a strategy for everyday operations in correctional and detention facilities and should be implemented at all times, even when the COVID-19 Community Level is low. Ensuring the availability of low-barrier diagnostic testing can help identify cases early and limit the size of outbreaks.

## Testing persons with signs or symptoms consistent with COVID-19

- Residents with COVID-19 symptoms, regardless of COVID-19 vaccination or booster status, should be moved to medical isolation in a separate environment from other people (ideally individually), medically evaluated, and tested. If the test result is positive, medical isolation should continue for 10 days from the date when symptoms began. Multiple residents with confirmed COVID-19 can be housed as a cohort in a dorm or cell environment, even if the dates of their positive test results are different. Facilities should consider suspending co-pays for residents seeking medical evaluation for possible COVID-19 symptoms, especially during outbreaks, to remove possible barriers to symptom reporting.
- Staff members with COVID-19 symptoms, regardless of COVID-19 vaccination and booster status, should be excluded from work and advised to seek testing. If the test result is positive, staff members should be excluded from work for 10 days from the date when symptoms began. (However, staff may use CDC guidance for the general public for isolation duration when they are not at work.) See section below on isolation duration for staff during crisis-level operations.
- Visitors, vendors, and volunteers with COVID-19 symptoms, regardless of COVID-19 vaccination and booster status, should be denied entry and encouraged to seek testing.

## COVID-19 case follow-up

Because of the risk of unrecognized infection, any new case of COVID-19 in a staff member or resident in a correctional or detention facility should prompt a case investigation and testing of close contacts as described below. The facility's ability to test staff may be limited by facility-specific policy.

Facilities should add enhanced prevention strategies when there is transmission occurring in the facility. If a case is identified in a resident who tests positive at intake but has not had close contact with other members of the facility's population and is immediately placed in medical isolation, this person's positive test result could be considered an isolated case rather than a part of a larger outbreak and may not trigger enhanced prevention strategies. However, it may still be necessary to test other people who were exposed during intake or transport before that decision is made.

Persons with recent exposure to SARS-CoV-2 can be identified in two ways:

- Traditional case investigation and contact tracing. Consult the CDC website for the current definition for when a person would be considered a close contact of someone with COVID-19. Case investigations should prioritize elicitation of close contacts who are more likely to get very sick from COVID-19 so they can be referred to a healthcare provider to determine eligibility for treatment if they test positive for SARS-CoV-2.
- Location-based contact tracing. When traditional case investigation and contact tracing are not feasible, facilities may identify persons with recent known or potential exposure to SARS-CoV-2 based on whether they spent time in the same locations as an infected person (e.g., all residents and staff members assigned to a housing unit where a case has been identified).

Testing asymptomatic persons with recent exposure to SARS-CoV-2

Testing asymptomatic persons with recent exposure to SARS-CoV-2

All persons identified as close contacts of someone with COVID-19, including all persons identified through location-based contact tracing, should be tested for SARS-CoV-2, *regardless of symptoms or COVID-19 vaccination or booster status*.

- Administer an initial diagnostic test as soon as possible (but not within the first 24 hours after close contact, because a test is unlikely to be positive that quickly).
- If the initial test result is negative, administer a second diagnostic test at least 5 days after the exposure occurred. (If the initial test was performed at least 5 days after the exposure, a second test is not needed.) See additional considerations below for serial testing in quarantine cohorts.
- People who had confirmed COVID-19 within the past 90 days and subsequently recovered do not need to be tested after exposure unless they develop new symptoms.
- For details on testing large numbers of people, such as those identified as close contacts through location-based contact tracing, review CDC guidance on Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings. Given the potential for rapid transmission, ensure there is a plan in place to prepare medical isolation spaces for a large number of infected persons. The scope of broad-based testing should be based on the extent of movement (of staff members and residents) between parts of the facility with and without cases. Examples of broad-based testing strategies include the following:
  - Testing all persons in a single housing unit where someone has tested positive, if there has not been movement or contact with other areas of the facility through the staff or residents (i.e., residents have not left the housing unit and the staff members work exclusively in that housing unit).
  - Testing all persons in an entire wing, floor, building, or complex when cases have been identified in multiple areas, or if there has been movement between areas with and without cases.

## Screening testing

Screening testing is used to identify people infected with SARS-CoV-2 who are asymptomatic or pre-symptomatic and do not have known or suspected exposure to someone with COVID-19. Screening testing can be a valuable tool in correctional and detention facilities for detecting infections early to help stop transmission quickly. NAATs or antigen tests can be used for screening testing.

Some forms of screening testing (i.e., testing at intake) are strategies for everyday operations in correctional and detention facilities, and other forms of screening testing are enhanced prevention strategies. Each screening testing strategy below is labeled accordingly.

## Movement-based screening testing

Testing residents at intake, before transfer to another facility, and before/after community visits or release can help prevent introduction of virus into the facility, across facilities, and from the facility into the community.

- Testing at intake (strategy for everyday operations). At intake, test all incoming residents OR implement a routine observation period. If intake testing is used, house incoming residents separately from the rest of the facility's population (individually if feasible) while waiting for their test results. The routine observation period option should only be used under the following scenarios: a) Residents under intake observation are housed individually, or b) Residents are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. (See additional details on implementing routine observation periods at intake below.)
- Testing before transfer to another facility (enhanced prevention strategy). Consider testing all residents before transfer to another correctional/detention facility. Wait for a negative test result before transfer, and do not transfer residents with a positive test unless necessary for medical care, infection control, lack of medical isolation/quarantine space, or extenuating correctional, judicial, or security concerns.
- Testing before release (enhanced prevention strategy). Consider testing residents before release from the facility. If using this strategy, test as close as possible to the day of the release. Testing before release is particularly important if residents will be housed in other congregate settings (e.g., homeless shelters, group homes, or halfway houses) or in households with persons who are more likely to get very sick from COVID-19. Notify public health authorities for assistance arranging medical isolation upon release for people who have a positive test result.
- Testing before/after community visits (enhanced prevention strategy). Consider testing residents before community visits (e.g., medical trips, court appearances, community programs). If using this strategy, test as close as possible to the

tied (e.g., medical trips, court appearances, community programs). If using this strategy, test as close as possible to the day of the visit. Facilities can also consider testing residents 5 days after they return from community visits. Facilities may consider routine screening testing for residents participating in work release programs (see below).

## Routine screening testing

Routine screening testing is an enhanced prevention strategy. However, even when the COVID-19 Community Level is low, routine screening testing can help identify increasing case trends early and can contribute to long-term COVID-19 prevention plans.

Routine screening testing is the regular testing of asymptomatic persons with no known or suspected exposure to SARS-CoV-2, to identify COVID-19 cases early and help prevent widespread transmission. Ideally, a routine screening testing program includes both residents and staff regardless of vaccination status. It can include all residents and staff members in a facility, or a targeted or random subset chosen according to criteria the facility designates (examples below).

If routine screening testing is conducted only among a subset of individuals in a facility or among a subset of facilities within a correctional system, the following factors can guide prioritization and selection:

Prioritize facilities/housing units that:

- House resident populations more likely to get very sick from COVID-19
- Have low rates of up to date vaccination (including residents and staff)
- Have difficulty maintaining prevention strategies such as physical distancing or adequate ventilation (e.g., in dormitory-based housing or in older facilities)
- Have had recent cases or outbreaks
- Have high levels of interaction with the community (e.g., through in-person visitation or frequent turnover, off-site medical visits, work release, or court appearances)

Prioritize individuals who:

- Are more likely to get very sick from COVID-19
- (Staff) Have self-identified to their employer that they are more likely to get very sick from COVID-19 due to an individual medical condition
- (Residents) Mix with persons in other housing units, for example:
    - Are assigned to work details that include residents from other housing units (e.g., food service, laundry)
    - Participate in programming with residents from other housing units
- (Residents) Participate in:
    - Off-site work release programs
    - Frequent off-site medical visits
    - Frequent in-person court appearances
- (Staff) Work in:
    - A facility designated for medical care
    - Multiple areas of the facility
    - Multiple congregate facilities (e.g., more than one correctional/detention facility, homeless shelters, group homes, or schools)
- (Staff) Live or spend time with other staff members who work in other areas of the facility (e.g., family or household members, carpools)

## Routine Observation Periods during Movement Protocols

Routine observation periods can be used as part of intake, transfer, and/or release processes to minimize potential transmission to/from other facilities or the community during movement. These observation periods are sometimes referred to as "routine intake/transfer/release quarantine" but are not related to a potential exposure to someone with COVID-19 and

should not be combined with post-exposure quarantine cohorts. Rather, they are periods where residents are housed separately from the rest of the facility's population (ideally individually, or as small cohorts if individual housing is not possible or is not advisable due to mental health concerns).

As a strategy for everyday operations, correctional and detention facilities should implement screening testing OR a routine observation period for all residents at intake. The routine observation period option should only be used under the following scenarios: a) Residents under intake observation are housed individually, OR b) Residents under intake observation are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. Routine observation periods during transfer and/or release (or during intake if not already in place) can be added as enhanced prevention strategies.

Observation periods should be 7-10 days if the residents under observation are not tested at the end of the observation period. A shorter period (minimum of 5 days) could be used if combined with testing at the end of the observation period.

## Medication to Prevent Severe Disease

As a strategy for everyday operations, correctional and detention facilities should maintain awareness of how to access medications to prevent severe COVID-19 in the resident population. Facilities without onsite healthcare capacity should maintain a plan to assess residents' risk for severe health outcomes and to ensure timely access to treatment outside the facility.

Monoclonal antibodies

The FDA has expanded EUAs for use of some investigational monoclonal antibody medications to prevent SARS-CoV-2 infection and severe health outcomes, including in correctional populations, under certain conditions. Refer to the National Institutes of Health website on Characteristics of SARS-CoV-2 Antibody-Based Products ☑ for details related to specific medications, including when they are recommended for use.

Antiviral medications

In addition, antiviral medications are available that are effective in preventing severe health outcomes in persons with COVID-19. The National Institute of Health COVID-19 Treatment Guidelines ☑ provide information about these medications and describe what is known about their effectiveness.

These medications can be ordered at no cost through the office of the Assistant Secretary for Preparedness and Response (ASPR) ☑ within the Department of Health and Human Services, from the manufacturer, or in some cases through facilities' usual medication procurement mechanisms.

Medications are *not* a substitute for vaccination. Vaccination remains the best tool to prevent severe illness and death from COVID-19.

## Medical Isolation and Quarantine

Isolation (for persons with suspected or confirmed COVID-19) and quarantine (for persons who have been exposed to someone with COVID-19) are strategies for everyday operations in correctional and detention facilities. The guidance below includes recommendations for modified isolation protocols during short-term periods of crisis-level operations, as well as modified quarantine approaches that can be considered based on a combination of factors including current COVID-19 Community Level, facility-level factors, and residents' mental health.

### Managing medical isolation and quarantine spaces

Have a plan in place to ensure that *separate physical locations* (dedicated housing areas and bathrooms) have been identified to:

- Medically isolate residents with *suspected* COVID-19 (ideally individually for short periods while awaiting test results)
- Medically isolate residents with *confirmed* COVID-19 (individually or as a cohort)

- Quarantine residents identified as close contacts of those with confirmed or suspected COVID-19 (ideally individually, but as a cohort if necessary. Note that when traditional contact tracing is not feasible, close contacts can be identified through location-based contact tracing.)

Note that facilities may determine that individual housing is not advisable in some situations due to mental health concerns. If close contacts are quarantined as a cohort, keep the number housed together as small as possible to minimize the risk of further transmission.

