# EXHIBIT 6

## Declaration of
## Owen Murray, D.O.

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Jacob B. Lee, Bar No. 030371
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com

*Attorneys for Defendant Kris Kline*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Claudia Romero-Lorenzo, et al., | NO. CV-20-00901-PHX-DJH (DMF) |
| Plaintiffs, | |
| v. | **DECLARATION OF OWEN MURRAY, D.O.** |
| Brian Koehn, et al., | |
| Defendants. | |

I, Owen Murray, state the following based upon my personal knowledge.

1.      I am over the age of 18 years old and competent to testify to the matters set forth in this Declaration based upon my own personal knowledge, review of records, and tours of the facilities.

2.      I am a licensed physician in the State of Texas and I am certified by the American Board of Family Medicine. I am also a Certified Correctional Health Professional by the National Commission on Correctional Health Care ("NCCHC").

3.      I have considerable expertise in correctional health care, with more than 30 years of experience in correctional medicine. Specifically, for the past 26 years, I have worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program.

4.    I currently serve as the Vice President of Offender Health Services, Correctional Managed Care for UTMB in which capacity I am responsible for ensuring the provision of all medical, mental health, and dental services for approximately 98,000 adult offenders in the Texas Department of Criminal Justice state jails and prisons (i.e., approximately 80% of the state's correctional facility population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department facilities.

5.    I oversee a staff of approximately 3,500 health care and clinical support employees located at more than 100 correctional facilities throughout the state of Texas as well as the prison hospital on the Galveston campus.

6.    Before joining UTMB in 1995, I served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections.

7.    In addition, I have served as a health care consultant for a number of correctional systems, including the California Department of Corrections and Rehabilitation and the Arizona Department of Corrections, Rehabilitation and Reentry.

8.    I have been a Commissioner for Accreditation for the American Correctional Association.

9.    In my role as Vice President of Offender Health Services for UTMB Correctional Managed Care (CMC), I have significant experience evaluating the management of infectious disease, to include COVID-19, in the correctional setting, consistent with standards and guidance promulgated by the American Correctional Association and the U.S. Centers for Disease Control and Prevention (CDC).

10.    Since the start of the pandemic, I have been focused on the planning and implementation of the COVID-19 mitigation strategies implemented in the TDCJ and TJJD. This involvement has included the development of applicable COVID-19 testing protocols and strategies for patients and staff; the development of policy and practice consistent with Centers of Disease Control (CDC) Interim Guidance in Correctional and Detention Facilities; and the oversight and health care coordination of acute care hospital and Intensive

1   Care services for over 1,000 TDCJ patients in both community and the prison hospital (HG)

2   on the UTMB Galveston campus.

3        11.     I have also assisted with acquisition and utilization of Remdesivir and

4   convalescent plasma therapy for TDCJ patients hospitalized at HG. I have worked with my

5   TDCJ colleagues to create and staff hundreds of additional infirmary and sheltered housing

6   beds throughout the state to manage the care requirements for COVID-19 hospital

7   discharged patients. I have worked with our CMC leadership team to coordinate the staffing,

8   personal protective equipment, and testing necessary to manage COVID-19 care at over 83

9   facilities across the state of Texas.

10       12.     Since May 2020 I have reviewed the adequacy of the COVID-19 mitigation

11  strategies in multiple jails and detention centers throughout the country, including:

12           • Irwin County Detention Center, GA

13           • Stewart Detention Center, GA

14           • Eloy Detention Center, AZ

15           • La Palma Correctional Center, AZ

16           • Krome Detention Center, FL

17           • Glades County Detention Center, FL

18           • Broward Transitional Center, FL

19           • Adelanto Detention Center, CA

20           • Metrowest Detention Center, FL

21           • Shelby County Jail, TN

22           • North Carolina Department of Corrections, NC

23           • Maricopa County Sheriff's Office Jails, AZ

24           • Otay Mesa Detention Center, CA

25       13.     My curriculum vitae is attached as Attachment A.

26       14.     I was provided the following materials for my review in this case:

27           • Declaration of Keith Ivens, Dkt. 16-02

28           • Declaration of Warden Kline, Dkt. 16-03

- First Supplemental Declaration of Warden Kline, Dkt. 23-1
- Declaration of Warden Kline, Dkt. 41-01
- Declaration of Warden Kline, Dkt. 57-01
- Declaration of Warden Kline, Dkt. 48-01
- Expert Report and C.V. of Homer Venters, MD (Plaintiffs' Expert)
- Deposition Transcripts with exhibits for the following witnesses:
  - Chief Bayless (USMS)
  - Keith Ivens, M.D.
  - Kristyn Jaramillo (CAFCC Complex HSA)
  - Warden Kris Kline (current CAFCC Warden)
  - Brian Koehn (former CAFCC Warden)
  - Carrie Rose, RN, BSN (CAFCC)
- Defendant Kline's Discovery Responses
- Photographs of CAFCC (May 2020 through February 2022)
- COVID-19 Trackers (USMS Detainees and CAFCC Staff)
  - USMS Detainees COVID-19 Vaccine Tracking (2021)
  - USMS Master Quarantine Roster (11/09/21)
  - Staff COVID-19 Positive Tracker (11/18/21)
  - USMS COVID-19 Vaccine Tracker (2/18/22)
  - USMS Master Quarantine Roster (2/11/22)
  - Staff COVID-19 log (2/14/22)
- COVID-19 Vaccine Information (USMS Detainees)
  - Janssen COVID-19 Vaccine Fact Sheet
  - Janssen COVID-19 Vaccine Fact Sheet-Spanish
  - Vaccine Here's the Scoop flyer
  - Vaccine Refusal Form
  - Vaccine Consent Form
  - Moderna Vaccine Community Release Info

- o Local Health Dept Contacts
- o Boosters & Vaccines flyer English & Spanish
- o Staff COVID-19 Educational Handout
- o Vaccine Facts IRDs-UPDATED-062021
- o Vaccine Facts IRDs SPANISH-UPDATED-062021
- o Moderna Vaccine Information Sheet
- o Moderna Vaccine Information Sheet for Providers
- o Boosters vaccines flyer English, Spanish
- o Updated Johnson & Johnson fact sheet 2-7-22
- o Janssen fact sheet Spanish 1.31.22
- CAFCC Sanitation Logs (April-July 2020; November 2020- November 2021)
  - o Unit Sanitation logs (April-Jul 2020)
  - o Unit Sanitation Logs (Nov. 2020)
  - o Zone 1 Sanitation Log Nov 2020 to Nov 2021
  - o Zone 2 Sanitation Logs Nov 2020 to Nov 2021
  - o Zone 3 Sanitation Logs Nov 2020 to Nov 2021
  - o Zone 4 Sanitation Logs Nov 2020 to Nov 2021
  - o Zone 5 Sanitation Logs Nov 2020 to Nov 2021
  - o Zone 6 Sanitation Logs Nov 2020 to Nov 2021
  - o Zone 7 Sanitation Logs Nov 2020 to Nov 2021
- CoreCivic COVID-19 Pandemic Response Plan
- Medical emergency Pandemic COVID-19 Plan
- Unit 11 Town Hall Meeting Records
- COVID-19 Testing Protocol
- CoreCivic Vaccination Plan (March 2021)
- COVID-19 Vaccination Plan (updated January 2022) CORECIVIC-MLG003499-3507
- CDC Pre-Vaccination Checklist

- CDC Pre-Vaccination Checklist (Spanish)
- COVID vaccine Moderna training plan for staff
- OSHA Process and Protocols for Employee COVID-19 Infection
- Weekly PC Dept of Health Vaccine Provider Meeting (01-14-21)
- Pinal County Dept. of Health Archives (11/16/21)
- Email to K. Jaramillo dated 3/5/21 - FW_ You have been enrolled in Pandemic Provider Courses
- AZ Dept. of Health Services – Certificate of Completion for K. Jaramillo for ASIIS Vaccine Storage and Handling
- Talking Points for Town Halls, updated Feb. 2022
- Here's the Scoop
- Photo of detainee tablet

15.     In forming my expert opinions in this case, I also conducted an on-site tour of CAFCC on April 15, 2022. During the tour I was able to speak with various CoreCivic security and health care staff. I did not interview any United States Marshals Service (USMS) detainees because to do so would not be appropriate where this is a certified class action lawsuit and the USMS detainees are represented by counsel.

16.     I have also reviewed all revisions to the CDC Interim Guidance for Correctional and Detention Facilities ("CDC Interim Guidance") since the pandemic started, to include the most recent iteration issued on May 3, 2022.

17.     As has been the case for the CDC's Interim Guidance from its initial issuance, the CDC guides that its strategies may not be feasible depending on a particular facility's resources and operational capabilities.

**Background on COVID-19 and CDC Interim Guidance**

18.     Illness caused by SARS-CoV-2 has been termed COVID-19 by the World Health Organization (WHO), an acronym derived from "Coronavirus Disease 2019."

19.     Set forth below is an abbreviated timeline of the first six months of events in connection with the initial public health response to COVID-19 following its discovery in

the United States.

- December 12, 2019:   A cluster of patients in Wuhan, China, begin to experience symptoms of what we would later learn to be COVID-19.
- January 7, 2020:  Chinese authorities identify and isolate a novel coronavirus as the causative agent of the COVID-19 outbreak.
- January 17, 2020: CDC implements health screenings in three U.S. airports.
- January 20, 2020:  CDC confirms the first U.S. confirmed case of COVID-19 from samples taken on January 18 in Washington state.
- January 29, 2020: WHO declares a Public Health Emergency.
- February 6, 2020:  CDC announces the first COVID-19 death in the U.S.
- February 11, 2020:  WHO announces the official name for the 2019 novel coronavirus outbreak is COVID-19.
- February 17, 2020:  During a House Foreign Affairs hearing, the CDC Director Robert Redfield testifies that "healthy people do not need to wear masks."
- February 29, 2020: Dr. Anthony Fauci, Director of the National Institute of Allergies and Infectious Diseases, reports that the country remains at "very low risk."
- March 8, 2020:  in an interview with *60 Minutes*, Dr. Fauci states that mask wearing is "not providing the perfect protection that people think that it is."
- March 11, 2020: WHO declares COVID-19 a global pandemic.
- March 15, 2020: CDC recommends canceling events of 50 or more people.
- March 16, 2020: CDC introduces social distancing guidelines.
- March 17, 2020:  U.S begins first human trial of COVID-19 vaccine.
- March 23, 2020: CDC issues Interim Guidance for Management of COVID-19 in Correctional and Detention Facilities. *See* "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," available at https://www.bop.gov/foia/docs//CDC

Correctionalfacilityguidance3.23.pdf.

- March 24, 2020:  Even as COVID-19 spreads across the U.S., CDC's advice remains unequivocal:  healthy people who do not work in the health care sector and are not taking care of an infected person at home do not need to wear masks.

- March 31, 2020:  Dr. Fauci reveals that the White House COVID-19 task force is seriously considering guidance that Americans wear masks to thwart the spread of the virus.

- April 3, 2020: CDC announces new mask-wearing guidelines and recommends that non-medical face coverings be worn in public when social distancing is difficult to maintain – especially in areas with significant amounts of community transmission.  The CDC publishes tutorials on making non-medical face masks using t-shirts and rubber bands.

- May 2, 2020: WHO renews its emergency declaration from three months prior calling the pandemic a global health crisis.

- June 18, 2020: California Governor Newsom makes face masks mandatory amid rising COVID-19 cases.

- June 25, 2020:  CDC expands the list of people at risk for severe COVID-19 illness by removing the specific age threshold from the older adult classification, noting that the risk increases with age.  CDC also includes people with chronic kidney disease, COPD, obesity, immunocompromised from solid organ transplant, serious heart conditions, sickle cell disease, and type 2 diabetes to be at increased risk of severe COVID-19 illness.

- July 14, 2020:  CDC Director Dr. Redfield declares: "Now's the time to wear a mask.  I think we're being very clear."

20.     This abbreviated "first six months" timeline reflects how rapidly COVID-19 affected the country at its early stages, to include its correctional and detention facilities.

21.     At the onset of COVID-19, most correctional systems had a pandemic flu

policy in place to assist with planning and practice associated with the management of influenza, norovirus, and other infectious illnesses. However, COVID-19 required a completely different response, well beyond what correctional systems had historically encountered.

22.     Upon its publication in late March 2020 through the present, the CDC Interim Guidance is the best practice standard to which all correctional and detention facilities in the U.S. are attempting to conform.

23.     The CDC's Interim Guidance spurred correctional systems and institutions to effectuate monumental changes in their policies, practices, and physical plants. In a relatively short period of time, correctional and detention facilities have had to examine their operations and confront the challenges of COVID-19 infection control in a variety of facility settings, with no two facilities being exactly alike.

24.     While implementation of the various recommended best practices is important, the CDC Interim Guidance does not set forth a hierarchy of priorities. Rather, it contains a series of considerations and recommended practices intended to provide guiding principles for correctional and detention facilities to mitigate the spread of COVID-19 in such institutional environments.

25.     The guiding principles will not, and are not intended to, address every possible custodial setting; rather, they affirmatively require tailoring to the individual environment.

26.     In this regard, the CDC Interim Guidance acknowledges up front that its guiding principles "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."

27.     Since their promulgation, time has not allowed for rigorous review of COVID-19 outcomes to determine the relative criticality of each of the guidelines and recommendations contained in the CDC's Interim Guidance.

28.     In the absence of such evidence-driven data, any given facility's implementation of the Interim Guidance had to be reviewed relative to the facility's

particular circumstances, attributes, and limiting factors.

29.     In other words, it is an individual correctional or detention facility's adherence to the guidance in totality—relative to the limitations created by physical space, staffing, population, operations, and other resources and conditions—and the organization's demonstrable commitment to modify over time, that ultimately yields the best outcome.

30.     Indeed, as information is learned about the transmissibility, testability, and treatment of COVID-19 on a day-to-day basis, any reliable measure of adherence to the Interim Guidance must be assessed with full awareness of this rapidly changing dynamic.

**CAFCC Facility Tour**

31.     On April 15, 2022, I toured and reviewed CAFCC's COVID-19 response operations for USMS detainees.  I was accompanied by Assistant Wardens M. Wallace and A. Hickson, Health Services Administrator  C. Rose, and Complex Health Services Administrator K.  Jarmillo.

32.     On that day, the facility had a total detainee/inmate population of approximately 3,639 across all jurisdictions housed at CAFCC, which included other jurisdictions than USMS detainees.

33.     I asked to see exemplar housing units, recreation areas, medical clinics, and PPE storage. I spoke with facility correctional and health care staff who were on-site during the tour.

34.     As noted above, I could not  speak with the detainees, as they are represented by counsel, who were not present during my tour.

35.     While touring the facility and speaking with security  and health care staff, I found ample evidence from which I concluded  that CAFCC has implemented, to the greatest extent possible, the recommendations from the CDC's Interim Guidance for correctional and detention center operations.

36.     My salient observations during the mid-April 2022 tour which support my conclusions are as follows.

**Visitor Entrance**

37.     We entered CAFCC through the main entrance of the facility and encountered a correctional officer who performed  temperature and symptom screening for each member of our party.  He indicated that this is standard procedure for the facility.

38.     Masks must be worn in the facility and a supply of surgical masks is available at the front desk should a prospective entrant need one. Hand sanitizer was present and available.

39.     The grey bins used to collect a visitor or employee's personal items that are required to pass through the x-ray machine are sanitized after each use.

40.     The front lobby officer pointed out the multiple COVID-19 educational posters  present in the lobby. The postings included a "Here is the Scoop on COVID-19 Vaccine and Boosters" poster which created by CAFCC's medical staff and was posted in both  English and Spanish.

**1000 Alpha Unit**

41.     I inspected 1000 Alpha Unit which has 19 two-person cells and can hold up to 38 detainees.

42.     There was a medical drop box for sick call requests. HSA  Rose noted that the sick call requests were triaged daily by CAFCC nursing staff.

43.     I observed numerous examples of written COVID-19 and vaccination information posted inside the unit for detainee review (posted in both English and Spanish).

44.     Vaccine booster informational postings were up to date and available in English and Spanish for review.

**1000 Echo Unit**

45.     1000 Echo Unit offers two-person cells and 14-person  group cells. There was a medical drop box for sick call requests.

46.     Identical COVID-19 information on the virus, vaccinations, and boosters was available in English and Spanish and up to date.

**Lima Alpha Unit**

47.     Lima Unit is made up of Alpha, Bravo, and Charlie sections, each of which

1   has 20, two-person cells.

2       48.     The Alpha and Bravo sections were used for housing t of COVID-19 positive

3   detainees.

4       49.     The detainees were housed in single cells where feasible due to population

5   numbers.

6       50.     Nursing services provides daily symptom checks, vital signs, and a blood

7   oxygenation test on all positive patients.

8       51.     The Charlie section was used for overflow and had been used only on

9   occasion during the pandemic.

10      52.     A Family Nurse Practitioner ("NP") personally oversees all care provided to

11  COVID-19 positive detainees housed  in the Lima Unit. The NP evaluates each patient daily

12  and can move detainee patients as necessary to higher levels of observation such as to

13  medical housing if their clinical symptoms or high-risk health condition warrant.

14      53.     The detainees in the Lima Unit are fed in their cells on  Styrofoam trays and

15  using disposable utensils so that trays used by COVID-19 detainees are not reused. COVID-

16  19 positive detainees must always be masked when outside of their cell.

17      54.     There was ample and appropriate PPE available for security and health care

18  staff and there was signage on the entrance door mandating its use prior to entry.

19      **Medical Four**

20      55.     I toured a medical clinic which offered provider rooms; mental health office

21  space; and lab, dental x-ray, and medication rooms. Ample COVID-19 rapid tests are

22  available.

23      56.     Using their clinical judgment, CAFCC health care providers decide whether

24  to order rapid testing or PCR testing for inmates suspected of having COVID-19.

25      57.     The medical unit had two negative air pressure rooms; there are five total

26  throughout the facility. Additionally, there are three single cell medical beds in the clinic

27  and 7 total in the facility.

28      58.     I saw a demonstration of the Allscripts electronic health record and its ability

1  to report patients by specific medical condition (hypertension) or COVID-19 risk factor
2  (age).

3       59.     Allscripts also documents and tracks detainee immunization status.
4  Additionally, CAFCC reviews the Arizona State Immunization Information System (ASIIS)
5  to validate a detainee's reported vaccination history provided during the intake screening
6  process. Unfortunately, most of detainees are not from Arizona and therefore do no not have
7  their vaccination history recorded in ASIIS.

8       60.     If a patient is unable to provide documentation of a valid vaccine
9  administration or their name is not in the ASIIS database, CAFCC identifies them as
10  unvaccinated.

11  **Infirmary**

12       61.     The infirmary is a twelve-bed open concept unit that had been created out of
13  space previously used for visitation. The infirmary is licensed by the Arizona Department of
14  Health.

15       62.     The unit is only available to USMS detainees. The unit has 24-hour RN
16  nursing coverage and focuses on higher acuity patients.

17       63.     While in the infirmary, I noted that COVID-19 vaccination information has
18  been placed on the home screen of the detainees' tablets. Specifically, the tablet shows a
19  copy of the "Here's the Scoop" flyer that is posted throughout the facility and provides
20  current information on how to request a COVID-19 vaccine, including boosters; who is
21  eligible for boosters; and the amount of time that must pass between vaccination and
22  administration of a booster.

23       64.     The detainee cannot access the tablet's content until the detainee has
24  acknowledged having read the vaccination information.

25  **Updated/Present CAFCC Operations**

26       65.     The CDC updated its Interim Guidance for correctional and detention
27  facilities on May 3, 2022, which was subsequent to my mid-April tour of CAFCC.

28       66.     Recent updates to the CDC Interim Guidance for Correctional and Detention

Facilities includes the May 3, 2022 update provide prevention strategies for everyday operations as well as enhanced prevision strategies to add when risk increases based upon community risk and spread, internal facility risk and spread, or a combination of both. (*See, e.g.,* May 3, 2022 Interim Guidelines attached hereto as Attachment B; May 3, 2022 Interim Guidelines CDC Slide Deck at Attachment C.)

67.     Of note, the May 3, 2022 Interim Guidelines guide that where feasible depending on the operations of the facility, a detention center operating under everyday operations should offer vaccinations, and either test for COVID-19 or employ a routine observation period (either individual housing at intake or house in small cohorts) at intake (new admissions).  Under Enhanced Prevention operations, the routine observation period may be 7-10 days in duration if no testing and a minimum of 5 days with testing at the end.  Likewise, the Interim Guidelines recommends that both "Every Day" and "Enhanced Operations" operations isolation/quarantine periods for detainees infected or exposed be 10 days.  Under the May 2, 2022 Guidance, masks should be offered to all detainees under Everyday Operations.  (Attachment B at slides 22-35.)

68.     A facility's determination whether to add or remove enhanced COVID-19 prevention strategies as discussed in the May 3, 2022 CDC Guidance, is fluid in terms of adding enhanced strategies and then which strategies a facility is able to add in a meaningful way. (Id.)

69.     During the mid-April 2022 tour, I discussed the availability and use of COVID-19 oral antivirals which were, based upon my personal experience in Texas, still difficult to obtain and if any were obtained, it was only in small amounts due to short supply. CAFCC medical staff communicated to me that they were aware of the oral antivirals and were working to ensure CAFCC would have access to the same when they became available.

70.     Based upon this discussion and my personal knowledge that the antivirals were difficult to obtain at that time, I did not specifically ask CAFCC medical staff I interviewed whether or not CAFCC had any in stock or had ordered any.

71.     Presently, CAFCC has access to the COVID-19 Paxlovid and Molnupiravir

antiviral medications through local pharmacy order, where clinically indicated to be prescribed to a COVID-19 patient and where the detainee patient agrees to take the antiviral medication.   Detainees have the right to refuse medical care including recommended medication prescriptions even where recommended by CAFCC health care providers. Moreover, antiviral medication (Paxlovid, Molnupiravir, or Remdesivir) may be clinically indicated to be prescribed for non-hospitalized patients who do not require supplemental oxygen, have had a positive COVID-19 test within 5 days of onset of COVID-19 symptoms, have existing COVID-19 risk factors and are at high risk of progressing to severe COVID-19 illness, and who do not have contraindications to the medication such as allergy or certain health conditions to include hypertension. If Remdesivir is clinically indicated, it is my experience that that the medication may be obtained for the patient by sending the detainee patient to a local hospital emergency department for evaluation and where clinically indicated, prescribe and provided at the hospital.

