1   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
2   Nicholas D. Acedo, Bar No. 021644
    Jacob B. Lee, Bar No. 030371
3   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
4   Chandler, Arizona 85226
    Telephone: (480) 420-1600
5   dstruck@strucklove.com
    rlove@strucklove.com
6   nacedo@strucklove.com
    jlee@strucklove.com
7
    *Attorneys for Defendant Kris Kline*
8

9                 **UNITED STATES DISTRICT COURT**

10                      **DISTRICT OF ARIZONA**

11  Claudia Romero-Lorenzo, et al.,          NO. CV-20-00901-PHX-DJH (DMF)

12                          Plaintiffs,      **DEFENDANT KLINE'S MOTION
                                             FOR SUMMARY JUDGMENT**
13          v.

14  Brian Koehn, et al.,

15                          Defendants.

16

17          Defendant Kris Kline, in his official capacity as Warden of the Central Arizona

18  Florence Correctional Complex ("CAFCC"),[1] moves for summary judgment on Plaintiffs'

19  remaining Fifth Amendment claim.

20  **I.    Factual Background**

21          **A.    CAFCC**

22          CAFCC was owned and operated by CoreCivic, Inc. ("CoreCivic") and houses, among

23  others, pretrial detainees in the legal custody of the United States Marshals Service

24  ("USMS"), which, along with the federal courts, makes all transfer and release decisions

25  _____

26          [1] Because Warden Kline is named in his official capacity only (Dkt. 1 at ¶ 24),
    Plaintiffs must demonstrate that their injuries were caused by a policy, practice, or custom
27  of CoreCivic, Inc. ("CoreCivic") which owns and operates CAFCC and employs Warden
    Kline. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Kentucky v. Graham*,
28  473 U.S. 159, 165-66 (1985).

pertaining to its detainees. (Defendant Kline's Statement of Facts ("DSOF"), ¶¶ 1–2.) CAFCC has a total design capacity of 5,003 detainees, with capacity for 3,900 USMS detainees, which it holds in 15 housing units, and for which it provides medical units, laundry facilities, kitchens, commissaries, a chapel, recreation yards, social and legal visitation facilities, and more. (Id. at ¶¶ 4–7.) Since the pandemic began, CAFCC has been operating at anywhere from 59.3% to 84% of its design capacity. (Id. at ¶¶ 8–13.)

## B. CDC Guidance

The Centers for Disease Control and Prevention ("CDC") first issued its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC guidelines") on March 23, 2020. (Id. at ¶ 14.) Since then, the CDC has revised its guidance multiple times as new information is learned about COVID-19 and how to respond to it. (Id. at ¶ 16.) The CDC has always recognized that its guidance must be adapted to each facility's physical space, staffing, population, operations, and other resources and conditions. (Id. at ¶¶ 15, 17–19.) As a result, each facility's response to COVID-19 is fluid in terms of which strategies to adopt and in what manner. (Id. at ¶¶ 20–24.) CAFCC has implemented, to the greatest extent possible, the CDC's recommendations. (Id. at ¶¶ 25, 1–375.)

## C. CoreCivic/CAFCC's Response to the COVID-19 Pandemic

In recognition of the unique and exceptional nature of the pandemic and its responsibility to protect the safety and security of detainees, staff, contractors, governmental partners, and the general public, CoreCivic has taken ample and appropriate steps to reduce COVID-19 exposure and infections at CAFCC. (Id. at ¶¶ 29–30, 1–375.) And CoreCivic's efforts have been successful: from April 2020 to July 2022, 44,703 USMS detainees have cycled through CAFCC. (Id. at ¶ 309.) Of those, only 1,782 have tested positive for COVID-19 (560 in 2020, 516 in 2021, and 706 in 2022)—i.e. only 3.9%. (Id. at ¶ 310.) During that same period, only 594 staff members have tested positive for COVID-19 out of 2,377 individuals who have worked at CAFCC. (Id. at ¶ 311.) Two USMS detainees have died while in custody at CAFCC due to COVID-19 related illness.

1    Considering the number of USMS detainees who have been housed at CAFCC since the

2    start of the pandemic, this results in a 0.15% mortality rate, far below those of the U.S.

3    (1.2%), Arizona (1.5%), and Pinal County (1.25%). (Id. at ¶¶ 312–313.) None of the three

4    named Plaintiffs—Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos—

5    tested positive for COVID-19 while they were detained at CAFCC. (Id. at ¶¶ 321–324.)

6         On August 11–13, 2020, USMS conducted an unannounced audit of CAFCC,

7    concluding that CAFCC's procedures go above and beyond procedures they have observed

8    at other facilities and that they would be sharing CAFCC's procedures with the Prisoner

9    Operation Division in Washington, D.C. as an example of best practices. (Id. at ¶ 319.) On

10   June 2, 2021, CAFCC was accredited by the National Commission on Correctional Health

11   Care ("NCCHC") following a rigorous on-site survey conducted on March 29–31, 2021 in

12   recognition of CAFCC's dedication to compliance with the most respected standards in

13   correctional health care. (Id. at ¶ 320.)

14        As early as January 2020, CoreCivic began monitoring the COVID-19 outbreak,

15   developing company-wide protocols in response to COVID-19, and providing guidance to

16   its facilities, including CAFCC, from its Facility Support Center ("FSC"). (Id. at ¶¶ 31–33.)

17   This included working with infectious disease specialists, monitoring updates from the

18   CDC, holding conference calls with facility leaders, and disseminating information through

19   the company's intranet SharePoint site. (Id. at ¶¶ 34–37.) At the facility level, CAFCC has

20   daily briefings with facility leadership and supervisory staff to discuss issues related to,

21   among other things, COVID-19. (Id. at ¶ 38.) CAFCC has developed and implemented new

22   sanitation protocols and a staffing contingency plan and has maintained continual contact

23   with USMS, the Pinal County Public Health Services District ("Pinal County"), CoreCivic

24   regional and corporate medical leads, and facility medical leads. (Id. at ¶¶ 39–45.) In

25   addition to information received from CoreCivic leadership, CAFCC leadership monitors

26   changes in guidance from the CDC and Pinal County. (Id. at ¶ 46.) Pinal County has

27   reviewed and approved CAFCC's quarantine, isolation, testing, and vaccination plans. (Id.

28   at ¶ 47.)

In addition to its pre-existing emergency medical and pandemic response plans, CoreCivic issued an initial Pandemic Coronavirus Plan and COVID-19 Medical Emergency Plan in 2020 that have been updated as guidance changes. (Id. at ¶¶ 48–50.) CAFCC suspended social visitation and stopped transporting detainees for in-person court hearings and non-urgent medical consults in March and April 2020, although it has since resumed these activities as conditions have allowed. (Id. at ¶¶ 51–53.)

