Jean-Jacques Cabou (#022835)
Thomas D. Ryerson (#028073)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  602-351-8000
Facsimile:  602-648-7000
JCabou@perkinscoie.com
TRyerson@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
BCalleros@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Plaintiffs*
*(additional counsel identified on signature page)*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Claudia Romero-Lorenzo; Tracy Ann Peuplie; James Tyler Ciecierski; and Marvin Lee Enos; each individually and on behalf of all others similarly situated, | No. CV-20-0901-PHX-DJH (DMF) |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkt. 187, 191)** |
| v. | |
| Brian Koehn, Warden of the Central Arizona Florence Correctional Complex; David Gonzales, U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; Michael Carvajal, Director of the Federal Bureau of Prisons, in their official capacities, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiffs' claims for injunctive relief arise from Defendants' flawed response to COVID at CAFCC.[1] The facility's shockingly low vaccination rate of just 10%, sharply lower than that of comparable carceral facilities, is direct evidence of Defendants' systemic failures. Defendants admit that the facility no longer quarantines new intakes—a decision to forgo a fundamental, readily available protective measure that Defendants' expert does not even attempt to justify. And CAFCC's medical care is so flawed that it has neither stocked nor administered even a single dose of Paxlovid or other antivirals—medications that have become a cornerstone of COVID treatment. Defendants' motions are replete with conclusory, self-serving, unsupported, and untested assertions about the current conditions at CAFCC.[2] Defendants' statements of 384 separate purported facts—many of which are contested or demonstrably false—are proof enough alone of the multitude of factual issues that can only be resolved at a full trial. Defendants' motions should be denied.

## II. DISCUSSION

### A. Plaintiffs' Claims Are Not Moot Because There Is a Certified Class and There Remains a Live Controversy Between the Class and Defendants.

Defendants contend Plaintiffs' claims are moot because "[a]ll named Plaintiffs have been released or transferred to other facilities" and because of changes in the pandemic that have "significantly curbed the risk of a serious illness or death from COVID-19 exposure." Dkt. 191 at 15-16. Their arguments fail to demonstrate that this case is moot for two reasons. First, Defendants fundamentally misunderstand the standard applied in the Ninth Circuit to

[1] This case involves the portion of the Central Arizona Florence Correctional Complex holding people on behalf of the U.S. Marshals Service. Plaintiffs refer to that portion of that complex as "CAFCC" herein.

[2] This opposition responds to the arguments raised in the Federal Defendants' Motion for Summary Judgment (Dkt. 187) and Warden Kline's Motion for Summary Judgment (Dkt. 191). All defendants have joined in both motions. Dkt. 195, 197. Plaintiffs do not oppose the request by Director Michael Carvajal (who has been replaced as Bureau of Prisons Director by Director Colette Peters) to dismiss him as a defendant because Plaintiffs' Eighth Amendment claim against him has been dismissed, *see* Dkt. 187 at 11-12, without prejudice to their right to appeal the dismissal of their Eighth Amendment claim.

determine if a case is moot when there is a certified class, as there is here. Second, significant evidence in the record refutes Defendants' claim that any changed circumstances have reduced class members' health risks to the point of extinguishing a live controversy between the class and Defendants. To the contrary, the evidence demonstrates that class members, many of whom are medically vulnerable or have disabilities, remain at severe risk of serious illness or death due to Defendants' ongoing failure to take adequate actions in response to the pandemic.

> **1. Defendants' Argument that this Case Is Moot Because Named Plaintiffs Were Released or Transferred Is Inapposite Because There Is a Certified Class.**

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). It is well established that "if the district court has certified a class, mooting the putative class representative's claim will not moot the class action. That is so because upon certification the class 'acquire[s] a legal status separate from the interest asserted by [the class representative],' so that an Article III controversy now exists 'between a named defendant and a member of the [certified] class.'" *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (alterations in original) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399, 402 (1975)); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) (explaining that in *Sosna*, the Supreme Court "held that when the claim of the named plaintiff becomes moot after class certification, a live controversy may continue to exist based on the ongoing interests of the remaining unnamed class members") (internal quotation marks and citation omitted).

Defendants entirely ignore this principle in their argument that Plaintiffs' claims are moot because the *named* Plaintiffs were released or transferred to another facility. *See* Dkt. 191 at 15. In November 2020, this Court granted Plaintiffs' Motion for Class Certification and certified, under Fed. R. Civ. P. 23(a) and (b)(2), "The Pretrial Class" consisting of "[a]ll current and future persons held by [Defendants] in pretrial detention at [CAFCC]." Dkt. 69

at 27. The fact that the named Plaintiffs were released or are no longer in custody at CAFCC does not moot this case because a live controversy remains between pretrial class members detained in CAFCC and Defendants. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (explaining that "[o]ur cases leave no doubt . . . that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review" even though "the claims of the named plaintiffs have . . . been rendered moot" because "they either received probable cause determinations or were released [from custody]"); *Kennerly v. United States*, 721 F.2d 1252, 1260 (9th Cir. 1983) ("A representative whose individual claim becomes moot may continue to represent the class if the class was duly certified prior to mootness."). As a result, Defendants' contentions regarding the moot status of the named Plaintiffs' claims are inapposite to whether this case is moot.[3]

### 2. Defendants Fail to Demonstrate that COVID Conditions at CAFCC Have Improved to the Point of Rendering this Case Moot.

Defendants, as "[t]he party asserting mootness," bear a "*heavy* burden to establish that there is *no effective relief* remaining for a court to provide." *In re Pintlar Corp.*, 124 F.3d 1310, 1312 (9th Cir. 1997) (emphasis added); *see also Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"); *Ramsey v. Kantor*, 96 F.3d 434, 445 (9th Cir. 1996) ("Defendants bear a 'heavy' burden of demonstrating that plaintiffs' claims are moot."); *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) ("That burden

---

[3] Defendants' argument that the "capable of repetition, yet evading review" exception should not apply is also misplaced. That exception applies *"[w]here no class action has been instituted*" and "the plaintiff can reasonably show that *he* will again be subject to the same injury." *Sample v. Johnson,* 771 F.2d 1335, 1339 (9th Cir. 1985) (first emphasis added, second emphasis in original). Indeed, the Supreme Court has expressly clarified that "nothing in our [precedents] holds or even intimates that the fact that the named plaintiff no longer has a personal stake in the outcome of a certified class action renders the class action moot unless there remains an issue 'capable of repetition, yet evading review.'" *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 754 (1976). Because Plaintiffs have no need to invoke the capable-of-repetition-yet-evading-review exception, Defendants' contention that this exception does not apply is irrelevant.

is 'heavy'; a case is not moot where any effective relief may be granted."). Mootness is a "more flexible" doctrine "than other strands of justiciability," such as standing. *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003). Accordingly, Defendants must demonstrate that there has been such a "change in the circumstances existing at the beginning of the litigation [that it] has 'forestalled any occasion for meaningful relief' that the court could grant." *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1108 (9th Cir. 2005). On summary judgment, Defendants' burden is even higher because they must prove there is no genuine dispute as to any fact material to their mootness argument. Fed. R. Civ. P. 56(a); *Mendoza v. Immigr. & Naturalization of the Angeles* [sic], No. CV 06-5805 GHK FFM, 2008 WL 4286959, at *3 (C.D. Cal. Sept. 16, 2008) ("[D]efendant has not met its initial burden of demonstrating the absence of any genuine issue of material fact on its claim of mootness."). Defendants fall far short of satisfying their formidable burden.

