# EXHIBIT A

1  Jean-Jacques Cabou (#022835)
2  Thomas D. Ryerson (#028073)
   Matthew R. Koerner (#035018)
3  Margo R. Casselman (#034963)
   **PERKINS COIE LLP**
4  2901 North Central Avenue, Suite 2000
5  Phoenix, Arizona 85012-2788
   Telephone:  602-351-8000
6  Facsimile:  602-648-7000
7  JCabou@perkinscoie.com
   TRyerson@perkinscoie.com
8  MKoerner@perkinscoie.com
   MCasselman@perkinscoie.com
9  DocketPHX@perkinscoie.com

10 *Attorneys for Plaintiffs*
11 *(additional counsel identified on signature page)*

12            **IN THE UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF ARIZONA**

14

15 | Claudia Romero-Lorenzo; Tracy Ann Peuplie;  | No. CV-20-0901-PHX-DJH (DMF)
16 | James Tyler Ciecierski; and Marvin Lee Enos;
   | each individually and on behalf of all others
17 | similarly situated,

18              Plaintiffs,                      **PLAINTIFFS' [PROPOSED]**
                                                 **SUPPLEMENTAL**
19 v.                                            **INTERROGATORIES**

20 Brian Koehn, Warden of the Central Arizona
21 Florence Correctional Complex; Van Bayless,
   Acting U.S. Marshal for the District of Arizona;
22 Donald W. Washington, Director of the U.S.
   Marshals Service; Colette Peters, Director of
23 the Federal Bureau of Prisons, in their official
24 capacities,

25              Defendants.

26

27

28

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Rule of Civil Procedure 33.1, Plaintiffs Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Cieciersky, and Marvin Lee Enos, each individually and on behalf of all others similarly situated, request that Defendants Kris Kline, Warden of the Central Arizona Florence Correctional Complex; Van Bayless, Acting U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; and Colette Peters, Director of the Federal Bureau of Prisons, in their official capacities provide written responses to the following interrogatories ("Interrogatories") separately and fully, in writing and under oath, and serve a copy thereof on Plaintiffs' counsel. Each of the Interrogatories are to be read in accordance with the definitions and instructions that follow.

## DEFINITIONS

1.    "And" and "or" shall be construed either conjunctively or disjunctively, whichever makes the request more inclusive.

2.    "Any" and "each" should be understood to include and encompass "all."

3.     "CAFCC" means CoreCivic, Inc.'s Central Arizona Florence Correctional Complex.

4.    "COVID-19" refers to the respiratory disease caused by SARS-CoV-2, a new coronavirus discovered in 2019, as defined by the Centers for Disease Control and Prevention at https://www.cdc.gov/dotw/covid-19/index.html.

5.    "COVID-19 Antiviral Medication" refers to any of the following medications: Paxlovid (ritonavir-boosted nirmatrelvir), Veklury (remdesivir), and Lagevrio (molnupiravir).

6.    "Course" refers to a series of Doses of a COVID-19 Antiviral Medication. For example, a series of 10 Doses of ritonavir and nirmatrelvir taken over 5 days could constitute a "Course" of Paxlovid (ritonavir-boosted nirmatrelvir); a series of a three Doses of Veklury (remdesivir) administered over three days could constitute a "Course" of Veklury (remdesivir); and a series of 10 Doses of Lagevrio (molnupiravir) taken over 5

days could constitute a "Course" of Lagevrio (molnupiravir).

7.      "Detainee" means any person held in U.S. Marshals Service custody at CAFCC for any extent of time between February 12, 2022 and the date of Defendants' response to these Interrogatories.

8.      "Dose" refers to a single administration of a COVID-19 Antiviral Medication. For example, two 150 mg nirmatrelvir tablets and one 100 mg ritonavir tablet taken at the same time could constitute a "Dose" of Paxlovid (ritonavir-boosted nirmatrelvir); 200 mg or 100 mg of Veklury (remdesivir) administered in a given day could constitute a "Dose" of Veklury (remdesivir); and four 200 mg capsules of Lagevrio (molnupiravir) taken at the same time could constitute a "Dose" of Lagevrio (molnupiravir).

9.      "Include" or "Including" are to be read as followed by the phrase "without limitation" so as to acquire the broadest meaning possible.

10.     "You," "Your," and "Defendants" means Defendants Kris Kline, Van Bayless, Donald W. Washington, and Colette Peters, in their official capacities, and each person acting on their behalf, Including employees, staff, agents, representatives, contractors, sub-contractors, investigators, attorneys, and business associates.

## INSTRUCTIONS

1.      In answering these Interrogatories, You must furnish all information known or available to You, regardless of whether this information is possessed directly by You or Your agents, employees, representatives, and/or investigators.

2.      Each of Your answers must be as complete and straightforward as the information reasonably available to You permits. If an Interrogatory cannot be answered completely, answer it to the extent possible.

3.      If You do not have enough personal knowledge to fully answer an Interrogatory, say so, but make a reasonable and good faith effort to get the information by asking other persons or organizations, unless the information is equally available to Plaintiffs.

4.      Each Interrogatory seeks all responsive information to the fullest extent provided for in the Federal Rules of Civil Procedure and shall be interpreted so as to make each Interrogatory inclusive rather than exclusive.

5.      Whenever any Interrogatory may be answered by referring to a document, the document may be attached as an exhibit to the response and referred to in the response. If the document has more than one page, refer to the page and section where the answer to the Interrogatory can be found.

6.      Unless otherwise specified, the time period applicable to these Interrogatories is February 11, 2021, to the date of Defendants' response.

## SUPPLEMENTAL INTERROGATORIES

**Supplemental Interrogatory No. 1**

Identify, by date and quantity ordered, all orders that have been placed by CAFCC for COVID-19 Antiviral Medication, from February 12, 2022 through the response date.

**Supplemental Interrogatory No. 2**

Identify, by date, name of person offered medication, and BOP register number of person offered medication, all offers of COVID-19 Antiviral Medication that have been made by CAFCC medical staff to people detained in US Marshals Service custody at CAFCC, from February 12, 2022 through the response date.

**Supplemental Interrogatory No. 3**

Identify, by date, name of person prescribed medication, and BOP register number of person prescribed medication, all prescriptions of COVID-19 Antiviral Medication that have been made by CAFCC medical staff for people detained in US Marshals Service custody at CAFCC, from February 12, 2022 through the response date.

**Supplemental Interrogatory No. 4**

Identify, by date, name of person who took a dose, and BOP register number of person who took a dose, all Doses of COVID-19 Antiviral Medication dispensed to people detained in

US Marshals Service custody at CAFCC, from February 12, 2022 through the response date.

**Supplemental Interrogatory No. 5**

Identify the number of Courses of COVID-19 Antiviral Medication that CAFCC has on site and available to prescribe to people in US Marshals Service custody, current as of the response date.

Dated:  August 4, 2023

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

By:  /s/ Kyle Virgien
Corene Kendrick*
ckendrick@alcu.org
Kyle Virgien*
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm St.
San Francisco, CA 94111
Telephone: 202-393-4930

Emma Andersson*
eandersson@aclu.org
Alejandro Ortiz*
ortiza@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Fl.
New York, New York 10004
Telephone:  917-345-1742

David Fathi**
dfathi@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC  20005
Telephone:  202-393-4930

Jared G. Keenan (#027068)
jkeenan@acluaz.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014

Jean-Jacques Cabou (#022835)
Thomas D. Ryerson (#028073)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*
** Admitted *pro hac vice*; not admitted in DC;
practice limited to federal courts.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

Jean-Jacques Cabou (#022835)
Thomas D. Ryerson (#028073)
Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone:  602-351-8000
Facsimile:  602-648-7000
JCabou@perkinscoie.com
TRyerson@perkinscoie.com
MKoerner@perkinscoie.com
MCasselman@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Plaintiffs*
*(additional counsel identified on signature page)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Claudia Romero-Lorenzo; Tracy Ann Peuplie; James Tyler Ciecierski; and Marvin Lee Enos; each individually and on behalf of all others similarly situated, | No. CV-20-0901-PHX-DJH (DMF) |
| Plaintiffs, | **PLAINTIFFS' [PROPOSED] SUPPLEMENTAL REQUEST FOR PRODUCTION** |
| v. | |
| Brian Koehn, Warden of the Central Arizona Florence Correctional Complex; Van Bayless, Acting U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; Colette Peters, Director of the Federal Bureau of Prisons, in their official capacities, | |
| Defendants. | |

Pursuant to Federal Rules of Civil Procedure 26 and 34 and Local Rule of Civil Procedure 34.1, Plaintiffs, each individually and on behalf of all others similarly situated, request that Defendants Kris Kline, Warden of the Central Arizona Florence Correctional Complex; Van Bayless, Acting U.S. Marshal for the District of Arizona; Donald W. Washington, Director of the U.S. Marshals Service; and Colette Peters, Director of the Federal Bureau of Prisons, in their official capacities, within 30 days of service, provide written responses to the following requests for production ("Requests") separately and fully, in writing and under oath, and serve a copy thereof on Plaintiffs' counsel. The responsive documents shall be produced to Perkins Coie LLP, 2901 North Central Avenue, Suite 2000, Phoenix, Arizona 85012. Each of the Requests are to be read in accordance with the definitions and instructions that follow.

## **DEFINITIONS**

1.    "And" and "or" shall be construed either conjunctively or disjunctively, whichever makes the request more inclusive.

2.    "Any" and "each" should be understood to include and encompass "all."

3.    "CAFCC" means CoreCivic, Inc.'s Central Arizona Florence Correctional Complex.

4.    "COVID-19" refers to the respiratory disease caused by SARS-CoV-2, a new coronavirus discovered in 2019, as defined by the Centers for Disease Control and Prevention at https://www.cdc.gov/dotw/covid-19/index.html.

5.    "COVID-19 Antiviral Medication" refers to any of the following medications: Paxlovid (ritonavir-boosted nirmatrelvir), Veklury (remdesivir), and Lagevrio (molnupiravir).

6.    "Detainee" means any person not presently serving a sentence who has been held in U.S. Marshals Service custody at CAFCC for any extent of time between February 12, 2022 and the date of Defendants' response to these Interrogatories.

7.    "Document" is used in the broadest possible sense to include all forms of recorded information, including without limitation computer accessible information (specifically including email and instant messages), the original and all drafts of written, graphic, audio, or video matter however stored, produced, or reproduced, of any kind or description, including correspondence, notes, email, calendar entries, telexes, facsimile transmissions, telecopies, photographs, recordings in any medium of oral communication, telephone and message logs, notes or memoranda relating to written or oral communication, whether or not sent or received, and all copies or versions thereof that are different in any way from the original.

8.    "Include" or "Including" are to be read as followed by the phrase "without limitation" so as to acquire the broadest meaning possible.

9.    "Risk Factor" means any of the medical conditions identified at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

10.    "Staff" means all employees, contractors, or affiliates of or associated with CAFCC.

11.    "You," "Your," and "Defendants" means Defendants Kris Kline, Van Bayless, Donald W. Washington, and Colette Peters, in their official capacities, and each person acting on their behalf, Including employees, staff, agents, representatives, contractors, sub-contractors, investigators, attorneys, and business associates.

## INSTRUCTIONS

1.    These Requests call for the production of all responsive Documents in Your possession, custody, or control.

2.    With respect to each responsive Document that was at one time in existence but is no longer in existence, please state and specify for each Document (a) the type of Document (such as whether it is a letter, memorandum, email, computer database, etc.); (b) the types of information contained therein; (c) the date upon which it ceased to exist; (d)

the circumstances under which it ceased to exist; (e) the identity of all persons having knowledge of the circumstances under which it ceased to exist; and (f) the identity of all persons having knowledge or who had knowledge of the contents thereof.

3.      If any otherwise responsive Document was, but is no longer in existence or in Your possession, custody, or control, identify its current or last known custodian, the location/address of such Document, and describe in full the circumstances surrounding its disposition from Your possession or control. Without limiting the generality of the foregoing, (a) in the event a text message (SMS or MMS) or iMessage that would be responsive to this request is no longer available, please identify the telephone number to or from which it was sent, and the name of the carrier for that telephone number at the time the text was sent or received, (b) in the event an app- and/or web-based direct- and/or instant-message that would be responsive to this request is no longer available, please identify the username, employee identification, IP address, and/or telephone number to or from which it was sent, and the name of the web- and/or app-based host and/or telephone carrier at the time the app- and/or web-based direct- and/or instant-message was sent or received.

4.      If You seek to withhold any responsive Document based on some limitation of discovery (including, without limitation, any claim of privilege or confidentiality), You must supply a list of the Documents withheld and state separately for each such Document: (i) the identity of each and every author, writer, or sender and the organization with which that person was then affiliated; (ii) the identity of each and every recipient or addressee and the organization with which that person was then affiliated; (iii) the date of creation or transmittal indicated on the Document, or an estimate of that date, indicated as such, if no date appears on the Document; (iv) a description of the general subject matter of the Document; and (v) the claimed grounds for limitation of discovery (e.g., "attorney-client privilege"). With respect to any Document that is withheld on the grounds of attorney-client privilege or work product protection, You should include the abbreviation "Esq." after the

name of any person listed as an author, sender, or recipient of the Document who was a practicing attorney and was acting in that capacity at the time he or she authored, sent, or received the Document.

5.      If You contend that a portion of a responsive Document contains information that is immune from discovery, then You shall produce the Document with the immune portion redacted therefrom and describe the redacted portion in a privilege log pursuant to the instructions in Instruction 4 above.

6.      Electronically Stored Information ("ESI") shall be produced in a form ready to load to an electronic discovery platform: as either native files or in single-page Tagged Image File Format (.TIFF) files along with image load files (.OPT) and multi-page searchable text (.TXT) files. Single-page TIFF images should be named according to a unique and sequential Bates number. The image load files should indicate page breaks, and each TIFF in a production must be referenced in the corresponding image load file. During the process of converting ESI from the electronic format of the application in which the ESI is normally created, viewed and/or modified to TIFF, metadata values should be extracted and produced in a load file ("metadata load file"). To the extent they are available, the metadata values that are to be extracted and produced in the metadata load files are: (a) for emails, email subject, author, recipient, CC, BCC, received date, received time, sent date, sent time; (b) for electronic files, file name, author created date, created time, modified time, and extension; (c) for all ESI, custodian or source, original path, and MD5 Hash; and (d) for documents that contained an attachment, production number begin, production number end, production attachment range number begin, production attachment range number end, attachment name, and production doc page count. Files that are not easily converted to image format, such as spreadsheet, presentation, audio and video, database, and drawing files, should be produced in native format. If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing text stating the document has been produced in native format should also be provided. Each such native file should be

named for its Bates number with its original file extension, and should be linked directly to its corresponding record in the load file using the NativeFileLink field.