Manage medical isolation and quarantine units as follows to prevent further transmission:

- Keep residents' movement outside the medical isolation/quarantine space to a minimum.
- Serve meals inside the medical isolation/quarantine space.
- Provide medical care inside the medical isolation/quarantine space, unless it is not physically possible to do so or if a resident needs to be transferred to a healthcare facility.
- Minimize shared air between medical isolation/quarantine spaces and other spaces within a building. Ventilation to/from the medical isolation/quarantine space should be separate from ventilation to other spaces within the same building. Air should flow from clean to less clean areas.
- Where possible, restrict medically isolated/quarantined residents from leaving the facility (including transfers to other facilities) during the medical isolation/quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of medical isolation/quarantine space, or extenuating correctional, judicial, or security concerns.
- Staff assignments to medical isolation/quarantine spaces should remain as consistent as possible, and these staff members should limit their movements to other parts of the facility. These staff members should wear recommended PPE appropriate for their level of contact with people under medical isolation/quarantine. See PPE section and Table 2.
- Clean and disinfect areas used by people with COVID-19 and their close contacts on an ongoing basis during medical isolation/quarantine.

Ensure that medical isolation and quarantine are operationally distinct from punitive segregation.

Because of limited individual housing spaces within many correctional and detention facilities, infected or exposed people are often placed in the same housing spaces that are used for administrative or disciplinary segregation. To encourage prompt reporting of COVID-19 symptoms and support mental health, ensure that medical isolation and quarantine are *operationally distinct* from administrative or disciplinary segregation, even if the same housing spaces are used for both. For example:

- As much as possible, provide similar access to radio, TV, reading materials, personal property, commissary, showers, and other resources as would be available in individuals' regular housing units.
- As much as possible, allow residents to return to their previously assigned housing spaces after medical isolation/quarantine ends, if that is their preference.
- Ensure that staff understand that the same restrictions placed on residents in segregated housing when used for disciplinary reasons should not be applied to residents housed in the same spaces for COVID-19 related reasons.
- To support mental health, consider allowing increased telephone time or other opportunities to communicate with others outside the facility during the medical isolation or quarantine period.
- Communicate regularly with residents in medical isolation or quarantine about the duration and purpose.

## Medical isolation during routine operations

### Medical isolation for residents with suspected or confirmed COVID-19

Regardless of their vaccination and booster status, residents showing symptoms of COVID-19 (suspected COVID-19) or testing positive for SARS-CoV-2 (confirmed COVID-19) should wear a well-fitting cloth or disposable procedure mask or respirator and should be immediately placed under medical isolation and medically evaluated (including eligibility for COVID-19 therapeutics ⧉ ). Facilities without onsite healthcare capacity to medically evaluate and/or treat residents should have a plan in place to ensure that timely evaluation and treatment take place through an offsite medical facility, additional healthcare providers, or other means.

Clinical staff evaluating and providing care for people with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), including wearing recommended PPE, and should monitor the guidance website regularly for updates to these recommendations.

Residents with suspected or confirmed COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Immediately upon identification of symptoms or positive test, until placed in medical isolation
- Once in the medical isolation space, whenever another individual enters (unless the person entering a medical isolation space for confirmed COVID-19 also has confirmed COVID-19)
- If they leave the medical isolation space for any reason

Residents with suspected COVID-19 should be tested for SARS-CoV-2 and should ideally be housed individually while waiting for test results. If the resident's SARS-CoV-2 test result is positive, they can be moved to cohorted medical isolation with other residents with confirmed COVID-19. If the resident's test result is negative, they can return to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

Residents with confirmed COVID-19 may be housed in medical isolation as a cohort (rather than in single cells), even if they tested positive on different dates. Cohorting residents during medical isolation can mitigate some mental health concerns associated with individual medical isolation and can increase capacity for medical isolation during case surges. Considerations for cohorted medical isolation include:

- Only residents with a positive SARS-CoV-2 test result should be housed together as a cohort. Do not cohort those with confirmed COVID-19 together with those with suspected COVID-19, with close contacts of people with confirmed or suspected COVID-19, or with those with other illnesses.
- When choosing a space to cohort groups of residents with confirmed COVID-19, use a single, large, well-ventilated room with solid walls and a solid door that closes fully. Using a single room will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

Medical isolation can be discontinued based on the following criteria:

- Residents with asymptomatic infection – Medical isolation can end 10 days after the first positive test result (with Day 0 being the date their specimen was collected).
- Residents with mild or moderate, symptomatic illness – Medical isolation can end 10 days after symptom onset and after resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. Loss of taste and smell can persist for weeks or months after recovery and need not delay end of isolation.
- Residents with severe illness – Medical isolation can end 10 days after symptom onset and after resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. Extending duration to up to 20 days may be warranted.
- Residents who are moderately or severely immunocompromised – Medical isolation should extend to 20 or more days because these people can have a longer infectious period. Use a test-based strategy to end isolation, and consult with an infectious disease specialist to determine the appropriate duration.

See section below on recommended duration of medical isolation during short-term periods of crisis-level operations (e.g., severe staffing or space shortages).

## Isolation for staff with COVID-19 symptoms or a positive test

Staff with COVID-19 symptoms should be excluded from work and advised to seek testing, regardless of their COVID-19 vaccination and booster status. Staff members with a positive test result (with or without symptoms) should be excluded from work for 10 days from the date when symptoms started, or from the date of the positive test if they do not have symptoms (with Day 0 being the date their specimen was collected). (However, staff may use CDC guidance for the general public for duration of isolation when they are not at work.) See section below on isolation duration for staff during crisis-level operations.

The same recommendations apply for access to the facility by visitors, vendors, and volunteers.

The same recommendations apply for access to the facility by visitors, vendors, and volunteers.

## Modifying isolation protocols during crisis–level operations

Because of the potential for rapid, widespread transmission of SARS-CoV-2 in congregate environments and evidence [↗] that infected people who are up to date on their COVID-19 vaccines can transmit the virus to others, CDC recommends maintaining 10-day isolation periods as much as possible for all infected residents and staff in correctional and detention facilities, regardless of their vaccination and booster status. (However, staff may use CDC guidance for the general public for duration of isolation when they are not at work.)

During crisis-level operations (examples below), facilities may need to consider short-term alternatives to the recommended 10-day isolation periods for staff and/or residents. Facilities should consult their state, local, tribal, or territorial department to discuss approaches that would meet their needs while maximizing infection control during these short-term periods.

Examples of crisis-level operation scenarios:

- Staffing shortages threaten to compromise the safety and security of the facility or the continuity of essential operations.
- There is insufficient space to medically isolate all residents who have been infected for the full 10-day period, and other options to increase space have been exhausted.

Once the period of crisis-level operations has passed, facilities should return to the recommendations for periods of routine operations (10 days for isolation for residents and staff). Facilities should ensure that both residents and staff understand that reduced isolation protocols are short-term, crisis-management tools and that the facility will return to the full 10-day isolation recommendations.

The following are guiding principles for reducing isolation periods during crisis-level operations:

- Reductions in isolation duration should be as minimal as possible to mitigate the crisis scenario.
- Decisions to shorten isolation duration should be made independently for staff and for residents, based on the specific resources that are constrained at the time.
- Before reducing isolation duration, consider alternatives (e.g., shifting from individual to cohorted medical isolation units for residents or reducing the resident population).
- Take into consideration the risk of transmission within the facility (e.g., layout) and the risk profile of the facility's population and access to COVID-19 therapeutics to prevent severe illness.
- If crisis-level protocols allow infected staff to return to work before 10 days of isolation, the risk of transmission can be reduced by assigning them to work exclusively in medical isolation units or in assignments where they have minimal contact with others until day 10.
- If a facility shortens isolation duration, it is possible to incorporate a negative test result into these protocols (i.e., "test-out" strategies). The following factors are necessary for facilities to incorporate test-out strategies without compromising essential functions:
  - Sufficient testing supplies and staff capacity to maintain recommended diagnostic testing and screening testing at intake (see section above on testing)
  - Fast test turn-around time to inform timely decision-making
  - Sufficient staff capacity to continue to prioritize care and treatment for residents at high risk for severe COVID-19

## Standard quarantine approach

### Quarantine for close contacts of those with confirmed or suspected COVID–19

The most stringent form of quarantine, with the lowest risk of transmission, is to individually quarantine all residents who have been in close contact with someone with confirmed or suspected COVID-19 for 10 days from the date of the last exposure, regardless of their vaccination and booster status. Note that when traditional contact tracing is not feasible, close contacts can be determined through location-based contact tracing.

Movement outside the quarantine space should be kept to a minimum. All quarantined residents should receive an initial diagnostic test as soon as possible after identification as a close contact (but not within the first 24 hours after a known exposure, because a test is unlikely to be positive that quickly) and should be monitored for symptoms once per day.

Residents who are more likely to get very sick from COVID-19 should also be evaluated for eligibility for COVID-19 therapeutics to prevent severe outcomes. If a resident develops symptoms, follow procedures detailed above for medical isolation of people with suspected COVID-19.

If the initial test result is negative, the resident should receive a second diagnostic test at least 5 days after the close contact in order to facilitate early identification of a potential infection to prevent severe outcomes. (If the initial test was performed at least 5 days after the close contact, a second test is not needed.) Day 0 is the date of last exposure/close contact.

Quarantined residents can be released from quarantine restrictions if they remain asymptomatic and have not tested positive for SARS-CoV-2 during the 10 days since their last potential exposure or known close contact with someone with confirmed or suspected COVID-19.

Residents who have been exposed to someone with COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Immediately upon identification as a close contact of someone with COVID-19 (if not already in a quarantine space)
- When another individual enters a quarantine space that is occupied by a single resident
- When quarantined residents are housed as a cohort
- If a resident under quarantine leaves the quarantine space for any reason

### Considerations for Cohorted Quarantine

Ideally, facilities should individually quarantine close contacts of persons with confirmed or suspected COVID-19, unless mental health concerns preclude individual housing. Cohorting multiple quarantined close contacts could result in further transmission. If cohorted quarantine is necessary, reduce transmission risk by selecting housing spaces for quarantine that:

- Are well ventilated
- Minimize the number of residents sharing the housing space
- Maximize the physical distance between residents sharing the housing space
- Are physically separated (i.e., solid walls and solid doors) from non-quarantine spaces

If cohorting close contacts is necessary, be especially mindful of those who are more likely to get very sick from COVID-19. Ideally, they would not be cohorted with other quarantined residents, to reduce their chance of infection. If cohorting is unavoidable, make all possible accommodations to reduce exposure for residents who are more likely to get very sick from COVID-19.

In addition, consider possible co-infection with other respiratory illnesses, such as influenza, in quarantine decisions. Individual quarantine is recommended for residents with co-infection.

Serial testing for cohorted quarantine. If quarantine cohorts are used, transmission may continue if some members of the cohort have an unrecognized infection. Serial testing of the entire quarantined cohort, *regardless of their vaccination and booster status,* can identify additional infections early and prevent continued transmission. When the transmissibility of circulating SARS-CoV-2 variant(s) is high, serial testing may be challenging to implement because of reduced staffing levels and/or large numbers of residents in cohorted quarantine. In such situations, facilities may choose to prioritize serial testing primarily when the circulating SARS-CoV-2 variant(s) also causes high rates of severe illness, with a focus on identifying infections early to prevent severe health outcomes. Facilities with a low risk tolerance may consider using serial testing in quarantine cohorts more routinely.

- To implement serial testing, re-test people quarantined as a cohort every 3–7 days until testing identifies no new cases in the cohort for 10 days since the most recent positive result. The testing interval should be based on the stage of an ongoing outbreak (i.e., testing every 3 days can allow for faster outbreak control in the context of an escalating outbreak; testing every 5–7 days may be sufficient when transmission has slowed). In addition, continue diagnostic testing for residents with symptoms.
- Anyone testing positive should be removed from the cohort, placed in medical isolation, and the 10-day quarantine period should re-start for the remainder of the cohort.