72.     Where CAFCC can obtain antiviral medications through local pharmacy order, there is no need to keep the medications in stock for every single detainee who may be prescribed the medication in the event that they actually become infected with COVID-19.   Rather, like any multitude of medications, the antivirals – now widely available – can simply be ordered by CAFCC health care providers when clinically indicated for a particular detainee patient.

73.     Consistent with current CDC Interim Guidance, presently all CAFCC new admission detainees are tested for COVID-19 during the intake process and unless they are symptomatic or test positive for COVID-19, they are then assigned to appropriate housing. Also consistent with current CDC Interim Guidance, detainees who show COVID-19 symptoms or are identified as close contacts with COVID-19 positive detainees are offered a COVID-19 test.

74.     Again, consistent with CDC Interim Guidance, detainees who are COVID-19 positive are isolated for 10 days.  Housing pods from which a COVID-19 positive detainee is identified (and removed from the housing pod and isolated) are quarantined for 8 days to

1  test close contact detainees and monitor for COVID-19 symptoms.[1]

2  **Response to Dr. Venters' Opinions**

3       75.    Dr. Venters recommends that CAFCC improve overall vaccination rates by

4  providing unit-based, vaccination-specific town hall meetings as well as individual

5  counseling for high-risk patients to improve vaccination acceptance. CAFCC is and has been

6  providing regular monthly town hall meetings with all detainees to educate and encourage

7  vaccination. For example, vaccination offering numbers from March 31, 2021 through

8  February 8, 2022 were as follows:

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| 03/31/21 | G, J, L | 246 |
| 04/07/21 | 1000, 1100, 400, 600, 800 | 258 |
| 04/16/21 | 1000, 1100, 400, 500, 600, L, SEG, ISO | 20 |
| 04/22/21 | 1100, 1200 | 219 |
| 04/23/21 | 1000, 1200, 400, 500, 600, 700, G, L | 20 |
| 04/27/21 | 700, 1200, G, Infirmary | 146 |
| 04/28/21 | 600, 900 | 284 |
| 04/29/21 | 600, 800, 900, D, SEG | 159 |
| 04/30/21 | 400, 500, 700, 800, 900, 1000, J | 33 |
| 05/04/21 | 1000, 700 | 143 |
| 05/05/21 | 1000, 400 | 223 |
| 05/06/21 | 1000, 500, 800 | 173 |
| 05/07/21 | G, SEG | 54 |
| 05/10/21 | L, J, 1000, Infirmary | 77 |
| 05/12/21 | J, 400, 800 | 260 |
| 05/13/21 | 600, 800 | 48 |
| 05/14/21 | 1100, 1200, 500, J | 203 |
| 05/17/21 | J | 31 |
| 05/18/21 | G, J | 33 |
| 05/19/21 | 1100, 1200 | 108 |
| 05/20/21 | J | 25 |
| 05/21/21 | D, F, J, L | 129 |

[1] In my deposition, I mistakenly testified that presently, CAFCC detainees are tested during intake and then cohorted for 8 days following admission. My misunderstanding of the reported present operations is corrected here.

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| 05/24/21 | 1100, 600, F, G, SEG | 29 |
| 05/25/21 | 700, F | 51 |
| 05/26/21 | 600, 900, Infirmary | 135 |
| 05/27/21 | 1100, 900, SEG | 82 |
| 05/28/21 | 1000, 1100, 1200, 400, 500, 700, 800, 900, D, F, J, SEG | 49 |
| 06/01/21 | 1100, 700 | 80 |
| 06/02/21 | 400, 500, G, J | 52 |
| 06/03/21 | 1000, 400, 500, 600 | 90 |
| 06/04/21 | 1000, 500, 600, D, F, G, J, SEG | 70 |
| 06/07/21 | 1000, 1200, 400, G, J | 29 |
| 06/08/21 | 1000, 400, 600, 700, 800 | 39 |
| 06/09/21 | 1200, 400, 500, 900 | 113 |
| 06/10/21 | 1000, 1100, 1200, 600, 700, 900, G | 51 |
| 06/11/21 | J, L, | 71 |
| 06/14/21 | J, 500, 400 | 18 |
| 06/15/21 | 1100, 1200, 500, L | 11 |
| 06/16/21 | D | 0 |
| 06/18/21 | J, L, 1100, 1200, D, J, L, SEG | 153 |
| 06/22/21 | D | 0 |
| 06/24/21 | D, 1000, 400, 600, 800, 900, J | 40 |
| 06/25/21 | 900, D, G, J, SEG | 108 |
| 06/29/21 | 1000, 1100, 500, 700, 900, F, G, J, SEG | 67 |
| 06/30/21 | | 64 |
| 07/02/21 | 1000, 500, 800, J | 116 |
| 07/05/21 | D, J | 34 |
| 07/06/21 | 1000, 500, 800, D, G | 19 |
| 07/07/21 | F, J, L | 42 |
| 07/09/21 | 1000, 1100, 600, J, O | 107 |
| 07/13/21 | J, L, 400, SEG | 70 |
| 07/14/21 | 900, D, J | 30 |
| 07/15/21 | 1000, 400, 700, 800, 900 | 22 |
| 07/16/21 | 500, 600, D, G, J | 60 |
| 07/20/21 | 500, 800, 900, D | 30 |
| 07/21/21 | 400, 600, 700, 900 | 13 |
| 07/22/21 | 500, 800, 900, 1100 | 16 |
| 07/23/21 | F, J | 67 |
| 07/27/21 | 400, 700, D, J, L | 25 |
| 07/30/21 | 1000, 1100, 500, 600, 700, G, J | 76 |

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| 08/04/21 | F, J, SEG | 28 |
| 08/06/21 | 1000, 400, 500, 600, F, G, J | 63 |
| 08/12/21 | J | 29 |
| 08/13/21 | 1000, 400, 500, 600, 700, J | 56 |
| 08/16/21 | D, G, J | 20 |
| 08/17/21 | D, J | 31 |
| 08/19/21 | 800, D, F, G, J, SEG | 51 |
| 08/27/21 | 1000, 1100, 400, 700, G, J | 85 |
| 08/30/21 | D, J | 32 |
| 09/03/21 | 1000, 400, 500, 600, 70, 800, G, J | 147 |
| 09/10/21 | 1000, 600, 800, J | 44 |
| 09/17/21 | D, G, J, L, SEG | 145 |
| 09/24/21 | 1000, 500, 600, 700, D, J, SEG | 110 |
| 09/27/21 | 1000, 1100, 400, 500, 700, 800, 900 | 289 |
| 10/01/21 | 1000, 600, D, G, J, L, SEG | 103 |
| 10/08/21 | 1000, 1100, 400, 500, 600, 700, 800, 900, F, G, J | 178 |
| 10/14/21 | 1100, 900, G, J, SEG | 148 |
| 10/19/21 | G, J | 11 |
| 10/22/21 | 1100, J, SEG | 86 |
| 10/26/21 | 1000, 400, 500, 600, 700, 800, 900, F, L | 33 |
| 10/29/21 | 1100, 400, G, J, L | 175 |
| 11/12/21 | Infirmary, medical isolation, 1100, 400, 600, 700, 800, 900, F, G, J, L | 294 |
| 11/19/21 | 1100, 400, 600, 700, 800, 900, D, F, G, infirmary, J, L, SEG | 171 |
| 11/22/21 | D, F, G, J | 141 |
| 11/26/21 | D, J, L | 92 |
| 11/29/21 | 1000, 1100, 400, 900, infirmary, F, J, L | 10 |
| 12/03/21 | 1100, 500, 800, L, SEG | 90 |
| 12/10/21 | O, medical, 1000, 1100, 400, 500, 600, 800, 900, D, F, G, J, L, SEG | 231 |
| 12/15/21 | 400, 600, 700, D, L, SEG | 133 |
| 12/17/21 | 1100, 400, 500, 600, 900, D, F, G, J, SEG | 88 |
| 12/22/21 | O, medical, 1000, 1100, 400, 500, 600, 800, 900, F, L, SEG | 75 |
| 12/24/21 | 1100, G, J, L, SEG | 97 |
| 12/31/21 | O, medical, 1000, 1100, 400, 600, 800, F, G, ISO, J, L | 136 |
| 01/07/22 | J, medical isolation, O, 1000, 1100, 400, 500, 600, | 81 |

18

| Date | Location(s) / Housing Units | Number of Detainees Offered Vaccine |
|---|---|---|
| | 700, 800, 900, L, SEG | |
| 01/14/22 | Infirmary, 1000, 1100, 400, 500, 600, 700, 800, 900, G, J, L, SEG | 64 |
| 02/07/22 | 1000, 400, 500, 600, 700 | 57 |
| 02/08/22 | 400, 500, 600 | 45 |

76.     As reflected above, more than 860 detainees per month, a total of 8,690 detainees, were offered the COVID-19 vaccine in less than a year's time.  Importantly, it should be noted that it is proven and commonly understood information in the medical field and in the community that a person who is fully vaccinated and has received COVID-19 boosters may still contract COVID-19.

77.     CAFCC also provides individual counseling for all detainees through the normal operations sick call process. Any detainee can submit a sick call form requesting a COVID-19 vaccine or to obtain education or evaluation for the same. This practice is consistent with community standards.

78.     Free-world health clinics do not reach out to their high-risk patients to schedule vaccination counseling sessions. Patients can seek that service if they so choose by making an appointment to see a licensed health care provider. The distinction is that vaccinations are therapeutic and preventative responses to COVID-19 – vaccinations are not "treatment" in the traditional sense of the concept.  Thus, it is not unreasonable either in the free world or the correctional or detention setting to, after providing education, make it incumbent upon the detainee population to request a vaccination or booster if so desired. This is especially so where presently, it is reasonable to believe that any new admission detainee has received education regarding COVID-19 in the community through media, friends, and family regarding the availability of vaccinations and boosters if so individually desired.  The same would apply to any detainee incoming from another correctional system considering we are now more than two years into the COVID-19 pandemic.

79.     Additionally, Dr. Venters asserts that CAFCC does not have a dedicated

health care employee assigned to improve vaccination rates among detainees and to determine the reasons why detainees are refusing. In discussion with HSA Rose and CHSA Jaramillo, they indicated that the entire health care team is dedicated to improving vaccination rates.

80.     This is consistent with my experience with TDCJ and most correctional or detention health care facilities which I have visited. Unfortunately, correctional and detention health care facilities have limited resources not unlike the community. It is not feasible to assign an individual who is solely dedicated to vaccination compliance.  Normal health care operations much continue against the backdrop of COVID-19 response operations.

81.     The community has the same challenges with vaccine compliance and my experience is that community health care providers are not implementing what Dr. Venters is suggesting.

82.     The CAFCC health care team has determined that the reasons detainees are refusing vaccination are the same as those who are unvaccinated in the community such as:

- It hasn't been around long enough.
- People who get vaccinated get sick.
- I have already had a COVID-19 infection.
- I am concerned about side effects.
- I am still doing my research.

83.     Through town hall meetings, written information, vaccine clinics, and counseling, CAFCC is making every reasonable and positive  effort to change the dynamic on vaccination within the detainee population.

84.     Dr. Venters suggests that CAFCC should assume responsibility for scheduling boosters for all applicable detainees rather than providing the service upon request. Again, the practice utilized by CAFCC is consistent with the community. CAFCC patients are made aware of their eligibility for a booster and are allowed to make their own health care decision regarding additional vaccine/booster doses.

85.     Additionally, with the average length of stay in CAFCC being less than 120 days, the logistics and time required to track booster eligibility for the rapidly changing detainee population is unreasonable.

86.     Dr. Venters opines that CAFCC should track vaccine dates on every detainee and verify those dates in the Arizona State Immunization Information System (ASIIS). In theory, Dr. Venters' suggestion is within reason.  However, CHSA Jaramillo informed me that the majority of CAFCC patients are from other states and countries.  Consequently, their vaccination histories are not stored in ASIIS. Upon intake, CAFCC makes every effort to obtain a vaccination history from each patient and relies on that information to provide appropriate vaccination guidance.

87.     Dr. Venters recommends expansion of vaccination, symptom screening, and testing to compensate for the challenges inherent to contract tracing. Dr. Venters provides no detail or additional information to support this recommendation. According to CAFCC staff, Dr. Venters' suggested activities have been performed throughout the entirety of the pandemic.

88.     Dr. Venters recommends that CAFCC offer Pfizer, Moderna, and Johnson & Johnson vaccines.  Currently, CAFCC receives its vaccine supply from the Pinal County Public Health Department (PCPHD).  It is PCPHD that determines which vaccines will be made available for use by CAFCC. At present, the County is providing CAFCC with the Moderna vaccine; CAFCC is no longer utilizing the Johnson & Johnson product. CAFCC does not have the ability to decide which vaccine product it will utilize.

89.     Dr. Venters recommends the use of all three vaccines, which in his opinion will improve vaccine rates. However, Dr. Venters provides no data to support his belief that offering all three vaccines improves acceptance. Dr. Venters does not provide a list of correctional facilities that are currently providing all three vaccines.

90.     In my experience both in Texas and in other parts of the country, most correctional systems utilize one vaccine as their primary agent. For instance, TDCJ utilizes the Moderna vaccine due to the need for ultra-cold refrigeration for the safe storage of the

1   Pfizer product.

2      91.    Dr. Venters recommends that CAFCC improve their vaccination educational

3   materials and ensure that they reflect that most updated information. In fact, CAFCC does

4   provide written vaccination information to all detainees.

5      92.    As mentioned previously, extensive vaccine information is made available

6   whenever detainees utilize tablets in the facility. Detainees may not proceed with use of the

7   tablet until they have acknowledged that they have been made aware of the vaccination and

8   booster information.  On the day of my inspection, every unit had posted up-to-date CDC

9   vaccination and booster information in English and Spanish.

10     93.    Dr. Venters recommends that staff vaccination rates be increased. CAFCC

11  has taken all reasonable efforts to increase staff vaccination rates. The staff vaccination rate

12  as of the date of my tour of CAFCC was reported to be 80%.

13     94.    On December 6, 2020, CAFCC initially offered vaccines to all staff before

14  making it available to detainees.

15     95.    To encourage vaccine acceptance, CAFCC hosted a steak cookout which

16  incorporated a town hall educational program. CAFCC did consider vaccine mandates;

17  however, like most correctional facilities and systems, the reality of significant staff

18  vacancies if vaccination was made mandatory guided against its adoption.

19     96.    Dr. Venters recommends that the vaccination status of every person be

20  reviewed at intake (using ASIIS) with priority for  all high-risk patients and for any who

21  remain unvaccinated or incompletely vaccinated.  Through their Allscripts electronic health

22  record, CAFCC is able to identify all high-risk detainees by specific COVID-19 risk factor

23  (e.g., obesity, asthma, age). CAFCC can run high-risk patient reports as necessary.

24     97.    Additionally, all nursing staff and providers are aware of any pertinent

25  COVID-19 risk factors when evaluating patients presenting to be seen. They incorporate the

26  risk associated with these other conditions as they determine COVID-19 testing, treatment,

27  and housing.

28     98.    While Allscripts cannot run a "COVID-19 risk factor" report per-se, I am

unaware of correctional systems who can run such a report. However, where Allscripts can run reports to select detainees with certain medical conditions to include the various COVID-19 risk factors, CAFCC health care staff are able to determine which detainees in the population have COVID-19 risk factors.

99.     Neither the CDC Interim Guidance nor other medical authorities of which I am aware require correctional and detention facilities to run daily "COVID-19 risk" reports and maintain such reports in paper form, to be updated daily. The suggestion that the same is required escapes me where Allscripts can run reports identifying detainees with specified risk factors at any time, and this was demonstrated to me during my tour. Moreover, it cannot go unnoted that health care providers treat the individual patient presenting to them versus providing treatment based upon presence on a list.

100.    Dr. Venters postulates that many detainees remain unvaccinated because they have questions or concerns that are not being addressed in a large-scale town hall meeting. Dr. Venters does not provide any data or study that supports his assertion. He does not elaborate on what questions or concerns detainees might have that are not covered in a public forum. Dr. Venters does not address the fact that all detainees can access one-on-one vaccination counseling through the sick call process and can be seen within 24 hours.

101.    Further, Dr. Venters does not address that, given the fact that COVID-19 vaccines have been present since late 2020, most people, including detainees, are aware of the strengths and weaknesses of vaccination and have come to their own decision about their personal health and well-being.

102.    Dr. Venters suggests that CAFCC should provide daily vital signs and symptom checks by nursing to all detainees in either an intake or exposure quarantine. In fact, CAFCC does provide daily symptom and temperature checks to detainees in an exposure quarantine. These checks are done by trained correctional officers rather than by nursing staff. CDC does not stipulate which type of credentials are required by staff performing the temperature and symptom checks.

103.    Furthermore, HSA Jaramillo indicated that the officers receive specialized

1   training on how to perform temperature and symptom checks. The officer who performed

2   our screening before entering the facility, corroborated HSA Jaramillo's statement and

3   confirmed that he had been provided the specialized training. The lobby officer also stated

4   that  he is confident in his ability to properly perform these functions and does not feel that

5   he is being asked to work outside his comfort level.

6          104.    In my experience most temperature and symptom checks can be done

7   adequately by security and non-medical personnel, just like most adults can do for

8   themselves or their family. CAFCC nursing staff makes rounds in all quarantine units

9   multiple times a day and can be accessed by any detainee during those rounds. Additionally,

10  if a detainee feels they are having any type of symptom, they can notify the unit officer who

11  will contact the CAFCC medical department for a disposition.

12         105.    Dr. Venters suggests that CAFCC create a specific COVID-19 nursing

13  evaluation form which would include whether the patient has any high-risk COVID-19

14  comorbidities and modifications to any care plan based upon those high-risk conditions.

15         106.    This has been a long-standing recommendation of Dr. Venters which I have

16  encountered in previous litigation. At present, creating a specific COVID-19 charting tool is

17  not a current CDC mandate. However, CDC does recommend that patients with high-risk

18  comorbidities for a poor outcome associated with a COVID-19 infection are taken into

19  consideration by nursing and provider staff.

20         107.    This recommendation is being followed by the CAFCC health care staff. HSA

21  Rose was emphatic when explaining that the entire CAFCC health care team understands

22  the risk factors for a poor outcome associated with a COVID-19 infection and takes all

23  measures necessary to ensure that patients with those conditions are afforded additional

24  safeguards such as being provided medical housing, more frequent vital sign monitoring,

25  and additional nursing and provider encounters.

26         108.    Dr. Venters recommends that a list of high-risk patients be kept. As stated

27  earlier, CAFCC can utilize Allscripts to produce a report that identifies all patients with a

28  COVID-19 risk factor.

109.    Dr. Venters' recommendation that all detainees be provided with surgical or KN95 masks and replaced weekly; and that when two or more cases have been detected among detainees or staff in a 14 day period that KN95 masks are mandated for all staff and detainee instead of surgical masks is not supported by CDC, which allows for the use of cloth, surgical, and KN95 or N95 masks. CAFCC provides both surgical and cloth masks to all detainees which is in accordance with CDC Interim Guidance.

110.    Dr. Venters recommends that CAFCC should increase the testing it performs in intake cohorts and provide at least two tests during the cohort period.  This is not mandated by current  CDC Interim Guidance.   CAFCC currently tests all new admission detainees as well as those that have COVID-19 symptoms.  This practice is consistent with the CDC's updated May 3, 2022 Interim Guidance.

111.    Dr. Venters' recommendation to provide a routine release quarantine was discussed with CHSA Jaramillo, HSA Rose, and Assistant Warden Wallace on the day of the tour. Approximately 95% of CAFCC detainees are transferred to another correctional facility and are provided COVID-19 testing prior to the transfer. Approximately half of the remaining 5% (approximately 2.5%) are released on a B&B (Bag and Baggage), which does not take place immediately, and CAFCC is able to provide COVID-19 testing prior to their release. The remaining 2.5% of the population is released immediately from court where the logistics of pre-release testing is not possible. However, each of these individuals who have gone to court and are directly released during a court hearing would have had a COVID-19 test performed before being transported to attend  court on that day, which essentially becomes a pre-release COVID-19 test.

112.    CAFCC has considered the creation of a pre-release quarantine unit however the logistics associated with the timing of the various detainees' releases is not conducive to such a unit where CAFCC is not necessarily advised of an anticipated release in enough time to perform a quarantine before release.  And, CAFCC cannot hold a detainee over beyond their release date to perform a pre-release quarantine period.

113.    Detainees who are released to the community from a quarantine unit are

1    provided information regarding their COVID-19 status and the safeguarding steps they

2    should follow.

3        114.    As to contact tracing, CAFCC provides contact tracing for positive staff

4    members to the extent possible. Early in the pandemic, CAFCC attempted to review facility

5    camera footage to ascertain with whom a positive staff member might have had a CDC-

6    defined contact. However, given the immense size of the facility, it was not logistically

7    feasible to review the volume of camera footage.

8        115.    Through its COVID-19 mitigation plan, CAFCC attempts to reduce the

9    opportunity for COVID-19 positive staff members to enter the facility. To that end, all staff

10   are temperature and symptom checked before entering the facility. If they answer

11   affirmatively to any symptom-based question, they are not allowed entrance to the facility

12   and are referred to their primary care physician. All CoreCivic staff have been educated to

13   stay at home if they have any COVID-19 symptoms or if they have come into contact with

14   a known COVID-19 positive individual.

15       116.    In summary, I opine that Dr. Venters' methodology and recommendations are

16   fundamentally flawed due to the fact that he never toured CAFCC prior to writing his report.