### 1. Social Distancing

Although it can be challenging in a custodial setting, CAFCC has implemented practices to promote social distancing consistent with CDC guidelines. (Id. at ¶¶ 54–61.) This includes advising detainees to make use of the large dayroom areas in the housing units, limitations on the number of individuals who can participate in in-person programming at any given time, and making use of CAFCC's large outdoor recreation yards. (Id. at ¶¶ 62–65.) CAFCC has always utilized a satellite feeding system in which meals are brought to the housing units, where detainees can spread out to eat their meals. (Id. at ¶ 66.) Social distancing is encouraged but not enforced through disciplinary measures. (Id. at ¶ 67.) Even with the advent of vaccines, CAFCC's policies regarding social distancing and housing have continued. (Id. at ¶ 68.)

### 2. Masks and Other Personal Protective Equipment ("PPE")

As CDC guidelines regarding masks and other PPE have evolved, so, too, have CAFCC's protocols. (Id. at ¶¶ 69–76, 78–100.) CAFCC began increasing its stock of PPE in February 2020 to avoid shortages and continues to maintain face shields, N-95 and paper surgical masks, gloves, and coveralls in stock. (Id. at ¶¶ 77, 96.) CAFCC has offered all detainees paper and/or cloth masks throughout the pandemic. (Id. at ¶¶ 80–84.) Detainees are not required to wear their masks inside their housing units, but they are encouraged to do so and have been educated as to why they should. (Id. at ¶¶ 85–86.) All detainees, however, are required to wear masks when they leave their pod, and detainees who are symptomatic or positive are required to wear masks while speaking to medical staff or when exiting their cell. (Id. at ¶¶ 87–89.) Similarly, detainees are screened prior to outside

transports; if they show any symptoms, they are immediately escorted to medical while wearing a mask. (Id. at ¶ 95.) Detainees who participate in the Voluntary Work Program as porters, kitchen workers, commissary workers, and laundry workers wear appropriate PPE while working. (Id. at ¶¶ 90–91.) Signs at the front gate and in the lobby advise all persons entering CAFCC that masks are required to enter. (Id. at ¶¶ 92–94.) Consistent with the CDC's May 3, 2022 guidance, CAFCC made masking voluntary on May 9, 2022, but returned to mandatory masking on June 30, 2022 due to increases in community and facility transmission. (Id. at ¶¶ 97–100.)

### 3.    Enhanced Sanitation Procedures

Consistent with CDC Interim Guidance, CAFCC enhanced its already robust sanitation practices in response to COVID-19. (Id. at ¶¶ 101–104.) This included increasing its inventory of cleaning chemicals starting in February 2020 and checking that inventory daily, updating and enhancing the facility housekeeping plan, educating detainees on how to sanitize surfaces, providing detainees adequate soap and water, providing detainees adequate disinfecting supplies, ensuring regular cleaning and sanitizing of high-touch areas, changing employee time-clock procedures to reduce the need for touching the clock, sanitizing detainee mattresses and library books and kiosks, training laundry workers to avoid shaking germs into the air and ensuring laundry is dried completely, sanitizing cells after they were occupied by a COVID-19 positive detainee, treating trash from cohort and quarantine units as medical waste, and sanitizing facility transport vehicles between uses. (Id. at ¶ 105–124.) Although CAFCC does not allow detainees to keep and use alcohol-based hand sanitizer, the CDC has stated that soap and water is still the most effective way to kill COVID-19. (Id. at ¶¶ 108, 111.) To that end, CAFCC gives each detainee two bars of soap and a bottle of shampoo/body wash each week and will replace/refill them on request; in the months of June and July 2022, CAFCC issued 60,000 bars of soap and 32,000 bottles of shampoo/body wash free of charge to detainees. (Id. at ¶¶ 108–110.)

### 4.    Inmate Screening and Health Assessments

CoreCivic developed its first screening tool as early as March 2020 and has amended

it as new information and symptoms have been identified by the CDC. (Id. at ¶¶ 125–128.) New intake detainees receive a full symptom screening and vital signs check as well as education about COVID-19 vaccines and can consent to a vaccine at that time. (Id. at ¶¶ 131–134.) Medical staff identify detainees with medical conditions that place them at higher risk from COVID-19. (Id. at ¶¶ 135–138.) During intake, medical staff attempt to confirm whether a detainee has received a COVID-19 vaccine through questions to the detainee, verification in the Arizona State Immunization Information System ("ASIIS") online portal, and through prior facility records where available. (Id. at ¶¶ 139–141, 145.) If staff are unable to confirm that a detainee has received a vaccine, the detainee is counted as unvaccinated. (Id. at ¶ 142.) If a detainee declines a vaccine or cannot be confirmed as having received on, they are given education about the vaccines and how to request them in the future. (Id. at ¶¶ 144–145.) A detainee who receives a vaccine at CAFCC receives a CDC vaccination card. (Id. at ¶143.)

### 5. COVID-19 Cohort/Quarantine Strategies

#### a. Intake Cohorting

Although the CDC initially recommended quarantining all new intakes for 14 days, the guidance has evolved to make such observation periods shorter and optional. (Id. at ¶¶ 146–150.) Beginning March 19, 2020, CAFCC cohorted all new arrivals for 14 days; effective June 1, 2022, CAFCC is no longer required to cohort new intake USMS detainees for any period of time. (Id. at ¶¶ 151–154, 157.) Detainees in intake cohorts were tested for COVID-19; if any tested positive or showed symptoms of COVID-19, they were removed from the cohort, which then converted to a quarantine status. (Id. at ¶¶ 155–157.) Detainees in cohorts were housed individually if possible and were only allowed to socialize with other detainees from their cohort until the cohort period ended. (Id. at ¶¶ 158–162.) Staff entering cohort areas were required to follow strict PPE and sanitization protocols. (Id. at ¶¶ 163–165.) Detainees in cohorts had access to the same activities and opportunities as they would have received in a general population pod, including medical assessments. (Id. at ¶¶ 166–168.)

### b.  Quarantine Housing

CDC-recommended quarantine periods for individuals who have had close contact with a confirmed positive COVID-19 case have changed over time from 14 days to eight days. (Id. at ¶¶ 169–172, 181–182.) Detainees in quarantine are generally housed individually but may be housed with a cellmate if both are confirmed positive or confirmed negative for COVID-19. (Id. at ¶ 177.) Close contacts of the detainee who tested positive are tested during quarantine, and detainees in the pod are screened for symptoms. (Id. at ¶¶ 178–180.) Detainees are also tested upon request and if they show symptoms; any new positives restart the quarantine period. (Id. at ¶¶ 183–184.) Detainees in quarantine are educated to sleep head to toe, increase sanitation practices, socially distance, and wear masks within the pod. (Id. at ¶ 185.) Detainees in quarantine may work within, but not outside of, the pod, and all meals, recreation, and programming are provided on-unit. (Id. at ¶¶ 186–187.)