In attempting to show that developments in the pandemic have mooted Plaintiffs' claims, Defendants point to "changes to CDC guidelines and CoreCivic's response, as well as the widespread availability of a vaccine and effective medication for treatment." Dkt. 191 at 16. However, general "widespread availability of a vaccine and effective medication for treatment" are of little help to the people detained at the CAFCC because serious failures in policies and practices by the Defendants have kept these medical advances from large numbers of class members.[4] COVID remains a serious risk, particularly to unvaccinated

---

[4] Defendants cite to *Martinez v. CoreCivic*, No. CV 20-1309 WJ/CG, 2021 WL 2550319 (D.N.M. June 22, 2021), where the court concluded "the mere availability of the vaccine at [the jail] also moots th[e] action." *Id.* at *7. However, that "lawsuit [was] premised entirely on COVID-19 exposure," *id.*, whereas Plaintiffs' claims are centered on abating the risk of serious harm from COVID, not just exposure to the virus. *See* Dkt. 1 at 21-23. Moreover, unlike in *Martinez*, here Defendants cannot show they have provided vaccines to class members in a timely and reliable manner and offered adequate vaccine education. In fact, the evidence conclusively shows that they have failed to do so. *Infra* at 16-21. Even so, Defendants' expert admits that "protection [from vaccines] varies based on the individual and a lot of other health parameters." Virgien Decl., Ex. 1 at 46:3-14. And this case involves a certified class with many members who are medically vulnerable and/or have disabilities, whereas many of the named petitioners in *Martinez* lacked any known risk factors. *See* 2021 WL 2550319 at *2–5. The other cases Defendants cite are similarly inapposite: of the four

people and people living in congregate settings.[5] Indeed, Defendant's motion states that, as of July 22, 2022, only "10%" of the people held at CAFCC for the U.S. Marshals Service "were fully vaccinated."[6] Dkt. 191 at 12 (citing Dkt. 192 at ¶ 317). This low rate flows directly from Defendants' flawed policies around vaccination. To date, Defendants have yet to indicate that they have administered a single treatment of Paxlovid or another COVID antiviral to any of the 1,782 people who tested positive (as of July 22, 2022) while held at CAFCC. *See* Declaration of Kyle Virgien ("Virgien Decl."), Ex. 1, June 30, 2022 Deposition Transcript of Owen Murray, D.O., at 29:1-15 ("my general sense was that they had not" prescribed any antivirals). Defendants' failures to make available the medical advances on which they base their mootness argument—combined with the other failures detailed above to take basic infection-prevention measures—mean that people detained at CAFCC continue to face a very real threat of serious illness and death. Defendants fail to offer any specific actions CAFCC has taken to show that class members' health risk is

---

cases, two concern compassionate release and one involves a motion for a reduced sentence that turn on facts specific to the petitioners-defendants, *see United States v. Hernandez-Moreno*, No. 2:14-CR-00197-RAJ, 2021 WL 3725652, at *4 (W.D. Wash. Aug. 23, 2021) (compassionate release); *United States v. Broadfield*, 5 F.4th 801 (7th Cir. 2021) (compassionate release); *United States v. Fordham*, No. 2:18-CR-00481-CW, 2021 WL 4627751, at *2 (D. Utah Oct. 7, 2021) (motion for reduced sentence), and one does not involve a correctional facility or detainees at all, *see Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 163 (4th Cir. 2021). None of these cases shed light on any changed circumstances to reduce the health risks class members in this case face.

[5] *See* U.S. Centers for Disease Control and Prevention, *COVID-19 Community Levels*, https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html (updated Mar. 24, 2022) (noting that "[p]eople who are up to date on vaccines have much lower risk of severe illness and death from COVID-19 compared with unvaccinated people" and "[h]igh-risk congregate settings may implement added prevention as needed in the event of a facility outbreak even if COVID-19 Community Levels in the surrounding community are low").

[6] Defendant's motion also asserts, without support, that the percentage of people who are vaccinated "may be higher" than this 10% figure because "there is no reliable way to confirm that new intake detainees who claim to be partially or fully vaccinated are so vaccinated." Dkt. 191 at 12. This elides the fact that it is indeed possible to confirm new intakes' vaccination status; but more significantly, such rank speculation and wishful thinking cannot support a showing of a rate higher than 10%—particularly at the summary judgment stage.

reduced to the extent that Plaintiffs' claims are no longer live.

Defendants also disregard the fact that some class members are medically vulnerable and/or have disabilities, with underlying conditions and risk factors which, according to the CDC, subject them to a heightened risk of serious illness or death. As a result, Defendants' contention that "the Omicron variant, which is currently the dominant variant in the United States, . . . generally causes less severe disease," Dkt. 191 at 16, and "cause[s] more mild disease," Dkt. 192 at 5, ¶ 27, is plainly irrelevant to the serious health risks these medically vulnerable class members face. It fails to consider that the Omicron variant and its highly transmissible subvariants, in fact, present a significant risk of causing severe disease or death among those who are medically vulnerable and unvaccinated. Venters Decl. at ¶¶ 14, 65; *see also* Dkt. 192 at 5, ¶ 27 (citing U.S. Centers for Disease Control and Prevention, *Omicron Variant What You Need to Know*, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (updated July 29, 2022) (stating "some people may still have severe disease, need hospitalization, and could die from the infection with [Omicron]").

Lastly, Defendants' assertion that the Plaintiffs "have either accepted the risk posed by COVID-19 (Peuplie) or reduced the risk to themselves (Ciercierski and Enos), and [that] the same is true of every other class member at CAFCC" Dkt. 191 at 17, is specious and misses the mark, as class members continue to experience unsafe and constitutionally inadequate COVID conditions at CAFCC that put them at continual risk of harm. More fundamentally, Defendants' argument ignores the extensive body of law that the relevant analysis is whether a prison or jail's condition exposes incarcerated people to a "substantial *risk* of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (emphasis added). "[I]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Brown v. Plata*, 563 U.S. 493, 531-32 (2011) ("Even prisoners with no present physical or mental illness may become afflicted, and all prisoners [] are at risk so long as the State continues to provide inadequate care. . . .

Prisoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in [the State's] medical care system. They are that system's next potential victims."); *Parsons v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013), *aff'd,* 754 F.3d 657 (9th Cir. 2014) ("When seeking only injunctive relief, a plaintiff need not wait until he suffers an actual injury because the constitutional injury *is* the exposure to the risk of harm") (emphasis in original).

Because Plaintiffs' claims are not moot due to the ongoing controversy between class members and Defendants, this Court retains jurisdiction to adjudicate this case and grant meaningful relief to Plaintiffs who continue to face serious health risks due to COVID.[7]

**B.      CAFCC's Dangerously Deficient COVID Response Raises Significant Triable Issues of Fact with Respect to Plaintiffs' Constitutional Claims.**

CAFCC has an admittedly low vaccination rate of just 10%, has ceased even basic protections like quarantines on intake, and has not provided a single dose of an antiviral medication despite hundreds of COVID infections. Ignoring these facts that dispute their rosy contentions, Defendants argue that this deeply flawed COVID response meets constitutional requirements.

Plaintiffs' constitutional claims arise under the Fifth Amendment.[8] The Court

---

[7] Defendants separately argue that Plaintiffs' request for declaratory relief is moot, and that even if it was not, "this Court should deny relief because it would not protect Defendant Kline against impending litigation or serve the public interest." Dkt. 191 at 18-19, 19 n.4. The Ninth Circuit has held that "where, as here, both injunctive and declaratory relief are sought but the request for injunctive relief is rendered moot, the case is not moot if declaratory relief would nevertheless provide meaningful relief." *Ctr. For Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007). Because neither type of requested relief is moot here, Plaintiffs remain entitled to all relief requested. Defendants misunderstand the purpose of a declaratory judgment: declaratory relief is available to any party as a remedy to establish the rights of the party, not just to serve the interests of Defendants. *See* 28 U.S.C § 2201(a); *see also Leivas v. United States*, No. C-92-3812-JPV, 1993 WL 128038, at *2 (N.D. Cal. Apr. 19, 1993) ("A case or controversy may exist for the purposes of declaratory relief when a party challenges a fixed or definite governmental policy.").

[8] While many cases cited relate to the Eighth Amendment standard for medical care for incarcerated people convicted of crimes, any condition that violates the Eighth Amendment standard also, a fortiori, violates the Fifth Amendment standard. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that "the due process rights

certified a pretrial class. Dkt. 69 at 27. A Fifth Amendment violation occurs when a defendant's conduct is "objectively unreasonable." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) The government has violated the Fifth Amendment if:

> (i) It made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the government did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved; and (iv) by not taking such measures, the government caused the plaintiff's injuries.

*Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (internal quotation, citation, and alterations omitted).[9] Notably, this standard does not require that the official have actually been aware of the level of risk—merely that they failed to meet the objective standard. *Gordon*, 888 F.3d at 1125, n.4.

> **1.    Defendants Made an Intentional Decision with Respect to the Conditions under which they Confine the Plaintiff Classes.**

Defendants baldly state that the "Plaintiffs have no evidence" to support the first element of the Fifth Amendment test (an intentional decision). Dkt. 191 at 21. But this element can be satisfied through a showing that either the defendant took an "affirmative act . . . knowingly and purposefully" or, when a claim involves "inaction rather than action," that the defendant's "conduct with respect to the plaintiff was intentional." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2015). "For example, if the claim relates to housing two individuals together, the inquiry at this step would be whether the placement decision was intentional." *Id.* "Or, if the claim relates to inadequate monitoring of the cell, the inquiry would be whether the officer chose the monitoring practices rather than, for

---

of a person [] are at least as great as the Eighth Amendment protections available to a convicted prisoner").