7.     Unless otherwise specified, the time period applicable to these Requests is February 11, 2021, to the date of Defendants' response.

**SUPPLEMENTAL REQUESTS**

**Supplemental Request No. 1**

For all Detainees who have tested positive for COVID while detained in US Marshals Service custody at CAFCC during the six-month period preceding the response date and who are over 50 years old or have a Risk Factor, all medical records dated from the day they received this positive test through 10 days after they received this positive test.

1  Dated:  August 4, 2023

2

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

3  By:  /s/ Kyle Virgien

Corene Kendrick*
4  ckendrick@aclu.org
Kyle Virgien*
5  kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION
39 Drumm St.
7  San Francisco, CA 94111
Telephone: 202-393-4930

8

Emma Andersson*
9  eandersson@aclu.org
Alejandro Ortiz*
10  ortiza@aclu.org
AMERICAN CIVIL LIBERTIES UNION
11  FOUNDATION
125 Broad St., 18th Fl.
12  New York, New York 10004
Telephone:  917-345-1742

13

David Fathi**
14  dfathi@aclu.org
AMERICAN CIVIL LIBERTIES UNION
15  FOUNDATION
915 15th St., NW
16  Washington, DC  20005
Telephone:  202-393-4930

17

Jared G. Keenan (#027068)
18  jkeenan@acluaz.org
AMERICAN CIVIL LIBERTIES UNION
19  FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
20  Phoenix, AZ 85014

21  Jean-Jacques Cabou (#022835)
Thomas D. Ryerson (#028073)
22  Matthew R. Koerner (#035018)
Margo R. Casselman (#034963)
23  PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
24  Phoenix, Arizona 85012-2788

25

*Attorneys for Plaintiffs*
26  *Admitted *pro hac vice**
** Admitted *pro hac vice*; not admitted in DC;
27  practice limited to federal courts.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

**Kyle Virgien**

| | |
|---|---|
| **From:** | Kyle Virgien |
| **Sent:** | Thursday, August 3, 2023 8:02 PM |
| **To:** | Staes, William (USAAZ); Jacob Lee; Dan Struck |
| **Cc:** | Lucero Gonzalez Team; Jared Keenan; Cabou, Jean-Jacques (J) (PHX); Ryerson, Thomas D. (PHX); Treadaway, David (MSN); Margo  Casselman; Koerner, Matthew (PHX); Branch, Katherine (USAAZ); Corene Kendrick |
| **Subject:** | RE: Romero - Limited Pre-Trial Discovery |

Jacob and Bill,

Thank you for providing your positions. We'll file a motion with the court setting out the areas where the parties were able to reach agreement and the areas where the defendants oppose our request.

As I mentioned on the phone when we met and conferred, we are willing to consider revisions to our Supplemental RFP in order to address Defendants' concerns about burden. Both of your emails this afternoon cited burden for this Supplemental RFP, so we are willing to narrow the RFP in the following ways to address these concerns: 1. We are willing to narrow the definition of "Detainee" to specify that it applies only to people held pretrial. 2. We are willing to narrow the date range of the medical records requested so that it includes only the medical records dated from the day the Detainee received their positive test through 10 days after they received this positive test. 3. We are willing to narrow the time range of the request so that it seeks medical records only for Detainees who tested positive in the six months preceding the date of the Defendants' response.

If this narrowed version of our Supplemental RFP is acceptable to you, please let us know by 4 pm tomorrow. Otherwise we will indicate in our motion that you oppose our request as to this Supplemental RFP.

**Kyle Virgien** | he/him | 310.801.3459

**From:** Staes, William (USAAZ) <William.Staes@usdoj.gov>
**Sent:** Thursday, August 3, 2023 3:44 PM
**To:** Jacob Lee <JLee@strucklove.com>; Kyle Virgien <kvirgien@aclu.org>; Dan Struck <DStruck@strucklove.com>
**Cc:** Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

**This Message Is From an External Sender**
This message came from outside your organization.

Kyle,

Federal Defendants agree to supplement responses to RFP Nos. 1, 4, 8, and 13 and Interrogatory Nos. 1, 2, 4, 5, 9, and 10. We agree to respond to Plaintiffs' Supplemental Interrogatory Nos. 1-5. We object to responding to Plaintiffs' supplemental RFP for largely the same reasons CoreCivic has summarized, including the burden that collecting and producing medical records for responsive detainees from February 2022 through present (over 1.5 years), and we object

to Plaintiffs' proposal of three additional fact witness depositions. We also have considered and now object to Plaintiffs' proposal of submitting supplemental expert reports, using the supplemental reports as written direct exam testimony, and doing supplemental expert depositions.

Best,

Bill

William C. Staes
Assistant U.S. Attorney
U.S. Attorney's Office – District of Arizona
40 N. Central Ave, Suite 1800
Phoenix, Arizona 85004
Phone: (602) 514-7659
Mobile: (480) 645-5248
William.Staes@usdoj.gov

CONFIDENTIALITY NOTICE:  This email may contain confidential, legally privileged information intended only for the named recipient.  If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited.  If you have received this email in error, please contact the sender immediately and delete this message.

**From:** Jacob Lee <JLee@strucklove.com>
**Sent:** Thursday, August 3, 2023 3:16 PM
**To:** Kyle Virgien <kvirgien@aclu.org>; Staes, William (USAAZ) <WStaes@usa.doj.gov>; Dan Struck <DStruck@strucklove.com>
**Cc:** Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <KBranch@usa.doj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** [EXTERNAL] RE: Romero - Limited Pre-Trial Discovery

Kyle,

To follow up, we've agreed to supplement CoreCivic's responses to RFPs 1, 4, 8, and 13 and ROGs 1, 2, 4, 5, 9, and 10. One thing that didn't come up the other day, though, is that our agreement to supplement our responses to these requests extends only to those topics that remain at issue (i.e., the 3 topics on which the Court denied our MSJ). Thus, for example, in supplementing our response to RFP 4, which seeks documents related to USMS approval of "any policy or protocol related to COVID-19 or Vaccination at CAFCC," we'll be supplementing our response with any new information pertaining to the 3 topics still at issue, rather than as to every COVID-19 policy or procedure that has been in place at CAFCC from the time of our last response to the present. Hopefully this is not a controversial proposition.

We also agreed to respond to Plaintiffs' Supplemental ROGs 1-5, for which we stated we'll need 30 days to respond. Because there is currently a dispute as to Plaintiffs' proposed Supplemental RFP, we consider the 30-day clock to start running from the date the Court resolves that issue so that if the Court orders us to respond to the RFP as well, our responses to all written discovery will be due at the same time. We also consider the 30-day window for our supplemental responses to the RFPs and ROGs listed above to start at the same time.

As you requested, we have given additional thought to your Supplemental RFP, including the reasons you gave for it during our call. Our position, however, remains unchanged—we have agreed to respond to the Supplemental ROGs because antivirals had just recently become available as of the time we filed our MSJ, such that there had not been (and

couldn't have been) any discovery as to antivirals. Medical treatment offered to detainees, however, has always been at issue. Plaintiffs have contended from the beginning of the litigation that detainees with identified risk factors need closer monitoring and treatment. Plaintiffs, however, never requested any medical files of detainees, even though we see no reason they couldn't have done so. Additionally, as we stated during the call, we consider the RFP to be overbroad and burdensome, as the wording of the request would include all USMS detainees, and only the pretrial detainees have claims (the Court certified the convicted but not yet sentenced class and then dismissed their claims on our Motion to Dismiss). Also, the time period requested is from the initial positive through 14 days after the first negative test, but the facility has never done additional tests and based treatment decisions off of a negative test, as people can test negative for months after they're no longer symptomatic or contagious, such that the request is actually seeking all medical records of responsive detainees from February 2022 to the present.

We also objected to the additional fact witness depositions, supplemental expert reports (including that the reports be the experts' direct exam testimony at trial), and supplemental expert depositions, and we maintain those objections.

Jacob

---

**From:** Kyle Virgien <kvirgien@aclu.org>
**Sent:** Wednesday, August 2, 2023 8:16 AM
**To:** Jacob Lee <JLee@strucklove.com>; Staes, William (USAAZ) <William.Staes@usdoj.gov>; Dan Struck <DStruck@strucklove.com>
**Cc:** Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

Jacob and Bill,

Thanks for meeting and conferring yesterday. Below is a summary of the parties' positions that we discussed on the call. Please let me know if I've incorrectly captured anything.

As we mentioned on the call, we're happy to discuss further on the phone, we'll look out for the defendants' positions by email this Thursday, 8/3 on the items that remain outstanding. All defendants agreed that, if there are remaining issues, the appropriate way to address them is to raise them to the court by a motion by the plaintiffs.

### Supplementation of Existing Discovery Requests

All defendants request the time period for supplementation of existing discovery responses to be 30 days. Subject to this modification of the timing of the plaintiffs' proposed approach, all defendants agree to supplement RFP Nos. 1, 4, 8, and 13, and Rog Nos. 1, 2, 4, 5, 9, and 10. All defendants also agree to the clarifications I included in my email below about the definitions of terms used in those requests.

### Reopened Discovery

All defendants request the time period for responses to supplemental discovery requests to be 30 days. Subject to this modification of the timing of the plaintiffs' proposed approach and to any objections they may assert, all defendants agree to provide substantive responses to all five supplemental interrogatories attached to my email below within 30 days. If the defendants' interrogatory responses cite documents, all defendants will make every effort to produce those documents within 30 days as well. All defendants will attempt to determine by this Thursday, 8/3, whether they can provide more definite assurances that they will be able to produce these documents within 30 days. All defendants initially disagreed with the need to respond to the supplemental RFP attached to my email below, but after some discussion of the Plaintiffs' reasons for making this request, the defendants agreed to consider further and let us know their positions by this Thursday, 8/3.

All defendants object to the plaintiffs' proposal of three fact depositions.

The CoreCivic defendants object to the plaintiffs' proposal of supplemental expert reports that can be used as written direct testimony at trial, and to the plaintiffs' proposal of expert depositions. The federal defendants will provide their position on these two issues by this Thursday, 8/3.

**Kyle Virgien** | he/him | 310.801.3459

**From:** Jacob Lee <JLee@strucklove.com>
**Sent:** Monday, July 31, 2023 1:41 PM
**To:** Staes, William (USAAZ) <William.Staes@usdoj.gov>; Kyle Virgien <kvirgien@aclu.org>; Dan Struck <DStruck@strucklove.com>
**Cc:** Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

Same for me. Thanks.

**From:** Staes, William (USAAZ) <William.Staes@usdoj.gov>
**Sent:** Monday, July 31, 2023 9:02 AM
**To:** Kyle Virgien <kvirgien@aclu.org>; Dan Struck <DStruck@strucklove.com>
**Cc:** Jacob Lee <JLee@strucklove.com>; Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

Sure. I'd prefer afternoon. But any time after 10:00 AM Arizona time works.

Bill

William C. Staes
Assistant U.S. Attorney
U.S. Attorney's Office – District of Arizona
40 N. Central Ave, Suite 1800
Phoenix, Arizona 85004
Phone: (602) 514-7659
Mobile: (480) 645-5248
William.Staes@usdoj.gov

*CONFIDENTIALITY NOTICE: This email may contain confidential, legally privileged information intended only for the named recipient. If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited. If you have received this email in error, please contact the sender immediately and delete this message.*

**From:** Kyle Virgien <kvirgien@aclu.org>
**Sent:** Monday, July 31, 2023 8:04 AM
**To:** Staes, William (USAAZ) <WStaes@usa.doj.gov>; Dan Struck <DStruck@strucklove.com>
**Cc:** Jacob Lee <JLee@strucklove.com>; Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <KBranch@usa.doj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** [EXTERNAL] RE: Romero - Limited Pre-Trial Discovery

Dan and Bill,

I'm following up on my email below. Can you please let us know some times that work for you to meet and confer by telephone tomorrow?

Thank you.

**Kyle Virgien** | he/him | 310.801.3459

---

**From:** Kyle Virgien
**Sent:** Thursday, July 27, 2023 3:50 PM
**To:** Staes, William (USAAZ) <William.Staes@usdoj.gov>; Dan Struck <DStruck@strucklove.com>
**Cc:** Jacob Lee <JLee@strucklove.com>; Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <JKeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

Dan and Bill,

Thanks for informing us of these scheduling issues. We had told the Court that we would file a motion, if necessary, tomorrow. In order to update the Court, we'll file something shortly explaining that we'll confer with you next Tuesday and will file a motion, if necessary, promptly afterward.

In the meantime, can you please let us know times that work for you to meet and confer by telephone next Tuesday (August 1)?

Thank you.

**Kyle Virgien** | he/him | 310.801.3459

**From:** Staes, William (USAAZ) <William.Staes@usdoj.gov>
**Sent:** Thursday, July 27, 2023 9:18 AM
**To:** Dan Struck <DStruck@strucklove.com>; Kyle Virgien <kvirgien@aclu.org>
**Cc:** Jacob Lee <JLee@strucklove.com>; Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Branch, Katherine (USAAZ) <Katherine.Branch@usdoj.gov>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** RE: Romero - Limited Pre-Trial Discovery

Kyle,

I'm in the same boat. I won't be able to look at this or talk with the Marshals until next week due to witness prep in an upcoming trial in another matter. I can say that your timeline isn't possible for me either given my schedule. I will get back to you by next Tuesday. If we can all agree not to rush things, since there's no trial date yet in our case, I'm hopeful we can figure something out.

Bill

William C. Staes
Assistant U.S. Attorney
U.S. Attorney's Office – District of Arizona
40 N. Central Ave, Suite 1800
Phoenix, Arizona 85004
Phone: (602) 514-7659
Mobile: (480) 645-5248
William.Staes@usdoj.gov

*CONFIDENTIALITY NOTICE: This email may contain confidential, legally privileged information intended only for the named recipient. If you are not the intended recipient, note that disclosure, copying, distribution or taking any action in reliance on the contents of this information, except its delivery to the intended recipient, is strictly prohibited. If you have received this email in error, please contact the sender immediately and delete this message.*

**From:** Dan Struck <DStruck@strucklove.com>
**Sent:** Wednesday, July 26, 2023 8:03 PM
**To:** Kyle Virgien <kvirgien@aclu.org>
**Cc:** Jacob Lee <JLee@strucklove.com>; Staes, William (USAAZ) <WStaes@usa.doj.gov>; Lucero Gonzalez Team <LuceroGonzalezTeam@strucklove.com>; Jared Keenan <jkeenan@acluaz.org>; Cabou, Jean-Jacques (J) (PHX) <JCabou@perkinscoie.com>; Ryerson, Thomas D. (PHX) <TRyerson@perkinscoie.com>; Treadaway, David (MSN) <DTreadaway@perkinscoie.com>; Margo Casselman <MCasselman@perkinscoie.com>; Koerner, Matthew (PHX) <MKoerner@perkinscoie.com>; Corene Kendrick <ckendrick@aclu.org>
**Subject:** [EXTERNAL] Re: Romero - Limited Pre-Trial Discovery

Kyle,

We aren't going to be able to look at this until next week, as we are in the midst of pretrial filings in another matter. I will tell you that your time line isn't possible, due to other matters that are more pressing than a case in which we don't even have a trial date. We also don't believe depositions are necessary.
We will get back to you by next Tuesday.