*Quarantine for staff members*

All staff members who have been potentially exposed or identified as a close contact to someone with COVID-19 should be advised to seek testing. If the test result is positive, staff members should be excluded from work for 10 days from the date when symptoms began, or from the date of the positive test if they do not have symptoms (with Day 0 being the date their specimen was collected).

Staff members should quarantine if their test result is negative. The quarantine approach with the lowest risk of transmission to residents and staff in the facility is to exclude exposed staff from work for 10 days after their last exposure, regardless of their vaccination and booster status. (However, staff may use the CDC guidance for the general public for duration of quarantine when they are not at work.) See section below on modified quarantine approaches that could be applied to staff.

The same recommendations apply for access to the facility by visitors, vendors, and volunteers.

## Modified quarantine approaches

Because of the potential for rapid, widespread transmission of SARS-CoV-2 in congregate environments and evidence ⧉ that infected people who are up to date on their COVID-19 vaccines can transmit the virus to others, CDC recommends maintaining 10-day quarantine periods as much as possible for all residents and staff in correctional and detention facilities who have been potentially exposed or come into close contact with someone with COVID-19, regardless of their vaccination and booster status. However, quarantine protocols for residents and/or staff may need to be modified in some facilities to balance the risks of severe disease from COVID-19 and the impact of prolonged quarantine on residents' mental health, or to adapt to changes in disease severity and transmissibility from different SARS-CoV-2 variants. Quarantine protocols for staff may also need to be modified during case surges to ensure adequate staff coverage to maintain safety, security, and essential services in the facility.

Quarantine can be very disruptive to the daily lives of residents because of the limitations it places on access to programming, recreation, in-person visitation, in-person learning, and other services. These challenges are especially pronounced when residents must be quarantined as cohorts, because quarantine periods can become prolonged due to continued transmission. In addition, recommended serial testing every 3–7 days during cohorted quarantine has been difficult for facilities to accomplish during large outbreaks when testing and staffing resources have been strained.

Table 3 presents a range of modified quarantine approaches that can be considered for residents and/or staff, with variations in duration, testing, movement, and monitoring strategies. When choosing among these approaches, facilities should consider the current COVID-19 Community Level (which incorporates both transmission and disease severity for currently circulating variants) in combination with facility-level factors and what is known about the incubation period of the variants circulating at the time. During times when risk tolerance is low (e.g., when disease severity is high), facilities should choose lower risk strategies.

## Table 3. Standard and modified quarantine approaches in correctional and detention facilities

| Quarantine Characteristic | Standard approach | Modified approaches* |
|---|---|---|
| Who is required to quarantine *(applies to residents and staff)* | All exposed residents and staff, regardless of vaccination and booster status | Only exposed residents and staff not up to date on their COVID-19 vaccines and who have not recovered from a prior SARS-CoV-2 infection in the last 90 days |

| Quarantine Characteristic | Standard approach | Modified approaches* |
|---|---|---|
| Movement outside the quarantine space *(applies to residents)* | Keep movement outside the quarantine space to a minimum. | Allow a quarantine cohort to move outside the quarantine space and continue daily activities as a group, but without mixing with residents or staff not assigned to their cohort. Maintain consistent staff assignments to support cohort integrity. Maintain use of well-fitting masks or respirators among staff and residents while indoors, and implement serial testing for residents. |
| Duration *(applies to residents and staff)* | Quarantine for 10 days after last exposure/close contact with someone with COVID-19. | *Test-out option*: Quarantine for no fewer than 5 days, with a negative viral test result after Day 5.<br><br>*Daily testing option:* Test daily for no fewer than 5 days, and allow normal activities/access to the workplace as long as viral test results are negative. |
| Testing (during individual quarantine) *(applies to residents)* | After the initial diagnostic test, test residents again after Day 5. | After the initial diagnostic test, release residents from quarantine after the full recommended 10-day period with no additional testing. (Test residents who develop symptoms, make additional testing available on request, and actively offer testing to residents more likely to get very sick from COVID-19 to identify infections early and assess treatment eligibility.) |
| Testing (during cohorted quarantine) *(applies to residents)* | Implement serial testing as recommended above, every 3-7 days for the entire cohort. | *Reduced cohort size option:* After the initial diagnostic test, implement serial testing every 3-7 days for the entire cohort. Use small cohort sizes to reduce the risk of continued transmission and prolonged quarantine periods.<br><br>*Reduced testing option – during crisis-level operations only:* After the initial diagnostic test, test residents who develop symptoms, and make additional testing available on request. Actively offer additional testing to residents more likely to get very sick from COVID-19 to identify infections early and assess treatment eligibility. Release cohorted residents from quarantine after 10 days have passed without any new cases. |
| Monitoring *(applies to residents)* | Conduct daily symptom checks for all quarantined residents. | Conduct daily symptom checks only for quarantined residents more likely to get very sick from COVID-19. Identifying symptomatic infection early can facilitate timely treatment and reduce the risk of severe outcomes. |

Regardless of the quarantine approach facilities choose, all residents and staff in the facility who have been potentially exposed or have close contact with someone with COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Whenever another individual enters a quarantine space that is occupied by a single resident
- When quarantined residents are housed as a cohort
- If a resident under quarantine leaves the quarantine space for any reason

In addition, if quarantine duration is reduced for staff members, facilities should still require exposed staff members to:

- Continue to self-monitor for symptoms of COVID-19 through day 10 after a known or suspected exposure
- Immediately isolate and get tested if symptoms of COVID-19 occur
- Adhere to all recommended prevention strategies for people who have been exposed to someone with COVID-19, including physical distancing and maintaining good hand hygiene

# Masks and Respirators

As a strategy for everyday operations in place at all times, provide a well-fitting mask or respirator to any residents and staff members who would like to use them based on their personal preference. Require universal indoor mask/respirator use as an enhanced prevention strategy when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk.

Correct and consistent mask or respirator use is key to preventing the spread of droplets and very small particles that contain the virus. Clearly explain the purpose of masks and respirators and when their use may be contraindicated. Provide masks or respirators at no cost to residents and staff and clean or replace them routinely.

In situations where the use of a respirator is not required either by the employer or by an Occupational Safety and Health Administration (OSHA) standard, the employer may still offer filtering facepiece respirators or permit employees to use their own respirators as long as the employer determines that such respirator use will not in itself create a hazard. This is considered voluntary use under the Respiratory Protection Standard. CDC encourages employers to permit workers to voluntarily use filtering facepiece respirators like N95s. If an employer allows voluntary use of filtering facepiece respirators, the employer must provide users with 29 CFR 1910.134 Appendix D – Information for Employees Using Respirators When Not Required Under the Standard ☑. See 29 CFR 1910.134(c)(2) ☑ for additional requirements applicable to voluntary respirator use.

See Table 2, including footnotes, for additional considerations for choosing a mask or respirator, including information on different types as well as safety and security considerations for their use in correctional and detention facilities.

# Preparing for Outbreaks

Maintain COVID-19 preparedness through essential actions detailed below.

- Monitor COVID-19 Community Levels and other local data, as well as updates to CDC and state public health websites, to inform decisions about when to add enhanced prevention strategies.
- Refine the facility's long-term COVID-19 plan as needed based on new information, and ensure staff are trained on the current plan. Ensure that the long-term COVID-19 plan includes:
  - Plans to procure COVID-19 vaccines and therapeutics to prevent severe outcomes
  - Plans to procure SARS-CoV-2 testing supplies
  - Ways to scale up medical isolation and quarantine spaces during an outbreak
  - Plans for operating during staffing shortages
  - Plans to restock PPE and cleaning and disinfection supplies during outbreaks
  - Considerations for offering revised duties during outbreaks for staff members who are more likely to get very sick from COVID-19
  - Plans to communicate with staff and residents about how they can protect themselves and others from COVID-19. Example signage and other communications materials are available on the CDC website. Printed materials should be easy to understand by non-English speakers, those with low literacy, and people with disabilities.
- Maintain collaborations with state, local, tribal, and territorial public health departments.
- Maintain communications with other correctional facilities to share information and collaborate on protocols to prevent transmission between facilities during resident transfers.
- Review the sick leave policies of each employer that operates within the facility. Employers are encouraged to implement flexible, non-punitive paid sick leave policies to reduce SARS-CoV-2 introduction and transmission in the facility.
- Ensure that all persons in the facility know the symptoms of COVID-19 and the importance of reporting symptoms if they develop.

# Physical Distancing

Physical distancing is the practice of increasing the space between individuals and decreasing frequency of contact to reduce the risk of spreading a disease. Physical distancing strategies can be applied on an individual level (e.g., avoiding close contact), a group level (e.g., temporarily suspending group activities where people would be in close contact), and an

operational level (e.g., rearranging chairs in the dining hall to increase distance between them or using protective barriers if space is limited). Physical distancing is an enhanced prevention strategy that can be considered when the COVID-19 Community Level is medium/high or when facility-level factors indicate increased risk.

- Make a list of possible physical distancing strategies that could be implemented as needed at different stages of transmission intensity. Strategies will need to be tailored to the individual space in the facility and the needs of the residents and staff.
- Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).
- If there are people with COVID-19 inside the facility, prevent unnecessary movement between different parts of the facility and mixing of people from different housing units. For example, maintain consistent duty assignments for staff across shifts to prevent transmission across different facility areas, and modify resident work detail assignments so that each detail includes only residents from a single housing unit.
- If possible, designate a room near each housing unit to evaluate residents with COVID-19 symptoms, rather than having them walk through the facility to the medical unit. If this is not feasible, consider staggering sick call.
- Consider increasing keep on person (KOP) medication orders.
- Identify staff duties that can be performed remotely.

## Visitation

At all times (even when COVID-19 Community Level is low):

- Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.
- Instruct visitors and volunteers to postpone their visit if they have symptoms of COVID-19.

When COVID-19 Community Level is medium/high or when facility-level factors indicate increased risk:

- Consider restricting non-essential visitors, vendors, volunteers, and tours from entering the facility, or restricting their interaction with sections of the facility where transmission is occurring. Suspending in-person visitation and volunteer services should only be done in the interest of the residents' physical health and the health of the community. Visitation and services provided by volunteers are important to maintain residents' mental health. If visitation is suspended, facilities should identify alternative ways for residents to communicate with their families, friends, and other visitors.
- If facilities maintain in-person visitation or volunteer services during periods of higher risk:
  - Require visitors and volunteers to wear a well-fitting cloth or disposable procedure mask or respirator while indoors.
  - Consider using protective barriers in visitation rooms and encouraging physical distancing.
  - Consider requiring visitors and volunteers to provide documentation of a negative SARS-CoV-2 test result within the last 72 hours before entry.

## Re-entry considerations

- If a resident preparing for release is not up to date on their COVID-19 vaccines, offer vaccination again. If they decline, provide them with information about where they can get vaccinated after release.
- When the COVID-19 Community Level is medium/high or when there is transmission in the facility, offer all residents screening testing before release, regardless of COVID-19 vaccination and booster status.
- Provide residents preparing for release with COVID-19 prevention information, hand hygiene supplies, and masks or respirators.
- Ensure that linkages to community services account for modified operations of providers due to COVID-19.
- When providing information on Medicaid enrollment and healthcare resources in the community, include information on continuity of care for chronic conditions that may make a person more likely to get very sick from COVID-19.
- When the COVID-19 Community Level is medium/high and when possible, encourage residents being released to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking residents to shared housing, link preferentially to accommodations with the greatest

capacity for physical distancing.