17       117.    He did not communicate with CAFCC staff, nor did he speak with CAFCC

18   detainees.

19       118.    Instead, he relied solely on documentation and secondhand information

20   supplied to him by Dr. Todd Wilcox and the plaintiffs' attorney, Mr. Jared Keenan.

21       119.    I am familiar with several COVID-19-related expert witness reports written

22   by Dr. Venters over the course of the pandemic. In those reports, visitation of the identified

23   facility was usually at the center of his methodology.  In the matter of CAFCC, however, Dr.

24   Venters failed to exercise any due diligence to tour the facility and observe COVID-19

25   response operations.

26       120.    Regarding Dr. Venters' recommendations, most are already being done.

27       121.    CAFCC has switched from using the J&J vaccine to Moderna.

28       122.    CAFCC routinely holds town hall meetings to promote vaccine acceptance

1    amongst the detainee population.

2         123.    CAFCC provides written and verbal vaccination education in both English

3    and Spanish.  Most recently, CAFCC has added vaccination information to the home screen

4    of the detainees' tablets which requires the detainee's acknowledgement before they are able

5    to access the tablet's content.

6         124.    CAFCC provides COVID-19 testing for most detainees when they leave the

7    facility.

8         125.    CAFCC tests all detainees upon admission to the facility.

9         126.    CAFCC has the ability to obtain the now widely available COVID-19

10   medications Paxlovid and Molnupiravir through local pharmacy services.

11        127.    CAFCC has been tracking all vaccination statistics since they began

12   vaccinations in 2021 and have always been able to produce the percentage of vaccinated

13   detainees.

14        128.    CAFCC has made all reasonable efforts to encourage staff vaccination while

15   maintaining a viable workforce.

16        129.    CAFCC, through its Allscripts electronic health record, can produce a list of

17   all patients who have a high-risk condition associated with a poor outcome due to a COVID-

18   19 infection. CAFCC nurses and providers utilize this information when evaluating any

19   patient who presents with a potential COVID-19 infection.

20        130.    High-risk patients being evaluated for a COVID-19 infection are provided

21   additional safeguards to include medical housing and more frequent health care encounters.

22        131.    CAFCC provides cloth as well as surgical masks to all detainees and replaces

23   them as needed or requested by the detainee.

24        132.    Since the CDC's Interim Guidance was promulgated in response to the

25   COVID-19 pandemic, CAFCC has largely implemented, and continues to actively

26   implement, the CDC's recommendations and best practices pertaining to operational

27   preparedness, prevention, and management as is feasible based upon the resources available

28   as well as operational capabilities.

133.     The CDC's guidance and recommendations are intended to mitigate, not eliminate, the risk of COVID-19. Correctional and detention facilities, as consistent with the community, will have to address sporadic episodes of COVID-19 infections despite the best mitigation efforts. CAFCC has demonstrated the ability to manage these sporadic events when they arise. CAFCC has sufficient COVID-19 testing, medical resources, cohort and isolation space, and staffing to provide appropriate assessment, care, and mitigation strategies.

134.     CAFCC has had two detainee deaths attributed to COVID-19 since the inception of the pandemic. As of the date of my report (April 20, 2022), the CAFCC COVID-19 mortality rate is 0.15% (2/1332), significantly less than the U.S. rate of 1.2% (991,000/81,200,000), Arizona state rate of 1.5% (29,951/2,020,000), and Pinal County rate of 1.25% (1,651/132,000), reflecting a competent COVID-19 mitigation and health care program. This also contradicts any claim that detainees are more likely to have an adverse outcome from a COVID-19 infection while in CAFCC custody.

135.     It is my opinion that, for the most part, CAFCC has successfully implemented CDC's Interim Guidance for Jails and Detention Facilities. In the few areas where they have not fully implemented the guidelines, CAFCC has done so based on a reasoned balancing of risk and available resources.

136.     CAFCC has also clearly demonstrated an organizational commitment to modifying these practices as further information is learned and additional guidance is developed.  I recommend the continued implementation of the precautions already in place at the facility. I do not believe that the additional recommendations by Dr. Venters are supported by CDC or would provide a meaningful difference in clinical outcomes.

137.     In my view, the health care and security staff at CAFCC operate with a high degree of   professionalism and integrity, and the clinical outcomes for the patients in their charge reflect that commitment to excellence.

/ / /

/ / /

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

Executed this _2nd_ day of August, 2022.

Owen J. Murray, D.O.

# <u>ATTACHMENT A</u>

# TO DECLARATION OF OWEN MURRAY, D.O.

# CURRICULUM VITAE

**NAME: Owen J. Murray, D.O., MBA**

**PRESENT POSITION AND ADDRESS:**

| | |
|---|---|
| 07/2009 - Present | Vice President, Offender Health Services |
| | Correctional Managed Care |
| | University of Texas Medical Branch at Galveston |
| | 301 University Boulevard |
| | Galveston, Texas 77555-1008 |

**BIOGRAPHICAL:**

Office Phone: 936-494-4170
Cell Phone: ████████
Email: ojmurray@utmb.edu

**EDUCATION:**

| | |
|---|---|
| 9/1979 – 5/1983 | B.S. (Biology), Boston College, Chestnut Hill, Massachusetts |
| 8/1984 – 6/1988 | D.O., Chicago College of Osteopathic Medicine, Chicago, Illinois |
| 7/1988 – 6/1989 | Internship (Osteopathy), Chicago Osteopathic Hospital, Chicago, Illinois |
| 7/1989 – 6/1991 | Residency (Family Practice), Borgess Medical Center, Michigan State University Kalamazoo Center for Medical Studies, Kalamazoo, Michigan |
| 8/1997 – 8/1999 | MBA, University of Houston–Clear Lake, Houston, Texas |

**BOARD CERTIFICATION:**

American Board of Family Medicine, July 12, 1991–present

Certified Correctional Health Professional (National Commission on Correctional Health Care), 1996–2000

**LICENSURE INFORMATION:**

Texas Medical Board: License no. J8070 (Expiration date: 08/31/2021)

**PROFESSIONAL WORK HISTORY AND TEACHING EXPERIENCE:**

CORECIVIC-MLG003628

| | |
|---|---|
| 1983–1984 | Postgraduate Research Assistant (Molecular Biology) Northwestern University, Chicago, Illinois |
| 1989–1991 | Emergency Department Physician Pipp Community Hospital, Plainwell, Michigan |
| 1989–1991 | Coverage Physician Kalamazoo Neuro Imaging, Kalamazoo, Michigan |
| 1991–1992 | Division Physician Cook County Department of Corrections, Chicago, Illinois |
| 1992–1993 | Medical Director Pontiac Correctional Center, Illinois Department of Corrections, Pontiac, Illinois |
| 1991–1995 | Medical Director Western Illinois Correctional Center, Illinois Department of Corrections, Mt. Sterling, Illinois |
| 1993–1994 | Medical Director Robinson Correctional Center, Illinois Department of Corrections, Robinson, Illinois |
| 1995–2005 | Medical Director Correctional Managed Care, University of Texas Medical Branch at Galveston |
| 1996–2001 | Instructor in Institutional and Correctional Health Department of Preventive Medicine and Community Health University of Texas Medical Branch at Galveston |
| 2001–present | Assistant Professor (N-T Trk Clin) Department of Preventive Medicine and Community Health University of Texas Medical Branch at Galveston |
| 2005–2009 | Executive Director for Clinical Services & Chief Physician Executive, Correctional Managed Care University of Texas Medical Branch at Galveston |
| 2009–present | Vice President, Offender Health Services Correctional Managed Care, University of Texas Medical Branch at Galveston |

**RESEARCH ACTIVITIES:**

Owen J. Murray, D.O.                                                                                                   2

CORECIVIC-MLG003629

### A.  Major Research Interests

- Medical and psychiatric disorders in the correctional setting
- Correctional health care utilization and delivery

### B.  Extramural Funding

| | |
|---|---|
| 2006 | Genzyme. CMC Operations. "SYNVISC Joint Injection Teaching." Project Director. |
| 2012–2013 | Texas Department of State Health Services/HRSA Subcontract. CMC Operations. "Texas DSHS Contract for Discharge Planning." Project Director, $120,000.00/1yr. |

## COMMITTEE RESPONSIBILITIES:

| | |
|---|---|
| 1996 | Committee to Revise Standards, National Commission on Correctional Health Care |
| 1996–2001 | UTMB-CMC Utilization Review Committee |
| 1996–1998 | Chairman, UTMB-CMC Pharmacy & Therapeutics Committee |
| 1996–2008 | Chairman, UTMB-CMC Physician Peer Review Committee |
| 1997–1999 | UTMB Telemedicine Committee |
| 1997–1998 | Work Group on HIV/AIDS Education Programs (UTMB) |
| 2002–2005 2009–2011 | Chairman, UTMB-CMC System Leadership Council |
| 2010–present | UTMB Strategic Executive Council |
| 2014–2015 | UTMB 340B Compliance Committee |
| 2015–2017 | Steering Committee, UTMB Training Council |

## OTHER PROFESSIONAL ACTIVITIES:

Consultant, Cermak Health Services of Cook County Survey, National Commission on Correctional Health Care, Chicago, IL, January 1997.

Member, Focus Group on Prison Health Care, National Institute of Corrections, U.S. Department of Justice, Washington, DC, August 1997.

Owen J. Murray, D.O.                                                                                      3

CORECIVIC-MLG003630

Consultant, HIV Education Behind Bars, Meeting the Challenges in the Year 2000. World Health Direct, November 1999

Course Director and Moderator, Managing HIV in the Correctional Setting [Series of CME-Accredited Conference Calls], World Health Direct, Ft. Lauderdale, FL, November 1999.

Consultant, J Allen Correctional Healthcare Management, LLC, 2013–present.

Elected to seat on American Correctional Association Commission on Accreditation for Corrections (Health Care) 2017–2021

**MEMBERSHIP IN SCIENTIFIC SOCIETIES/PROFESSIONAL ORGANIZATIONS**:

American Academy of Family Physicians

American Correctional Association

Texas Osteopathic Medical Association

**HONORS:**

Chief Resident, Family Practice Residency, Michigan State University Kalamazoo Center for Medical Studies, Borgess Medical Center (1990–1991)

Resident Director of Recruiting, Family Practice Residency, Michigan State University Kalamazoo Center for Medical Studies, Borgess Medical Center (1989–1991)

Illinois Department of Public Health Medical Student Scholarship, Chicago College of Osteopathic Medicine (1986–1989)

**PUBLISHED:**

**A.   Articles in Peer-Reviewed Journals**

1.   Baillargeon J, Contreras S, Grady JJ, Black SA, **Murray O**. Compliance with antidepressant medication among prison inmates with depressive disorders. *Psychiatric Services* 51:1444–1446; 2000.

2.   Baillargeon J, Ducate S, Pulvino J, Bradshaw P, **Murray O**, Olvera R. The association of psychiatric disorders and HIV infection in the correctional setting. *Annals of Epidemiology* 13:606–612; 2003.

3.   Baillargeon J, Black SA, Leach CT, Jenson H, Pulvino J, Bradshaw P, **Murray O**. The infectious disease profile of Texas prison inmates. *Preventive Medicine* 38:607–612; 2004.

Owen J. Murray, D.O.                                                                                     4

4. Baillargeon J, Soloway RD, Paar D, Giordano TP, **Murray O**, Grady J, Williams B, Pulvino JS, Raimer BG. End-stage liver disease in a state prison population. *Annals of Epidemiology* 17:808–813; 2007.

5. Baillargeon J, Paar DP, Wu ZH, Giordano TP, **Murray OJ**, Raimer BG, Avery EN, Diamond PM, Pulvino JS. Psychiatric disorders, HIV infection, and HIV/hepatitis co-infection in the correctional setting. *AIDS Care* 20:124–129; 2008.

6. Baillargeon J, Thomas CR, Williams B, Begley CE, Sharma S, Pollock BH, **Murray OJ**, Pulvino JS, Raimer B. Medical emergency department utilization patterns among uninsured patients with psychiatric disorders. *Psychiatric Services* 59:808–811; 2008.

7. **Murray OJ**. Assessing demand for wheelchair use. *Virtual Mentor* 10:84–87; 2008.

8. Harzke AJ, Baillargeon J, Paar DP, Pulvino J, **Murray OJ**. Chronic liver disease mortality among male prison inmates in Texas, 1989–2003. *American Journal of Gastroenterology* 104:1414–1419; 2009.

9. Baillargeon J, Penn JV, Thomas CR, Temple JR, Baillargeon G, **Murray OJ**. Psychiatric disorders and suicide in the nation's largest state prison system. *Journal of the American Academy of Psychiatry and the Law* 37:188–193; 2009.

10. Baillargeon J, Binswanger IA, Penn JV, Williams BA, **Murray OJ**. Psychiatric disorders and repeat incarcerations: The revolving prison door. *American Journal of Psychiatry* 166:103–109; 2009.

11. Raimer BG, **Murray OJ**, Pulvino JS. Health care in the Texas prison system: A looming fiscal crisis. *Texas Public Health Journal* 62(4):12–17; 2010.

12. Schneider BC, Harzke AJ, Ivanitskaya L, **Murray OJ**. Prioritization of inpatient hospital services to prisoners: A method for justifying care and costs. *Journal of Health Care for the Poor and Underserved* 25:863–876; 2014

B. **Other Publications**

1. **Murray OJ**. Hurricane Rita leaves lessons in its wake [Guest Editorial]. *CorrectCare* 20(1):3; 2006.

2. **Murray OJ**, Pulvino J, Baillargeon J, Paar D, Raimer BG. Managing hepatitis C in our prisons: Promises and challenges. *CorrectCare* 21(2):1, 16–17; 2007.

3. **Murray OJ,** Pulvino J, Baillargeon J, Paar D, Raimer BG. Treating all prisoners with hepatitis C may not be feasible. In: Langwith J, ed. *Hepatitis: Perspectives on Diseases and Disorders*. Farmington Hills, MI: Greenhaven Press; 2009: pp. 74–81.

C. **Abstracts**

1. Li H, Dang M, Johnson CW, Appel DJ, Pulvino JS, **Murray OJ**, Johnson L, Chao GC, Calhoun JH, Clements LM, Raimer BG. Evaluation of preferences and attitudes toward telemedicine evaluation of diabetic retinopathy. *Telemedicine Journal and e-Health* 7(2):147; 2001.

CORECIVIC-MLG003632

2. Li HK, Dang M, Uwaydat S, Horna J, Appel DJ, Pulvino JS, **Murray OJ**, Johnson L, Chao GC, Clements LM, Raimer BG. Operational challenges and outcomes of store-and-forward telemedicine evaluation of diabetic retinopathy in a prison health care system. *Telemedicine Journal and e-Health* 7(2):182; 2001.

3. Baillargeon J, **Murray O**, Pulvino J. Applying epidemiologic methods to the study of Texas prison inmates. Abstracts of the National Symposium on Correctional Health Care, Houston, Texas, September 2002.

4. Baillargeon J, Ducate S, **Murray O**, Pulvino, J. The association of HIV infection and psychiatric disorders among Texas prison inmates. Abstracts of the National Symposium on Correctional Health Care, Houston, Texas, September 2002.

5. Garza−Gutierrez G, Sharma G, Cardenas V, Baillargeon G, **Murray O**, Williams B, Baillargeon J. Use of intensive care at the end of life among a state prison population. *American Journal of Respiratory and Critical Care Medicine* 179:2009; A5226.

6. Raimer B, **Murray O**. Health care in the Texas prison system: A looming fiscal crisis. Proceedings of the 4th Academic and Health Policy Conference on Correctional Health, Boston, Massachusetts, March 10–11, 2011.

7. Tong EK, Zepeda SD, Gonzalez J, Sandmann RM, Fisher DR, **Murray O**, Khan J. Effectiveness of switching virologically suppressed HIV-infected patients from emtricitabine and emtricitabine-containing products to lamivudine. Presented at the Alcalde XXVII Southwestern Leadership Conference, San Marcos, Texas, April 24–25, 2013.

## INVITED PRESENTATIONS:

Comprehensive correctional pharmaceutical program. 1st Annual Health Care Education Program for Pharmaceutical Companies, Houston, Texas, November 1995

Correctional managed health care. 19th National Conference on Correctional Health Care, Washington, DC, November 13–15, 1995.

Fast food mentality in a managed care world. American Correctional Health Services Association Multidisciplinary Training Conference, Houston, Texas, February 1996.

Correctional managed health care. 21st National Conference on Correctional Health Care, San Antonio, Texas, November 10–12, 1997.

Primary approach to managing depression in a correctional environment. Prime Works Symposium, Houston, Texas, January 1998.

Correctional managed health care. 22nd National Conference on Correctional Health Care, Long Beach, California, November 2–4, 1998.

Improving care and lowering cost in a correctional medical facility. American Correctional Association Winter Conference, San Antonio, Texas, January 19–21, 1998.

CORECIVIC-MLG003633

CyberCare: The virtual physician's office. The National Healthcare Congress, Miami, Florida, November 6, 1999.

CyberCare: The correctional medical delivery systems of the future. 23rd National Conference on Correctional Health Care, Fort Lauderdale, Florida, November 8–10, 1999.

HIV care in the Texas Department of Criminal Justice. Texas/Oklahoma AIDS Education and Training Center (AETC) HIV Conference, Austin, Texas, October 2003.

Chronic care/disease case management. American Correctional Health Services Association Multidisciplinary Training Conference, Houston, Texas, March 25–28, 2004.

HIV care in the Texas Department of Criminal Justice. Texas Department of State Health Services 14th Texas HIV-STD Conference, Austin, Texas, December 13–17, 2004.

Addressing end stage liver disease. Hepatitis Summit (Sponsors: Texas Board of Criminal Justice & Correctional Managed Health Care Committee), Houston, Texas, September 7, 2006.

Texas Department of Criminal Justice healthcare and HIV programs. Department of State Health Services HIV/STD Program 15th Texas HIV-STD Conference, Austin, Texas, December 11–15, 2006.

Correctional health: Disaster management preparedness [moderator & speaker]. American Correctional Association 2007 Winter Conference, Tampa, Florida, January 20–24, 2007.

Developing a critical incident medical plan - from the healthcare administrator's perspective [moderator]. American Correctional Association 2007 Winter Conference, Tampa, Florida, January 20–24, 2007.

*In omnia paratus*—"Ready for anything" [moderator]. American Correctional Association 2007 Summer Conference, Kansas City, Missouri, August 11–15, 2007.

Cracks: Finding and fixing unintended and unfortunate places our patients fall. National Conference on Correctional Health Care. Chicago, Illinois, October 18–22, 2008.

Telemedicine: Not just a subspecialty tool [with Stephen R. Smock and Glenn Hammack]. National Commission on Correctional Health Care Updates in Correctional Health Care Conference, San Antonio, TX, May 19–22, 2012.

Life in the big house: A look at medicine behind bars. UTMB Healthy Health Policy Lunch & Lecture Series, Galveston, TX, November 28, 2012.

Cost savings and care innovations for prisoner health [with Matt McKillop and Aaron Edwards]. National Conference of State Legislatures Webinar, November 1, 2013.

CORECIVIC-MLG003634

Telehealth innovations–Transforming medical practice models [panel discussion with Kirk Gillis and Monica Fernandez]. American Osteopathic Association of Medical Informatics Conference, Seattle, WA, October 26, 2014.

Tele-Health: Pioneering new models for care [moderator]. American Correctional Association 146th Congress of Correction, Boston, MA, August 6, 2016.

## INVITED TESTIMONY

UTMB Correctional Managed Care [joint presentation with William R. Elger]. Texas Senate Committee on Finance, Austin, TX, February 21, 2011.

House Bill 25, correctional health care cost containment. Texas House of Representatives Corrections Committee, Austin, TX, June 7, 2011.

UTMB Correctional Managed Care update. Texas Senate Committee on Finance, Austin, TX, July 9, 2012.

Correctional Managed Health Care system. Texas House of Representatives Appropriations Subcommittee on Articles I, IV & V. Austin, TX, August 24, 2012.

House Bill 512, relating to the eligibility of certain inmates for release on medically recommended intensive supervision. Texas House Corrections Committee, Austin, TX, March 13, 2013.

Correctional Managed Health Care population and cost trends. Texas House of Representatives Appropriations Subcommittee on Articles I, IV & V and House Corrections Committee Joint Hearing, Austin, TX, May 29, 2014.

Telemedicine in Correctional Managed Care & the UT System Virtual Health Network. Senate Committee on Health & Human Services, Austin, TX, June 16, 2016.