### c.  Medical Isolation

As CDC guidelines regarding medical isolation for COVID-19-positive detainees have evolved, CAFCC protocols have as well. (Id. at ¶¶ 188–191.) Detainees who report or show symptoms are immediately moved to medical isolation pending test results in individual cells with solid walls and doors; if the test is positive, the detainee remains in isolation for 10 days; if the test is positive, the detainee is returned to the general population. (Id. at ¶¶ 192–194, 197–199.) Detainees in medical isolation receive daily symptom screenings conducted by medical staff and are instructed to report any symptoms immediately to medical or security staff. (Id. at ¶¶ 195–196, 203.) In addition to the designated medical isolation housing units, CAFCC has a 12-bed infirmary with 24-hour nursing coverage that focuses on higher-acuity patients. (Id. at ¶¶ 200–201.) Detainees who require closer monitoring because of low O2 saturation or other medical conditions that put them at higher risk from COVID-19 may be housed in observation cells in one of the facility's medical units. (Id. at ¶ 202.)

### 6.    COVID-19 Testing

Early in the pandemic, CAFCC practice was to test symptomatic detainees for COVID-19 as determined necessary by a licensed independent medical provider based on a particular detainee's symptoms. (Id. at ¶ 206.) CAFCC now also tests detainees who have been in close contact with a confirmed COVID-19-positive individual, consistent with CDC guidelines. (Id.) Where a PCR swab test was offered to every new intake detainee within 24 hours of their arrival unless they arrived on a Friday night, Saturday, or Sunday, in which case they were tested on Monday, effective July 19, 2022, all new intakes are swabbed with a rapid test during intake, including detainees who arrive over the weekend. (Id. at ¶ 207.) Consistent with current CDC Interim Guidance, unless they are symptomatic or test positive for COVID-19, they are then assigned to appropriate housing. (Id.) Detainees who show or report COVID-19 symptoms or are identified as close contacts of COVID-19-positive detainees are offered a test as well. (Id. at ¶ 208.) Detainees are also tested if they go to court or are transferred to another facility. (Id. at ¶¶ 209–214.) Although CAFCC does not have a formal protocol for testing detainees prior to their release to the community, the logistics of how those releases occur generally results in the detainees being tested. (Id. at ¶ 213.) In recent months, the majority of CAFCC detainees who test positive for COVID-19 are asymptomatic. (Id. at ¶ 215.)

### 7.    Staff Screening

Since the start of the pandemic, all persons entering CAFCC, whether they are a CoreCivic employee, contractor, USMS or other government partner employee, attorney, or other visitor, are subject to screening before entering the facility. (Id. at ¶¶ 216–221, 224–225.) Although the precise procedures have changed, CAFCC continues to perform contact tracing when an employee is denied entry to the facility. (Id. at ¶¶ 222–223.)

### 8.    COVID-19 Vaccines and Boosters

In December 2020, CAFCC established a COVID-19 Vaccination Plan that sets out the facility's plan for the administration of the COVID-19 vaccine, including preparation, registration, storage, tracking, reporting, training, and vaccination administration measures;

the plan is meant to be adapted as circumstances change. (Id. at ¶¶ 226–228.) CAFCC began offering the COVID-19 vaccine to detainees on January 22, 2021 consistent with CDC and Pinal County guidelines. (Id. at ¶¶ 229–231.) CAFCC designated areas in each housing unit for vaccination purposes; developed protocols for entering vaccination information into detainee health records and checking detainee risk factors when evaluating patients; and followed Pinal County guidelines as to which detainees to offer the vaccine to first. (Id. at ¶¶ 232–235.) Since March 31, 2021, however, vaccines and boosters are now offered to all CAFCC detainees over the age of 18. (Id. at ¶ 236.) Although the facility has offered both the Johnson & Johnson and the Moderna vaccines, it currently offers only the Moderna vaccine for both initial series and boosters. (Id. at ¶¶ 237–240.) CAFCC has never run out of doses, but has a plan in place to prioritize detainees with medical conditions that put them at higher risk from COVID-19 if there ever is a shortage. (Id. at ¶¶ 241–242.)

Initially, CAFCC carried out "vaccination events" in the detainee housing units during which several rounds of town hall meetings were held to advise detainees that the vaccines would be available; provide education about the types of vaccines that would be offered; and give the detainees an opportunity to have their questions answered and either consent to or refuse the vaccine. (Id. at ¶¶ 243–248, 250–251.) As a result of the 85 "vaccination events" that were held, more than 860 detainees per month, a total of 8,690 detainees, were offered the COVID-19 vaccine in less than a year's time. (Id. at ¶ 248.) Since then, the vaccine is offered to all new intake detainees as they arrive. (Id. at ¶ 249.)

Detainees are educated that they can request the vaccine even if they initially refused it and changed their mind by submitting a written request to medical. (Id. at ¶¶ 252–253.) Detainees who request a vaccine receive it as soon as possible based on available supply, scheduling, staffing, and other pending requests; CAFCC's priority is to ensure all detainees are offered the vaccine and that no detainee who wants to receive the vaccine is missed. (Id. at ¶¶ 252, 254–258.) Although CAFCC takes steps to ensure (to the extent possible) that no unused doses are allowed to expire, it will not deny a detainee the opportunity for a vaccination or booster simply to avoid allowing doses to expire. (Id. at ¶ 257.)

Detainees receive vaccine fact sheets specific to the vaccine they will be receiving. (Id. at ¶¶ 259–260.) They can also receive individual counseling about vaccines through the sick call process or during a medical encounter. (Id. at ¶¶ 261–262.) Detainees who receive a dose of a vaccine at CAFCC also receive a CDC vaccination card confirming their vaccination; if a detainee is released before receiving the second dose of a two-dose series, they also receive information about where and when they can get the second dose. (Id. at ¶¶ 263–264.) Detainees who receive a first dose of the Moderna vaccine at CAFCC are scheduled for the second dose, but if they are transferred or released before that occurs, CAFCC cannot prevent or delay their transfer or release. (Id. at ¶¶ 2, 265.)

CAFCC uses the Moderna vaccine for booster shots unless contraindicated. (Id. at ¶ 269.) Detainees are educated about booster shots, including how to request them. (Id. at ¶¶ 266–268.) CAFCC medical staff identify detainees who should receive a booster based on their medical conditions and track detainees who have received them. (Id. at ¶¶ 270–271.)