[9] The due process rights the federal government owes a person detained pre-trial under the Fifth Amendment are the same as those a state entity owes a person detained pre-trial under the Fourteenth Amendment. *See Roman*, 977 F.3d at 943 (applying the Fourteenth Amendment test from *Gordon*, 888 F.3d at 1124, to Fifth Amendment claims). This brief, like the Ninth Circuit's *Roman* opinion, uses Fourteenth Amendment and Fifth Amendment law interchangeably.

example, having just suffered an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell." *Id.* In this case, Defendants disprove this element only if their "inaction resulted from something totally unintentional." *Id*; *see also Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL-JFM, 2020 WL 2319980, at \*10 (D. Ariz. May 11, 2020) (explaining that when detention centers do not "implement responsive measures specific to high-risk detainees[,] . . . despite knowledge of the acute risks posed to them" by COVID, then they "have made an intentional decision").

Ample evidence shows that Defendants' actions and inactions with respect to COVID at CAFCC have been intentional. This Court has already found that the Plaintiffs' complaint "satisf[ied] the requirement that, to state a Fifth Amendment claim, Plaintiffs must allege that Defendants made intentional decisions respecting the conditions under which detainees are confined." Dkt. 89 at 25. The evidence confirms that CAFCC has intentionally chosen its COVID policies and practices. Defendants admit that CoreCivic was aware of "the COVID-19 outbreak" by "January 2020." Dkt. 192 at 7, ¶ 33. Defendants admits that the facility's Health Services Administrator has "devis[ed] and disseminat[ed] protocols based on CDC Guidelines, host[ed] and le[d] meetings with a facility multi-disciplinary team to manage COVID-19, [and] prepar[ed] and disseminat[ed] training information and materials to staff . . . ." *Id.* at 9, ¶ 46. Warden Kline, too, admits he "has remained in continual contact with USMS and other governmental partners to keep them updated on all protocols and procedures in place at CAFCC, to report on the status of facility operations and detainee health statistics, and to address any concerns or directives they may have regarding CAFCC operations." *Id.* at 8, ¶ 42. The Defendants have thus knowingly, intentionally implemented the facility's COVID policies and practices, and the flaws and shortcomings in those policies and practices represent intentional decisions not to protect the plaintiff classes. *Urdaneta*, 2020 WL 2319980, at \*10; *Roman*, 977 F.3d at 943 (holding that the Fifth Amendment was violated under the same test applicable here because "[t]he Government was aware of the risks these [COVID] conditions posed, especially in light of high-profile outbreaks at other carceral facilities that had already occurred at the time, and

yet had not remedied the conditions."). This case is even further analogous to *Urdaneta* because Defendants, like the *Urdaneta* respondents, specifically declined to provide protections for people with medical vulnerabilities to COVID. *Urdaneta*, 2020 WL 2319980, at *10; Virgien Decl., Ex. 2, Feb. 2, 2022 Deposition Transcript of Carrie Rose, at 135:9-17, 138:11-18 (explaining that CAFCC has stopped tracking who in its custody has a medical vulnerability and stopped protecting them with single cells in quarantine units).

The Federal Defendants further argue that, even if CAFCC made intentional decisions with respect to COVID, the Federal Defendants did not make any such intentional decision because they took a hands-off approach to managing the facility's pandemic response. Dkt. 187 at 7-8. This argument fails. The U.S. Marshals Service cannot shirk its duties to provide constitutionally compliant conditions simply by contracting out the detention and medical care of those in its custody. West v. Atkins, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."); Jensen v. Shinn, No. CV-12-00601-PHX-ROS, 2022 WL 2911496, at *60 n.36 (D. Ariz. June 30, 2022), amended, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022) ("Defendant Shinn, as ADCRR Director, is legally responsible for providing a constitutionally adequate health care system. . . . [W]hen Defendant Shinn believes his chosen vendor must provide health care in a different manner, he must enforce his rights under the vendor contract.") (citation omitted). The U.S. Marshals Service had the authority to ensure adequate COVID protections and failed to exercise that authority. The statutory authority under which the Federal Defendants contract with CAFCC mandates that CAFCC "shall . . . comply with any . . . regulations that the Marshals Service deems appropriate." 18 U.S.C. § 4013(c)(2)(E). CAFCC's then-warden testified that "the directives given to us from the U.S. Marshals Service, you know, we are required to follow." Virgien Decl., Ex. 3, Jan. 14, 2021 Deposition Transcript of Warden Brian Koehn, at 83:20-84:2; *see also id.*

-11-

at 84:22-85:2 ("Q. Are there any conditions when the U.S. Marshals Service or BOP cannot require CAFCC to perform certain practices related to COVID-19? . . .THE WITNESS: Not that I'm aware of."). Warden Kline admits in his Statement of Facts that he "has remained in continual contact with USMS and other governmental partners to keep them updated on all protocols and procedures in place at CAFCC, to report on the status of facility operations and detainee health statistics, and to address any concerns or directives they may have regarding CAFCC operations." Dkt. 192 at 8, Fact No. 42. In fact, before CAFCC changed its masking policy in May of 2022, Warden Kline admits that he first "sought and obtained USMS approval." *Id.* at 17, Fact No. 99. Chief Bayless of the U.S. Marshals Service similarly testified that "we provide the general guidelines based on what we talked about, the federal detention standards, and then [CAFCC employees] take that guidance, and they implement whatever it is that's being asked." Virgien Decl., Ex. 4, Nov. 15, 2021 Deposition Transcript of Chief Van Bayless, at 50:18-51:3. The Marshals Service decided not to use this authority to ensure meaningful protections. Instead, it simply "sent CDC guidance to the facilities that it contracts with" and audited CAFCC once in 2020. Dkt. 188 at 2, Fact Nos. 6, 9. The private contractor operating CAFCC has admitted that it considers the CDC guidance to be flexible: that it is "just that—guidance—[that] contains key caveats, such as that its recommendations may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Dkt. 191 at 24. The U.S. Marshals' decision to simply point its contractor to a CDC guidance document that the contractor planned to ignore represents an intentional determination to forgo its authority to order the measures necessary to protect the people in its custody. *See, e.g., Roman*, 977 F.3d at 946-47 (affirming an injunction in the same form Plaintiffs seek here on analogous Fifth Amendment COVID claims: relief against both the warden of a private facility contracted by ICE and against ICE employees in their official capacities).[10]

--------

[10] For the same reasons, the Federal Defendants also fail to show by undisputed fact that they had no "longstanding practice or custom." Dkt. 187 at 8-9. The Federal Defendants' determination that from March of 2020 through the present they would not exercise their

**2.      There are Fact Disputes Whether the Class Is at Substantial Risk.**

Defendants contend that undisputed facts show that the classes are not at "substantial risk of serious harm" from COVID. Dkt. 194 at 21.

The Supreme Court has long acknowledged that the risk of exposure to infectious diseases is a condition for which the Constitution requires a remedy, even if it "was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 33. This risk is borne by all people incarcerated at CAFCC. *Roman*, 977 F.3d at 944 ("The alleged due process violations exposed all Adelanto detainees to an unnecessary risk of harm, not only those who are uniquely vulnerable to COVID-19 . . . ."). This Court has already found that Plaintiffs "alleged serious health risks associated with the spread of COVID-19," permitting the inference that the deficiencies they alleged in CAFCC's COVID measures "have placed detainees at substantial risk of suffering serious harm." Dkt. 89 at 25 (citing *Roman*, 977 F.3d at 943)*. Defendants cannot meet their burden to show otherwise by undisputed facts. As explained in detail below, flaws in CAFCC's policies put class members at serious risk of harm. *See infra* at 16-27; *see also Urdaneta*, 2020 WL 2319980, at *9 (citing CDC guidance and finding that "individuals within detention facilities have a heightened risk of contracting and transmitting COVID-19, and individuals with certain underlying medical conditions face a high risk of severe illness or death if they contract COVID-19"). Defendants admit the tragic consequences of their flawed policies: two class member deaths over this time period have been directly attributed to COVID (with potentially others unaccounted for), along with five deaths of staff members. Dkt. 192 at 55, ¶ 312.