Dan Struck.

Sent from my iPhone

> On Jul 26, 2023, at 6:28 PM, Kyle Virgien <kvirgien@aclu.org> wrote:

> Jacob and Bill,

As we mentioned in the notice of readiness that we filed on Monday, the Romero case seeks prospective injunctive and declaratory relief, but discovery ended over a year ago. Therefore limited discovery, for the purpose of ensuring that Plaintiffs understand the most recent conditions as they exist at the relevant facilities, is necessary to ensure a fair and efficient trial. Below, Plaintiffs provide their proposal for a targeted, efficient approach to this limited discovery. We plan to seek this limited discovery by motion on Friday if the parties cannot come to an agreement by the end of the day tomorrow. To that end, please let us know a time tomorrow when you are available to meet and confer about this proposal.

Plaintiffs propose this limited discovery take two parts. First, Defendants will supplement discovery as required by Rule 26(e). Rather than requiring full supplementation of the entire discovery record, Plaintiffs are amenable to a proposal where Defendants need only supplement a targeted subset of the discovery requests: RFP Nos. 1, 4, 8, 13, and Interrogatory Nos. 1, 2, 4, 5, 9, and 10.

By way of clarification, Plaintiffs note that the terms "Vaccine," "Vaccines," "Vaccination," "Vaccinate," "Vaccinated," and "Vaccinating" as used in these RFPs and Interrogatories encompass both initial doses and booster doses of COVID-19 vaccines. Similarly, the term "Fully Vaccinated" presently refers to a person who has received the initial dose or course of the vaccine and who is not currently eligible to receive a booster dose (i.e., someone who received an initial dose or course, and also received any booster shot for which they are currently eligible).

Second, Plaintiffs propose a targeted reopening of discovery. This reopening of discovery will involve five Supplemental Interrogatories and a single Supplemental RFP, all of which are attached. Plaintiffs propose that Defendants' responses and production be due on August 11. Plaintiffs also propose three additional depositions, of Carrie Rose, Kristyn Jaramillo, and Kris Kline, to be limited to four hours of on-the-record time and to be completed by August 25. Plaintiffs then propose that Homer Venters and Owen Murray submit supplemental expert reports, which will also serve as the experts' written direct testimony at trial, by September 8. Finally, Plaintiffs propose expert depositions, also to be limited to four hours of on-the-record time, to be completed by September 15.

**Kyle Virgien**
Pronouns: he/him

Senior Staff Attorney
National Prison Project
American Civil Liberties Union Foundation
39 Drumm St., San Francisco, CA 94111
310.801.3459 | kvirgien@aclu.org

---

This electronic mail transmission contains information from the law firm Struck Love Bojanowski & Acedo, PLC that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise

specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Richard Pratt, et al., | |
| Defendants. | |

In February 2015, the Court accepted the parties' "Stipulation" as a fair, reasonable, adequate settlement under Federal Rule of Civil Procedure 23(e)(2). The Stipulation contemplated a specific period of monitoring and possible enforcement. Over the past six years, Defendants have consistently failed to meet many of the Stipulation's critical benchmarks. Beyond these failures, Defendants have in the past six years proffered erroneous and unreliable excuses for non-performance, asserted baseless legal arguments, and in essence resisted complying with the obligations they contractually knowingly and voluntarily assumed. The Court has repeatedly used the remedies authorized by the Stipulation and often exercised forbearance rather than imposing sanctions. The remedies and tolerance by the Court have proven ineffective. Prisoners are not entitled to "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). But they are entitled to "adequate medical care." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Courts should not be engaged in running prisons. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). The present situation must end.

1    On January 31, 2020, the Court issued its third Order to Show Cause warning of

2    increased and recurring sanctions if Defendants did not perform their obligations under the

3    Stipulation.  Defendants' response to the January 31, 2020 Order to Show Cause (OSC)

4    (Doc. 3881) again contains factual and legal arguments that have no basis.  Given

5    Defendants' failure to remedy their failures to avoid sanctions under the January 2020

6    OSC, along with Defendants' persistent lack of performance over the last six years, the

7    Court's approval of the Stipulation will be rescinded.  This case will proceed to trial on

8    Plaintiffs' claims in the original complaint that the delivery of health care and housing in

9    isolation amount to constitutional deprivations in violation of the Eighth Amendment.

10    **OVERVIEW**

11    What follows are findings of fact regarding Defendants' failure to perform their

12    obligations and the numerous efforts to enforce compliance.

13    The Complaint presented claims for relief involving inadequate medical, dental, and

14    mental health care as well as inadequate physical exercise, inadequate nutrition, and

15    conditions of extreme social isolation and environmental deprivation.  After two and a half

16    years of litigation the parties negotiated a settlement agreement—the Stipulation—that was

17    intended to, over a reasonable amount of time, resolve all claims such that the complaint

18    would be dismissed.  (Doc. 1185).

19    The Stipulation contained health care and maximum custody provisions to be

20    assessed against specified performance measures.  With respect to health care, performance

21    measures were to be assessed and reported monthly at each of the ten prison complexes.

22    (Doc. 1185 at 3).  The Stipulation provided that the parties were to agree to a protocol for

23    assessing compliance with each health care performance measure and, if the parties failed

24    to agree, the matter would be submitted for mediation or resolution by the Court.  (*Id.*).

25    Finally, the monitoring and reporting of Defendants' performance of health care provisions

26    would end if they achieved and maintained specified thresholds: 75% compliance the first

27    12 months, 80% the second 12 months, and 85% thereafter.  (*Id.*).

28    Defendants also agreed to comply with maximum custody performance measures.

(*Id.* at 5). These performance measures were also to be reported monthly to determine if ADC substantially complied. Again the performance measures regarding maximum custody were intended to end if Defendants achieved and maintained specified thresholds: 75% compliance the first 12 months, 80% the second 12 months, and 85% thereafter. Judge Duncan accepted the Stipulation in February 2015. (Doc. 1458).

## MONITORING AND ENFORCEMENT 2016-2018

After approximately one year of auditing, in April 2016, Plaintiffs filed their first "Motion to Enforce Settlement." (Doc. 1576). The auditing showed Defendants were reporting compliance numbers well below the required 75% benchmark. (Doc. 1576 at 5-6). Judge Duncan[1] found Defendants substantially noncompliant. (Doc. 1582). He also ordered Defendants to provide a "remedial plan" regarding 12 performance measures at multiple complexes. It was clear, as of May 2016, Defendants had largely failed to perform their obligations across many locations. But Defendants' remediation plan regarding most of the performance measures was approved despite the Court expressing "concern" that the plan would be insufficient to remedy Defendants' failures. (Doc. 1619 at 1).

On August 17, 2016, Plaintiffs filed a Motion to Enforce the Stipulation regarding four performance measures for a subset of locations. (Doc. 1663). Plaintiffs requested Judge Duncan order "Defendants to develop a *meaningfully specific and detailed* plan to permanently remedy their continued substantial noncompliance with the[se] Four Performance Measures." (Doc. 1663 at 4) (emphasis in original). Defendants argued some of the low compliance figures were merely "the result of documentation issues," they were close to complying, and they would provide a plan for compliance.

Judge Duncan noted Defendants' report "demonstrate[d] continued serious and abject failures in compliance and d[id] not indicate that Defendants ha[d] implemented a successful remediation plan," and "[a]bsent a striking turn around it w[ould] be necessary for the Court to implement aggressive compliance measures." (Doc. 1708 at 1).

---

[1] Magistrate Judge David Duncan handled the parties' settlement negotiations and assumed responsibility over the case after the parties agreed to the Stipulation.

1    At a status hearing on November 9, 2016, the parties discussed identified

2    performance measures and the data demonstrating continued failures to comply.  (Doc.

3    1780).  Defendants asked for more time to comply "to see if the current remediation efforts

4    are working" and Judge Duncan granted an additional 60 days.  (Doc. 1780).  An order

5    followed finding Defendants' remediation plan failed to bring performance measures into

6    compliance and ordered Defendants to

7
                 use all available community health care services including, but
8                not limited to, commercial pharmacies, community-based
                 practitioners, urgent care facilities, and hospitals (collectively,
9                "Outside Providers") to provide the health care services
                 required in the Stipulation's Performance Measures.
10

11   (Doc. 1754 at 4).

12   On November 23, 2016, Defendants moved to vacate the Order arguing requiring

13   use of community health care resources violated the Stipulation.  Defendants also argued

14   it was impossible to comply because they would be required to transport "dozens--if not

15   hundreds--of inmates outside the prison to community emergency rooms."[2] (Doc. 1779 at

16   2).  Judge Duncan denied the motion. (Doc. 1917).

17   Judge Duncan made clear he would order remedial action once compliance levels

18   dipped below the required percentage of 80%.  Regarding transporting prisoners to

19   community health care providers, Judge Duncan emphasized Defendants were free to

20   provide adequate health care at the prisons, if possible. (Doc. 1917 at 5).

21   Plaintiffs filed a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure

22   requesting the Stipulation be modified to allow Judge Duncan to require an increase in

23   staffing levels, arguing "an underlying assumption of the Stipulation was that the

24   Defendants would make a good faith effort to comply," but lack of staff indicated

25   Defendants did not intend to comply.  (Doc. 1790 at 15).  Judge Duncan denied that motion

26   because the Stipulation precluded ordering staffing increases.  (Doc. 1910 at 2).  Plaintiffs

27   _____

     [2] Before the motion to vacate was even fully briefed, Defendants filed a notice of appeal
28   regarding the requirement that they use community health care resources.  (Doc. 1817).

- 4 -

1     appealed that Order.  (Doc. 1932).

2        The parties continued to dispute the methodology for measuring compliance with
3 the Stipulation.  (Docs. 1755, 1760).  At the December 14, 2016, status conference, Judge
4 Duncan heard evidence of Defendants' attempts to receive partial credit despite non-
5 compliance with some of the performance measures.  (Doc. 1831).[3]  Judge Duncan found
6 material errors in the data including incorrect compliance numbers for PM 66 in Doc. 1743.
7 And that Defendants changed the monitoring reports without a valid explanation.

8        A January 26, 2017, telephonic hearing was held regarding Corizon's inaccurate
9 audit/review process.  And again the most recent numbers were found noncompliant.
10 Defendants had introduced remedial plans in April and May of 2016, with relatively
11 minimal increase in compliance.  An evidentiary hearing was set.

12        Also on January 26, 2017, Judge Duncan found the open clinic model requiring
13 prisoners report to a medical unit instead of filing a Health Needs Request (HNR)
14 prevented accurate measurement of at least a dozen health care performance measures.[4]
15 The result was artificially inflated compliance.

16        At the February 8, 2017 status hearing, Judge Duncan found the worst-performing
17 measures were for prescription medication, sick visits, doctor visits, review of diagnostic
18 reports, receipt of diagnostic reports, chronic care visits, and infirmary care, and warned
19 without immediate improvement remedial action would be taken.  (Doc. 1933, 1956 at 32).

20        On February 23, 2017, Plaintiffs filed a "Motion to Enforce the Stipulation"
21 regarding the maximum custody performance measures because Defendants were not
22 accurately monitoring them.  Defendants said the motion was premature and argued the

23 _____

[3] For example, Defendants unilaterally decided in their November 6, 2016 version of the
24 Monitoring Guide that they would calculate compliance by breaking down the six
requirements listed in PM 16 and giving partial credit for meeting some requirements but
25 not all of that measure.  (Doc. 1756-1 at 458-459).
26 [4]  The Stipulation contained multiple health care performance measures which measured
compliance against when HNRs were received.   Despite the Stipulation explicitly
27 measuring compliance against when HNR forms were deposited in HNR boxes,
Defendants unilaterally without Court approval violated the Stipulation by removing the
28 HNR boxes.

1    monitoring showed compliance.

2         A hearing was held on March 8, 2017.  Health care monitors claimed that after

3    Corizon was given preliminary compliance numbers, it was allowed to attempt to rebut the

4    monitors' findings but no written instructions or guidelines were provided to describe this

5    process.  Of particular significance when prisoners were returned from the hospital no one

6    acted on the hospital's recommendations, which was required for compliance.  On March

7    21, Dr. Nicole Taylor, an ADC psychologist, testified that the monitoring practices

8    regarding the mental health performance measures inflated results.

9         As of May 2017, there were a mere seven staff physicians and five psychiatrists for

10   the entire ADC prisoner population of more than 40,000.  (Doc. 2071 at 64, 67, 76, 79).

11   Defendant Richard Pratt testified Corizon may well have decided to pay the fine rather than

12   fill staffing positions.  (Doc. 2071 at 85).  Judge Duncan emphasized managing prisons by

13   a judge was not what was contemplated in the Stipulation.  (Doc. 2071 at 145).

14        At the June 14, 2017, status hearing, Judge Duncan ordered the parties to confer and

15   designate an expert qualified to assist Defendants in reaching compliance.  And that all

16   future noncompliance for particular performance measures would result in "an order to

17   show cause hearing as to why a $1,000.00 fine should not be imposed."  (Doc. 2124 at 1).

18   Defendants moved for reconsideration, arguing the Order would "effectively and

19   impermissibly [rewrite] the Stipulation."  (Doc. 2135).

20        At the hearing on August 8-9, 2017, Defendant Richard Pratt, Warden Jeffrey Van

21   Winkle, and Deputy Warden of Operations Norman Twyford testified.  (Doc. 2233).  After

22   which Judge Duncan made clear he was inclined to issue an order to show cause why

23   Defendants should not be found in contempt.  He also informed the parties he would retain

24   an expert—Mr. BJ Millar from the Advisory Board—to advise him regarding staffing

25   issues.

26        Judge Duncan held omnibus hearings on September 11-13, 2017, where he set forth

27   persistent confusion, mistakes, and misrepresentations by Defendants.  (Doc. 2330 at 11).

28   He said, "[t]he history of this case is filled with such mistakes and also filled with the

- 6 -

profound mistake of failing to address these performance measures."  And warned again of the imposition of sanctions.