# Previous Updates

Updates from Previous Content                                                    ⌄

As of February 10, 2022

- Consolidated the following three guidance documents that were previously posted on the CDC COVID-19 Corrections webpage: Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities; Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities; and Recommendations for Quarantine Duration in Correctional and Detention Facilities.
- Reduced quarantine duration during routine operations from 14 days to 10 days.
- Added recommendations on isolation and quarantine duration for staff and residents in correctional and detention facilities during crisis-level operations.
- Added description of the use of medication for prevention of severe COVID-19 disease.
- Updated language on vaccination status to include booster doses and additional doses for people who are eligible for them. (Removed references to "fully vaccinated" to refer instead to being "up to date on COVID-19 vaccines.")
- Updated recommendations on use of personal protective equipment (PPE), masks, and respirators for correctional residents and staff.

As of June 9, 2021

- Considerations for modifying COVID-19 prevention measures in correctional and detention facilities in response to declining community transmission

As of May 6, 2021

- Updated cleaning and disinfection information

As of February 19, 2021

- Clarification that correctional and detention facilities should continue to use a 14-day quarantine period.
- Updated language on quarantine recommendations
- Updated language for the close contact definition.
- Updated criteria for releasing individuals with confirmed COVID-19 from medical isolation (symptom-based approach).
- Added link to CDC Guidance for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings
- Reorganized information on Quarantine into 4 sections: Contact Tracing, Testing Close Contacts, Quarantine Practices, and Cohorted Quarantine for Multiple Close Contacts
- Added testing and contact tracing considerations for incarcerated/detained persons (including testing newly incarcerated or detained persons at intake; testing close contacts of cases; repeated testing of persons in cohorts of quarantined close contacts; testing before release). Linked to more detailed Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities.
- Added recommendation to consider testing and a 14-day quarantine for individuals preparing for release or transfer to another facility.
- Added recommendation that confirmed COVID-19 cases may be medically isolated as a cohort. (Suspected cases should be isolated individually.)
- Reduced recommended frequency of symptom screening for quarantined individuals to once per day (from twice per day).
- Added recommendation to ensure that PPE donning/doffing stations are set up directly outside spaces requiring PPE. Train staff to move from areas of lower to higher risk of exposure if they must re-use PPE due to shortages.
- Added recommendation to organize staff assignments so that the same staff are assigned to the same areas of the facility over time, to reduce the risk of transmission through staff movements.

- Added recommendation to suspend work release programs, especially those within other congregate settings, when there is a COVID-19 case in the correctional or detention facility.
- Added recommendation to modify work details so that they only include incarcerated/detained persons from a single housing unit.
- Added considerations for safely transporting individuals with COVID-19 or their close contacts.
- Added considerations for release and re-entry planning in the context of COVID-19.

Last Updated May 3, 2022

# <u>EXHIBIT 5</u>

**CDC Guidance
February, 2022**





## COVID-19

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated Feb. 10, 2022

# Summary of Recent Changes

## Updates as of February 10, 2022 ⌄

- Consolidated the following three guidance documents that were previously posted on the CDC COVID-19 Corrections webpage: Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities; Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities; and Recommendations for Quarantine Duration in Correctional and Detention Facilities.
- Reduced quarantine duration during routine operations from 14 days to 10 days.
- Added recommendations on isolation and quarantine duration for staff and residents in correctional and detention facilities during crisis-level operations.
- Added description of the use of medication for prevention of severe COVID-19 disease.
- Updated language on vaccination status to include booster doses and additional doses for people who are eligible for them. (Removed references to "fully vaccinated" to refer instead to being "up to date on COVID-19 vaccines.")
- Updated recommendations on use of personal protective equipment (PPE), masks, and respirators for correctional residents and staff (Table 1).

View Previous Updates

This document provides guidance specific for correctional and detention facilities regarding coronavirus disease 2019 (COVID-19) and consolidates previous CDC corrections-specific guidance documents. This guidance is based on what is currently known about the transmission and severity of COVID-19 as of February 10, 2022.

The U.S. Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated guidance.

# Intended Audience

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities for adults and juveniles to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes COVID-19) in their facilities. (Visit the CDC website for healthcare workers for more information pertinent to healthcare staff specifically.) These facilities include but are not limited to federal and state prisons; local jails; detention centers; law enforcement agencies that have custodial authority for persons who are detained (i.e., U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Marshals Service); and their respective

community-based departments of health. Some of these facilities and agencies might adapt CDC guidance for correctional and detention facilities based on their specific populations or operational needs. This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. This guidance does not replace any applicable federal, state, Tribal, local, or territorial health and safety laws, rules, and regulations.

For the purpose of this document, "incarcerated/detained persons" or "residents" refers to persons held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced as well as those held for pre-trial or civil purposes.

"Staff" refers to the group of all public or private sector employees (e.g., contracted healthcare or food service workers) working within a correctional or detention facility. "Staff" does not distinguish between healthcare, custody, and other types of staff members, nor between government and private employers.

"Congregate settings" refers to a setting in which a group of usually unrelated persons reside for an extended period of time in close physical proximity. Congregate settings, including correctional and detention facilities, are characterized by a diverse and varying set of factors that can increase risk and affect exposure to and transmission of COVID-19.

Refer to CDC guidance on the definition of staying "up to date" on COVID-19 vaccines. This definition is subject to change over time based on updates to CDC vaccination guidance.

**This guidance should be adapted based on an individual facility's physical space, staffing, population, operations, history of SARS-CoV-2 outbreaks, community factors, and other resources and conditions.** Facilities should contact CDC (eocevent366@cdc.gov) or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

# Guidance Overview

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

1. Strategies for applying and sustaining COVID-19 prevention measures in correctional and detention facilities based on local data
2. Communication
3. Vaccination
4. Infection prevention and control
5. Testing considerations
6. Medical isolation and quarantine
   - Shortening quarantine or isolation during crisis-level operations
7. Medication for prevention of severe COVID-19 disease
8. Considerations for reentry programming

# 1. Strategies for applying and sustaining COVID–19 prevention measures in correctional and detention facilities based on local data

To develop a long-term COVID-19 prevention plan, facilities should weigh the logistical and mental health challenges related to prolonged, intensive mitigation measures against the risks associated with transmission of SARS-CoV-2. To help provide considerations for this decision-making, this section includes:

- Prevention measures to keep in place at all times
- Metrics to guide modification of COVID-19 prevention measures at the facility level, using data on local trends and facility characteristics

# Prevention measures to keep in place at all times

Facilities should maintain, at all times, the following aspects of standard infection control, monitoring, and capacity to respond to cases of COVID-19:

- **Provide COVID-19 vaccination, including boosters:** Continue to provide and encourage up to date COVID-19 vaccination for staff members and residents (including additional doses for people who are immunocompromised and others who are eligible for them, and boosters). (See Vaccination section below).

- **Maintain standard infection control:** Maintain optimized ventilation, handwashing, proper mask wearing, and cleaning and disinfection for standard prevention of infectious diseases, including COVID-19. For details, see the section below on Infection Prevention and Control and CDC's site on Safe and Proper Use of Disinfectants to Reduce Viral Surface Contamination in Correctional Facilities.

- **Maintain SARS-CoV-2 testing strategies:** Maintaining a robust testing program (including both diagnostic and screening testing) can help prevent or reduce transmission in congregate settings and provide critical data for ongoing assessment. Maintain the testing strategies below to the maximum extent possible based on facility resources and supplies.
  - **Diagnostic testing** should be performed for anyone who shows signs or symptoms of COVID-19 and for anyone who has been potentially exposed or identified as a close contact of someone with COVID-19, regardless of COVID-19 vaccination and booster status. See Testing section below for details.
  - **Routine screening testing** should be performed for all residents at intake and before transfer and release, regardless of COVID-19 vaccination and booster status.
  - See section below on Testing Considerations for SARS-CoV-2 for more information about testing strategies, including options for designing a screening testing program based on the unique features of a particular facility and its population.

- **Prevent COVID-19 introduction from the community:** Regardless of their vaccination and booster status, exclude staff members from work if they have symptoms of COVID-19, test positive for SARS-CoV-2, or have been potentially exposed or identified as a close contact of someone with COVID-19. See sections below on quarantine and isolation duration for staff during routine vs. crisis operations.

- **Prepare for outbreaks:** Monitor community data to be prepared for an outbreak, and maintain the ability to effectively communicate to staff members and residents about what to expect if an outbreak occurs. Maintain the ability to respond quickly to an outbreak, including the ability to scale up medical isolation and quarantine.

The response to COVID-19 in correctional and detention facilities should consider the broader mental health impacts for residents and staff, both for those with and without pre-existing mental illness. Some COVID-19 prevention measures, such as prolonged quarantine periods, repeated isolation, and restrictions on visitation and programming, are known to lead to negative impacts on mental health and well being.

# Applying or modifying COVID–19 prevention measures at the facility level using data on local trends and facility characteristics

As epidemiologic trends shift due to new variants and other factors, administrators may consider strengthening or relaxing COVID-19 prevention measures for individual facilities based on the five primary metrics listed below. No single metric should be used alone in decision-making. Consult with local public health partners in decision-making about modifying prevention measures, especially for facilities without internal public health or infectious disease experts. Any relaxing of prevention measures should be conducted in a stepwise fashion, one prevention measure at a time, with continued diagnostic testing and screening in place to carefully monitor for cases of COVID-19 in the facility before making changes to additional prevention measures. Communicate clearly with staff and residents about any changes made to procedures.

- **Vaccination coverage:** Determine the proportion of staff and residents who are up to date on their COVID-19 vaccines.

COVID-19 vaccines are highly effective in preventing severe illness, hospitalization, and death from COVID-19. Although not enough information is available to determine a specific level of vaccination coverage needed to modify facility-level prevention measures, maximizing up to date COVID-19 vaccination coverage is critical to protect staff members and residents.

- **Transmission in the facility:** Evaluate the current and historical level of COVID-19 transmission within the facility.

**Facility-level prevention measures should not be lifted when transmission is occurring within the facility.** Because of the risk of unrecognized infection, a single new case of SARS-CoV-2 infection in a staff member or resident in a correctional or detention facility should be evaluated as a potential outbreak. (However, if a resident tests positive at intake but has not had close contact with other members of the facility's population and is immediately placed in medical isolation, this person's positive test result could be considered an isolated case rather than transmission in the facility.)

If historical transmission levels in the facility have been high or if outbreak response has been difficult, maintain COVID-19 prevention measures for a longer duration.

- **Transmission in the community:** Monitor the level of COVID-19 transmission in the surrounding community.

Consider the community where the facility is located as well as the communities from which residents originate and where staff members live. County-level transmission indicators can be found on CDC's COVID Data Tracker website. Maintain prevention measures when community transmission levels are higher, since introduction of the virus into the facility is more likely during those times.

- **Demographic and health-related characteristics:** Determine the proportions of the facility's residents and staff who are at increased risk for severe COVID-19 illness. Consider the potential impact of prolonged mitigation measures on mental health.

Maintain facility-level prevention measures for longer durations in facilities with high proportions of people at increased risk for severe illness.

- **Facility structural and operational characteristics:** Assess how facility characteristics and operational protocols can contribute to SARS-CoV-2 spread within the facility.

Maintain COVID-19 prevention measures for longer durations in facilities where the layout (e.g., dorm/open barracks vs. individual cells), ventilation, or movement patterns inhibit physical distancing or the frequency of air exchange, and where staff members work across multiple units that otherwise have no shared close contacts.