## LITIGATION

Vice President UTMB CMC Cases: Deposed

1. McCollum v. Livingston U.S.D.C. (S.D. Texas), Case No. 4:14-cv-03253; 2017 U.S. Dist. LEXIS 19602 2018
2. Roppollo v. Linthicum U.S.D.C. (S.D. Tex.), Case No. 2:19-cv-00262
3. Kazee, Inc. v Callender CIVIL ACTION NO. 4:19-CV-31-SDJ

Expert Witness Cases: Deposed
4. Ashker v. Brown 4:09-cv-05796 (N.D. Cal.) 2018
5. Lippert v. Ghosh, U.S.D.C. (N.D. Ill.), Case No. 1:10-cv-04603; 2017 U.S. Dist. LEXIS 646
6. Kelvin Hernandez Roman, et al., v Chad F. Wolf, et al Case No. 5:20-cv-00768

CORECIVIC-MLG003635

7. Patrick Gayle, et al., v. Michael W. Meade et al. Case No. 20-21553-Civ-COOKE/GOODMAN
8. Victor Antonio Parsons v. Charles L. Ryan No. 18-16358


General Expert Witness Litigation Work

9. Plata v. Newsom No. 4:01-cv-01351-JST
10. Estate of Gerardo Cruz-Sanchez v. United States of America Case No. 17-cv-569-AJB-NLS
11. Jeremy Laintz v. Correctional Health Partners LLC, et al. Civil Action No. 18-cv-02122-RM-STV
12. Ray Carpenter Jr. v. CoreCivic of Tennessee LLC. CV-19-16-GF-BMM
13. Aristoteles Sanchez Martinez, et al., v. Michael Donahue Case No. 7:20-cv-00062 CDL-MSH
14. Kelvin Hernandez Roman, et al., v. Chad F. Wolf et al. Case No. 5:20-cv-00768
15. Veenaben Dhirubhai Patel, et al., v. William P. Barr et al. Case No. CV-20-00709-PHX-DLR
16. Janet Malam, v. Rebecca Adducci, et al. Civil No. 20-10829
17. United States of America v. Miami Dade County Case No. 13-21570-CIV ZLOCH
18. NAACP v. Cooper, No. 20 CVS 500110
19. Favian Busby, et al. V. Floyd Bonner Jr. et al. Case No. 2:20-cv-02359

CORECIVIC-MLG003636

# **ATTACHMENT B**

# **TO DECLARATION OF OWEN MURRAY, D.O.**

 Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

## COVID-19



# Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated May 3, 2022     Languages ▾     Print

## Summary of Recent Changes

Updates as of May 3, 2022                                                    

- Separated the previous version of this guidance document into two sections:
  - **Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities** – *guidance on designing a flexible COVID-19 prevention plan based on COVID-19 Community Levels and facility-level factors*
  - **Appendix** – *detailed guidance on implementing specific prevention strategies in correctional and detention facilities*
- Separated COVID-19 prevention strategies into two categories and provided guidance on when to apply each category in correctional and detention facilities.
  - Strategies for Everyday Operations
  - Enhanced COVID-19 Prevention Strategies
- Added modified post-exposure quarantine options for facilities to consider to reduce the impact of quarantine on residents' mental health and access to services.
- Removed COVID-19-specific PPE recommendations for persons handling laundry or used food service items from people with COVID-19 or their close contacts.

View Previous Updates

This document provides guidance regarding the prevention of coronavirus disease 2019 (COVID-19), tailored for correctional and detention facilities housing adults and/or juveniles. This guidance is based on what is currently known about the transmission and severity of COVID-19 as of May 3, 2022.

The U.S. Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated guidance.

## On This Page

Intended Audience and Terminology

Section 1: Introduction

Section 3: Strategies for Everyday Operations vs. Enhanced COVID-19 Prevention Strategies

# Intended Audience and Terminology

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities for adults and juveniles to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes COVID-19) in their facilities. These facilities include but are not limited to federal and state prisons, local jails, juvenile detention and correctional facilities, detention centers, law enforcement agencies that have custodial authority for persons who are detained (i.e., U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Marshals Service), and the respective community-based departments of health and child welfare agencies. Some of these facilities and agencies might adapt CDC guidance for correctional and detention facilities based on their specific populations or operational needs. Note that this guidance does not define specific occupancy limits for any correctional or detention facility. It provides a framework to assess COVID-19 risk in a facility and to prioritize prevention strategies based on community and facility-level factors, including factors beyond the control of the facility. This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. This guidance does not replace any applicable federal, state, local, tribal, or territorial health and safety laws, rules, and regulations.

It is important to note that youth who are detained or committed have unique needs related to their age and development, including a need for access to in-person learning. Facilities housing youth may also need to adapt aspects of this guidance document to comply with regulatory requirements and facility operations specific to the juvenile justice and child welfare systems.

This guidance may need to be adapted based on an individual facility's physical space, staffing, population, operations, history of SARS-CoV-2 outbreaks, community factors, and other resources and conditions. Facilities should contact CDC (eocevent366@cdc.gov) or their state, local, tribal, or territorial, public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

Definitions of terms

- **COVID-19 Prevention Strategies**
    - **Strategies for everyday operations:** COVID-19 prevention strategies that correctional and detention facilities should keep in place at all times, even when the COVID-19 Community Level is low.
    - **Enhanced COVID-19 prevention strategies:** Additional COVID-19 prevention strategies for facilities to use when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk.
- **Close contact or exposure to someone with COVID-19:** Persons with recent exposure to SARS-CoV-2 can be identified in correctional and detention facilities in two ways:
    - **Traditional case investigation and contact tracing.** Consult the CDC website for the current definition for when a person would be considered a close contact of someone with COVID-19.
    - **Location-based contact tracing.** When traditional case investigation and contact tracing are not feasible, facilities may identify persons with recent known or potential exposure to SARS-CoV-2 based on whether they spent time in the same locations as an infected person (e.g., all residents and staff members assigned to a housing unit where a case has been identified).
- **Incarcerated/detained persons** or **residents:** Adults and juveniles held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced as well as those held for pre-trial or civil purposes.
- **Medical isolation:** Physical separation of an individual with confirmed or suspected COVID-19 to prevent contact with others and reduce the risk of transmission.
- **Quarantine:** Physical separation of an individual who has had close contact with someone with confirmed or suspected COVID 19, to reduce the risk of transmission to others if the individual is later found to have

suspected COVID-19 or unable to be tested, as others who have been exposed to someone with COVID-19.

- **Staff:** All public or private sector employees working within a correctional or detention facility. "Staff" does not distinguish between healthcare, custody, food service, and other types of staff members, nor between government and private employers.
- **Up to date** on COVID-19 vaccines is defined by CDC guidance. This definition is subject to change over time based on updates to CDC vaccination guidance.

Top of Page

# Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities

## Section 1: Introduction

This document describes a flexible, long-term approach to COVID-19 prevention in correctional and detention facilities. First, it outlines community and facility-level indicators to use to assess COVID-19 risk in a facility. Second, it describes which COVID-19 prevention strategies should be used at all times (strategies for everyday operations) versus only at times of increased risk (enhanced prevention strategies). Additional information on applying each COVID-19 prevention strategy in correctional and detention facilities can be found in the Appendix.

When applying enhanced prevention strategies, correctional and detention facilities should weigh the risks associated with SARS-CoV-2 transmission against their impact on facility operations, mental health, and availability of services and programming for residents. Because of the variation across facilities (e.g., differences in layout, infrastructure, security level, mission, population health needs, on-site healthcare, and staffing levels) and shifting epidemiologic trends due to new SARS-CoV-2 variants and other factors, there is no single COVID-19 prevention plan that will apply across all facilities or time periods.

Top of Page

# Section 2: Assessing COVID-19 Risk in Correctional and Detention Facilities

To develop a flexible, long-term COVID-19 prevention plan, correctional and detention facilities should first assess their unique COVID-19 risks to inform the intensity of prevention strategies needed over time. This risk assessment should be based on a combination of:

- CDC COVID-19 Community Levels
- Facility-level factors

## COVID-19 Community Levels

CDC recommends using COVID-19 Community Levels to guide individual and community decisions about when to apply specific COVID-19 prevention strategies. COVID-19 Community Levels are categorized as low, medium, and high based on the number of COVID-19 cases in a given community and the impact of severe disease on community-based healthcare systems. Visit the CDC website to check any county's current COVID-19 Community Level and to see more detail about how these levels are determined.

When correctional and detention facilities assess a local area's COVID-19 Community Level, they should consider the community where the facility is located as well as the communities from which residents originate and where staff members live. Facilities receiving residents from international locations should make reasonable efforts to determine the risk level in originating countries. See the World Health Organization COVID-19 dashboard [⧉] for case counts by country. Facilities that receive large numbers of residents from a wide geographical area may

consider weighing facility-level factors more heavily than COVID-19 Community Levels in decisions about when to apply specific prevention strategies.

**Note that correctional and detention facilities providing healthcare services should consult CDC's Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic (which uses COVID-19 Community Transmission Levels rather than COVID-19 Community Levels to guide application of certain COVID-19 prevention strategies in healthcare facilities) for guidance on recommended infection prevention and control strategies for patient care.**

# Facility-level Factors

Because COVID-19 Community Levels do not always reflect the COVID-19 risk in correctional and detention facilities, each facility should also assess facility-level factors that reflect its unique characteristics, operations, and populations to guide decisions about when to add or remove enhanced prevention strategies. Examples of relevant facility-level factors are detailed below. However, guidance is not available to set specific thresholds for these factors, or to specify how many factors to consider before shifting to enhanced prevention measures.

**Facility-level factors to consider include:**

- **Vaccination coverage:** Determine the proportion of staff and residents who are up to date on COVID-19 vaccines.

  COVID-19 vaccines are highly effective in preventing severe illness, hospitalization, and death from COVID-19. Facilities that do not have high up to date vaccination coverage should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low.

- **Transmission in the facility:** Evaluate the current level of SARS-CoV-2 transmission within the facility. Transmission can be assessed through diagnostic testing of symptomatic persons and their close contacts, through ongoing routine screening testing, or surveillance testing that the facility uses (such as wastewater testing). Results of testing at intake are not recommended as an indicator of transmission inside the facility, since infections identified at intake most likely occurred elsewhere.

  Because of the risk of unrecognized infection, any new case of COVID-19 in a staff member or resident in a correctional or detention facility should prompt follow-up as described in the Appendix, including a case investigation and/or location-based contact tracing and testing of persons identified as close contacts. Facilities should shift to enhanced prevention strategies if one or more additional cases are identified after follow-up, even if the COVID-19 Community Level is low. Note that enhanced prevention strategies that are put in place due to transmission can be targeted to certain portions of a facility (rather than a whole building or complex) as long as movement and staff assignments are restricted between areas with and without known transmission.

- **Risk of severe health outcomes:** Determine whether the facility's residents or staff are more likely to get very sick from COVID-19. Additionally, evaluate whether the facility is able to assess infected residents' eligibility for COVID-19 therapeutics and, for eligible residents, to ensure timely access to treatment to prevent severe health outcomes. See Nonhospitalized Patients: General Management | COVID-19 Treatment Guidelines ☐ . Facilities should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low if they are unable to do one of the following: a) access and administer COVID-19 therapeutics on-site to prevent severe health outcomes among residents more likely to get very sick from COVID-19, OR b) assess residents' risk for severe outcomes and ensure timely access to care outside the facility.

- **Facility structural and operational characteristics**: Assess how facility characteristics and operational protocols can contribute to or mitigate SARS-CoV-2 spread within the facility.

  Facilities with dense housing arrangements (e.g., dorm/open barracks), frequent population turnover, or ventilation systems that do not meet code-minimum ventilation requirements may consider applying some enhanced prevention strategies, even when the COVID-19 Community Level is low.

Top of Page

# Section 3: Strategies for Everyday Operations vs. Enhanced COVID-19 Prevention Strategies

At all times, facilities should keep certain strategies for everyday operations in place. In addition, facilities should maintain the ability to add or remove enhanced COVID-19 prevention strategies based on ongoing risk assessment as described above. When shifting from a period of higher to lower risk, avoid removing enhanced COVID-19 prevention strategies all at once.

Table 1 provides a summary of which prevention strategies are recommended as strategies for everyday operations (in place at all times) vs. as enhanced COVID-19 prevention strategies (added or removed based on risk assessment). See the Appendix for detailed information on tailoring each of these prevention strategies to correctional and detention facilities.

## Table 1: Strategies for Everyday Operations vs. Enhanced Prevention Strategies

| COVID-19 Prevention Strategy | Strategies for Everyday Operations* | Enhanced COVID-19 Prevention Strategies* |
|---|:---:|:---:|
| Up to date COVID-19 vaccination | ✓ | |
| Standard infection control | ✓ | |
| Enhanced ventilation+ | | ✓ |
| Testing | | |
| symptomatic people | ✓ | |
| close contacts of people with COVID-19 | ✓ | |
| all residents at intake (or routine observation period) | ✓ | |
| before transfer | | ✓ |
| before/after community visits | | ✓ |
| before release | | ✓ |
| routine screening testing | | ✓ |
| Access to COVID-19 therapeutics | ✓ | |
| Medical isolation & quarantine | ✓ | |
| Well-fitting masks/respirators | | |
| offer to residents and staff | ✓ | |

| | | |
|---|:---:|:---:|
| universal indoor masking | | ✓ |
| Prepare for outbreaks | ✓ | |
| Routine observation periods during transfer/release protocols | | ✓ |
| Minimize movement and contact across housing units and with the community | | ✓ |
| Physical distancing | | ✓ |

*At all times, facilities should keep Strategies for Everyday Operations in place. In addition, facilities should add Enhanced COVID-19 Prevention Strategies when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk. Facilities may not be able to apply all Enhanced COVID-19 Prevention Strategies due to local resources, facility and population characteristics, and other factors, but they should add as many as feasible, as a multi-layered approach to increase the level of protection against COVID-19. Refer to the CDC Framework to Assess COVID-19 Risk and to Select Prevention Strategies in Correctional and Detention Facilities for details.

ᵃAs a Strategy for Everyday Operations, enhanced ventilation options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.

## Strategies for Everyday Operations

At all times, correctional and detention facilities should maintain the following aspects of standard infection control, monitoring, and capacity to respond to COVID-19 cases:

- **Provide up to date COVID-19 vaccination, including boosters:** Continue to provide and encourage up to date COVID-19 vaccination for staff members and residents (including boosters, as well as additional doses for people with weakened immune systems and for others who are eligible for additional doses).

- **Maintain standard infection control strategies:** Maintain recommended handwashing and cleaning and disinfection for standard prevention of infectious diseases, including COVID-19. Ensure that ventilation systems operate properly and provide acceptable indoor air quality for the current occupancy level for each space. Make improvements and repairs as necessary. Prepare in advance for periods of higher risk by identifying, obtaining, and testing enhanced ventilation interventions that will be deployed as enhanced prevention strategies when needed (see below for examples and additional resources). Ensure that recommended personal protective equipment (PPE) is available for staff and residents based on their level of risk. (See the Appendix for a table detailing recommended PPE.)

- **Maintain diagnostic testing and intake testing strategies:** Maintaining a robust COVID-19 testing program can help prevent transmission in congregate settings and can provide critical data for ongoing assessment of the facility's long-term prevention plan. Maintain the COVID-19 testing strategies below to the maximum extent possible based on facility resources and supplies. See the Appendix for details about each testing strategy.

  - **Diagnostic testing** should be performed for anyone who shows signs or symptoms of COVID-19 and for anyone who has been potentially exposed or identified as a close contact of someone with COVID-19 (either through traditional contact tracing or through location-based contact tracing), regardless of COVID-19 vaccination and booster status.

  - **Routine COVID-19 screening testing OR a routine observation period should be implemented for all residents at intake,** regardless of COVID-19 vaccination and booster status. The routine observation period option should only be used in the following scenarios: a) Residents under intake observation are housed individually, OR b) Residents under intake observation are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. See the Appendix for detailed information on implementing routine observation periods during intake.

  - In facilities that use wastewater testing, continuing its use as a strategy for everyday operations when the COVID-19 Community Level is low can provide timely data to guide decisions about when to shift to

enhanced COVID-19 prevention strategies.

- COVID-19 screening testing at intake can be added to existing policies for routine intake testing for other infectious diseases, such as tuberculosis, though testing may not need to occur at the same time points for all diseases.

- **Assess residents' risk for severe health outcomes from COVID-19 and ensure timely treatment after infection for those who are eligible for** COVID-19 therapeutics. For facilities without onsite healthcare capacity, have a plan in place to ensure timely access to care offsite. See Nonhospitalized Patients: General Management | COVID-19 Treatment Guidelines ☑ .

- **Maintain medical isolation and quarantine procedures for residents:** Regardless of their vaccination and booster status, medically isolate residents who test positive for SARS-CoV-2 and quarantine residents who have been potentially exposed or identified as a close contact of someone with COVID-19 (either through traditional contact tracing or through location-based contact tracing). See the Appendix for detailed information on a) modified approaches to quarantine to reduce the impact of quarantine on mental health, in-person learning, and essential facility operations, b) duration of medical isolation during routine vs. crisis-level operations, and c) ensuring that the conditions in medical isolation and quarantine housing are not punitive and support mental health. Maintain the ability to quickly scale up medical isolation and quarantine during an outbreak.

- **Prevent COVID-19 introduction from staff:** Regardless of their vaccination and booster status, exclude staff members from work if they have symptoms of COVID-19, test positive for SARS-CoV-2, or have been potentially exposed or identified as a close contact of someone with COVID-19. See the Appendix for detailed information on a) standard and modified approaches to quarantine for staff and b) isolation duration for staff during routine vs. crisis-level operations.

- **Offer masks/respirators to all residents and staff who want them:** Facilities should make well-fitting masks or respirators available to any residents and staff who would like to use them based on their personal preference. See the Appendix for detailed information on types of masks and respirators and considerations for using them in correctional and detention facilities.

- **Prepare for outbreaks:** Monitor COVID-19 Community Levels and facility-level factors to be prepared for periods of increased SARS-CoV-2 transmission. Maintain communication with staff members and residents about what to expect if an outbreak occurs, and with external partners including public health and other local correctional and detention facilities.

## Enhanced Prevention Strategies

In addition to the strategies for everyday operations above, facilities should add enhanced COVID-19 prevention strategies when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk. Facilities with low risk tolerance can apply any enhanced prevention strategies at any time, even when the CDC COVID-19 Community Level is low.

Depending on the risk in different areas of the facility, enhanced prevention strategies can be applied across an entire facility OR can be targeted to a single housing unit, wing, or building.

When selecting enhanced prevention strategies, facilities should consider their impact on mental health, access to in-person learning (especially for youth populations), and the likelihood of compliance from staff and residents. Facilities may not be able to apply all enhanced prevention strategies due to local resources, facility and population characteristics, and other factors, but they should add as many as feasible, as a multi-layered approach to increase the level of protection against COVID-19. **Enhanced prevention strategies for correctional and detention facilities include the following:**

- **Require masks/respirators indoors:** Require all residents, staff, visitors, vendors, volunteers, and any other persons in the facility to wear a well-fitting mask or respirator while indoors.

- **Enhance ventilation in the facility:** Use enhancements to code-minimum ventilation requirements to improve overall ventilation in the facility. For options to improve ventilation in buildings, such as increasing the introduction of outdoor air, using portable HEPA filters, and using upper room or in-duct ultraviolet germicidal irradiation systems (UVGI), see COVID-19 Ventilation in Buildings. These options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.

**Strengthen SARS-CoV-2 testing strategies:** In addition to providing low-barrier diagnostic testing at all times and universal screening testing or a routine observation period for residents at intake (strategies for everyday operations), add other screening testing strategies to identify cases early and to prevent transmission during movement. Options include:

- – **Routine screening testing for residents and staff** – see the Appendix for more information on designing a screening testing program based on the unique features of a particular facility and its population.
- – **Additional movement-based screening testing:**
  - * Before transfer to another facility
  - * Before/after community visits
  - * Before release

- **Add routine observation periods during movement:** Implement routine observation periods as part of intake, transfer and/or release processes to minimize transmission to/from other facilities and the community during movement. See the Appendix for implementation details.

- **Minimize movement and contact across housing units and with the community:** For short-term periods, reduce contact between different areas of the facility, and between the facility and the community, to prevent transmission. Examples include:
  - – Restricting contact between housing units, including maintaining consistent staff assignments and ensuring that internal work details do not include residents from multiple housing units who do not otherwise interact
  - – Restricting work release programs
  - – Postponing non-essential community visits
  - – Restricting movement across different areas of the facility
  - – Restricting movement between facilities
  - – Restricting in-person visitation (while ensuring access to virtual options)

  Consider the impact of prolonged restrictions on mental health and well-being for residents and staff with and without pre-existing mental illness.

- **Implement physical distancing strategies where feasible:** Increase the amount of physical space between people where possible. Examples include:
  - – Staggering use of common spaces by different housing units
  - – Limiting the size of group activities
  - – Temporarily suspending group activities where residents will be in closer contact than they are in their housing environment (while considering impact on mental health and access to services)
  - – Implementing decompression/population reduction strategies

Top of Page

# Appendix: Considerations for Applying COVID-19 Prevention Strategies in Correctional and Detention Facilities

This Appendix provides details on tailoring specific COVID-19 prevention strategies to correctional and detention settings. Refer to the full guidance document above for recommendations on when to apply each prevention strategy, based on a combination of COVID-19 Community Levels and facility-level factors.

COVID-19 prevention strategies described in this Appendix include:

- Vaccination
- Standard infection prevention and control
- COVID-19 testing
- Routine observation periods during movement protocols
- Medication to prevent severe disease

- Medical isolation and quarantine
- Masks and respirators
- Preparing for outbreaks
- Physical distancing
- Visitation
- Re-entry considerations

# COVID-19 Vaccination

COVID-19 vaccination is a strategy for everyday operations in correctional and detention facilities and is the most important tool available to prevent severe COVID-19. For more information on vaccine effectiveness, visit Ensuring COVID-19 Vaccines Work.

COVID-19 and other vaccines, including influenza vaccines, may be co-administered at the same time. See the Interim Guidance for Routine and Influenza Immunization Services During the COVID-19 Pandemic for additional considerations for influenza vaccination of persons in congregate settings during the COVID-19 pandemic.

**Correctional and detention facilities should:**

- Ensure that vaccines and boosters are available for all residents and staff in order to stay up to date.
- Promote COVID-19 vaccination by educating staff and residents on the effectiveness, safety, and importance of vaccines.
- Work with local health departments, healthcare providers, and community organizations on effective ways to increase vaccination uptake, informed by input from residents and staff about why they may not wish to receive the vaccine. Consider recruiting residents and staff who received the vaccine to be peer supporters to encourage others to be vaccinated.

**Additional vaccine resources:**

- Stay Up to Date with Your Vaccines
- COVID-19 vaccine communications resources available to print specifically for correctional facilities: Print Resources
- Building Confidence in COVID-19 Vaccines
- Workplace Vaccination Program
- COVID-19 Vaccine Information for Specific Groups
- COVID-19 vaccine information for children and teens
    - Vaccines for Children and Teens
    - Resources to Promote the COVID-19 Vaccine for Children & Teens
- Ensuring the Safety of COVID-19 Vaccines in the United States
- COVID-19 Vaccine Booster Shot
- Frequently asked Questions about the COVID-19 Vaccine
- COVID-19 Rapid Community Assessment Guide

# Standard Infection Prevention and Control

Infection prevention and control strategies are strategies for everyday operations in correctional and detention facilities.