Through town hall meetings, written information, vaccine clinics, and counseling, CAFCC is making every reasonable and positive effort to change the dynamic on vaccination within the detainee population. (Id. at ¶ 272.) Nevertheless, it is proven and commonly understood in both the medical field and in the community that a person who is fully vaccinated and has received COVID-19 boosters may still contract COVID-19. (Id. at ¶ 273.) As such, despite the availability of vaccinations, CAFCC's COVID-19 mitigation plan remains largely the same as it has been throughout the pandemic. (Id. at ¶ 274.)

### 9.    COVID-19 Treatment

CAFCC has access to COVID-19 antiviral medications (Paxlovid and Molnupiravir) where clinically indicated to be prescribed to a COVID-19 patient and where the detainee patient agrees to take the antiviral medication through local pharmacies. (Id. at ¶ 275.) Because these medications are available through local pharmacies, CAFCC does not keep them in stock at the facility. (Id. at ¶¶ 276–277.) Detainees are always free to refuse any recommended or prescribed medical care, including these medications or other COVID-19-related treatments. (Id. at ¶ 278.)

### 10.     COVID-19 Education

CAFCC complies with CDC guidelines recommending signage throughout the facility regarding COVID-19 symptoms, what to do if you are sick, hand-washing, sanitation and cleanliness, mask use, steps to reduce the risk of exposure, social distancing, how to report, who to report to, vaccines, and boosters that is updated as needed based on new information. (Id. at ¶¶ 279–281, 295.) CAFCC has a committee that includes the chief of unit management and unit manages that ensures all COVID-19 information is contained on flyers posted in the units. (Id. at ¶ 293.) Additionally, unit staff hold town hall meetings to discuss changes in procedures or protocols, sometimes as often as once or twice a week, especially in the early days of the pandemic, and town hall meeting records are posted in the housing units afterwards so detainees can refer back to them regarding what was discussed. (Id. at ¶ 282–286.) Unit and security staff are trained to recognize COVID-19 symptoms, conduct temperature and symptom screenings, and answer detainee questions. (Id. at ¶¶ 287–288, 293.) Medical staff are also educated as to vaccines, complications, symptoms that can arise after receiving a vaccine, and other vaccine-related issues so they can answer detainee questions. (Id. at ¶ 294.)

COVID-19 vaccines are available at CAFCC for all staff and detainees, and CAFCC encourages staff and detainees to become vaccinated. (Id. at ¶ 296.) With regard to vaccines specifically, a document titled "Here's the Scoop" is posted throughout the facility and on detainee tablets with information about vaccines and boosters such as how to request a COVID-19 vaccine or booster; who is eligible for boosters; and the amount of time that must pass between vaccination and administration of a booster. (Id. at ¶ 291.) Detainees cannot access the tablets until they acknowledge having read the information. (Id. at ¶ 292.)

### 11.     Inmate Programming and Services

Programming was reduced, but not eliminated, during the early days of the pandemic to allow social distancing. (Id. at ¶ 297.) Since July 2021, in-person programming has returned to pre-pandemic levels. (Id. at ¶ 297.) Recreation has largely gone unchanged due to the size of the recreation yards. (Id. at ¶ 298.) In addition to in-person programming,

detainees also have access to a wide variety of programming and classes, including religious classes, on tablets. (Id. at ¶¶ 299–301.)

### 12. Court Services

CDC has adjusted its court transportation and videoconferencing services as needed based on changing CDC guidelines and court rules and protocols. (Id. at ¶¶ 303–304.) Legal visitation was not suspended, but video teleconferencing ("VTC") was encouraged; at the height of the pandemic, CAFCC was facilitating approximately 650–700 VTC uses (court appearances, probation interviews, initial appearances, and other court hearings) per week. (Id. at ¶¶ 305, 308.) Strict sanitation protocols are followed before and after in-person attorney visits. (Id. at ¶ 306.) Detainees can also make confidential calls to their attorneys while observing social distancing protocols in the housing unit dayrooms. (Id. at ¶ 307.)

### 13. COVID-19 Statistics

Between January 22, 2021, when CAFCC began offering the COVID-19 vaccine, and July 22, 2022, a total of 13,089 detainees have been offered a COVID-19 vaccine at CAFCC, including 9,967 USMS detainees. (Id. at ¶ 314.) A total of 2,785 USMS detainees have received at least one dose of a COVID-19 vaccine at CAFCC, and 2,657 have been fully vaccinated at CAFCC (i.e., they have received either two doses of the Moderna vaccine or one dose of the Johnson & Johnson vaccine). (Id. at ¶ 315.)

As of July 22, 2022, 1,700 USMS detainees have received the Johnson & Johnson vaccine, 1,085 USMS detainees have received the first dose of the Moderna vaccine, 957 USMS detainees have received the second dose of the Moderna vaccine, and 256 USMS detainees have received a booster shot while detained at CAFCC; 8,265 USMS detainees have exercised their right to refuse the vaccine. (Id. at ¶ 316.) As of July 22, 2022, the total USMS population at CAFCC was 3,724; of those, 10% were fully vaccinated. (Id. at ¶ 317.) This number includes only detainees who became fully vaccinated at CAFCC, as there is no reliable way to confirm that new intake detainees who claim to be partially or fully vaccinated are so vaccinated, such that the percentage of USMS detainees at CAFCC who are fully vaccinated may be higher. (Id.) As of February 16, 2022, approximately 61% of

staff members had received the COVID-19 vaccine. (Id. at ¶ 318.)

### D.   Named Plaintiffs

Named Plaintiffs Tracy Ann Peuplie, James Tyler Ciecierski, and Marvin Lee Enos were appointed as class representatives for the Pretrial Class, and Plaintiff Claudia Romero-Lorenzo was appointed as class representative for the Post-Conviction Class on November 3, 2020. (Dkt. 69.) The Court dismissed Plaintiffs' Eighth Amendment claims brought on behalf of the Post-Conviction Class on February 19, 2021. (Dkt. 89.)

### 1.   Medical Histories

According to the medical record on file, Peuplie was booked into CAFCC on December 30, 2019 and transferred from CAFCC on May 19, 2021. (DSOF at ¶ 321.) She was identified as at higher risk for COVID-19-related illness due to age and diagnosed asthma and hypertension. (Id.) She refused the Moderna COVID-19 vaccine on May 13, 2021. (Id.) Her COVID-19 transfer test on May 18, 2021was negative. (Id.) Peuplie never tested positive for COVID-19 while detained at CAFCC. (Id.)