**3.      There are Fact Disputes Whether CAFCC's COVID Response Has Included Reasonable, Necessary, and Available Measures to Abate the Risk of Harm.**

Defendants contend that they have "taken extensive and objectively reasonable measures to protect detainees and abate the risks from COVID-19 at CAFCC." Dkt. 191 at

---

authority to ensure adequate conditions is a longstanding practice or custom, or at the very minimum, gives rise to a fact dispute as to the existence of such a practice or custom.

21. Defendants' argument on this point takes two parts.

First, Defendants argue that their COVID response is adequate because other courts considering claims under the Eighth Amendment "have held that similar measures in response to COVID-19 were constitutionally adequate." Dkt. 191 at 22-23 (citing several unpublished or out-of-circuit opinions). This argument is flawed. As an initial matter, the Eighth Amendment sets a higher bar than the Fifth Amendment does here. *E.g.*, Dkt. 89 at 27 (dismissing Plaintiffs' claims that Defendants' policies violate the Eighth Amendment but declining to dismiss Plaintiffs' claims that those same policies violate the Fifth Amendment). That an unpublished Ninth Circuit opinion, for example, found the California State prison system's COVID response not to constitute cruel and unusual punishment under the Eighth Amendment does not permit any conclusion whether that response would violate the Fifth Amendment—much less whether CAFCC's response violates the Fifth Amendment. Additionally, these opinions show that courts address constitutional claims involving COVID conditions not by making sweeping comparisons but by examining the reasonableness of particular measures based on the facts applicable to particular systems or facilities. For example, in the unpublished *Plata v. Newsom* decision, the court held that a district court order requiring all prison staff to be vaccinated for COVID was not warranted, because the prison system was not deliberately indifferent when it "requir[ed] only workers in healthcare settings, and not all prison workers (subject to exemptions), to be vaccinated" against COVID. No. 21-16696, 2022 WL 1210694, at *1 (9th Cir. Apr. 25, 2022) (unpublished). It reviewed a full factual record from the district court Receiver's determination and reached this holding "because the agency took significant action," including "enacting policies to encourage and facilitate staff . . . vaccination, requiring staff to wear personal protective equipment, and ensuring unvaccinated staff members regularly test for COVID." Id. These measures provided a backstop so that the staff vaccination policy reasonably excluded some staff members from the vaccination requirement. *Id.* Similarly, in *Valentine v. Collier*, the Fifth Circuit eventually resolved the case by reviewing a full trial record and finding the facility's response reasonable—for example, finding the

facility's lack of cleaning supplies not to require injunctive relief because the facility's installation of an "electrostatic sprayer was a reasonable response to the need to disinfect" units and obviated the need for access to cleaning supplies. 993 F.3d 270, 288 (5th Cir. 2021). But here, as Plaintiffs explain below, Defendants fall well short of proving through undisputed facts that the specific elements of their COVID response represent "reasonable available measures to abate th[e] risk" that COVID poses. *Roman*, 977 F.3d at 943.

Second, presumably in recognition that their response is actually ***not*** consistent with actions found sufficient by other courts, Defendants argue that they can prevail even if their COVID response "did not follow all CDC guidelines, was not perfect, or did not avert all harm." Dkt. 191 at 24. This argument, which focuses on what showing they ***do not*** need to make, does nothing to advance the showing that they ***do*** need to make: that they took the "reasonable, necessary, and available measures to abate the risk of harm" from COVID. *Urdaneta*, 2020 WL 2319980, at *10 (explaining that the respondents' deficient response to COVID was constitutionally defective even though the respondents "ha[d] taken some action in [the detention facility] to prevent and mitigate the spread of COVID-19" because they had failed to take the "reasonable, necessary, and available measures").[11]

Plaintiffs detail their numerous disputes with Defendants' contentions about their COVID response in their responses to Defendants' lengthy statement of facts. Plaintiffs' Response to Warden Kline's Statement of Facts at Resps. to Fact Nos. 14-320. In the interests of brevity, they do not retread those responses in their entirety here.[12] Below,

---

[11] Federal Defendants raise a separate argument that squarely conflicts with this argument that the facility permissibly diverges from CDC guidance. Those defendants argue that they "adhere to and follow guidance from the CDC in responding to COVID-19 at detention facilities housing USMS detainees" and thus should not be found to have violated the Fifth Amendment. Dkt. 187 at 8 (citing Dkt. 188 at 2, Fact No. 5). As explained below, CAFCC's COVID measures do not comply with CDC guidance, so the Federal Defendants' assertion is—at a minimum—subject to factual dispute. *Infra* at 16-27.

[12] For example, Warden Kline's Statement of Facts contends that "[c]lose contacts of [any] detainee who test[s] positive are also tested." *See* Plaintiffs' Responses to Warden Kline's Statement of Facts at Resp. to Fact No. 178. But the evidence shows that CAFCC actually does not test close contacts—a policy that violates CDC guidance and that Dr. Venters

Plaintiffs highlight several particularly relevant aspects of Defendants' COVID response to demonstrate that CAFCC falls well short of taking reasonably available measures:

**Vaccination:** Since COVID vaccines first became available, they have become a cornerstone of efforts to protect against the disease. Courts have found in the context of COVID and other infectious diseases that a failure to provide vaccines violates incarcerated people's constitutional rights. *E.g.*, *Maney v. Brown*, 516 F.Supp.3d 1161, 1185 (D. Or. 2021) (issuing preliminary injunction under the Eighth Amendment requiring people incarcerated in Oregon state prisons to receive higher priority for COVID vaccines); *cf. Patel v. Cnty. of Orange*, No. 817CV01954JLSDFM, 2019 WL 4238875, at *6 (C.D. Cal. June 19, 2019) (finding plaintiffs pled a claim based on a jail's failure to provide them with a vaccine against Hepatitis B). Defendants' expert agrees that "[v]accines should be part of a mitigation program that jails and prisons should be including." Virgien Decl., Ex. 1 at 48:8-14. Courts also find that incarcerated people are entitled "to receive sufficient information to exercise" their right to refuse medical care—here, to decide whether or not to be vaccinated—"intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citations omitted); *see also White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990) ("Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment."). Defendants' expert again agrees that "[e]ducation on vaccines is important. . . ." Virgien Decl., Ex. 1 at 48:15-19.

Just 10% of the people held at CAFCC are vaccinated. Dkt. 191 at 12 (citing Dkt. 192 at ¶ 317). According to Dr. Murray, as of his June 30, 2022 deposition, between 16% and 30% of the people held at CAFCC were vaccinated. Dr. Murray admitted that this rate was "low," Virgien Decl., Ex. 1 at 156:13-23, and it has only dropped since his deposition. Dr. Venters similarly opines that this rate is "low." Venters Dec., ¶ 43. This rate is far below

opines is dangerous. *Id.* This statement of facts contains related false statements that Defendants test people in quarantine units "upon request," test people before their release to the community, and "conduct contract tracing by interviewing persons who have tested positive . . . ." *Id.* at Nos. 183, 213, 223.

other, comparable rates. For example, the vaccination rate in the Arizona state prison system is over 80%. *ADCRR Vaccinates More than 80% of Its Inmate Population* (Oct. 27, 2021), https://corrections.az.gov/article/adcrr-vaccinates-more-80-its-inmate-population-0. Defendants claim that their COVID measures are "similar" to those another court found adequate in California's prison system, Dkt. 191 at 22, but that system, too, has a far higher vaccination rate of 81%. Virgien Decl. Ex. 5.[13]

This low vaccination rate flows directly from missteps in CAFCC's vaccination program. Dr. Venters explains that people at high risk from COVID should be prioritized for vaccination and given individual outreach appointments with medical staff. Venters Decl., ¶ 45. This is because high-risk people experience the greatest protective effect and tend to have the most questions about interactions between the vaccine and other medications or conditions. *Id.* at ¶ 48. The California prison system, a system that defendants point to as taking "similar" measures, Dkt. 191 at 22, makes targeted offers and reoffers of the vaccine and has experienced much higher rates of acceptance—66.5% acceptance overall within the first 10 weeks the vaccine was available, with 46% acceptance among people who initially declined vaccination and were then reoffered vaccination. Chin, et al., *COVID-19 Vaccine Acceptance in California State Prisons*, New England J. of Medicine (May 12, 2021). Dr. Venters similarly notes that after the BOP adopted this strategy of targeted outreach at its Lompoc facility, "many high-risk unvaccinated people were able to obtain answers to their questions [specific to their medical conditions or medications] and became vaccinated." Venters Decl., ¶ 48. CAFCC does not even track who within the facility is at high risk or affirmatively reach out to anyone who has not yet been vaccinated, much less provide this targeted outreach. Virgien Decl., Ex. 2 at 135:9-17. CAFCC's only policy for identifying immunocompromised people—who the CDC recommends should receive additional vaccine boosters compared to the general

---

[13] The other prisons and prison systems to which Defendants point as comparisons, *see* Dkt. 191 at 22-23, noticeably do not publish comparable vaccination rates.

population[14]—is to hope "that person might be on the medical director's radar" and then would somehow be flagged for the Clinic Supervisor, Ms. Rose. *Id.* at 151:13-152:21 (also noting that only one immunocompromised person had ever been identified for an additional dose as of February 2, 2022). Ms. Jaramillo, Complex Health Services Administrator at CAFCC, testified that CAFCC has no policy requiring vaccinations be provided within a specific timeframe after a detainee's request. Virgien Decl., Ex. 6, Feb. 4, 2022 Deposition Transcript of Kristyn Jaramillo, at 41:11-42:2.