On October 10, 2017, Judge Duncan found "pervasive and intractable failures to comply with the Stipulation" that required imposition of contempt fines for future noncompliance.  (Doc. 2373).  He made clear "a civil contempt sanction of $1,000 per incident of non-compliance commencing the month of December 2017" might well be ordered.  (Doc. 2373 at 3-4).  The following day, Judge Duncan found Defendants substantially noncompliant with 17 additional PMs at multiple locations. (Doc. 2403).

On December 4, 2017, Judge Duncan officially appointed BJ Millar as a Rule 706 expert to address "provider staffing and retention."  (Doc. 2483 at 3).  On December 20, 2017, Judge Duncan questioned Defendants' and Corizon's credibility.  (Doc. 2516 at 5-6).  Judge Duncan said the monitoring program was probably too compromised for reliability.  (Doc. 2516 at 12).

On February 23, 2018, Defendants filed a "Motion to Disqualify Judge Duncan from All Proceedings" arguing he was biased against them which was denied in May 2018. (Doc. 2791).

The evidentiary and status hearing continued on February 27, 2018, and Dr. Jan Watson, a locum tenens (temporary) primary care physician at the Eyman Complex testified that while employed she learned of the possibility of monetary fines for lack of medical care.  (Doc. 2670 at 20-22, 31).  Concomitantly one of Eyman's clinical care coordinators—Sara Neese—sent an email to Dr. Watson on September 18, 2017, asking Dr. Watson to "please cancel the infectious disease consults.  There are two.  We do not have a provider to send him to.  One was approved and has been sitting there for 42 days. *After 30 days we get nailed for a thousand bucks a day until they are seen*."  (Doc. 2670 at 23) (emphasis added).  Dr. Watson continued that on September 11, 2017, Ms. Neese sent an email asking her to cancel a cardiology request for a prisoner and to resubmit it later, closer to November, "as we only have a 60-day window to get it processed and scheduled. *If it's past that time frame we get fined $1,000 per day for just that one consult*."  (Doc.

2670 at 24-25) (emphasis added).

Dr. Watson testified she did not receive the customary 5 days of ADC training (Doc. 2670 at 33), she saw 20 patients a day, and had insufficient time to adequately address the medical needs (Doc. 2670 at 34, 35-36), she was also forced to respond to emergency situations (Doc. 2670 at 36-37), and medication was not timely distributed to prisoners (Doc. 2670 at 39-40).

Regarding requests for specialist consultations, Dr. Watson said Corizon's Utilization Management Committee often provided an "Alternative Treatment Plan," to provide care on site which was often inadequate and required her consult requests be denied. (Doc. 2670 at 56-57). In particular: a request to see an audiologist was rejected and Dr. Watson was ordered to fix a prisoner's hearing aid (Doc. 2670 at 60); a request to see an orthopedist because a prisoner had a fractured hand (confirmed by x-ray showing the bone sticking up) was rejected because the angulation of the bone was not clear (Doc. 2670 at 62-63); three requests for urgent neurology consults for a prisoner with uncontrolled seizures (sometimes 14 in one day) were denied (Doc. 2670 at 68-73); an infectious disease consultation was cancelled for a prisoner with HIV who had a detectable viral load and needed his medication regimen adjusted (Doc. 2670 at 76-82); and a consult request was denied for a prisoner to see a radiation oncologist upon review of a CT scan that showed possible chest nodules (Doc. 2670 at 92). Dr. Watson made clear that she was not qualified to render the care requested and needed.

Finally, Dr. Watson testified about a prisoner who complained of chest pain and had an abnormal EKG. (Doc. 2670 at 116). He was transferred to the hospital but was returned to the prison. A few days later, Dr. Watson had a conversation with her supervisor, Dr. Stewart, who told Dr. Watson that if the prisoner came back "keep him comfortable and let him die because none of his arteries were bypassable." (Doc. 2670 at 117-118). But upon review Dr. Watson read the hospital records which showed a successful bypass was possible. When Dr. Watson raised an issue about care, Corizon staff accused her of not doing things "the Corizon way," which she understood meant spending less time with

patients, ordering less medications, and ordering fewer consultations. (Doc. 2670 at 125).

On February 28, 2018, prisoner William Upton testified he had been diagnosed with small cell B lymphoma in November 2015. (Doc. 2671 at 67). He received some medication and his condition improved but his symptoms returned. (Doc. 2671 at 68-69). The oncologist saw him again and wanted to restart treatment, but it was denied by Corizon. (Doc. 2671 at 70). Seven months later he received the same medication and briefly improved, but his symptoms quickly returned. (Doc. 2671 at 71-72). Mr. Upton did not see an oncologist for another seven months when undergoing a bone marrow biopsy was deemed immediately essential. (Doc. 2671 at 73-74). But Mr. Upton did not begin treatment until four months later. (Doc. 2671 at 80).

Dr. David Robertson, a physician monitor also testified. (Doc. 2671 at 87). One of his responsibilities was to conduct mortality reviews after a prisoner died to identify the causes of death. Seventeen mortality reviews reviewed by Dr. Robertson included failure to recognize symptoms, delay in access to care, and failure to address requests for care. (Doc. 2671 at 102-103). Dr. Robertson mentioned a prisoner who died from untreated metastatic cancer despite multiple urgent requests for oncology consultations. (Doc. 2671 at 105-109). Another prisoner died of a ruptured spleen, which Dr. Robertson said could have been prevented by timely intervention. (Doc. 2671 at 115). Dr. Robertson also made clear there was lack of communication among health care staff. (Doc. 2671 at 137-138).

A status hearing was held on March 14, 2018, at which BJ Millar and the Advisory Board presented their initial data which showed a gap in health care workers in Pinal County, Yuma County, and Cochise County, where the Eyman, Florence, Yuma, and Douglas complexes are located. (Doc. 3240-1).

Hearings followed on March 26 and 27, 2018, regarding the October 10, 2017 Order to Show Cause. (Docs. 2722, 2735). Defendants attempted to offer evidence of efforts to bring the health care performance measures into compliance. The hearing continued on April 10 and 11, 2018 at which Director Ryan testified that Corizon indemnified ADC for the money spent on counsel. (Doc. 2769 at 51). He said ADC sanctioned Corizon $5,000

for each noncompliant performance measure, but there was a $90,000 monthly cap on sanctions. (Doc. 2769 at 55). Ryan acknowledged that because Corizon received $407,000 *each day*, the *monthly* cap on sanctions was only approximately 25% of what Corizon received for each day. (Doc. 2769 at 56). Thus, Corizon should have been sanctioned $565,000 for 113 noncompliant performance measures, but the $90,000 cap precluded it. (Doc. 2769 at 58-59). Ryan claimed without explanation that the cap was a "smart business decision." (Doc. 2769 at 56-57). Finally, he said Corizon had been authorized to receive a 4% increase upon renewal of the contract through March 2018. (Doc. 2769 at 60).

On May 9, 2018, Judge Duncan said he would be retiring. (Doc. 2807 at 6). Defendants then filed a motion with the District Court to vacate the Magistrate referral for lack of subject matter jurisdiction which was denied by Judge Humetewa. (Doc. 2825 at 2).

Evidentiary hearings continued before Judge Duncan on May 31 and June 1, 2018. (Docs. 2844, 2850). Angela Fischer, a mental health clinician (counselor) and candidate for a PhD in clinical psychology, said she had worked for Corizon as a psychology associate between October 2016 and March 2018. (Doc. 2875 at 13). But she left because of the "the lack of quality care that the patients were receiving in the facility, and after many months of trying to work on the team to try to improve that treatment, it became a point where I didn't feel like I could be effective in improving that quality." (Doc. 2875 at 23). Ms. Fischer was concerned that what Defendants documented as treatment of prisoners was wrong. Also, she was concerned about the lack of frequency of the care, and duration of the care. She explained there was "box checking" rather than providing necessary care. She said there was inadequate staffing and too much turnover. She explained she was forced to choose which prisoner to treat.

Cecelia Edwards, a Corizon administer, testified she was concerned "with patient care . . . where some of the patients were . . . getting turned away, and they were not receiving treatment or allowed to put their HNR in. There w[ere] issues with a scheduler [who] continually made errors . . . and people were either getting sent to the wrong place

or weren't getting the treatment. . . . [T]here was a lot of communication . . . [by] me to 'my uppers' [that] [patients] weren't receiving what they needed." (Doc. 2878 at 37). So she decided to say something. (*Id.*). But after raising her concerns and agreeing to testify, she learned she was being investigated by Corizon and feared she would be fired because she was aware of adverse action taken against other employees who were vocal about the problems.

On June 22, 2018, Judge Duncan issued six orders. Three critical ones follow:

1. "Order and Judgment of Civil Contempt." (Doc. 2898). Because of failure to comply with numerous health care performance measures and based on 1,445 instances where Defendants had not performed their obligations, Defendants were ordered to pay $1,445,000. (Doc. 2898 at 23).

2. Order on Motion to Terminate Monitoring. Some health care performance measures were terminated but the Court found the monitoring so unreliable that a Rule 706 expert was needed to determine why the results were so bad.

3. The Court found HNR boxes had been unilaterally removed by Defendants. It was ordered Defendants restore the HNR boxes for monitoring as required by the Stipulation. (Doc. 2901).

Finally, Judge Duncan ordered the parties to submit two proposed experts. He then retired, the case was reassigned to the undersigned, and Defendants appealed all Judge Duncan's Orders. (Docs. 2935, 2936, 2937).

**MONITORING AND ENFORCEMENT 2018-2021**

In December 2018, Dr. Marc Stern was appointed by the Court as an expert pursuant to Rule 706 to address two issues. (Doc. 3089). First he was to determine why there were irregularities and errors in the monitoring process required by the Stipulation. (Doc. 2900). Second he was to determine why there was substantial noncompliance with critical aspects of health care delivery: Access to prescription medications, diagnostic testing, routine and specialty physician consultations, treatment for chronic health care problems, and emergency care. (Doc. 2905).

1    In January 2019, Defendants moved to terminate all monitoring of the maximum

2  custody performance measures, and two were terminated by stipulation.  Termination was

3  otherwise denied.  Flaws in the monitoring process continued along with uncertainties

4  regarding Defendants' compliance with performance measures.  (Doc. 3359).  The Court

5  directed the parties to mediate, but mediation was unsuccessful.  (Doc. 3396).

6    On May 6, 2019, the Court issued the second Order to Show Cause directing

7  Defendants to bring health care performance measures into compliance no later than July

8  1, 2019 or face a fine of $50,000 per non-compliant performance measure.  (Doc. 3235).

9  Defendants sought a stay, claiming their pending appeal of previous orders would resolve

10  whether contempt and sanctions were appropriate (Doc. 3265).  The motion was denied.

11    Dr. Stern issued his report on October 2, 2019.  (Doc. 3379).  He recommended

12  changes to the monitoring protocols regarding requirements: screening HNRs be within 24

13  hours, sick call prisoners be seen by an RN within 24 hours after receiving an HNR, routine

14  provider referrals be addressed within 14 days, urgent provider referrals be seen within 24

15  hours, hospital's treatment recommendations be reviewed and acted on within 24 hours

16  return from inpatient hospital stay, medical providers review diagnostic reports and act

17  upon abnormal values within five days, within 14 days the reason Utilization Management

18  denied a request for specialty services be documented, within 30 days urgent specialty

19  consultations be scheduled and completed, within 60 days routine specialty consultations

20  be scheduled and completed, disease management guidelines for chronic diseases be

21  implemented, and mental health HNRs be responded to within specific timeframes.  These

22  recommendations were made because Defendants' data were unreliable and resulted in

23  artificially inflated compliance.

24    As to mental health performance measures, Dr. Stern found that it is imperative

25  prisoners be actually "seen" by a mental health professional.  It was disputed whether "very

26  short mental health visits (some as short as 5, 3, or 2 minutes)" should qualify as "seen."

27  Dr. Stern found because the mental health performance measures did not specify a

28  minimum length of time for a visit, Defendants could claim compliance based on markedly

- 12 -

1   short and ineffective interactions.  After reviewing medical records Dr. Stern concluded

2   "some of the short visits are too short to be clinically effective, and in the context of the

3   cases, place patients at significant risk of substantial harm" and there was "an unfortunate

4   and glaring deficiency" in the mental health performance measures. (Doc. 3379 at 31).

5   Defendants' documentation of visits showed a patient was deemed "'seen,' regardless of

6   the length of the visit." (Doc. 3379 at 33).  He found "*significant risk of serious harm*"

7   posed by this interpretation.  (Emphasis in original).

8        Dr. Stern also assessed whether the "failure to successfully perform on PMs pose[d]

9   a significant risk of serious harm to patients." (Doc. 3379 at 72).  As to numerous health

10  care performance measures, he found compliance failures often did pose a substantial risk

11  of serious harm to prisoners.

12       After receiving Dr. Stern's report, the Court informed the parties the "report

13  confirms the Court's long-held belief that pervasive issues have precluded accurate

14  monitoring" and that "the low compliance levels reported in some instances may be

15  worse."  And the Court found the report shows Defendants' behavior has created "a

16  significant risk of serious harm to prisoners' health and . . . that additional funding would

17  be necessary to provide required healthcare." (Doc. 3385 at 2).  Three potential paths

18  forward were identified: Continuing to enforce the Stipulation; negotiating a new

19  settlement; or setting the case for trial and the parties were ordered to choose an option.

20  Plaintiffs chose to proceed to trial while Defendants believed more settlement negotiations

21  would work. (Doc. 3399, 3402).

22       On November 12, 2019, the Court referred the matter to settlement negotiations as

23  requested by Defendants.  But briefing was ordered to address "the remedies available for

24  Defendants' non-compliance." (Doc. 3416 at 2).  Defendants argued the only remedies

25  available were "(1) rescission; (2) specific performance; or (3) damages."[5] (Doc. 3435).

26  _____

27  [5] Significantly at the Ninth Circuit, Defendants expressed the view that the only way for
    the Stipulation to be enforced was for Plaintiffs to file a separate suit alleging breach of
28  contract or for Plaintiffs to seek rescission.  (Opening Brief, Doc. 36, Appeal No. 18-
    16358) ("Thus, the only 'remedy available at law' is to sue and seek state law remedies for

- 13 -

But Defendants' positions were irreconcilable.  Ordering "specific performance" made no sense because Defendants also argued the Stipulation did not allow contempt sanctions.  In essence, Defendants' position, to the Ninth Circuit and to this Court, was "specific performance" was appropriate but if Defendants failed to perform, there was no remedy.