# 2. Communication

Administrators maintain preparation for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and the importance of reporting those symptoms if they develop. They should ensure that materials are easy to understand by non-English speakers, those with low literacy, and people with disabilities. Other essential actions are detailed below.

Develop information-sharing systems with external partners.

- Public health partners
  - Identify points of contact in relevant state, local, tribal, and territorial public health departments. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
  - Notify and coordinate with the public health department when a person has suspected or confirmed COVID-19. Request any necessary assistance.
  - Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.
- Correctional partners
  - Communicate with other correctional facilities to share information including the number of cases and deaths (e.g. disease surveillance) and absenteeism patterns among the staff.
  - Where possible, put plans in place to restrict transfers of residents between facilities during their quarantine or isolation period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine/isolation space, or extenuating correctional, judicial, or security concerns.

Encourage all persons in the facility to take actions to protect themselves and others from COVID-19, including staying up to date on their COVID-19 vaccines, wearing well-fitting masks or respirators indoors, practicing physical distancing as much as possible, and maintaining good hand hygiene.

- Provide residents and staff with up-to-date information about COVID-19 and changes to facility policies on a regular basis.
- Train staff on the facility's COVID-19 plan.
- Address concerns related to reporting symptoms (e.g., being sent to medical isolation), and explain that quarantine and medical isolation are not the same as disciplinary solitary confinement. In addition, ensure that medical isolation and quarantine are truly operationally distinct from disciplinary solitary confinement (see section on Medical Isolation and Quarantine).
- Post signs throughout the facility about ways staff and residents can protect themselves and others from COVID-19. Example signage and other communications materials are available on the CDC website.
- Ensure that the pandemic plan addresses staff safety and potential staffing shortages.
- Identify duties that can be performed remotely. Where possible, allowing staff to work from home can be an effective physical distancing strategy to reduce the risk of SARS-CoV-2 infection during an outbreak.
- Consider offering revised duties to staff members who are at increased risk for severe COVID-19 illness. Review the sick leave policies of each employer that operates within the facility. Employers are encouraged to implement flexible, non-punitive paid sick leave and supportive policies and practices as part of a comprehensive approach to prevent and reduce transmission among employees and to prevent introduction into the resident population.
- Plan for absences. Staff members should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals. Identify critical job functions and plan for alternative coverage. Consider increasing keep on person (KOP) medication orders in case of healthcare staff shortages.

# 3. Vaccination

Increasing COVID-19 vaccination rates and ensuring that staff and residents stay up to date on their COVID-19 vaccines is the most important tool available to prevent correctional staff and residents from getting sick with COVID-19. Currently authorized or approved vaccines in the United States are highly effective in protecting against severe illness, hospitalization, and death. For more information on vaccine effectiveness, visit Ensuring COVID-19 Vaccines Work.

COVID-19 and other vaccines, including influenza vaccines, may be co-administered at the same time. See the Interim Guidance for Routine and Influenza Immunization Services During the COVID-19 Pandemic for additional considerations for influenza vaccination of persons in congregate-settings during the COVID-19 pandemic.

Correctional and detention facilities should:

- Ensure that vaccines and boosters are available for all staff and residents in order to stay up to date.
- Promote COVID-19 vaccination by educating the staff and residents on the effectiveness, safety, and importance of vaccines; consider recruiting residents who received the vaccine to be peer supporters to encourage other residents to get the vaccine and recruiting staff peers to encourage staff vaccination.
- Work with local health departments, healthcare providers, and community organizations on effective ways to increase vaccination uptake, informed by input from residents about why they may not wish to receive the vaccine.

Additional vaccine resources:

- Stay Up to Date with Your Vaccines
- COVID-19 vaccine communications resources available to print specifically for correctional facilities: Print Resources
- Building Confidence in COVID-19 Vaccines
- COVID-19 Vaccine Information for Specific Groups
- Ensuring the Safety of COVID-19 Vaccines in the United States
- COVID-19 Vaccine Booster Shot

- COVID-19 Vaccine Communication Toolkit
- Frequently asked Questions about the COVID-19 Vaccine
- COVID-19 Rapid Community Assessment Guide

# 4. Infection prevention and control

For more Infection Prevention Control information for healthcare workers, see CDC's Infection Control Guidance for Healthcare Professions about Coronavirus (COVID-19).

## Hand hygiene

- All staff members and residents should use everyday preventive actions including regularly washing their hands, avoiding touching their eyes, nose, and mouth, and covering their cough.
- Facilities should ensure that staff members and residents have adequate access to hand hygiene materials at no cost. These materials should include soap, water, and clean towels or alcohol-based hand sanitizer with at least 60% alcohol.

## Cleaning and disinfection

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response.
- Facilities should have a plan in place to restock supplies as needed during a COVID-19 outbreak.

## Physical distancing

- Physical distancing is the practice of increasing the space between individuals and decreasing frequency of contact to reduce the risk of spreading a disease (ideally maintaining at least 6 feet between all people, even those who do not have symptoms). Physical distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where people would be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them or using protective barriers if space is limited).
- Make a list of possible physical distancing strategies that could be implemented as needed at different stages of transmission intensity. When distancing is not possible, protective barriers may be used in areas such as offices and classrooms. Strategies will need to be tailored to the individual space in the facility and the needs of the residents and staff.
- Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).
- When feasible and consistent with security priorities, encourage staff members to maintain a distance of 6 feet or more from a person with COVID-19 symptoms while interviewing, escorting, or interacting in other ways. Staff members should always wear recommended PPE when in close contact with a person with COVID-19 symptoms.
- If there are people with COVID-19 inside the facility, prevent unnecessary movement between different parts of the facility and mixing of people from different housing units. For example, maintain consistent duty assignments for staff across shifts to prevent transmission across different facility areas, and modify resident work detail assignments so that each detail includes only residents from a single housing unit.
- If possible, designate a room near each housing unit to evaluate residents with COVID-19 symptoms, rather than having them walk through the facility to the medical unit. If this is not feasible, consider staggering sick call.

## Symptom screening and temperature checks

- Screening for COVID-19 symptoms (including temperature checks) and asking about recent exposure can help identify staff members or visitors who should be excluded from a facility before entry and residents (at intake or in the existing population) who should be evaluated for potential medical isolation or quarantine. Symptom screening alone will not prevent all transmission, since it is largely based on voluntary self-report and will not identify people with asymptomatic infection.
- Symptom screening and temperature checks should be used in combination with a screening testing program (described below) to minimize the risk of SARS-CoV-2 transmission. Symptom screening and temperature checks should be

conducted daily during the quarantine period among residents who have been exposed to someone with COVID-19.

# Routine Mask or Respirator Use

- All staff members and residents should wear a well-fitting cloth or disposable procedure mask or a respirator as much as possible while indoors (unless contraindicated), even in areas not used for quarantine or medical isolation. If masks or respirators are not worn outdoors, ensure that physical distancing is maintained. Correct and consistent mask or respirator use is key to preventing the spread of droplets and very small particles that contain the virus (i.e., source control). Provide masks or respirators at no cost to residents and staff and clean or replace them routinely.

- Considerations for choosing a mask or respirator:

  - Masks and respirators can provide different levels of protection depending on the type of product and how they are used. Choose the most protective mask or respirator that fits well and can be worn consistently.

  - Loosely woven cloth products provide the least protection; layered finely woven products offer more protection; well-fitting disposable procedure masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection.

  - When possible based on facility resources and supply, offer different types of masks and respirators to staff and residents so that they can choose the option that fits them best and that they can wear consistently. The options that are offered in correctional and detention facilities may be limited by safety and security considerations, such as concerns about metal nose wires.

  - Residents should be offered masks or respirators providing the same level of protection as those provided to staff when residents are in a similar environment. See Table 1 for recommended masks and respirators for different scenarios.

- Clearly explain the purpose of masks and respirators and when their use may be contraindicated.

- See Table 1 for more information about when different types of masks and respirators are recommended for residents or staff based on their scope of duties and risk of exposure to SARS-CoV-2.

# Recommended PPE and PPE Training for Staff Members and Residents

- Recommended PPE for staff members and residents in a correctional facility will vary based on the type of contact they have with someone with COVID-19 or their close contacts. See Table 1 for recommended PPE for residents and staff members with varying levels of contact with people with COVID-19 or their close contacts. In case of shortages, use strategies for safely optimizing PPE supplies.

- Ensure that staff members and residents who are required to wear PPE have been trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities:

  - PPE donning and doffing training videos and job aids 📄
  - Protecting Healthcare Personnel (as found on the CDC website)
  - Infection control guidance for healthcare professionals about COVID-19
  - CDC COVID-19 Correction Unit's Infection Prevention and Control training slides 📄

- Have designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include the following (See the full list of recommended materials in the CDC Correction Unit's Infection Prevention and Control training slides 📄 ):

  - A dedicated trash can for disposal of used PPE (one for laundry and one for trash or biohazard)
  - A hand washing station or access to alcohol-based hand sanitizer with at least 60% alcohol
  - Posters illustrating correct donning and doffing procedures

- If not already in place, employers operating within the facility should establish a respiratory protection program, as appropriate, to ensure that staff members and residents are fit-tested, medically cleared, and trained for any respiratory protection they will need within the scope of their responsibilities. For more details, see the OSHA Emergency Temporary Standard for Healthcare Workers 🔗 , which contains guidance for the elements needed in a mini respiratory protection program, which is relevant for healthcare workers outside of traditional hospitals and clinics, if certain criteria are present.

- If staff members must serve multiple facility areas, ensure that they change PPE when leaving the medical isolation or quarantine space. If a shortage of PPE supplies necessitates reuse, ensure that staff members move only from low to high exposure risk areas while wearing the same PPE to prevent cross-contamination. For example, start in a housing

unit where no one is known to be infected or exposed, then move to a space used as quarantine for close contacts, and end in an isolation unit.

## Table 1. Recommended Personal Protective Equipment (PPE) and Source Control for Residents and Staff in a Correctional or Detention Facility

Note: To maximize protection from highly transmissible SARS-CoV-2 variants of concern and prevent possible spread to others, residents and staff members of correctional facilities should wear a cloth or disposable procedure mask or respirator regardless of vaccination and booster status while indoors, and should maintain physical distancing outdoors if not masked. The PPE described below may only be required for certain activities, see footnotes for details.

| | NIOSH-approved Respirator* | International Respirator* or Disposable Procedure Mask | Cloth Mask | Eye Protection | Gloves | Gown/Coveralls |
|---|---|---|---|---|---|---|
| **Residents** | | | | | | |
| With confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | X[†§] | | | | |
| Quarantined (individually or in a cohort) as a close contact of someone with COVID-19 | | X[†§] | | | | |
| Handling laundry or used food service items from someone with COVID-19 or their close contacts | X[†§] | | | X[¶] | X | X |
| Working in an area designated for quarantine or medical isolation (*without* having close contact with persons under quarantine or isolation precautions) | X | | | If using cleaning products, additional PPE may be needed based on the cleaning product label. See CDC guidelines for details. | | |
| Working in an area designated for quarantine or medical isolation (*with* close contact with persons under quarantine or isolation precautions) | X | | | X | X | X |
| Living or working in areas of the facility not designated for quarantine or medical isolation | | X[†§] | | | | |
| **Staff** | | | | | | |
| Working in medical isolation or quarantine areas (*without* close contact with persons under quarantine or isolation precautions) | X | | | If using cleaning products, additional PPE may be needed based on the cleaning product label. See CDC guidelines for details. | | |

| | NIOSH-approved Respirator* | International Respirator* or Disposable Procedure Mask | Cloth Mask | Eye Protection | Gloves | Gown/Coveralls |
|---|---|---|---|---|---|---|
| Having close contact with (including transport) or providing medical care to persons under quarantine or isolation precautions | X | | | X | X | X |
| Performing temperature checks for any persons who are *not* under quarantine or isolation precautions** | | X† | | X | X | |
| Handling laundry or used food service items from someone with COVID-19 or their close contacts | X† | | | X¶ | X | X |
| Working in areas of the facility not designated for quarantine or medical isolation | | X† | | If using cleaning products, additional PPE may be needed based on the cleaning product label. See CDC guidelines for details. | | |

* NIOSH-approved respirators include N95s. International respirators include KN95s and KF94s. Visit the CDC website of Types of Masks and Respirators for a full list of NIOSH-approved and international respirators.