Note that correctional and detention facilities providing healthcare services should consult CDC's Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic (which uses COVID-19 Community Transmission Levels rather than COVID-19 Community Levels to guide application of certain COVID-19 prevention strategies in healthcare facilities) for guidance on recommended infection prevention and control strategies for patient care.

## Hand Hygiene

- All individuals in the facility should use preventive actions including regularly washing their hands, avoiding touching their eyes, nose, and mouth, and covering their cough.
- Facilities should ensure adequate access to hand hygiene materials at no cost to staff or residents. These materials should include soap, water, and clean towels or alcohol-based hand sanitizer with at least 60% alcohol.

## Cleaning and disinfection

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 pandemic, including Safe and Proper Use of Disinfectants to Reduce Viral Surface Contamination in Correctional Facilities.
- Facilities should have a plan in place to restock cleaning and disinfection supplies quickly during a COVID-19 outbreak.

## Ventilation

- As a strategy for everyday operations, facilities should ensure that ventilation systems operate properly and provide acceptable indoor air quality for the current occupancy level for each space. Improvements and repairs should be made as necessary.
- As an enhanced prevention strategy, facilities should use enhancements to code-minimum ventilation requirements to improve overall ventilation in the facility. For more information about ventilation considerations and strategies to improve ventilation, such as increasing the introduction of outdoor air, using portable HEPA filters, and using upper room or in-duct ultraviolet germicidal irradiation systems (UVGI), see COVID-19 Ventilation in Buildings. These options should be identified, obtained, and tested in advance of higher risk periods to be ready to deploy when needed.

## Recommended PPE

Recommended PPE for staff members and residents in a correctional facility will vary based on the type of contact they have with someone with COVID-19 or their close contacts. See Table 2.

- Ensure that staff members and residents who are required to wear PPE have been trained to correctly don, doff, and dispose of PPE they will need to use within the scope of their responsibilities:
    - PPE donning and doffing training videos and job aids 📄
    - Protecting Healthcare Personnel (as found on the CDC website)
    - Infection control guidance for healthcare professionals about COVID-19
    - CDC COVID-19 Correction Unit's Infection Prevention and Control training slides 📄
- Maintain designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include the following (see the full list of recommended materials in the CDC Correction Unit's Infection Prevention and Control training slides 📄 ):
- A dedicated trash can to dispose of used PPE (one for laundry and one for trash or biohazard)
- A hand washing station or access to alcohol-based hand sanitizer with at least 60% alcohol
- Posters illustrating correct donning and doffing procedures
- If not already in place, employers operating within the facility should establish a respiratory protection program, 🔗 as appropriate, to ensure that staff members are fit-tested, medically cleared, and trained for any respiratory protection they will need within the scope of their responsibilities. Residents may also be considered for enrollment in a respiratory protection program depending on work-related exposure risk. For example, residents working in an environment where they may be exposed to COVID-19 – such as in a medical isolation unit – would be considered for enrollment due to occupational risk. For more details, see the OSHA Respiratory Protection Standard 🔗 .
- If staff members must serve multiple facility areas, ensure that they change PPE when leaving medical

isolation or quarantine spaces. If a shortage of PPE supplies necessitates reuse, prevent cross-contamination by ensuring that staff members move only from areas of low to high exposure risk while wearing the same PPE. For example, start in a housing unit where no one is known to be infected or exposed, then move to a space used as quarantine for close contacts, and end in a medical isolation unit.

- In case of PPE shortages, use strategies for safely optimizing PPE supplies.

## Table 2. Recommended Personal Protective Equipment (PPE) and Source Control for Residents and Staff in a Correctional or Detention Facility

The PPE described below may only be required for certain activities. See footnotes for details. Note that when the COVID-19 Community Level is low, a well-fitting mask or respirator should be offered and provided to all residents and staff who want them. When the COVID-19 Community Level is medium or high, or when facility-level factors indicate higher risk, facilities should require all persons in the facility to wear a well-fitting mask or respirator indoors.

| | NIOSH-approved Respirator* | International Respirator* or Disposable Procedure Mask | Cloth Mask | Eye Protection† | Gloves† | Gown/Coveralls† |
|---|---|---|---|---|---|---|
| **Residents** | | | | | | |
| With confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | X§ | | | | |
| Quarantined (individually or in a cohort) as a close contact of someone with COVID-19 | | X§ | | | | |
| Working in an area designated for quarantine or medical isolation (*without* having close contact with persons under quarantine or isolation precautions) | X§ | | | | | |
| Working in an area designated for quarantine or medical isolation (*with* close contact with persons under quarantine or isolation precautions) | X§ | | | X | X | X |

| | | | | |
|---|---|---|---|---|
| Living or working in areas of the facility not designated for quarantine or medical isolation | X[§][¶] | | | |
| **Staff** | | | | |
| Working in medical isolation or quarantine areas (*without* close contact with persons under quarantine or isolation precautions) | X | | | |
| Having close contact with (including transport) or providing medical care to persons under quarantine or isolation precautions | X | | X | X | X |
| Performing temperature checks for any persons who are *not* under quarantine or isolation precautions** | | X[§] | X | X | |
| Working in areas of the facility not designated for quarantine or medical isolation | | X[§][¶] | | | |

*NIOSH-approved respirators include N95s. International respirators include KN95s and KF94s. Visit the CDC website of Types of Masks and Respirators for a full list of NIOSH-approved and international respirators.

†If residents or staff are using cleaning products, additional PPE may be needed based on the cleaning product label. See CDC guidelines for details.

§Masks and respirators can provide different levels of protection depending on the type and how they are used. Choose the most protective mask or respirator that fits well and can be worn consistently. Loosely woven cloth products provide the least protection; layered finely woven products offer more protection; well-fitting disposable procedure masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection. When possible, offer different types of masks and respirators to staff and residents so that they can choose the option that fits them best and that they can wear consistently. The options that are offered in correctional and detention facilities may be limited by safety and security considerations, such as concerns about metal nose wires. In environments where the risk of transmission is higher (e.g., post-exposure quarantine units) and safety and security considerations allow, residents should be offered masks or respirators providing the same level of protection as those provided to staff in a similar environment.

¶When the COVID-19 Community Level is low, a well-fitting mask or respirator should be offered and provided to all residents

facilities should require all persons in the facility to wear a well-fitting mask or respirator indoors.

\*\*Sanitize or change gloves between each temperature check. A gown could be considered if extensive contact with the person being screened is anticipated.

# COVID-19 Testing

## Types of tests and accessing testing supplies

For information on types of tests and how to choose a test, refer to Overview of Testing for SARS-CoV-2, the virus that causes COVID-19.

Facilities can contact their state or local health departments to request access to testing supplies when they are available locally. If testing supplies are unavailable, facilities can consider screening for COVID-19 symptoms (including temperature checks) and asking about recent close contact with someone with COVID-19. Facilities may also consider adding symptom screening as an added layer of protection in addition to testing. Symptom screening can help identify staff members, visitors, vendors, or volunteers who should be excluded from a facility before entry and residents (at intake or in the existing population) who should be evaluated for potential medical isolation or quarantine. *Symptom screening and temperature checks alone will not prevent all transmission, because it will not identify people with asymptomatic or pre-symptomatic infection.*

## Diagnostic testing

Diagnostic testing is used to identify current infection and is performed when a person has signs or symptoms consistent with COVID-19, or when a person is asymptomatic but has recent known or suspected exposure to someone with COVID-19. Viral tests authorized ☑ by the Food and Drug Administration (FDA) for diagnostic testing include nucleic acid amplification tests (NAATs) and antigen tests. Antibody tests are used to detect past infection with SARS-CoV-2. CDC does not recommend using antibody testing to diagnose current infection or to assess immunity.

Diagnostic testing is a strategy for everyday operations in correctional and detention facilities and should be implemented at all times, even when the COVID-19 Community Level is low. Ensuring the availability of low-barrier diagnostic testing can help identify cases early and limit the size of outbreaks.

## Testing persons with signs or symptoms consistent with COVID-19

- **Residents with COVID-19 symptoms**, regardless of COVID-19 vaccination or booster status, should be moved to medical isolation in a separate environment from other people (ideally individually), medically evaluated, and tested. If the test result is positive, medical isolation should continue for 10 days from the date when symptoms began. **Multiple residents with confirmed COVID-19 can be housed as a cohort in a dorm or cell environment, even if the dates of their positive test results are different.** Facilities should consider suspending co-pays for residents seeking medical evaluation for possible COVID-19 symptoms, especially during outbreaks, to remove possible barriers to symptom reporting.
- **Staff members with COVID-19 symptoms**, regardless of COVID-19 vaccination and booster status, should be excluded from work and advised to seek testing. If the test result is positive, staff members should be excluded from work for 10 days from the date when symptoms began. (However, staff may use CDC guidance for the general public for isolation duration when they are not at work.) See section below on isolation duration for staff during crisis-level operations.
- **Visitors, vendors, and volunteers with COVID-19 symptoms**, regardless of COVID-19 vaccination and booster status, should be denied entry and encouraged to seek testing.

## COVID-19 case follow-up

Because of the risk of unrecognized infection, any new case of COVID-19 in a staff member or resident in a correctional or detention facility should prompt a case investigation and testing of close contacts as described below. The facility's ability to test staff may be limited by facility-specific policy.

**Facilities should add enhanced prevention strategies when there is transmission occurring in the facility.** If a case is identified in a resident who tests positive at intake but has not had close contact with other members of the facility's population and is immediately placed in medical isolation, this person's positive test result could be considered an isolated case rather than a part of a larger outbreak and may not trigger enhanced prevention strategies. However, it may still be necessary to test other people who were exposed during intake or transport before that decision is made.

Persons with recent exposure to SARS-CoV-2 can be identified in two ways:

- **Traditional case investigation and contact tracing.** Consult the CDC website for the current definition for when a person would be considered a close contact of someone with COVID-19. Case investigations should prioritize elicitation of close contacts who are more likely to get very sick from COVID-19 so they can be referred to a healthcare provider to determine eligibility for treatment if they test positive for SARS-CoV-2.

- **Location-based contact tracing.** When traditional case investigation and contact tracing are not feasible, facilities may identify persons with recent known or potential exposure to SARS-CoV-2 based on whether they spent time in the same locations as an infected person (e.g., all residents and staff members assigned to a housing unit where a case has been identified).

## Testing asymptomatic persons with recent exposure to SARS-CoV-2

**All persons identified as close contacts of someone with COVID-19, including all persons identified through location-based contact tracing, should be tested for SARS-CoV-2, *regardless of symptoms or COVID-19 vaccination or booster status*.**

- Administer an initial diagnostic test as soon as possible (but not within the first 24 hours after close contact, because a test is unlikely to be positive that quickly).

- If the initial test result is negative, administer a second diagnostic test at least 5 days after the exposure occurred. (If the initial test was performed at least 5 days after the exposure, a second test is not needed.) See additional considerations below for serial testing in quarantine cohorts.

- People who had confirmed COVID-19 within the past 90 days and subsequently recovered do not need to be tested after exposure unless they develop new symptoms.

- For details on testing large numbers of people, such as those identified as close contacts through location-based contact tracing, review CDC guidance on Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings. Given the potential for rapid transmission, ensure there is a plan in place to prepare medical isolation spaces for a large number of infected persons. The scope of broad-based testing should be based on the extent of movement (of staff members and residents) between parts of the facility with and without cases. Examples of broad-based testing strategies include the following:

  - Testing all persons in a single housing unit where someone has tested positive, if there has not been movement or contact with other areas of the facility through the staff or residents (i.e., residents have not left the housing unit and the staff members work exclusively in that housing unit).

  - Testing all persons in an entire wing, floor, building, or complex when cases have been identified in multiple areas, or if there has been movement between areas with and without cases.

## Screening testing

Screening testing is used to identify people infected with SARS-CoV-2 who are asymptomatic or pre-symptomatic and do not have known or suspected exposure to someone with COVID-19. Screening testing can be a valuable tool in correctional and detention facilities for detecting infections early to help stop transmission quickly. NAATs or antigen tests can be used for screening testing.

Some forms of screening testing (i.e., testing at intake) are strategies for everyday operations in correctional and detention facilities, and other forms of screening testing are enhanced prevention strategies. Each screening testing strategy below is labeled accordingly.

## Movement-based screening testing

help prevent introduction of virus into the facility, across facilities, and from the facility into the community.

- **Testing at intake (strategy for everyday operations)**. At intake, test all incoming residents OR implement a routine observation period. If intake testing is used, house incoming residents separately from the rest of the facility's population (individually if feasible) while waiting for their test results. The routine observation period option should only be used under the following scenarios: a) Residents under intake observation are housed individually, or b) Residents are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. (See additional details on implementing routine observation periods at intake below.)
- **Testing before transfer to another facility (enhanced prevention strategy)**. Consider testing all residents before transfer to another correctional/detention facility. Wait for a negative test result before transfer, and do not transfer residents with a positive test unless necessary for medical care, infection control, lack of medical isolation/quarantine space, or extenuating correctional, judicial, or security concerns.
- **Testing before release (enhanced prevention strategy)**. Consider testing residents before release from the facility. If using this strategy, test as close as possible to the day of the release. Testing before release is particularly important if residents will be housed in other congregate settings (e.g., homeless shelters, group homes, or halfway houses) or in households with persons who are more likely to get very sick from COVID-19. Notify public health authorities for assistance arranging medical isolation upon release for people who have a positive test result.
- **Testing before/after community visits (enhanced prevention strategy).** Consider testing residents before community visits (e.g., medical trips, court appearances, community programs). If using this strategy, test as close as possible to the day of the visit. Facilities can also consider testing residents 5 days after they return from community visits. Facilities may consider routine screening testing for residents participating in work release programs (see below).

## Routine screening testing

Routine screening testing is an enhanced prevention strategy. However, even when the COVID-19 Community Level is low, routine screening testing can help identify increasing case trends early and can contribute to long-term COVID-19 prevention plans.

Routine screening testing is the regular testing of asymptomatic persons with no known or suspected exposure to SARS-CoV-2, to identify COVID-19 cases early and help prevent widespread transmission. Ideally, a routine screening testing program includes both residents and staff regardless of vaccination status. It can include all residents and staff members in a facility, or a targeted or random subset chosen according to criteria the facility designates (examples below).

**If routine screening testing is conducted only among a subset of individuals in a facility or among a subset of facilities within a correctional system, the following factors can guide prioritization and selection:**

**Prioritize facilities/housing units that:**

- House resident populations more likely to get very sick from COVID-19
- Have low rates of up to date vaccination (including residents and staff)
- Have difficulty maintaining prevention strategies such as physical distancing or adequate ventilation (e.g., in dormitory-based housing or in older facilities)
- Have had recent cases or outbreaks
- Have high levels of interaction with the community (e.g., through in-person visitation or frequent turnover, off-site medical visits, work release, or court appearances)

**Prioritize individuals who:**

- Are more likely to get very sick from COVID-19
- (Staff) Have self-identified to their employer that they are more likely to get very sick from COVID-19 due to an individual medical condition

- (Residents) Mix with persons in other housing units, for example:
  - Are assigned to work details that include residents from other housing units (e.g., food service, laundry)
  - Participate in programming with residents from other housing units
- (Residents) Participate in:
  - Off-site work release programs
  - Frequent off-site medical visits
  - Frequent in-person court appearances
- (Staff) Work in:
  - A facility designated for medical care
  - Multiple areas of the facility
  - Multiple congregate facilities (e.g., more than one correctional/detention facility, homeless shelters, group homes, or schools)
- (Staff) Live or spend time with other staff members who work in other areas of the facility (e.g., family or household members, carpools)

## Routine Observation Periods during Movement Protocols

**Routine observation periods can be used** as part of intake, transfer, and/or release processes to minimize potential transmission to/from other facilities or the community during movement. These observation periods are sometimes referred to as "routine intake/transfer/release quarantine" but are not related to a potential exposure to someone with COVID-19 and **should not be combined with post-exposure quarantine cohorts**. Rather, they are periods where residents are housed separately from the rest of the facility's population (ideally individually, or as small cohorts if individual housing is not possible or is not advisable due to mental health concerns).

As a strategy for everyday operations, correctional and detention facilities should implement screening testing OR a routine observation period for all residents at intake. The routine observation period option should only be used under the following scenarios: a) Residents under intake observation are housed individually, OR b) Residents under intake observation are housed in small cohorts due to mental health concerns associated with individual housing, and all cohort members begin the observation period on the same day and will be tested at the end of the observation period. Routine observation periods during transfer and/or release (or during intake if not already in place) can be added as enhanced prevention strategies.

Observation periods should be 7-10 days if the residents under observation are not tested at the end of the observation period. A shorter period (minimum of 5 days) could be used if combined with testing at the end of the observation period.

## Medication to Prevent Severe Disease

As a strategy for everyday operations, correctional and detention facilities should maintain awareness of how to access medications to prevent severe COVID-19 in the resident population. Facilities without onsite healthcare capacity should maintain a plan to assess residents' risk for severe health outcomes and to ensure timely access to treatment outside the facility.

### Monoclonal antibodies

The FDA has expanded EUAs for use of some investigational monoclonal antibody medications to prevent SARS-CoV-2 infection and severe health outcomes, including in correctional populations, under certain conditions. Refer to the National Institutes of Health website on Characteristics of SARS-CoV-2 Antibody-Based Products ⧉ for details related to specific medications, including when they are recommended for use.

### Antiviral medications

In addition, antiviral medications are available that are effective in preventing severe health outcomes in persons

with COVID-19. The National Institute of Health COVID-19 Treatment Guidelines [2] provide information about these medications and describe what is known about their effectiveness.

These medications can be ordered at no cost through the office of the Assistant Secretary for Preparedness and Response (ASPR) ☐ within the Department of Health and Human Services, from the manufacturer, or in some cases through facilities' usual medication procurement mechanisms.

Medications are *not* a substitute for vaccination. Vaccination remains the best tool to prevent severe illness and death from COVID-19.

# Medical Isolation and Quarantine

Isolation (for persons with suspected or confirmed COVID-19) and quarantine (for persons who have been exposed to someone with COVID-19) are strategies for everyday operations in correctional and detention facilities. The guidance below includes recommendations for modified isolation protocols during short-term periods of crisis-level operations, as well as modified quarantine approaches that can be considered based on a combination of factors including current COVID-19 Community Level, facility-level factors, and residents' mental health.

## Managing medical isolation and quarantine spaces

**Have a plan in place to ensure that *separate physical locations* (dedicated housing areas and bathrooms) have been identified to:**

- Medically isolate residents with *suspected* COVID-19 (ideally individually for short periods while awaiting test results)
- Medically isolate residents with *confirmed* COVID-19 (individually or as a cohort)
- Quarantine residents identified as close contacts of those with confirmed or suspected COVID-19 (ideally individually, but as a cohort if necessary. Note that when traditional contact tracing is not feasible, close contacts can be identified through location-based contact tracing.)

Note that facilities may determine that individual housing is not advisable in some situations due to mental health concerns. If close contacts are quarantined as a cohort, keep the number housed together as small as possible to minimize the risk of further transmission.

**Manage medical isolation and quarantine units as follows to prevent further transmission:**

- Keep residents' movement outside the medical isolation/quarantine space to a minimum.
- Serve meals inside the medical isolation/quarantine space.
- Provide medical care inside the medical isolation/quarantine space, unless it is not physically possible to do so or if a resident needs to be transferred to a healthcare facility.
- Minimize shared air between medical isolation/quarantine spaces and other spaces within a building. Ventilation to/from the medical isolation/quarantine space should be separate from ventilation to other spaces within the same building. Air should flow from clean to less clean areas.
- Where possible, restrict medically isolated/quarantined residents from leaving the facility (including transfers to other facilities) during the medical isolation/quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of medical isolation/quarantine space, or extenuating correctional, judicial, or security concerns.
- Staff assignments to medical isolation/quarantine spaces should remain as consistent as possible, and these staff members should limit their movements to other parts of the facility. These staff members should wear recommended PPE appropriate for their level of contact with people under medical isolation/quarantine. See PPE section and Table 2.
- Clean and disinfect areas used by people with COVID-19 and their close contacts on an ongoing basis during medical isolation/quarantine.

**Ensure that medical isolation and quarantine are operationally distinct from punitive segregation.**

Because of limited individual housing spaces within many correctional and detention facilities, infected or

exposed people are often placed in the same housing spaces that are used for administrative or disciplinary segregation. To encourage prompt reporting of COVID-19 symptoms and support mental health, ensure that medical isolation and quarantine are *operationally distinct* from administrative or disciplinary segregation, even if the same housing spaces are used for both. For example:

- As much as possible, provide similar access to radio, TV, reading materials, personal property, commissary, showers, and other resources as would be available in individuals' regular housing units.
- As much as possible, allow residents to return to their previously assigned housing spaces after medical isolation/quarantine ends, if that is their preference.
- Ensure that staff understand that the same restrictions placed on residents in segregated housing when used for disciplinary reasons should not be applied to residents housed in the same spaces for COVID-19 related reasons.
- To support mental health, consider allowing increased telephone time or other opportunities to communicate with others outside the facility during the medical isolation or quarantine period.
- Communicate regularly with residents in medical isolation or quarantine about the duration and purpose.

## Medical isolation during routine operations

### Medical isolation for residents with suspected or confirmed COVID-19

**Regardless of their vaccination and booster status, residents showing symptoms of COVID-19 (suspected COVID-19) or testing positive for SARS-CoV-2 (confirmed COVID-19) should wear a well-fitting cloth or disposable procedure mask or respirator and should be immediately placed under medical isolation and medically evaluated (including eligibility for COVID-19 therapeutics** ). Facilities without onsite healthcare capacity to medically evaluate and/or treat residents should have a plan in place to ensure that timely evaluation and treatment take place through an offsite medical facility, additional healthcare providers, or other means.

Clinical staff evaluating and providing care for people with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), including wearing recommended PPE, and should monitor the guidance website regularly for updates to these recommendations.