According to the medical record on file, Ciecierski was booked into CAFCC on February 27, 2020 and released to the community on April 12, 2021. (Id. at ¶ 322.) He received the Johnson & Johnson vaccine on March 31, 2021 but refused the Moderna booster on March 2, 2022. (Id.) He also refused a COVID-19 release test. (Id.) Ciecierski never tested positive for COVID-19 at CAFCC. (Id.) During his detention at CAFCC, he was hospitalized (non-respiratory). (Id.) He was tested for COVID-19 while hospitalized and the test was negative. (Id.)

According to the medical record on file, Enos was booked into CAFCC on August 6, 2019 and released on July 1, 2021. (Id. at ¶ 323.) He was identified as at higher risk for COVID-19-related illness due to hypertension and asthma. (Id.) He received two doses of the Moderna vaccine—the first on April 29, 2021 and the second on May 27, 2021. (Id.) Enos never tested positive for COVID-19 at CAFCC. (Id.)

### 2.   Exhaustion of Administrative Remedies

CAFCC has a detailed grievance policy that is included in the USMS Detainee

Handbook that is provided to detainees during intake and is available for detainees to review upon request from the CAFCC law library. (Id. at ¶ 324.) Detainees sign an acknowledgment when they receive the handbook and are provided education about the grievance process during orientation or as requested and/or needed. (Id. at ¶¶ 325–326.) Grievance forms are available in the housing units or upon request from staff, and detainees may receive help from staff or other detainees when filling out the forms. (Id. at ¶¶ 327–328.) Grievance forms must be submitted to the housing unit grievance mailbox, which is check each night except on weekends, and grievances are logged and tracked as they proceed through the various steps. (Id. at ¶¶ 329–339.)

The grievance process includes three steps: informal resolution, formal grievance, and appeal. (Id. at ¶¶ 340–352.) Each step includes time limits for submissions and responses. (Id.) To fully and properly exhaust the grievance process, a detainee must timely submit both a formal grievance and an appeal (the informal resolution is optional and changes the applicable timeframe for the formal grievance if utilized). (Id.) There is also an emergency grievance process for situations in which the regular time requirements would subject a detainee to risk of personal injury, including medical-related issues. (Id. at ¶¶ 353–357.) None of the named Plaintiffs completed the grievance process and exhausted the available administrative remedies with respect to the claims raised in the Complaint. (Id. at ¶¶ 358–374.)

## II.   Legal Argument[2]

### A.   Plaintiffs' Claims Are Moot.

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must

---

[2] At the outset of the litigation, the Court denied Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2), finding that Plaintiffs were unlikely to succeed on the merits of any of their claims. (Dkt. 29 at 15, 18.) In support of its ruling, the Court found that "[t]here is no dispute between the parties that Defendants have enacted various policies in response to the risks posed by COVID-19," and that "Defendants' policies reflect the recommendations from the CDC, and have been implemented without unreasonable delay as the CDC's recommendations have been promulgated and updated." (Id. at 14, 17.) The Court further found that "[a]lthough there may be instances in which

be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citation omitted). A case becomes moot—and, hence, non-justiciable—if the "requisite personal interest" captured by the standing doctrine ceases to exist at any point during the litigation. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). In other words, a case is moot if there is no "present controversy as to which effective relief can be granted*." Doe No. 1 v. Reed*, 697 F.3d 1235, 1238 (9th Cir. 2012) (citation omitted).

### 1.    Plaintiffs' Release or Transfer Moots Their Claims.

An inmate's release or transfer moots his or her challenges to the facility's conditions of confinement. *See Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991). All three named Plaintiffs have been released or transferred to other facilities, thus mooting their claims. (DSOF at ¶¶ 321–323.) *See U.S. v. Hernandez*, 2021 WL 4710807, at *3 (S.D. Tex. Oct. 7, 2021) (transfer to different facility mooted "complaints regarding poor medical care and the increase in COVID-19 cases"); *Sekerke v. Gore*, 2021 WL 5299851, at *2 (S.D. Cal. Oct. 8, 2021) (inmate's transfer to prison moots habeas petition seeking release due to risk of COVID-19 exposure).

### 2.    Changes in the Pandemic, Prior Infection, and/or the Widespread Availability of the Vaccine Also Moot Plaintiffs' Claims.

As another court explained, changes in the pandemic and the widespread availability of a vaccine moots inmate claims seeking release due to the risk of COVID-19 exposure:

> [T]he mere availability of the vaccine at CCCC also moots this action (and strips standing from all detainees for all future risk-based coronavirus actions), given that this lawsuit is premised entirely on COVID-19 exposure. … In fact, every time a staff member, or pre-trial detainee, or prisoner is vaccinated, the overall risk of outbreak at CCCC decreases. Approaching this issue pragmatically, rather than through a clouded political lens, the vaccine must smother all attempts by prisoners or pre-trial detainees to request COVID-19-related relief based upon the theory that the risk of infection

---

Defendants' policies have not been *followed* … this does not reflect that the policies *themselves* are objectively insufficient." (Id. at 18) (emphasis in original.) Plaintiffs have no evidence to support any contrary findings now.

violates the constitution; persons in custody who refuse the vaccine are now imperiled solely as a result of their own free will and not because a detention center allegedly offended the Fifth, Eighth, and Fourteenth Amendments by failing to sufficiently implement prophylactic measures. …. Nonetheless, in a strained attempt to overcome the justiciability bar, Petitioners maintain that the deficiencies at CCCC are capable of being repeated … [T]his Country and this State are in the waning days of the pandemic. Petitioners are grasping at straws and COVID-19 will not offer Petitioners the get-out-of-jail remedy they seek.

*Martinez v. CoreCivic*, 2021 WL 2550319, at *7–9 (D.N.M. June 22, 2021). Courts have consistently dismissed similar claims as moot for these reasons.[3]

Likewise here, changes in the pandemic and corresponding changes to CDC guidelines and CoreCivic's response, as well as the widespread availability of a vaccine and effective medication for treatment have significantly curbed the risk of a serious illness or death from COVID-19 exposure. (DSOF at ¶¶ 14–323.) Current vaccines protect against the Omicron variant, which is currently the dominant variant in the United States, and which generally causes less severe disease. (Id. at ¶¶ 26–28.) Of the three named Plaintiffs, Peuplie refused the vaccine, Ciecierski received the Johnson & Johnson vaccine but refused the Moderna booster, and Enos received two doses of the Moderna vaccine. (Id. at ¶¶ 321–323.)