CAFCC also fails to undertake adequate efforts to educate people in its custody about the COVID vaccine, despite clear CDC guidance that it should do so. Virgien Decl., Ex. 7, Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, at 8 ("Promote COVID-19 vaccination by educating staff and residents on the effectiveness, safety, and importance of vaccines."). Defendants make a handful of references in their moving papers to "vaccine manufacturer fact sheets." Dkt. 192-2 at 57, ¶ 56; *see also* Dkt. 191 at 10. It is unclear from these moving papers whether this fact sheet is in fact distributed to all class members, since those moving papers state it is distributed at "town hall" meetings, which have been discontinued. Dkt. 192-2 at 57, ¶ 56; *see also id.* at 11, ¶ 50 (stating town hall meetings have been discontinued).[15] But even assuming it is distributed (which is certainly not supported by undisputed facts), it is severely deficient. The fact sheet that Defendants attached to their moving papers for the Moderna vaccine (the primary vaccine they administer) states that "[t]he Moderna COVID-

[14] *See* U.S. Centers for Disease Control and Prevention, *COVID-19 Vaccine Boosters*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html?s_cid=11710:covid%20booster%20immunocompromised:sem.ga:p:RG:GM:gen:PTN.Grants:FY22 (updated July 20, 2022) (stating that adults ages 50 years and older and moderately or severely immunocompromised individuals are recommended to receive 2 boosters as opposed to everyone else ages 5 years and older who are recommended to receive 1 booster).

[15] Defendants' Statement of Facts also claims that unspecified "educat[ion] . . . about vaccinations" takes place during intake, but the declaration on which Defendants rely makes no mention of any educational efforts on intake. *Compare* Dkt. 192 at 24, Fact No. 145 (citing Dkt. 192-2 at 59, ¶ 77) *with* Dkt. 192-2 at 59, ¶ 77.

19 Vaccine is an unapproved vaccine" and that "[t]here is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19"—dangerous falsehoods likely to decrease acceptance. Dkt. 192-2 at 77-78. It also contains just three lines of lukewarm statements about the vaccine's benefits, followed by a full page of warnings and instructions about negative reactions (including several that are unhelpful in a carceral setting such as recommendations to call 911 or use a smartphone app to report side effects). *Id.* at 78-79. CAFCC's refusal to use appropriate educational materials that would increase vaccine uptake is a significant failure that has contributed to its low vaccination rates. Venters Decl. at ¶ 56.d.[16]

CAFCC and its expert point to its "town hall" meetings about vaccination as the core protection it is providing to ensure that class members have adequate access to vaccines and information about them. Dkt. 191 at 10 ("Through town hall meetings, written information, vaccine clinics, and counseling, CAFCC is making every reasonable and positive effort to change the dynamic on vaccination within the detainee population."); Dkt. 192-3 at 21, ¶ 83 (Dr. Murray including the same quotation in his declaration); Plaintiffs' Response to Defendant Kline's Statement of Facts at Resps. to Fact Nos. 246, 247, 250, 258, 259, 268, 283-86 (correcting Defendants' repeated misstatements that town hall meetings are currently occurring).[17] But CAFCC and Dr. Murray are wrong that these monthly town hall

---

[16] For example, a team at the University of California at San Francisco that focuses on correctional health prepared a fact sheet in collaboration with formerly incarcerated people, which clearly sets out answers to questions commonly asked by incarcerated people, available at https://amend.us/wp-content/uploads/2021/11/COVID-Vax-info-for-residents_2021_11_11_Final.pdf. CAFCC could use this fact sheet.

[17] Defendants also point to materials that Ms. Rose claims "are placed throughout the facility, including the medical and housing units." Dkt. 192-2 at 56, ¶ 52; *see also id.* at 62-65 (the materials Ms. Rose claims are posted). These materials provide no meaningful education. They consist of a fact sheet and a poster titled "Here's the Scoop," but there is a significant dispute whether the fact sheet is actually placed in areas accessible to people incarcerated in the facility. Ms. Rose's declaration states that the fact sheet was placed in those areas, but this conflicts with her deposition testimony stating was "not aware" whether the fact sheet was placed there. Virgien Decl., Ex. 2 at 179:7-180:11. Photographs produced on February 28, 2022 (after the close of fact discovery) reveal that the only document posted in housing units is the "Here's the Scoop" poster. Virgien Decl., Ex. 8, CORECIVIC-

-19-

meetings are occurring. Despite Defendants' reliance on town hall meetings in its arguments, Defendant Kline admits that "[s]ince [February 8, 2022], no further [town hall] 'vaccination events' have been scheduled to occur." Dkt. 192-2 at 11, ¶ 50; *see also* Dkt. 191 at 9 (explaining that "town hall meetings" were held "initially," and that CAFCC has transitioned to a procedure not involving town hall meetings "[s]ince then"). Dr. Murray does not even attempt any opinion that CAFCC's decision to discontinue these town hall meetings was reasonable. Dkt. 192-3 at 21, ¶ 83. Nor can he—he admits that they are a "reasonable and positive effort" for CAFCC to make, so CAFCC's decision to discontinue them represents a determination not to make use of a reasonably available, helpful method to increase vaccine uptake. Defendants' failure to take this reasonably available measure—particularly in the face of their abysmal 10% vaccination rate—violates the Fifth Amendment.

Defendants' policies about booster doses are even worse. Just 256 boosters have been administered to people incarcerated at the facility, a minuscule fraction of the "44,703 USMS detainees [who] have cycled through CAFCC" over the pendency of this litigation and a small fraction even when compared against the woefully small group of 2,785 people who have received their initial dose at CAFCC. Dkt. 192 at ¶¶ 309, 315. The deficiencies identified above in vaccine availability and education have also contributed to this low rate of booster uptake, but it has been further depressed by failures specific to booster doses. CAFCC will not administer a booster shot unless a someone specifically requests one. Virgien Decl., Ex. 2 at 154:5-18. For example, even if a person's responses to the intake questionnaire indicate that they are eligible to receive a booster, medical staff do not inform them of this eligibility and will not place them in the queue to receive a booster unless they specifically ask. Virgien Decl., Ex. 6 at 104:13-20; Virgien Decl., Ex. 9, Nov. 9, 2021 Deposition Transcript of Warden Kris Kline, at 37:3-7. CAFCC does not include any

---

MLG003592-624. The "Here's the Scoop" poster that is accessible to incarcerated people contains only logistical information about how find and when to receive the vaccine—not any educational information about the vaccine itself. Dkt. 192-2 at 64-65.

notation or reminder in its electronic medical records system of the date someone is eligible for a booster. Virgien Decl., Ex. 2 at 154:5-18, Ex. 1 at 153:3-5, 13-15. This is so even though Dr. Murray admits that electronic health record systems are capable of both notations and reminders for follow-up appointments. *E.g.*, Virgien Decl., Ex. 1 at 44:8-18 (admitting that, in the Texas state system that he runs, when people become eligible for their annual TB test, "the patient is going to be notified and brought to the place where the testing is going to occur"). Dr. Murray attempts to excuse this failure by taking the "opinion . . . that it's reasonable to shift the responsibility for scheduling boosters from CAFCC to the people detained there." *Id.* at 184:4-7. This opinion is wrong: incarcerated people generally lack access to their medical records, so it is unreasonable to expect them to remember when they were last vaccinated and to know when to request a booster. Venters Decl. at ¶ 53.[18] For this reason, it is part of long-established carceral medical practices to notify people when they are eligible for procedures, including vaccines such as pneumovax and shingles that are available only to certain people. *Id.* CAFCC's decision not to take this available measure that is a common part of correctional medical practice is far from reasonable, and conflicts with specific CDC guidance. Virgien Decl., Ex. 7 at 6 ("Continue to provide and encourage up to date COVID-19 vaccination for staff members and residents (including boosters, as well as additional doses for people with weakened immune systems and for others who are eligible for additional doses).").