Shortly after the Court ordered settlement negotiations again the parties did not reach a settlement.  (Doc. 3469 at 1).  Plaintiffs then requested the Court set the case for trial.  (Doc. 3469 at 3).  Defendants again argued additional settlement negotiations might be "beneficial" and requested the Court to order the parties to attend now a third settlement conference.  But in the meantime the Ninth Circuit issued a unanimous opinion resolving crucial aspects of the Court's enforcement powers and rejecting nearly all of Defendants' arguments.

The Ninth Circuit held a district court could issue "an injunction requiring specific performance" and could use "the paradigmatic coercive contempt sanction of prospective, conditional fines" if Defendants did not comply.  *Parsons v. Ryan*, 949 F.3d 443, 454-55 (9th Cir. 2020).  What followed was an Order by this Court that Defendant come into compliance with additional health care performance measures or they would be "required to pay $100,000 for each instance of future non-compliance."  (Doc. 3490 at 3).  And the Court would "pursue additional efforts to enforce the Stipulation" or rescind the Stipulation and reinstate the claims and litigation.  (Doc. 3495 at 1).  The Court exercised restraint once again.  The Court did not rescind the Stipulation.  Rather Defendants were allowed one final attempt at compliance.  (Doc. 3495 at 1).

The Court also provided guidance on how particular health care performance measures are to be monitored.  Dr. Stern's proposed approach was adopted on determining whether prisoners were "seen" by mental health professionals; if presumptive durations were not met, a "mental health clinician" had to review the records and "determine whether the length was meaningful and appropriate in the context of the patient's overall care."  (Doc. 3518 at 4).

_____

a breach of contract or for rescission.").

- 14 -

1          In 2020, more disputes emerged.  Plaintiffs moved to enforce the Stipulation based
2    on Defendants' failure to comply with the Stipulation, which required Defendants to
3    provide interpretive services when a prisoner was not fluent in English.  Defendants
4    conceded they violated the Stipulation but argued failures to comply were harmless
5    because health care encounters were still held even though prisoners were not fluent in
6    English.  The Court found this specious and in particular if a prisoner was not fluent in
7    English, continuing without interpretive services was definitive proof of Defendants'
8    noncompliance.  (Doc. 3861 at 11-12).  Thus, for *every* health care encounter with a
9    prisoner not fluent in English, Defendants were directed to provide either 1) "a qualified
10   health care practitioner who is proficient in the prisoner's language"; or 2) "language line
11   interpretation service."  Defendants appealed the Order.

12         The 2020 disputes also involved maximum custody.  In May 2020, the parties had
13   a discovery dispute regarding Plaintiffs' request for "[d]ocuments sufficient [to] show
14   average length of stay for prisoners in maximum custody units, including the average
15   length of stay in Step 1, Step 2, and Step 3 under DI 326/DO 812."  (Doc. 3613 at 2-3).
16   The Court ordered Defendants to produce the requested documents, but they did not.  After
17   careful review it was determined that Defendants produced incomplete and internally
18   inconsistent data, and Plaintiffs were awarded attorneys' fees.  Defendants then moved for
19   Rule 60(b) relief, arguing the Court misinterpreted the Stipulation and expanded it.

20         The motion was denied.  (Doc. 3861 at 1-2).  The Court added if Defendants
21   believed they were not required to "implement" the Step Program Matrix they
22   acknowledged they entered into the Stipulation in bad faith.  (Doc. 3861 at 2).  Defendants
23   were ordered to produce evidence showing prisoners' progression through the Step
24   Program Matrix.  (Doc. 3861 at 2).  Defendants appealed.

25         The Court also addressed several other issues that undermined the reliability of the
26   maximum custody compliance numbers and required finding the numbers invalid.  (Doc.
27   3861 at 7-12).

28

The Stipulation required maximum custody prisoners at Step I of DI 326/DO812[6] be "offered a minimum of 7.5 hours out-of-cell time per week," prisoners at Step II be offered 8.5 hours, and prisoners at Step III be offered 9.5 hours. (Doc. 1185-1 at 38). All maximum custody prisoners "who [were] eligible for participation in [DI 326/DO812 were to be] offered out-of-cell time." The record demonstrated prisoners were not offered the appropriate recreation blocks consistent with their Step Level. (Doc. 3666-2 at 245). And despite the offers not matching what is required, Defendants claimed compliance. Plaintiffs identified many other failures. (Doc. 3775 at 36). The Court held the Stipulation was complied with only if a prisoner is offered recreation in enclosures of the size mandated and that Defendants' failures clearly violated the Stipulation such that none of their maximum custody compliance data was acceptable.[7]

Plaintiffs also moved to enforce the Court's Order mandating Dr. Stern's recommendation regarding the length of mental health visits. In particular, Defendants ignored the requirement that a mental health clinician determine whether a visit of less than ten minutes was meaningful and appropriate. Rather, Defendants left the determination to the compliance monitors (without mental health training) who had not reviewed the prisoners' medical records. The Court ordered a mental health professional to perform the necessary evaluation. (Doc. 3861 at 13). But Defendants failed to comply, forcing Plaintiffs to move for relief again.

Defendants had failed to comply with the previous order requiring a mental health professional evaluate encounters that fall below the minimum duration threshold, so Defendants were again reporting artificially inflated compliance numbers. Sadly, this may have been confirmed by recent suicides. Three prisoners committed suicide between January 5 and February 3, 2021 after receiving only very short mental health care

---

[6] This is the ADC policy implementing a multi-step system for maximum custody housing.
[7] The Court informed Defendants in its September 16, 2019 Order that Defendants' selection process was not random. (Doc. 3359 at 8). The Court anticipated that at the very least Defendants would initiate random samples in future months. Instead, Defendants made no changes and ignored their contractual obligations under the Stipulation.

encounters.[8]  One of the mortality reviews said "failure to communicate effectively with patient" was a contributing cause and that the suicide was "possibly avoidable."  (Doc. 3903-3 at 44).

Defendants admitted they ignored the Court's Order regarding mental health review, stating "ADCRR determined [mental health professional review] could not be done." (Doc. 3907 at 6).  Critically, Defendants never sought reconsideration or informed the Court that they could not or would not comply.  Simply, they chose to violate the order and Stipulation.

### JANUARY 2020 OSC

Defendants have been found in civil contempt twice during the monitoring phase of this action.  The first sanction was $1.445 million and the second was $1.10 million. Neither sanction coerced or even motivated complete compliance.  Thus, the January 31, 2020 Order to Show Cause was the third attempt to address Defendants' failure to comply with the Stipulation in critical and significant ways. In its January 31, 2020 OSC, the Court stated:

> Defendants must bring every Performance Measure identified above into immediate compliance.  Defendants will be required to pay $100,000 for each instance of future non-compliance with this Order.  For the Performance Measures identified above that were compliant in the most recent numbers, Defendants must ensure those Performance Measures remain compliant.  If Defendants do not bring every Performance Measure into compliance, or if Defendants allow any previously-compliant Performance Measure to become non-compliant, the Court will impose contempt sanctions unless Defendants can establish they took all reasonable steps to achieve compliance but still fell short.  If Defendants are found in contempt, the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order.   The fines will recur on a monthly basis until

---

[8] Eight people have died by suicide to date since the beginning of FY 2021 (July 1, 2020-June 30, 2021).  The suicide mortality rate for state prisoners between 2001-2016 was 16 prisoners per 100,000.  Arizona's rate is currently nearly 24 prisoners per 100,000.  (Doc. 2857 at 3 n.6).

Defendants bring each Performance Measure and location into compliance.

(Doc. 3490).  The chart below reflects the very minimal compliance with the relevant PMs between March and December 2020.[9]  Yellow entries are noncompliant, green are entries rounded such that they are compliant, and red entries are those noncompliant but reported inaccurately by Defendants.

| PM | Location | March 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|----|----------|-----------|-----------|----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
| 11 | Eyman | 82% | 86% | 82% | 86% | 86% | 94% | 82% | 92% | 82% | 78% |
| 11 | Lewis | 85% | 84% | 99% | 81% | 90% | 86% | 89% | 90% | 90% | 82% |
| 11 | Winslow | 93% | 88% | 91% | 87% | 92% | 92% | 72% | 96% | 86% | 89% |
| 11 | Yuma | 88% | 94% | 90% | 90% | 94% | 90% | 84% | 88% | 88% | 92% |
| 13 | Eyman | 96% | 86% | 98% | 98% | 94% | 94% | 60% | 76% | 100% | 92% |
| 13 | Florence | 94% | 98% | 84.88% | 86% | 90% | 90% | 81% | 74% | 100% | 90% |
| 13 | Lewis | 95% | 95% | 95% | 95% | 87% | 87% | 75% | 70% | 83% | 90% |
| 13 | Yuma | 92% | 98% | 98% | 98% | 92% | 92% | 76% | 70% | 100% | 90% |
| 35 | Eyman | 94% | 100% | 96% | N/A | 87% | 100% | 100% | 93% | 100% | 83% |
| 35 | Florence | 96% | 89% | 75% | 86% | 83% | 89% | 100% | 92% | 100% | 95% |
| 35 | Tucson | 98% | 95% | 93% | 90% | 90% | 75% | 96% | 90% | 85% | 82% |
| 37 | Tucson | 85% | 91% | 85% | 87% | 88% | 88% | 82% | 92% | 77% | 61% |
| 37 | Winslow | 97% | 93% | 100% | 93% | 100% | 83% | 87% | 93% | 100% | 93% |
| 37 | Yuma | 92% | 84% | 80% | 74% | 92% | 86% | 90% | 96% | 90% | 80% |
| 39 | Eyman | 90% | 86% | 78% | 92% | 86% | 94% | 98% | 98% | 98% | 86% |
| 39 | Lewis | 94% | 92% | 90% | 96% | 83% | 100% | 99% | 99% | 100% | 97% |
| 39 | Yuma | 96% | 90% | 92% | 84% | 84% | 94% | 98% | 96% | 100% | 88% |
| 40 | Eyman | 91% | 100% | 86% | 90% | 68% | 91% | 100% | 100% | 100% | 100% |
| 40 | Tucson | 64% | 100% | 80% | 67% | 83% | 100% | N/A | 100% | 100% | 67% |
| 42 | Eyman | 94% | 98% | 92% | 98% | 86% | 84% | 82% | 96% | 96% | 82% |
| 42 | Lewis | 84.00% | 99% | 93% | 90% | 100% | 96% | 94% | 98% | 93% | 96% |
| 44 | Eyman | 39% | 75% | 53% | 53% | 47% | 65% | 68% | 63% | 45% | 53% |
| 44 | Florence | 68% | 73% | 74% | 81% | 75% | 72% | 64% | 85% | 64% | 69% |
| 44 | Lewis | 84.62% | 78% | 77% | 74% | 81% | 86% | 70% | 83% | 76% | 70% |
| 44 | Winslow | 92% | 100% | 100% | 75% | 100% | 83% | 57% | 67% | 71% | 100% |
| 45 | Tucson | 94% | 92% | 95% | 84% | 95% | 94% | 86% | 98% | 97% | 93% |
| 46 | Eyman | 86% | 90% | 94% | 92% | 94% | 94% | 90% | 90% | 98% | 80% |
| 46 | Yuma | 98% | 92% | 88% | 92% | 88% | 80% | 94% | 86% | 88% | 88% |

[9] PM 12, PM 19, PM 20, and PM 54 have been terminated.  (Doc. 3495 at 12, 13-14).

| PM | Location | March 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|----|----------|-----------|-----------|----------|-----------|-----------|-----------|------------|-----------|-----------|-----------|
| 47 | Eyman | 91% | 97% | 91% | 89% | 88% | 86% | 70% | 83% | 92% | 83% |
| 47 | Florence | 82% | 89% | 94% | 96% | 90% | 70% | 88% | 92% | 96% | 90% |
| 47 | Lewis | 93% | 90% | 91% | 93% | 94% | 89% | 78% | 97% | 93% | 91% |
| 47 | Perryville | 95% | 96% | 90% | 97% | 91% | 93% | 95% | 90% | 96% | 97% |
| 47 | Phoenix | 100% | 75% | 80% | 100% | 100% | 100% | 92% | 100% | 89% | 100% |
| 47 | Tucson | 97% | 97% | 100% | 89% | 85% | 74% | 88% | 94% | 94% | 82% |
| 47 | Winslow | 100% | N/A | 100% | N/A | 80% | 67% | 67% | N/A | 100% | 100% |
| 49 | Perryville | 100% | 100% | 100% | 100% | 100% | 83% | 100% | 100% | 100% | 100% |
| 49 | Tucson | 92% | 100% | 100% | 100% | 100% | 96% | 89% | 100% | 71% | 92% |
| 50 | Florence | 40% | 0% | 82% | 0% | 50% | 0% | 71% | 74% | 70% | 71% |
| 50 | Perryville | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 83% |
| 50 | Tucson | 68% | 0% | 69% | 0% | 72% | 0% | 0% | 68% | 80% | 82% |
| 51 | Douglas | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 51 | Eyman | 34% | 0% | 80% | 0% | 58% | 84% | 76% | 74% | 0% | 84% |
| 51 | Florence | 58% | 0% | 0% | 0% | 77% | 0% | 70% | 74% | 0% | 75% |
| 51 | Perryville | 83% | 0% | 0% | 0% | 0% | 0% | 84% | 0% | 0% | 83% |
| 51 | Tucson | 68% | 0% | 77% | 0% | 83% | 0% | 0% | 81% | 82% | 0% |
| 51 | Yuma | 0% | 0% | 0% | 0% | 0% | 80% | 76% | 82% | 84% | 82% |
| 52 | Eyman | 71% | 86% | 86% | 76% | 74% | 76% | 84% | 90% | 80% | 68% |
| 52 | Florence | 81% | 86% | 87% | 87% | 89% | 84.62% | 84.62% | 87% | 87% | 87% |
| 52 | Perryville | 81% | 91% | 95% | 96% | 93% | 89% | 88% | 90% | 93% | 93% |
| 52 | Phoenix | 96% | 100% | 87% | 100% | 90% | 100% | 90% | 100% | 100% | 83% |
| 52 | Tucson | 86% | 91% | 91% | 92% | 90% | 85% | 89% | 92% | 91% | 80% |
| 55 | Eyman | 86% | 86% | 84% | 88% | 94% | 86% | 84% | 86% | 86% | 78% |
| 66 | Florence | 99% | 100% | 83% | 68% | 52% | 48% | 94% | 100% | 96% | 95% |
| 66 | Lewis | 95% | 100% | 84% | 83% | 89% | 98% | 100% | 99% | 100% | 91% |
| 66 | Tucson | 100% | 100% | 81% | 81% | 67% | 67% | 85% | 93% | 99% | 100% |
| 67 | Lewis | 99% | 100% | 66% | 61% | 74% | 99% | 100% | 84.50% | 76% | 95% |
| 67 | Tucson | 99% | 100% | 57% | 72% | 46% | 54% | 97% | 89% | 86% | 93% |
| 80 | Lewis | 100% | 94% | 89% | 90% | 98% | 98% | 91% | 95% | 92% | 84% |
| 85 | Eyman | 89% | 75% | 88% | 100% | 95% | 85% | 90% | 100% | 95% | 84% |
| 85 | Lewis | 95% | 100% | 87% | 97% | 88% | 84.85% | 91% | 95% | 88% | 97% |
| 85 | Tucson | 95% | 97% | 97% | 100% | 100% | 83% | 97% | 98% | 98% | 97% |
| 92 | Eyman | 90% | 100% | 95% | 95% | 85% | 80% | 100% | 100% | 95% | 95% |
| 92 | Lewis | 95% | 100% | 100% | 95% | 75% | 100% | 95% | 90% | 85% | 90% |
| 98 | Douglas | 100% | 100% | 100% | 90% | 67% | 100% | 100% | 100% | 100% | 100% |
| 98 | Eyman | 96% | 92% | 84% | 88% | 82% | 86% | 84% | 91% | 88% | 86% |
| 98 | Florence | 91% | 86% | 90% | 90% | 90% | 98% | 94% | 79% | 97% | 89% |
| 98 | Winslow | 100% | 91% | 100% | 100% | 90% | 83% | 84.62% | 100% | 100% | 100% |

| PM | Location | March 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|----|----------|------------|------------|----------|-----------|-----------|-----------|------------|-----------|-----------|-----------|
| Total | | 18 | 16 | 25 | 24 | 26 | 26 | 30 | 18 | 19 | 29 |