† Masks and respirators can provide different levels of protection depending on the type and how they are used. Choose the most protective mask or respirator that fits well and can be worn consistently. Loosely woven cloth products provide the least protection; layered finely woven products offer more protection; well-fitting disposable procedure masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection. When possible, offer different types of masks and respirators to staff and residents so that they can choose the option that fits them best and that they can wear consistently. The options that are offered in correctional and detention facilities may be limited by safety and security considerations, such as concerns about metal nose wires.

§Residents should be offered masks or respirators providing the same level of protection as those provided to staff in a similar environment.

¶Eye protection should be added if splashes or sprays during cleaning and disinfection activities are anticipated or if otherwise required based on the selected cleaning products.

** Sanitize or change gloves between each temperature check. A gown could be considered if extensive contact with the person being screened is anticipated.

# Considerations for Visitors

- If transmission in the facility and/or substantial community transmission is occurring, restrict non-essential vendors, volunteers, and tours from entering the facility or sections where transmission has been occurring.
  - Consider restricting visitation when there is moderate to high community transmission to prevent the introduction of the virus into the facility.
  - Suspending in-person visitation should only be done in the interest of the residents' physical health and the health of the community. Visitation is important to maintain residents' mental health. If visitation is suspended, facilities should identify alternative ways for residents to communicate with their families, friends, and other visitors.
- Require visitors to wear cloth or disposable procedure masks or respirators (unless contraindicated) and perform symptom and exposure screening and temperature checks for all visitors and volunteers on entry.
- Display signage and other communications materials outside visiting areas explaining the COVID-19 symptom screening and temperature check process. Ensure that materials are understandable for non-English speakers, those with low literacy, and people with disabilities.

- Exclude visitors and volunteers who do not clear the screening process or who decline screening or are not wearing masks or respirators (unless contraindicated).
- Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.
- Use protective barriers such as sneeze guards in visitation rooms when possible, as a part of a layered strategy to prevent SARS-CoV-2 transmission.
- Use physical distancing and visual cues such as stickers or decals to maintain physical distancing.
- Instruct visitors to postpone their visit if they have symptoms of COVID-19.

# 5. Testing considerations

People undergoing testing in any setting, including correctional and detention facilities, should receive clear information on what the results mean, recommended actions associated with negative or positive results, the difference between testing for screening versus for medical diagnosis, who will be able to access the results, and how the results may be used. Individuals tested are required to receive patient fact sheets as part of the test's emergency use authorization ⧉ (EUA).

Because of the risk of unrecognized infection, a single new case of SARS-CoV-2 infection in a staff member or resident in a correctional or detention facility should be evaluated as a potential outbreak. If a resident tests positive at intake but has not had close contact with other members of the facility's population and is immediately placed in medical isolation, this person's positive test result could be considered an isolated case rather than a part of a larger outbreak. However, it may be necessary to test other people who were exposed during intake or transport.

## A. Test types

There are currently two types of tests to identify SARS-CoV-2 infection or exposure: viral and antibody tests.

Viral tests authorized ⧉ by the Food and Drug Administration (FDA), including nucleic acid amplification tests (NAATs), and antigen tests, are used to **diagnose current infection** with SARS-CoV-2, the virus that causes COVID-19.

Tests can differ based on sensitivity (i.e., number of false-negative results/missed detections of SARS-CoV-2) and/or specificity (i.e., number of false-positive results/tests incorrectly identifying SARS-CoV-2 when the virus is not present).

- NAATs are high-sensitivity, high-specificity tests for diagnosing SARS-CoV-2 infection. Most NAATs need to be processed in a laboratory, and the time to obtain results varies (~1–3 days), but some NAATs are point-of-care tests with results available in about 15–45 minutes.
- Antigen tests are immunoassays that detect the presence of a specific protein on the surface of the virus. Different antigen tests generally have similar specificity, but are less sensitive than most NAATs. Most are less expensive than NAATs and can be conducted at the point of care testing site, usually with faster turnaround times. It may be necessary to confirm some antigen test results with a laboratory-based NAAT (i.e., a negative antigen test result in persons with symptoms or a positive antigen test result in persons without symptoms or known exposure). Based on the authorization from FDA ⧉ , some point-of-care NAATs that provide presumptive results cannot be used for confirmatory testing. Use of the CDC Antigen Testing Algorithm is recommended to determine when confirmatory testing is needed.

Antibody (or serology) tests are used to detect previous infection with SARS-CoV-2 and can aid in the diagnosis of Multiple Inflammatory Syndrome in Children (MIS-C) and in adults (MIS-A). CDC does not recommend using antibody testing to diagnose current infection or to assess immunity. For more information on test types and how to choose a test, refer to Overview of Testing for SARS-CoV-2.

## B. Diagnostic testing

Diagnostic testing is intended to identify current infection and is performed when a person has signs or symptoms consistent with COVID-19, or when a person is asymptomatic (without symptoms) but has recent known or suspected exposure to someone with COVID-19. See Overview of Testing for SARS-CoV-2 for details.

**Facilities should consider suspending co-pays for residents seeking medical evaluation for possible COVID-19 symptoms, to remove possible barriers to symptom reporting.**

*Testing and managing persons with signs or symptoms consistent with COVID-19, regardless of vaccination or booster status*

- **Residents with symptoms**, regardless of COVID-19 vaccination or booster status, should be moved to medical isolation in a separate environment from other people (ideally individually), medically evaluated, and tested. If the test result is positive, medical isolation should continue for 10 days. Multiple residents with confirmed COVID-19 can be housed as a cohort (in a dorm or cell environments) regardless of the date of their positive test result. Facility staff should carefully evaluate and support the mental health needs of residents during medical isolation.
- **Staff members with symptoms**, regardless of COVID-19 vaccination and booster status, should be excluded from work and advised to seek testing. If the test result is positive, staff members should be excluded from work for 10 days. (However, staff may use the guidance for the general public for duration of isolation when they are not at work.) See section below on isolation duration for staff during routine vs. crisis operations.
- **Visitors with symptoms**, regardless of COVID-19 vaccination and booster status, should be denied entry and encouraged to seek testing through their healthcare providers or local health department.

*Testing asymptomatic persons with recent known or suspected exposure to SARS-CoV-2*

Because of the potential for asymptomatic and pre-symptomatic transmission, close contacts (people who were less than 6 feet away from an infected person for a total of 15 minutes or more over a 24-hour period) should be tested *regardless of their COVID-19 vaccination or booster status*.

In correctional and detention facilities, contact tracing to identify each individual's close contacts, including visitors, can be difficult. Therefore, people considered to be close contacts may include all persons defined by a particular setting/location (such as all residents and staff members assigned to a dormitory or unit where a case has been identified). Refer to the quarantine considerations section for information about quarantine for people with known or suspected exposure to SARS-CoV-2 in correctional and detention facilities.

- **Initial tests**: All persons with known or suspected exposure to someone with COVID-19, *regardless of their COVID-19 vaccination and booster status*, should receive an initial diagnostic test as soon as possible after they have been identified as a close contact (but not within the first 24 hours after exposure/close contact, since a test is unlikely to be positive that quickly). If the initial test is negative, they should receive a second diagnostic test at least 5 days after the exposure/close contact. (If the initial test was performed at least 5 days after the exposure/close contact, a second test is not needed.) Depending on local laboratory capacity, rapid point-of-care tests may offer the shortest turnaround time to facilitate timely action based on results.
- **Broad-based testing when contact tracing is challenging**: In settings where contact tracing is difficult, such as in a large dormitory, facilities should conduct broad-based testing in areas where an exposure has occurred. Broad-based testing involves testing everyone in the affected area(s) of the facility, *regardless of their COVID-19 vaccination and booster status*. For details on performing testing for large numbers of people, review CDC guidance on Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings.
  - The scope of broad-based testing should be based on the extent of movement (of staff members and residents) between parts of the facility with and without cases. Examples of broad-based testing strategies include the following:
    - Testing all persons in a single housing unit where someone has tested positive, if there has not been movement to or contact with other areas of the facility through the staff or residents (i.e., residents have not left the housing unit and the staff members work exclusively in that housing unit).
    - Testing all persons in an entire building or complex when cases have been identified in multiple parts of the building or complex, or if there has been movement between parts of the building or complex with and without cases.
  - If a resident tests positive at intake but has not had close contact with other members of the facility's population and is immediately placed in medical isolation, this person's positive test result would not trigger broad-based testing and could be considered an isolated case rather than a part of a larger outbreak. However, it may be necessary to test other people who were exposed during intake or transport.
  - Facility administrators should consider including staff in broad-based testing efforts *regardless of vaccination and booster status*, in order to help ensure that any COVID-19 cases are identified quickly, and to slow transmission. If it

is not feasible to test staff members at the facility, facilities should work with community partners or state/local health departments to implement staff testing.

- – Facilities should make plans for how they will modify their operations based on test results. Given the potential for rapid transmission and high numbers of infections, ensure that plans include medical isolation options to house large numbers of infected persons and quarantine options to house large numbers of close contacts. For example, consider how the facility's housing operations could be modified for multiple test result scenarios (e.g., if testing reveals that 10%, 30%, 50%, or more of a facility's population is infected with SARS-CoV-2).

- **Serial re-testing of a quarantined cohort:** If quarantine cohorts are used (i.e., people who are exposed are quarantined together rather than individually due to space constraints or mental health concerns), facilities should conduct serial re-testing of the entire quarantined cohort, *regardless of their vaccination and booster status*.

  - – Facilities should re-test people quarantined as a cohort every 3–7 days until testing identifies no new cases in the cohort for 10 days since the most recent positive result. The testing interval should be based on the stage of an ongoing outbreak (i.e., testing every 3 days can allow for faster outbreak control in the context of an escalating outbreak; testing every 5–7 days is sufficient when transmission has slowed).

  - – Anyone testing positive should be removed from the cohort, placed in medical isolation, and the 10-day quarantine period should re-start for the remainder of the cohort.

  - – If any person in the quarantine cohort develops symptoms, refer to the section titled Testing persons with signs or symptoms consistent with COVID-19, regardless of their vaccination and booster status.

- **Testing people with prior diagnosis of SARS-CoV-2 infection:** People who have recovered from SARS-CoV-2 infection within the past 90 days and have been re-exposed to SARS-CoV-2 may not need to be tested but should still receive regular temperature and symptom screening checks. If a person develops new symptoms during the 90-day period after their initial infection, and an evaluation fails to identify a diagnosis other than SARS-CoV-2 infection (e.g., influenza), then the person warrants evaluation for SARS-CoV-2 reinfection in consultation with an infectious disease or infection control expert.

Medical isolation might be warranted before and during this evaluation, particularly if symptoms developed after close contact with an infected person or in association with an outbreak setting. If more than 90 days have passed since a prior SARS-CoV-2 infection, testing and management, including quarantine and medical isolation if indicated, should proceed as it would for someone who had not previously been diagnosed with SARS-CoV-2 infection. Facilities should also consider the potential for coinfection of influenza and COVID-19.