Residents with suspected or confirmed COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Immediately upon identification of symptoms or positive test, until placed in medical isolation
- Once in the medical isolation space, whenever another individual enters (unless the person entering a medical isolation space for confirmed COVID-19 also has confirmed COVID-19)
- If they leave the medical isolation space for any reason

**Residents with suspected COVID-19 should be tested for SARS-CoV-2 and should ideally be housed individually while waiting for test results.** If the resident's SARS-CoV-2 test result is positive, they can be moved to cohorted medical isolation with other residents with confirmed COVID-19. If the resident's test result is negative, they can return to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

**Residents with confirmed COVID-19 may be housed in medical isolation as a cohort (rather than in single cells), even if they tested positive on different dates**. Cohorting residents during medical isolation can mitigate some mental health concerns associated with individual medical isolation and can increase capacity for medical isolation during case surges. Considerations for cohorted medical isolation include:

- Only residents with a positive SARS-CoV-2 test result should be housed together as a cohort. Do not cohort those with confirmed COVID-19 together with those with suspected COVID-19, with close contacts of people with confirmed or suspected COVID-19, or with those with other illnesses.
- When choosing a space to cohort groups of residents with confirmed COVID-19, use a single, large, well-ventilated room with solid walls and a solid door that closes fully. Using a single room will conserve PPE and reduce the chance of cross-contamination across different parts of the facility

**Medical isolation can be discontinued based on the following criteria:**

- **Residents with asymptomatic infection** – Medical isolation can end 10 days after the first positive test result (with Day 0 being the date their specimen was collected).
- **Residents with mild or moderate, symptomatic illness** – Medical isolation can end 10 days after symptom onset and after resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. Loss of taste and smell can persist for weeks or months after recovery and need not delay end of isolation.
- **Residents with severe illness** – Medical isolation can end 10 days after symptom onset and after resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms. Extending duration to up to 20 days may be warranted.
- **Residents who are moderately or severely immunocompromised** – Medical isolation should extend to 20 or more days because these people can have a longer infectious period. Use a test-based strategy to end isolation, and consult with an infectious disease specialist to determine the appropriate duration.

See section below on recommended duration of medical isolation during short-term periods of crisis-level operations (e.g., severe staffing or space shortages).

### Isolation for staff with COVID-19 symptoms or a positive test

**Staff with COVID-19 symptoms should be excluded from work and advised to seek testing, regardless of their COVID-19 vaccination and booster status. Staff members with a positive test result (with or without symptoms) should be excluded from work for 10 days from the date when symptoms started, or from the date of the positive test if they do not have symptoms (with Day 0 being the date their specimen was collected).** (However, staff may use CDC guidance for the general public for duration of isolation when they are not at work.) See section below on isolation duration for staff during crisis-level operations.

The same recommendations apply for access to the facility by visitors, vendors, and volunteers.

## Modifying isolation protocols during crisis-level operations

Because of the potential for rapid, widespread transmission of SARS-CoV-2 in congregate environments and evidence ☐ that infected people who are up to date on their COVID-19 vaccines can transmit the virus to others, CDC recommends maintaining 10-day isolation periods as much as possible for all infected residents and staff in correctional and detention facilities, regardless of their vaccination and booster status. (However, staff may use CDC guidance for the general public for duration of isolation when they are not at work.)

During crisis-level operations (examples below), facilities may need to consider short-term alternatives to the recommended 10-day isolation periods for staff and/or residents. Facilities should consult their state, local, tribal, or territorial department to discuss approaches that would meet their needs while maximizing infection control during these short-term periods.

**Examples of crisis-level operation scenarios:**

- Staffing shortages threaten to compromise the safety and security of the facility or the continuity of essential operations.
- There is insufficient space to medically isolate all residents who have been infected for the full 10-day period, and other options to increase space have been exhausted.

**Once the period of crisis-level operations has passed, facilities should return to the recommendations for periods of routine operations (10 days for isolation for residents and staff).** Facilities should ensure that both residents and staff understand that reduced isolation protocols are short-term, crisis-management tools and that the facility will return to the full 10-day isolation recommendations.

The following are guiding principles for reducing isolation periods during crisis-level operations:

- Reductions in isolation duration should be as minimal as possible to mitigate the crisis scenario.
- Decisions to shorten isolation duration should be made independently for staff and for residents, based on

the specific resources that are constrained at the time.

- Before reducing isolation duration, consider alternatives (e.g., shifting from individual to cohorted medical isolation units for residents or reducing the resident population).
- Take into consideration the risk of transmission within the facility (e.g., layout) and the risk profile of the facility's population and access to COVID-19 therapeutics to prevent severe illness.
- If crisis-level protocols allow infected staff to return to work before 10 days of isolation, the risk of transmission can be reduced by assigning them to work exclusively in medical isolation units or in assignments where they have minimal contact with others until day 10.
- If a facility shortens isolation duration, it is possible to incorporate a negative test result into these protocols (i.e., "test-out" strategies). The following factors are necessary for facilities to incorporate test-out strategies without compromising essential functions:
  - Sufficient testing supplies and staff capacity to maintain recommended diagnostic testing and screening testing at intake (see section above on testing)
  - Fast test turn-around time to inform timely decision-making
  - Sufficient staff capacity to continue to prioritize care and treatment for residents at high risk for severe COVID-19

## Standard quarantine approach

### Quarantine for close contacts of those with confirmed or suspected COVID-19

**The most stringent form of quarantine, with the lowest risk of transmission, is to individually quarantine all residents who have been in close contact with someone with confirmed or suspected COVID-19 for 10 days from the date of the last exposure, regardless of their vaccination and booster status. Note that when traditional contact tracing is not feasible, close contacts can be determined through location-based contact tracing.**

Movement outside the quarantine space should be kept to a minimum. All quarantined residents should receive an initial diagnostic test as soon as possible after identification as a close contact (but not within the first 24 hours after a known exposure, because a test is unlikely to be positive that quickly) and should be monitored for symptoms once per day. Residents who are more likely to get very sick from COVID-19 should also be evaluated for eligibility for COVID-19 therapeutics to prevent severe outcomes. If a resident develops symptoms, follow procedures detailed above for medical isolation of people with suspected COVID-19.

If the initial test result is negative, the resident should receive a second diagnostic test at least 5 days after the close contact in order to facilitate early identification of a potential infection to prevent severe outcomes. (If the initial test was performed at least 5 days after the close contact, a second test is not needed.) Day 0 is the date of last exposure/close contact.

Quarantined residents can be released from quarantine restrictions if they remain asymptomatic and have not tested positive for SARS-CoV-2 during the 10 days since their last potential exposure or known close contact with someone with confirmed or suspected COVID-19.

Residents who have been exposed to someone with COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Immediately upon identification as a close contact of someone with COVID-19 (if not already in a quarantine space)
- When another individual enters a quarantine space that is occupied by a single resident
- When quarantined residents are housed as a cohort
- If a resident under quarantine leaves the quarantine space for any reason

### Considerations for Cohorted Quarantine

**Ideally, facilities should individually quarantine close contacts of persons with confirmed or suspected COVID-19, unless mental health concerns preclude individual housing.** Cohorting multiple quarantined close contacts could result in further transmission. If cohorted quarantine is necessary, **reduce transmission risk by selecting housing**

spaces for quarantine that:

- Are well ventilated
- Minimize the number of residents sharing the housing space
- Maximize the physical distance between residents sharing the housing space
- Are physically separated (i.e., solid walls and solid doors) from non-quarantine spaces

If cohorting close contacts is necessary, be especially mindful of those who are more likely to get very sick from COVID-19. Ideally, they would not be cohorted with other quarantined residents, to reduce their chance of infection. If cohorting is unavoidable, make all possible accommodations to reduce exposure for residents who are more likely to get very sick from COVID-19.

In addition, consider possible co-infection with other respiratory illnesses, such as influenza, in quarantine decisions. Individual quarantine is recommended for residents with co-infection.

**Serial testing for cohorted quarantine.** If quarantine cohorts are used, transmission may continue if some members of the cohort have an unrecognized infection. Serial testing of the entire quarantined cohort, *regardless of their vaccination and booster status,* can identify additional infections early and prevent continued transmission. When the transmissibility of circulating SARS-CoV-2 variant(s) is high, serial testing may be challenging to implement because of reduced staffing levels and/or large numbers of residents in cohorted quarantine. In such situations, facilities may choose to prioritize serial testing primarily when the circulating SARS-CoV-2 variant(s) also causes high rates of severe illness, with a focus on identifying infections early to prevent severe health outcomes. Facilities with a low risk tolerance may consider using serial testing in quarantine cohorts more routinely.

- **To implement serial testing, re-test people quarantined as a cohort every 3–7 days until testing identifies no new cases in the cohort for 10 days since the most recent positive result.** The testing interval should be based on the stage of an ongoing outbreak (i.e., testing every 3 days can allow for faster outbreak control in the context of an escalating outbreak; testing every 5–7 days may be sufficient when transmission has slowed). In addition, continue diagnostic testing for residents with symptoms.
- Anyone testing positive should be removed from the cohort, placed in medical isolation, and the 10-day quarantine period should re-start for the remainder of the cohort.

### Quarantine for staff members

**All staff members who have been potentially exposed or identified as a close contact to someone with COVID-19 should be advised to seek testing.** If the test result is positive, staff members should be excluded from work for 10 days from the date when symptoms began, or from the date of the positive test if they do not have symptoms (with Day 0 being the date their specimen was collected).

**Staff members should quarantine if their test result is negative. The quarantine approach with the lowest risk of transmission to residents and staff in the facility is to exclude exposed staff from work for 10 days after their last exposure, regardless of their vaccination and booster status.** (However, staff may use the CDC guidance for the general public for duration of quarantine when they are not at work.) See section below on modified quarantine approaches that could be applied to staff.

The same recommendations apply for access to the facility by visitors, vendors, and volunteers.

## Modified quarantine approaches

Because of the potential for rapid, widespread transmission of SARS-CoV-2 in congregate environments and evidence ⧉ that infected people who are up to date on their COVID-19 vaccines can transmit the virus to others, CDC recommends maintaining 10-day quarantine periods as much as possible for all residents and staff in correctional and detention facilities who have been potentially exposed or come into close contact with someone with COVID-19, regardless of their vaccination and booster status. However, quarantine protocols for residents and/or staff may need to be modified in some facilities to balance the risks of severe disease from COVID-19 and the impact of prolonged quarantine on residents' mental health, or to adapt to changes in disease severity and transmissibility from different SARS-CoV-2 variants. Quarantine protocols for staff may also need to be modified

during case surges to ensure adequate staff coverage to maintain safety, security, and essential services in the facility.

Quarantine can be very disruptive to the daily lives of residents because of the limitations it places on access to programming, recreation, in-person visitation, in-person learning, and other services. These challenges are especially pronounced when residents must be quarantined as cohorts, because quarantine periods can become prolonged due to continued transmission. In addition, recommended serial testing every 3–7 days during cohorted quarantine has been difficult for facilities to accomplish during large outbreaks when testing and staffing resources have been strained.

**Table 3 presents a range of modified quarantine approaches that can be considered for residents and/or staff, with variations in duration, testing, movement, and monitoring strategies.** When choosing among these approaches, facilities should consider the current COVID-19 Community Level (which incorporates both transmission and disease severity for currently circulating variants) in combination with facility-level factors and what is known about the incubation period of the variants circulating at the time. During times when risk tolerance is low (e.g., when disease severity is high), facilities should choose lower risk strategies.

## Table 3. Standard and modified quarantine approaches in correctional and detention facilities

| Quarantine Characteristic | Standard approach | Modified approaches* |
|---|---|---|
| **Who is required to quarantine** (applies to residents and staff) | All exposed residents and staff, regardless of vaccination and booster status | Only exposed residents and staff not up to date on their COVID-19 vaccines and who have not recovered from a prior SARS-CoV-2 infection in the last 90 days |
| **Movement outside the quarantine space** (applies to residents) | Keep movement outside the quarantine space to a minimum. | Allow a quarantine cohort to move outside the quarantine space and continue daily activities as a group, but without mixing with residents or staff not assigned to their cohort. Maintain consistent staff assignments to support cohort integrity. Maintain use of well-fitting masks or respirators among staff and residents while indoors, and implement serial testing for residents. |
| **Duration** (applies to residents and staff) | Quarantine for 10 days after last exposure/close contact with someone with COVID-19. | *Test-out option*: Quarantine for no fewer than 5 days, with a negative viral test result after Day 5. *Daily testing option:* Test daily for no fewer than 5 days, and allow normal activities/access to the workplace as long as viral test results are negative. |
| **Testing (during individual quarantine)** (applies to residents) | After the initial diagnostic test, test residents again after Day 5. | After the initial diagnostic test, release residents from quarantine after the full recommended 10-day period with no additional testing. (Test residents who develop symptoms, make additional testing available on request, and actively offer testing to residents more likely to get very sick from COVID-19 to identify infections early and assess treatment eligibility.) |
| **Testing (during cohorted quarantine)** (applies to | Implement serial testing as recommended above, every 3-7 days for the entire cohort. | *Reduced cohort size option:* After the initial diagnostic test, implement serial testing every 3-7 days for the entire cohort. Use small cohort sizes to reduce the risk of continued transmission and prolonged quarantine periods. *Reduced testing option – during crisis-level operations only:* |

| | | |
|---|---|---|
| *residents)* | | After the initial diagnostic test, test residents who develop symptoms, and make additional testing available on request. Actively offer additional testing to residents more likely to get very sick from COVID-19 to identify infections early and assess treatment eligibility. Release cohorted residents from quarantine after 10 days have passed without any new cases. |
| **Monitoring** *(applies to residents)* | Conduct daily symptom checks for all quarantined residents. | Conduct daily symptom checks only for quarantined residents more likely to get very sick from COVID-19. Identifying symptomatic infection early can facilitate timely treatment and reduce the risk of severe outcomes. |

Regardless of the quarantine approach facilities choose, all residents and staff in the facility who have been potentially exposed or have close contact with someone with COVID-19 should wear a well-fitting cloth or disposable procedure mask or respirator under the following circumstances:

- Whenever another individual enters a quarantine space that is occupied by a single resident
- When quarantined residents are housed as a cohort
- If a resident under quarantine leaves the quarantine space for any reason

In addition, if quarantine duration is reduced for staff members, facilities should still require exposed staff members to:

- Continue to self-monitor for symptoms of COVID-19 through day 10 after a known or suspected exposure
- Immediately isolate and get tested if symptoms of COVID-19 occur
- Adhere to all recommended prevention strategies for people who have been exposed to someone with COVID-19, including physical distancing and maintaining good hand hygiene

# Masks and Respirators

As a strategy for everyday operations in place at all times, provide a well-fitting mask or respirator to any residents and staff members who would like to use them based on their personal preference. Require universal indoor mask/respirator use as an enhanced prevention strategy when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk.

Correct and consistent mask or respirator use is key to preventing the spread of droplets and very small particles that contain the virus. Clearly explain the purpose of masks and respirators and when their use may be contraindicated. Provide masks or respirators at no cost to residents and staff and clean or replace them routinely.

In situations where the use of a respirator is not required either by the employer or by an Occupational Safety and Health Administration (OSHA) standard, the employer may still offer filtering facepiece respirators or permit employees to use their own respirators as long as the employer determines that such respirator use will not in itself create a hazard. This is considered voluntary use under the Respiratory Protection Standard. CDC encourages employers to permit workers to voluntarily use filtering facepiece respirators like N95s. If an employer allows voluntary use of filtering facepiece respirators, the employer must provide users with 29 CFR 1910.134 Appendix D – Information for Employees Using Respirators When Not Required Under the Standard ☐ . See 29 CFR 1910.134(c)(2) ☐ for additional requirements applicable to voluntary respirator use.

See Table 2, including footnotes, for additional considerations for choosing a mask or respirator, including information on different types as well as safety and security considerations for their use in correctional and detention facilities.

# Preparing for Outbreaks

Maintain COVID-19 preparedness through essential actions detailed below.

- Monitor COVID-19 Community Levels and other local data, as well as updates to CDC and state public health websites, to inform decisions about when to add enhanced prevention strategies.
- Refine the facility's long-term COVID-19 plan as needed based on new information, and ensure staff are trained on the current plan. Ensure that the long-term COVID-19 plan includes:
  - Plans to procure COVID-19 vaccines and therapeutics to prevent severe outcomes
  - Plans to procure SARS-CoV-2 testing supplies
  - Ways to scale up medical isolation and quarantine spaces during an outbreak
  - Plans for operating during staffing shortages
  - Plans to restock PPE and cleaning and disinfection supplies during outbreaks
  - Considerations for offering revised duties during outbreaks for staff members who are more likely to get very sick from COVID-19
  - Plans to communicate with staff and residents about how they can protect themselves and others from COVID-19. Example signage and other communications materials are available on the CDC website. Printed materials should be easy to understand by non-English speakers, those with low literacy, and people with disabilities.
- Maintain collaborations with state, local, tribal, and territorial public health departments.
- Maintain communications with other correctional facilities to share information and collaborate on protocols to prevent transmission between facilities during resident transfers.
- Review the sick leave policies of each employer that operates within the facility. Employers are encouraged to implement flexible, non-punitive paid sick leave policies to reduce SARS-CoV-2 introduction and transmission in the facility.
- Ensure that all persons in the facility know the symptoms of COVID-19 and the importance of reporting symptoms if they develop.

## Physical Distancing

Physical distancing is the practice of increasing the space between individuals and decreasing frequency of contact to reduce the risk of spreading a disease. Physical distancing strategies can be applied on an individual level (e.g., avoiding close contact), a group level (e.g., temporarily suspending group activities where people would be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them or using protective barriers if space is limited). Physical distancing is an enhanced prevention strategy that can be considered when the COVID-19 Community Level is medium/high or when facility-level factors indicate increased risk.

- Make a list of possible physical distancing strategies that could be implemented as needed at different stages of transmission intensity. Strategies will need to be tailored to the individual space in the facility and the needs of the residents and staff.
- Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).
- If there are people with COVID-19 inside the facility, prevent unnecessary movement between different parts of the facility and mixing of people from different housing units. For example, maintain consistent duty assignments for staff across shifts to prevent transmission across different facility areas, and modify resident work detail assignments so that each detail includes only residents from a single housing unit.
- If possible, designate a room near each housing unit to evaluate residents with COVID-19 symptoms, rather than having them walk through the facility to the medical unit. If this is not feasible, consider staggering sick call.
- Consider increasing keep on person (KOP) medication orders.
- Identify staff duties that can be performed remotely.

## Visitation

**At all times (even when COVID-19 Community Level is low):**

- Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.
- Instruct visitors and volunteers to postpone their visit if they have symptoms of COVID-19.

**When COVID-19 Community Level is medium/high or when facility-level factors indicate increased risk:**

- Consider restricting non-essential visitors, vendors, volunteers, and tours from entering the facility, or restricting their interaction with sections of the facility where transmission is occurring. Suspending in-person visitation and volunteer services should only be done in the interest of the residents' physical health and the health of the community. Visitation and services provided by volunteers are important to maintain residents' mental health. If visitation is suspended, facilities should identify alternative ways for residents to communicate with their families, friends, and other visitors.
- If facilities maintain in-person visitation or volunteer services during periods of higher risk:
    - Require visitors and volunteers to wear a well-fitting cloth or disposable procedure mask or respirator while indoors.
    - Consider using protective barriers in visitation rooms and encouraging physical distancing.
    - Consider requiring visitors and volunteers to provide documentation of a negative SARS-CoV-2 test result within the last 72 hours before entry.

## Re-entry considerations

- If a resident preparing for release is not up to date on their COVID-19 vaccines, offer vaccination again. If they decline, provide them with information about where they can get vaccinated after release.
- When the COVID-19 Community Level is medium/high or when there is transmission in the facility, offer all residents screening testing before release, regardless of COVID-19 vaccination and booster status.
- Provide residents preparing for release with COVID-19 prevention information, hand hygiene supplies, and masks or respirators.
- Ensure that linkages to community services account for modified operations of providers due to COVID-19.
- When providing information on Medicaid enrollment and healthcare resources in the community, include information on continuity of care for chronic conditions that may make a person more likely to get very sick from COVID-19.
- When the COVID-19 Community Level is medium/high and when possible, encourage residents being released to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking residents to shared housing, link preferentially to accommodations with the greatest capacity for physical distancing.