---

[3] *See, e.g., Lighthouse Fellowship Church v. Northam*, 2021 WL 5894891, at *4 (4th Cir. Dec. 14, 2021) ("We are now better informed concerning COVID-19. The availability of vaccines and other measures to combat the virus have led to a significant change in the relevant circumstances — including the resumption of pre-COVID-19 activities — as evidenced by the removal of many restrictions."); *U.S. v. Boradfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("For the many prisoners who seek release based on the special risks created by COVID 19 for people living in close quarters, vaccines offer relief far more effective than a judicial order."); *U.S. v. Fordham*, 2021 WL 4627751, at *2 (D. Utah Oct. 7, 2021) (A "Covid-19 vaccine is now widely available, which is at least 91% effective in preventing Covid-19, but also mitigates the development of severe symptoms and death."); *U.S. v. Hernandez-Moreno*, 2021 WL 3725652, at *3 (W.D. Wash. Aug. 23, 2021) ("While no vaccine is 100% effective, it substantially reduces the likelihood of Mr. Hernandez-Moreno contracting the virus."); *U.S. v. Baeza-Vargas*, 2021 WL 1250349, at *3 (D. Ariz. Apr. 5, 2021) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances. And the same goes for an inmate receiving a COVID-19 vaccination.") (citations omitted; collecting cases).

As such, these Plaintiffs have either accepted the risk posed by COVID-19 (Peuplie) or reduced the risk to themselves (Ciecierski and Enos), and the same is true of every other class member at CAFCC. *See Martinez*, 2021 WL 2550319 at *7–9; *see also U.S. v. Gonzalez*, 2021 WL 2433817, at *3 (S.D.N.Y. June 15, 2021) ("Fortunately, however, Gonzalez has received an approved vaccine which is 'safe and effective at preventing COVID-19,'" which "make[s] it substantially less likely [Gonzalez] will get COVID-19," and will "help[ ] keep [Gonzalez] from getting seriously ill even if [he] do[es] get COVID-19.") (alterations in original); *U.S. v. Brown*, 2021 WL 1154207, at *3–4 (S.D.N.Y. Mar. 26, 2021) (denying relief because the defendant "will soon be fully vaccinated, [so] any risk that he may become severely ill from COVID-19 will be reduced significantly"); *U.S. v. Poupart*, 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021) ("Mr. Poupart's argument that his significant medical needs warrant his release lacks persuasive force since the vaccine has empowered Mr. Poupart to reduce these risks."); *U.S. v. Williams*, 2021 WL 321904, at *3 (D. Ariz. Feb. 1, 2021) ("Defendant's own behavior [in refusing vaccination] is inconsistent with his position that he believes he is at increased risk from the virus.").

Similarly, although none of the three named Plaintiffs ever tested positive for COVID-19 at CAFCC (DSOF at ¶¶ 321–323), to the extent any class members did and recovered, or have had asymptomatic COVID-19 that never showed up on a test, their risk from COVID-19 is also reduced; this is especially true for such detainees who later received a COVID-19 vaccine as well. *See, e.g., U.S. v. Bolton*, 2021 WL 4812971, at *2 (C.D. Ill. Oct. 15, 2021) (finding inmate's "prior asymptomatic infection and subsequent vaccination make it unlikely that he will contract COVID19 again or suffer severe complications if he does."); *U.S. v. Stone*, 2021 WL 4343439, at *3 (W.D. Ky. Sept. 23, 2021) ("A prior positive Covid-19 test reduces Stone's medical concerns about remaining in prison."). These changes in circumstances moot Plaintiffs' claims.

### 3.     The Exception to Mootness Does Not Apply.

Although there is an exception to mootness for claims "capable of repetition, yet evading review," that exception does not apply unless the challenged action is too short in

1   duration to allow full litigation before it cease, and there is a reasonable expectation that the

2   plaintiffs will again be subject to the same action. *First Nat'l Bank of Boston v. Bellotti*, 435

3   U.S. 765, 774 (1978). Here, the duration of the challenged action—CoreCivic's COVID-19

4   response—is not too short in duration to allow full litigation. Plaintiffs have received the

5   full benefit of litigating this case for two years since filing this lawsuit on May 8, 2020.

6        There is also no reasonable possibility that Plaintiffs would be subjected to the same

7   alleged conditions. It is merely speculative that they would be rearrested and placed back

8   in CAFCC under the same conditions. *See Grande v. Shinn*, 2022 WL 1619012, at *12 (D.

9   Ariz. May 23, 2022). This is especially true given the changes in circumstances discussed

10  above. *See U.S. v. Perry*, 2021 WL 4593547, at *2 (S.D. Ind. Oct. 6, 2021) ("[E]ven if he

11  is returned to prison at some point in the future, … it will be when the official state of

12  emergency for the COVID-19 pandemic has ended. If the pandemic has subsided enough

13  that the state of emergency has been lifted, it is similarly likely that the risk to Mr. Perry

14  from COVID-19 will also have subsided."); *Paul v. Decker*, 2021 WL 1947776, at *5 &

15  n.6 (S.D.N.Y. May 14, 2021) (same). Plaintiffs' claims are thus moot, and they lack

16  standing to represent the class members. *See Hodgers-Durgin v. De la Fina*, 199 F.3d 1037,

17  1044-45 (9th Cir. 1999)) ("Unless the named plaintiffs are themselves entitled to seek

18  injunctive relief, they may not represent a class seeking that relief."); *Maney v. Brown*, 2021

19  WL 4449266, at *5 (D. Or. Sept. 28, 2021) (allegations that defendant's conduct will subject

20  unnamed class members to the alleged harm insufficient to establish standing to seek

21  injunction on behalf of the class).

22        **4.      Plaintiffs' Request for Declaratory Judgment Is Also Moot.**

23        "[A] declaratory judgment may not be used to secure judicial determination of moot

24  questions." *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 816 (9th Cir. 1995) (quotations

25  and citation omitted). Because the corresponding constitutional claims are moot, Plaintiffs'

26  request for declaratory judgment is also moot. *Slockish v. U.S. Dep't of Transp.*, 2021 WL

27

28

5507413, at *2 (9th Cir. Nov. 24, 2021).[4]

**B.     Plaintiffs Failed to Exhaust Administrative Remedies.**

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under … any … Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion … is mandatory."). The PLRA's mandatory exhaustion requirement applies equally to pretrial criminal detainees, 42 U.S.C. § 1997e(h), and, indeed, "all inmate suits about prison life[.]" *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion requires compliance with "all steps" of the facility's grievance system. *Woodford*, 548 U.S. at 88, 90–91. Strict compliance is necessary so that officials are alerted to "the nature of the wrong for which redress [is] sought" and can "take corrective action where appropriate." *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (quoting *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), and citing *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016)).

Here, administrative remedies were available to Plaintiffs.[5] (DSOF at ¶¶ 324–357.)