**Intake Cohort Units and Defendants' Failure to Implement Enhanced COVID Prevention Standards:** In certain circumstances, the CDC recommends a quarantine process for new intakes to the facility. In times of increased risk (such as when community transmission levels are medium or high), the facility should implement "enhanced prevention strategies," including keeping people recently admitted to the facility in "routine

---

[18] Defendants cite a "Here's the Scoop" flyer as providing information about boosters. Dkt. 191 at 11. But that document contained incorrect information about the timeframe for the Moderna booster until Plaintiffs' counsel pointed the error out to Ms. Rose at deposition, and it still lacks any information about boosters for people who received a Pfizer initial course outside of the facility. Virgien Decl., Ex. 2 at 188:3-190:5; Dkt. 192-2 at 64-65.

observation" for a period of time before they are allowed to enter general population. Virgien Decl., Ex. 7 at 6-7; *see also* Dkt. 192-3 at 15, ¶ 67 (admitting that a "routine observation period" is required under enhanced prevention operations). As with quarantine, this intake isolation "ideally" takes place "individually," but can be conducted in "small cohorts" of people housed together. *Id.* 14-15. CAFCC refers to this process as "intake cohorting." *E.g.*, Dkt. 191 at 6. This process helps to prevent people entering the facility with a COVID case from spreading it to the general population. It is a crucial COVID protection, which is why it is one of the two protections that Defendants' expert asked about in the conversation he had with CAFCC staff on June 29, 2022, the day before his deposition. Virgien Decl., Ex. 1 at 80:8-16.

When Defendants' expert asked CAFCC staff on June 29, they informed him that the facility was performing intake cohorting for a time period of eight days. *Id.* at 77:20-24. In his declaration attached to Defendants' motion, Dr. Murray states that he was "mistaken[]" at his deposition when he testified that CAFCC was conducting this intake cohorting. Dkt. 192-3 at 17 n.1. His declaration is completely silent about CAFCC's actual intake cohorting policies. Defendants' motion explains that CAFCC has entirely stopped conducting intake cohorting as of June 1, 2022. Dkt. 191 at 6 ("[E]ffective June 1, 2022, CAFCC is no longer required to cohort new intake USMS detainees for any period of time"). Tellingly, Dr. Murray does not attempt to justify this decision to stop this important protective measure. Dr. Venters explains that it is inappropriate. Venters Decl. at ¶ 81. The unrebutted expert record thus shows that CAFCC's decision to cease using the available measure of intake cohorting is irresponsible and unsafe. The entirety of the case law before the Court is in accord. Each of the court orders that Defendants cite as approving "similar" measures also addressed a system that conducted intake cohorting. Dkt. 191 at 22; Cal. Correctional Health Care Servs., *COVID-19 Screening and Testing Matrix for Patient Movement* at 2, https://cchcs.ca.gov/wp-content/uploads/sites/60/COVID19/Appendix13-PatientMovement.pdf (explaining that the California prison system "[q]uarantine[s] all new arrivals for a minimum of 10 days"); *Wilson v. Williams*, 961 F.3d 829, 834 (6th Cir. 2020)

(basing its finding that the BOP's efforts complied with the constitution in part on a policy "requir[ing] asymptomatic arrivals to be placed in quarantine for fourteen days"); *Valentine v. Collier*, 455 F. Supp. 3d 308, 325 (S.D. Tex. 2020) (noting the Texas state prison system's policy of "routine intake quarantine for all new intakes for 14 days"); Louisiana Dep't of Public Safety & Corrs., *Summary of COVID-19 Response 4/9/20* at 1, https://doc.louisiana.gov/wp-content/uploads/2020/04/DOC-Summary-of-COVID-19-Response-for-WEBSITE.pdf ("Each intake is screened and assessed for symptoms, and then quarantined for 14 days before being placed in general population.").

Defendants are also wrong that CAFCC's decision to discontinue intake cohorting is "consistent with CDC guidelines." Dkt. 191 at 21-22. CDC guidance explains that intake cohorting (termed a "routine observation period") is an enhanced prevention strategy that should be implemented when any of five community and facility factors point to increased risk. Virgien Decl., Ex. 7 at 4-5; *see also* Plaintiffs' Response to Defendant Kline's Statement of Facts at Resp. to Fact No. 149.

***First***, the CDC guidance cautions that enhanced protections must be taken when the county "COVID-19 Community Level is medium or high." Virgien Decl., Ex. 7 at 5. Pinal County's level was medium as recently as one month ago, and CAFCC did not implement intake cohorting. Stephanie Innes, *COVID-19 weekly update: Arizona case numbers decline; 81 new deaths reported* Arizona Republic (Aug. 17, 2022), https://www.azcentral.com/story/news/local/arizona-health/2022/08/17/arizona-weekly-covid-19-update-adds-12-244-cases-81-deaths/10330465002/; *see also* Venters Decl., ¶ 29.

***Second***, the 10% vaccination rate is very low and further requires enhanced measures. Virgien Decl., Ex. 7 at 4 ("Facilities that do not have high up to date vaccination coverage should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low."); Venters Decl., ¶ 30; Virgien Decl., Ex. 1 at 70:11-17 ("Q. . . . [T]he vaccination rate amongst people incarcerated at CAFCC should be an important input into the facility's determination whether to add or remove enhanced prevention strategies? A. Yeah. I think it's – it's one of the inputs into that decision making.

-23-

I would agree with that.").

***Third***, the CDC guidance explains that "any new case of COVID-19 in a staff member or resident in a correctional or detention facility should prompt . . . testing of persons identified as close contacts," and that "if one or more additional cases are identified" as a result of this testing, "[f]acilities should shift to enhanced prevention strategies." *Id.* CAFCC does not report its current COVID rates, but Defendants admit that 1,782 people detained there have tested positive between April, 2020, and July, 2022—up 450 from the 1,332 positive cases Dr. Murray reported on April 20, 2022. Dkt. 192 at 55, ¶¶ 310, 313. This rate—averaging over two new cases each day over the pendency of this litigation and over 4 cases per day in April-July of this year—suggests a high degree of internal spread. *See* Venters Decl. at ¶ 31.

***Fourth***, CAFCC's refusal to identify who is at high risk and inability to provide therapeutic medications to people detained in the facility additionally requires enhanced protections. *See Id.* at ¶ 32. CDC guidance states that facilities should "[d]etermine whether the facility's residents or staff are more likely to get very sick from COVID-19" and "consider applying enhanced prevention strategies even when the COVID-19 Community Level is low if they are unable to" either "administer COVID-19 therapeutics on-site" or "ensure timely access to care outside the facility." Virgien Decl., Ex. 7 at 4; Virgien Decl., Ex. 1 at 74:5-9 (agreeing that "part of what CAFCC is supposed to be doing . . . under the CDC guidance is determining what portion of its residents have risk factors for severe complications from COVID"). CAFCC used to keep a list of all people held at the facility with risk factors, which it used to provide them with increased protections. Virgien Decl., Ex. 2 at 138:11-18 (describing providing people at high risk with individual cells when quarantined). CAFCC has stopped tracking who is at high risk and providing them with protections. *Id.* at 135:9-17, 138:11-18. And, as described below, CAFCC does not stock therapeutic medications and has not provided a single dose of those medications. *See infra* at 25-27.

***Fifth***, CAFCC's frequent population turnover also requires enhanced protections.

Virgien Decl., Ex. 7 at 4 (explaining that facilities with "frequent population turnover" "may consider applying some enhanced prevention strategies, even when the COVID-19 Community Level is low"). Both experts agree that turnover at CAFCC is "frequent." Venters Decl. at ¶ 33; Virgien Decl., Ex 1 at 184:23-185:6 (admitting the turnover is "fairly frequent").