In response to the January OSC, Defendants failed to clearly and accurately identify the scope of their noncompliance.  They identified 178 PMs that were noncompliant, but they overlooked their previous acknowledgement that their 2020 compliance numbers for some PMs were inaccurate.  (Doc. 3822 at 2).  Defendants attempted to assure the Court they would either reaudit those PMs or reduce the compliance measure to 0% as a sanction. They did neither.  In fact they relied on the falsified compliance numbers.  The chart above reflects the sanction with which Defendants agreed to: 0% compliance for two PMs.  (Doc. 3822 at 3).  Defendants were noncompliant with 231 PMs, at $100,000 per violation, for a total of $23.1 million.

As previously held, "[b]efore finding civil contempt, a court must determine by clear and convincing evidence that: (1) a valid court order exists that is 'specific and definite'; (2) the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged noncompliance; and (3) the party failed to take '*all* reasonable steps to comply with the order.'"  *Parsons v. Ryan*, No. CV-12-0601-PHX-DKD, 2018 WL 3239691, at *2 (D. Ariz. June 22, 2018) (citations omitted) (emphasis in original).

Defendants filed a written response to the OSC on July 10, 2020 but sought clarification whether it applied to only the February 2020 numbers or if they were to address February and the following months.  Defendants also sought clarification whether the OSC contemplated sanctioning them for a performance measure that was compliant at some point after January 2020 but became non-compliant in later months.  The Court was amazed at Defendants' misunderstanding but explained they were to completely comply beginning March 1, 2020, reminding them "the Stipulation requires Defendants obtain an 85% compliance rate *every* month for *every* PM at *every* location."  (Doc. 3861 at 6).

Defendants incredibly maintained the Court did not adequately inform them that they would face contempt sanctions if a compliant PM fell out of compliance, they would

1    still be in contempt.

2        **A.    Specific and Definite**

3        Defendants argue they were unaware that they were required to maintain

4    compliance.  But the OSC clearly stated:

5            If Defendants do not bring every Performance Measure into
6            compliance, or if Defendants allow any previously-compliant
             Performance Measure to become non-compliant, the Court will
7            impose contempt sanctions unless Defendants can establish
             they took all reasonable steps to achieve compliance but still
8            fell short.

9                                    ***

10           The fines will recur on a monthly basis until Defendants bring
             each Performance Measure and location into compliance.
11

12   (Doc. 3490).   While Defendants acknowledge they were required to ensure the PMs

13   "remain compliant," Doc. 3490 at 3, they claim the January OSC did not require the health

14   care PMs compliant as of January 2020 to remain compliant thereafter.  (Doc. 3881 at 18).

15   Again Defendants are wrong.

16       **B.    Knowledge and Opportunity to be Heard**

17       The two substantive responses to the OSC filed by Defendants do not support their

18   position that they have not had an adequate opportunity to respond.  (Docs. 3656, 3881).

19       **C.    All Reasonable Measures**

20       Defendants were told "COVID-19 cannot be used as a complete shield against

21   noncompliance."   (Doc. 3866 at 3).   Defendants did not heed the Court's warning.

22   Defendants' omnibus response identified COVID-19 as the primary barrier to compliance

23   from March 1 through December 31, 2020.  (Doc. 3881 at 4-14).  Defendants attempt to

24   excuse 131 instances of noncompliance due to COVID-19, but in Defendants' own

25   monthly PM charts, Defendants did not cite COVID-19 as a reason for their noncompliance

26   as to the PMs in the accompanying footnote.[10]

27   _____
     [10] PM 11 at Eyman (March, May, September, November, December 2020); PM 11 at Lewis
28   (April June December 2020); PM 11 at Winslow (September 2020); PM 13 at Eyman
     (September, October 2020); PM 13 at Florence (May, September, October 2020); PM 13

Even when Defendants claimed COVID-19 precluded compliance, those explanations were incredible. In the contemporaneous performance measure charts submitted to the Court, Defendants frequently said noncompliance was based on "poor documentation," which obviously has nothing to do with COVID-19.

Beyond invoking COVID-19, Defendants also argue the sample size chosen in the Stipulation for evaluating certain PMs was not statistically reliable. But the sizes were negotiated and voluntarily accepted by the Defendants as a part of the Stipulation.

Defendants also point to Arizona Governor Ducey's elective-surgery executive order, which limited access to specialty consultations, as an explanation. That Executive Order 2020-32 allowed elective surgeries to resume as of May 1, 2020, yet Defendants'

at Lewis (September, October, November 2020); PM 13 at Yuma (September, October 2020), PM 35 at Eyman (December 2020); PM 35 at Florence (July 2020), PM 35 at Tucson (August, December 2020); 37 at Tucson (September, November, December 2020); PM 37 at Winslow (August 2020); PM 37 at Yuma (April, May, June, December 2020); PM 39 at Eyman (May 2020); PM 39 at Lewis (July 2020); PM 39 at Yuma (June, July 2020); PM 40 at Eyman (July 2020); PM 40 at Tucson (March, May, June, July, September, December 2020); PM 42 at Eyman (August, September, December 2020); PM 44 at Eyman (March, April, May, June, July, August 2020); PM 44 at Florence (March, April, May, June, July, August, September, October, November, December 2020); PM 44 at Lewis (April, May, June, July, September, October, November, December); PM 44 at Winslow (June, August, September, October, November 2020); PM 46 at Eyman (December 2020); PM 46 at Yuma (August 2020); PM 47 at Eyman (September, October, December 2020); PM 47 at Florence (March, August 2020); PM 47 at Lewis (September 2020); PM 47 at Phoenix (April, May 2020); PM 47 at Tucson (August, December 2020); PM 47 at Winslow (July, August, September 2020); PM 49 at Perryville (September 2020); PM 49 at Tucson (November 2020); PM 50 at Florence (September, October, November 2020); PM 50 at Perryville (December 2020); PM 51 at Eyman (September, October 2020); PM 51 at Florence (September, October, December 2020); PM 51 at Perryville (March, September, December 2020); PM 51 at Tucson (March, October, November 2020); PM 51 at Yuma (September, October, November, December 2020); PM 51 at Eyman (March, June, July, August, September, November, December 2020); PM 52 at Florence (March 2020); PM 52 at Perryville (March 2020); PM 52 at Phoenix (December 2020); PM 52 at Tucson (December 2020); PM 55 at Eyman (May, September, December 2020); PM 66 at Florence (May, June, July, August 2020); PM 66 at Lewis (May, June 2020); PM 66 at Tucson (May, June, July, August 2020); PM 67 at Lewis (May, June, July, October, November 2020); PM 80 at Lewis (December 2020); PM 85 at Eyman (April 2020); PM 85 at Tucson (August 2020); and PM 92 at Eyman (August 2020).

noncompliance persisted throughout 2020.  *See* Gov. Ducey Executive Order 2020-32, available at https://azgovernor.gov/executive-orders.  There is no explanation why outside consultations were not rescheduled after the Governor's Order was lifted or why urgent specialty consultations—such as those for oncology or surgery—were not obtained at a hospital.

Defendants also attempt to make much of COVID-19's impact on Yuma. (Doc. 3881 at 8-9). But Yuma was only subject to the OSC as to six PMs and there is no explanation how the COVID-19 outbreak in Yuma impeded compliance in Florence, Eyman, or Tucson.

Defendants further maintain that staffing issues, purportedly triggered by COVID-19, impeded compliance.  They said Centurion continued to try to staff, recruit, and retain staff.  (Doc. 3881 at 13-14).  As they did previously, Defendants offer no evidence or discussion as to efforts to attract and retain health care staff sufficient to meet the needs of Arizona prisoners.  And staffing shortages are nothing new; it has been the Achilles' heel of the entire duration of the Stipulation.  The Court has solicited expert assistance to identify barriers to staffing and ways to attract and retain health care staff members.  But Defendants never stated that they employed such strategies to attract and retain staff.

Defendants highlight bonus payouts made between March and December 2020 as evidence that "all reasonable measures" were taken to boost staffing and reduce shortages caused by the pandemic.  But the total amount of bonus payments, $511,514.03, pales in comparison to the approximate $657,927.72 *per day*[11] that Centurion was paid between March and December 2020, when the average monthly prisoner population was 39,634.[12] (Doc. 3881 at 13).   In short, COVID-19 does not justify or excuse Defendants' noncompliance for every noncompliant PM at various complexes between March and December 2020.

---

[11]  See  https://app.az.gov/page.aspx/en/ctr/contract_manage_public/47912  (last  visited May 21, 2021)

[12]  See  https://corrections.az.gov/sites/default/files/REPORTS/CAG/2020/cagdec20.pdf (last visited May 21, 2021), taking the average of the monthly prisoner populations.

1    Defendants argue they took all reasonable measures to comply with the OSC, and,

2  if they did not, the Court should excuse noncompliance with 28 PMs because they "barely

3  missed compliance," "noncompliance was based on a technical violation," or third parties'

4  "inactions or omissions" caused noncompliance.  (Doc. 3881 at 23).  Not only does this

5  have no bearing on whether Defendants took all reasonable measures, but it again ignores

6  the 85% benchmark already forgives isolated failures.  Defendants' persistent unreasonable

7  attempts to justify noncompliant scores as "barely miss[ing] compliance" is an admission

8  by Defendants that they have violated the agreed upon Stipulation.

9    Defendants' final argument is their overall theory of compliance.  They view the

10  health care performance measures in the aggregate (103 x 10 facilities) and maintain that

11  their overall compliance during 2020 ranged between 77.78% and 94.12%.  This is a sad

12  illusion.  The performance measures that have been and remain noncompliant over the past

13  six years involve some of the most fundamental and critical aspects of health care that

14  formed the basis of this lawsuit in 2012, of which Defendants are very aware.

15    To illustrate, Defendants' theory of compliance would require the Court view every

16  performance measure as equally important.  One performance measure requires Defendants

17  ensure prisoners' medical records be "legible" and include details such as the time and the

18  name of the medical provider.  Tragically, at the time of the Stipulation Defendants were

19  not even maintaining legible records.  Defendants were, however, able to perform this

20  requirement and the performance measure was terminated.  In other words, after a few

21  years of effort, Defendants were able to perform the absolute bare minimum of maintaining

22  legible medical records.  But requiring legible records cannot be compared to other

23  performance measures related to substantive care.  For example, a performance measure

24  required Defendants act on discharge instructions when a prisoner was returned from an

25  inpatient hospital stay.  Defendants have consistently failed to comply with this

26  performance measure.  Defendants' view that each performance measure should be viewed

27  as equally important is misguided.

28    In truth, Defendants' arguments are unavailing because they have again failed to

- 24 -

provide "clear and convincing" evidence that they took all reasonable measures to ensure compliance.  Their entire response focuses on Centurion's limitations in light of the pandemic.  But the Director, not the private health care contractor is legally responsible in Arizona for the provision of health care.  Ariz. Rev. Stat. § 31-201.01(D); *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.").  Defendants' response does not establish that either Shinn or Pratt took "all reasonable measures" to urge, facilitate, and require compliance with the Stipulation with which they undertook to comply.