# C. Screening testing

Screening testing is intended to identify people infected with SARS-CoV-2 who are asymptomatic or pre-symptomatic and do not have known, suspected, or reported exposure to SARS-CoV-2. NAATs, antigen tests, or both can be used for screening testing. Screening testing can be a valuable tool in correctional and detention facilities because it can detect SARS-CoV-2 early to help stop transmission quickly. Screening testing may be particularly useful in areas with moderate to high community transmission, to catch asymptomatic infections early.

## Movement–based screening testing

Movement-based screening testing is the routine screening testing of residents at intake, before transfer to another facility, and before community visits or release. All residents, regardless of vaccination and booster status, should undergo testing at these time points to help prevent introduction of virus into the facility, across facilities, and from the facility into the community.

Screening testing based on movement should include testing for residents in the following scenarios:

- **At intake.** Test all incoming residents at intake, and house them separately from the rest of the facility's population (individually if feasible) while waiting for test results. Testing can be combined with a 10-day observation period (sometimes referred to as "routine intake quarantine") before persons are assigned housing with the rest of the facility's population (especially if community transmission high). People under routine intake quarantine should be quarantined separately from those quarantined due to exposure to COVID-19. If incoming residents undergo intake quarantine, consider re-testing them at the end of the intake quarantine period before they are assigned housing with the rest of the facility's population. If residents undergo intake quarantine as a cohort, consider testing every 3–7 days if community transmission is high to prevent transmission within the cohort.

- **Before transfer to another facility.** Test all residents before transfer to another correctional/detention facility. Wait for a negative test result before transfer. Testing before transfer can be combined with a 10-day observation period (sometimes referred to as "routine transfer quarantine") before an individual's projected transfer. People under routine transfer quarantine should be quarantined separately from those quarantined due to exposure to COVID-19. Routine transfer quarantine is recommended particularly when there is transmission known to be occurring within the originating facility.

- **Before release.** Test residents leaving the facility as close as possible (and no more than 3 days prior) to the day of the release (whether into the community or to a halfway house or other transitional location). Testing before release is particularly important if residents will be housed in other congregate settings (e.g., homeless shelters, group homes, or halfway houses) or in households with persons who are at higher risk of severe illness from COVID-19, including older adults and people with certain medical conditions. Testing before release can be combined with a 10-day observation period (sometimes referred to as "routine release quarantine") before a person's release date. People under routine release quarantine should be quarantined separately from those quarantined due to exposure to COVID-19. Notify public health authorities for assistance arranging medical isolation upon release for people who have a positive test result.

- **Before community visits.** If performing testing before community visits, test residents leaving the facility as close as possible (and no more than 3 days prior) to the day of the visit (e.g., medical trips, court appearances, community programs). If community transmission is high, facilities can consider testing 5 days after return.

## Routine screening testing

Routine screening testing is the regular testing of all or a subset of residents and staff in a facility, with the goal of identifying COVID-19 cases early to prevent widespread transmission. Routine screening testing can include point-of-care testing and laboratory testing, and it can include all residents and staff members in a facility, or a targeted or random subgroup according to criteria the facility designates (examples below).

For any routine screening testing strategy that is put in place, testing at least weekly is recommended. Routine screening testing programs ideally include both residents and staff. If staff are tested during routine screening testing, consider testing them on the first test of their work week ⧉ (defined as four or more consecutive work days), rather than randomly or regularly on another day of the work week, if feasible. If community prevalence increases rapidly, consider more frequent testing. If performing large scale testing on-site, consider staggering testing throughout the day or on different days to avoid overcrowding, long wait times, and burden on testing staff. If it is not feasible to test staff as part of a screening testing program, facilities should investigate options to work with community partners or state/local health departments to test staff.

Data on facility and community transmission level and testing capacity can guide decisions about when to implement routine screening testing strategies. Consider routine screening testing when community transmission is substantial or high (Table 2). The community transmission indicators below can be found for your county on CDC's COVID Data Tracker website.

## Table 2. Indicators of Community Transmission*

| Indicator | Low | Moderate | Substantial | High |
|---|---|---|---|---|
| Cumulative number of new cases per 100,000 persons within the last 7 days[†] | <10 | 10–49 | 50–99 | ≥100 |
| Percentage of NAATs[§] that were positive during the last 7 days[¶] | <5% | 5%–7.9% | 8%–9.9% | ≥10% |

* If the two indicators suggest different transmission levels, the higher level should be selected.

[†] Number of new cases in the county (or other administrative level) in the last 7 days divided by the population in the county (or other administrative level) multiplied by 100,000.

[§] Nucleic acid amplification tests

[¶] Number of positive test results in the county (or other administrative level) during the last 7 days divided by the total number of tests resulted in the county (or other administrative level) during the last 7 days. See "Calculating Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Laboratory Test Percent Positivity: CDC Methods and Considerations for Comparisons and Interpretation."

If routine screening testing is conducted only among a subset of individuals or facilities within a correctional system, the following factors can guide the prioritization and selection of the subset:

Facility-level factors

- Facilities that have had cases or outbreaks within the past month
- Housing units where preventive measures such as physical distancing or adequate ventilation are difficult to implement (e.g., dormitory-based housing)
- Facilities allowing in-person visitation
- Facilities with high levels of community movement (e.g., frequent off-site medical visits, work release, or court appearances)
- Facilities with frequent admissions of new residents or residents transferring in from other facilities
- Units within facilities, as well as facilities within a correctional system, housing resident populations at higher risk of severe illness from COVID-19

Individual-level factors

- Residents and staff members who are at higher risk of severe illness from COVID-19†
- Residents assigned to critical on-site work details within the facility that require them to leave their housing unit or mix with persons in other housing units (e.g., food service, laundry)
- Residents participating in:
  - Work release programs
  - Off-site medical visits
  - Court appearances
- Staff working in:
  - A facility designated for medical care (e.g., medical facility, long-term care or skilled nursing facility)
  - Multiple areas of the facility
  - Multiple congregate facilities (e.g., more than one correctional/detention facility, homeless shelters, group homes, or schools)
- Staff members who live or spend time with other staff members who work in other areas of the facility (e.g., family or household members, carpools)

# 6. Medical isolation and quarantine

**Medical isolation** refers to the physical separation of an individual with confirmed or suspected COVID-19 infection to prevent their contact with others and reduce the risk of transmission. In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion, and should ensure that the conditions in medical isolation spaces are distinct from those in punitive isolation. Residents in medical isolation should receive regular visits from medical staff and should have access to mental health services.

**Quarantine** refers to the physical separation of an individual who has had close contact with someone with confirmed or suspected COVID-19 to determine whether they develop symptoms or test positive for the disease. Quarantine reduces the risk of transmission to others if the individual is later found to have COVID-19.

Facilities should have a plan in place to ensure that *separate physical locations* (dedicated housing areas and bathrooms) have been identified to:

- Medically isolate residents with *suspected* COVID-19 (ideally individually while awaiting test results)
- Medically isolate residents with *confirmed* COVID-19 (individually or as a cohort)
- Quarantine residents identified as close contacts of those with confirmed or suspected COVID-19 (ideally individually, but as a cohort if necessary)

Facilities' medical isolation and quarantine plans should include expansion contingencies to prepare for surges in cases and/or close contacts. Regardless of the location, facilities should ensure that placement in medical isolation or quarantine does not create barriers to access to medical or mental health care.

Note that facilities may determine that single-cell housing is not advisable in some situations due to mental health concerns. If close contacts are quarantined as a cohort, keep the number housed together as small as possible to minimize the risk of further transmission.

Residents with confirmed COVID-19 may be housed in medical isolation as a cohort (rather than in single cells). Cohorting residents during medical isolation can mitigate some mental health concerns associated with individual isolation and can increase capacity for medical isolation during case surges. Considerations for cohorted medical isolation include:

- Only residents with *laboratory-confirmed* COVID-19 should be housed together as a cohort. Do not cohort those with confirmed COVID-19 together with those with suspected COVID-19, with close contacts of people with confirmed or suspected COVID-19, or with those with other illnesses.
- When choosing a space to cohort groups of residents with confirmed COVID-19, use a single, large, well-ventilated room with solid walls and a solid door that closes fully. Using a single room will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

Movement of residents who are housed in medical isolation or quarantine units should be restricted as follows:

- Keep residents' movement outside the medical isolation/quarantine space to an absolute minimum.
- Serve meals inside the medical isolation/quarantine space.
- Provide medical care inside the medical isolation/quarantine space, unless it is not physically possible to do so, or unless a resident needs to be transferred to a healthcare facility.
- Exclude medically isolated/quarantined residents from all group activities outside the medical isolation/quarantine space.
- Where possible, restrict medically isolated/quarantined residents from leaving the facility (including transfers to other facilities) during the medical isolation/quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of medical isolation/quarantine space, or extenuating correctional, judicial, or security concerns.
- Staff assignments to quarantine spaces should remain as consistent as possible, and these staff members should limit their movements to other parts of the facility. These staff members should wear recommended PPE appropriate for their level of contact with people under medical isolation/quarantine. See PPE section below.
- Clean and disinfect areas used by people with COVID-19 on an ongoing basis during medical isolation.

## A. Clearly communicate to residents and staff that quarantine and medical isolation are not intended to be punitive

Because of limited individual housing spaces within many correctional and detention facilities, infected or exposed people are often placed in the same housing spaces that are used for administrative or disciplinary segregation. To avoid being placed in these conditions, residents may be hesitant to report COVID-19 symptoms or close contact with people with COVID-19, leading to continued transmission within shared housing spaces and, potentially, lack of timely health care and greater risk of adverse health outcomes for people infected with SARS-CoV-2 who delay reporting symptoms. Ensure that medical isolation and quarantine are *operationally* distinct from administrative or disciplinary segregation, even if the same housing spaces are used for both. For example

- Make efforts to provide similar access to radio, TV, reading materials, personal property, commissary, showers, and other resources as would be available in individuals' regular housing units.
- To support mental health, consider allowing increased telephone time or other opportunities to communicate with others inside and outside the facility during the isolation or quarantine period.
- Communicate regularly with residents who are in medical isolation or quarantine about the duration and purpose.
- Ensure that staff understand that the same restrictions placed on residents in segregated housing when used for disciplinary reasons should not be applied to residents housed in the same spaces for COVID-9 related reasons.

## B. Medical isolation for people with suspected COVID–19

As soon as a resident shows symptoms of COVID-19, they should be given a cloth or disposable procedure mask or respirator (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other people (ideally individually), and medically evaluated and tested for SARS-CoV-2. Facilities without onsite healthcare capacity to medically evaluate and/or treat residents with suspected COVID-19 should have a plan in place to ensure that timely evaluation and treatment take place through an offsite medical facility, additional healthcare providers, or other means.

- If the resident's SARS-CoV-2 test result is positive, they can be moved to a cohorted medical isolation unit with other people with confirmed COVID-19.
- If the SARS-CoV-2 test result is negative, the person can return to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

Residents who are medically isolated due to suspected COVID-19 should wear cloth or disposable procedure masks or respirators under the following circumstances:

- Whenever another individual enters the medical isolation space
- If the resident leaves the medical isolation space for any reason

The clinical staff evaluating and providing care for people with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), including wearing recommended PPE, and monitoring the guidance website regularly for updates to these recommendations.

## C. Medical isolation for people with confirmed COVID–19

As soon as a person tests positive for SARS-CoV-2 they should be given a cloth or disposable procedure mask or respirator (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other people (individually or in a cohort with other people with confirmed COVID-19), and medically evaluated. Medical isolation can be discontinued 10 days after symptom onset and after resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. See section below on recommended duration of medical isolation during short-term periods of crisis-level operations (e.g., severe staffing or space shortages).