## Previous Updates

Updates from Previous Content                                                    ⌄

Top of Page

   

Last Updated May 3, 2022
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

 Community, Work, & School

Health Equity – Promoting Fair Access to Health                                  +



Cleaning, Disinfecting, & Ventilation +

Workplaces & Businesses +

Schools, Child Care, and Higher Education +

Retirement & Shared Housing +

Homeless Populations +

**Correctional & Detention Facilities** −

Guidance for Correctional & Detention Facilities

Tribal Communities +

Guidance for COVID-19 +

Communication Resources +

What's New



## ✉ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?                                    Submit



**HAVE QUESTIONS?**
Visit CDC-INFO
Call 800-232-4636
Email CDC-INFO
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players
Other Languages

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility
Vulnerability Disclosure Policy |
Español

**CONNECT WITH CDC**

COVID-19 Web Archive

U.S. Department of Health & Human Services          USA.gov          CDC Website Exit Disclaimer

**LANGUAGE ASSISTANCE**

Español          Tagalog          Français          Deutsch

繁體中文          Русский          Polski          日本語

Tiếng Việt          العربية          Português          فارسی

한국어          Kreyòl Ayisyen          Italiano          English

# ATTACHMENT C

## TO DECLARATION OF OWEN MURRAY, D.O.

# Updates to CDC COVID-19 Guidance for Correctional and Detention Facilities

**May 19, 2022**

**Liesl Hagan, MPH**

Senior Scientist for Correctional Health

Office of the Deputy Director for Infectious Diseases

Centers for Disease Control and Prevention

**This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of May 19, 2022.**

**The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the [CDC website](#) periodically for updated interim guidance.**





**cdc.gov/coronavirus**

# Overview

1) Current COVID-19 context and Community Levels (general public)
2) Updates to corrections-specific guidance (posted May 3, 2022)
   o New categorization of prevention strategies: "Everyday" vs. "Enhanced"
   o Risk assessment framework to shift between them
   o Modified quarantine approaches
   o Assorted technical content updates
3) Q&A



# Current COVID-19 Context

### Daily Trends in Number of COVID-19 Cases in the United States Reported to CDC



- Cases increasing

- Hospitalizations increasing

- Deaths still decreasing

- Hot spots in the Northeast and upper-Midwest

As of May 19, 2022

https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html



# Overall CDC Shift from Limiting the Spread of COVID-19 to Minimizing Severe Disease (1 of 2)

- **Current high level of population immunity – reduces the risk of severe outcomes**

- **Recent variants have been associated with milder disease**

- **Tools are available to prevent severe health outcomes for people who are infected**
  - Broad availability of vaccines, treatments

 https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html

# Overall CDC Shift from Limiting the Spread of COVID-19 to Minimizing Severe Disease (2 of 2)

- **Prevention strategies should focus on minimizing the effect of severe COVID-19 illness on health and society**
  - Preventing medically significant illness
  - Minimizing burden on the healthcare system
  - Protecting the most vulnerable through vaccines, treatment, and enhanced COVID-19 prevention strategies



Science Brief: Indicators for Monitoring COVID-19 Community Levels and Making Public Health Recommendations

# CDC COVID-19 Community Levels

- **Framework for assessing COVID-19 risk in the general public**

- **3 levels: Low – Medium – High**

- **Different from Community Transmission Levels - takes into consideration:**
    1. Number of COVID-19 cases
    2. Impact of severe disease on local healthcare systems

- **At each level, CDC recommends increasing the intensity of COVID-19 prevention strategies.** Example for the general public:
    - **Low:** Masking based on personal preference
    - **Medium:** Consider masking if you are at risk for severe illness or have contacts who are
    - **High:** Universal indoor masking in public



# How are COVID-19 Community Levels Calculated?



The COVID-19 community level is determined by the higher of the new admissions and inpatient beds metrics, based on the current level of new cases per 100,000 population in the past 7 days

https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html



# How are COVID-19 Community Levels Calculated? EXAMPLE

| New COVID-19 Cases<br>Per 100,000 people in the past 7 days | Indicators | Low | Medium | High |
|---|---|---|---|---|
| Fewer than 200<br><br>**157** | New COVID-19 admissions per 100,000 population (7-day total) | <10.0<br>**7** | 10.0-19.9 | ≥20.0 |
| | Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average) | <10.0% | 10.0-14.9%<br>**12%** | ≥15.0% |
| 200 or more | New COVID-19 admissions per 100,000 population (7-day total) | NA | <10.0 | ≥10.0 |
| | Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average) | NA | <10.0% | ≥10.0% |

The COVID-19 community level is determined by the higher of the new admissions and inpatient beds metrics, based on the current level of new cases per 100,000 population in the past 7 days



https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html

# Where Can I Find My County's COVID-19 Community Level?

## COVID Data Tracker: COVID-19 Integrated County View



**Map screenshot date:**
June 8, 2022

# How are Community Levels Different from Transmission Levels?



**COVID-19 Community Levels**

High
Medium
Low

**Community Transmission Levels**

High
Substantial
Moderate
Low



**Healthcare facilities continue to use Community Transmission Levels to determine what prevention measures to use**

https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

# How is COVID-19 Risk Assessment Different in Correctional and Detention Facilities?

**Corrections-specific guidance updated May 3, 2022:**
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html



# How do I Choose Which COVID-19 Prevention Strategies to Use?

COVID-19 prevention strategies for corrections are separated into 2 groups

**Strategies for Everyday Operations**

Baseline - use at all times

⟷

**Enhanced Prevention Strategies**

**Add** as many as possible when risk increases

Remove gradually when risk decreases

Shift between them based on COVID-19 Community Levels + facility-level factors



# How do COVID-19 Community Levels Apply to Corrections?



**Defining "community" can be challenging**

- Staff living across multiple counties/states
- Residents transferred across jurisdictional lines



**Community data do not fully represent the risks in the facility**

- Higher risk of transmission
- Higher risk of severe illness and impact on *internal* healthcare resources
- Risks to mental health



# COVID-19 Risk Assessment in Corrections

Loosen or strengthen COVID-19 prevention strategies in corrections based on a **combination of Community Levels + facility-level factors:**



**COVID-19 Community Levels**

High
Medium
Low

**+**

**Vaccination coverage**

**Transmission in the facility**

**Risk of severe health outcomes**

**Structural characteristics**

# Facility-level Factors to Guide COVID-19 Prevention Strategies: Vaccination



**Up to date vaccination coverage**

**What proportion of staff and residents are up to date on their COVID-19 vaccines?**

- Safe and highly effective against severe illness and death
- Continue to perform well against known SARS-CoV-2 variants

**If vaccination coverage is not high, consider using enhanced COVID-19 prevention measures even when the Community Level is Low.**



# Vaccination Communications Materials for Corrections





 https://www.cdc.gov/coronavirus/2019-ncov/communication/print-resources.html?Sort=Date%3A%3Adesc&Search=correctional

# Facility-level Factors to Guide COVID-19 Prevention Strategies: Transmission



**Transmission in the facility**

**Is there currently any transmission in the facility?**

- Diagnostic testing
  (symptomatic people + close contacts)
- Routine screening testing
  (regular testing of asymptomatic people – exclude intake testing)
- Surveillance testing (e.g., wastewater)

**Use enhanced COVID-19 prevention strategies if there is transmission in the facility, even if the COVID-19 Community Level is Low.**



# Facility-level Factors to Guide COVID-19 Prevention Strategies: Severe Health Outcomes



**Risk of severe health outcomes**

**What is the risk of severe health outcomes among residents and staff?**

- Older age, certain medical conditions, and some disabilities associated with high risk of severe COVID-19
- Access to COVID-19 therapeutics, or ability to transfer to community care for treatment

**Consider using enhanced COVID-19 prevention strategies if the facility cannot access therapeutics or transfer patients for treatment offsite.**



**Persons more likely to get very sick from COVID-19:** https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

# Facility-level Factors to Guide COVID-19 Prevention Strategies: Facility Characteristics



**Facility characteristics**

**Are there facility characteristics that contribute to transmission?**

- Dense housing
- Frequent population turnover
- Ventilation systems that do not meet code-minimum requirements

**If yes, consider using enhanced COVID-19 prevention strategies even when the COVID-19 Community Level is Low.**



**Tools to improve ventilation:** https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html

# COVID-19 Prevention Strategies

Testing

Vaccines

Hygiene

Quarantine

Treatment

Isolation

Masking

Ventilation

# Strategies for Everyday Operations and Enhanced Prevention Strategies

COVID-19 prevention strategies for corrections are separated into 2 groups

**Strategies for Everyday Operations**

Baseline - use at all times

**Enhanced Prevention Strategies**

**Add** as many as possible when risk increases

Remove gradually when risk decreases

Shift between them based on
COVID-19 Community Levels + facility-level factors

**GOAL:** Flexible guidance that facilities can use across a range of situations over time



# When to Use Everyday vs. Enhanced Prevention Strategies





# Which are Everyday, and Which are Enhanced?

**Vaccination**

**Everyday Operations**
(use at all times)

**Enhanced Prevention** (add as many as possible when risk is higher)

Offer up to date vaccination

CDC

# Which are Everyday, and Which are Enhanced?

**Everyday Operations**
(use at all times)

**Enhanced Prevention** (add as many as possible when risk is higher)

Offer up to date vaccination

Standard infection control

Enhance ventilation

## Infection Control



**Tools to Enhance Ventilation**
https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html

# Which are Everyday, and Which are Enhanced?

## COVID-19 Testing

**Everyday Operations**
(use at all times)

**Enhanced Prevention** (add as many as possible when risk is higher)

Offer up to date vaccination

Standard infection control

Enhance ventilation

Diagnostic testing

Add/increase frequency of routine screening testing

Testing OR observation period at intake

Add testing to transfer/release

**Observation instead of testing ONLY IF:**

Individual housing during observation
**OR**
Housed as small cohorts starting observation at the same time + testing at end



# Which are Everyday, and Which are Enhanced?

## Routine Observation Periods

Housing people separately before/after movement

NOT related to exposure to COVID-19

**Everyday Operations**
(use at all times)

Offer up to date vaccination

Standard infection control

Diagnostic testing

Testing OR observation period at intake

**Enhanced Prevention** (add as many as possible when risk is higher)

Enhance ventilation

Add testing to transfer/release

Add/increase frequency of routine screening testing

Add routine observation periods to movement protocols

**Duration**

**If no testing:** 7-10 days

**If combined with testing at the end:** Minimum 5 days

# Which are Everyday, and Which are Enhanced?

## Isolation & Quarantine

**Isolation** (infected)
- 10 days
- Decrease only short-term during crisis operations

**Quarantine** (exposed)
- 10 days or modified (more later)

**Everyday Operations**
(use at all times)

Offer up to date vaccination

Standard infection control

Diagnostic testing

Testing OR observation period at intake

Isolation & Quarantine

**Enhanced Prevention** (add as many as possible when risk is higher)

Enhance ventilation

Add testing to transfer/release

Add/increase frequency of routine screening testing

Add routine observation periods to movement protocols

# Which are Everyday, and Which are Enhanced?

## COVID-19 Treatment

**Assess residents for risk of severe health outcomes**

### Everyday Operations
(use at all times)

- Offer up to date vaccination
- Standard infection control
- Diagnostic testing
- Testing OR observation period at intake

- Isolation & Quarantine
- Treat or transfer for care

### Enhanced Prevention
(add as many as possible when risk is higher)

- Enhance ventilation
- Add testing to transfer/release
- Add/increase frequency of routine screening testing
- Add routine observation periods to movement protocols



# Which are Everyday, and Which are Enhanced?

## Masks

### Everyday Operations
(use at all times)

### Enhanced Prevention
(add as many as possible when risk is higher)

| Everyday Operations | Enhanced Prevention |
|---|---|
| Offer up to date vaccination | |
| Standard infection control | Enhance ventilation |
| Diagnostic testing | Add testing to transfer/release |
| Testing OR observation period at intake | Add/increase frequency of routine screening testing |
| | Add routine observation periods to movement protocols |
| Isolation & Quarantine | |
| Treat or transfer for care | |
| Offer masks to all | Require masks indoors |



## Which are Everyday, and Which are Enhanced?

**Movement & Distancing**

**Everyday Operations**
(use at all times)

**Enhanced Prevention**
(add as many as possible when risk is higher)

Offer up to date vaccination

Standard infection control

Diagnostic testing

Testing OR observation period at intake

Enhance ventilation

Add testing to transfer/release

Add/increase frequency of routine screening testing

Add routine observation periods to movement protocols

Isolation & Quarantine

Treat or transfer for care

Offer masks to all

Require masks indoors

Minimize movement

Decrease crowding as possible



# Which are Everyday, and Which are Enhanced?

**Prepare for Outbreaks**

## Everyday Operations
(use at all times)

## Enhanced Prevention
(add as many as possible when risk is higher)

| Everyday Operations | Enhanced Prevention |
|---|---|
| Offer up to date vaccination | |
| Standard infection control | Enhance ventilation |
| Diagnostic testing | Add testing to transfer/release |
| Testing OR observation period at intake | Add/increase frequency of routine screening testing |
| | Add routine observation periods to movement protocols |
| Isolation & Quarantine | |
| Treat or transfer for care | |
| Offer masks to all | Require masks indoors |
| | Minimize movement |
| | Decrease crowding as possible |
| Prepare for outbreaks | |



# Choose Enhanced Strategies Based on Local Needs and Priorities



- **It may not be feasible to use all enhanced strategies because of resources, facility characteristics**
- **Add as many as possible during periods of higher risk**
- Apply enhanced strategies across a whole facility, or target to specific areas
- Consider impact on mental health, in-person learning, and compliance
- During periods of lower risk, remove enhanced strategies gradually

# Modified Approaches to Post-Exposure Quarantine in Correctional and Detention Facilities



## Review

**Standard Quarantine Approach**

**Lowest transmission risk**

| | **Individual** | **Cohorted** |
|---|---|---|
| **Who?** | All exposed persons, regardless of vaccination status | |
| **How long?** | 10 days | Until 10 days have passed with no new cases identified |
| **Testing** | Initial diagnostic test + 2nd test ≥5 days after exposure | Serial test the whole cohort every 3-7 days |
| **Movement** | Minimal movement outside the quarantine space | |
| **Monitoring** | Monitor for symptoms daily | |





**Challenges with Quarantine**

- **One of the most challenging parts of the pandemic for corrections**
  - Prolonged quarantine periods for cohorts
  - Long periods without access to programs, visitation
  - Mental health risks

- **Also one of the most difficult prevention strategies to modify**
  - Based on the incubation period of the virus
  - Can have immense impact on transmission in congregate settings

**At this point in the pandemic, we need flexibility** to meet local needs and to adapt to variants with different characteristics



## New Table in Updated Guidance

### MODIFIED Quarantine Approaches

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html



**Allows Variation in:**

Who?

How long?

Testing

Movement

Monitoring

**Emphasizes risk tolerance levels**

- Choose a stricter approach when risk of severe health outcomes is high (e.g., the circulating variant is associated with more severe disease)

- Allow more permissive approaches when risk is lower, to balance mental health and programmatic needs

# Prioritizing COVID-19 Prevention Strategies in Corrections

SARS-CoV-2 transmission

Severe illness

Death

Post-COVID-19 conditions



Mental health

Quality of life

Operational needs

Institution's mission



# Technical Content Updates



Technical Updates

# "Routine Observation Periods"

- Previous versions of the guidance used "routine intake/transfer/release quarantine"

- Easy to confuse this terminology with true quarantine
  after an exposure

- Has resulted in mixing groups of people:

  - Exposed

  - Under routine quarantine during movement (not exposed)

- **Changing to "routine observation periods"**



## Symptom Screening + Temperature Checks

Technical Updates

- **Less emphasis on these tools for people without a known exposure**
  - Low sensitivity (does not catch all infections)
  - Staff and time-intensive

- **Still important to use for people in quarantine after an exposure**
  - Helps identify infections early to prevent severe health outcomes



## Technical Updates

# Guidance for Healthcare Workers

- Corrections-specific guidance does not replace guidance for healthcare workers.

- Facilities providing healthcare services should use CDC's Infection Prevention and Control Recommendations for Healthcare Personnel for patient care areas: https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

- CDC healthcare guidance continues to use Community Transmission Levels rather than Community Levels to guide prevention strategies.



# Summary

- Updated corrections guidance shifts focus to preventing severe health outcomes.

- Assess risk on an ongoing basis using COVID-19 Community Levels and facility-level factors.

- Use Strategies for Everyday Operations at all times.

- During periods of higher risk, ADD enhanced prevention strategies where feasible. Remove gradually.

- Every facility is different. Prioritize enhanced prevention measures to balance COVID-related risks with mental health risks & programmatic needs.







# THANK YOU!

Contact us with questions: **SpecialPopulations@cdc.gov**



# EXHIBIT 7

## Declaration of
## K. Jaramillo

1   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
2   Nicholas D. Acedo, Bar No. 021644
    Jacob B. Lee, Bar No. 030371
3   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
4   Chandler, Arizona  85226
    Telephone:  (480) 420-1600
5   dstruck@strucklove.com
    rlove@strucklove.com
6   nacedo@strucklove.com
    jlee@strucklove.com
7
    *Attorneys for Defendant Kris Kline*
8
                        **UNITED STATES DISTRICT COURT**
9
                            **DISTRICT OF ARIZONA**
10
11  Claudia Romero-Lorenzo, et al.,              NO. CV-20-00901-PHX-DJH (DMF)

12                              Plaintiffs,       **DECLARATION OF K. JARAMILLO**

13          v.

14  Brian Koehn, et al.,

15                              Defendants.

16

17      I, K. Jaramillo, state the following based upon my personal knowledge:

18      1.     I am over the age of 18 years and competent to testify to the matters set

19  forth in this Declaration. I make this Declaration in support of Defendant Kline's Motion

20  for Summary Judgment. I have personal knowledge of the facts set forth in this

21  Declaration, and if called as a witness, can competently testify to them.

22      2.     I have a Bachelor of Science in Nursing and am employed by CoreCivic

23  currently serving as the Complex Health Services Administrator ("Complex HSA") at

24  CoreCivic's Central Arizona Florence Correctional Complex ("CAFCC"), located in

25  Florence, Arizona (Pinal County). I have held this position since 2017. Prior to that I was

26  the Health Services Administrator ("HSA") at CAFCC. I have worked for CoreCivic at

27  CAFCC since June 2012.

28      3.     I am a Registered Nurse, licensed and in good standing with the Arizona

                                        1

1    State Board of Nursing.

2        4.    CoreCivic owns and operates CAFCC and houses a population of United

3    States Marshals Service ("USMS") detainees at CAFCC pursuant to a correctional

4    services agreement with the USMS.

5        5.    As Complex HSA, I am responsible for risk management and quality

6    assurance associated with the operation of CAFCC's medical department, managing

7    medical department processes and procedures, developing healthcare services protocols,

8    overseeing healthcare staff compliance, scheduling, maintaining facility healthcare

9    accreditations, and overseeing the USMS services agreement as related to delivery of

10   detainee healthcare services as well as other jurisdictions' services agreements regarding

11   the same.

12       6.    I supervise a Health Services Administrator, as well as four Clinical

13   Supervisors. Nursing staff at CAFCC report directly to me, which includes

14   Communicable Infectious Diseases ("CID") nursing staff. I also have oversight of facility

15   healthcare providers, including physicians as related to administrative operations only.

16       7.    I am familiar with the Center for Disease Control ("CDC") Guidelines for

17   procedures relating to the treatment and containment of COVID-19. I am also familiar and

18   have relied upon the CDC Interim Guidance for Correctional and Detention Facilities

19   ("CDC Interim Guidance").

20       8.    I have relied upon CDC Interim Guidance, the Pinal County Health

21   Department, NCCHC virtual online training material, and emergency preparedness plans

22   brought through CoreCivic's Facility Support Center ("FSC") as resources with best

23   practices for addressing COVID-19 in a correctional setting.

24       9.    Specifically, I am familiar with CDC Interim Guidance and am aware that

25   the CDC issued revisions to those guidelines on July 14, 2020; February 19, 2021; May 6,

26   2021; June 9, 2021; February 10, 2022; and May 3, 2022.

27       10.   I am registered with the Pinal County Public Health Department and attend

28   monthly COVID-19 meetings by telephone conference. I also receive communications

2

from the Pinal County Public Health Department when there are changes with vaccines or quarantine processes and procedures. I have registered for these courses so that CAFCC can implement and administer a vaccine clinic within the facility.

11. I received a Certificate of Completion issued by the Arizona Department of Health Services for Keeping on Track with ASIIS and Vaccine Storage and Handling on December 18, 2020. This Certificate was renewed in January 2022.

12. In March 2020, I took a National Commission on Correctional Health Care ("NCCHC") virtual class on COVID-19 pandemic management. In May 2020, I took another NCCHC class on challenges that correctional workers face with the COVID-19 pandemic and how to overcome those challenges. I have also been involved in weekly meetings with CoreCivic's Chief Medical Officer at CoreCivic's national headquarters in Nashville, Tennessee relating to the pandemic and CoreCivic response operations to address the same.

13. In December 2020, CAFCC became registered with the Arizona Immunization Program Office ("AIPO") in preparation for disbursement of the COVID-19 vaccine.

14. I enrolled in Pandemic Provider Courses by the AIPO on March 5, 2021. These courses have provided me with training on using the Arizona State Immunization Information System ("ASIIS") and training on COVID-19 vaccine handling and storage.

15. The Pandemic Provider Courses I participated in also provided training on record-keeping for patients as to COVID-19 vaccination status, which was instituted at CAFCC.

16. The Pinal County Health Department has reviewed and approved CAFCC's quarantine, isolation, testing, and vaccination plans.

17. As the Complex HSA for CAFCC, my responsibilities related to COVID-19 response operations have included devising and disseminating  protocols based on CDC Guidelines, hosting and leading meetings with a facility multi-disciplinary team to manage COVID-19, preparing and disseminating training information and materials to

3

staff, participating in detainee Town Hall meetings that take place in detainee living units to provide COVID-19 prevention and vaccine education and answering detainee questions, creating documents for educational purposes for the nursing staff and the detainee populations that we serve, and monitoring COVID-19 trends both within CAFCC and in the community. I also work closely with the Pinal County Public Health Department to acquire additional information and resources and provide the Department with any COVID-19 information they seek regarding facility operations or infection rates. I also oversee the CAFCC Clinical Supervisor, C. Rose, RN, BSN, who oversees the Infectious Disease Program at CAFCC.

18.     In the performance of my duties related to COVID-19 response operations, I also rely upon written materials provided by the USMS relating to COVID-19 testing guidelines, guidelines on consultations to mitigate exposure during offsite medical consultations, and quarantine and isolation guidelines.

**Vaccinations**

19.     In accordance with the updated COVID-19 Vaccination Plan for Health Services at CAFCC, I am the primary Vaccine Coordinator. A true and correct copy of the CAFCC Vaccination Plan (updated 11/16/21) is attached as Attachment A. (CORECIVIC-MLG003499-3507.) The Vaccination Plan addresses vaccination preparedness plans, storage and handling requirements, training on ordering/tracking/storage/vaccine administration, vaccine administration practices, staffing resources, and vaccine contraindications.

20.     Facility vaccination administration protocols relevant to the Vaccination Plan continue to evolve as the pandemic evolves. Of significance as related to the last iteration of the Vaccination plan issued in November 2021 (Attachment A), CAFCC now only administers the Moderna vaccine – used both for initial vaccination and booster purposes.

21.     Upon initial detainee intake, CAFCC makes every effort to obtain a vaccination history from each detainee in order to provide appropriate vaccination/booster guidance for the detainee population.

22.     CAFCC medical staff also review the Arizona State Immunization Information System (ASIIS) to validate a detainee's reported vaccination history provided during the intake screening process.