---

[4] Even if a declaratory judgment were not moot, this Court should deny relief because it would not protect Defendant Kline against impending litigation or serve the public interest. *See Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426, 431 (1948) ("A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest."); *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981) (The purpose of declaratory relief under the Declaratory Judgment Act is "to relieve potential defendants from the Damoclean threat of impending litigation ….").

[5] The Supreme Court has identified only three situations in which administrative remedies are "unavailable." First, an "administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 1859. Third, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," the administrative remedy is effectively unavailable. *Id.* at 1860. None of these situations exists here.

19

None of the named Plaintiffs, however, exhausted their claims before filing this lawsuit. (Id. at ¶¶ 358–374.) The COVID-19 pandemic does not excuse the failure to exhaust. *See Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020); *Marlowe v. LeBlanc*, 2020 WL 2043425, at *3 (5th Cir. Apr. 27, 2020); *U.S. v. Otero*, 2020 WL 1912216, at *3 (S.D. Cal. Apr. 20, 2020). Because Plaintiffs did not exhaust the available administrative remedies prior to filing suit, they cannot succeed on the merits of their claims. *See Swain v. Junior*, 2020 WL 2161317, at *7 (11th Cir. May 5, 2020); *see also U.S. v. Tomlinson*, 2020 WL 1935522, at *1 (D. Ariz. Apr. 22, 2020) (denying federal prisoner's request for an early release in light of COVID-19 where he failed to exhaust administrative remedies in strict compliance with 18 U.S.C. § 3582(c)(1)(A)(i)).

### C.  Plaintiffs' Fifth Amendment Claim Fails as a Matter of Law.

To establish a *Monell* liability claim against Defendant Kline, who is sued in his official capacity, Plaintiffs must prove: (1) they were deprived of a constitutional right; (2) CoreCivic had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiffs' constitutional rights; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Due process claims under the Fifth and/or Fourteenth Amendment brought by pretrial detainees are evaluated under a reckless disregard, or objective deliberate indifference, standard.[6] *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). Plaintiffs must present evidence that:

(i) the defendant made an intentional decision with respect to the conditions

---

[6] Although case law continues to use the term "deliberate indifference," the more correct term for cases involving pretrial or civil detention Fifth or Fourteenth Amendment claims is "reckless disregard." *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 660 n.7 (9th Cir. 2021) (Berzon, J., dissenting).

under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved ...; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, [CoreCivic's] conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (citation omitted).

"The 'reckless disregard' standard is a formidable one." *Fraihat*, 16 F.4th at 636 (9th Cir. 2021) "[A] de minimis level of imposition" is insufficient. *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979). "Neither 'mere lack of due care,' nor 'an inadvertent failure to provide adequate medical care,' nor even '[m]edical malpractice,' without more, is sufficient to meet this standard." *Fraihat*, 16 F.4th at 636 (citation omitted). "Instead, [Plaintiffs] must show that [CoreCivic] disregard[ed] an excessive risk' to [their] health and safety by failing to take 'reasonable and available measures' that could have eliminated that risk." *Id.* (citations omitted).

Here, Plaintiffs cannot meet any of the elements necessary to prove their claim. Plaintiffs have no evidence that CoreCivic made any intentional decision to knowingly expose them to an unacceptable risk of severe illness or death from COVID-19 infection. Nor is there any evidence that conditions at CAFCC actually placed them at such risk, that CoreCivic did not take reasonable available measures to abate the risk, or that Plaintiffs were injured as a result of those actions.

Since the start of the pandemic, and long before Plaintiffs filed this lawsuit, CoreCivic has taken extensive and objectively reasonable measures to protect detainees and abate the risks from COVID-19 at CAFCC. (DSOF at ¶¶ 14–323.) As demonstrated above, CoreCivic's COVID-19 response was comprehensive, robust, and consistent with CDC guidelines—CoreCivic coordinated with state and local health agencies and developed and

1    implemented measures with respect to recommended practices for social distancing, masks

2    and other PPE, enhanced sanitation procedures, detainee screening and health assessments,

3    housing strategies that include use of intake cohorts, quarantine housing, and medical

4    observation, testing, staff and visitor screening, staff and detainee vaccination, treatment,

5    education, detainee programming and services, and court services. (Id.)

6         In the related context of Eighth Amendment subjective deliberate indifference claims

7    brought by convicted inmates, courts have held that similar measures in response to

8    COVID-19 were constitutionally adequate. *See Plata v. Newsom*, 2022 WL 1210694, at *1

9    (9th Cir. Apr. 25, 2022) ("CDCR's COVID-19 vaccination policy was not deliberately

10   indifferent because the agency took significant action to address the health risks posed by

11   COVID-19, including making vaccines and booster doses available to prisoners and

12   correctional staff, enacting policies to encourage and facilitate staff and prisoner

13   vaccination, [and] requiring staff to wear personal protective equipment…. Defendants also

14   employed other widely accepted mitigation measures to reduce the risk of prisoners

15   contracting COVID-19, including symptom screening for all individuals entering the

16   prisons; enhanced cleaning in the facilities; adopting an outbreak action plan; upgrading

17   ventilation; establishing quarantine protocols for medically vulnerable patients; and testing,

18   masking, and physical distancing among inmates."); *Wilson v. Williams*, 961 F.3d 829, 841

19   (6th Cir. 2020) ("Our sister circuits have concluded that similar actions by prison officials

20   demonstrate a reasonable response to the risk posed by COVID-19") (citing *Swain*, 958

21   F.3d at 1089–90 ("Accepting, as the district court did, that the defendants adopted extensive

22   safety measures such as increasing screening, providing protective equipment, adopting

23   social distancing when possible, quarantining symptomatic inmates, and enhancing

24   cleaning procedures, the defendants' actions likely do not amount to deliberate

25   indifference.")); *Valentine*, 956 F.3d at 802 (finding "no evidence that [prison officials]

26   subjectively believe that the measures they are taking are inadequate. To the contrary, the

27   evidence shows that TDCJ has taken and continues to take measures—informed by

28   guidance from the CDC and medical professionals—to abate and control the spread of the

virus."); *Marlowe*, 810 F. App'x at 305 (finding "no evidence establishing that Defendants subjectively believed that the measures they were (and continue) taking were inadequate. If anything, the record proves just the opposite. Defendants point to a plethora of measures they are taking to abate the risks posed by COVID-19 ….").[7]