In fact, Defendants admit that they are currently required to put another enhanced protection, universal masking, into place. Under this CDC guidance, universal masking and routine observation periods are both "enhanced COVID-19 prevention strategies" that should be put into place unless the community and facility factors all indicate that it is safe to discontinue them. Virgien Decl., Ex. 7 at 3, 5; *see also* Dkt. 192-2 at 5, ¶ 22. CAFCC decided on May 9, 2022 that these factors supported ceasing universal masking. Dkt. 192-2 at 6, ¶ 24. Although that decision was incorrect, CAFCC later—correctly—reversed course on June 30, 2022 and "returned to mandatory masking because of increases in community and facility transmission consistent with [CDC] guidance." *Id.* at 6, ¶ 25. At that point, those same concerns about community and facility transmission should have caused CAFCC to also implement the other enhanced protections, including intake cohorting. Venters Decl. at ¶ 81. CAFCC's failure to do so recklessly declined to make use of this important, available protective measure.

**Paxlovid and Other Antiviral Medications:** Another key protection against the harmful effects of COVID is antiviral medication including Paxlovid. The CDC guidance states that facilities should prescribe Paxlovid and other antivirals in accordance with the guidance of the National Institutes of Health (NIH) on COVID treatment. Virgien Decl., Ex. 7 at 15. Dr. Murray takes the same opinion, testifying that the NIH guidelines for COVID treatment set out "a standard of practice" that should guide medical providers' decisions in prescribing antiviral treatments. Virgien Decl., Ex. 1 at 165:11-24. The NIH guidance, in turn, recommends that everyone with a CDC risk factor (such as age or high blood pressure) who tests positive for COVID within five days of symptom onset be evaluated for Paxlovid, so long as their disease is not serious enough to require

hospitalization or supplemental oxygen, which would trigger a different evaluation. Virgien Decl., Ex. 10, NIH, Coronavirus Disease 2019 (COVID-19) Treatment Guidelines, at 56. Dr. Murray agrees that "[i]f someone at CAFCC tests positive for COVID within five days of symptom onset[,] does not require hospitalization or supplemental oxygen[,] and has a CDC risk factor, then they should be evaluated for Paxlovid." Virgien Decl., Ex. 1 at 172:12-18; *see also* Venters Decl., ¶ 71. When, as is the case for many people incarcerated at CAFCC who have tested positive, an antiviral medication is available and clinically indicated, the constitution requires that the antiviral medication be provided. *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 WL 4361639, at *20 (S.D. Ind. Sept. 13, 2018); *Chimenti v. Wetzel*, No. 15-3333, 2018 WL 3388305, at *9 (E.D. Pa. Jul. 12, 2018). This is particularly true in the case of COVID because antiviral medications are such an important tool to fight the serious health consequences of the virus. In fact, they are so important that the drugs' availability was one of the two questions Dr. Murray asked CAFCC staff the day before his deposition and is one of the factors the CDC has enumerated to determine whether facilities can safely relax their COVID protections. Virgien Decl., Ex. 1 at 80:8-16, Ex. 7 at 4.

CAFCC has fallen well short of its duty to obtain and prescribe Paxlovid and other antiviral medications. At this point in the pandemic, these drugs are widely available. Other facilities in Arizona have had these medications on hand and available to prescribe for months. Virgien Decl., Ex. 1 at 141:6-9 (admitting that at least one jail in Arizona had antiviral medications against COVID on site by March 18, 2022). However, Defendant claims that "CAFCC does not keep [Paxlovid or other antivirals] in stock at the facility" "[b]ecause these medications are available through local pharmacies." Dkt. 191 at 10; *see also* Virgien Decl., Ex. 1 at 27:19-28:5 (admitting that "CAFCC was planning on[,] should the need arise to prescribe oral antivirals against COVID to people in the facility[,] of going to a local Walgreens or CVS and acquiring the oral antivirals from there"). Defendants' excuse for not stocking Paxlovid and other antivirals does not hold water: CAFCC stocks many other medications on hand, even though they are also available at local pharmacies.

As a result of this decision not to stock any COVID antivirals, CAFCC has failed to prescribe even a single dose of Paxlovid or Molnupiravir, despite hundreds of positive COVID cases during the time period over which these medications have been available. *Id.* at 29:8-10 (testifying his "general sense was that they had not" prescribed any Paxlovid or other antiviral medication at CAFCC); Dkt. 191 at 23 (admitting there were 706 positive COVID cases in 2022). CAFCC's argument that it can go to the local CVS or Walgreen's to obtain Paxlovid or Molnupiravir is not a justification—it is a flimsy excuse for CAFCC's decision against taking the straightforward, available step of stocking and providing these crucial medications.

### 4. Evidence Shows that Flaws in Defendants' COVID Response Result in a Sufficiently Imminent Danger to the Plaintiff Class.

Defendants state baldly that "Plaintiffs have no evidence that . . . Plaintiffs were injured as a result of [CoreCivic's] actions." Dkt. 191 at 21. Defendants are wrong: ample evidence satisfies the relevant inquiry. A plaintiff seeking injunctive relief "need only prove a sufficiently imminent danger" to satisfy this element of the Fifth Amendment test, "because a remedy for unsafe conditions need not await a tragic event." *Roman*, 977 F.3d at 943 (citing *Helling*, 509 U.S. at 33-34 ) (quotation marks omitted); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); *Brown,* 563 U.S. at 531-32 ("Even prisoners with no present physical or mental illness may become afflicted and all prisoners [] are at risk so long as the State continues to provide inadequate care. . . . Prisoners who are not sick . . . [are] in no sense [] remote bystanders in [the prison's] medical care system. They are that system's next potential victims."); *Commonwealth of Pennsylvania v. State of West Virginia*, 262 U.S. 553, 593 (1923), *aff'd sub nom. Com. of Pennsylvania v. State of W. Virginia*, 263 U.S. 350 (1923) (holding that a party "does not have to await the consummation of threatened injury to obtain preventive relief"). As explained above,

Defendants' actions place the people they detain in significant, imminent danger. *See supra* at 16-27.

Defendants do not seriously dispute that the Plaintiff class faces a **risk** of imminent harm sufficient to support prospective injunctive relief. Instead, they mistakenly frame their argument as though this case involves an amalgamation of individual damages claims that require a showing of an injury to a particular, individual "Plaintiff[]." Dkt. 191 at 21 (mistakenly framing the inquiry as whether "Plaintiffs were injured"). This framing "continues to misconstrue the foundation upon which this case was certified and the governing legal standard controlling it." *Parsons v. Ryan*, No. CV-12-00601-PHX-NVW, 2014 WL 3887867, at *2 (D. Ariz. Aug. 7, 2014). In a class action seeking prospective injunctive relief, "inmates need not wait until a constitutional harm occurs to seek injunctive relief." *Id.* "For this fundamental reason, establishing that no Named Plaintiff has a viable claim for damages stemming from their own medical treatment does not end the Court's inquiry." *Id.*; *see also Jensen v. Shinn*, No. CV-12-00601-PHX-ROS, 2022 WL 2911496, at *65 (D. Ariz. June 30, 2022) ("Defendants seem to believe this litigation consists of determining whether the medical care provided to the named plaintiffs was constitutional. But this case raises the question of whether Defendants' policies and practices create a substantial risk of harm to all prisoners.").

### C.   Defendants Do Not Carry Their Burden on Their Affirmative Defense of Exhaustion.

Defendants also contend that the Court should grant summary judgment against Plaintiffs' claims based on the exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *See* Dkt. 191 at 19.[19] Failure to exhaust is an affirmative defense, and Defendant carries the burden of proof. *Jones v. Bock*, 549 U.S. 199, 204

---

[19] Courts have discretion to waive compliance with the exhaustion process when administrative remedies would be inadequate, futile, or pursuit of them would cause irreparable injury. *Aleknagik Natives, Ltd. v. Andrus*, 648 F.2d 496, 499 (9th Cir. 1980); *Liang v. Ashcroft*, 370 F.3d 994, 1001-01 (9th Cir. 2004); *see also Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017).

-28-

(2007). On summary judgment, Defendant must first produce evidence that there was an unexhausted administrative remedy available. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (*en banc*). If Defendant meets this burden of production, then "the prisoner has the burden . . . to come forward with evidence showing there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable" but, "as required by *Jones*, the ultimate burden of proof remains with the defendant." *Id.* And Defendant must show that each class representative failed to exhaust these administrative remedies. As in all cases involving summary judgment, all factual inferences must be made in favor of the non-moving party. *Id.*

The PLRA "does not require exhaustion when circumstances render administrative remedies 'effectively unavailable.'" *Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010) (citation omitted); *see also Ross v. Blake*, 578 U.S. 632, 643 (2016) (holding that the PLRA only requires exhaustion of remedies that are "capable of use to obtain relief"); 42 U.S.C. § 1997e(a) (requiring exhaustion only of "administrative remedies [that] are available"). Defendant attempts to meet its burden by pointing to its written policy that outlines a grievance process. Dkt. 191 at 13-14. That a grievance process is "officially on the books," however, does not meet Defendant's burden of production to show it is in practice "capable of use to obtain relief." *Ross*, 578 U.S. at 643. The evidence shows serious flaws in Defendants' grievance system that rendered relief unavailable.