**D.    Defendants Remain Noncompliant**

Critically, compliance numbers from January, February, and March 2021 remove any doubt whether COVID-19 was the moving force behind noncompliance in 2020.  It was not.  The yellow highlighted entries are noncompliant.

| PM | Location | January 2021 | February 2021 | March 2021 | April 2021 |
|----|----------|--------------|---------------|------------|------------|
| 11 | Eyman | 84% | 78% | 94% | 82% |
| 13 | Eyman | 86% | 84% | 84% | 80% |
| 13 | Florence | 88% | 65% | 77% | 86% |
| 13 | Lewis | 69% | 96% | 93% | 99% |
| 13 | Perryville | 84% | 82% | 86% | 79% |
| 13 | Yuma | 64% | 74% | 78% | 74% |
| 13 | Tucson | 90% | 94% | 94% | 82% |
| 15 | Eyman | 80% | 86% | 86% | 90% |
| 35 | Lewis | 98% | 100% | 89% | 75% |
| 35 | Tucson | 92% | 94% | 91% | 77% |
| 37 | Lewis | 87% | 91% | 79% | 90% |
| 37 | Tucson | 64% | 49% | 45% | 57% |
| 37 | Yuma | 78% | 84% | 88% | 90% |
| 39 | Eyman | 80% | 94% | 92% | 100% |
| 40 | Eyman | 100% | 100% | 63% | 60% |
| 40 | Florence | N/A | 100% | N/A | 0% |
| 40 | Tucson | 100% | 0% | 0% | 0% |
| 42 | Eyman | 96% | 78% | 92% | 90% |

| PM | Location | January 2021 | February 2021 | March 2021 | April 2021 |
|---|---|---|---|---|---|
| 44 | Eyman | 52% | 56% | 69% | 78% |
| 44 | Florence | 88% | 66% | 71% | 61% |
| 44 | Lewis | 81% | 88% | 66% | 72% |
| 44 | Phoenix | 50% | 50% | 100% | 100% |
| 44 | Tucson | 74% | 60% | 59% | 67% |
| 44 | Winslow | 55% | 100% | 100% | 83% |
| 46 | Tucson | 97% | 91% | 90% | 82% |
| 47 | Eyman | 78% | 88% | 90% | 93% |
| 47 | Lewis | 91% | 74% | 87% | 86% |
| 47 | Perryville | 73% | 86% | 76% | 88% |
| 47 | Safford | 88% | 100% | 75% | 100% |
| 47 | Tucson | 79% | 83% | 86% | 82% |
| 50 | Florence | 69% | 83% | 74% | 81% |
| 50 | Perryville | 85% | 90% | 80% | 95% |
| 50 | Tucson | 59% | 93% | 89% | 92% |
| 51 | Eyman | 76% | 68% | 92% | 92% |
| 51 | Florence | 63% | 90% | 87% | 93% |
| 51 | Perryville | 81% | 76% | 72% | 83% |
| 51 | Tucson | 80% | 83% | 85% | 90% |
| 51 | Yuma | 72% | 86% | 86% | 80% |
| 52 | Eyman | 84% | 78% | 74% | 82% |
| 52 | Florence | 78% | 85% | 80% | 80% |
| 52 | Lewis | 87% | 90% | 84% | 79% |
| 52 | Tucson | 86% | 87% | 88% | 84% |
| 55 | Eyman | 82% | 84% | 82% | 90% |
| 67 | Tucson | 98% | 82% | 85% | 86% |
| 72 | Eyman | 100% | 83% | N/A | 100% |
| 80 | Lewis | 88% | 86% | 24% | 43% |
| 80 | Tucson | 99% | 87% | 17% | 42% |
| 85 | Eyman | 95% | 97% | 25% | 73% |
| 85 | Florence | 83% | 100% | 50% | 100% |
| 85 | Lewis | 97% | 97% | 24% | 69% |
| 85 | Perryville | 92% | 83% | 0% | 68% |
| 85 | Tucson | 98% | 100% | 6% | 69% |
| 85 | Yuma | 97% | 100% | 5% | 85% |
| 91 | Phoenix | 100% | 100% | 80% | 100% |
| 94 | Eyman | 94% | 100% | 82% | 91% |
| 94 | Florence | 93% | 100% | 80% | 93% |
| 94 | Tucson | 100% | 96% | 80% | 92% |

| PM | Location | January 2021 | February 2021 | March 2021 | April 2021 |
|---|---|---|---|---|---|
| 98 | Eyman | 80% | 82% | 94% | 82% |
| 98 | Lewis | 90% | 89% | 78% | 89% |
| 98 | Winslow | 75% | 100% | 100% | 100% |
| Total Noncompliant | | 29 | 25 | 33 | 32 |

This plainly establishes that despite the emergence from the pandemic, Defendants remain noncompliant with some of the most fundamental and critical aspects of medical and mental health care delivery.

## RESCISSION

### A.    Defendants Know Rescission Was Always Possible

After concluding the Stipulation represented an appropriate resolution, the Court closed this case "subject to the Court maintaining jurisdiction to supervise the enforcement of the settlement as provided in the parties' Stipulation." (Doc. 1458).  On November 15, 2018, the Court warned Defendants their "actions raise the distinct miserable possibility that the Stipulation will have to be set aside and the parties instructed to litigate again." (Doc. 3057 at 9).  Defendants acknowledged as much when arguing before the Ninth Circuit Court of Appeals in September 2019.  At oral argument, defense counsel told the Ninth Circuit this Court lacked contempt authority under the Stipulation and argued, instead, that the Court could vacate the settlement and set the case for trial.  Defense counsel made this clear in response to Judge Callahan questioning Defendants' position that the Court lacked the authority to enforce the stipulation through its contempt powers.

> **Judge Callahan**: So the stipulation then just basically means nothing?  I mean it's just this is what we agree to and if it doesn't work out then that's it.  The court can't do anything?
>
> **Defendants' Counsel**:  No.  The court definitely has enforcement ability.  First of all, if the court concludes that the parties aren't dealing with the . . . complying with the stipulation, it can vacate the stipulation and we can go back and litigate the case.

Defendants later attempted to graft a post-hoc rationalization for their oral argument statement, saying they meant only that "state law contractual remedies . . . are available to

- 27 -

enforce noncompliance, including initiating an action in state court for breach of contract."
(Doc. 3411 at 1).  But that is far from what they said.  Rather, Defendants represented that
if the Court "concludes that the parties aren't . . . complying with the stipulation, it can
vacate the stipulation" and resume litigation.  Defendants were very aware their failures
could result in the resumption of litigation.

Further, as Defendants were told in October 2019, after reviewing Dr. Stern's expert
report, the Court identified rescission of the Stipulation as one of the three remaining
options.  The other two—renewed settlement negotiations and further contempt
sanctions—have now since been repeatedly attempted but proven unsuccessful in
provoking compliance.  And the Court recognized in February 2020 that the "record
supports a finding of rescission," but elected to give Defendants "one more, but final,
attempt at coercive sanctions." (Doc. 3495 at 1).  As detailed above, that attempt obviously
failed again to bring about compliance.

### B.    Legal Basis for Undoing Settlement

In 1994, the Supreme Court addressed federal courts' power to enforce settlement
agreements.  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994).  In
distinguishing between a district court enforcing a settlement agreement and reopening a
dismissed action because of a parties' repudiation of a settlement agreement, the Supreme
Court recognized that "some Courts of Appeals have held the latter can be obtained under
Federal Rule of Civil Procedure 60(b)(6)."  *Id.* at 377 (internal footnote omitted).  The
Supreme Court cited the Ninth Circuit as one such circuit.  *Id.* at 378 (citing *Keeling v.
Sheet Metal Workers Int'l Assn.*, 937 F.2d 408, 410 (9th Cir. 1991)).  The Ninth Circuit is
not alone as the First, Fourth, and Sixth Circuits have also so held.  *See, e.g., Delay v.
Gordon*, 475 F.3d 1039, 1044-45 & n.11 (9th Cir. 2006); *United States v. Baus*, 834 F.2d
1114, 1124 (1st Cir. 1987); *Fairfax Countywide Citizens Assn. v. Fairfax County*, 571 F.2d
1299, 1302-1303 (4th Cir. 1978*); Hinsdale v. Farmers Natl. Bank & Trust Co.*, 823 F.2d
993, 996 (6th Cir. 1987); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir.
1975).  Thus, it is well-established that a party's behavior after entering into a settlement

1    agreement can lead to the resumption of litigation.

2           The Ninth Circuit authority addressing resumption of litigation after a settlement

3    agreement cited approvingly to an older First Circuit decision.  In *United States v. Baus*,

4    the First Circuit acknowledged that "[w]here the [settlement] agreement is made, as here,

5    under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as

6    officers of the court, to make every reasonable effort to carry it through to a successful

7    conclusion."  834 F.2d 1114, 1124 (1st Cir. 1987) (quoting *Warner v. Rossignol*, 513 F.2d

8    678, 682 (1st Cir. 1975)).  Nevertheless, it recognized that "[a]s a legal matter, it is well-

9    accepted that the material breach of a settlement agreement which has been incorporated

10   into the judgment of a court entitles the nonbreaching party to relief from judgment

11   under Rule 60(b)(6)."  *Id.*

12          Citing *Baus*, in 1991 the Ninth Circuit upheld a district court's vacatur of a

13   settlement agreement, finding an employer's repudiation of a settlement agreement was an

14   "extraordinary circumstance" that justified vacating the prior order of dismissal under Rule

15   60(b)(6).  *Keeling*, 937 F.2d at 410.  In doing so, the Ninth Circuit explained "[i]n the usual

16   course upon repudiation of a settlement agreement, the frustrated party may sue anew for

17   breach of the agreement and may not, as here, reopen the underlying litigation after

18   dismissal."  *Id.*  But when a court makes a finding "of repudiation, or 'complete frustration,'

19   of the settlement agreement," the court can vacate the relevant order and have the parties

20   resume litigation.  *Id.* The Ninth Circuit has repeatedly cited *Keeling* for this proposition.

21   *In re Hunter*, 66 F.3d 1002, 1006 (9th Cir. 1995); *Lehman v. United States*, 154 F.3d 1010,

22   1017 (9th Cir. 1998).

23          While it has established some settlement agreements can be undone, the Ninth

24   Circuit has not elaborated on the type of behavior necessary to establish "repudiation" or

25   "complete frustration" of an agreement.  Assuming the relevant principles should be drawn

26   from contract law, Defendants' behavior over the past six years establishes constant

27   material breaches of the agreement.  In the context of this case, such behavior qualifies as

28   "complete frustration" of the Stipulation.

1      Under Arizona law, determining whether a breach is material requires consideration

2  of the factors set forth in the Restatement (Second) of Contracts § 241. *Found. Dev. Corp.*

3  *v. Loehmann's, Inc.*, 788 P.2d 1189, 1197 (Ariz. 1990).  The Restatement's multi-factor

4  test "is necessarily imprecise and flexible."  Restatement (Second) of Contracts § 241 cmt.

5  a.  The four five factors are:

6          (a) the extent to which the injured party will be deprived of the
           benefit which he reasonably expected;
7
8          (b) the extent to which the injured party can be adequately
           compensated for the part of that benefit of which he will be
9          deprived;

10         (c) the extent to which the party failing to perform or to offer
           to perform will suffer forfeiture;
11
12         (d) the likelihood that the party failing to perform or to offer to
           perform will cure his failure, taking account of all the
13         circumstances including any reasonable assurances; and

14         (e) the extent to which the behavior of the party failing to
           perform or to offer to perform comports with standards of good
15         faith and fair dealing.

16  Restatement (Second) of Contracts § 241.  Application of these factors to the present case

17  establish the material nature of Defendants' failures to perform.

18              **1.  Plaintiffs Have Been Deprived of the Benefits of the Stipulation**

19         There is overwhelming undisputed evidence Plaintiffs have been deprived of many

20  of the core benefits of the Stipulation.  The underlying claims presented were deliberate

21  indifference to Plaintiffs' healthcare, dental, and mental health needs.  In the Class

22  Certification Order, the Court identified evidence regarding longstanding staffing

23  deficiencies, prolonged delays in seeing healthcare providers or receiving outside

24  consultations, inadequate mental health care, and minimal out-of-cell time for prisoners in

25  maximum custody.  (Doc. 372).  The Stipulation was intended to address these, and other,

26  deficiencies.  Defendants' noncompliance with the Stipulation results in class members

27  still not receiving adequate health care.  Indeed, Plaintiffs' are not receiving the benefit of

28  the Stipulation if there are an inadequate number of healthcare providers, prisoners cannot

access specialty or diagnostic care, or inadequate mental health care results in increased suicides.

In addition, Defendants fail to fulfill basic promises made explicit in the Stipulation. Plaintiffs were promised by agreement language interpretation services at every health care encounter; Defendants opted not to provide such services.  Plaintiffs were promised by agreement a maximum custody regime where prisoners could progress from the most restrictive to the least restrictive housing assignments; some prisoners have remained at restrictive custody levels despite no evidence of misbehavior and Defendants, despite their agreement, are adamant they have no obligation to implement a system ensuring progression is available (or even keep records).  Plaintiffs were promised by agreement an exact number of recreation opportunities in recreation enclosures of exact size; Defendants have not provided those opportunities.  Plaintiffs were promised by agreement random selection of individuals for monitoring; Defendants have not used a random selection method.  Plaintiffs were promised by agreement at least 85% performance of *every* performance measure no later than two years after the Stipulation took effect.  It has now been six years and it is obvious Defendants will not take the steps necessary to ensure compliance.  And there is more.

Viewed as a whole, Defendants never approached their obligations under the Stipulation with the required level of commitment.  Almost immediately after the Stipulation went into effect, Defendants began depriving Plaintiffs of the benefits they were entitled.  More than six years later, Plaintiffs still wait.  Defendants' past conduct shows they had no problem with depriving Plaintiffs of the benefits of the Stipulation and Defendants' behavior undoubtedly will not end.

**2.  Plaintiffs Cannot be Compensated for the Benefits Not Provided**

The Stipulation was aimed at improving medical care and decreasing the level of restrictions for individuals in maximum custody.  It is difficult to draw an exact line between Defendants' failures to comply with the health care performance measures and the harms suffered by Plaintiffs.  But it is even more difficult to formulate some possible

compensation for Defendants' behavior.  As made clear at hearings before Judge Duncan and throughout subsequent proceedings, Defendants' failures to provide adequate medical care have had tragic consequences.  That is, Defendants' failures have led to preventable deaths, possibly including suicides.  Defendants' failures have also led to untold suffering by individuals unable to obtain medical treatment.  In these circumstances, there is no plausible compensation that can be provided to Plaintiffs.  The dead are not advantaged by Defendants' repeated promises of better behavior in the future nor are they able to gain from monetary awards.  It is impossible to quantify, monetarily, the harm suffered by prisoners because of a lack of adequate health care.

As for the maximum custody performance measures, it is similarly difficult to quantify the harm caused by Defendants' failures to perform.  For example, it would be nonsensical to put a monetary price on each time an individual was denied the recreation opportunities promised by the Stipulation.  And there is no plausible compensation available for Defendants' maximum custody failures.

Finally, there is no possible compensation available for Defendants' many other failures.  For example, Plaintiffs were promised language interpretation services at every health care encounter.  The failure to provide such services may have led to a medical condition going undiagnosed and untreated.  It would be impractical to identify every failure and award compensation.

In the circumstances of this case, Defendants' constant failures to perform under the Stipulation resulted in inadequate health care, excessive confinement under onerous conditions, and other harms.  No adequate compensation is possible for those harms.

### 3.  Defendants Will Not Suffer Forfeiture

The Restatement requires the Court look to the possible "forfeiture" Defendants will suffer if their breaches are deemed material.  The Restatement explains the relevant inquiry is the costs the breaching party has already incurred through "preparation or performance" that will be "forfeited" in the event the breach is deemed material.  Restatement (Second) of Contracts § 241 cmt. d.  Here, Defendants have invested in a reporting and monitoring

regime.   But undoing the Stipulation will not require Defendants to forfeit those investments because they must, independent of the Stipulation, monitor the private healthcare contractor's compliance with national standards,[13] which are identical to the healthcare performance measures.   Moreover, Defendants' choice to take inadequate corrective actions indicates they are not concerned with forfeiting any investments related to the Stipulation.   A party interesting in avoiding a forfeiture of its investments would act with a much greater sense of urgency than Defendants have ever displayed.