Facilities without onsite healthcare capacity to medically evaluate and/or treat residents with suspected COVID-19 should have a plan in place to ensure that timely evaluation and treatment take place through an offsite medical facility, additional healthcare providers, or other means.

Residents who are medically isolated should wear cloth or disposable procedure masks or respirators under the following circumstances:

- Whenever another individual enters the medical isolation space (excluding others with confirmed COVID-19)
- If the resident leaves the medical isolation space for any reason

The clinical staff evaluating and providing care for people with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), including wearing recommended PPE, and monitoring the guidance website regularly for updates to these recommendations.

## D. Quarantine of close contacts of those with confirmed or suspected COVID–19

Regardless of vaccination and booster status, residents who have been in close contact with someone with confirmed or suspected COVID-19 (whether the infected person is another resident, staff member, or visitor) should receive an initial diagnostic test as soon as possible after they have been identified as a close contact (but not within the first 24 hours after exposure/close contact, since a test is unlikely to be positive that quickly) and should quarantine for 10 days. If the initial test is negative, they should receive a second diagnostic test at least 5 days after the exposure/close contact. (If the initial test was

performed at least 5 days after the exposure/close contact, a second test is not needed.) If an individual is quarantined due to close contact with someone with suspected COVID-19 who is subsequently tested and receives a negative result, they can be released from quarantine.

Residents who are quarantined should be monitored for COVID-19 symptoms at least once per day, including temperature checks. If a resident develops symptoms, they should be considered a person with suspected COVID-19. Follow procedures detailed above for medical isolation of people with suspected COVID-19.

Quarantined residents can be released from quarantine restrictions if they remain asymptomatic and have not tested positive for SARS-CoV-2 during the 10 days since their last potential exposure or known close contact with someone with confirmed COVID-19 (if that person was tested) or suspected COVID-19 (if that person was not tested). Ending quarantine before 10 days have passed is not recommended, even with a negative test. See section below on recommended duration of quarantine during short-term periods of crisis-level operations (e.g., severe staffing or space shortages).

Quarantined residents should wear cloth or disposable procedure masks or respirators under the following circumstances:

- Whenever another individual enters a quarantine space that is occupied by a single resident
- When quarantined residents are housed as a cohort
- If a resident under quarantine leaves the quarantine space for any reason

## E. Cohorted Quarantine

Facilities should make every possible effort to individually quarantine close contacts of residents with confirmed or suspected COVID-19 unless mental health concerns preclude individual housing. Cohorting multiple quarantined close contacts could result in transmission of SARS-CoV-2 from those who are infected to those who are uninfected. If cohorted quarantine is necessary, **reduce transmission risk by selecting the housing spaces** that:

- Are well ventilated
- Minimize the number of residents sharing the housing space
- Maximize the physical distance between residents sharing the housing space
- Are physically separated (i.e., solid walls and solid doors) from non-quarantine spaces

If cohorting close contacts is necessary, be especially mindful of those who are at increased risk for severe COVID-19 illness. Ideally, they should not be cohorted with other quarantined residents. If cohorting is unavoidable, make all possible accommodations to reduce exposure for residents with increased risk of severe illness. (For example, intensify physical distancing strategies for residents with increased risk.)

## F. Quarantine for staff members

All staff members who have been exposed to someone with COVID-19 should be advised to seek testing and should be excluded from work for 10 days after their last exposure, regardless of their vaccination and booster status. (However, staff may use the guidance for the general public for duration of quarantine when they are not at work.) See section below on recommended quarantine duration for staff during short-term periods of crisis operations (e.g., severe staffing shortages).

- If quarantine duration is reduced for staff members during crisis-level operations, then facility management should require exposed staff members to:
  - Continue to self-monitor for symptoms of COVID-19 through day 10 after known or suspected exposure to or close contact with a person with COVID-19
  - Immediately isolate if symptoms of COVID-19 occur
  - Adhere to all recommended prevention strategies, including wearing a well-fitting mask or respirator, physical distancing, and maintaining good hand hygiene

## G. Shortening quarantine or isolation during crisis-level operations

In December 2021, CDC updated and shortened the recommended quarantine (after potential exposure or close contact with someone with COVID-19) and isolation (after testing positive) periods for the general public. Because of the potential for rapid, widespread transmission of SARS-CoV-2 in congregate environments and evidence ⧉ that people who are fully vaccinated can transmit the virus to others, CDC recommends maintaining 10-day isolation and quarantine periods for both residents and staff in high-risk congregate settings, including correctional and detention facilities. (However, staff may use the guidance for the general public for duration of quarantine and isolation when they are not at work.)

These recommended 10-day quarantine and isolation periods are preferred, to reduce the risk of transmission. During crisis-level operations (examples below), facilities may need to consider short-term alternatives to the recommended 10-day quarantine and/or isolation periods for staff and/or residents. Because each facility's resource constraints, population, and transmission risks are unique, there is not a standard set of alternate strategies that CDC recommends for all correctional and detention facilities to follow under crisis-level operations. Facilities should consult their state, local, territorial, or tribal health department to discuss approaches that would meet their needs while maximizing infection control during these short-term periods.

Examples of crisis-level operation scenarios:

- Staffing shortages threaten to compromise the safety and security of the facility or the continuity of essential operations.
- There is insufficient space to isolate/quarantine all residents who have been infected/exposed for the full 10-day periods, and other options to increase space have been exhausted.

**Once the period of crisis-level operations has passed, facilities should return to the recommendations for periods of routine operations (10 days for quarantine and isolation).** Facilities should ensure that both residents and staff understand that reduced quarantine and/or isolation protocols are short-term, crisis-management tools and that the facility will return to the full 10-day quarantine and isolation recommendations.

The following are guiding principles for reducing quarantine and/or isolation periods during crisis-level operations:

- Reductions in duration should be as minimal as possible to mitigate the crisis scenario.
- Decisions to shorten duration should be made independently for staff and for residents, based on the specific resources that are constrained at the time. (For example, shortening isolation and/or quarantine for staff due to staffing shortages would not automatically trigger shortened duration for residents as well.)
- Before reducing quarantine and/or isolation duration, consider alternatives (e.g., shifting from individual to cohorted isolation units for residents or reducing the resident population).
- Take into consideration the risk of transmission within the facility (e.g., layout) and the risk profile of the facility's population.
- Consider reducing quarantine duration for groups at lower risk of infection first (e.g., those who are up to date on their COVID-19 vaccines).
- If crisis-level protocols allow infected staff to return to work before 10 days of isolation, the risk of transmission can be reduced by assigning them to work exclusively in isolation units or in assignments where they have minimal contact with others until day 10.
- If a facility shortens quarantine and/or isolation, it is possible to incorporate negative test results into these protocols (i.e., "test-out" strategies). The following factors are necessary for facilities to incorporate test-out strategies without compromising essential functions:
  - Sufficient testing supplies and staff capacity to maintain recommended diagnostic testing and screening testing at intake (see section above on testing)
  - Fast turn-around time to inform timely decision-making
  - Sufficient staff capacity to continue to prioritize care and treatment for residents at high risk for severe COVID-19
  - Note that test-out strategies to reduce isolation periods should be based on negative results from two consecutive respiratory specimens collected ≥24 hours apart.

In facilities with severe resource constraints during crisis-level operations, it may be necessary to modify other COVID-19 prevention measures detailed elsewhere in this document, in order to prioritize the prevention of severe outcomes from COVID-19. Facilities should consult their state, local, territorial, or tribal health department if they are considering such short-term modifications.

# 7. Medication for prevention of severe disease

The FDA has expanded EUAs for use of certain investigational monoclonal antibody medications to prevent SARS-CoV-2 infection,, including in correctional populations, under the following conditions:

- There is an occurrence of COVID-19 in other individuals in the same institutional setting, **and;**
- The patient being treated is not fully vaccinated or is not expected to mount an adequate immune response to complete COVID-19 vaccination, **and;**
- The patient being treated is at higher risk for progression to severe COVID-19, including hospitalization or death (e.g., they have certain comorbidities).

In addition, antiviral medications are now available that are effective in preventing severe outcomes from COVID-19. These medications can be ordered at no cost either through the office of the Assistant Secretary for Preparedness and Response (ASPR) within the Department of Health and Human Services, the manufacturer, or possibly through their usual mechanism for obtaining medications. The National Institute of Health COVID-19 Treatment Guidelines ⧉ provide information about these drugs and describe what is known about their effectiveness.

Medications are *not* a substitute for vaccination. Corrections management should consult facility healthcare providers about their use for post-exposure prophylaxis.

# 8. Considerations for reentry programming

- If a person preparing for release is not up to date on their COVID-19 vaccines, offer vaccination again. If they decline, provide them with information about where they can get vaccinated after release.
- Provide screening testing before release for all residents, regardless of COVID-19 vaccination and booster status.
- Ensure that facility reentry programs include information on accessing:

  - Housing, social services, mental health services, and medical care, including medication-assisted treatment for opioid use disorder to substance use, harm reduction, and/or recovery support ⧉ . Ensure that linkages to community services account for modified operations of providers due to COVID-19.
  - Medicaid enrollment and healthcare resources, ⧉ including continuity of care for chronic conditions that may place a person at increased risk for severe illness from COVID-19 (e.g., HIV, hepatitis, tuberculosis, etc.).

- Provide residents about to be released with COVID-19 prevention information, hand hygiene supplies, and masks or respirators.
- When possible, encourage residents who are being released to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking residents to shared housing, link preferentially to accommodations with the greatest capacity for physical distancing.

# Previous Updates

## Updates from Previous Content                                                                                    ⌃

**As of June 9, 2021**

- Considerations for modifying COVID-19 prevention measures in correctional and detention facilities in response to declining community transmission

**As of May 6, 2021**

- Updated cleaning and disinfection information

**As of February 19, 2021**

- Clarification that correctional and detention facilities should continue to use a 14-day quarantine period. Recommendations for quarantine duration in correctional and detention facilities
- Updated language on quarantine recommendations
- Updated language on quarantine recommendations
- Updated language for the close contact definition.
- Updated criteria for releasing individuals with confirmed COVID-19 from medical isolation (symptom-based approach).
- Added link to CDC Guidance for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings
- Reorganized information on Quarantine into 4 sections: Contact Tracing, Testing Close Contacts, Quarantine Practices, and Cohorted Quarantine for Multiple Close Contacts
- Added testing and contact tracing considerations for incarcerated/detained persons (including testing newly incarcerated or detained persons at intake; testing close contacts of cases; repeated testing of persons in cohorts of quarantined close contacts; testing before release). Linked to more detailed Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities.
- Added recommendation to consider testing and a 14-day quarantine for individuals preparing for release or transfer to another facility.
- Added recommendation that confirmed COVID-19 cases may be medically isolated as a cohort. (Suspected cases should be isolated individually.)
- Reduced recommended frequency of symptom screening for quarantined individuals to once per day (from twice per day).
- Added recommendation to ensure that PPE donning/doffing stations are set up directly outside spaces requiring PPE. Train staff to move from areas of lower to higher risk of exposure if they must re-use PPE due to shortages.
- Added recommendation to organize staff assignments so that the same staff are assigned to the same areas of the facility over time, to reduce the risk of transmission through staff movements.
- Added recommendation to suspend work release programs, especially those within other congregate settings, when there is a COVID-19 case in the correctional or detention facility.
- Added recommendation to modify work details so that they only include incarcerated/detained persons from a single housing unit.
- Added considerations for safely transporting individuals with COVID-19 or their close contacts.
- Added considerations for release and re-entry planning in the context of COVID-19.