23.     The majority of CAFCC detainees, however, are from other states and countries, which makes verification of their vaccination history information challenging where the information in ASIIS only pertains to vaccinations administered in Arizona.

24.     If a detainee is unable to document a valid vaccine administration or verification cannot be made in ASIIS, CAFCC identifies the detainee as unvaccinated in the detainee's medical record.

25.     Prior to March 31, 2021, and during the time period when vaccines were not widely available, CAFCC detainees were offered COVID-19 vaccinations in accordance with Pinal County Health Department Guidelines, including guidelines that were based on age tiers and COVID-19 co-morbidity risk factors. Detainees identified as vulnerable or at higher risk of serious COVID-19 related illness per CDC Guidelines and those over the age of 65, were offered the vaccination first, with additional available vaccinations offered to other detainees based upon the early tiered guidelines for vaccine eligibility.

26.     As the vaccines became widely available and specifically starting on March 31, 2021, vaccines are now offered to all CAFCC detainees over the age of eighteen and without regard to CDC risk factors. Vaccine boosters are likewise offered to all detainees over the age of eighteen.

27.     CAFCC previously offered both the Moderna and Johnson & Johnson vaccines.  Detainees requesting a COVID-19 vaccine were given education regarding both available vaccines so they could choose which one to receive.

28.     CAFCC currently offers only the Moderna COVID-19 vaccine for both initial courses and boosters, and the vaccines are stored onsite.

5

29.     To obtain a vaccine or booster, detainees may submit a medical request form for a COVID-19 vaccine to the medical department. While a written request is preferred, if a request is made verbally to either security or medical staff, the detainee is directed to submit a medical request form for the same.

30.     If a detainee requests a vaccination or booster during a medical encounter with a health care provider, the provider will task a request for the same in the Electronic Health Record (EHR) and the detainee will be added to the queue of detainees who will be scheduled to receive a vaccine or booster.  If a vaccination clinic is offered in a housing location and the detainee has not previously made a request for a vaccination/booster, the detainee may receive one without making a formal written medical request, provided the detainee is provided the vaccine Fact Sheet and signs the required consent form prior to vaccination/booster.

31.     Detainees are provided vaccine Fact Sheets specific to the vaccine and acknowledge receipt of the same prior to being provided a vaccine or booster. Fact Sheets are provided in English and Spanish to detainees during Town Hall meetings and/or before being provided with a requested vaccine/booster.  Fact Sheets are updated as guidance to do the same is provided to me by the Pinal County Health Department.

32.     A detainee cannot receive a vaccination or a booster unless the detainee has acknowledged receipt of a Fact Sheet.  Indeed, the vaccine Fact Sheet is part of the consent packet provided to the detainee.  The consent form acknowledges receipt of the Fact Sheet. The detainee must sign the vaccination consent form before receiving a vaccination or booster.

33.     CAFCC medical personnel often participate in detainee Town Hall meetings where COVID-19 education/prevention and vaccination/booster information is provided.

34.     Vaccines/boosters are provided to detainees within a reasonable period of time from when the requests are made. The time period between the request and administration of the vaccine/booster can vary where considerations as to available supply, scheduling, staffing, and pending requests are at play.

35.     As illustration, per normal medical request protocols that apply to any manner of request for medical care, CAFCC medical staff have 24 hours within which to triage a request for medical care. Thereafter, CAFCC nursing staff have 72 hours to further review a non-urgent/emergent request and schedule the detainee to be seen.  As to a request for a COVID-19 vaccination or booster, the detainee's name is then placed onto the vaccine log which will track when the detainee made the request and when the vaccination/booster is administered.

36.     Each vial of the Moderna vaccine contains approximately 10–15 doses. If only one or a few detainees is/are currently requesting a vaccine or booster, CAFCC schedules vaccination/booster administrations so as to avoid allowing unused doses to expire to the extent reasonably practicable.

37.     Once a vial of Moderna vaccine is punctured, it should be discarded within 12 hours of puncture.  Unpunctured vials may be stored in refrigeration for up to 30 days.

38.     Nevertheless, CAFCC will not deny a detainee the opportunity for a vaccination or booster simply to avoid allowing doses to expire.[1]

39.     These vaccine clinics are run in housing units to provide vaccinations and boosters not only for those detainees who have previously requested and been scheduled to receive them, but to also on-the-spot offer them to any detainee in the particular housing location who has not been previously vaccinated or boosted and is eligible to do so.

40.     It is proven and commonly understood in both the medical field and in the community that a person who is fully vaccinated and has received COVID-19 boosters may still contract COVID-19.

_____

[1] As a vaccination (first or second shot) is administered, medical staff enter orders into CAFCC's Allscripts electronic medical record for the second shot or booster to track when detainees are eligible for the same. Boosters may be given five months after the second series vaccination shot.  This time period changed from six months to five months in early 2022 due to guidance provided by the Pinal County Health Department.

7

41.     If there becomes a shortage on COVID-19 vaccine or boosters, those detainees who are at higher risk for serious COVID-19 related illness will be offered vaccination/booster as a priority (or "first") before detainees who do not have CDC risk factors for developing serious COVID-19 related illness.

42.     Since vaccine supplies became widely available in March 2021, I do not recall CAFCC experiencing any circumstance where detainee demand for vaccinations or boosters has exceeded CAFCC's supply.

**COVID-19 Testing, Isolation, and Quarantine**

43.     Previously, all new detainee intakes to CAFCC were tested for COVID-19 within 24 hours of being placed in a new admission cohort housing pod, unless they arrived on a Saturday or Sunday, in which case they would be tested on the following Monday.

44.     Effective July 19, 2022, all new intakes are swabbed with a COVID-19 rapid test during the intake process, including detainees who arrive over the weekend.

45.     PCR tests are also available at CAFCC and the facility uses Garcia Labs to process the PCR tests. The turnaround time is typically around two to three days to receive the PCR test results.

46.     In recent months, the majority of CAFCC detainees who test positive for COVID-19 are asymptomatic.

47.     Currently, and consistent with current CDC Interim Guidance, all CAFCC new admission detainees are rapid tested for COVID-19 during the intake process and unless they are symptomatic or test positive for COVID-19, they are then assigned to appropriate housing.

48.      Also consistent with current CDC Interim Guidance, once assigned to their housing locations, detainees who show or report COVID-19 symptoms, or are identified as close contacts with COVID-19 positive detainees, are offered a COVID-19 test.

49.     Detainees who are COVID-19 positive or who show or report symptoms of COVID-19, are immediately medically isolated for 10 days.  Where housing unit cell

8

space provides, detainees who are COVID-19 positive are single-celled. The cells have solid cement walls and solid metal doors (with a window).  If medical isolation bed space does not allow for single-celling, only detainees who are confirmed COVID-19 positive by test results are celled together.  This is done in order to protect against a suspected COVID-19 positive case (who later turns out to be negative) being celled together with a confirmed COVID-19 positive case (and thus exposed to a positive case).

50.  Detainees who require closer monitoring because of low O2 saturation (i.e., below 95%) or other medical conditions that put them at higher risk of COVID-19 related illness (e.g., asthma, diabetes, hypertension, etc.) may be housed in an observation cell in one of CAFCC's medical units.

51.  Detainees in medical isolation in one of CAFCC's medical units receive symptom screening at least once per shift (i.e., once every eight hours) and as often as every four hours if ordered by the physician or nurse practitioner. Detainees who are in medical isolation but housed in a designated isolation housing unit receive symptom screening, including their temperature and O2 saturation, once a day.  They also have contact with medical staff at least twice a day during pill pass times. Detainees are instructed to report any symptoms they are experiencing to the pill pass nurses or to unit staff.

52.  A housing pod from which a COVID-19 positive detainee is identified (and removed from the housing pod and isolated) is quarantined for 8 days to test close contact detainees and to monitor the housing pod detainees for COVID-19 symptoms (monitored daily). If a detainee in quarantine tests positive for COVID-19, the quarantine period restarts for the housing pod.

53.  During quarantine, unit staff conducts daily symptom screenings, including temperature checks, of all detainees in the pod (except for those detainees, if any, who refuse the screenings). Medical staff reviews the results to ensure any detainees who might require additional follow-up receive it.

9

54.     Unit staff instruct detainees in quarantine to sleep head to toe to increase the distance between their airways. Staff also instruct detainees in quarantine to socially distance and wear masks and increase sanitation within the pod.

**Masks**

55.     All CAFCC detainees are provided cloth face masks during admission into the facility. The security operations staff provide the detainees with the cloth masks. Replacements are available upon request and the cloth masks may be laundered with he inmate's uniform or handwashed.

56.     In addition, CAFCC medical staff provide detainees who are symptomatic or COVID-19 positive with additional medical grade surgical masks. Replacement masks are also available.

57.     Symptomatic or COVID-19 positive detainees who are on isolation status must wear their masks (even while in cell) when they are talking to or interacting with medical staff.  They must also wear the surgical mask when exiting the cell.

**Antiviral Medications**

58.     Presently, CAFCC has access to the COVID-19 antiviral medications (Paxlovid and Molnupiravir) where clinically indicated to be prescribed to a COVID-19 patient and where the detainee patient agrees to take the antiviral medication.[2]  CAFCC may obtain such medications through local pharmacy order.

59.     Because CAFCC can obtain antiviral medications through local pharmacy order, the facility does not keep the medications in stock for every single detainee who may be eligible for prescription of the medication in the event that they actually become infected with COVID-19.

60.     Rather, like any other medications, COVID-19 antiviral medications can simply be ordered by CAFCC health care providers from local pharmacies when clinically indicated for a particular detainee patient.

---

[2] Detainees have the right to refuse medical care including recommended medication prescriptions even where recommended by CAFCC health care providers.

**Specific Detainee COVID-19 Status**

61.    According to the medical record on file, CAFCC USMS Detainee Tracy Ann Peuplie was admitted into CAFCC on December 30, 2019 and transferred from CAFCC on May 19, 2021. She was identified as at higher risk for COVID-19 related illness due to age and diagnosed asthma and hypertension.  While detained at CAFCC, she refused the Moderna COVID-19 vaccine on May 13, 2021. Her COVID-19 transfer test that was administered on May 18, 2021, was negative. Detainee Peuplie never tested positive for COVID-19 while detained at CAFCC.

62.    According to the medical record on file, CAFCC USMS Detainee James Tyler Ciecierski was admitted into CAFCC on February 27, 2020 and released to the community on April 12, 2021. He received the Johnson & Johnson vaccine on March 31, 2021 but refused the Moderna booster on March 2, 2022. He also refused a COVID-19 release test. Detainee Ciecierski never tested positive for COVID-19 at CAFCC.  During his detention at CAFCC, he was hospitalized (non-respiratory). He was tested for COVID-19 while hospitalized and the test was negative.

63.    According to the medical record on file, CAFCC USMS Detainee Marvin Lee Enos was admitted into CAFCC on August 6, 2019 and released on July 1, 2021. He was identified as at higher risk for COVID-19 related illness due to hypertension and asthma.  He received two doses of the Moderna vaccine – the first on April 29, 2021 and the second on May 27, 2021. Detainee Enos never tested positive for COVID-19 at CAFCC.

64.    Even while in custody, detainees may refuse all medical care unless court ordered.  As such, CAFCC USMS detainees have the right to refuse COVID-19 tests, offered vaccination and boosters, offered and/or prescribed COVID-19 antiviral medications, and any offered or recommended therapeutic treatments for COVID-19 symptoms or COVID-19 related illness.

/ / /

/ / /

11

1    I declare under penalty of perjury under the laws of the State of Arizona that the

2    foregoing is true and correct.

3        Executed in Florence, Arizona, on August __5__, 2022.

4

5                                    K. Jaramillo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

## TO DECLARATION OF K. JARAMILLO



**COVID19 Vaccination Plan for Health Services**

**Facility Vaccine ID #63957**

**Pin** 

### Section 1 Preparation:

Pandemic vaccination response planning will require collaboration among multi-disciplinary groups and a team approach to accomplish the goal of executing vaccines to both the staff and the detainee population. Following the planning guidance below can assist in developing a correctional settings baseline readiness to launch the COVID-19 vaccination program for Central Arizona Correctional Complex (CAFCC).

**Registration:** The first step in the preparedness phase was to register Dr. J▮▮Osteen MD the facility Medical Director in the Arizona Immunization Program Office (AIPO) via the online registration. The purpose of this registration was to ensure the provider understands the requirements and that the facility is able to meet those requirements, CAFCC registration was completed on 12/4/2020.

During registration the amount of doses for the vaccine were accounted for. There is approx. 926 employees and 4,200 detainees. This is an estimated amount of 10,252 doses.

CORECIVIC-MLG003499

At the time of registration an additional three LIP providers were allocated to the vaccine program, names, license numbers, and titles were documented. Providers include Dr. Johnson DO, R███Taylor NP, and A███ Erdman NP.  In addition to the providers, a Primary Vaccine Coordinator was established as well as a Back up Coordinator and Office Manager for the program. At this facility C.H.S.A Jaramillo is the primary Coordinator, followed by H.S.A Navarro as the Secondary Coordinator, followed by CS Rose.

### Section 2 Storage and Handling Requirements

We will be receiving the Moderna vaccine first. After EUA for the Janssen vaccine, we expect to be receiving this one.

**Units:**  the facility will purchase approx. 10 units to store vaccines. Refrigerator vaccines will be stored at 36 to 46 degree F and will have a separate temperature control. Freezer units will have a separate temperature control and will be stored at -4 degree F. the business Manager and Maintenance Manager will review the AAP Immunization Resource Storage and Handling Series Refrigerators, Freezers, and Vaccine Storage guidelines and budget as well as order the units.

**Equipment:** approx. 10 units will be ordered. Digital continuous thermometers will be ordered for each unit along with back up portable data loggers. Water bottles to keep the units cold will be available as well as dry ice if needed. VFC Refrigerator temperature logs will be distributed.

**Areas:** Units will be distributed in assigned areas that are convenient for staff and meet safety guidelines. 10 Unit management offices are being discussed as main housing for the units. Units will be plugged into one outlet only. Units will not be plugged into surge protectors, an

CORECIVIC-MLG003500

outlet that is controlled by a switch, or outlets that have a reset button. Maintenance will need to certify that the outlets meet the requirements.

**Update:** due to the ability to continuously obtain COVID-19 vaccines, the 10 storage units were not needed and reduced to two freezers and one refrigerator and are stored in medical two with secure locks. All units have data loggers to monitor for temperature compliance.

**Safety:** Units are required to have signage posted with safety guidelines. Warning signs not to unplug, as well as who to contact for issues, as well as vaccine storage signs have been downloaded and will be placed on all units.  To ensure that temperature control is appropriate a VFC Refrigerator temperature log will be maintained and monitored twice daily every day by the designated supervisor.  If at any time it is noted that the temperature is outside of the guidelines, the supervisor must call the vaccine center at 602-364-3642.

### Section 3 Training

Staff members who play a role in ordering, tracking, storage and administration of the vaccine will need to have general training on their roles responsibilities, and vaccine/patient safety.

**Update**: As of 12/21/2020 staff were trained on storage and general information for Moderna COVID-19 vaccine. As of 3/25/2021 staff was trained on general storage of Johnson and Janssen vCOVID-19 vaccine. Training Rosters(4-2A) remain on file in the H.S.A office.

**Provider Training:** C.H.S.A. Jaramillo, H.S.A. Navarro, C.S. Rose, Medical Director Osteen, NP Taylor, Dr. Johnson, and NP Erdman will register for the AIP train and learn platform that provides training for ordering, storing, and administration of the vaccine.

**Update:** Due to the nature of storage and all that it entails it was decided that H.S.A Navarro and H.S.A Jaramillo would be the  main personnel to registry for the AIPO train and complete the storage and handling training. Copies of certificates are on file in the H.S.A office.

**Other Personnel:** Staff who administer the vaccine will be instructed on supplies, PPE, documentation, adverse reactions, and administration of the vaccine. Medical Records Clerk or designees will be trained on how to enter Arizona State Immunization Information System (ASIIS) to order, receive, and account for pandemic vaccines. Captain or designees will be trained on how to check units twice daily and report any deficiency as well as how to document on the logs. Front lobby officers will be trained on how to receive shipment.

**Update:** A small group of credentialed staff are assigned to conduct vaccines. Not all staff is trained. Only those as part of the vaccine team have been trained by H.S.A Jaramillo, H.S.A Navarro, or CS Rose. Training records for the vaccine team were completed on

**Vaccine:** the facility will need to be educated that the doses are not interchangeable and that patients must complete the series of the same product. Staff will need to be educated on each brands preparation method and doses.

### Section 4 Administration of the vaccine

Only licensed medical staff will be able to administer the vaccine. For CAFCC that includes nursing staff, providers, Clinical supervisors, and Certified Medical Assistant.

CORECIVIC-MLG003502

**Supplies:** It is anticipated that ancillary supply kits needed to administer the vaccine will be included with the vaccine kit. This includes needles, syringes, alcohol prep pads, vaccination record cards, and minimal PPE. The facility will order additional sharps containers, gloves, bandages, and PPE needed for the vaccine.

**Priority**: All medical staff will first be offered the vaccine, followed by essential staff workers as identified by Pinal County Health Department. All detainees will be offered the vaccine in accordance with Pinal County Guidelines.  The guidance at this time is for age tiers.

**Pre-vaccination**: Prior to being vaccinated the staff member or detainee will be asked to sign a consent form or refusal form provided by FSC.  A pre-town hall will occur approximately 1-5 days prior to vaccine administration along with an educational flier; unit management will conduct this.  A town hall will occur for all detainees by the UM staff in preparation of what to expect, answer questions, distribute the consent/refusal forms, and screening questionnaires. This will be conducted by UM staff and a medical staff.    HR will send out notifications to employees. Staff and detainees will be educated to inform medical and or HR of any adverse reactions. Designated areas will be established for administration.

For detainees, designated areas in each housing unit will be utilized for the purpose of vaccine administration. An order for the vaccine will be entered into Allscripts as a nursing orderable, along with an approved standing order signed by the medical director.

**Vaccination**:

Effective March 31, 2021, in accordance with Pinal County Health Department Guidelines, vaccines will be offered to those 18 years and older.  Medical staff will be going unit to unit in order to vaccinate the

CORECIVIC-MLG003503

current population.  Infirmary, O POD, and 1000, has been identified a more vulnerable population, and will be offered first.

**Initial dose:** After the initial education and consent is obtained, the patient will receive the initial dose of vaccine. The Qualified Health Care Provider (QHCP) will document in the EMR the name of the vaccine administered, the vaccine manufacturer, lot number, administration route, and site.  The QHCP will then order the next dose to be given at the appropriate interval per manufacture. A report of who was given the vaccine will be given to the assigned personnel to then be entered into the ASIIS system.

**Follow up:** If the manufacturer requires, a second dose will be administered per order and the above documentation for the EMR and the ASIIS will occur. Weekly a supervisor or designee will update the ASIIS for additional supplies and vaccine orders as well as upload daily temperature logs and monitoring of storage logs. The program will be updated, audited, and reviewed by the health service management team weekly.

**Duration:** Administration will occur on an ongoing basis until further notice based off of vaccine availability, staffing resources, and guidance from the local health department.  The facility building schedule will be adjusted to facilitate the administration of the vaccine. Escorts will be assigned to medical to facilitate the process and unit management teams will assist with the process. Once all current detainees and staff are offered the vaccine, the program will extend to all new books and new hires until further notice and will be conducted as part of the new intake process and COVID testing plan.

CORECIVIC-MLG003504

## Section 5 Staffing

The ADO team as well as the medical supervisor team and HR will need to review the staffing plan for resources. Regional Director Sells will be asked to see if other AZ facilities can assist with mass vaccinations to include CMA, nurses, and record clerks for data entry. Additional registry resources may be utilized as well as office staff to meet the demand. HR will be responsible for entering all employees into the ASIIS system. Additional non-medical staff may apply for access to ASIIS to enter data.  During staff shortage crises, a priority system will be used to vaccinate detainees. High risk detainees are the priority as well as severely mentally impaired and those with disabilities.

## Section 6 Contraindications

In accordance with CDC guidelines, the following detainees will not be offered a vaccine.

- Detainees on a quarantine for a known COVID-19 exposure
- Detainees that were COVID-19 positive <u>and</u> received monoclonal antibody treatment in the last 90 days
- Detainees who are in isolation precautions for COVID-19
- Detainees who have stated that they have had a prior vaccine but do not have documented proof.
- Detainees who had a dose of a vaccine that is not allocated to our facility.
- Those who have reported a severe allergic reaction to a prior vaccine or any components of the vaccine allocated to this facility.

## Section 7 Conclusion

In summery the facility has obtained an official approval of the registration for the vaccine and has been assigned an ID number that is 63957 and a pin number that is ████ . Units are in the process of being ordered and accountability and delegation of staff responsibility is in place. Training is being conducted via the AIPO. Access is being granted on the ASIIS system and the facility is preparing for the vaccine program. The biggest challenge is going to be medical staff to administer the vaccine and update the ASIIS system. Each challenge will be addressed in meetings with ADO and medical staff.

### Section 8 Addendum

The facility is approved to provide both Moderna COVID-19 vaccine as well as Johnson and Janssen COVID-19 vaccine. As of 11/3/2021 the facility has been approved to provide boosters doses to the detainee population. Prior to the administration of booster vaccines, staff will be trained on compatibility and dosing. A 4-2a training roster will be maintained. Dr O'steen the Medical Director will sign off on a booster protocol with orders for the vaccine. Signs will be posted in the units with information on how to obtain a booster dose. Detainees will be educated to submit a health request to medical to inquire the vaccine. Medical will do monthly clinics based off detainee request. The priority of care is to administer first and second doses opposed to booster vaccines; However, high risk detainees who are severely immunocompromised will be the highest priority. All detainee will have access to booster doses while we continue vaccinating new intakes and those detainees who may have refused at one time but would now like the vaccine.

Note: This plan was modified 4/9/2021. See information added in red text.

Note: This plan was updated on 11/16/2021 by H.S.A Jaramillo. See Updates in bold.

**CORECIVIC-MLG003507**