As a result of CoreCivic's efforts, none of the named Plaintiffs ever tested positive for COVID-19. (DSOF at ¶¶ 321–323.) Of the 44,703 USMS detainees who cycled through CAFCC between April 2020 and July 2022, only 1,782 tested positive for COVID-19 (560 in 2020, 516 in 2021, and 706 in 2022). (Id. at ¶¶ 309–310.) In other words, only 3.9% (1,782/44,703) of USMS detainees at CAFCC have tested positive for COVID-19 since the start of the pandemic and since testing became available. (Id.) During that same time period, only 594 of approximately 2,377 individuals who have been on staff at CAFCC during that time period have tested positive for COVID-19. (Id. at ¶ 311.) Two detainees have died while in custody at CAFCC due to COVID-19-related illness. (Id. at ¶ 213.) Considering that 44,703 USMS detainees cycled through CAFCC between April 2020 and July 2022, this results in a COVID-19 mortality rate (0.15%) that is far below the U.S. (1.2%), Arizona (1.5%), and Pinal County (1.25%) rates. (Id. at ¶¶ 309, 313.) CoreCivic did not recklessly disregard the risks of harm to Plaintiffs or any other detainees at CAFCC. *See Fraihat*, 16 F.4th at 641; *see also, e.g., Cameron v. Bouchard*, 818 F. App'x 393, 395 (6th Cir. 2020)

---

[7] *See also, e.g., Cole v. Sinclair*, 2021 WL 5889377, at *6 (W.D. Wash. Nov. 8, 2021) ("DOC undertook a comprehensive approach to address the risks of COVID-19 within the prison setting, including testing, quarantines, restricted movement orders, and limitations on gathering of inmates. Far from being indifferent to the risks of COVID-19, defendants have shown that DOC addressed these risks and attempted to mitigate them within the confines of the prison setting.") (internal record citation omitted), *report and recommendation adopted*, 2021 WL 5882016 (W.D. Wash. Dec. 13, 2021); *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1087–88 (D. Idaho 2020) ("CDCR's COVID-19 vaccination policy was not deliberately indifferent because the agency took significant action to address the health risks posed by COVID-19, including making vaccines and booster doses available to prisoners and correctional staff, enacting policies to encourage and facilitate staff and prisoner vaccination, requiring staff to wear personal protective equipment, and ensuring unvaccinated staff members regularly test for COVID-19. Defendants also employed other widely accepted mitigation measures to reduce the risk of prisoners contracting COVID-19, including symptom screening for all individuals entering the prisons; enhanced cleaning in the facilities; adopting an outbreak action plan; upgrading ventilation; establishing quarantine protocols for medically vulnerable patients; and testing, masking, and physical distancing among inmates.").

1  (holding that measures similar to those at CAFCC constituted a reasonable response to

2  COVID-19 and granting the defendants' motion to stay the preliminary injunction);

3  *MacDonald v. Harold*, 2022 WL 205671, at *2 (D. Or. Jan. 24, 2022) (same, and granting

4  the defendants' motion for summary judgment); *Ndir v. Doll*, 459 F. Supp. 3d 627, 636–37

5  (M.D. Pa. 2020) (finding that "allegations concerning the lack of protective measures are

6  squarely contradicted by the record evidence supplied by respondent" and denying the

7  petitioner's petition for writ of habeas corpus).

8       Any argument Plaintiffs may make that CoreCivic's COVID-19 response did not

9  follow all CDC guidelines, was not perfect, or did not avert all harm do not establish

10  reckless disregard. *See Fraihat*, 16 F.4th at 647 ("There is considerable distance between

11  imperfect implementation of a policy, or even knowledge of the imperfect implementation

12  of a policy, and [reckless disregard] in the constitutional sense."); *see also Hope v. Warden

13  York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) (rejecting argument that the

14  government "must eliminate entirely their risk of contracting COVID-19. That task is not

15  the constitutional standard…."); *Rodriguez v. Sacramento Cnty. Sheriff Dep't*, 2021 WL

16  4147110, at *2 (E.D. Cal. Sept. 13, 2021) ("The fact that RCCC was not able to implement

17  all CDC … guidelines does not demonstrate a constitutional violation."); *Leeper v. Cnty. of

18  Sacramento*, 2020 WL 3840458, at *3 (E.D. Cal. July 8, 2020) (allegations "that plaintiff's

19  place of detention is not meeting CDC recommendations in responding to the COVID-19

20  threat" insufficient). The CDC Interim Guidance is just that—guidance—and "contains key

21  caveats, such as that its recommendations 'may need to be adapted based on individual

22  facilities' physical space, staffing, population, operations, and other resources and

23  conditions.'" *Hernandez Roman v. Wolf*, 829 F. App'x 165, 174–75 (9th Cir. 2020).

24  Moreover, legitimate governmental objectives associated with detention may make strict

25  adherence to COVID-19 guidelines unfeasible. *Fraihat*, 16 F.4th at 640, 647 ("[W]e easily

26  conclude that there is a 'legitimate governmental objective' in detaining [immigration

27  detainees] … suspected of having violated the immigration laws or are otherwise removable

28

….");  *Hope*, 972 F.3d at 327 (finding pretrial detainees' "confinement implicates multiple legitimate governmental objectives").

**III.    Conclusion**

    For the foregoing reasons, the Court should dismiss the remaining Fifth Amendment claim against Defendant Warden Kline/CoreCivic with prejudice.

    DATED this 5th day of August, 2022.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By    /s/ Jacob B. Lee
    Daniel P. Struck
    Rachel Love
    Nicholas D. Acedo
    Jacob B. Lee
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    *Attorneys for Defendant Kris Kline*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**PERKINS COIE LLP**

Benjamin C. Calleros          bcalleros@perkinscoie.com
Jean-Jacques Cabou            jcabou@perkinscoie.com
Margo R. Casselman           mcasselman@perkinscoie.com
Mathew R. Koerner            mkoerner@perkinscoie.com
Thomas Ryerson              tryerson@perkinscoie.com
*Attorneys for Plaintiffs*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Emma A. Andersson          eandersson@aclu.org
Alejandro Agustin Ortiz       ortiza@aclu.org
Somil Bharat Trivedi          strivedi@aclu.org
David C. Fathi               dfathi@aclu.org
Corene T. Kendrick           ckendrick@aclu.org
Kyle Virgien                kvirgien@aclu.org
Mark Carter                mcarter@aclu.org
Aditi Shah                 ashah@aclu.org
*Attorneys for Plaintiffs*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA**

Jared G. Keenan             jkeenan@acluaz.org
Christine K. Wee            cwee@acluaz.org
*Attorneys for Plaintiffs*

**GLENN B. McCORMICK**
**Acting United States Attorney District of Arizona**

William Charles Staes         William.Staes@usdoj.gov
*Attorneys for the Federal Defendants*

/s/ Allen Rowley