To briefly explain the process, Defendants argue that detainees may either utilize an "informal" resolution process or instead file a formal grievance. Dkt. 191 at 14. Defendants' policy, however, emphasizes Defendants' preference for the informal system by stating that "[m]any matters [including facility conditions, treatment, and policies and procedures] can and should be resolved directly and promptly between the detainee and institutional staff." Dkt. 16-8 at 15 (CORECIVIC-MLG000009), CoreCivic SOF at ¶ 341 ("Detainees are encouraged to informally resolve their issue with the appropriate staff prior to filing a grievance."). In the alternative, Defendant suggests that emergency grievances are available where there is risk of personal injury by complying with the regular time requirements

(which could take up to 27 days from the time of incident assuming Defendant complies with the stated time requirements (*see* Dkt. 16-8 at 16 (CORECIVIC-MLG000010))). Dkt. 191 at 14. But in fact, the emergency grievance procedure sets out no time limits by which Defendant is expected to respond. *See* Dkt. 16-18 at 16 (CORECIVIC-MLG000010).

There is no possibility of relief through the administrative process where Defendant lacks a meaningful emergency grievance procedure. "Delay in responding to a grievance, particularly a time-sensitive one, may demonstrate that no administrative process is in fact available." *Brown v. Valoff*, 422 F.3d 926, 943 n.18 (9th Cir. 2005). When "a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) (citations omitted); *id.* at 1174 ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust."). No matter the title Defendant puts on it, if Defendant lacks an expedited grievance procedure for responding to emergencies (which it does), that demonstrates that an administrative remedy is unavailable. *McPherson v. Lamont*, 457 F. Supp. 3d 67, 81 (D. Conn. 2020) (holding that administrative remedies were unavailable because the correctional facility lacked an emergency grievance process to quickly address COVID related complaints).

Defendants have failed to meet their burden to produce evidence that their exhaustion procedures were available because the grievance procedures provide for no meaningful emergency relief and would have denied the named plaintiffs any relief through the grievance process for (at least) up to 27 days during the rapid and dangerous spread of COVID in the Spring of 2020. *See* Dkt. 16-8 at 16 (setting out a process for the formal grievance, but not the emergency grievance, that will take at least 27 days). These procedures do not require expedited action, outline the steps Defendants will take to address emergency grievances, or place CAFCC staff under any deadline to resolve emergencies.

In other words, to the extent Defendants offer up an "emergency procedure," it is in name only. Basically, Defendants' policies lack any semblance of a substantive emergency protocol. At most, they offer up the vague assertion that "the Detainee may request that the grievance be considered an emergency grievance." *Id.* But this policy offers no assurance that staff will respect such request when a grievance requires relief in less than the 27-day timeframe of a standard grievance. Lastly, and most tellingly, Defendants offer neither recourse for a person detained at CAFCC to challenge the determination of whether a grievance is an emergency, nor deadlines or steps for resolving the emergency. Defendants' failure to produce any evidence showing they could provide emergency relief for the urgent circumstances the named plaintiffs faced in the early days of the pandemic further show that they have failed to support their affirmative defense as to all named plaintiffs.[20]

Further, "despite what regulations or guidance materials may promise," Defendants' grievance process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643; *see, e.g., Beltran- Ojeda v. Doe*, No. CV 12-1287-PHX-DGC, 2013 WL 6059242, at *6 (D. Ariz. Nov. 18, 2013) (finding that a jail's grievance procedure was unavailable partly because "jail officials did not abide by their own internal regulations"). Defendants argue that named plaintiffs did not exhaust their administrative remedies by pointing to a cursory search of their internal Grievance Log and showing named plaintiffs did not each submit an informal

[20] Defendants argue that the COVID pandemic does not excuse the failure to exhaust. Dkt. 191 at 20 (citing *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020); *United States v. Otero*, No. 17CR879-JAH, 2020 WL 1912216, at *3 (S.D. Cal. Apr. 20, 2020)). However, although those non-binding opinions found no blanket exception to the exhaustion requirement exists for COVID, they are irrelevant here, where the specific facts of the grievance process at the facility showed that it was unavailable to provide relief during the COVID emergency in June of 2020. In *Valentine*, all parties agreed that the Texas prison's administrative process was open for some plaintiffs' use, and the plaintiffs did not argue that the facility was incapable of providing some (albeit inadequate) relief. *See Valentine*, 956 F.3d at 804. *Otero* did not address the exhaustion requirement under the PLRA at all, instead turning on a textual interpretation of a different exhaustion requirement under the CARES Act. 2020 WL 1912216, at *2 (examining the exhaustion language set out in 18 U.S.C. § 3852(c)(1)(A)).

-31-

resolution, formal grievance, emergency grievance and appeal. Dkt. 191 at 14. Defendants' argument assumes each and every grievance is properly filed in its Grievance Log. Ms. Peuplie, Mr. Enos, and Mr. Ciecierski meanwhile each state they have filed grievances—grievances that were never recorded in Defendants' log. *See* Dkt. 1-7 ¶ 14, 1-8 ¶22, 1-8 ¶10. Further, Ms. Peuplie and Mr. Ciecierski state that grievance forms are frequently unavailable. Dkt. 1-7 ¶14, 1-8 ¶10. There is thus—at a minimum—a significant fact dispute whether Defendants even offered the bare process they claimed to make available. This unavailability of any relief means that Defendants have failed to show their grievance system was "available," and their affirmative defense fails as to all named plaintiffs. 42 U.S.C. § 1997e(a).

Defendants have failed to support their affirmative defense by meeting their burden of production of evidence that their supposed grievance process was "capable of use to obtain relief." *Ross*, 578 U.S. at 643. The Court should reject their exhaustion defense.

**I.     CONCLUSION**

Defendants' motion for summary judgment should be denied.

Dated:  September 19, 2022

**PERKINS COIE LLP**

By: /s/ *Kyle Virgien*

Jean-Jacques Cabou (#022835)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
Benjamin C. Calleros (#034763)
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Emma Andersson*
eandersson@aclu.org
Alejandro Ortiz*
ortiza@aclu.org
Aditi Shah*
ashah@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Fl.
New York, New York 10004
Telephone:  917-345-1742

Somil Trivedi*
strivedi@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, DC  20012
Telephone:  202-715-0802

Corene Kendrick*
ckendrick@aclu.org
Kyle Virgien*
kvirgien@aclu.org
39 Drumm Street
San Francisco, CA 94111
Telephone:  202-393-4930

Jared G. Keenan (#027068)
jkeenan@acluaz.org
AMERICAN CIVIL LIBERTIES
UNION
FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2022, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| GARY M. RESTAINO United States Attorney District of Arizona WILLIAM C. STAES Assistant U.S. Attorney Illinois State Bar No. 6314835 40 North Central Avenue, Suite 1800 Phoenix, Arizona 85004-4449 Telephone: (602) 514-7500 Email: William.Staes@usdoj.gov Attorneys for the Federal Defendants | Emma A. Andersson Mark Carter Alejandro Agustin Ortiz ACLU-New York, NY 125 Broad St., 18th Fl. New York, NY 10004 Email: eandersson@aclu.org Email: mcarter@aclu.org Email: ortiza@aclu.org |
| Christine Keeyeh Wee Jared G. Keenan ACLU-Phoenix, AZ P.O. Box 17148 Phoenix, AZ 85011 Email: cwee@acluaz.org Email: jkeenan@acluaz.org | Corene T. Kendrick David Cyrus Fathi ACLU-Washington, DC 915 15th St. NW, 7th Fl. Washington, DC 2005 ckendrick@aclu.org dfathi@aclu.org |
| Kyle Virgien ACLU-San Francisco, CA 39 Drumm St. San Francisco, CA 94111 kvirgien@aclu.org Attorneys for Plaintiffs | Somil Bharat Trivedi ACLU-Washington, DC 915 15th St. NW, 7th Fl. Washington, DC 20005 Email: strivedi@aclu.org Attorneys for Plaintiffs |

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Jacob B. Lee, Bar No. 030371
STRUCK LOVE BOJANOWSKI&
ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com
Attorneys for Respondent Kline

/s/ *Allison L. Miller*
Allison L. Miller