### 4. Defendants Are Unlikely to Perform in the Future

The past six years establish there is no reasonable timetable in which Defendants will come into full compliance with the Stipulation which was contemplated by all parties at the outset.   Defendants' failures regarding health care performance measures have resulted in millions of dollars in fines and attorneys' fees.[14]   Those fines did not provoke Defendants to comply.   The January 2020 OSC threatened seemingly significant fines if Defendants did not bring specific health care performance measures into compliance.   But even those fines were insufficient to convince Defendants to comply.

The pervasive theme of Defendants' conduct throughout the course of attempted enforcement of the Stipulation is indifference.   Defendants have always deflected their failures and employed scorched-earth tactics to oppose every attempt to resolve outstanding noncompliance.   Defendants' longstanding refusal to acknowledge their shortcomings and identify plausible paths to compliance evidences their pattern of conduct will not change.   There does not appear to be a contempt sanction robust enough to coerce compliance.   Defendants are steadfastly unwilling to make the fundamental changes necessary to comply with the Stipulation.   Thus, continued attempts at enforcing the Stipulation would be a significant drain on the resources of the parties, the Court, and the public, for no purpose.

…

---

[13] The standards are those issued by the National Commission on Correctional Health Care.

[14] As Plaintiffs point out, Defendants are indemnified from having to pay any fines themselves.  (Doc. 3649-1 at 33).

- 33 -

**5. Defendants' Behavior Establishes Lack of Good Faith and Fair Dealing**

Finally, the history of Defendants' conduct establishes a lack of good faith and fair dealing. The record establishes Defendants, who were represented by competent counsel, understood the terms of the Stipulation and chose to knowingly and voluntarily enter into it. Defendants' post-Stipulation behavior has involved chronic failures to perform health care performance measures, falsifying records in connection with health care performance measures, and refusing to correct obvious errors such as nonrandom selection processes. In addition, Defendants have adopted legal positions fundamentally at odds with an intention to perform under the Stipulation. For example, years after the Stipulation went into effect, Defendants argued Judge Duncan lacked jurisdiction to conduct *any* activities. (Doc. 2825). In other words, years into the Stipulation's life, Defendants were desperately casting about for a way to undo the Stipulation itself. More recently, defense counsel was warned not to present the pandemic as a blanket excuse for noncompliance. Defense counsel then presented the pandemic as a blanket excuse for noncompliance. Defendants and their counsel have very little interest in performing all their obligations under the Stipulation or presenting reasonable legal arguments explaining their failures. The Court assumes Defendants entered the Stipulation in good faith, but they immediately abandoned that allegiance in favor of persistent resistance.

**6. Repudiation and Complete Frustration**

Based on the relevant factors, Defendants' post-Stipulation behavior establishes constant material breaches of the Stipulation and the certainty of future material breaches of the Stipulation. In the terms used by the Ninth Circuit, Defendants have repudiated and completely frustrated the Stipulation.

It is true the parties expected compliance would take time. But neither Plaintiffs nor the Court expected that six years after the Stipulation, the Court would be faced with having to sanction Defendants for at least 229 instances of noncompliance regarding health care performance measures, assessing Defendants' refusal to comply with clear Court

orders regarding monitoring requirements, and beginning anew with maximum custody and mental health monitoring.

The level of frustration of expectations, as well as the inability for monetary sanctions to have effect, can be illustrated by focusing on a *single* measurement, health care performance measure 44 at Eyman.  That performance measure requires:

> Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.

This performance measure involves inpatient hospital stays or visits to emergency rooms, meaning it involves individuals with significant health care needs.  Therefore, it is one of the most significant indicators of how Defendants are treating prisoners most in need.

From January 2016 through March 2021, scores for performance measure 44 at Eyman reflected the following, with the noncompliant months highlighted:

| Jan-16 | 87% | Jan-17 | 50% | Jan-18 | 56% | Jan-19 | 44% | Jan-20 | 92% | Jan-21 | 52% |
|--------|-----|--------|-----|--------|-----|--------|-----|--------|-----|--------|-----|
| Feb-16 | 72% | Feb-17 | 58% | Feb-18 | 43% | Feb-19 | 40% | Feb-20 | 46% | Feb-21 | 56% |
| Mar-16 | 60% | Mar-17 | 50% | Mar-18 | 40% | Mar-19 | 50% | Mar-20 | 39% | Mar-21 | 69% |
| Apr-16 | 28% | Apr-17 | 15% | Apr-18 | 23% | Apr-19 | 50% | Apr-20 | 75% | Apr-21 | 78% |
| May-16 | 50% | May-17 | 80% | May-18 | 35% | May-19 | 82% | May-20 | 53% |  |  |
| Jun-16 | 37% | Jun-17 | 96% | Jun-18 | 31% | Jun-19 | 93% | Jun-20 | 53% |  |  |
| Jul-16 | 44% | Jul-17 | 93% | Jul-18 | 17% | Jul-19 | 79% | Jul-20 | 47% |  |  |
| Aug-16 | 46% | Aug-17 | 100% | Aug-18 | 46% | Aug-19 | 89% | Aug-20 | 65% |  |  |
| Sep-16 | 72% | Sep-17 | 100% | Sep-18 | 25% | Sep-19 | 95% | Sep-20 | 68% |  |  |
| Oct-16 | 85% | Oct-17 | 89% | Oct-18 | 33% | Oct-19 | 89% | Oct-20 | 63% |  |  |
| Nov-16 | 89% | Nov-17 | 20% | Nov-18 | 44% | Nov-19 | 82% | Nov-20 | 45% |  |  |
| Dec-16 | 72% | Dec-17 | 11% | Dec-18 | 0% | Dec-19 | 88% | Dec-20 | 53% |  |  |

For the 52 months from January 2016 through April 2021, this performance measure was compliant only 14 times.  This performance measure was the subject of an early threat of a contempt fine and, in fact, a contempt fine was imposed in June 2018. (Doc. 2898 at 18). After that contempt fine, the performance measure was noncompliant an additional twenty-seven times.  This performance measure was identified in the January 2020 OSC as well. Thus, as of January 2020, Defendants knew that every future noncompliant month would

result in a $100,000 fine.  Instead of possible fines spurring compliance, PM 44 at Eyman has not been compliant for even one month after January 2020.  Thus, PM 44 at Eyman has now been noncompliant for fourteen straight months.  There is no indication a contempt fine of $1.4 million would change things.  In short, there is no evidence Defendants are interested in performing their obligations under the Stipulation and it would be absurd to continue down a path of trying to elicit Defendants to act differently.

**Plaintiffs Recognize the Stipulation has Failed**

Given Defendants' post-Stipulation behavior, Plaintiffs have consistently recognized the need for a different approach.  In response to the Court's May 2019 Order to Show Cause, Plaintiffs recognized in "light of [Defendants'] ongoing intractable and contumacious behavior, the time has come for this Court to take additional actions.  Plaintiffs ask that in addition to the monetary fine, the Court enter an injunctive order pursuant to Rule 66 of the Federal Rules of Civil Procedure, appointing a receiver to manage ADC's delivery of health care services to class members." (Doc. 3352 at 3).  And again, in responding to the Court's October 11, 2019 Order soliciting the parties' preferences "regarding the future course of this case," Plaintiffs indicated their preference was to set the case for trial, stating "[i]t is clear from Defendants' conduct in the past five years that they have no intention of complying with all of the substantive provisions of the Stipulation." (Doc. 3402 at 2).  More recently, in addition to advocating for setting aside the Stipulation, Plaintiffs again sought a receivership to administer the delivery of healthcare to Arizona's prisoners.  (Doc. 3430 at 13-14).

**CONCLUSION**

In some circumstances, a party's refusal to comply with a settlement agreement may require drastic action.  *See, e.g.*, *McClendon v. City of Albuquerque*, 630 F.3d 1288 (10th Cir. 2011) (discussing district court's decision to undo class action settlement eleven years after acceptance).  The present circumstances merit such action.  This case must move beyond six years of judicial attempts to enforce the Stipulation.

Accordingly,

1    **IT IS ORDERED** Defendants' pervasive material breaches of the Stipulation
2  justify Rule 60(b)(6) relief.

3    **IT IS FURTHER ORDERED** the Court's approval of the Stipulation under Rule
4  23(e) is **RESCINDED** and the February 15, 2015 Order (Doc. 1458) is **VACATED**.  The
5  Clerk of Court shall reopen this case.

6    **IT IS FURTHER ORDERED** no later than **July 26, 2021**, the parties must confer
7  and submit a proposed schedule for discovery and preparation for trial, which must result
8  in both sides being ready for trial no later than **November 1, 2021**.  Defendants must
9  provide constitutionally adequate health care in the interim.

10    **IT IS FURTHER ORDERED** the following motions are **DENIED** as moot, as
11  they pertain to the enforcement of the Stipulation: Doc. 3805, 3832, 3840, 3857, and 3901.

12    **IT IS FURTHER ORDERED** the Motions to Seal (Doc. 3837, 3889, 3902) are
13  **GRANTED**.

14    **IT IS FURTHER ORDERED** the Motion to Withdraw (Doc. 3867) is
15  **GRANTED**.

16    **IT IS FURTHER ORDERED** the Motion to Intervene (Doc. 3908) is **DENIED**.
17    Dated this 16th day of July, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge

- 37 -

# EXHIBIT E

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Shawn Jensen, et al.,                    No. CV-12-00601-PHX-ROS

10              Plaintiffs,                    **ORDER**

11   v.

12   Richard Pratt, et al.,

13              Defendants.

14

15          Plaintiffs move to present direct expert testimony by declaration with in-court cross-

16   examination.  (Doc. 3938).  Most trial attorneys would welcome this procedure for direct

17   testimony.  Both parties knowing in advance the direct testimony has the advantage of clear

18   notice, *i.e.*, knowing precisely what the direct testimony will be of the experts.  This is in

19   great contrast to trials where opposing counsel expect to be surprised by the direct

20   testimony and must be on their haunches, prepared to make objections pursuant to

21   perceived violations of the Federal Rules of Evidence.  Further, counsel have the advantage

22   of significant time to prepare for cross-examination.  The Court has previously employed

23   such a procedure in a bench trial and Defendants' vigorous opposition is surprising.

24          Defendants' opposition suggests this is a complicated issue.  It is not.  This trial will

25   require time and effort from the parties and the Court.  But trial time is not unlimited, even

26   in a complex case of "extraordinary" breadth.  (Doc. 3942 at 6.)  For that reason, allowing

27   Plaintiffs—and by extension, Defendants—to present their experts' direct testimony by

28   declaration is a common-sense effort to further bring this matter to an efficient resolution.

In fact, the Ninth Circuit has long "accepted and encouraged" replacing live direct testimony with declarations as a "technique for shortening bench trials." *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 889 F.2d 224, 232 (9th Cir. 1989).

Defendants' various procedural arguments against allowing declarations are unpersuasive. According to Defendants, the "law of the case" doctrine prevents granting Plaintiffs' request. It is true that Judge Humetewa denied a similar request from Plaintiffs in 2014. But a seven-year-old procedural not legal decision does not preclude a different result now. "Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case." *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014). Judge Humetewa's discretionary decision based on the evidence and posture of the case in 2014 does not prevent the Court, based on a vastly different evidentiary record and posture, from reaching a different result.

Next, Defendants argue Plaintiffs' motion is an untimely motion brought pursuant to Federal Rule of Civil Procedure 59(e). That rule only applies when there has been entry of a "judgment." *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989) ("Rule 59(e) clearly contemplates entry of judgment as a predicate to any motion."). Because there is no judgment in this case, Rule 59(e) is inapplicable.

Beyond the procedural objections, Defendants acknowledge the decision whether to allow testimony by declaration is a "highly discretionary" one authorized by Federal Rule of Evidence 611. That rule allows the Court to exercise "control over the mode and order of examining witnesses and presenting evidence" to facilitate "determining the truth" and "avoid wasting time." Defendants respond that "declarations prepared by counsel" do not support a quest for the truth, insinuating that Plaintiffs' experts will have a limited role in crafting their opinions or declarations and, as a consequence, the Court will be unable to accurately assess the experts' credibility. That is inaccurate. Written declarations will allow the Court critical time to review the testimony with care in preparation for any direct examination Plaintiffs wish to present as well as all of Defendants' cross-examination and questions that might be prompted by the Court. And significantly, it is the "crucible of

- 2 -

cross-examination," not direct examination, that often dictates whether a witness's testimony is deemed reliable. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

Defendants were ordered to identify any perceived prejudice they might experience if written testimony were allowed. Defendants maintain they have "relied" on Judge Humetewa's prior ruling in the month since the Court set this matter for trial. (Doc. 3942 at 12). Defendants provide no specific details regarding prejudice and it is difficult to imagine Defendants suffering any detrimental reliance at this point. The parties only recently began trial preparations, are still engaged in pre-trial discovery, and granting Plaintiffs' motion will provide Defendants *more* time to prepare their cross-examination than if the experts testified exclusively in court. In addition, the presentation of expert testimony through written declaration, with live cross-examination, will provide the Court more information on which to base its ultimate decision. In a case of this magnitude and complexity, more information only inures to the parties' benefit. Therefore, Plaintiffs' motion will be granted.[1]

The Court is very conscious of the obligation to allow a fair trial to both parties and the Court will ensure it. Thus, the Court will make adjustments, as necessary, but the parties should plan on the following. The parties will be given equal time to present their claims and defenses. With an expected total of 100 hours available for trial, each side will be allotted 50 hours. The parties will be free to use their allotted time as they wish. Thus, Defendants can spend as much time as they wish cross-examining Plaintiffs' expert witnesses, but all cross-examination will necessarily be subtracted from Defendants' allotment. Similarly, if Defendants insist on presenting their experts' testimony live in court, all that time will be subtracted from Defendants' allotment. Finally, to preserve trial time, the parties will not be allowed to present opening or closing arguments.

Accordingly,

**IT IS ORDERED** Plaintiffs' Motion to Present Direct Expert Testimony by

---

[1] At present, Defendants will be required to submit their experts' direct testimony by declaration. If Defendants believe that will deprive them of their ability to present their defense effectively, they will be required to file a motion explaining the *specific* prejudice they will suffer.

1    Declaration (Doc. 3938) is **GRANTED**.  The parties shall present direct testimony from

2    their experts through written declaration filed five days prior to the date that witness will

3    be called.

4            **IT IS FURTHER ORDERED** no later than **September 10, 2021**, Defendants shall

5    file a motion seeking leave to present live direct testimony from their experts.  That motion

6    must identify the specific prejudice Defendants will suffer if live direct testimony is not

7    allowed.

8            Dated this 2nd day of September, 2021.

9

10

11                                        Honorable Roslyn O. Silver

12                                        Senior United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -